UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT ASHLAND

***Electronically Filed***

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* ROBERT C. O'LAUGHLIN, M.D.<br><br>PLAINTIFFS,<br><br>v.<br><br>RADIATION THERAPY SERVICES, P.S.C. dba ASHLAND BELLEFONTE CANCER CENTER, KIRTI K. JAIN, M.D., P.S.C., dba HIGHLANDS CANCER CENTER, LOGAN ONCOLOGY CARE ASSOCIATES, dba LOGAN REGIONAL CANCER CENTER, A ONE BIZ SOLUTIONS, LLC, and KIRTI K. JAIN, M.D.<br><br>DEFENDANTS. | ) | CIVIL ACTION NO. 0:16-cv-148-HRW |

## DEFENDANTS' JOINT MOTION TO DISMISS

The Defendants, Radiation Therapy Services, P.S.C. d/b/a Ashland Bellefonte Cancer Center, Kirti K. Jain, M.D., P.S.C. d/b/a Highlands Cancer Center, A-One Biz Solutions, LLC, and Kirti K. Jain, M.D. (collectively, "Defendants"), by counsel, move the Court pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) to dismiss Plaintiff's Complaint for failure to state a claim for which relief can be granted and also for failure to plead allegations of fraud with particularity. In support of its Motion, Defendants state as follows:

## BACKGROUND

This case has been brought by a disgruntled former employee of two of the Defendants, as a Relator. Following an extensive investigation, the United States declined to intervene in the matter against the Defendants, however the Relator has decided to continue to pursue this

litigation. The Complaint makes an attempt at articulating a scheme to defraud the government, but the allegations ultimately fall woefully short. Specifically, the allegations regarding physician supervision are fatally flawed. The Complaint merely alleges that the radiation therapy administration was not delivered by a radiation oncologist. This allegation however, even if it were true, does not amount to a violation of the False Claims Act ("FCA"), as there exists no requirement that radiation therapy administration be supervised by a radiation oncologist. To that extent, the Relator's Complaint conflates the supervision requirements beyond what is prescribed by CMS and fails to articulate a claim upon which relief may be granted. In fact, all allegations of fraud contained within the Complaint fail, as they are merely threadbare allegations and legal conclusions. As such, Relator's Complaint must be dismissed.

## I. ALLEGATIONS OF THE COMPLAINT

This case was brought by a disgruntled, former employee of the Cancer Center Defendants fourteen months after he left their employ. On August 12, 2019, the United States declined to intervene in this action against Highlands Cancer Center, Ashland Bellefonte Cancer Center, Kirti Jain, M.D., and A One Biz and thereafter requested that this Court unseal the Complaint. The Complaint contains blanket allegations charging the Defendants with FCA violations, collectively, and predicates its claims by using erroneous legal conclusions that take the form of mischaracterizations of CMS administrative Manuals and Regulations.

Ashland Bellefonte Cancer Center ("ABCC") and Highlands Cancer Center ("HCC") (collectively, "the Cancer Centers") are physician-owned medical and radiation oncology and hematology clinics which treat vulnerable cancer patients in Ashland and Prestonsburg, KY, respectively. (DN 1 at ¶¶2, 7,9). The Cancer Centers are wholly owned by Dr. Kirti Jain, a medical oncologist whose practice is concentrated in the areas of blood and cancer care and

internal medicine. (DN 1 at ¶¶6, 8, 10). Like many providers, the Cancer Centers do not submit their claims for services rendered to patients directly to payors, but instead employ a billing company, specifically A One Biz Solutions, which is located in Miramar, Florida. (DN 1 at ¶13). After introductory statements about the Cancer Centers, Dr. Jain and A One Biz, the Complaint quickly groups all of the parties together and thereafter refers to them as "Defendants."

The Complaint alleges the Defendants "willfully presented and caused to be presented for payment fraudulent claims to federally-funded health care programs" in relation to patients "supposedly" treated by the Relator himself. (DN 1 at ¶36). Specifically, the Complaint pleads that: "Of the O'Laughlin claims, *many were false and fraudulent*, in that they stated that Dr. O'Laughlin provided, or supervised, the radiation oncology billed in these claims, whereas in truth and in fact . . . Dr. O'Laughlin did not provide these services . . . [he] did not supervise these services . . . [and] the provision of these services was not delegated to a qualified radiation oncologist." (DN 1 at ¶38). With respect to the patients that the Relator alleges were administered radiation therapy procedures without the Relator's supervision, the Complaint pleads that, "At no time was the provision of these services provided to Patient [ ] delegated to, or performed by, a qualified radiation oncologist. (DN 1 at ¶¶46, 51, 56, 61).

The Complaint goes on to plead that the Defendants, "knowingly and willfully made and used, and caused to be made and used, false records and statements material to the above described false and fraudulent claims" under 31 U.S.C. §3729(a)(1)(B). (DN 1 at ¶69). Expanding on this allegation, the Complaint pleads that "the aforesaid false records were the following: (a) patient charts and files that contained the aforesaid false statements; (b) patient billing summaries that contained the aforesaid false statements; and (c) claims that contained the aforesaid false statements." (DN 1 at ¶71). To that extent, the Complaint seems to allege that

these false records basically entailed listing the radiation oncologist as the rendering provider for radiation therapy services, rather than the supervising physician when completing the records used to submit claims for payment for radiation therapy services. (*Id.*, DN 1 at ¶70).

