UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT ASHLAND

***Electronically Filed***

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* ROBERT C. O'LAUGHLIN, M.D.<br><br>PLAINTIFFS,<br><br>v.<br><br>RADIATION THERAPY SERVICES, P.S.C. dba ASHLAND BELLEFONTE CANCER CENTER, KIRTI K. JAIN, M.D., P.S.C., dba HIGHLANDS CANCER CENTER, A ONE BIZ SOLUTIONS, LLC, MANISH JAIN, and KIRTI K. JAIN, M.D.<br><br>DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 0:16-cv-148-HRW |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS RELATOR'S AMENDED COMPLAINT**

The Relator, a disgruntled former employee of two of the Defendants, has fruitlessly attempted to cure his fatally deficient Complaint by filing the Amended Complaint. However, even with this second bite at the proverbial apple, the Relator still fails to state a claim that would satisfy the pleading standards set forth in the Federal Rules of Civil Procedure. The Amended Complaint, while attempting to cure the deficiencies inherent in the original Complaint, makes the same mistakes in misrepresenting standards regarding requirements of physician supervision for reimbursement. The Amended Complaint merely uses new language to articulate the same erroneous position that the Cancer Center's radiation therapy administration was not reimbursable because it was not delivered by a radiation oncologist. As the Defendants originally pointed out in their initial Motion to Dismiss the original Complaint, even if this allegation were true, it does not amount to a violation of the False Claims Act, as there exists no requirement that radiation

therapy administration be supervised by a radiation oncologist. To that extent, the Amended Complaint, like the original Complaint, conflates the supervision requirements beyond what is prescribed by CMS. Therefore, the Amended Complaint fails to articulate a claim upon which relief may be granted. As such, the Amended Complaint must be dismissed.

## **BACKGROUND**

### I. ALLEGATIONS OF THE COMPLAINT

Like the original Complaint, the Amended Complaint contains blanket allegations charging the Defendants, collectively, and predicates its claims by using erroneous legal conclusions that take the form of mischaracterizations of CMS administrative Manuals and Regulations.

The Amended Complaint contains primarily the same allegations as the original Complaint, notably that Ashland Bellefonte Cancer Center ("ABCC") and Highlands Cancer Center ("HCC") (collectively, "the Cancer Centers") are physician-owned medical and radiation oncology and hematology clinics which treat vulnerable cancer patients in Ashland and Prestonsburg, KY, respectively. (DN 53 at ¶¶2, 8, 10). The Cancer Centers are wholly owned by Dr. Kirti Jain, a medical oncologist whose practice is concentrated in the areas of blood and cancer care and internal medicine. (DN 53 at ¶¶6, 9, 11). Like many providers, the Cancer Centers do not submit their claims for services rendered to patients directly to payors, but instead employed a billing company, specifically A One Biz Solutions, which is located in Miramar, Florida. (DN 53 at ¶14). The Amended Complaint adds an additional Defendant who was not present in the original Complaint, Manish Jain. (DN 53 at ¶7). The Amended Complaint alleges that Manish Jain was a manager at Ashland Bellefonte Cancer Center, and Logan Cancer Center and was a member and manager at A One Biz Solutions and that Manish Jain was business manager at Ashland

Bellefonte Cancer Center. (DN 53 at ¶7, 9). The Amended Complaint alleges that A One Biz, through Manish Jain, employed a process of "scrubbing" claims prior to submission to ensure that claims would be eligible for payment and would be properly adjudicated. (DN 53 at ¶41). Astoundingly, the Amended Complaint seems to attempt to plead that "scrubbing" of claims is equated with fraud, but does not offer any definition or description of what "scrubbing" actually is. As it applies to medical billing, a "scrub" is recognized as an "internal control to ensure claims are processed for NCCI [National Correct Coding Initiative] edits before submission." Brian Meredith, Fit NCCI Edits into Hospital Chargemaster Before Claims Submission, American Academy of Professional Coders Knowledge Center (Sept. 11, 2018), www.aapc.com/blog/43826-fit-ncci-edits-into-hospital-chargemaster-before-claims-submission/. As such, the process of "scrubbing" claims is essentially a pre-submission dry-run of adjudication of the claim to ensure that it is properly coded and eligible for reimbursement. Rather than being a fraud scheme, "scrubbing" is a recognized tool for preventing fraudulent overpayments. *Id.* ("Scrubbing prevents fraudulent overpayments. To prevent an inflated charge, the hospital should edit the claim (scrub) . . . Consistent failure to scrub hospital claims to avoid unbundling may be considered intentional and . . . even fraudulent . . . Accordingly some payers…are adopting policies that include mandatory inpatient claim scrubbing.") In attempting to plead "scrubbing" in such a way as to insinuate that it is a fraudulent scheme,[1] the Amended Complaint mischaracterizes "scrubbing" as a nefarious scheme, when, in fact, the opposite is actually the case.

After introductory statements about the Cancer Centers, Dr. Jain, Manish Jain and A One Biz, the Amended Complaint quickly groups all of the parties together and thereafter refers to them as "Defendants." The Amended Complaint omitted Logan Cancer Center as a Defendant, despite

[1] The Amended Complaint does not actually plead how the "scrubbing" effectuated fraud, but instead makes conclusory statements and insinuations.

it being a Defendant in the original Complaint. This is likely due to the fact that the United States declined intervention against all Defendants aside from Logan Cancer Center. As such, the only potential Defendants at Relator's disposal for whom they could articulate an Amended Complaint were those against whom the Government had not chosen to intervene. Thus, with the Government's declination against all Defendants aside from Logan Cancer Center, those entities became the focus of the Amended Complaint, not Logan. Instead, Logan is identified as a "co-conspirator." (DN 53 at ¶12).

