**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**Ashland Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| ***ex rel.* ROBERT C. O'LAUGHLIN, M.D.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **0:16-CV-148-DLB** |
| **RADIATION THERAPY SERVICES, P.S.C.,** | ) | |
| **dba ASHLAND BELLEFONTE CANCER** | ) | |
| **CENTER, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPPOSITION OF RELATOR ROBERT C. O'LAUGHLIN, M.D. TO THE JOINT MOTION OF THE DEFENDANTS TO DISMISS THE AMENDED COMPLAINT

Robert C. O'Laughlin, M.D. ("Dr. O'Laughlin"), the Plaintiff and Relator in this matter, acting through his undersigned attorney, opposes the Joint Motion of the Defendants to Dismiss his Amended Complaint.

The initial Complaint (Dkt. 1) was filed under seal against five defendants: three clinics, a billing company, and a medical oncology physician, this being Defendant Kirti K. Jain, M.D. After mediation, the Government reached settlement with one of the initial clinic-Defendants, Logan Oncology Care Associates, LLC, dba Logan Regional Cancer Center ("Logan CC"). The Government has since filed a Notice of Dismissal with prejudice as to that Defendant. (Dkt. 65.)

As alleged in the initial Complaint, the same fraudulent schemes were implemented by the Defendants at all three clinics. The Government is allowing Dr. O'Laughlin to purse his Complaint against all remaining Defendants, both the remaining clinic-Defendants and the non-clinic Defendants.

Dr. O'Laughlin filed his Amended Complaint on January 13, 2020. (Dkt. 53.) The Amended Complaint (hereinafter the "Complaint") added additional particularity for some of the allegations, and clarified regulatory requirements regarding the supervision of radiology and chemotherapy services; but it did not add any new causes of action. It did, however, add a new defendant, Manish Jain, alleged to be both a member and manager of Defendant A One Biz Solutions, LLC ("A One Biz") and a manager for two of the named clinics: Logan CC and Ashland Bellefonte Cancer Center ("Ashland CC") (Amd. Cmpl. ¶ 7).[1]

**MEMORANDUM**

The Complaint alleges a simple set of schemes implemented by the Defendants for the purpose of defrauding federal health care programs, with most schemes having one common thread: the inappropriate or *complete* lack of supervision of radiation oncology and chemotherapy services with the intent that the programs would be billed for, and would pay for, services that were *not* reimbursable given the supervision (or lack thereof) *actually* provided. In addition, the Defendants' chronic and deliberate failure to document services properly is also alleged as one of the fraudulent schemes.

As simple as the Defendants' schemes may be, the regulatory framework governing reimbursement for cancer services is itself complex and detailed, and for that reason we take

[1] Despite the express authority of the United States to dismiss an action when it deems appropriate, and despite the express policy of the U.S. Department of Justice to seek such dismissal when it considers the continued pursuit by a relator of a declined matter to be, *inter alia*, meritless, a waste of government resources, or otherwise against the Government's interest, *see* Mem. M. Granston, Dir., Comm. Litig. Branch, Fraud Sec., U.S. Dept. Justice to Attorneys, Comm. Litig. Branch, Fraud Sec., U.S. Depart. of Justice and Asst. U.S. Attorneys, Offices of the U.S. Attorneys, *re* Factors for Evaluating Dismissal Pursuant to 31 U.S.C. § 3730(c)(2)(A) (Jan. 10, 2018), in this case the Government has decidedly chosen *to not seek* any such dismissal regarding the remaining Defendants, and has instead allowed Dr. O'Laughlin to pursue the case and also to add Manish Jain as a Defendant. On its face, this demonstrates some level of approval of this continued prosecution by Dr. O'Laughlin on behalf of the United States.

time here to explain this framework, and also to explain both the Complaint and how the Defendants implemented their fraudulent schemes. The claims and allegations in the Complaint are summarized in **Table I** hereof, below:

**TABLE I**

| Counts | ¶¶ | Claims | Services | Comments |
|---|---|---|---|---|
| **I** | 44-76 | False Claims | Radiation Oncology | Patients Supposedly Treated by Dr. O'Laughlin |
| **II** | 77-83 | False Statements | Radiation Oncology | Patients Supposedly Treated by Dr. O'Laughlin |
| **III** | 84-112 | False Claims | Radiation Oncology | Patients Supposedly Treated Named Physicians |
| **IV** | 113-119 | False Statements | Radiation Oncology | Patients Supposedly Treated by Dr. O'Laughlin |
| **V** | 120-165 | False Claims | Chemotherapy | Chemotherapy Patients Not Treated by Physicians but by Nurse Practitioners or Physician Assistants |
| **VI** | 166-172 | False Statements | Chemotherapy | Chemotherapy Patients Not Treated by Physicians but by Nurse Practitioners or Physician Assistants |
| **VII** | 173-194 | False Claims | Radiation Oncology | Simulation Services and Documentation for Same |
| **VIII** | 195-200 | Conspiracy | All | |

### A. Supervision for Radiation Oncology Services

Counts One through Four allege that the Defendants knowingly submitted (or caused to be submitted) false claims to federal health insurance programs, in that they billed for radiation oncology services under the names of physicians who were *not qualified* to provide or to supervise such services; and that, in fact, *no qualified physicians* provided or supervised the services. The Defendants attempt to make much of the change from the initial Complaint's use of the assertion that the supervising physician must be a "radiation oncologist" whereas the

amended complaint uses the term "qualified radiation physician." However, this distinction is without a difference, as explained below.

Under federal regulations, a person who supervises radiation oncology services must have the appropriate qualifications to do so; and hence the Amended Complaint alleges that the claims submitted were false in that the physicians whose names appeared on the Defendants' claim forms *did not possess the necessary qualifications*—and for that matter, in some instances, they did not provide or supervise the services *at all*. It should be noted that, in determining who *is* qualified to supervise radiation oncology services, the federal regulations incorporate state laws and regulations (*see infra*). Kentucky law requires that a *radiation oncologist* must supervise the provision of radiation oncology services: the applicable regulation requires that a radiation therapist (*i.e*., the person who provides the radiation therapy directly to the patient) must be supervised by a radiation oncologist when providing such services to patients.

