UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT ASHLAND

***Electronically Filed***

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel*. ROBERT C. O'LAUGHLIN, M.D.<br><br>PLAINTIFFS,<br><br>v.<br><br>RADIATION THERAPY SERVICES, P.S.C. dba ASHLAND BELLEFONTE CANCER CENTER, KIRTI K. JAIN, M.D., P.S.C., dba HIGHLANDS CANCER CENTER, A ONE BIZ SOLUTIONS, LLC, MANISH JAIN, and KIRTI K. JAIN, M.D.<br><br>DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 0:16-cv-148-HRW |

**DEFENDANTS' REPLY IN SUPPORT OF**
**MOTION TO DISMISS AMENDED COMPLAINT**

Comes now Defendants, Radiation Therapy Services, PSC, d/b/a Ashland Bellefonte Cancer Center, and Kirti K. Jain, MD, PSC, d/b/a Highlands Cancer Center (hereafter referred in combination as "the Cancer Centers"), and A One Biz Solutions, LLC, Manish Jain, and Kirti K. Jain, MD (collectively, "Defendants"), by counsel, having moved this Court to dismiss the Amended Complaint pursuant to FRCP 12(b)(6) and 9(b); and the Relator having filed his Response, the Defendants hereby file their Reply in support of the Motion to Dismiss. In support hereof the Defendants state as follows:

The Relator has requested this Court to allow the Amended Complaint to survive dismissal, but rather than providing grounded reasons to deny the Motion to Dismiss, the Relator's Response instead highlights the fact that the Amended Complaint fails to state a claim. The Relator's Response essentially summarizes the allegations of the Complaint into two categories: a failure to

provide qualified supervision for radiation oncology therapy; and a failure to adequately document procedures. This allegation of a failure to document encompasses allegations that the Cancer Centers submitted claims where the incorrect physician was listed on the CMS 1500 claim form. The Response does nothing to cure the deficiencies of the Amended Complaint, which absolutely fails to articulate a legally viable claim of a violation of the Federal False Claims Act.

First, rather than making a curative effort at the Amended Complaint's mischaracterization of the supervision requirements for radiation therapy, the Response doubles-down on the misstatements, and attempts to establish a convoluted regulatory argument to state, by virtue of misapplied federal and state regulations, that somehow "Kentucky law" would impact CMS guidelines for Medicare reimbursement. Relator performs these legal gymnastics in an attempt to discredit both the plain language of the Medicare Provider Manual, and Federal Courts, which have recognized the Manual as merely requiring "a physician" to perform supervision for radiation therapy services, and not a radiation oncologist as Relator suggests. Unfortunately, the Relator misapplies the relevant regulations, while citing completely irrelevant regulations for good measure in his attempt to murky the clear language of the Manual through "Kentucky law." In the end, the Relator's "Kentucky law" argument is fundamentally without merit.

Similarly, the Response makes concerted efforts to establish that the False Claims Act was violated when the Cancer Centers allegedly listed an incorrect physician on CMS 1500 claim forms for radiation therapy and for incident-to services, including chemotherapy administration rather than the physician who actually supervised the service. In doing so, however, the Relator once again fails to take into account the fact that radiation therapy services are technical, not professional, in nature and the services are rendered not by a physician at all. While the services must be performed with a physician in the office suite, available to provide assistance and

redirection, if necessary, Relator does not cite, nor does there exist, any requirement or guidance from CMS that would indicate that the supervising physician must be listed on the CMS 1500 claim form. Even if the wrong physician were listed on the claim form, the Response fails to establish that such a documentation error would amount to an actionable FCA violation. Specifically, though the Response asserts, albeit incorrectly, that the listing of an incorrect physician on a claim form violates a condition of payment, the Response fails to explain how naming the wrong physician would satisfy the materiality element of the FCA, given that had the "correct" physician been named on the claim form, CMS would have reimbursed the claim in the same manner.

The Relator's Response is a meritless attempt to explain away what is clearly stated in the Medicare Provider Manual and recognized in Federal Courts: CMS does not require radiation therapy to be supervised by a radiation oncologist in order to be reimbursable. Instead, CMS merely requires supervision "by a physician." Because the entire theory of liability articulated in the Amended Complaint rests on the premise that the Cancer Centers did not have a radiation oncologist present, supervising radiation therapy administration, it does not articulate an FCA claim upon which relief may be granted. Further, the Amended Complaint's claims related to insufficient documentation are likewise fundamentally flawed inasmuch as the Amended Complaint fails to satisfy materiality as it cannot plead that had the claims been documented as Relator states that they should have, that reimbursement would have changed. Because the alleged

"failure to properly document" did not impact reimbursement, the Amended Complaint fails to plead materiality. For those reasons, the Amended Complaint must be dismissed.

