UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT ASHLAND

***Electronically Filed***

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* ROBERT C. O'LAUGHLIN, M.D.<br><br>PLAINTIFFS,<br><br>v.<br><br>RADIATION THERAPY SERVICES, P.S.C. dba ASHLAND BELLEFONTE CANCER CENTER, KIRTI K. JAIN, M.D., P.S.C., dba HIGHLANDS CANCER CENTER, A ONE BIZ SOLUTIONS, LLC, and KIRTI K. JAIN, M.D.<br><br>DEFENDANTS. | ) | CIVIL ACTION NO. 0:16-cv-148-HRW |

**DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT**

This case has been brought by a disgruntled former employee of two of the Defendants, as a Relator. Following an extensive investigation, the United States declined to intervene in the matter against the Defendants, however the Relator has decided to continue to pursue this litigation. The operative Complaints in this case have yet to fully withstand scrutiny and the Relator has spent the past six years re-writing them in hopes of articulating an actionable Complaint. Despite representing numerous curative attempts, the Third Amended Complaint is legally insufficient, pleading purely unsupported legal conclusions and misrepresenting CMS billing guidelines and other federal law. As such, Relator's Complaint must be dismissed.

**BACKGROUND AND ALLEGATIONS OF THE COMPLAINT**

This case was brought by a disgruntled, former employee of the Cancer Centers (defined below) fourteen months after he left their employ. On August 12, 2019, the United States declined

to intervene in this action against Highlands Cancer Center, Ashland Bellefonte Cancer Center, Kirti Jain, M.D., and A One Biz and thereafter requested that this Court unseal the Complaint. [Doc. 34.] The initial Complaint was subjected to a Motion to Dismiss. [Doc. 50.] Before that Motion could be adjudicated, the Relator filed an Amended Complaint. [Doc. 53.] That Complaint was likewise met with a Motion to Dismiss. [Doc. 64.] On October 20, 2020, this Court granted, in large part, that Motion to Dismiss. [Doc. 76.] Several of the Relator's legal claims, including claims that legally misrepresented the supervision requirements for radiation therapy administration, were dismissed *with prejudice*. [*Id.* at p. 10.] Several other legal claims, including claims related to billing for services under the name of an absent physician or billing for incident-to services under an incorrect physician's name were dismissed without prejudice. [*Id*. at pp. 15-22.] The only legal claims that survived the Motion to Dismiss involved claims related specifically to physician services for radiation therapy and documentation claims related to simulation procedures, and to the extent that it related to those isolated issues, the conspiracy claim remained.

Rather than to make a good-faith curative effort, the Relator essentially re-filed the Amended Complaint with some cosmetic alterations, while captioning it as the Second Amended Complaint. [Doc. 91.] Once again, the Defendants moved this Court to dismiss the Second Amended Complaint. [Doc. 95.] Relator curiously acknowledged that the Motion to Dismiss the Second Amended Complaint was well-founded and urged the Court to allow him leave to file yet another amendment to the Complaint. [Doc. 102.] This Court granted Relator leave to file a Third Amended Complaint, while offering the strict warning that it would not permit any further amendments. [Doc. 123.]

The Third Amended Complaint alleges that Ashland Bellefonte Cancer Center ("ABCC") and Highlands Cancer Center ("HCC") (collectively, "the Cancer Centers") are physician-owned

medical and radiation oncology and hematology clinics which treat vulnerable cancer patients in Ashland and Prestonsburg, KY, respectively. [Doc. 124 at ¶¶ 8-11.] The Cancer Centers are wholly owned by Dr. Kirti Jain, a medical oncologist whose practice is concentrated in the areas of blood and cancer care and internal medicine. [*Id.* at ¶¶ 6-11.] Like many providers, the Cancer Centers do not submit their claims for services rendered to patients directly to payors, but instead employ a billing company, specifically A One Biz Solutions LLC ("A One Biz"), which is located in Miramar, Florida. The Third Amended Complaint alleges that Manish Jain was a manager at Ashland Bellefonte Cancer Center, and Logan Cancer Center and was a member and manager at A One Biz Solutions. [*Id.* at ¶ 14-16.] Like the numerous preceding complaints, the Third Amended Complaint alleges that A One Biz, through Manish Jain, employed a process of "scrubbing" claims prior to submission to ensure that claims would be eligible for payment and would be properly adjudicated. [*Id.* at ¶ 40.] In pleading this way, the Third Amended Complaint attempts to plead that "scrubbing" of claims is equated with fraud, but does not offer any definition or description of what "scrubbing" actually is. As it applies to medical billing, a "scrub" is recognized as an "internal control to ensure claims are processed for NCCI [National Correct Coding Initiative] edits before submission."[1] As such, the process of "scrubbing" claims is essentially a pre-submission dry-run of adjudication of the claim to ensure that it is properly coded and eligible for reimbursement. Rather than being a fraud scheme, "scrubbing" is a recognized tool for preventing fraudulent overpayments. *Id.* ("Scrubbing prevents fraudulent overpayments. To prevent an inflated charge, the hospital should edit the claim (scrub) . . . Consistent failure to scrub hospital claims to avoid unbundling may be considered intentional and . . . even fraudulent

---

[1] Brian Meredith, Fit NCCI Edits into Hospital Chargemaster Before Claims Submission, AMERICAN ACADEMY OF PROFESSIONAL CODERS Knowledge Center (Sept. 11, 2018), www.aapc.com/blog/43826-fit-ncci-edits-into-hospital-chargemaster-before-claims-submission/.