The claims that made up the alleged false claims for radiation therapy administration are pleaded within Paragraphs 43, 48, 53, and 58 of the Complaint. According to the Complaint, the medical billing codes (be they CPT Codes or HCPC Codes) that were billed in these instances, are not payable unless certain conditions of payment are met, most notably supervision by a physician. (DN 1 at ¶30). According to the Complaint, some radiation oncology services require "Direct Supervision" while others require supervision by a "Qualified Physician." (DN 1 at ¶34). The Complaint describes these supervision requirements by pleading the legal conclusions that "'Direct Supervision' means direct supervision by the treating physician; and the notation 'Qualified Physician' means that the service may be delegated to, and performed by, a qualified radiation oncologist." *Id.* The Complaint thereafter doubles-down on this legal conclusion and for all of the allegations that plead false claims involving radiation therapy delivery, the Complaint pleads that "Dr. O'Laughlin did not provide these services; Dr. O'Laughlin did not supervise these services; and the provision of these services was not delegated to a qualified radiation oncologist." (DN 1 at ¶38; see also, generally, DN 1 at ¶¶39, 44-46, 49-51, 54-56, 59-61). As such, the Relator's entire Complaint is predicated upon the legal conclusion that, at a very minimum, the claims at issue in this case had to have been supervised by a radiation oncologist in order to be reimbursable. For the reasons that shall be put forth below, this legal conclusion is wholly erroneous such that the entire premise of this case is fundamentally flawed.

The Complaint then goes on to plead that any claims where a physician is listed as rendering physician on records and claim forms, but was not the physician who provided the

services or supervised the services, are false claims. (DN 1 at ¶¶ 75-80, 104-109). The Complaint dubbed these allegations as the "Absent Physician claims" and/or "Patients Supposedly Treated by Named Physicians." *Id.*

The Complaint next alleges that "the Defendants presented claims to the Federal Programs, stating and otherwise representing that services included in these claims had been provided to patients by physicians, whereas, in truth and in fact, such services had been provided by [nurse practitioners and physician's assistants, "NPPs"] and not by physicians (the "NPP claims"). . . ." (DN 1 at ¶113). With regard to this allegation, the Complaint pleads that the claims submitted were false or fraudulent because they listed the physician who supervised and/or was ultimately responsible for the care of the patient receiving chemotherapy services, as the rendering provider rather than the chemotherapy nurse or physician assistant who administered the chemotherapy infusion as an "incident to" service. (DN 1 at ¶147). The Complaint pleads that the use of the responsible/supervising physician as the rendering physician amounts to a falsification of records. (DN 1 at ¶153). The trouble with these allegations is that they misrepresent and otherwise conflate the supervision requirements under the FCA and other applicable federal legislation (explained *infra*). Otherwise, the Relator pleads no plausible violations of the FCA in regard to this practice, which, like the previous causes of action in the Complaint, is predicated on the Relator's legal conclusions, rather than adequately-pleaded facts.

The Complaint then goes on to plead that the Defendants' claims for simulation procedures are false or fraudulent. (DN 1 at ¶¶160-178). Simulation procedures are essentially the equivalent of a "dry run" for radiation treatments. (DN 1 at ¶163). The Complaint alleges that the claims for simulations were fraudulent for the same reason the radiation therapy services were alleged to be fraudulent: because they were not personally supervised by a radiation

oncologist. (DN 1 at ¶164). The Complaint also alleges that the requisite documentation was not generated or otherwise signed by the treating physician and was therefore fraudulent. (DN 1 at ¶166).

Finally, as a last ditch effort, the Complaint alleges that all of the Defendants, who, ironically, the Relator has grouped together and has pleaded are owned by a single individual—Dr. Kirti Jain, conspired together with themselves to commit false claims. (DN 1 at ¶¶180-184). It is unclear how this catch-all allegation could survive or even how an entity or individual can be alleged to conspire with themselves, but the Complaint pleads as such.

The allegations pleaded within the Complaint are, in general terms, predicated upon erroneous legal conclusions, or are otherwise legally impossible. The Complaint fails to plead any plausible claim for relief and as such, this Motion to Dismiss follows.

## ARGUMENT

The Complaint in this case should be dismissed as it simply contains threadbare recitals of factual allegations, supported by mere conclusory statements. To the extent that the Complaint does plead factual allegations, the Complaint marries those allegations to erroneous legal conclusions which are not entitled to any deference or presumption. In fact, the Complaint takes great pains to attempt to identify the supervision requirements that must be met as a prerequisite for payment, however the legal conclusions regarding these requirements are fundamentally erroneous and cannot form the basis of a claim upon which relief can be granted. Therefore, the Complaint fails to survive scrutiny under CR 12(b)(6) and 9(b) and must be dismissed.

## I. THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM WITH PARTICULARITY UNDER FED R. CIV P. 12(b)(6) AND 9(b).

### A. The FRCP 12(b)(6) and 9(b) Pleading Standard

It is well settled that the primary function of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the legal sufficiency of the complaint. *See, e.g., Denton v. Bedinghaus,* 40 Fed. Appx. 974, 976-77 (6th Cir. 2002). The United States Supreme Court in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 554 (2007), ushered in a new pleading standard that moved away from the pure notice pleading standard that had previously been employed by the Federal Rules of Civil Procedure. *See In re Travel Agent Com'n Antitrust Litig.*, 583 F.3d 896, 911-12 (6th Cir. 2009) (recognizing need for more than simple notice and conclusory statements of ultimate facts about the case subsequent to *Twombly*). Two years later, in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court clarified that the new *Twombly* standard and asserted that while the new pleading standards governing Rule 8(a) do not require "detailed factual allegations," they do require "factual enhancement." *Id*. at 1949. Only "a complaint that states a plausible claim for relief" will survive a motion to dismiss. *Id*. at 1950. This is a "context–specific task" requiring the court "to draw upon [its] judicial experience and common sense." *Kiser v. Kamdar*, 831 F.3d 784, 787 (6th Cir. 2016) (citations omitted). The Sixth Circuit has followed *Iqbal* and *Twombly* without hesitation. *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) ("the combined effect of *Twombly* and *Iqbal* require plaintiffs to have greater knowledge now of factual details in order to draft a 'plausible complaint'").