The Amended Complaint alleges the Defendants "willfully presented and caused to be presented for payment fraudulent claims to federally-funded health care programs" in relation to patients "supposedly" treated by the Relator himself. (DN 53 at ¶45). Specifically, the Amended Complaint pleads that: "Of the O'Laughlin claims, *many were false and fraudulent*, in that they stated that Dr. O'Laughlin provided, or supervised, the radiation oncology billed in these claims, whereas in truth and in fact . . . Dr. O'Laughlin did not provide these services . . . [he] did not supervise the provision of these services . . . [and] the provision of these services was not delegated to a physician qualified to perform the radiation oncology services." (DN 53 at ¶47). This represents the largest apparent departure between the original Complaint and Amended Complaint inasmuch as the original Complaint pleaded that reimbursement for radiation therapy administration required supervision "by a qualified radiation oncologist." (DN 1 at ¶38).

Relator amended the original Complaint to remove the "qualified radiation oncologist" requirement that he pleaded in the original Complaint following the Defendant's previous Motion to Dismiss, which pointed out that Federal law runs contrary to the Relator's employed definition of supervision. (DN 50 at pp.14-18). However, the substance of the Relator's mischaracterized definition of supervision is preserved in the Amended Complaint. The Amended Complaint does

this through a number of misstatements and mischaracterizations of regulations and false definitions of services provided. For instance, the Amended Complaint pleads that administration of radiation therapy includes "both the professional and the non-professional, *i.e.* technical component[s]". (DN 53 at ¶37).[2] From there, the Amended Complaint alleges that both professional and technical components require requisite supervision by a physician. (*Id.*) As to what that level of supervision might be, Relator alleges that "the administration of a specific type of radiation therapy requires a specific level of supervisory or personal care by a qualified physician, **that is, by a Radiation Oncologist or other 'qualified radiation oncology physician.'**" (DN 53 at ¶32). It is not clear from the Amended Complaint where the Relator actually derives this heightened requirement for supervision, but it is clear that the Amended Complaint's supposed de-referencing of requirements that radiation therapy must be supervised by a radiation oncologist is disingenuous. Instead, the Amended Complaint presents a more circular reasoning that ultimately leads to the same faulty conclusion that radiation therapy must be supervised by radiation oncologists. This has never been recognized, and, to the contrary, Courts have rejected this interpretation of the supervision requirements for these services. Simply put, despite the alterations to the Amended Complaint, the substance of Relator's flawed argument still remains intact, which is that the supervision requirements were not met because the supervision was by physicians other than radiation oncologists. With respect to the patients that the Relator alleges were administered radiation therapy procedures without Relator's supervision, the Amended Complaint applies this inappropriate standard, pleading that, "the provision of these services was not delegated to a physician qualified to perform the radiation oncology services." (DN 53 ¶¶47, 55, 60, 65, 70).

[2] As will be discussed below, this assertion is patently incorrect, as CMS has acknowledged that administration of radiation therapy is a purely technical service without a professional component.

The Amended Complaint goes on to plead that the Defendants, "knowingly and willfully made and used, and caused to be made and used, false records and statements material to the above described false and fraudulent claims" under 31 U.S.C. §3729(a)(1)(B). (DN 53 at ¶78). Expanding on this allegation, the Amended Complaint pleads that "the aforesaid false records were the following: (a) patient charts and files that contained the aforesaid false statements; (b) patient billing summaries that contained the aforesaid false statements; and (c) claims that contained the aforesaid false statements." (DN 53 ¶80). To that extent, the Amended Complaint seems to allege that these false records basically entailed listing the radiation oncologist as the rendering provider for radiation therapy services, rather than the supervising physician, when completing the records used to submit claims for payment for radiation therapy services. (*Id.*; DN 53 at ¶87).

In fact, the crux of the Amended Complaint is predicated upon the legal conclusion that, at a very minimum, all claims for radiation therapy administration have to be supervised by a radiation oncologist in order to be reimbursable. The Relator's alteration of language from the original Complaint to the Amended Complaint whereby he substituted "a physician qualified to perform the radiation oncology services" as the required supervision in the stead of "a qualified radiation oncologist" does not cure the fact that as a whole, the Amended Complaint still conflates the supervision requirements in such a way that only a radiation oncologist would be qualified to supervise radiation therapy services. For the reasons that shall be put forth below, this legal conclusion is wholly erroneous such that the entire premise of this case is fundamentally flawed. Likewise the Amended Complaint mischaracterizes as "fraudulent" claims which, at worst would be documentation errors, or at best are properly submitted. Specifically, the Amended Complaint incorrectly declares as "false" claims where a physician is listed as the rendering physician on records and claim forms when that physician did not provide or supervise the services. (DN 53 at

¶¶84-89, 114-119). The Amended Complaint dubbed these allegations as the "Absent Physician claims" and/or "Patients Supposedly Treated by Named Physicians." *Id.* Aside from adding a phrase referencing Logan Cancer Center as a co-conspirator, these allegations were unchanged from the original Complaint to the Amended Complaint.

The Amended Complaint also retained the nearly verbatim allegation that "the Defendants presented claims to the Federal Programs, stating and otherwise representing that services included in these claims had been provided to patients by physicians, whereas, in truth and in fact, such services had been provided by [nurse practitioners and physician's assistants, "NPPs"] and not by physicians (the "NPP claims"). . . ." (DN 53 at ¶123). As was the case with the original Complaint, the Amended Complaint pleads that the claims submitted were false or fraudulent because they listed the physician who supervised and/or was ultimately responsible for the care of the patient receiving chemotherapy services as the rendering provider, rather than the chemotherapy nurse or physician assistant who administered the chemotherapy infusion. (DN 53 ¶161). Defendants had previously moved to dismiss this Claim because the use of a chemotherapy nurse or a physician assistant is appropriate for "incident to" billing. The Amended Complaint contains the exact language of the original Complaint for this Claim, with the exception being that the Amended Complaint makes the threadbare conclusory statement that "None of the described services was provided "incident to" the service of Dr. Kirti K. Jain, as specified and pursuant to the requirements of 42 CFR §410.26(b), as these services were not provided under the direct supervision of Dr. Kirti K. Jain." (DN 53 at ¶¶133, 141, 157). These alterations still do not remedy the Complaint's misrepresentation of the supervision requirements under the FCA and other applicable federal legislation (explained *infra*). In the end, instead of pleading plausible violations of the FCA in

regard to this practice, the allegations of the Amended Complaint are predicated on the Relator's legal conclusions, rather than adequately-pleaded facts.