1. <u>Medicare Coverage of Therapeutic Services</u>

Medicare Part B pays for "medical and other health services," 42 C.F.R. § 410.10, including physician services, 42 C.F.R. § 410.10(a), and X-ray and other radiation therapy services. 42 C.F.R. § 410.10(f). *See also* 42 C.F.R. § 410.35. Medicare Part B pays for physician therapy services, provided that "they are furnished by one of the following professionals who is legally authorized to practice in the State in which he or she performs the functions or actions, and who is acting within the scope of his or her license." 42 C.F.R. § 410.20(a). Among the specified professionals is a doctor of medicine. *See* 42 C.F.R. § 410.20(b)(1). To be reimbursable, services must be furnished by a facility or other person specified in the Code of Federal Regulations. *See* 42 C.F.R. § 410.12(a)(2). Such services include radiation therapeutic services ("X-ray therapy"). *See* 42 C.F.R. § 410.35.

2. <u>The Supervision Requirements for Radiation Oncology Services—in General</u>

Medicare pays for services "incident to" the service of a physician, as follows:

> In general, services and supplies must be furnished under the *direct supervision* of the physician (or other practitioner). Designated care management services can be furnished under general supervision of the physician (or other practitioner) when these services or supplies are provided incident to the services of a physician (or other practitioner). The physician (or other practitioner) supervising the auxiliary personnel need not be the same physician (or other practitioner) who is treating the patient more broadly. However, *only the supervising physician* . . . may bill Medicare for incident to services.

*See* 42 C.F.R. § 410.26(b)(5) (emphasis added). The take-away here is this: a physician may bill for services as if he/she personally performed them if he/she, directly supervised another person (the "auxiliary personnel") who actually provided the services to the patient. So, for example, Dr. O'Laughlin (who is a qualified radiation oncologist) could bill for radiation therapy services provided to a patient by a radiation technician if he directly supervised the provision of those services by that technician—*but only Dr. O'Laughlin* could bill Medicare for those services.

The definition of "direct supervision" is set forth in 42 C.F.R. § 410.26(b)(5), done by reference to 42 C.F.R. § 410.32(b)(3)(ii). In pertinent part, 42 C.F.R. § 410.32(b)(3) reads:

> [W]hen direct or personal supervision is required, physician supervision at the specified level is required throughout the performance of the test.
>
> (i) *General supervision* means the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure. Under general supervision, the training of the nonphysician personnel who actually perform the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician.
>
> (ii) *Direct supervision* in the office setting means **the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure**. It does not mean that the physician must be present in the room when the procedure is performed.
>
> (iii) *Personal supervision* means a physician must be in attendance in the room during the performance of the procedure.

(Italics in original; bold added.)

The above-stated "direct supervision" requirement is crucial. As one commentator has explained, the level of the supervision requirements in the free-standing facility environment, such as the Defendant-clinics, is stricter than that required in a hospital setting:

> CMS's supervision requirements set a higher bar for physician offices and freestanding centers than for hospital outpatient departments. Whereas CMS allows APs [nurse practitioners or physician assistants] to provide supervision in hospital outpatient departments, **a physician is required to supervise these services in the freestanding settin**g . . . .
>
> In addition, CMS does not require the supervising practitioner in the hospital outpatient setting to be physically present in the same office suite, just that he or she is "immediately available." **In contrast, the supervising physician in the freestanding setting must be present in the office suite or center.**

"What You Need to Know About Medicare's Physician Supervision Requirements," Deidre Saulet, The Advisory Board Company (May 13, 2016) (emphasis added).[2]

Further clarification of the supervision requirements of the above-cited regulations is found in the in the Medicare Benefits Policy Manual, Chapter 15, Section 90:

> X-ray, radium, and radioactive isotope therapy furnished in a nonprovider[3] facility *require direct personal supervision of a physician*. The physician need not be in the same room, but must be in the area and immediately available to provide assistance and direction throughout the time the procedure is being performed. This level of physician involvement does not represent a physician's service and cannot be billed

---

[2] https://www.advisory.com/research/oncology-roundtable/oncology-rounds/2013/01/what-you-need-to-know-about-medicares-physician-supervision-requirements. *See also* 42 C.F.R. § 410.27(a)(1)(iv)(A) (regarding therapeutic outpatient hospitals or Critical Access Hospitals):

> [D]irect supervision" means that the physician or nonphysician practitioner must be immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician or nonphysician practitioner must be present in the room when the procedure is performed[.]

[3] A "nonprovider" facility is a non-hospital entity, such as a physician's office or other freestanding facility that is not classified as a hospital outpatient department. Radiation therapy services provided in freestanding radiation therapy centers, such as the Defendant-clinics, are treated differently from therapeutic services provided in a hospital outpatient department. Freestanding center radiation therapy services are *specifically covered* under Section 1861(s)(4) of the Social Security Act. Further guidance pertinent to physician supervision of these services is provided in Chapter 15, Section 90 of the Medicare Benefit Policy Manual.

> as a Part B service. The physician would have to furnish a reasonable and necessary professional service as defined in §§ 30 of this chapter, in order for the physician's activity to be covered.

*Id*. Section 30.1.A defines "professional service" as:

> [T]hat part of the physician's activities that is directly related to the medical care of the individual patient. It represents remuneration for the identifiable medical services by the physician that contribute to the diagnosis of the patient's condition or to his treatment.