## I. THE RELATOR'S RESPONSE CONTINUES TO MISCONSTRUE THE SUPERVISION REQUIREMENTS FOR RADIATION THERAPY.

The original Complaint in this case alleged that the FCA was violated because the Cancer Centers billed for radiation therapy services which were not supervised by a radiation oncologist. The Relator amended the Complaint to allege that the radiation therapy services were not supervised by a "qualified radiation physician." The Defendants assumed this change to have been deliberate, however the Response acknowledges that "this distinction is without a difference." [DN 66 at 4]. Thus, rather than relaxing its draconian interpretation of Medicare's supervision requirements, the Relator is continuing to allege that Medicare requires supervision by a radiation oncologist in order for technical radiation therapy services to be reimbursable. Relator maintains this allegation of an elevated supervision requirement despite the fact that all Medicare guidance, and all interpretations of Medicare guidance, including Federal Courts who have looked at this issue, would indicate that Medicare only requires supervision by "a physician" in order for radiation therapy services to be reimbursable. In order to circumvent the clear directives handed down by Medicare concerning supervision of radiation therapy services, the Response articulates a convoluted legal argument that attempts to establish that Medicare reimbursement is determined by "Kentucky law" and "Kentucky law" requires supervision by a radiation oncologist for radiation therapy services to be reimbursable by Medicare. This argument is unfounded and nonsensical, as the Kentucky regulations that the Relator cites actually have no bearing upon Medicare reimbursement. Further, those regulations incorporate by reference third-party opinions, which clearly indicate that they are not intended to be used to establish a legal standard of care and should not be used in litigation. Put simply, the Response is nothing more than an attempt to

enlarge the supervision requirements which have been clearly articulated in the Medicare Manual and the interpretations of those regulations by a Federal Court by forcing the proverbial square peg in the round hole. In the end, Medicare has been clear in its guidance, and it has been well-recognized, that Medicare only requires a physician to be present and available in the office suite for supervision of radiation therapy services. Relator's assertion that supervision requires a radiation oncologist is over-reaching and erroneous. The Amended Complaint must therefore be dismissed.

Despite the Relator's pleas to the contrary, conditions of payment for Medicare services are set by CMS alone. CMS, in its Manuals, has recognized that radiation therapy delivery services are technical services that do not include any professional component in its reimbursement. *Medicare Benefits Policy Manual* Ch. 13, §70.3. The Manual, however, does recognize that while radiation therapy delivery is purely technical, it does require direct personal supervision by a physician. *Medicare Benefits Policy Manual* Ch. 15, §90. The supervision, however, does not contemplate a sufficient level of involvement to represent a "physician's service." *Id.* To that end, the physician supervision is not reimbursable. *Id.* The Manual articulates absolutely no requirement that the supervising physician be a radiation oncologist. The Manual merely requires supervision to be performed by "a physician." *Id.* CMS has articulated no further qualification for supervision aside from the presence of a physician. Relator is in error to conflate this requirement. As the Response acknowledges, a Federal Court in a sister District has reviewed these Manual provisions and has agreed that when a complaint alleges "only an absence of a radiation oncologist present in the facility, not an absence of any physician, [the complaint] does not state a violation of the Medicare Benefit Policy Manual." *United States v. Space Coast Med. Assocs., L.L.P.*, 94 F. Supp. 3d 1250, 1261 (M.D. Fla. 2015).