. . . Accordingly some payers…are adopting policies that include mandatory inpatient claim scrubbing.") In attempting to plead "scrubbing" in such a way as to insinuate that it is a fraudulent scheme,[2] the Third Amended Complaint mischaracterizes "scrubbing" as a nefarious scheme, when, in fact, the opposite is actually the case. After introductory statements about the Cancer Centers, Dr. Jain, Manish Jain and A One Biz, the Third Amended Complaint quickly groups all of the parties together and thereafter refers to them as "Defendants."

The Third Amended Complaint continues in the tradition of the Relator's former complaints inasmuch as it continues to plead the rejected theory that the Defendants' radiation oncology claims were false because they were not "provided under the direct or personal supervision of physicians" and were not "personally performed by [the] qualified physicians identified in those claims." [Doc. 124 at p. 1.] To that end, the allegations of the Third Amended Complaint are best summarized as a continuation of the "Named Physician" claims pleaded in previous complaints. In this way, the Third Amended Complaint, like Relator's previous complaints, continues to plead that the Defendants' claims for life-saving cancer treatments and services were false simply because the wrong physician's name was listed on the claim form.

The Third Amended Complaint pleads uncited and conclusory descriptions of the backgrounds of the services provided by the Cancer Centers, including offering the Relator's own summation of what constitutes "radiation oncology" and a "radiation oncologist". [Doc. 124 at ¶¶ 27-28.] The Third Amended Complaint also provides conclusory over-simplifications of the nature of complex coding structures for radiation therapy procedures. [*Id.* at ¶¶ 31-39.] For example,, Relator's pleadings attempt to provide, albeit incorrectly, a rudimentary understanding of the professional versus technical aspects of these services. These pleadings also recognize that

[2] The Third Amended Complaint does not actually plead how the "scrubbing" effectuated fraud, but instead makes conclusory statements and insinuations.

not all relevant service are provided by physicians (and, in fact, most are purely technical services). For these services, Relator shifts to pleading an even more overly-simplified description of the supervision requirements for these services. [*Id.* at ¶¶ 32-39.]

The Third Amended Complaint, like the defective complaints that Relator filed before it, pleads that an error in documentation, such as listing the incorrect physician on the claim form, constitutes fraud. Specifically, Relator pleads that having the correct "name and National Practitioner Identifier ("NPI") number of the treating practitioner listed on the claim form . . . was a precondition and material for payment." [*Id.* at ¶ 41.] In doing so, Relator continues the fallacious pattern that he engaged in throughout all of the previous complaints that he filed in this case--namely equating an error in documentation to a false claim.

As to the actual legal claims, Count I of the Third Amended Complaint is essentially a re-hashing of Count I of the defective Second Amended Complaint. While the Relator pleads some re-tooled language, the allegations stay essentially the same. Both the Second and Third Amended Complaints plead that the Defendants submitted claims to the federal government "for radiation oncology services supposedly provided to patients by Robert O'Laughlin, M.D." [Doc. 91 at ¶ 46; Doc. 124 at ¶ 49.] The Second Amended Complaint alleged that of these claims, "many were false and fraudulent, in that they stated that Dr. O'Laughlin provided, or supervised, the radiation oncology services billed in these claims, whereas in truth and in fact: (a) Dr. O'Laughlin *did not* provide these services; (b) Dr. O'Laughlin *did not* supervise the provision of these services; and (c) the provision of these services was not delegated to physician qualified to perform the radiation oncology services." [Doc. 91 at ¶ 47.]

The Third Amended Complaint alters this language slightly, but with no real effect, pleading that of these claims, "many were false and fraudulent, in that they stated that Dr.

O'Laughlin provided the radiation oncology services billed in these claims, whereas in truth and in fact these services were not provided by Dr. O'Laughlin nor by any physician qualified to perform the radiation oncology services." [Doc. 124 at ¶ 50.] All other aspects of the pleading of Count I essentially remain the same[3]. To this extent, the Third Amended Complaint actually pleads *less* of a legal claim against the Defendants than was pleaded previously. The Third Amended Complaint retains the pleading of the defective Second Amended Complaint that the Defendants billed for radiation therapy services with Dr. O'Laughlin's name listed on the claim form when Dr. O'Laughlin did not perform the services. The Third Amended Complaint also pleads that the services were not performed by "a qualified radiation oncologist," thereby retaining the same defective pleading and the same defective qualification standards that were present in the Second Amended Complaint. The Third Amended Complaint, however, discards the insufficient supervision allegations that were present in the Second Amended Complaint. The Third Amended Complaint still pleads as an example, one patient who was seen at Logan Cancer Center—an entity that has been dismissed from this action. [Doc. 124 at ¶¶ 54-56.] Count II of the Third Amended Complaint is a verbatim recitation of Count II of the defective Second Amended Complaint.