In deciding a 12(b)(6) challenge, the Court must accept all well-pleaded factual allegations as true. *Rodriguez v. Honigman Miller Schwartz & Cohn LLP*, 465 Fed. Appx. 504, 507 (6th Cir. 2012). The Court is not required, however, to accept conclusory legal allegations as correct. *Id*.

Instead, when a party chooses to plead a legal theory in the complaint, that complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436-37 (6th Cir. 1988) (citation omitted). Perhaps most importantly, courts must keep in mind that "[t]hread-bare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949 (*quoting Twombly*, 550 U.S. at 555). Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 129 S. Ct. at 1950. These requirements were even required under the more relaxed "notice pleading" standard that existed prior to *Iqbal* and *Twombly*.

In evaluating the purported claims that are pleaded, the Court must consider *Iqbal*'s plausibility standard. Again, specifically, any claims that are pleaded as potential representative examples of fraud must be pleaded in such a way to be more than "mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949. Conclusory allegations are not entitled to any presumption of truth. *Rodriguez v. Honigman Miller Schwartz & Cohn LLP*, 465 Fed. Appx. 504, 507 (6th Cir. 2012). Likewise, legal conclusions are not entitled to any presumption of truth. *Lewis v. ACB Business Services, Inc.*, 135 F.3d. 389, 405 (6th Cir. 1998) ("Only well-pleaded facts, however, must be taken as true. The trial court need not accept as true legal conclusions or unwarranted factual inferences.")

B. The Elements of the False Claims Act

In order to satisfy an FCA claim, the government must prove the following elements:

> First, the defendant must have made a false statement or created a false record, and must have done so with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information. Second, the defendant must have submitted a claim for payment to the federal government. Third, the defendant's false statement must have been made with the purpose of getting a false or fraudulent claim paid or approved by the government. Finally, the defendant's false statement or record must have been material to the government's decision to make the payment sought in the defendant's claim.

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 505 (6th Cir. 2008) (citations omitted). The FCA requires a showing of a scheme to defraud; innocent mistakes or mere negligence are not actionable. *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 413 (6th Cir. 2016). To that extent, in order to be actionable under the False Claims Act, a claim must include a false statement that is material to the government's decision to pay a claim. *United States ex. rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 442-43 (6th Cir. 2005). In determining materiality, only actual, and not theoretical or conjectural, damages are recoverable under the FCA. *U.S. v. United Technologies Corp.*, 626 F.3d 313 (6th Cir. 2010).

C. Supervision as a Condition of Payment

The False Claims Act does not punish every alleged violation of Medicare's provider contract, or the Medicare and/or Medicaid Manuals; but instead punishes only those provisions that are material to the government's decision to pay. *United States ex rel. Hobbs v. Medquest Assocs., Inc.*, 711 F.3d 707 (6th Cir. 2012); *United States ex rel. Doe v. Jan-Care Ambulance Serv.*, 187 F. Supp. 3d 786 (E.D. Ky. 2016). When a claimant knowingly certifies compliance with a regulation or contractual provision which the Government has stated is a condition of payment for such a service, such a violation of a condition of payment could give rise to FCA liability under a "false certification theory." *Hobbs*, 711 F.3d at 714. For a regulatory or contractual provision to

be considered a "condition of payment" such that failure to abide by the condition could give rise to FCA liability, compliance with the "particular statute, regulation, or contractual term [must be] a prerequisite for payment, [such that] failure to comply would render the claim fraudulent." *Chesbrough v. V.P.A., P.C.,* 655 F.3d 461, 467 (6th Cir. 2011). Not every regulatory or contractual violation constitutes a violation of condition of payment rising to FCA liability. *See Universal Health Servs., Inc. v. United States*, 136 S.Ct. 1989, 2003 (2016) ("The False Claims Act is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations.") Instead, the violation of a condition of payment must be material to the decision to pay. *Id.* However, "materiality . . . cannot be found where noncompliance is minor or insubstantial." *Id.*

Medicare and Medicaid's conditions of payment for radiation therapy services and for incident-to services are no secret, and insofar as those conditions are met, a provider is entitled to reimbursement for such services. For both incident-to and radiation therapy services, the only condition which is in question is the requirement of physician supervision. The Complaint, however, mischaracterizes these physician supervision requirements. The Complaint asserts that regarding radiation therapy services, "the physician has the authority to delegate tasks and responsibilities to other health professionals . . . however, for the provision of radiation oncology services, the physician performing the service must himself or herself be a qualified radiation oncologist." (DN 1 at ¶33; see also DN 1 at ¶34, asserting that when CMS requires a "Qualified Physician" for supervision, "'Qualified Physician' means that the service may be delegated to, and performed by, a qualified radiation oncologist."). These summaries of supervision requirements within the Complaint are demonstrative of legal conclusions, not entitled to any presumption of truth. *Lewis,* 135 F.3d. at 405. The Complaint's only real allegations regarding supervision not

being met are pleaded with regard to radiation therapy procedures. As will be discussed, below, the legal conclusions of the Complaint, however are fundamentally flawed as they both mischaracterize the requisite supervision for radiation therapy provision, which requires only a physician, not a radiation oncologist, and for the service itself, which is a technical, not a professional service. The Complaint's mischaracterization of supervision requirements are hereby disabused as follows:

E&M AND CHEMOTHERAPY SERVICES

The Complaint does not even mention the supervision requirements for "incident to" services that would be at issue in chemotherapy services performed by chemotherapy nurses or physician assistants, as alleged in the Complaint. The Complaint states that "the Defendants presented claims to the Federal Programs, stating and otherwise representing that services included in these claims had been provided to patients by physicians, whereas, in truth and in fact, such services had been provided by [physician assistants and nurse practitioners] and not by physicians. (DN 1 at ¶113). The Complaint alleges that by listing the physician on the claim, rather than the nurse practitioner or the physician assistant, that the claims were false or fraudulent. This is a mischaracterization of CMS' billing guidance and is exemplary of the systemic erroneous legal conclusions that permeate throughout the Complaint. In practice, patients who are receiving ongoing treatments and other services will often, if not typically, be seen by or have treatments administered by, providers other than their primary physician. This is especially the case regarding provision of chemotherapy services such as those pleaded in the Complaint (DN 1 at ¶115) because chemotherapy nurses have greater experience in the technical/mechanical act of administering infusions than an oncologist, whose expertise is applied to the diagnostic service as well as to the prescription of the chemotherapy drugs. CMS

has deemed such services provided by providers other than the medical oncologist as "incident to" services. *Medicare Benefits Policy Manual* Ch. 15, §60.1. In order for a service to be considered "incident to," the "services or supplies [must be] furnished as an integral, although incidental, part of the physician's personal professional services in the course of diagnosis or treatment of an injury or illness." *Id.* CMS has recognized the appropriateness of reimbursement for incident to services, stating that such "services and supplies commonly furnished in physicians' offices are covered under the incident to provision." *Id.* This is codified in the Federal Regulations. Specifically, 42 C.F.R. §410.26(b) recognizes that "Medicare Part B pays for services and supplies incident to the service of a physician" so long as certain conditions are met. Direct supervision is one such condition of payment, as coverage of incident to services "is limited to situations in which there is direct physician supervision of auxiliary personnel." *Medicare Benefits Policy Manual* Ch. 15, §60.1. The CFR further elaborates on who can provide "direct physician supervision" stating that "the physician (or other practitioner) supervising the auxiliary personnel need not be the same physician who is treating the patient more broadly." 42 CFR §410.26(b)(5).

Clearly, 42 CFR §410.26(b)(5) defines the "who" regarding the provision of direct physician supervision, and allows that the direct supervision need not be provided by the physician who is primarily responsible for the broader general treatment. As to the level of supervision that must generally be delivered to establish "direct physician supervision," 42 CFR §410.26(a)(2) directs that "direct supervision means the level of supervision by the physician of auxiliary personnel as defined in §410.32(b)(3)(ii)." The statutory definition of "direct supervision" which is grandfathered into 42 CFR §410.26 from 42 CFR §410.32(b)(3)(ii) states that "direct supervision . . . means the physician must be present in the office suite and

immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." 42 CFR §410.32(b)(3)(ii).

In practical terms, for evaluation and management and/or chemotherapy services provided by auxiliary personnel to be considered covered "incident to" services, they must meet the requirements of direct supervision. Therefore, there must be a physician (who does not need to be the physician primarily responsible for the patient's broad treatment) present in the office suite, and who is immediately available to furnish assistance and/or direction as needed while the procedure is being performed. If such a physician is indeed present in the facility, then the service is covered under the conditions of payment for incident to billing.

The level of supervision required to make "incident to" services reimbursable, however, is wholly academic in this case. The Complaint does not plead that supervision requirements were not met with regard to any of the "incident to" services. Instead, the Complaint makes the broad, and incorrect, assertion that by noting the responsible physician on the claim forms, rather than chemotherapy nurse or physician assistant who performed the service under the physician's supervision, that the claims were false or fraudulent. In doing so, the Complaint ignores the legal framework that allows for reimbursement of "incident to" services and ultimately fails to state a claim for a violation of the FCA.

<u>RADIATION THERAPY SERVICES</u>

Like "incident to" services, radiation therapy is a service which is not delivered by the physician who is primarily responsible for the overall treatment of the patient.[1] Radiation

[1] In fact, radiation therapy administration is a technical service that involves the operation of a machine which emits radiation. Radiation oncologists, whose services are professional in nature and reimbursed as such, are not trained on the operation of the machine that administers treatment and therefore cannot operate it.

therapy, however, does differ from incident to services in several important aspects. First, in order to be eligible for reimbursement as an incident to service, a particular service must meet 42 CFR §410.26(a)(8)'s definition of "services and supplies," which limits incident to-eligible services and supplies to those "that are included in section 1861(s)(2)(A) of the [Social Security] Act *and are not specifically listed in the Act as a separate benefit included in the Medicare program.*" 42 CFR §410.26(A)(8) (emphasis added). Radiation therapy services are not payable "incident to" the professional services of a physician because they have their own benefit category at 42 USC §1395x(s)(4), for "X-ray, radium, and radioactive isotope therapy, including materials and services of technicians," thus placing them outside 42 CFR §410.26(a)(8)'s definition of "services and supplies" eligible for incident to treatment. As such, the billing and reimbursement requirements of 42 CFR §410.26 do not apply to radiation therapy.