The Amended Complaint then goes on to mimic the original Complaint's pleading that the Defendants' claims for simulation procedures are false or fraudulent. (DN 53 at ¶¶173-194). Simulation procedures are essentially the equivalent of a "dry run" for radiation treatments. (DN 53 at ¶177). The original Complaint alleged that the claims for simulations were fraudulent for the same reason the radiation therapy services were alleged to be fraudulent: because they were not personally supervised by a radiation oncologist. (DN 1 at ¶164). The Amended Complaint further inflates the supervision requirement, stating simulations "can only be done by a qualified physician who has complete knowledge of the location and extent of the patient's malignancy." (DN 53 at ¶178). The Amended Complaint concludes that this "qualified physician" "must be the radiation oncologist who is treating the patient or another physician who is similarly qualified and who is treating the patient." (*Id.*) This mischaracterization of the supervision requirement for simulations is a legal conclusion that the Relator half-heartedly asserts by referencing a Local Coverage Determination from Nebraska, which neither enunciates that draconian standard nor is even applicable to Kentucky. (DN 53 at ¶177). In truth, and as will be discussed, below, simulations, like other radiation treatment delivery services, merely require supervision of a "physician" and not a "radiation oncologist."

Finally, as a last ditch effort, the Amended Complaint parrots the allegations of the original Complaint that all of the Defendants conspired together with themselves to commit false claims. (DN 53 at ¶¶ 195-200). The only difference between the Amended Complaint and the original Complaint is that Manish Jain is included as a Defendant and Logan Cancer Center is re-branded as a co-conspirator, as opposed to a Defendant. Still, the Amended Complaint maintains common

ownership amongst the Defendants by Kirti Jain and common management amongst the various entity Defendants by Manish Jain. As such, it is unclear how this catch-all allegation could survive or even how an entity or individual can be alleged to conspire with themselves, but the Amended Complaint pleads as such.

The allegations pleaded within the Amended Complaint are, in general terms, predicated upon erroneous legal conclusions, or are otherwise legally impossible. The Amended Complaint fails to plead any plausible claim for relief and as such, this Motion to Dismiss follows.

## ARGUMENT

The Amended Complaint in this case should be dismissed as it simply contains threadbare recitals of factual allegations, supported by mere conclusory statements. To the extent that the Amended Complaint does plead factual allegations, the Amended Complaint marries those allegations to erroneous legal conclusions which are not entitled to any deference or presumption. In fact, the Amended Complaint takes great pains to attempt to identify the supervision requirements that must be met as a prerequisite for payment, however the legal conclusions regarding these requirements are fundamentally erroneous and cannot form the basis of a claim upon which relief can be granted. Therefore the Amended Complaint fails to survive scrutiny under CR 12(b)(6) and 9(b) and must be dismissed.

### I. THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM WITH PARTICULARITY UNDER FED R. CIV P. 12(b)(6) AND 9(b).

#### A. The FRCP 12(b)(6) and 9(b) Pleading Standard

It is well settled that the primary function of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the legal sufficiency of the complaint. *See, e.g., Denton v. Bedinghaus*, 40

Fed. Appx. 974, 976-77 (6th Cir. 2002). The United States Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007), ushered in a new pleading standard that moved away from the pure notice pleading standard that had previously been employed by the Federal Rules of Civil Procedure. *See In re Travel Agent Com'n Antitrust Litig.*, 583 F.3d 896, 911-12 (6th Cir. 2009) (recognizing need for more than simple notice and conclusory statements of ultimate facts about the case subsequent to *Twombly*). Two years later, in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), the Supreme Court clarified the new *Twombly* standard and asserted that while the new pleading standards governing Rule 8(a) do not require "detailed factual allegations," they do require "factual enhancement." *Id*. at 1949. Only "a complaint that states a plausible claim for relief" will survive a motion to dismiss. *Id*. at 1950. This is a "context–specific task" requiring the court "to draw upon [its] judicial experience and common sense." *Kiser v. Kamdar*, 831 F.3d 784, 787 (6th Cir. 2016) (citations omitted). The Sixth Circuit has followed *Iqbal* and *Twombly* without hesitation. *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) (the combined effect of *Twombly* and *Iqbal* require plaintiffs to have greater knowledge now of factual details in order to draft a 'plausible complaint'").

In deciding a 12(b)(6) challenge, the Court must accept all well-pleaded factual allegations as true. *Rodriguez v. Honigman Miller Schwartz & Cohn LLP*, 465 Fed. Appx. 504, 507 (6th Cir. 2012). The Court is not required, however, to accept conclusory legal allegations as correct. *Id*. Instead, when a party chooses to plead a legal theory in the complaint, that complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436-37 (6th Cir. 1988) (citation omitted). Perhaps most importantly, courts must keep in mind that "[t]hread-bare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Iqbal*, 129 S.Ct. at 1949 (*quoting Twombly*, 550 U.S. at 555). Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 129 S.Ct. at 1950. These requirements were even required under the more relaxed "notice pleading" standard that existed prior to *Iqbal* and *Twombly*.