The supervision requirements for the therapeutic radiation oncology services are published by CMS in its Medicare Physician Fee Schedule.[4] This schedule describes services that may be provided by a physician, and the level of participation, including supervision, that the physician must provide for the service to be reimbursable by Medicare. It is updated periodically. **Table II** hereof, below, lists the codes and the procedures at issue in this case. The meaning of the numbers in the column under the heading "Physician Level" is explained below.

**TABLE II**

| Code | Procedure | Physician Level |
|---|---|---|
| 77014 | Computed tomography guidance for, and monitoring of, parenchymal tissue ablation | 09 |
| 77280 | Therapeutic radiology simulation-aided field setting; simple | 09 |
| 77290 | Therapeutic radiology simulation-aided field setting; complex | 09 |
| 77334 | Treatment Device Complex | 09 |
| 77413 | Radiation treatment, beam three or more areas 6-10 MeV | 09 |
| 77418 | Computed tomography guidance for placement of radiation therapy fields | 09 |
| 77421 | Stereoscopic X-ray guidance for localization of target volume for the delivery of radiation therapy | 09 |
| 77421TC | Stereoscopic X-ray guidance for localization of target volume for the delivery of radiation therapy, technical component | 02 |

[4] *See* www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched/PFS-Relative-Value-Files-Items/CMS1241243 (file PPRRVU11_110210(3).txt); authorized by 42 C.F.R. § 414.20.

| Code | Procedure | Physician Level |
|---|---|---|
| 77427 | Radiation Treatment Management, 5 treatments | 02 |
| 78815 | PET with CT for Attenuation Correction skull base to mid-thigh[5] | 09 |
| G6002 | Stereoscopic x-ray guidance for localization of target volume for the delivery of radiation therapy | 09 |
| G6013 | Radiation treatment delivery, 3 or more separate treatment areas, custom blocking, tangential ports, wedges, rotational beam, compensators, electron beam; 11-19 MeV | 02 |

The definitions of the relevant physician participation levels are found in the "National Fee Schedule Relative Value File Calendar" published by CMS for each year[6]; and in the Medicare Claims Processing Manual Chap. 23 "Fee Schedule Administration and Coding Requirements." Relevant physician levels for the professional and technical components of the relevant procedures are defined in **Table III** hereof, below, as follows:

**TABLE III**

| Level | Physician Level |
|---|---|
| **0** | Physician service codes: This indicator identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC [Professional Component/Technical Component] does not apply since physician services cannot be split into professional and technical components. |
| **01** | Diagnostic tests or radiology services: This indicator identifies codes that describe diagnostic tests, *e.g.*, pulmonary function tests, or therapeutic radiology procedures, *e.g.*, radiation therapy. These codes generally have both a professional and technical component. |
| **02** | Professional component only codes: This indicator identifies standalone codes that describe the physician work portion of selected diagnostic tests for which there is an associated code that describes the technical component of the diagnostic test only and another associated code that describes the global test. |
| **09** | Concept of a professional/technical component does not apply. |

[5] Tumor imaging, positron emission tomography (PET) with concurrently acquired computed tomography (CT) for attenuation correction and anatomical localization; skull base to mid-thigh.

[6] *See* www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched/PFS-Relative-Value-Files-Items/CMS1241243 (file RVUPUF11.docx).

The term "concept does not apply" for level 09 does not mean that a physician's participation in the service is *not required.* Instead, it means that the service cannot be split for reimbursement purposes into a physician-service component and a (separately billable) technical component performed by a technician or other professional. The physician can either perform the service him/herself, or delegate provision of the service to an appropriately qualified medical professional, *e.g.*, a radiation therapist (or technician), under his/her supervision. Either way, *only one charge* is reimbursable by CMS, payable as if it had been performed directly by the physician. *See* 42 C.F.R. § 414.34(b). Under Kentucky law, as incorporated by the CMS regulations, the supervising physician must be a radiation oncologist (see *infra*).

3. For CMS, the Question of Who Supervises Radiation Oncology Services Is Material

Before analyzing *who* may supervise the provision of radiation therapy, *i.e.*, any physician or someone who is specially qualified to provide those services, we further address the materiality element of the supervision requirement. We do this both to learn the "mindset" of CMS and to "set the table," so to speak.

The question we now ask is whether, when considering reimbursement of a claim, CMS considers it material that the physician supervising the provision of radiation oncology services be someone who is *qualified to provide radiation oncology services*, as opposed to any other physician—generalist or specialist. The answer—from CMS directly—is "yes." The 2011 Final Rule published by CMS (in November 2010) for its outpatient prospective payment system (OPPS) includes the following description of the comments of interested public entities and the response of CMS:

> Comment: During the past year, we were often questioned about clinical requirements for practitioners supervising extremely specialized services, *notably radiation oncology services*. One commenter requested that CMS consider the direct supervision

> requirement to be met for diagnostic or therapeutic radiation oncology services if a non-specialist practitioner who can handle an emergency provides the direct supervision and also has access by phone or other telemedicine link to a specialist who is able to change the plan of care should the need arise. One commenter asserted that one does not have to possess the clinical skills to fully provide a service in order to be an effective supervisor.
>
> Response: As we have stated in the Medicare Benefit Policy Manual (Pub. No. 100-02), Chapter 6, Section 20.5.24, "the *supervisory physician* or nonphysician practitioner must have, *within his or her State scope of practice* and hospital-granted privileges, *the knowledge, skills, ability, and privileges to perform* the service or procedure. Specially trained ancillary staff and technicians are the primary operators of some specialized diagnostic or therapeutic equipment, and while in such cases CMS does not expect the supervisory practitioner to operate the equipment instead of a technician, *CMS does expect the physician* or nonphysician practitioner *that supervises the provision of the service must be knowledgeable about the test and clinically appropriate to furnish the test*. The supervisory responsibility is more than the capacity to respond to an emergency, and *includes furnishing assistance and direction throughout the performance of a procedure* and, as appropriate to the supervisory physician or nonphysician practitioner and the patient, *to change a procedure or the course of care* for a particular patient. CMS would not expect that the supervisory practitioner would make all decisions unilaterally without informing or consulting the patient's treating physician or nonphysician practitioner." We do not believe it is sufficient or consistent with our rules for direct supervision for the individual on site to be capable of only emergency management. *The supervisory physician or nonphysician practitioner who is physically present should have the training and knowledge to clinically redirect the service or provide additional orders*.[7]