Relator understandably does not care for the holding in *Space Coast*, and seeks to diminish it in his Response. In order to do this, Relator claims that *Space Coast* was decided under "Florida law" and not "Kentucky law." [DN 66 at 14]. But *Space Coast* did not interpret Florida law; it interpreted the plain language of the Medicare Benefits Policy Manual, which controls and which sets forth the supervision requirements pertinent in this case. Relator's misplaced reliance upon "Kentucky law" stems from an argument that utilizes extreme legal gymnastics and which essentially traces Federal regulations which purportedly reference a requirement that payments for healthcare procedures must meet standards of care. Relator thereafter traces Kentucky statutes which allow for the creation of a professional board to promulgate regulations for the advancement of radiation technology and therapy. From there, the Relator claims that the Kentucky Board of Medical Imagery and Radiation Therapy adopts standards from the American College of Radiology, who, in conjunction with the American Society for Radiation Oncology, created a document, which Relator claims requires supervision to be conducted by a radiation oncologist. Relator then travels this purported statement back up the chain, and contends that this ACR-ASTRO paper has the mass effect of overriding Medicare's own supervision requirements, thus narrowing the supervision requirement to such a degree that only a radiation oncologist can properly supervise radiation therapy delivery services. This legal traversing that Relator indulges in is ultimately nonsensical as this ACR-ASTRO paper is in no way incorporated by reference in the Medicare Benefit Policy Manual's articulation of supervision requirements, nor does the paper create a standard of care. Finally, rather than advance Relator's proffered supervision requirement, the agency behind the paper recognizes the same supervision requirement enunciated in the Manual and in *Space Coast*.

The Response tries to apply dicta from educational guidelines in a paper co-authored by the American College of Radiology ("ACR") and the American Society for Radiation Oncology ("ASTRO"[1]) to create a standard of care to supersede the supervision requirements articulated in the Medicare Benefit Policy Manual. Relator states that the guidelines articulated in the ACR-ASTRO paper are incorporated by reference into Kentucky's regulations promulgated by the Kentucky Board of Medical Imaging and Radiation Therapy as "practice standards" for radiation therapists in 201 KAR 46:035 §3[2]. Relator contends that this Kentucky regulation impacts Medicare reimbursement because of two Federal Regulations, neither of which appear to be applicable here. First, Relator quotes 42 CFR §410.20(b)[3] as requiring, as a condition of Medicare payment, that services must be "furnished by one of the following professionals who is legally authorized to practice in the State" in which the service is delivered. 42 CFR §410.20(b) then proceeds to list the relevant professionals as "(1) a doctor of medicine or osteopathy…(2) a doctor of dental surgery or dental medicine; (3) a doctor of podiatric medicine; (4) a doctor of optometry; [or] (5) a chiropractor." Nowhere does 42 CFR §410.20 appear to apply to a radiation technologist or radiation therapist, whose practice is governed by the Kentucky Board of Medical Imaging and Radiation Therapy or 201 KAR 46:035. As Relator is in error by attempting to extend the ACR-ASTRO guidelines to the Defendants' billing via 42 CFR §410.20, as that regulation only applies to physician billing, and the claims at issue in this matter are radiation therapy delivery claims, which are not physician claims, but technical claims with no professional physician component.

---

[1] It is important to note that both ASTRO and the ASRT, whose published standards Relator misapplies and which will be discussed later, are 501(c)(6) professional societies whose purposes are to promote and advocate for Radiation Oncologists and Radiation Technologists, respectively. They are not government agencies, nor do they possess any legislatively-granted authority to enact administrative laws or regulations. As such, Relator's argument that their practice standards, which he conveniently mischaracterizes, somehow establish "Kentucky law" is fundamentally incorrect.

[2] Relator actually incorrectly cites the language from 201 KAR 46:035 §3 as "201 KAR 46:040 (Section 1)."

[3] Once again, Relator mis-cites the appropriate regulation. Relator actually quotes the language of 42 CFR §410.20(b) while citing the language as 42 CFR §410.20(a).

Relator also attempts to shoe-horn the ACR-ASTRO guidelines by virtue of characterizing the radiation therapists as "auxiliary personnel" operating under the supervision of a physician pursuant to 42 CFR §410.26(a)(1). This regulatory reference is likewise inapplicable here as 42 CFR §410.26's definition of "auxiliary personnel" only applies to non-physician personnel who provide "incident to" services under a physician's supervision. 42 CFR §410.26(a)(1). Radiation therapy services are not incident to services. In order for a service to be considered "incident to," the "services or supplies [must be] furnished as an integral, although incidental, part of the physician's personal professional services in the course of diagnosis or treatment of an injury or illness." *Medicare Benefits Policy Manual* Ch. 15, §60.1. As discussed above, and in the Motion to Dismiss, radiation therapy delivery services are not a physician "professional service" but a technical service, and thus outside the definition of incident to services per the Manual. Additionally, in order to be eligible for reimbursement as an incident to service, a service must meet 42 CFR §410.26(a)(8)'s definition of "services and supplies," which limits incident to-eligible services and supplies to those "that are included in section 1861(s)(2)(A) of the [Social Security] Act *and are not specifically listed in the Act as a separate benefit included in the Medicare program.*" 42 CFR §410.26(A)(8) (*emphasis added*). Radiation therapy services are not payable "incident to" the professional services of a physician because they have their own benefit category at 42 USC 1395x(s)(4), for "X-ray, radium, and radioactive isotope therapy, including materials and services of technicians," thus placing them outside 42 CFR §410.26(a)(8)'s definition of "services and supplies" eligible for incident to treatment. As such, the billing and reimbursement requirements of 42 CFR §410.26 do not apply to radiation therapy, and Relator is in error by trying to force Kentucky administrative practice guidance into Medicare regulations and policy through the regulation.