Count III of the Third Amended Complaint shares an identical format and nearly identical content with the pleading of Count III of the Second Amended Complaint. Still, it contains a new title—"False Claims Regarding Patients Supposedly Treated or Supervised by Physicians." [Doc. 124 at p. 29.] Count III of the Third Amended Complaint alleges that the Defendants defrauded the government by submitting claims "for radiation oncology services supposedly provided to patients by physicians who were, in fact, not present in the facilities where these services were

[3] The only alteration in Count I is that the Third Amended Complaint omits one of the representative example patients, "Patient P-2", who was pleaded on the Second Amended Complaint. [Doc. 91 at ¶¶ 51-55.]

supposedly rendered." [*Id.* at ¶ 78.] The Relator refers to these as the "Absent Physician claims." [*Id.*] As in previous defective pleadings, this allegation merely alleges that the physician named on the claim form did not perform the services. However, the Third Amended Complaint does, after six years of this case pending and three previous pleadings being filed, for the first time allege that "no physician provided these services; no physician provided direct or personal supervision of the provision of these services; and no physician was on the premises when these services were provided." [*Id.* at ¶¶ 79, 80.] While the Third Amended Complaint added a patient who had not been pleaded previously as a representative example, P-2, this patient received services at Logan Cancer Center, which has been dismissed from this action. [Doc. 124 at ¶¶ 85-88.] Count IV of the Third Amended Complaint, which pleads a false presentment claim that is meant to piggyback off of the pleadings of Count III, is a near-verbatim recitation of Count IV of the defective Second Amended Complaint. The only cosmetic change is that the Relator now pleads that "neither the Named Physician, nor any physician" provided or supervised the services billed or were on the premises when the services were performed, whereas the previous complaints pleaded that "Neither the Named Physician, nor any qualified physician" were involved in the provision of services.

Count V of the Third Amended Complaint mirrors the Count V of the defective Second Amended Complaint in that it pleads that the Defendants billed for chemotherapy services that were provided by nurse practitioners, and not by physicians. [*Id.*at ¶¶ 118-163.] As has been noted in previous filings and in this Court's previous Orders dismissing these legal claims, chemotherapy delivery is not typically performed by a physician, but instead is typically performed by a nurse practitioner as an "incident to" service. [Doc. 76 at p. 22.] Relator's refusal to accept this fact is evident in the Third Amended Complaint, which pleads that the performance of the

service by a physician is a "precondition[] and material for the payment of the NPP claims, as the Contractors to which the Defendants presented these claims would not have made payments in the amounts that they actually paid had they known that the services had been provided to patients by NPPs and not by physicians." [Doc. 124 at ¶122.] The Third Amended Complaint deviates from the previous pleadings in that, after six years and four attempts to plead an actionable case, the Relator now adds additional language to the same recycled claims and representative examples that not only did the listed physician not provide the services, but the services were delivered by the nurse practitioner without supervision "by any physician." [*Id.* at 127.] The Third Amended Complaint pleads therefore, that the services are exempt from "incident to" billing. [*Id*. at ¶ 131.] Count VI of the Third Amended Complaint likewise pleads that the submission of the claim forms for chemotherapy administration services contained false statements because they stated "that a particular physician, this being Dr. Kirti K. Jain, provided these services to these patients, whereas in truth and in fact…neither Dr. Kirti K. Jain nor any physician provided or directly or personally supervised these services." [*Id.* at ¶ 166.] However, as will be discussed at more detail, below, chemotherapy services do not require performance or supervision by a physician, but are reimbursable if they are provided, or even supervised by a nurse practitioner or physician assistant, as the Third Amended Complaint pleads was the case here.

The Third Amended Complaint also maintains the same "false presentment" theory related to simulation services in Count VII. Like the previous complaints, the Third Amended Complaint alleges that the Defendants submitted claims for simulation procedures which implicitly certified that the treating physician prepared, and signed or initialed, a record of the simulation, and that the Defendants maintained the requisite documentation of the simulation procedures, when one or all of these conditions were not satisfied. [Doc. 124 at ¶179.] The Third Amended Complaint alleges

that such documentation is a "precondition[] and material for payment" such that the failure to document is considered fraudulent. [*Id*. at ¶ 180.] Finally, the Third Amended Complaint also included a catch-all civil conspiracy claim (Count VIII.)

**ARGUMENT**

The Third Amended Complaint represents the Relator's fourth-bite at the pleading apple. Despite having six years and four complaints, the Relator continues to struggle to articulate an actionable case against the Defendants. Instead, the Third Amended Complaint maintains the same misstated legal conclusions and conflated requirements for payment that cannot justify this case proceeding any further. For these reasons, the Motion to Dismiss should be granted.

I. THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM WITH PARTICULARITY UNDER FED R. CIV P. 12(b)(6) AND 9(b).

A. The FRCP 12(b)(6) and 9(b) Pleading Standard

It is well settled that the primary function of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the legal sufficiency of the complaint. *See, e.g., Denton v. Bedinghaus*, 40 F. App'x 974, 976-77 (6th Cir. 2002). The United States Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007), ushered in a new pleading standard that moved away from the pure notice pleading standard that had previously been employed by the Federal Rules of Civil Procedure. *See In re Travel Agent Com'n Antitrust Litig.*, 583 F.3d 896, 911-12 (6th Cir. 2009) (recognizing need for more than simple notice and conclusory statements of ultimate facts about the case subsequent to *Twombly*). Two years later, in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court clarified that the new *Twombly* standard and asserted that while the new pleading standards governing Rule 8(a) do not require "detailed factual allegations," they do require "factual enhancement." *Id*. at 1949. Only "a complaint that states a plausible claim for relief" will survive a motion to dismiss. *Id*. at 1950. This is a "context–specific task" requiring

the court "to draw upon [its] judicial experience and common sense." *Kiser v. Kamdar*, 831 F.3d 784, 787 (6th Cir. 2016) (citations omitted).