Instead, the billing and reimbursement requirements for radiation therapy services are governed by the Medicare Benefit Policy Manual. The Manual requires that "radioactive isotope therapy furnished in a nonprovider facility requires direct personal supervision of a physician." *Medicare Benefits Policy Manual* Ch. 15, §90 ("the Manual"). The Manual goes on to elaborate on this level of supervision, noting that "the physician need not be in the same room, but must be in the area and immediately available to provide assistance and direction throughout the time the procedure is being performed." *Id.* Importantly, the Complaint does not allege that there was no physician present "in the area" and "immediately available" while radiation therapy services were provided. Instead, the Complaint merely alleges that the Relator was not present, or, more generally, that there was no radiation oncologist present when the service was performed.

By asserting that claims submitted for radiation therapy that were performed without the supervision of a radiation oncologist are *prima facie* fraudulent, the Complaint mischaracterizes

the legal requirements for reimbursement of these services and ultimately fails to state a claim for which relief can be granted. This is because the Manual merely requires the supervision to be provided by "a physician" and does not require supervision by a radiation oncologist. *See United States v. Space Coast Med. Assocs., L.L.P.*, 94 F. Supp. 3d 1250, 1261 (M.D. Fla. 2015) ("the Second Amended Complaint does not allege a violation of the Manual. Because **Relators allege only an absence of a radiation oncologist** present in the facility, (see id. ¶ 109)—**not the absence of any physician**—the Second Amended Complaint does not state a violation of the Medicare Benefit Policy Manual." (emphasis added)). This is a crucial distinction in this case and application of *Space Coast* to the Complaint would require the Complaint's dismissal. The Complaint repeatedly pleads that the claims for radiation therapy treatment administration was fraudulent because the Relator "did not provide these services"; "did not supervise these services"; and "the provision of these services was not delegated to a qualified radiation oncologist." (DN 1 at ¶¶38, 46, 51, 56, 61). The Complaint explicitly pleads the legal conclusion that reimbursement for radiation therapy administration is predicated and conditioned upon the supervision of "a qualified radiation oncologist." (DN 1 at ¶¶33, 34). To this extent, the Complaint makes the same mistake that the complaint in *Space Coast* made—the Complaint compounds the supervision requirements to attempt to plead that supervision requirements are not met unless a radiation oncologist supervises the procedure. *Space Coast* recognizes what is apparent from the plain language of the Manual, which is that the supervision requirements for radiation therapy only requires a physician to be in the area, and not a radiation oncologist. Because, like the relator in *Space Coast*, the Relator's Complaint pleads a more draconian standard for physician supervision than that which is actually required by law, the facts pleaded in the Complaint do not state a claim for a violation of the FCA and must be dismissed.

Furthermore, while the Manual requires that the supervising physician "be in the area and immediately available to provide assistance and direction," any notion that the supervising physician is required to have a particular specialty (namely a radiation oncologist) has been specifically disregarded, both by the Courts, and by CMS' agents. Local Coverage Determination L36711 states:

> The CMS Manual System, Pub. 100-08, *Medicare Program Integrity Manual*, Chapter 13, section 13.5.1 outlines that reasonable and necessary services are "ordered and furnished by qualified personnel"; IMRT (Intensity Modulated Radiation Therapy) services will be considered reasonable and necessary only when performed by appropriately trained providers . . . These personnel include the radiation oncologist **or other qualified physicians**.

*Novitas Solutions, Inc.*, LCD L36711 (Dec. 1, 2016). This LCD spotlights another inherent error in the Complaint's legal conclusions, namely that the Complaint characterizes radiation therapy administration as a "radiation oncology service" which must be performed by radiation oncologist. (DN 1 at ¶¶33, 34). In doing so, the Complaint pleads the legal conclusion that radiation therapy administration is a professional service, when in fact it is a technical service. This is evident in the LCD, where CMS clearly recognizes that radiation therapy services are technical, not professional, services, stating "the IMRT treatment delivery is performed by qualified **technical personnel** following the treatment protocol devised by the qualified radiation oncology physician." *Id.*

This distinction is important as it serves as the over-arching rationale for the supervision requirements and the lack of requirement for specialty supervision. CMS has long recognized that radiation therapy administration is not a professional service, and claims for radiation therapy administration are not claims for professional fees. *See Medicare Benefits Policy Manual* Ch. 15, §90 ("This level of physician involvement does not represent a physician's service"); *Medicare Benefits Policy Manual* Ch. 13, §70.3, (discussing radiation treatment

delivery services, stating that "MACs pay for these TC (technical component) services on a daily basis under CPT codes 77401-77416 for radiation treatment delivery."). CMS provides tangible elaboration of its recognition of the technical aspect of radiation therapy, versus the professional component of physician examination services in its *Medicare and Medicaid Guide Explanations and Annotations*, providing the following example:

> A radiologist examines a patient on Monday prior to the first session of radiation therapy, is present in the facility to provide supervision during the patient's daily treatment sessions Monday through Friday, and examines the patient again on Friday to evaluate progress and make any necessary changes in dosage. Only two visits on Monday and Friday represent billable physician's services, although the facility would bill for the technical component in the five sessions of therapy.