In evaluating the purported claims that are pleaded, the Court must do so while taking consideration of *Iqbal*'s plausibility standard. Again, specifically, any claims that are pleaded as potential representative examples of fraud must be pleaded in such a way to be more than "mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949. Conclusory allegations are not entitled to any presumption of truth. *Rodriguez*, 465 Fed. Appx. at 507. Likewise legal conclusions are not entitled to any presumption of truth. *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d. 389, 405 (6th Cir. 1998), ("Only well-pleaded facts, however, must be taken as true. The trial court need not accept as true legal conclusions or unwarranted factual inferences.")

B. <u>The Elements of the False Claims Act</u>

In order to satisfy an FCA claim, the government must prove the following elements:

> First, the defendant must have made a false statement or created a false record, and must have done so with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information. Second, the defendant must have submitted a claim for payment to the federal government. Third, the defendant's false statement must have been made with the purpose of getting a false or fraudulent claim paid or approved by the government. Finally, the defendant's false statement or record must have been material to the government's decision to make the payment sought in the defendant's claim.

*U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 505 (6th Cir. 2008) (citations omitted).

The FCA requires a showing of a scheme to defraud; innocent mistakes or mere negligence are

not actionable. *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 413 (6th Cir. 2016). To that extent, in order to be actionable under the False Claims Act, a claim must include a false statement that is material to the government's decision to pay a claim. *U.S. ex. rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 442-43 (6th Cir. 2005). In determining materiality, only actual, and not theoretical or conjectural, damages are recoverable under the FCA. *U.S. v. United Tech. Corp.*, 626 F.3d 313 (6th Cir. 2010).

C. Supervision as a Condition of Payment

The False Claims Act does not punish every alleged violation of Medicare's provider contract, or the Medicare and/or Medicaid Manuals; but instead punishes only those provisions that are material to the government's decision to pay. *U.S. ex rel. Hobbs v. Medquest Assocs., Inc.,* 711 F.3d 707 (6th Cir., 2012); *U.S. ex re. Doe v. Jan-Care Ambulance Serv.*, 187 F. Supp. 3d 786 (E.D. Ky. 2016). When a claimant knowingly certifies compliance with a regulation or contractual provision which the Government has stated is a condition of payment for such a service, such a violation of a condition of payment could give rise to FCA liability under a "false certification theory." *Hobbs*, 711 F.3d at 714. For a regulatory or contractual provision to be considered a "condition of payment" such that failure to abide by the condition could give rise to FCA liability, compliance with the "particular statute, regulation, or contractual term [must be] a prerequisite for payment, [such that] failure to comply would render the claim fraudulent." *Chesbrough v. V.P.A., P.C.,* 655 F.3d 461, 467 (6th Cir. 2011). Not every regulatory or contractual violation constitutes a violation of condition of payment rising to FCA liability. *See Universal Health Servs., Inc. v. U.S.*, 136 S.Ct. 1989, 2003 (2016) ("The False Claims Act is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations."). Instead, the violation of a condition of payment must be material to the

decision to pay. *Id.* However, "materiality…cannot be found where noncompliance is minor or insubstantial." *Id.*

Medicare and Medicaid's conditions of payment for radiation therapy services and for incident-to services are no secret, and insofar as those conditions are met, a provider is entitled to reimbursement for such services. For both incident-to and radiation therapy services, the only condition which is in question is the requirement of physician supervision. Like the original Complaint, the Amended Complaint mischaracterizes these physician supervision requirements. The Amended Complaint asserts that regarding radiation therapy services, "the physician has the authority to delegate tasks and responsibilities to other health professionals provided that the delegee has the educational background and competence to perform his duties." (DN 53 at ¶36). [3] The Amended Complaint does omit the original Complaint's elaboration that "however, for the provision of radiation oncology services, the physician performing the service must himself or herself be a qualified radiation oncologist." (DN 1 at ¶33). Likewise, the original Complaint pleaded that when CMS requires a "Qualified Physician" for supervision, '"Qualified Physician' means that the service may be delegated to, and performed by, a qualified radiation oncologist." (DN 1 at ¶34). However, the Amended Complaint alters this language slightly to state that "Qualified Physician' means…a physician who is qualified to perform radiation oncology services." (DN 53 at ¶39). In doing so, the Amended Complaint, from a purely superficial level, seems to remove the original Complaint's explicit conclusion that radiation therapy administration must be supervised by a radiation oncologist in order to be reimbursable, but one need not peel the proverbial layers back very far before it is clear that the Amended Complaint maintains the

[3] Once again, it is not clear where the Relator derives this draconian standard, but it is not present in any Medicare Manual.

pleading of these same draconian supervision standards. From a threshold standpoint, it must be pointed out that these summaries of supervision requirements within the Amended Complaint are demonstrative of legal conclusions, not entitled to any presumption of truth. *Lewis,* 135 F.3d. at 405. As will be discussed below, the legal conclusions of the Amended Complaint, however, are fundamentally flawed as they both mischaracterize the requisite supervision for radiation therapy provision, which requires only a physician, not a physician qualified to perform radiation oncology services, and for the service itself, which is a technical, not a professional service. The Amended Complaint's mischaracterization of supervision requirements are hereby disabused as follows:

E&M AND CHEMOTHERAPY SERVICES

The Amended Complaint states that "the Defendants presented claims to the Federal Programs, stating and otherwise representing that services included in these claims had been provided to patients by physicians, whereas, in truth and in fact, such services had been provided by [physician assistants and nurse practitioners] and not by physicians." (DN 53 at ¶123). The Amended Complaint alleges that by listing the physician on the claim, rather than the nurse practitioner or the physician assistant, the claims were false or fraudulent. This is a mischaracterization of CMS' billing guidance and exemplary of the systemic erroneous legal conclusions that permeate throughout the Amended Complaint. In practice, patients who are receiving ongoing treatments and other services will often, if not typically, be seen by or have treatments administered by, providers other than their primary physician. This is especially the case regarding provision of chemotherapy services such as those pleaded in the Amended Complaint (DN 53 at ¶125) because chemotherapy nurses have greater experience in the technical/mechanical act of administering infusions than an oncologist, whose expertise is applied to the diagnostic service as well as to the prescription of the chemotherapy drugs. CMS has

deemed such services provided by providers other than the medical oncologist as "incident to" services. *Medicare Benefits Policy Manual* Ch. 15, §60.1. In order for a service to be considered "incident to," the "services or supplies [must be] furnished as an integral, although incidental, part of the physician's personal professional services in the course of diagnosis or treatment of an injury or illness." *Id.* CMS has recognized the appropriateness of reimbursement for incident to services, stating that such "services and supplies commonly furnished in physicians' offices are covered under the incident to provision." *Id.* This is codified in the Federal Regulations. Specifically, 42 C.F.R. §410.26(b) recognizes that "Medicare Part B pays for services and supplies incident to the service of a physician" so long as certain conditions are met. Direct supervision is one such condition of payment, as coverage of incident to services "is limited to situations in which there is direct physician supervision of auxiliary personnel." *Medicare Benefits Policy Manual* Ch. 15, §60.1. The CFR further elaborates on who can provide "direct physician supervision" stating that "the physician (or other practitioner) supervising the auxiliary personnel need not be the same physician who is treating the patient more broadly." 42 CFR §410.26(b)(5).

Clearly, 42 CFR §410.26(b)(5) defines the "who" regarding the provision of direct physician supervision, and allows that the direct supervision need not be provided by the physician who is primarily responsible for the broader general treatment. As to the level of supervision that must generally be delivered to establish "direct physician supervision," 42 CFR §410.26(a)(2) directs that "direct supervision means the level of supervision by the physician of auxiliary personnel as defined in §410.32(b)(3)(ii)." The statutory definition of "direct supervision" which is grandfathered into 42 CFR §410.26 from 42 CFR §410.32(b)(3)(ii) states that "direct supervision…means the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean

that the physician must be present in the room when the procedure is performed." 42 CFR §410.32(b)(3)(ii).

In practical terms, for evaluation and management and/or chemotherapy services provided by auxiliary personnel to be considered covered "incident to" services, they must meet the requirements of direct supervision. Therefore, there must be a physician (who does not need to be the physician primarily responsible for the patient's broad treatment) present in the office suite, and who is immediately available to furnish assistance and/or direction as needed while the procedure is being performed. If such a physician is indeed present in the facility, then the service is covered under the conditions of payment for incident to billing.

In the present case, the Amended Complaint alleges that some personnel, presumably auxiliary personnel, performed the chemotherapy services. The Amended Complaint alleges that the services were not "provided 'incident to' the service of Dr. Kirti K. Jain…as these services were not provided under the direct supervision of Dr. Kirti K. Jain." (DN 53 at ¶¶133, 141, 149, 157). The Amended Complaint **does not** allege that these services were unsupervised. The Amended Complaint merely alleges that the claims were not supervised by Dr. Kirti K. Jain. At best, the Amended Complaint merely alleges that a physician other than the supervising physician was listed on the claim form. As will be discussed at length below, listing the wrong physician on a claim form is not fraud, as there is no materiality for such a clerical mistake. Absent materiality, the Amended Complaint fails to state an FCA violation. Instead, the Amended Complaint makes the broad, and incorrect, assertion that by noting the patient's treating physician, as opposed to the supervising physician or the chemotherapy nurse or physician assistant who performed the service under the supervision of a physician, that the claims were false or fraudulent. Such an allegation

fails to meet the materiality element of FCA liability as there has been no ill-gotten gain. As such, the Amended Complaint fails to plead an actionable violation of the FCA.

RADIATION THERAPY SERVICES

The Amended Complaint erroneously pleads that in order to be reimbursable, radiation therapy services must be supervised by "a physician qualified to perform the radiation oncology services." (DN 53 at ¶47). This legal conclusion, which is made without citation to any Medicare regulation or Manual provision, completely misrepresents not only the requirements set forth by Medicare, but also the nature of the radiation therapy delivery service, itself, as well as the billing codes associated with the service. As established in Chapter 15 §90 of the Manual, CMS only indicates that direct personal supervision by a physician is required. A "physician" is defined by the Social Security Act as a doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the State in which he performs such function. 42 USC §1395x(r). As such the Amended Complaint completely misstates the supervision requirements for radiation therapy delivery.

More so, the Amended Complaint's legal conclusion that the physician who supervises radiation therapy delivery services must be "qualified to perform the radiation oncology service" being billed is not only blatantly incorrect, it is also nonsensical, given the fact that the actual radiation oncology service at issue in the Amended Complaint is a purely technical service, with no professional component. The distinction between technical and professional services is important as it serves as the over-arching rationale for the supervision requirements at issue in this litigation and the lack of requirement for specialty supervision.

CMS has long recognized that radiation therapy administration is not a professional service, and claims for radiation therapy administration are not claims for professional fees. *See*

*Medicare Benefits Policy Manual* Ch. 15, §90 ("This level of physician involvement does not represent a physician's service"); *Medicare Benefits Policy Manual* Ch. 13, §70.3, (discussing radiation treatment delivery services, stating that "MACs pay for these TC (technical component) services on a daily basis under CPT codes 77401-77416 for radiation treatment delivery.") CMS provided tangible elaboration of its recognition of the technical aspect of radiation therapy, versus the professional component of physician examination services in its *Medicare and Medicaid Guide Explanations and Annotations*, providing the following example:

> "A radiologist examines a patient on Monday prior to the first session of radiation therapy, is present in the facility to provide supervision during the patient's daily treatment sessions Monday through Friday, and examines the patient again on Friday to evaluate progress and make any necessary changes in dosage. Only two visits on Monday and Friday represent billable physician's services, although the facility would bill for the technical component in the five sessions of therapy."