4. Kentucky Law Answers the Question

The next question is whether there is a *legal* requirement that the supervising physician must in some manner be qualified to provide the highly-specialized services in question. Before doing so, we briefly revisit 42 C.F.R. § 410.20(a) (discussed above): it authorizes the payment by Medicare Part B for physician therapy services, provided that "they are furnished by [a professional] who is legally authorized to practice in the State in which he or she performs the functions or actions, and who is acting within the scope of his or her license."[8]

---

[7] 75 Fed. Reg. 71799, 72012 (Nov. 24, 2010) (emphasis added).

[8] 42 C.F.R. § 410.20(a).

The U.S. District Court of Colorado encountered this same situation in the context of radiology services provided in a hospital setting. *See Baker v. Banner Health*, Civ. No. 12-cv-3029, 2015 U.S. Dist. LEXIS 69045 (D. Colo. May 28, 2015). There, the defendant, Banner Health, provided radiation therapy at its facilities "without the physical presence of a medical practitioner authorized to perform such therapy." *Id*. at *2-3. The resulting question was whether the Medicare requirements were violated. The Court determined that the answer hinged on state law: could the non-radiologist physicians who supervised the services also *prescribe* the services? The Court found that under Colorado law *they could not*; and thus, under Medicare regulations, they were not qualified to supervise the services and reimbursement for the services was *not allowed*.

The regulation at issue in *Baker* was 42 C.F.R. § 410.27(a), which addresses hospitals and critical access hospitals (CAH). Here, because we are concerned, not with hospitals but rather with freestanding (*e.g*., nonprovider) clinics, and with provision of services by radiation therapists (under the supervision of a physician), we look instead to 42 C.F.R. § 410.26, which defines "auxiliary personnel" as any individual who is acting under the supervision of a physician—here, radiation therapists. Included in this definition is that such person must "meet[] *any applicable requirements* to provide incident to services." 42 C.F.R. § 410.26(a)(1) (emphasis added). (As noted above, services provided by nonphysicians "incident to" a physician's services are payable as if they were performed by the physician. 42 C.F.R. § 414.34(b).)

Radiation therapists are the professionals who operate the equipment and other sources of radiation that deliver the radiation to patients. The Commonwealth of Kentucky has numerous statutes and regulations governing the licensure and practice of radiation therapists, many enforced through the Kentucky Board of Medical Imaging and Radiation Therapy (the "Board").

In Kentucky, A radiation therapist is defined as an individual who:

> (a) Has completed an accredited educational program in radiation therapy;
>
> (b) Is licensed by the board; and
>
> (c) Is authorized to utilize ionizing radiation-generating equipment and sources of radiation for the planning, localization, and delivery of therapeutic procedures on human beings . . . .

KRS 311B.020(15). By statute, the Board regulates the profession, among other mechanisms, by enforcing the practice standards of nationally-recognized professional organizations. The Board:

> [R]ecognizes and enforces the current rules and regulations, practice standards, scopes of practice, and ethical standards for the nationally recognized professional organizations and certifying bodies for technologists and therapists regulated by this chapter.

KRS 311B.80. Kentucky regulation KAR 46:040 further explains the authorization and limitations placed on radiation therapists, requiring that radiation therapists be supervised by a physician, and then by specifying—*in two places*—who that physician must be, doing so by the incorporation of professional practice standards and scope of practice. Section 1 of the regulation provides:

> This administrative regulation shall apply to individuals who perform medical imaging or radiation therapy for diagnostic medical imaging or therapeutic purposes while *under the direct or indirect supervision*[9] of a licensed practitioner of the healing arts as *specified by practice standards*, *by scope of practice*, and in the ACR-AAPM Technical Standard For The Management Of The Use Of Radiation In Fluoroscopic Procedures as listed in Section 11 of this administrative regulation.

*Id*. at § 1 (emphasis added). Then, Section 11 expressly incorporates the practice standards. It reads in pertinent part (emphasis added):

> Individuals licensed pursuant to this administrative regulation shall perform according to practice standards of the discipline for which they hold credentials, as established by the American Society of Radiologic Technologists (ASRT*)*, the American College

[9] "Direct supervision" means supervised by, and *in the physical presence of*, a licensed practitioner of the healing arts. 201 KAR 46:010(14). "Indirect supervision" means supervised by a licensed practitioner of the healing arts who is *immediately available in the individual's place of employment*. 201 KAR 46:010(17) (emphasis added).

of Radiology (ACR), the American Association of Physicists in Medicine (AAPM), and the Society of Nuclear Medicine and Molecular Imaging (SNMMI) and *incorporated by reference.*

The acronym "ACR" stands for the American College of Radiology. The ACR issues practice standards for radiation oncology, including the roles of radiation oncologists and radiation therapists. In pertinent part, those ACR practice standards provide:

> *A radiation oncologist should be available for direct care and quality review and should be on the premises whenever radiation treatments are being delivered.* The radiation oncologist, facility, and support staff should be available to initiate urgent treatment within a medically appropriate response time on a 24-hour basis or refer to a facility that is available to treat on a 24-hour basis. *When unavailable, the radiation oncologist is responsible for arranging appropriate coverage.* A radiation oncologist's availability must be consistent with state and federal requirements.

ACR-ASTRO Practice Parameter for Radiation Oncology ¶ III.B.2.1 (rev. 2014) (Exhibit A).