Additionally, and most strikingly, the ACR-ASTRO paper attached as an Exhibit in the Response, and which Relator contends created a standard of care that is adopted by reference by Kentucky's Board of Medical Imaging and Radiation Therapy thereby overturning the Medicare Benefit Policy Manual's own language, contradicts the very position that Relator posits. One need not read any farther than the preamble of the ACR-ASTRO paper to realize that the guidance put forth by ACR and ASTRO in the paper is extremely limited and not intended to have the effect that Relator uses it for. Specifically, ACR-ASTRO clearly states that the paper "is an educational tool designed to assist practitioners in providing appropriate radiation oncology care for patients." [DN 66-1 at 1]. ACR-ASTRO goes on to recognize that "Practice Parameters and Technical Standards are not inflexible rules or requirements of practice" and the guidance in the paper "are not intended, nor should they be used, to establish a legal standard of care." *Id.* Despite Relator's insistence that the ACR-ASTRO paper should be seen to create a standard of care that would be applied as a Medicare condition of payment for FCA liability, the paper itself rejects this application from the outset and instead explicitly states that "the American College of Radiology and our collaborating medical specialty societies caution against the use of these documents in litigation." *Id.* ACR-ASTRO never intended the guidance in the paper to be used to create a standard of care that would be applied as a Medicare condition of payment. There is no evidence that the Kentucky Board of Medical Imaging and Radiation Therapy ever intended the guidance in the paper to be a standard of care applicable as a condition of payment for Medicare. And there is no evidence that CMS ever intended the ACR-ASTRO guidance to override the CMS Medicare Benefit Policy Manual's supervision requirement, which only requires "a physician" be present in the office suite, available to offer assistance and direction, as a Medicare condition of payment for

radiation therapy treatment delivery. Relator misapplies the ACR-ASTRO guidance where it was never intended to be applied.

Indeed, ACR-ASTRO never intended the guidance of the paper to override the clearly articulated standards in the Manual. This is clear from the fact that ASTRO has, in fact, recognized that CMS only requires supervision by a physician, and specifically has recognized, as *Space Coast* recognized, that the Manual does not require that radiation therapy delivery be supervised by a radiation oncologist. ASTRO has recognized: "Regarding clinical qualifications for the supervising provider of freestanding radiation therapy services, CMS only indicates that direct personal supervision by a physician is required…*CMS does not explicitly state that a radiation oncologist must supervise radiation therapy.*" *ASTRO Guidance on Supervision of Radiation Therapy Services* at 6 (*emphasis in original*) [EX 1]. Instead of creating some separate standard of care, ASTRO recognized that CMS merely requires a physician for supervision. And while ASTRO went on to state that, in their opinion, a radiation oncologist is perhaps the most "clinically appropriate physician" to supervise radiation therapy services, they indicated that in cases, such as the one at bar, they "recognize that some flexibility is necessary for those practices that deliver care to underserved populations who may experience access to care issues." *Id.* Thus ASTRO recognized not only that CMS does not require a radiation oncologist for supervision, but also that in medically underserved areas such as the ones where the Defendant Cancer Centers are located, supervision by a radiation oncologist is likely an unrealistic standard.