In deciding a 12(b)(6) challenge, the Court must accept all well-pleaded factual allegations as true. *Rodriguez v. Honigman Miller Schwartz & Cohn LLP*, 465 F. App'x 504, 507 (6th Cir. 2012). The Court is not required, however, to accept conclusory legal allegations as correct. *Id*. Instead, when a party chooses to plead a legal theory in the complaint, that complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436-37 (6th Cir. 1988) (citation omitted). Perhaps most importantly, courts must keep in mind that "[t]hread-bare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949 (*quoting Twombly*, 550 U.S. at 555). Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950. These requirements were even required under the more relaxed "notice pleading" standard that existed prior to *Iqbal* and *Twombly*.

In evaluating the purported claims that are pleaded, the Court must do so while taking consideration of *Iqbal*'s plausibility standard. The Court's analysis does not stop with this standard, however. Because Relator's claims are rooted in allegations of fraud, his claims are analyzed under the exacting standard imposed by Rule 9(b): "In alleging fraud or mistake, a party *must state with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b)(emphasis added). Hence, under the applicable rules, Relator is required to plead with particularity claims that are plausible without solely relying on mere conclusory statements or legal conclusions—Relator's *factual* claims must be able to withstand this rigorous scrutiny.] Again,

specifically, any claims that are pleaded as potential representative examples of fraud must be pleaded in such a way to be more than "mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949. Conclusory allegations are not entitled to any presumption of truth. *Rodriguez v. Honigman Miller Schwartz & Cohn LLP*, 465 Fed. Appx. 504, 507 (6th Cir. 2012). Likewise legal conclusions are not entitled to any presumption of truth. *Lewis v. ACB Business Services, Inc.,* 135 F.3d. 389, 405 (6th Cir. 1998), ("Only well-pleaded facts, however, must be taken as true. The trial court need not accept as true legal conclusions or unwarranted factual inferences.")

B. The Elements of the False Claims Act

In order to satisfy an FCA claim, the government must prove the following elements:

> First, the defendant must have made a false statement or created a false record, and must have done so with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information. Second, the defendant must have submitted a claim for payment to the federal government. Third, the defendant's false statement must have been made with the purpose of getting a false or fraudulent claim paid or approved by the government. Finally, the defendant's false statement or record must have been material to the government's decision to make the payment sought in the defendant's claim.

*U.S. ex rel. SNAPP, Inc. v. Ford Motor Co*., 532 F.3d 496, 505 (6th Cir. 2008) (citations omitted). The FCA requires a showing of a scheme to defraud; innocent mistakes or mere negligence are not actionable. *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 413 (6th Cir. 2016). To that extent, in order to be actionable under the False Claims Act, a claim must include a false statement that is material to the government's decision to pay a claim. *U.S. ex. rel. A+ Homecare, Inc. v. Medshares Management Group, Inc*., 400 F.3d 428, 442-443 (6th Cir. 2005). In determining materiality, only actual, and not theoretical or conjectural, damages are recoverable under the FCA. *U.S. v. United Technologies Corp.*, 626 F.3d 313 (6th Cir. 2010).

C. Supervision as a Condition of Payment

The False Claims Act does not punish every alleged violation of Medicare's provider contract, or the Medicare and/or Medicaid Manuals; but instead punishes only those provisions that are material to the government's decision to pay. *United States ex rel. Hobbs v. Medquest Associates, Inc.,* 711 F.3d 707 (6th Cir., 2012); *United States ex re. Doe v. Jan-Care Ambulance Service*, 187 F. Supp. 3d 786 (E.D. Ky., May 11, 2016). When a claimant knowingly certifies compliance with a regulation or contractual provision which the Government has stated is a condition of payment for such a service, such a violation of a condition of payment could give rise to FCA liability under a "false certification theory." *Hobbs*, 711 F.3d at 714. For a regulatory or contractual provision to be considered a "condition of payment" such that failure to abide by the condition could give rise to FCA liability, compliance with the "particular statute, regulation, or contractual term [must be] a prerequisite for payment, [such that] failure to comply would render the claim fraudulent." *Chesbrough v. V.P.A., P.C.,* 655 F.3d 461, 467 (6th Cir. 2011). Not every regulatory or contractual violation constitutes a violation of condition of payment rising to FCA liability. *See Universal Health Services, Inc. v. United States*, 136 S.Ct. 1989, 2003 (2016) ("The False Claims Act is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations.") Instead, the violation of a condition of payment must be material to the decision to pay. *Id.* However, "materiality…cannot be found where noncompliance is minor or insubstantial." *Id.*

For incident-to services, the only condition of payment which is in question is the requirement of supervision. The Third Amended Complaint, however, mischaracterizes the supervision requirements, incorrectly pleading that chemotherapy services must be supervised by a physician in order to be payable. Federal law permits reimbursement for chemotherapy services

whether they are performed by an non-physician practitioner ("NPP") such as a physician's assistant or nurse practitioner, or even performed by some other auxiliary personnel under the supervision of an NPP. Further, the Third Amended Complaint mischaracterizes many of the radiation therapy services as professional services rather than merely technical services, and once again conflates the requirements of the provider of the service such that it pleads a higher level of qualification for the service provider than is actually required. These summaries of billing requirements within the Third Amended Complaint are demonstrative of legal conclusions, not entitled to any presumption of truth. *Lewis,* 135 F.3d. at 405. Because the Third Amended Complaint continues to enlarge the requirements for payment beyond the actual regulatory requirements, the legal claims are fundamentally flawed and must therefore by dismissed.