*Medicare and Medicaid Guide Explanations and Annotations*, at §3136. In providing this example, CMS has recognized that claims for radiation therapy sessions are claims for technical, and not professional fees. The facility, and not the physician, bills for these services. Weekly evaluation services are claims for professional services and are wholly distinct from purely technical therapy sessions.

Because radiation therapy services are wholly technical services, the administration of radiation therapy is performed by "technical personnel" and such technical personnel perform the services in accordance with the detailed "treatment protocol devised by the qualified radiation oncology physician." *Novitas Solutions, Inc.,* LCD L36711, (Dec. 1, 2016). The radiation oncologist's professional work has been meticulously performed prior to the administration of the therapy. Additional professional services are performed weekly during the treatment course to monitor the patient, however the actual administration remains technical. Still, physician supervision is required, however nothing in the Medicare Manual, nor the LCDs require that such supervision must be performed by a radiation oncologist. Instead, the LCDs acknowledge that the radiation oncologist most likely will not be present during administration and instead

urges that the radiation oncologist be available by telephone to consult with the supervising physician:

> The qualified radiation oncology physician, if not physically present in the radiation treatment center, must be immediately available by telephone or other electronic means of communication and must be able to receive and remotely review guidance images allowing the qualified physician to provide advice and/or treatment modification before treatment is provided in situations requiring radiation oncology physician contact.[2]

*Novitas Solutions, Inc.*, LCD L36711, (Dec. 1, 2016). These LCDs demonstrate CMS' recognition that the supervision standard does not require supervision by a radiation oncologist, but instead allows for a radiation oncologist to be available by phone to assist the supervising physician should a radiation oncologist be needed.[3] The Complaint does not allege that these technical services were administered without physician supervision. Instead, the Complaint merely pleads that they were administered by someone other than a radiation oncologist, or without a radiation oncologist present to supervise. In doing so, and pursuant to the ruling in *Space Coast*, the Complaint does not plead sufficient facts to state a plausible claim that the Defendants violated the FCA and as such must be dismissed.

D. <u>The Listing of the Physician on the Claim Form</u>

The Complaint alleges that the Defendants submitted false claims by submitting claims forms which listed a physician other than the healthcare professional who performed the service. (DN 1 at ¶¶69-102, 103-151). First and foremost, even if the wrong physician was listed on the CMS 1500 claim form, such a clerical error would not be material to the payment of the claim

---

[2] That is to say, in situations in which the advice of a radiation oncologist is requested. This is not meant to say that physical contact with a radiation oncologist is required.

[3] This LCD outlines the roles of "all personnel involved in administering, supervising, and treating patients" during radiation therapy. These roles require that "the treatment protocol [be] devised by the qualified radiation oncology physician" however "treatment delivery [need only be] performed by qualified technical personnel." *Novitas Solutions, Inc.*, LCD L36711, (Dec. 1, 2016). Clearly CMS, through its agents, contemplate that treatment delivery does not need to be delivered by a radiation oncologist.

and thus cannot form the basis of an FCA claim. *U.S. ex. rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc*., 400 F.3d 428, 442-43 (6th Cir. 2005). It is well-established that the FCA is not intended to be used as a vehicle to police regulatory or requirements or clerical errors. *United States ex rel. Garst v. Lockheed—Martin Corp.*, 358 F.3d 374, 376 (7th Cir. 2003). Even still, the nature of the claims at issue, in light of the legal requirements of claims submission, would indicate that the Complaint fails to state a violation of the FCA because the Defendants properly identified either the responsible physician or the technical services at issue in this case.

While radiation therapy does require direct physician supervision to be considered a covered service [*Medicare Benefits Policy Manual* Ch. 15, §90], there exists no requirement that the supervising physician be listed on the CMS 1500 claim form. In fact, the language of the claim form is such that requiring the listing of the supervising physician would be both nonsensical and impossible, and inferring such a requirement could not be achieved without reaching an absurd result. Box 31 of the CMS 1500 claim form requires the "Signature of Physician or Supplier" and further indicates that the physician that signs that box "certif[ies] that the statements on the reverse [back page of the 1500 form] apply to this bill and are made a part thereof." The certification on the reverse page states that the physician "certif[ies] that the services shown on this form were medically indicated and necessary for the health of the patient." Put simply, the physician listed on the CMS 1500 form certifies that the services billed on the claim form are medically necessary. A supervising physician, however, is merely a physician who is "in the area" and "available to provide assistance and direction" as needed. In the vast majority of instances, this supervising physician has never even seen the patient. Indeed, unless the patient experiences some medical need during treatment administration, the supervising physician will never see the patient. It is impossible, therefore, to force a physician

who has never seen the patient to certify that the patient's treatments are medically necessary.[4] Instead, the medical necessity of the strict, technical component-radiation therapy services, which are the ultimate culmination of extensive examination and preparation by the ordering and treating radiation oncologist, is most appropriately certified by the radiation oncologist who is ultimately responsible for the patient's treatment.

Again, regardless of who should be listed as "physician" on the 1500 form, the only question that affects coverage for the radiation therapy service is whether a physician was "immediately available" "in the area" and capable "to provide assistance and direction." Further, the only qualification requirement is that the supervision be from "a physician" and the qualification for such physician be that he or she is capable of providing "assistance and direction" during the technical service.[5] Courts have acknowledged that the supervision requirement merely requires a physician and not specifically a radiation oncologist. *United States v. Space Coast Med. Assocs., L.L.P.*, 94 F. Supp. 3d 1250, 1261 (M.D. Fla. 2015). The Complaint fails to state a plausible claim that the Defendants violated the FCA by billing for services provided without the requisite supervision and as such the Complaint must be dismissed.