*Medicare and Medicaid Guide Explanations and Annotations,* at §3136. In providing this example, CMS has recognized that claims for radiation therapy sessions are claims for technical, and not professional fees. The facility, and not the physician, bills for these services. Weekly evaluation services are claims for professional services and are wholly distinct from purely technical therapy sessions.

Because radiation therapy services are wholly technical services, the delivery of radiation therapy is performed by "technical personnel" and such technical personnel perform the services in accordance with the detailed "treatment protocol devised by the qualified radiation oncology physician." *Novitas Solutions, Inc.,* LCD L36711, (Dec. 1, 2016). The radiation oncologist's professional work has been meticulously performed prior to the administration of the therapy. Additional professional services are performed weekly during the treatment course to monitor the patient, however the actual administration remains technical. Still, physician supervision is required, however nothing in the Medicare Manual, nor the LCDs require that such supervision

must be performed by a radiation oncologist, nor do the Manual or LCDs require that the supervising physician need understand how to operate the technical machine that the technician utilizes to deliver radiation therapy. Instead, the Manual simply states that this technical service requires the "direct personal supervision of a physician." *Medicare Benefits Policy Manual* Ch. 15, §90. The Manual makes it clear that the purpose of the physician supervision is not to run the machine or administer the treatment, as the Amended Complaint would assert. Indeed, the Manual even recognizes that the "physician need not be in the same room" for the services to be reimbursable. *Id.* But instead the physician "must be in the area and immediately available to provide assistance and direction throughout the time the procedure is being performed." *Id.* Again, the Manual explicitly goes on to say that even though the physician needs to be in the area in case assistance is needed, the radiation therapy delivery is still not a professional service as "This level of physician involvement does not represent a physician's service and cannot be billed as a Part B service. The physician would have to furnish a reasonable and necessary professional service as defined in §§30 of this chapter, in order for the physician's activity to be covered." *Id.*

The LCDs for radiation therapy delivery are explicit as to the technical aspect of the service. While the LCDs require that "the treatment protocol [be] devised by the qualified radiation oncology physician," the treatment delivery on the other hand, need only be "performed by qualified technical personnel." *Novitas Solutions, Inc.*, LCD L36711, (Dec. 1, 2016). Clearly, radiation therapy delivery is a technical service that is performed by a technician and is billed with no professional fees associated with its reimbursement. CMS does place a requirement that a physician needs to be in the area and available to provide assistance in order for the service to be reimbursable. This physician is considered the "supervising physician." But their physician supervisory services are not normally separately reimbursable. Despite the Amended Complaint's

legal conclusion to the contrary, there is no requirement from CMS that the physician needs to be qualified to perform radiation oncology services.

The Amended Complaint does not allege that the Defendants performed radiation therapy delivery without any physician supervision. The Amended Complaint instead alleges that the physician who did supervise the services was not qualified to perform the radiation oncology services. As stated above, this is not the requisite supervision standard. As such, the Amended Complaint fails to plead a claim that the Defendants violated the FCA when it billed for radiation therapy delivery. *See United States v. Space Coast Med. Assocs., L.L.P.*, 94 F. Supp. 3d 1250, 1261 (M.D. Fla. 2015) ("the Second Amended Complaint does not allege a violation of the Manual. Because **Relators allege only an absence of a radiation oncologist** present in the facility, (*see id.* ¶ 109)—**not the absence of any physician**—the Second Amended Complaint does not state a violation of the Medicare Benefit Policy Manual." (emphasis added)). This is a crucial distinction in this case and application of *Space Coast* to the Amended Complaint would require the Amended Complaint's dismissal. In the present case, the Relator, like the relator in *Space Coast,* compounds the supervision requirements to attempt to plead a heightened supervision requirement that is not present in the Manual or otherwise required by CMS. *Space Coast* recognizes what is apparent from the plain language of the Manual, which is that the supervision requirements for radiation therapy only requires **a physician** to be in the area. Because, like the relator in *Space Coast,* the Amended Complaint pleads a more draconian standard for physician supervision than that which is actually required by law, the facts pleaded in the Amended Complaint do not state a claim for a violation of the FCA and must be dismissed.

D. The Listing of the Physician on the Claim Form.

The Amended Complaint alleges that the Defendants submitted false claims by submitting claims forms which listed a physician other than the healthcare professional who performed the service. (DN 53 at ¶¶ 78-112, 113-165). First and foremost, even if the wrong physician were listed on the CMS 1500 claim form, such a clerical error would not be material to the payment of the claim and thus cannot form the basis of an FCA claim. *U.S. ex. rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc*., 400 F.3d 428, 442-43 (6th Cir. 2005). It is well-established that the FCA is not intended to be used as a vehicle to police regulatory or requirements or clerical errors. *U.S. ex rel. Garst v. Lockheed—Martin Corp.*, 358 F.3d 374, 376 (7th Cir. 2003). Even still, an evaluation of the legal requirements for submission of the claims at issue in this litigation demonstrates that Defendants properly identified the responsible physician for the technical services at issue in this case the nature of the claims at issue Therefore the Amended Complaint fails to state a violation of the FCA and must be dismissed.