By incorporating the ACR's practice standards into its regulations, Kentucky requires that the person who provides the required direct or indirect supervision, *i.e.*, the on-the-premises supervision, must be a radiation oncologist. This reading is supported by the additional requirement that the supervision must be provided by a licensed practitioner of the healing arts, *i.e.*, a physician, "by [his or her] scope of practice." That is, by a physician whose scope of practice is the delivery of radiation oncology therapy, *viz*., a radiation oncologist.

The acronym "ASRT" stands for the American Society of Radiologic Technologists. The 2011[10] and 2015[11] versions of the Practice Standards of the ASRT read in pertinent part:

> Radiation therapists assist the radiation oncologist in localizing the treatment area, participate in treatment planning and deliver high doses of ionizing radiation as prescribed by the radiation oncologist.

---

[10] The ASRT Radiation Therapy Practice Standards at 4 (June 19, 2011) (Exhibit B).

[11] The ASRT Radiation Therapy Practice Standards at 3 (June 28, 2015) (Exhibit C).

The 2019 version is even more direct, reading in pertinent part[12] (emphasis added):

> The practice of radiation therapy is performed by health care professionals responsible for the administration of ionizing radiation for the purpose of treating diseases, primarily cancer. A radiation therapist performs *radiation therapy procedures under the supervision of a radiation oncologist*. It is typically the radiation therapist who administers the radiation to the patient throughout the course of treatment.

The reliance placed by the Defendants on the Florida case of *United States v. Space Coast Med. Assoc*s., L.L.P, 94 F. Supp. 3d 1250 (M.D. Fla. 2015) is misplaced: Florida law does not apply in Kentucky; and the incorporation of state law into the CMS regulations governing supervision requirements for radiation oncology procedures was never raised by those plaintiffs nor addressed by that Court.

### B. The Defendants Overbilled for Chemotherapy

The Defendants' reliance upon the "incident to" provisions of the Code of Federal Regulations to challenge Counts Five and Six of the Complaint is woefully misplaced. The billing of the chemotherapy services that are the subject of these counts *did not satisfy the "incident to" requirements for CMS*—notwithstanding their contrary assertions, the fact remains that the Defendants overbilled Medicare, doing so intentionally.[13]

---

[12] The ASRT Practice Standards for Medical Imaging and Radiation Therapy at 7 (June 23, 2019). These detailed practice standards are 80 pages in length. They can be found at: https://www.asrt.org/docs/default-source/practice-standards/asrt-practice-standards-for-medical-imaging-and-radiation-therapy.pdf?sfvrsn=de532d0_14.

[13] The Complaint alleges the claims are "false and fraudulent." Fraud incorporates the element of materiality. *See Neder v. United States*, 527 U.S. 1 (1999); *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662 (2008). In contrast, a mere false statement does not. *United States v. Wells*, 519 U.S. 482, 489-500 (2008) (interpreting 18 U.S.C. 1014). But whereas a "false" representation requires an outright false statement, a "fraudulent" representation need not be literally false, but must be *material*: it may be an objectively true, material statement (or omission or a required disclosure) that is misleading or deceptive when taken in context. To be cognizable as a violation of the False Claims Act, a claim may be *either* false or fraudulent.

The clinic-Defendants billed chemotherapy services for cancer patients as if those services had been provided by a medical oncologist—Defendant Kirti Jain. They were *not in fact provided by Defendant Kirti Jain:* instead, they were provided by a nurse practitioner or physician's assistant. The reimbursable rate for chemotherapy when provided by a medical doctor is *higher* than when those services are provided by a nurse practitioner. As explained by the District Court in *United States ex rel. Schiff v. Mardler*, No. 1:13-cv-24503, 2016 U.S. Dist. LEXIS 132280, at *18 (Sept. 23, 2016):

> Payment for services performed by either a physician's assistant ("PA") or nurse practitioner ("NP") (collectively, "NPP's"), must not be more than "85 percent of the physician fee schedule amount." *Landau v. Lucasti*, 680 F. Supp. 2d 659, 662, 667 (D.N.J. 2010) (citing 42 C.F.R. §§ 405.520(a), 414.52, 414.56); *see also U.S. ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1035 (S.D. Fla. 2007) ("When the Government is billed for services rendered by a nurse or nurse practitioner which are not incident to the services of a physician, the provider is reimbursed at 85-percent of the rate otherwise paid.").

We have already explained the meaning of "incident to billing" (*supra*). Notably, the Defendants also provide their version of an explanation. Both sides agree that in order to bill under the "incident to" provision of CMS' regulations, the physician under whose name the billing is done must "directly supervise" the nurse practitioner or physician's assistant who actually provides the service.[14] Direct supervision means, *inter alia*, that the supervising physician must be *on the premises* where the services are being provided. *See* 42 C.F.R. § 410.26(a)(2) and 410.10(b)(3)(ii).

The Amended Complaint specifically alleges that these chemotherapy services were *not* provided under the direct supervision of Defendant Kirti K. Jain (Amd. Cmpl. ¶ 133, 141, 149, 157); that he neither personally provided, nor personally or directly supervised the provision of

[14] There are nine requirements and qualifications for "incident to" services to be reimbursable. *See* 42 C.F.R. § 410.26(b). The requirement for direct supervision is 42 C.F.R. § 410.26(b) (5).

these services (Amd. Cmpl. ¶¶ 131, 139, 147, 155); that he "was neither on the premises, nor near the facility, where the services were provided" (Amd. Cmpl. ¶¶ 132, 140, 148, 156). Thus, these services were, as alleged, not provided "incident to services" provided by Defendant Kirti Jain. (Amd. Cmpl. ¶ 133, 141, 149, 157.). The Complaint further alleges that the subject claims were "false and fraudulent" in that the Defendants "well knew" that Defendant Kirti Jain did *not* directly supervise these services, was *not* near the premises when the services were provided, and that the services had instead been provided by a nurse practitioner or physician's assistant. (Amd. Cmpl. 161.)