Similarly, Relator's reliance upon various articulations of practice standards articulated by the American Society of Radiologic Technologists ("ASRT") is equally flawed. First, these published practice standards explicitly state that they are not intended to supersede Medicare's directives and reimbursement policies articulated in the Medicare Benefit Policy Manual. [*See*

DN 66-2 at 2, ("Federal and state laws, accreditation standards necessary to participate in government programs and lawful institutional policies and procedures supersede these standards.")] And the weight and interpretation that Relator gives these standards in his Response is misplaced. The standards' statement, quoted on page 14 of the Response, that "A radiation therapist performs radiation therapy procedures under the supervision of a radiation oncologist" is not meant to second-guess, supersede or even elaborate on the supervision requirement that Medicare sets as a condition of payment for radiation therapy delivery. Instead, this practice standard merely articulates that the radiological plan that is implemented during radiation therapy treatments is to be developed by a radiation oncologist, and it is outside the scope of practice for a radiation therapist to develop such a plan. The fact that this reference is not intended to apply to the actual supervising physician during radiation therapy delivery is clear later in the document when the ASRT states that, with regard to radiation therapy, the "medical imaging and radiation therapy professional…Determines when to contact the radiation oncologist *or licensed practitioner* regarding patient side effects or questions." The ASRT Practice Standards for Medical Imaging and Radiation Therapy at 23-25 (June 23, 2019). [EX 2]. This demonstrated that the ASRT acknowledges that supervision of radiation therapy delivery does not necessarily require the presence of a radiation oncologist, but instead can be supervised by a "licensed practitioner", i.e. a "physician" and thus is in harmony with the CMS Manual and *Space Coast.* In the end, it is clear that both ACR-ASTRO and ASRT endorse, and do not supplant, CMS' requirement that radiation therapy delivery services be supervised by "a physician."

Clearly, Relator's position that ACR-ASTRO and ASRT articulated standards of care, adopted into "Kentucky law" that create a condition of payment for Medicare more draconian than articulated in CMS' Medicare Benefit Policy Manual, is patently incorrect. First and foremost,

ACR-ASTRO and ASRT have all indicated that their guidance is intended to be educational in nature and not meant supersede Medicare policy. Even if the standards articulated by ACR-ASTRO and ASRT were given legal effect, these professional societies have all recognized that CMS' controlling supervision standard for radiation therapy is that which is articulated in the Manual, i.e. supervision by "a physician." As noted in the Motion to Dismiss, a sister Court has already recognized that under the Manual's language, an FCA Complaint whose claims are based on a failure to provide supervision by a radiation oncologist cannot meet federal pleading standards. *United States v. Space Coast Med. Assocs., L.L.P.*, 94 F. Supp. 3d 1250, 1261 (M.D. Fla. 2015). Relator seeks to distinguish *Space Coast*, claiming that it was decided under "Florida law" when, in fact, it was based upon a plain-language interpretation of the same Manual provision at issue in this case. Relator also attempts to counter this persuasive authority with the case of *Baker v. Banner Health*, 2015 US Dist. LEXIS 69045 (D. Colo. May 28, 2015). This reliance in misplaced, however, as *Baker* involved radiology services administered in a hospital, not a freestanding setting, and, as Relator recognizes, did not entail the supervision of technical services, but instead asked whether a non-physician could prescribe radiological procedures, when prescription is clearly a physician service. [DN 66 at 11, citing *Baker* at *2-3]. It is unclear why Relator believes *Baker* to be pertinent here, when it has absolutely no bearing on this case. The provision of radiation therapy delivery services are not a physician service. There is no allegation in the Amended Complaint that the services were prescribed by anyone other than a physician. Likewise there are no allegations that the radiation therapy delivery services were not supervised by a physician, but only that they were not supervised by a radiation oncologist. All authority-from the Manual, to ASTRO, to *Space Coast*, recognize that CMS' policies only require supervision by a physician and do not require a radiation oncologist for the services to be

reimbursable. The Response is therefore fundamentally flawed and the Motion to Dismiss should be granted.

## II. RELATOR FAILED TO PLEAD A LEGALLY SOUND CLAIM OF FAILURE TO DOCUMENT.

The second main category in which Relator's claims fall, and which is likewise fundamentally flawed, are the claims involving improper documentation. Primarily, Relator claims that the Cancer Centers erroneously listed the incorrect physician on the CMS 1500 claim forms submitted for radiation therapy delivery and chemotherapy administration services. Relator claims that the physicians listed were not the actual physicians who provided supervision for these services. This allegation fails to state a claim for a variety of reasons.