## II. THE THIRD AMENDED COMPLAINT FAILS TO STATE A CLAIM REGARDING PROFESSIONAL SERVICES NOT PROVIDED BY A "QUALIFIED PHYSICIAN" IN COUNTS I AND II, AS WELL AS THE SIMULATION CLAIMS OF COUNT VII AS THEY ARE BASED UPON ALLEGED REQUIREMENTS THAT ARE NOT ESTABLISHED IN THE RELEVANT REGULATIONS.

### A. THE ALLEGED "PROFESSIONAL SERVICES" OF COUNTS I AND II.

Following this Court's October 20, 2020 Order dismissing, in part, the First Amended Complaint, the only remaining claims at issue in this case were those based upon allegations of Counts I and II that Defendants falsely certified that certain professional radiation oncology services were performed by Relator or another qualified radiation oncologist, when they were not performed by a qualified radiation oncologist. [Doc. 76 at 29.] The Order also allowed allegations of lack of documentation related to simulation procedures in Count VII and the conspiracy claim of Count VIII to proceed to discovery. [*Id.*] In the October 20th Order, the Court noted that it was only allowing those claims to proceed because of certain legal issues that the Defendants failed to address in the initial Motion to Dismiss, which allowed these claims to proceed to discovery. [*See id.* at p. 10]. While the Third Amended Complaint made changes to the language which articulated

their legal claims, the substance has remained unchanged since the Amended Complaint. With respect to Counts I and II of the Third Amended Complaint, the Relator pleads that the Defendants committed fraud by billing for radiation therapy services that were not performed by a qualified radiation oncologist and that the Defendants falsely certified that a qualified physician reviewed and approved guidance images. [Doc. 124 at ¶ 64.]

With regard to the professional services, the Third Amended Complaint alleges that these services must be performed by "a qualified radiation oncologist." [*Id.* at ¶ 34.] The Relator contends that these qualifications are necessary "to ensure that the physician properly targets the diseased tissue to be treated by radiation; and the physician can implement real-time corrections to the imaging device at the time of treatment." [*Id.* at ¶ 35.] Conspicuously absent from the Third Amended Complaint, however, is any citation as to where these "qualifications" come from. The Third Amended Complaint alleges that several, but not all, of the billing codes utilized by the Defendants had a professional component. [*Id.* at ¶ 33.] And the Complaint pleads the conclusory statement that these professional components were not met by "qualified physicians." [*Id.* at ¶¶50, 64.] But it is apparent from the pleadings of the Third Amended Complaint that these "qualifications" alluded to by the Relator are not based in law, but are merely conclusory and do not satisfy the pleading requirements.

Indeed, it is equally apparent that the pleading of Counts I and II of the Third Amended Complaint essentially serves as an attempt to resurrect the previously-rejected legal theory that a radiation oncologist must be present to supervise radiation treatment delivery. This is apparent in the Relator's rationale that a qualified physician is equated to a "qualified radiation oncologist" [*Id.* at ¶ 34] and that the physician must be a radiation oncologist so that "the physician can implement real-time corrections to the imaging device at the time of treatment." [*Id.* at ¶ 35.] This

rationale for the Relator's proffered requirements is not in line with federal law, which has recognized that Medicare does not require a radiation oncologist to be present when radiation therapy is administered. *See United States v. Space Coast Med. Assocs., L.L.P.,* 94 F. Supp. 3d 1250, 1261 (M.D. Fla. 2015) (striking down a complaint that pleaded "only an absence of a radiation oncologist present in the facility, not an absence of any physician," and finding that the complaint "does not state a violation of the Medicare Benefit Policy Manual.") The Third Amended Complaint's pleading that the services that the Defendants provided were required to be provided by a "qualified radiation oncologist" is a legal conclusion, which runs contrary to federal law, and fails to satisfy pleading requirements. Counts I and II must therefore be dismissed.

The Third Amended Complaint also pleads that "the supervision requirements of CMS" include a requirement that "a qualified radiation oncology physician must review and approve guidance images that were produced prior to each daily treatment within 24 hours or prior to the next treatment delivery." [DN 124 at ¶ 39.] This allegation is parroted from Paragraph 38 of the Amended Complaint, and the Defendants failed to address it in their Motion to Dismiss that Complaint. Therefore, the Court, while dismissing Counts I and II with prejudice, originally allowed discovery to proceed regarding whether the Defendants falsely certified that this "requirement" was satisfied. While absent in their first Motion, Defendants addressed this allegation in the Motion to Dismiss the Second Amended Complaint and now once again address it in the Motion to Dismiss the Third Amended Complaint.[4]

Relator twice pleads in the Third Amended Complaint the legal conclusion that guidance images must be reviewed by a "qualified radiation oncology physician" within 24 hours or prior to the next treatment delivery." [*Id.* at ¶¶ 39, 64.] However the Third Amended Complaint does

[4] The Motion to Dismiss the Second Amended Complaint was denied as moot following the Court's granting of leave to the Relator to file a Third Amended Complaint. Therefore, this issue has not yet been addressed.