Finally, the Complaint takes the position that by listing the primary oncologist, rather than the supervising physician, on the CMS 1500 form, the Defendants somehow submitted false claims in violation of the FCA. (DN 1 at ¶¶69-102). This theory of liability is flawed on multiple levels. First, misstatements, or even misrepresentations, alone are not sufficient to trigger FCA liability. Instead, when determining whether a misstatement or misrepresentation

---

[4] This is true even in situations where another radiation oncologist supervises treatments for a patient s/he has never met. Other radiation oncologists are not prone to second guessing the work of the treating radiation oncologist.

[5] *See 2011 OPPS Comments on Physician Supervision Rule*, noting that "CMS would not expect that the supervisory practitioner would make all decisions unilaterally without informing or consulting the patient's treating physician or nonphysician practitioner."

invokes FCA liability, the FCA "looks to the effect" the misrepresentation had upon the government. *Universal Health Servs., Inc. v. U.S.*, 136 S.Ct. 1989, 2002 (2016). The ultimate question is whether the materiality element of the FCA is satisfied. *Id.* at 2003. Whether a misstatement or a non-compliance with an instruction or condition is "material" under the FCA is a holistic determination. *United States v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 831 (6th Cir. 2018). If the government pays the claim regardless of the misstatement or whether or not non-compliance exists, then the misstatement or non-compliance cannot be considered "material" to the government's decision to pay. *Id.* at 831. In the present case, there is no "but-for" relationship with regard to how the 1500 forms were filled out. Instead, had the supervising physician been listed on the claims for incident to services, the government still would have paid the claims. Whether the appropriate physician was listed on the claim form is not "material" to the government's decision to pay and therefore cannot be used as a basis for FCA liability. *U.S. ex rel. Rockey v. Ear Inst. of Chicago, LLC*, 92 F. Supp 3d 804, 822 (N.D. Ill, 2015). Therefore, even if the wrong physician was listed on the 1500 form, the elements of the FCA are not satisfied and there has been no actionable violation of the FCA.

## II. <u>THE COMPLAINT FAILS TO SUFFICIENTLY PLEAD KNOWLEDGE.</u>

The False Claims Act is an elemental statute, and as such, all elements must be met in order for liability to be established. In the present case, the Complaint pleads no facts that would indicate the requisite elements of knowledge, falsity, or materiality. As such, the Complaint fails to plead a plausible claim that the Defendants violated the FCA.

In order to succeed in a claim under the False Claims Act, the Relator must show that the Centers:

> "Knowingly presented, or caused to be presented, to an officer of the United States Government a false or fraudulent claim for payment or approval; or

knowingly made or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government." 31 U.S.C. §3729(a)

A False Claims Act violation is not a strict liability offense. *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296 (6th Cir. 1998). Instead, a provider's conduct must be done knowingly in order to be actionable under the False Claims Act. 31 U.S.C. § 3729(b). This knowledge is defined to include "actual knowledge of the information, or with deliberate ignorance or reckless disregard of the truth or falsity of the information." *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 451 (6th Cir. 2005). It is well-settled that "the False Claims Act condemns fraud but not negligent errors or omissions." *United States ex rel. Garst v. Lockheed—Martin Corp.*, 358 F.3d 374, 376 (7th Cir. 2003). Likewise, "the FCA was not intended by Congress to punish honest mistakes or incorrect claims submitted through mere negligence." *U.S. Code Cong. & Admin. News* 1986 pp 5266, 5272. Similarly, "minor technical regulatory violations do not make a claim "false" for purposes of the FCA." *United States, ex rel. Gross v. Aids Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). Instead, "the existence of mere technical regulatory violations tend to undercut any notion that a prior representation of regulatory compliance was knowingly and falsely made in order to deceive the government." *Id.* (*citing United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999)). Put simply, because the Complaint fails to plead that the Defendants did not meet the conditions of payment for incident to and radiation therapy services, it does not plead an actionable claim under the FCA and therefore must be dismissed.

## III. THE CONSPIRACY CLAIMS ARE LEGALLY DEFECTIVE AND MUST BE DISMISSED.

Among the claims pleaded in the Complaint is Count 8, Conspiracy to violate the FCA. Specifically, the Complaint alleges that "the Defendants Radiation Therapy Services, P.S.C. (dba

Ashland Bellefonte Cancer Center), Kirti K. Jain, M.D., P.S.C. (dba Highlands Cancer Center), Logan Oncology Care Associates, LLC (dba Logan Regional Cancer Center), A One Biz Solutions, LLC, and Kirti K. Jain, M.D . . . conspired and agreed together to defraud the Government by getting false or fraudulent claims approved or paid; and by making or using false statements and records material to false or fraudulent claims." (DN 1 at ¶180) In essence, the Complaint is alleging that all of the Defendants in this action conspired to violate the FCA. This is especially problematic given the facts pleaded in this case, which includes that Defendant Kirti Jain is a medical oncologist who is also the director, president, vice president, sole corporate director and sole shareholder of ABCC and HCC as well as a manager of A One Biz. (DN 1 at ¶¶6, 8, 9, 10, 13). Therefore, given the allegations of the Complaint, the Conspiracy claim essentially pleads that Dr. Jain conspired with himself to violate the FCA. As such, even if the pleaded facts were taken as true, they would not suffice to establish a claim of conspiracy without running afoul of the corporate conspiracy doctrine. The conspiracy claims are fatally defective and must be dismissed.