The Amended Complaint pleads the erroneous legal conclusion that by listing the patient's treating radiation oncologist on the CMS 1500 form instead of the supervising physician, that the Defendants violated the FCA. (DN 53 at ¶¶ 78-112). This is a legally deficient claim. While radiation therapy does require direct physician supervision to be considered a covered service [*Medicare Benefits Policy Manual* Ch. 15, §90], there exists no requirement that the supervising physician be listed on the CMS 1500 claim form. In fact, the language of the claim form is such that requiring the listing of the supervising physician would be both nonsensical and impossible, and inferring such a requirement could not be achieved without reaching an absurd result. Box 31 of the CMS 1500 claim form requires the "Signature of Physician or Supplier" and further indicates that the physician that signs that box "certif[ies] that the statements on the reverse [back page of the 1500 form] apply to this bill and are made a part thereof." The certification on the reverse

page states that the physician "certif[ies] that the services shown on this form were medically indicated and necessary for the health of the patient." Put simply, the physician listed on the CMS 1500 form certifies that the services billed on the claim form are medically necessary. A supervising physician, however, is merely a physician who is "in the area" and "available to provide assistance and direction" as needed. In the vast majority of instances, this supervising physician has never even seen the patient. Indeed, unless the patient experiences some medical need during treatment administration, the supervising physician may never see the patient. It is impossible therefore, to force a physician who has never seen the patient to certify that the patient's treatments are medically necessary.[4] Instead, the medical necessity of the strict, technical component-radiation therapy delivery services, which are the ultimate culmination of extensive examination and preparation by the ordering and treating radiation oncologist, is most appropriately certified to by the radiation oncologist who is ultimately responsible for the patient's treatment. Therefore, as it relates to the physician who is listed on the CMS 1500 claim form for radiation therapy delivery services, the Amended Complaint fails to state a claim that the FCA was violated.

Likewise, the Amended Complaint is legally defective by pleading that by listing the primary oncologist, rather than the supervising physician, on the CMS 1500 form, the Defendants somehow submitted false claims in violation of the FCA. (DN 53 at ¶¶ 113-165). This theory of liability is flawed as appellate courts have roundly established that misstatements, or even misrepresentations, alone are not sufficient to trigger FCA liability. Instead, when determining whether a misstatement or misrepresentation invokes FCA liability, the FCA "looks to the effect" the misrepresentation had upon the government. *Universal Health Servs., Inc. v. U.S.,* 136 S.Ct.

[4] This is true even in situations where another radiation oncologist supervises treatments for a patient s/he has never met. Other radiation oncologists are not prone to second guessing the work of the treating radiation oncologist.

1989, 2002 (2016). The ultimate question is whether the materiality element of the FCA is satisfied. *Id.* at 2003. Whether a misstatement or a non-compliance with an instruction or condition is "material" under the FCA is a holistic determination. *U.S. v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822 (6th Cir., 2018). If the government pays the claim regardless of the misstatement or whether or not non-compliance exists, then the misstatement or non-compliance cannot be considered "material" to the government's decision to pay. *Id.* at 831. In the present case, there is no "but-for" relationship with regard to how the 1500 forms were filled out. Instead, had the supervising physician been listed on the claims for incident to services, the government still would have paid the claims. Whether the appropriate physician was listed on the claim form is not "material" to the government's decision to pay and therefore cannot be used as a basis for FCA liability. *U.S. ex rel. Rockey v. Ear Inst. of Chicago, LLC*, 92 F. Supp 3d 804, 822 (N.D. Ill. 2015). Therefore, even if the wrong physician was listed on the 1500 form, the elements of the FCA are not satisfied and there has been no actionable violation of the FCA. The Amended Complaint must therefore be dismissed.

II. <u>THE AMENDED COMPLAINT FAILS TO SUFFICIENTLY PLEAD KNOWLEDGE.</u>

The False Claims Act is an elemental statute, and as such, all elements must be met in order for liability to be established. In the present case, the Amended Complaint pleads no facts that would indicate the requisite elements of knowledge, falsity, or materiality. As such, the Amended Complaint fails to plead a plausible claim that the Defendants violated the FCA.

In order to succeed in a claim under the False Claims Act, the Relator must show that the Centers:

> "Knowingly presented, or caused to be presented, to an officer of the United States Government a false or fraudulent claim for payment or approval; or knowingly made or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government."

31 U.S.C. §3729(a). A False Claims Act violation is not a strict liability offense. *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296 (6th Cir. 1998). Instead, a provider's conduct must be done knowingly in order to be actionable under the False Claims Act. 31 U.S.C. § 3729(b). This knowledge is defined to include "actual knowledge of the information, or with deliberate ignorance or reckless disregard of the truth or falsity of the information." *U.S. ex rel. A+ Homecare, Inc. v. Medshares Management Group, Inc.*, 400 F.3d 428, 451 (6th Cir. 2005). It is well-settled that "the False Claims Act condemns fraud but not negligent errors or omissions." *U.S. ex rel. Garst v. Lockheed—Martin Corp.*, 358 F.3d 374, 376 (7th Cir. 2003). Likewise, "the FCA was not intended by Congress to punish honest mistakes or incorrect claims submitted through mere negligence." *U.S. Code Cong. & Admin. News* 1986 pp 5266, 5272. Similarly, "minor technical regulatory violations do not make a claim "false" for purposes of the FCA." *U.S. ex rel. Gross v. Aids Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). Instead, "the existence of mere technical regulatory violations tend to undercut any notion that a prior representation of regulatory compliance was knowingly and falsely made in order to deceive the government." *Id.* (citing *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999)). Put simply, because the Amended Complaint fails to plead that the Defendants did not meet the conditions of payment for incident to and radiation therapy services, it does not plead an actionable claim under the FCA and therefore must be dismissed.

## III. THE CONSPIRACY CLAIMS ARE LEGALLY DEFECTIVE AND MUST BE DISMISSED.

Among the claims pleaded in the Amended Complaint is Count 8, Conspiracy to violate the FCA. Specifically, the Amended Complaint alleges that "the Defendants Radiation Therapy Services, P.S.C. (dba Ashland Bellefonte Cancer Center), Kirti K. Jain, M.D., P.S.C. (dba Highlands Cancer Center), A One Biz Solutions, LLC, and Kirti K. Jain, M.D., and Manish Jain,… together with Co-conspirator Logan CC, conspired and agreed together to defraud the Government by getting false or fraudulent claims approved or paid; and by making or using false statements and records material to false or fraudulent claims." (DN 53 at ¶196) In essence, the Amended Complaint is alleging that all of the Defendants in this action conspired to violate the FCA. This is especially problematic given the facts pleaded in this case, which includes that Defendant Kirti Jain is a medical oncologist who is also the director, president, vice president, sole corporate director and sole shareholder of ABCC and HCC as well as a manager of A One Biz. (DN 53 at ¶¶6, 9, 10, 11, 16). Therefore, given the allegations of the Amended Complaint, the Conspiracy claim essentially pleads that Dr. Jain conspired with himself to violate the FCA. As such, even if the pleaded facts were taken as true, they would not suffice to establish a claim of conspiracy without running afoul of the corporate conspiracy doctrine. The conspiracy claims are fatally defective and must be dismissed.