The Defendants raise an interesting defense:

> At best the amended Complaint merely alleges that a physician other than the supervising physician was listed on the claim form. As will be discussed at length below, listing the wrong physician on a claim form is not fraud, as there is no materiality for such a clerical mistake.

(Def. Motion at 16.) Unfortunately for them, CMS requires that "[O]nly the supervising physician . . . may bill Medicare for incident to services." 42 C.F.R § 410.26(b)(5). Defendant Kirti Jain was *not* the supervising physician. Use of his name was a deliberate, *false* statement intended to secure an undeservedly higher reimbursement from Medicare. As alleged in the Complaint (Amd. Cmpl. ¶ 42, 120, 124), the identity of the supervising or providing physician, by name or by his National Provider Number, was a *material* false statement.[15]

Moreover, the Defendants' argument that there is no fraud where a mere clerical mistake occurs is not applicable at this stage of the litigation: it seeks to raise an affirmative, factual defense. This defense can be raised on summary judgment or at trial. For now, Dr. O'Laughin's Complaint adequately alleges both *knowledge* and *intent* on the part of all Defendants to deceive

[15] *See Nawaz v. Price*, Nos. 4:16-cv-386, 4:16-cv-387, 2017 U.S. Dist. LEXIS 99862 at *10 (E.D. Tx. June 28, 2017) (upholding revocation of Medicare billing privileges).

the Government, doing so with more than sufficient detail. *United States ex rel. Snapp, Inc. v. Ford Motor Co.*, 532 F.3d 496, 503-04 (6th Cir. 2008). Given the very broad definition of the element of "knowing" or "knowingly" as provided in the False Claims Act, *e.g*., actual knowledge, deliberate ignorance, or reckless disregard[16]; and given that knowledge and intent need only be alleged generally[17] this affirmative defense does not constitute grounds upon which to justify a dismissal of this Complaint on a motion filed under Fed. R. Civ. P. 12(b).

### C. The Claims Submitted Were False and Fraudulent

The Complaint expressly alleges that Defendant Kirti Jain is a physician who is board certified in medical oncology; who practices medicine in the areas of blood and cancer care, and in internal medicine; and who was *at no time* "qualified to perform or to supervise radiation oncology services." (Amd. Cmpl. ¶ 6.)

1. Counts One and Two: Claims Falsely Billed Under the Name of Dr. O'Laughlin

Counts One and Two address claims submitted to CMS for radiation oncology services purportedly provided to patients by Dr. O'Laughlin, where the allegation in paragraph 72(c) is that the claims were false for three independent and sufficient reasons: (a) Dr. O'Laughlin *did not* provide these services; (b) Dr. O'Laughlin *did not* supervise the provision of these services; and (c) the provision of these services *was not* delegated by Dr. O'Laughlin to a physician qualified to perform the radiation oncology services.

The Defendants make much of the fact that the third prong of this allegation *in this paragraph* uses the phrase "the provision of these services was not delegated to physician qualified to perform the" services, as opposed to "the provision and supervision" being so

[16] 31 U.S.§ 3729(b)(1).
[17] Fed. R. Civ. P. 9(b).

delegated. However, the Defendants ignore paragraphs 72(c) of Count One, and 79(d) of Count Two, that make it clear the the full allegation in both paragraphs is the following—that the claims as submitted falsely represented:

> that a physician qualified to perform the radiation oncology services . . . provided *or supervised* these services for these patients, whereas in truth and in fact, as the Defendants then well knew, these services were neither provided nor supervised by a physician qualified to perform the radiation oncology services . . . .

*Id*. (emphasis added).

Thus, the claims are adequately pled, as the Defendants were not allowed to bill under the name of an unqualified physician. *See* 42 C.F.R. § 410.26(b)(5). The Defendants' hyper-technical argument is properly disregarded. *Snapp, Inc.*, 532 F.3d at 503-04 (holding that the rules of pleading fraud "should be interpreted in harmony with Rule 8's statement that a complaint must only provide 'a short and plain statement of the claim' made by 'simple, concise, and direct allegations.'"[18]

2. Counts Three and Four: Claims Billed Under Non-Present Physicians

The Defendants also attack Counts Three and Four, asserting that they merely allege that the "Named Physician" did not provide or supervise the services, rather than alleging that *no* physician provided or supervised the services. This is an affirmative defense at best, speculating that *someone* who was qualified *might have* supervised the procedures; and an insufficient one at that: 42 C.F.R. § 410.26(b)(5) requires that the billing to Medicare be made in the name of the *actual* providing or supervising physician. This requirement is material (*supra*), is alleged to be material (Amd. Cmpl. ¶ 89), and the claims covered by these counts are false as they are alleged. *See Nawaz*, 2017 U.S. Dist. LEXIS 99862 at *10.

---

[18] Quoting *United States ex. rel. Clausen v. Lab. Corp. of Am., Inc*., 290 F.3d 1301, 1310 (11th Cir. 2002).

3. Count Seven: Simulation Services

Paragraph 190 of Count Seven alleges a failure of the Defendants to document certain simulation procedures; that such documentation was required and material to the payment of the claims submitted for these services[19]; and, for these reasons (and for an additional reason) the claims were false. The procedures addressed by Count Seven are Intensity Modulated Radiation Therapy (IMRT) procedures, including "CPT Codes" (current procedural terminology codes) 77280 and 77290, which are (respectively) for simple and complex simulation procedures—the procedures addressed by and described in Count Seven.

When a provider bills CMS (or other payor) using a CPT Code, it is making an express statement that the specifications and conditions defining that code have been satisfied.[20] In other words, instead of using a paragraph (or more) to describe the procedure, the provider simply uses the code (a number) for the same purpose: the provider makes a statement by using a five digit code instead of a lengthy description.