As it relates to radiation therapy delivery services, these services are technical, and not professional services. Therefore, there are no professional services being billed, and therefore there is no clear directive as to who the appropriate physician is to include on the CMS 1500 claim form. As stated above, radiation therapy services are not incident to services provided by auxiliary personnel under the supervision of a physician. There is no reimbursable physician professional component to these services. CMS merely requires as a condition of payment that a physician be present in the office suite and available to offer assistance and redirection as needed. As explained more in depth in the original Motion to Dismiss, the physician listed on a CMS 1500 claim form certifies medical necessity for the service billed. Because the supervising physician is not in a position to certify medical necessity due to the fact that he is only providing assistance and direction on an as-needed basis, he is not the most appropriate physician to list on the CMS 1500 form. Instead, the radiation oncologist, who actually prescribed the technical service, would be the best suited to certify medical necessity. As such, the Amended Complaint fails to state a claim

that radiation therapy services were billed improperly when the supervising physician was not listed.

From a broader sense, Relator contends in his Response that when a physician other than the physician who provided supervision for radiation therapy or chemotherapy services was listed on the CMS 1500 claim form, such listing was a violation of the FCA. [DN 66 at 16]. Relator claims that, specifically, the Cancer Centers listed Kirti Jain as the rendering provider on chemotherapy services when he was not the supervising physician. *Id.* Relator states that the "use of [Kirti Jain's] name was a deliberate, *false* statement intended to secure an undeservedly higher reimbursement from Medicare." *Id. (emphasis in original)* To that end, Relator states that "the identity of the supervising or providing physician, by name or by his Nation Provider Number, was a *material* false statement." *Id. (emphasis in original)*. This allegation, however does not satisfy the FRCP 12(b)(6) and 9(b) plausibility standards of *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). Merely stating the legal conclusion that the correct listing of a physician's name is material does not satisfy plausibility. The False Claims Act does not punish every alleged violation of Medicare's provider contract, or the Medicare and/or Medicaid Manuals; but instead punishes only those provisions that are material to the government's decision to pay. *United States ex rel. Hobbs v. Medquest Assocs., Inc.*, 711 F.3d 707 (6th Cir., 2012); *United States ex re. Doe v. Jan-Care Ambulance Serv.*, 187 F.Supp.3d 786 (E.D. Ky. 2016). When a claimant knowingly certifies compliance with a regulation or contractual provision which the Government has stated is a condition of payment for such a service, such a violation of a condition of payment could give rise to FCA liability under a "false certification theory." *Hobbs*, 711 F.3d at 714. For a regulatory or contractual provision to be considered a "condition of payment" such that failure to abide by the condition could give rise to FCA liability, compliance with the "particular statute, regulation, or

contractual term [must be] a prerequisite for payment, [such that] failure to comply would render the claim fraudulent." *Chesbrough v. V.P.A., P.C.*, 655 F.3d 461, 467 (6th Cir. 2011). Not every regulatory or contractual violation constitutes a violation of condition of payment rising to FCA liability. *See Universal Health Servs., Inc. v. United States*, 136 S.Ct. 1989, 2003 (2016) ("The False Claims Act is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations.") Instead, the violation of a condition of payment must be material to the decision to pay. *Id.* However, "materiality…cannot be found where noncompliance is minor or insubstantial." *Id.*

In the present case, assuming *en arguendo*, that the Amended Complaint were correct and some physician other than Kirti Jain supervised incident to services for chemotherapy administration, there would still be no materiality as to whether or to what amount the Government would have paid. The act of placing Kirti Jain's name on the claim form did not impact the Government's decision to reimburse the claim. The Government would have reimbursed the claim regardless of whether Dr. Jain or some other physician at the Cancer Centers had been listed on the claim form. The Amended Complaint does not plead that Dr. Jain's name was placed on the form so as to get an otherwise non-reimbursable claim paid, or to get the claim paid at a higher rate than if another physician's name were on the form. Indeed, there is nothing magical about Kirti Jain, at least as it relates to Medicare reimbursement. His reimbursement rate is the same as all other oncologists who provide oncology services (including supervision of incident to services) at the Cancer Centers. The Amended Complaint does not plead that they are reimbursed at a lower rate, and indeed that would not be plausible, given Medicare reimbursement policies.