not provide any citation to any such requirement, which makes clear that this is nothing more than a conclusory allegation that is insufficiently pleaded. *Twombly,* 550 U.S. at 555. Further, no such requirement seems to appear in Chapter 13 of the Medicare Claims Processing Manual, which addresses Radiology Services and other Diagnostic Procedures or in Chapter 15 of the Medicare Benefit Policy Manual, which addresses Covered Medical and Other Health Services. T Even more so, the pleaded allegation runs contrary to guidance provided by professional service organizations such as the American Society of Radiation Oncology ("ASTRO"). In January of 2013, ASTRO published its "Health Policy Coding Guidance for Image Guided Radiation Therapy-Coding and Physician Supervision Guidelines" whereby it noted that "A radiation oncologist, or *a medical physicist or trained therapist* under the direct supervision of the radiation oncologist, reviews the automated image fusion and makes manual or automatic adjustments as necessary." [Do. 66-1 at p. 4.] Therefore, ASTRO has acknowledged that the review of guidance images need not be performed by the radiation oncologist, but can be performed by "a medical physicist or trained therapist" under the supervision of the radiation oncologist. Because the Third Amended Complaint only pleads that the guidance images were not reviewed by a radiation oncologist, it fails to plead an actionable claim under Rule 12(b)(6) and Counts I and II must be dismissed.

B. SIMULATION DOCUMENTATION CLAIMS IN COUNT VII.

Finally, the Third Amended Complaint pleads nearly identical allegations as the Amended and Second Amended Complaints with regard to simulation services encompassed within Count VII. Both the Amended and Second Amended Complaint pleaded that the Defendants violated the FCA by falsely certifying that documentation requirements and retention were satisfied, including that treating physician prepared a record of the simulation procedure and signed or

initialed the record, when this was not the case; and that a radiation oncologist had performed the simulations, when the radiation oncologist had not, in fact performed the simulation. [DN 91 at ¶¶ 177-185.] Again, when faced with the exact same pleading, this Court dismissed Count VII to the extent that it alleged that Defendants falsely certified that a radiation oncologist performed the simulation services, because the services were, in fact, not required to be performed by a physician, but need only have been supervised by a physician. [DN 76 at 14.] The Order of dismissal, however noted:

> Yet, Relator raises another basis for liability with regard to simulation services in the Amended Complaint. . . Count VII also alleges that "[t]he simulation claims were false and fraudulent, in that they represented by implication that the required documentation had been prepared by the treating physician and was maintained by the Defendants, whereas in truth and fact: (a) the treating physician did not prepare a written record of the simulation procedure, (b) the treating physician did not sign or initial a written record of the simulation procedure; and (c) the Defendants did not possess or maintain the Required Documentation.

[DN 76 at 14-15, quoting DN 53 at ¶181.] The Court noted that failure to document does not, in and of itself amount to a violation of the FCA. *U.S. ex rel. Sanderson v. HCA-The Healthcare Co.,* 447 F.3d 873, 878 (6th Cir. 2006). Still, the Court acknowledged that failure to document can be the basis for a violation if the documentation is a condition of payment. *Chesbrough v. VPA, P.C.,* 655 F. 3d 461, 467 (6th Cir. 2011). The Court went on to state that "Defendants do not specifically argue that the documentation requirements at issue were not a precondition of payment. . . . Accordingly, Defendants have not shown that dismissal of these documentation-related claims regarding simulation services is warranted at this time." [DN 76 at 15.] The Third Amended Complaint adopts the allegations of the Amended Complaint to Count VII that the Defendants' "Simulation claims were false and fraudulent, in that they represented by implication that the required documentation had been prepared by the treating physician and was maintained by the Defendants, whereas in truth and in fact, the treating physician did not prepare a written

record of the simulation procedure; the treating physician did not sign or initial a written record of the simulation procedure; and the Defendants did not possess or maintain the Required Documentation." [Doc. 124 at ¶179.] Defendants now affirmatively argue that these documentation requirements set forth in the Third Amended Complaint are not preconditions of payment for simulation services.

Once again, the Third Amended Complaint contains no reference to CMS policy to establish this supposed precondition of payment. Instead, the Third Amended Complaint impermissibly attempts to establish this condition through articulations of legal conclusions, which are not entitled to deference. *Twombly,* 550 U.S. at 555. Moreover, this alleged condition is notably absent from guidance published by CMS' agents.

Noridian Healthcare Solutions serves as a Medicare Administrative Contractor ("MAC"), who acts as a fiscal agent for Medicare, administering the Medicare Program and processing claims. As a MAC, part of Noridian's role is to provide guidance as to Medicare conditions of payment through the issuance of published guidance. Among Noridian's published guidance includes guidance related to documentation requirements for radiation oncology services.[5] Aside from a general requirement that simulation services, like all oncology services, must contain sufficient documentation to establish medical necessity, Noridian's guidance does not identify any requisite documentation for these procedures which would serve as a prerequisite for payment for the services. As such, the Third Amended Complaint fails to state an actionable claim, since documentation errors, in and of themselves, cannot serve as the basis of a FCA violation. The burden is on the Relator to plead with requisite particularity that the documentation is a condition

---

[5] https://med.noridianmedicare.com/web/jfb/specialties/radiation-oncology#documentation

of payment. Because the Third Amended Complaint merely pleads this allegation through threadbare legal conclusions, the pleading standards are not met and Count VII must be dismissed.