It is well established that with regard to the FCA, "general civil conspiracy principles apply." *United States ex. rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999). Among the "general civil conspiracy principles" which have been recognized by the Sixth Circuit is the intracorporate conspiracy doctrine, which serves to bar conspiracy claims where all the alleged conspirators are employees of the same corporate entity. *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019); *Copperweld Corp. v. Independence Tube, Corp.*, 467 U.S. 752 (1984). The policy behind the doctrine is simple; the doctrine recognizes that it is legally impossible for individuals within a single entity to essentially conspire with themselves. *Id.* Indeed, the Sixth Circuit has acknowledged that a successful civil conspiracy claim requires a showing that "(1) a

single plan existed, (2) the conspirators shared a conspiratorial objective . . . and (3) an overt act was committed in furtherance of the conspiracy." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (*quoting Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). Most importantly, under the intracorporate conspiracy doctrine, there must be separate people to form a conspiracy, and when "all of the defendants are members of the same collective entity" no conspiracy can exist because the entity cannot conspire with itself. *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994).

While the Sixth Circuit has yet to be presented with the question of whether the intracorporate conspiracy doctrine applies to claims originating under the FCA, sister Districts within the Seventh Circuit have applied the doctrine in the context of the FCA. *United States ex. rel. Chilcott v. KBR, Inc.*, No. 09-cv-4018, 2013 WL 5781660 (C.D. Ill. Oct. 25, 2013). In *Chilcott*, the District Court for the Central District for Illinois recognized that because general civil conspiracy principles apply to the FCA, "nothing about the FCA indicates that its conspiracy claims should be treated differently from other civil conspiracy claims" and to not apply the intracorporate conspiracy doctrine would be to "depart from the accepted wisdom of conspiracy law." *Id.* at *12. The Court therefore applied the intracoporate conspiracy doctrine to the FCA and dismissed the claims of conspiracy to violate the FCA where all co-defendants were all employees within the same corporate entity.

In the present case, the Complaint pleads Dr. Kirti Jain as a Defendant. The Complaint further pleads that Dr. Jain was the "facility director" the "president," "vice president," "sole corporate director" and "sole shareholder" of each of the Cancer Center Defendants. (DN 1 at ¶¶8, 10). The Complaint also alleges that Dr. Jain was a manager of A One Biz. (DN 1 at ¶15). After pleading Dr. Jain's direct managerial involvement in the facilities, the Complaint thereafter

grouped all of the Defendants together for the remainder of the Complaint, notably not alleging any differential facts amongst them, with the exception of the Complaint's repeated allegations that A One Biz' sole role in the scheme was the submission of the claim as the billing company.[6] Taken as a whole, the Complaint essentially pleads that Dr. Jain, through the Cancer Centers, conspired with himself to defraud the Government. Not only are these allegations ludicrous and nonsensical, they are legally impossible and specifically not actionable under the intracorporate conspiracy doctrine. There has been no showing of the principal element of independent parties acting in concert to perpetuate a wrong. Due to the intracorporate conspiracy doctrine, this pleading is insufficient and the conspiracy claims must be dismissed.

## IV. THE DISMISSAL SHOULD BE WITH PREJUDICE.

The Defendants have set forth ample reasons why the Court should dismiss the Complaint. Under *Twombly* and *Iqbal*, the dismissals must be with prejudice. As *Iqbal* has noted, "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S.Ct. at 1950. In fact, in *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046 (6th Cir. 2011), the Sixth Circuit affirmed the District Court's application of *Iqbal* when dismissing a complaint with prejudice for failure to plead a plausible claim and refused the plaintiff's request to amend his complaint. Specifically, where the *New Albany Tractor* Court held that when a complaint is procedurally flawed, *Iqbal* declares that a "plaintiff may not use the discovery process to obtain facts after filing suit" in an effort to cure the deficiencies. *Id.* at 1051.

[6] The lack of factual pleading against A One Biz is the subject of a Motion to Dismiss filed upon their behalf previously and currently pending before this Court.

The Relator's entire case is based upon a mischaracterization of the prerequisite conditions of payment for the services encompassed in this litigation. This mischaracterization, which penetrates to the very marrow of this litigation, cannot be cured by amendment. As such, there is no reason to believe that the Relator would be able to draft a better Complaint if given a second chance. This Court should therefore dismiss the Complaint with prejudice.

WHEREFORE, the Defendants respectfully move that the Relator's Complaint in this matter be DISMISSED. A proposed order is attached hereto.

Respectfully submitted,

*/s/ Christopher A. Melton*
Christopher A. Melton
cmelton@wyattfirm.com
Jake Eldemire Smith
jeldemiresmith@wyattfirm.com
WYATT, TARRANT & COMBS, LLP
400 West Market Street
Suite 2000
Louisville, Kentucky 40202
Telephone: 502.589.5235

*Counsel for Defendants Ashland Bellefonte Cancer Center, Highlands Cancer Center, A One Biz Solutions and Kirti Jain, M.D.*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2019, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Andrew Grosso, Esq.
Andrew Grosso & Associates
1101 Thirtieth Street, NW
Suite 500
Washington, D.C. 20007

*/s/ Christopher A. Melton*
Christopher A. Melton