It is well established that with regard to the FCA, "general civil conspiracy principles apply." *U.S. ex. rel. Durcholz v. FKW Inc.*, 189 F.3d 542 (7th Cir. 1999). Among the "general civil conspiracy principles" which have been recognized by the Sixth Circuit is the intracorporate conspiracy doctrine, which serves to bar conspiracy claims where all the alleged conspirators are employees of the same corporate entity. *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir., 2019); *Copperweld Corp. v. Independence Tube, Corp.*, 467 U.S. 752 (1984). The policy behind the doctrine is simple; the doctrine recognizes that it is legally impossible for individuals within a

single entity to essentially conspire with themselves. *Id.* Indeed, the Sixth Circuit has acknowledged that a successful civil conspiracy claim requires a showing that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective…and (3) an overt act was committed in furtherance of the conspiracy." *Robetson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (quoting *Revis v. Meldrum,* 489 F.3d 273, 290 (6th Cir. 2007). Most importantly, under the intracorporate conspiracy doctrine, there must be separate people to form a conspiracy, and when "all of the defendants are members of the same collective entity" no conspiracy can exist because the entity cannot conspire with itself. *Johnson v. Hills & Dales Gen. Hosp.,* 40 F.3d 837, 839 (6th Cir. 1994).

While the Sixth Circuit has yet to be presented with the question of whether the intracorporate conspiracy doctrine applies to claims originating under the FCA, sister Districts within the Seventh Circuit have applied the doctrine in the context of the FCA. *U.S. ex. rel. Chilcott v. KBR, Inc.,* No. 09-cv-4018, 2013 WL 5781660 (C.D. Ill. Oct. 25, 2013). In *Chilcott,* the District Court for the Central District for Illinois recognized that because general civil conspiracy principles apply to the FCA, "nothing about the FCA indicates that its conspiracy claims should be treated differently from other civil conspiracy claims" and to not apply the intracorporate conspiracy doctrine would be to "depart from the accepted wisdom of conspiracy law." *Id.* at *12. The Court therefore applied the intracoporate conspiracy doctrine to the FCA and dismissed the claims of conspiracy to violate the FCA where all co-defendants were all employees within the same corporate entity.

In the present case, the Amended Complaint pleads Dr. Kirti Jain as a Defendant. The Amended Complaint further pleads that Dr. Jain was the "facility director," the "president," "vice president," "sole corporate director" and "sole shareholder" of each of the Cancer Center Defendants. (DN 53 at ¶¶ 9, 11). The Amended Complaint also alleges that Dr. Jain was a manager

of A One Biz. (DN 53 at ¶16). After pleading Dr. Jain's direct managerial involvement in the facilities, the Amended Complaint thereafter grouped all of the Defendants together for the remainder of the Amended Complaint, notably not alleging any differential facts amongst them, with the exception of the Amended Complaint's repeated allegations that A One Biz' sole role in the scheme was the submission of the claim as the billing company. Taken as a whole, given these facts, the Amended Complaint essentially pleads that Dr. Jain conspired with himself through the Cancer Centers to defraud the Government. Not only are these allegations ludicrous and nonsensical, they are legally impossible and specifically not actionable under the intracorporate conspiracy doctrine. There has been no showing of the principal element of independent parties acting in concert to perpetuate a wrong. Due to the intracorporate conspiracy doctrine, this pleading is insufficient and the conspiracy claims must be dismissed.

## IV. THE DISMISSAL SHOULD BE WITH PREJUDICE.

The Defendants have set forth ample reasons why the Court should dismiss the Amended Complaint. Under *Twombly* and *Iqbal*, the dismissals must be with prejudice. As *Iqbal* has noted, "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S.Ct. at 1950. In fact, in *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046 (6th Cir. 2011), the Sixth Circuit affirmed the District Court's application of *Iqbal* when dismissing a complaint with prejudice for failure to plead a plausible claim and refused the plaintiff's request to amend his complaint. Specifically, where the *New Albany Tractor* Court held that when a Complaint is procedurally flawed, *Iqbal* declares that a "plaintiff may not use the discovery process to obtain facts after filing suit" in an effort to cure the deficiencies. *Id.* at 1051.

The Relator's entire case is based upon a mischaracterization of the prerequisite conditions of payment for the services encompassed in this litigation. This mischaracterization, which penetrates to the very marrow of this litigation, cannot be cured by amendment. The Relator previously filed a deficient Complaint and the controlling Complaint is an Amendment of that Complaint. But the Relator merely amended the initial Complaint to once again mischaracterize and conflate CMS' supervision requirements for the services at issue in this case. As such, there is no reason to believe that the Relator would be able to draft a better Complaint if given a third chance. This Court should therefore dismiss the Amended Complaint with prejudice.

WHEREFORE, the Defendants respectfully move that the Amended Complaint be DISMISSED.

Respectfully submitted,

*/s/ Christopher A. Melton*
Christopher A. Melton
cmelton@wyattfirm.com
Jake Eldemire Smith
jeldemiresmith@wyattfirm.com
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street, Suite 2800
Louisville, Kentucky 40202
Telephone: 502.589.5235

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2020, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the Parties.

*/s/ Christopher A. Melton*
Christopher A. Melton

100232553.1