Among the specifications included in all radiology CPT Codes is the following: "A written report signed by the interpreting individual should be considered an integral part of a

---

[19] Section 1833(e) of the Social Security Act (42 U.S. § 1395I) reads: "No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period."

[20] As explained by the Office of the Inspector General of the U.S. Department of Health and Human Services:

> Level I HCPCS codes consist of Current Procedural Terminology (CPT) codes, a numeric coding system maintained by the AMA [American Medical Association], and are used primarily to identify medical services and procedures furnished by physicians and other health care professionals . . . .

"Medicare Improperly Paid Hospitals Millions of Dollars for Intensity-Modulated Radiation Therapy Planning Services" at 2, Report No. A-09-16-02033 (August 2018)

radiological procedure or interpretation."[21] Thus, by using these codes, the provider is telling CMS that it has documented the procedure with the specified written, signed report. CMS considers the existence and maintenance of this documentation to be material. *See* Radiation Oncology Including Intensity Modulated Radiation Therapy (IMRT), National Imaging Associates, Inc. (Oct. 2015)[22] (Exhibit D).

The Defendants used the IMRT radiology CPT codes 77280 and 77290 to bill CMS. The allegations include that that they did not create the documentation that is part of the definition of these codes: in short, they lied. Had CMS known the truth, the Defendants would not have been reimbursed for the procedures.

The Defendants "explain" their failure to satisfy the document requirements as mere "errors" (Def. Mem. at 6) (thus conceding that there was no documentation). However, this "defense" is factual and is an affirmative defense—it should not be raised or considered at this point. The Defendants will have the opportunity to introduce evidence in support of this assertion at an appropriate time later in the proceedings—if any such evidence exists.

And by-and-by, the Defendants ignore the allegation in paragraph 183 of the Complaint:

> The Simulation claims were further false and fraudulent, in that they represented by implication that a radiation oncologist had performed the simulations, whereas in truth and in fact no radiation oncologist had performed the simulations.

(*See also* Amd. Cmpl. ¶ 190(d).) Implied certifications, when they are false, qualify as fraudulent statements. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 579

---

[21] CPT Professional Edition 2015 at 407, American Medical Association (AMA). The AMA holds the copyright to the CPT codes.

[22] "Documentation of simulation requires a written record of the procedure and hard copy of electronic images and evidence of image review by a physician including signature of initials and date of review." *Id*. at 5.

U.S. __, 136 S. Ct. 1989 (2016). Together with the legal analysis provided above regarding Counts One through Four, this is yet another reason why these claims are false and fraudulent.

Finally, the Defendants complain that Dr. O'Laughlin's Complaint quotes a Local Coverage Determination (LCD) issued by a Medicare Administrative Contractor (MAC) having no jurisdiction over Kentucky. However, Dr. O'Laughlin did not quote this LCD for the purpose of citing any applicable rule, but rather because it clearly and concisely defines "radiation oncology simulation," explaining the significance of this procedure in the treatment of a patient. Noteworthy, the Defendants cite in *their own* Memorandum, at 18, the LCD of *Novitas Solutions, Inc*., LCD L36711 (Dec. 1, 2016). Novitas is a MAC that also has no jurisdiction over Kentucky.[23] However, this LCD does have value: it strongly supports Dr. O'Laughlin's position regarding who must supervise the treatment of Intensity Modulated Radiation Therapy (IMRT) services.[24] Under the heading of “Provider Qualifications”, it reads:

> It is expected that all personnel involved in administering, supervising, and treating patients for the indications outlined in this LCD meet the regulations set forth by each state or district, as well as for Medicare and the Nuclear Regulatory Commission (NRC), as applicable. These personnel include the *radiation oncologist or other qualified physician radiation/medical physicist*, radiation technologist and radiation assistant.

Medical oncologists such as Defendant Kirti Jain are *not* included in the above-specified personnel.

---

[23] Novatis Solutions is the Medicare contractor for Delaware, New Jersey, Pennsylvania, and the District of Columbia. The cited LCD is located at https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=36711&ver=48&Date=03%2f04%2f2020&SearchType=Advanced&DocID=L36711&bc=KAAAAAgAAAAA&

[24] *See* Amd. Cmpl. ¶ 57 (Table V).

### D. The Defendants Are Properly Charged With Conspiracy

The Defendants rely upon the "intra corporate conspiracy" doctrine to argue that the conspiracy alleged in Count Eight must be dismissed. Given the relationships among the Defendants, this argument fails.

A civil conspiracy is an agreement between two or more persons to injure another person through unlawful action. The agreement need not be express, and all of the conspirators need not know all the details of the conspiracy or of all the participants involved. *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991). In this context, the Sixth Circuit has explained the intra corporate conspiracy doctrine as follows:

> It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.

*Doherty v. American Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984) (quoting *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911,914 (5th Cir. 1952)). Then, *In Hull v. Cuyahoga Valley Joint Vocational School District Ed. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991), the court "adopted the general rule in civil conspiracy cases that a corporation cannot conspire with its own agents or employees." Courts have used this doctrine "to bar conspiracy claims where the purported conspirators were a parent company and a wholly owned subsidiary." *United States v. IASIS Healthcare LLC*, No. CV-15-00872, 2016 WL 6610675, *15 (D. Ariz. Nov. 9, 2016) (citations omitted).

The Complaint names five Defendants as conspirators, and an additional conspirator. (Amd. Cmpl. ¶¶ 6-16.) The conspiracy is the cause of action in Count Eight.

Three clinics are named as conspirators: (1) Defendants Ashland Bellefonte Cancer Center ("Ashland CC"); (2) Defendant Highlands Cancer Center (Highlands CC); and (3) non-

Defendant Logan CC. The fourth corporate conspirator is Defendant A One Biz. No corporate conspirator is a subsidiary of any other, and thus none is barred from being liable for conspiring with another under the intra-corporate conspiracy doctrine.