As the Defendants previously acknowledged in the Motion to Dismiss, the Amended Complaint alleges, at best, a clerical error whereby the incorrect physician was listed on the claim

form. Clerical errors are not actionable under the FCA. *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 413 (6th Cir. 2016). Despite what Relator contends in his Response, this is not due to a lack of intent[4], it is due to a lack of materiality, as the decision of whether to reimburse the claim was never impacted by what physician was listed on the claim form. *U.S. v. United Tech. Corp.*, 626 F.3d 313 (6th Cir. 2010); *See also U.S. ex. rel. Landers v. Baptist Mem'l Health Care Corp.*, 525 F. Supp. 2d 972, 978 (W.D. Tenn. 2007) ("The FCA does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions.") (*internal quotes omitted.)* In fact, Courts have even recognized that the mere fact that an incorrect physician was named on a CMS 1500 form cannot, in and of itself, serve as a basis for FCA liability. *U.S. ex rel. Rockey v. Ear Inst. of Chicago, LLC,* 92 F. Supp 3d 804, 822 (N.D. Ill, 2015).[5]

In the same way, the Amended Complaint fails to plead a plausible claim that the Defendants violated the FCA with its billing for simulation services. The Response elaborates on the Amended Complaint's pleadings, contending that the Amended Complaint alleges that because the Defendant Cancer Centers' documentation for simulation services was not sufficient to satisfy the expectations of the American Medical Association's CPT codes, that the simulation services

[4] Even though the Defendants do not base this argument on Relator's failure to plead intent, it is still accurate that Relator fails to plead sufficient facts to establish intent, even generally. Indeed, even the authority cited by Relator in his Response recognizes that "CMS's physician supervision requirements continue to be an area of uncertainty and confusion" thus undercutting the general pleading of a plausible claim of knowingly submitting false claims. "What You Need to Know About Medicare's Physician Supervision Requirements," Deidre Saulet, The Advisory Board Company (May 13, 2016).

[5] Relator attempts to distinguish *Rockey* by citing *U.S. ex rel. Ortiz v. Mount Sinai Hosp.*, 256 F.Supp.3d 443 (S.D.N.Y. 2017). However this distinction is incorrect. *Mount Sinai* dealt with a scheme in which physicians were named on the CMS 1500 claim forms instead of physicians who had actually performed the service because the physicians who actually performed the service had not yet completed enrollment and were not recognized Medicare providers. In *Mount Sinai*, the act of "doctor swapping" on the claim form was material, where as in *Rockey*, as is the case at bar, there is no allegation that the listing of a different physician than the one who supervised the service had any impact on reimbursement, and thus the different physician listing was not material to the Government's decision to pay. *Rockey* controls in this case and Relator's attempt to distinguish it is without merit.

violated a condition of payment and therefore violated the FCA under a false certification theory of liability. This argument represents a fundamental misunderstanding of the FCA. As the Ninth Circuit so appropriately recognized, "It is not the case that any breach of contract, or violation of regulations or law, or receipt of money from the government where one is not entitled to receive the money, automatically gives rise to a claim under the FCA…The FCA is far narrower. It requires a false claim." *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265 (9th Cir. 1996). Likewise, the Sixth Circuit, recognizing *Hopper*, noted that "violations of regulations alone do not create a cause of action under the FCA" but instead "the fraudulent claim is the *sine qua non* of a False Claims Act violation." *U.S. ex rel. Sanderson v. HCA-The Healthcare Corp.*, 447 F.3d 873, 878 (6th Cir. 2006), (*internal citations omitted.)* The Amended Complaint does not plead that simulation procedures were not provided. The Amended Complaint does not plead that the simulation services were not documented. Even with the benefit of presumption of accuracy, the Amended Complaint merely, at best, pleads that the Cancer Centers' documentation did not rise to the level expected for the CPT code billed. This is not an FCA violation. At most, it is an overpayment. But it is not fraud. As such, the Amended Complaint fails to state a legally viable violation of the FCA and must therefore be dismissed.

WHEREFORE, the Defendants respectfully request that the Motion to Dismiss be GRANTED, and this matter be DISMISSED WITH PREJUDICE.

Respectfully submitted,

*/s/ Christopher A. Melton*
Christopher A. Melton
cmelton@wyattfirm.com
Jacob Eldemire Smith
jeldemiresmith@wyattfirm.com
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street, Suite 2800
Louisville, Kentucky 40202
Telephone: 502.589.5235

*Counsel for Defendant Ashland Bellefonte Cancer Center*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2020, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the Parties.

*/s/ Christopher A. Melton*
Christopher A. Melton

61898044.1