## III. COUNTS III AND IV OF THE THIRD AMENDED COMPLAINT FAIL TO STATE A CLAIM AS THEY MISCHARACTERIZE THE SERVICES THAT WERE RENDERED AND FURTHER MISCHARACTERIZE PURELY TECHNICAL SERVICES AS PROFESSIONAL SERVICES.

The Third Amended Complaint pleads in Count III that the Defendants violated the FCA by billing "for radiation oncology services supposedly provided to patients by physicians who were, in fact, not present in the facilities where these services were supposedly rendered." [Doc. 124 at ¶ 78.] Count IV of the Third Amended Complaint pleads a related "false statement" claim based upon the same allegations. [*Id.* at ¶¶ 111-117.] The Relator elaborated on these salacious claims by pleading that the claims were false and/or fraudulent because "they stated that a physician provided or supervised services, including the technical component of these services, billed in these claims, whereas in truth and in fact no physician provided these services; no physician provided direct or personal supervision of the provision of these services; and no physician was on the premises when these services were provided." [*Id.* at ¶¶ 79,80.] From the outset, it should be noted that these allegations were thoroughly investigated by the United States Department of Justice and that investigation led to the DOJ's declination decision. Second, Relator's representative examples include claims that were purportedly submitted by Logan Cancer Center, an entity that is no longer a defendant in this case. Finally, the representative examples that Relator pleads in this case involve overwhelmingly technical, and not professional claims, which do not require a physician to perform. [*see id.* at ¶ 86 (all technical claims); 94 (only one professional code).]

Of the codes that are pleaded as fraudulently billed within Count III of the Third Amended Complaint, only two are professional codes that would have been performed by a physician. These

two codes are 77421, which is the code for Stereoscopic X-Ray Guidance for Localization of Target V; and 78815, which is the code for PET with CT for attenuation correction. These two codes accompany radiation delivery and are essentially codes for services relating to interpretation of radiological procedures. These services do not necessarily have to be performed on the premises in order to be reimbursable. The interpretation of radiological testing or films are routinely performed outside the purview of a patients and are not performed at the point of care. An allegation that the physician performed these technical services while not present in the facility is not an articulation of an actionable claim. Therefore, even taking the pleading of Counts III and IV and giving them the presumption of truth, they still would not suffice to allege a claim, because most of the claims are technical in nature and are not performed by a physician, while the few that do supposedly have a professional component are not of the variety that a physician would need to even be in the premises to render the professional service.

As such, Counts III and IV of the Third Amended Complaint fail to plead a claim with particularity upon which relief may be granted. As such, they must therefore be dismissed.

## IV. COUNTS V AND VI FAIL TO STATE A CLAIM AND MUST BE DISMISSED AS THEY FUNDAMENTALLY CONFLATE THE REIMBURSEMENT REQUIREMENTS FOR CHEMOTHERAPY ADMINISTRATION.

The Relator has offered slight alterations of his pleadings related to chemotherapy services throughout each step of his pleading, but has never been able to articulate an actionable claim. The Third Amended Complaint continues this trend and ultimately fails to state a valid legal claim as well. Whereas previously, the Amended Complaint alleged that the Defendants fraudulently represented "chemotherapy services . . . as having been provided by Kirti K. Jain, M.D., but which were in fact provided by a physician's assistant or a nurse practitioner," [DN 53 at ¶¶129, 137, 145, 153] the Second Amended Complaint added an additional descriptor, to state that the Defendants

fraudulently represented "chemotherapy services…as having been provided by Kirti K. Jain, M.D., but which were in fact provided not by Dr. Kirti K. Jain or by any physician, but by a physician's assistant or a nurse practitioner." [DN 91 at ¶¶ 131, 139, 147, 155.] Now, having deficiently pleaded these claims on two previous occasions, the Third Amended Complaint pleads that the Defendants fraudulently submitted claims for chemotherapy services that represented "that the services included in these claims had been provided to patients by physicians, whereas, in truth and in fact, such services had been provided by NPPs, and been neither provided by nor directly or personally supervised by physicians." [Doc. 124 at ¶ 121.] Specifically, the Third Amended Complaint further pleads that these claims "were in fact neither provided nor supervised by Dr. Kirti K. Jain or by any physician, but were provided by a physician's assistant or a nurse practitioner." [*Id.* at ¶ 127.] The Third Amended Complaint refers to these claims as the "NPP claims," because the services were performed by non-physician providers. [*Id.* at 119.]

Over the course of the six years that this case has been pending, the Relator has claimed that the Defendants' chemotherapy claims are fraudulent because (1) the physician named on the claim did not perform the services; (2) the physician named on the claim did not perform or supervise the services; and now (3) the services were performed by non-physician providers, and were not performed or supervised by a physician. None of these allegations plead a legally actionable violation, however. Simply put, there exists no requirement by CMS or any other federal law that chemotherapy services be performed or supervised by a physician. To the contrary, federal law recognizes that chemotherapy services can be performed, and/or supervised by an NPP. *What You Need to Know about Medicare's Physician Supervision Requirements*, ADVISORY BOARD: THE BLOG (March 29, 2018) **https://www.advisory.com/blog/2018/03/what-you-need-to-know-about-medicares-physician-supervision-requirements** (noting that

"chemotherapy supervision in the freestanding setting . . . can be performed by either a physician or an AP.") [EX 1.] Advanced Practitioners, or APs include NPPs.[6] [EX 2.] Indeed, CMS has recognized as much, having stated:

> On days when a patient receives chemotherapy administration but the physician has no face-to-face contact with the patient, the physician may report and be paid for "incident to" services furnished by one of the physician's employees, in addition to the chemotherapy administration, if they are furnished under direct personal supervision in the office **by one of the physician's employees** and the medical records reflect the physician's active participation in and management of the course of treatment."