Defendant Kirti Jain is alleged to be the sole shareholder, and an officer and manager, of Ashland CC and Highlands CC. (Amd. Cmpl. ¶¶ 9(a) and 11(a)). Defendant Kirti Jain is not alleged to be an owner, manager, officer or director of Logan CC. Logan CC is not barred by the doctrine from being liable for conspiring with the other clinics or with Defendant Kirti Jain.

A One Biz is alleged to be a Florida limited liability company. Its managers are alleged to include Defendant Manish Jain. (Amd. Cmpl. ¶15.) Defendant Kirti Jain is also alleged to have been at one time a manager, up to 2010 but not afterwards. (Amd. Cmpl. ¶16.) A One Biz is not barred from being liable for conspiring with any of the three named clinics; nor with Defendant Kirti Jain for any period after 2010.

Defendant Manish Jain is alleged to be a manager of Ashland CC and Logan CC, and a member and manager of A One Biz. (Amd. Cmpl. ¶7.) He is not barred under the applicable doctrine from being liable for conspiring with Highlands CC. Nor with Defendant Kirti Jain, with the caveat that both of these individual Defendants are alleged to be officers and employees of Ashland CC. (Amd. Cmpl. ¶9.)

This analysis of the application of the intra corporate conspiracy doctrine is summarized in **Table IV**, below, where "Yes" means that two parties can legally conspire with each other; where "No' means that they cannot; and where an empty cell means "not applicable" because, of course, a party cannot conspire with *itself*. (The notation "Yes*" means that Kirti Lain and Manish Jain can conspire with each other as individuals—to the extent that they do not do so solely as employees, officers, or directors of any one corporation.)

**TABLE IV**

| | Ashland | Highlands | Logan | A One Biz | Kirti Jain | M. Jain |
|---|---|---|---|---|---|---|
| **Ashland** | | Yes | Yes | Yes | No | No |
| **Highlands** | Yes | | Yes | Yes | No | Yes |
| **Logan** | Yes | Yes | | Yes | Yes | No |
| **A One Biz** | Yes | Yes | Yes | | Yes | No |
| **Kirti Jain** | No | No | Yes | Yes | | Yes* |
| **M. Jain** | No | Yes | No | No | Yes* | |

This leaves us with the following inescapable conclusions: (i) there is a properly alleged conspiracy, in which (ii) all of the Defendants are implicated. Some of the Defendants are liable for conspiring with certain other conspirators; other Defendants are barred from being liable with yet different conspirators.[25] This fact pattern can be appropriately handled at trial by use of a special verdict form determining who is liable for conspiring with whom. There is no basis for dismissing the conspiracy claim.

**E. Final Points**

The Defendants complain about the use of the word "scrubbing," asserting that it has a legitimate meaning. This is true, just as the word "mailing" has a non-nefarious meaning. However, if one mails a letter with the intent to defraud, doing so is criminal: it is mail fraud. Similarly, if one "scrubs" Medicare claims with the intent to deceive CMS, doing so is part and parcel to a scheme to violate the False Claims Act.

[25] A defendant is jointly and severally liable for the (triple) damages and penalties under the False Claims act for which all of his co-conspirators are found, by the trier of fact, to be individually liable. *See United States ex rel. Augustine v. Century Health Servs.*, 136 F. Supp. 2d 876, 896 (M.D. Tenn. 2000).

The Defendants also complain that the Complaint fails to adequately plead "knowledge." However, the element of knowledge need only be pled generally, Fed. R. Civ. P. 9(b), whereas this Complaint specifically addresses how the individual defendants knew the claims were false and fraudulent and purposely acted to deceive CMS. (Amd. Cmpl. ¶ 41 (d-f).)

Finally, the Defendants reliance on *United States ex rel. Rockey v. Ear Inst. of Chi., LLC*, 92 F. Supp. 3d 804 (N.D. Ill. 2015) to challenge materiality is misplaced. There, the Ear Institute of Chicago brought a violation of a new regulatory rule to the attention of the Medicare Administrative Contractor's attention, doing so itself; and explained how the error occurred. Under these circumstances the MAC told the Institute that it "appreciate[d] your honesty and openness about this matter," and forgave the erroneous billing. Here, the publications of CMS strongly indicate that the supervision requirements alleged in the Complaint are material. This is now a fact question, and cannot be decided on a motion to dismiss. *See United States ex rel. Ortiz v. Mount Sinai Hosp.*, 256 F. Supp. 3d 443, 453 (S.D.N.Y. 2017) (distinguishing *Rockey* and denying motion to dismiss); *Nawaz,* 2017 U.S. Dist. LEXIS 99862, at *10.

**CONCLUSION**

For the reasons set forth above, the Defendants' joint motion should be denied in its entirety. In the event that the Court is of the opinion that one or more counts are deficient in some way, Dr. Robert O'Laughlin respectfully asks that he be given leave to amend.

By: /s/ Andrew Grosso
Andrew Grosso, Esq. (D.C Bar No. 358326)
*Pro Hac Vice*
ANDREW GROSSO & ASSOCIATES
1101 Thirtieth Street, NW, Suite 500
Washington, D.C. 20007
Telephone: (202) 298-6500
Email: Agrosso@acm.org

Dated: March 6, 2020 Attorney for Relator Robert C. O'Laughlin, M.D.

**CERTIFICATE OF SERVICE**

I hereby certify on March 6, 2020, the foregoing was electronically filed with the clerk of the court by using the Court's electronic filing system to all counsel of record.


By: /s/ Andrew Grosso
Andrew Grosso, Esq. (D.C Bar No. 358326)
*Pro Hac Vice*
ANDREW GROSSO & ASSOCIATES
1101 Thirtieth Street, NW, Suite 500
Washington, D.C. 20007
Telephone: (202) 298-6500
Facsimile: (202) 298-5599
Email: Agrosso@acm.org

Attorney for Relator Robert C. O'Laughlin, M.D.