*Medicare Carriers' Manual,* Transmittal 1776; HN 15400(D), October 25, 2002 (emphasis added). [EX 3.] Therefore, the allegations of the Third Amended Complaint that the Defendants "fraudulently represented [chemotherapy claims] as having been provided by Kirti K. Jain, M.D. but which were in fact neither provided not supervised by Dr. Kirti K. Jain or by any physician, but were provided by a physician's assistant or a nurse practitioner" [Doc. 124 at ¶ 127] do not state an actionable claim, as chemotherapy services are allowed to be provided or even supervised by nurse practitioners or physician assistants, and are still reimbursable.

The Relator further pleads within the Third Amended Complaint that none of the chemotherapy "services was [*sic*] provided 'incident to' the service of Dr. Kirti K. Jain or any physician. . . as these services were not provided under the direct supervision of Dr. Kirti K. Jain or any physician." [*Id.* at ¶131.] However, this pleading completely misconstrues the applicable regulations, as "incident to" services need not be supervised by a physician in order to be reimbursable. To the contrary, 42 C.F.R. §410.26(b) clearly states that "Medicare Part B pays for services and supplies incident to the service of a physician (*or other practitioner*)." (*emphasis in original*). The term "practitioner," which appears in the parenthetical, is defined as "an

[6] https://integrisok.com/resources/on-your-health/2020/february/advanced-practice-providers

individual credentialed within a recognized health care discipline and involved in providing the services of that discipline to patients." 42 C.F.R. §480.101. NPPs such as physician assistants and nurse practitioners have long been recognized to fit within 42 C.F.R. §480.101's definition of "practitioner" and have consistently been noted to be "credentialed within a recognized healthcare discipline and involved in providing services of that discipline to patients" in situations involving chemotherapy. The Third Amended Complaint simply misstates the law. CMS **does** reimburse for chemotherapy services that are provided and/or supervised by an NPP, even if a physician is not providing supervision. And this allowance is in line with the regulatory mandates for "incident to" billing, which allows for supervision by "practitioners" like those that the Third Amended Complaint pleads were intimately involved in the care that was delivered in this case.

Finally, the Third Amended Complaint's contention that the services delivered by NPPs should have been subject to a reimbursement reduction of eighty-five percent (85%) of the physician fee schedule [Doc. 124 at ¶ 119] once again ignores the nature of the services that are at issue in this case. The reimbursement limitations that the Third Amended Complaint refers to apply only to "physician assistant's, nurse practitioner's, and clinical nurse specialists' services, and services and supplies furnished incident to their ***professional services***." 42 C.F.R. §405.520(a) (emphasis added). Chemotherapy services are not "professional services" under this regulatory structure, but instead have been recognized as an "in-office ancillary service" and not a "professional service." 69 Fed. Reg. 16105, 16070. This is why an oncology office can provide chemotherapy services to their patients without running afoul of the STARK law. 42 C.F.R. §411.355(b). This is also intuitive, as drug administration through injections and infusions is not typically a service that is provided by a physician, but instead is most often provided by auxiliary personnel other than the physician. Indeed, if an 85% reimbursement limitation were placed upon

chemotherapy services rendered by an NPP, then the service would essentially *never* be reimbursed at 100% of the fee schedule, because chemotherapy administration is simply not a service provided by physicians. Therefore, it only makes sense that CMS would choose to recognize that chemotherapy administration is an "in-office ancillary service" and not a "professional service." Because of this distinction, the 85% reimbursement limitation of 42 C.F.R. §§ 414.52 and 424.56 do not apply. The Third Amended Complaint fails to state an actionable claim against the Defendants related to their chemotherapy administration and must therefore be dismissed.

V. <u>THE CONSPIRACY CLAIM MUST BE DISMISSED.</u>

The Sixth Circuit has acknowledged that a successful civil conspiracy claim requires a showing that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective…and (3) an overt act was committed in furtherance of the conspiracy." *Robetson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (quoting *Revis v. Meldrum,* 489 F.3d 273, 290 (6th Cir. 2007). Without the satisfaction of each of these elements, the civil conspiracy claim fails. As noted, above, Counts I-VII are hereby ripe for full dismissal. Because dismissal of these Counts is appropriate, there exists no "overt act" that can be "committed in furtherance of the conspiracy." Put another way, the Defendants cannot conspire to do nothing wrong.

Because Counts I-VII fail to state and actionable claim for a violation of the FCA, there can be no conspiracy to violate the FCA if there is no scheme by which the FCA is to be violated. As such, the conspiracy claim must likewise be dismissed.

WHEREFORE, the Defendants respectfully move that the Third Amended Complaint in this matter be DISMISSED.

Respectfully submitted,

*/s/ Christopher A. Melton*

Christopher A. Melton
cmelton@wyattfirm.com
Victoria Boland Fuller
vfuller@wyattfirm.com
WYATT, TARRANT & COMBS, LLP
400 West Market Street, Suite 2000
Louisville, Kentucky 40202
Telephone: 502.589.5235

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2022, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the Parties.

*/s/ Christopher A. Melton*
Christopher A. Melton

100739536.1