**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**Ashland Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **ROBERT C. O'LAUGHLIN, M.D.** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **CIVIL ACTION NO. 0:16-CV-148-DLB** |
| **RADIATION THERAPY SERVICES, P.S.C., dba ASHLAND BELLEFONTE CANCER CENTER,** ***et al.*****,** | ) | |
| **Defendants.** | ) | |

**OPPOSITION OF RELATOR ROBERT C. O'LAUGHLIN, M.D.**
**TO THE JOINT MOTION OF THE DEFENDANTS**
**TO DISMISS THE THIRD AMENDED COMPLAINT**

Robert C. O'Laughlin, M.D., Relator in this matter, acting through his undersigned attorney, opposes the Joint Motion of the Defendants to Dismiss his Third Amended Complaint (the "Motion to Dismiss"). In support of this Opposition, Dr. O'Laughlin submits the following.

## PROCEDURAL HISTORY OF THE CASE

The initial Complaint (Dkt. 1) was filed under seal on December 7, 2016, naming five defendants. These were three clinics, one billing company, and one medical oncology physician—the Defendant Kirti K. Jain, M.D. The clinics were:

(a) Radiation Therapy Services, P.S.C., dba Ashland Bellefonte Cancer Center ("Ashland BCC")[1];

(b) Kirti K. Jain, M.D., P.S.C., dba Highlands Cancer Center ("Highlands CC"); and

---

[1] Ashland BCC has since assumed the name "Precision Cancer Center" for operating purposes, filing a Certificate of Assumed Name with the Kentucky Secretary of State on October 1, 2020.

(c) Logan Oncology Care Associates, LLC, dba Logan Regional Cancer Center ("Logan CC").

The billing company was A One Biz Solutions, LLC ("A One Biz").

As alleged in the initial, and in all of the amended, complaints, the three clinics had overlapping management and personnel (Dkt. 1 at ¶¶ 8, 10, 12); they used the same billing company for the submission of claims to federal insurance programs, this being Defendant A One Biz (Dkt. 1 at ¶ 14, 64); and Mr. Manish Jain was the manager of both the billing company and one of the clinics (Logan CC) (Dkt. 1 ¶¶ 12, 14, 64). Mr. Manish Jain has since been added as a defendant.

The Government intervened against and reached a settlement with Logan CC, and thereafter filed a Notice of Dismissal with prejudice as to that particular defendant. (Dkt. 65.) The Government then not only allowed Dr. O'Laughlin to pursue the case against the remaining defendants, but also allowed him to add Mr. Manish Jain as an additional defendant.[2]

Defendant A One Biz filed a Motion to Dismiss (Dkt. 47), doing so on December 13, 2019. On December 26, 2019, all Defendants (including A One Biz) filed a second, joint Motion to Dismiss (Dkt. 48). In response Dr. O'Laughlin filed his Amended Complaint (Dkt. 53), adding

---

[2] In this way, the Government has demonstrated a level of approval of Dr. O'Laughlin's continued prosecution of this lawsuit on behalf of the United States. The United States has the express authority to dismiss an action when it deems appropriate, including when it deems that the continued pursuit of a case by a relator of a declined matter to be to be, *inter alia*, meritless, a waste of government resources, or otherwise against the Government's interest, *see* Mem. M. Granston, Dir., Comm. Litig. Branch, Fraud Sec., U.S. Dept. Justice to Attorneys, Comm. Litig. Branch, Fraud Sec., U.S. Depart. of Justice and Asst. U.S. Attorneys, Offices of the U.S. Attorneys, *re* Factors for Evaluating Dismissal Pursuant to 31 U.S.C. § 3730(c)(2)(A) (Jan. 10, 2018). Here, however, the Government has affirmatively chosen to *not* seek any such dismissal, and in fact has allowed expansion of the lawsuit to include an additional defendant.

Mr. Manish Jain as a defendant; removing Logan CC as a defendant (while retaining it as a co-conspirator); and narrowing some of the issues.

The Defendants filed their (renewed) Motion to Dismiss (Dkt. 58-2) and memorandum in support thereof (Dkt. 58-3). Dr. O'Laughlin's Response was filled on March 6, 2020 (Dkt. 66).

This Honorable Court issued its Order (Dkt. 76) denying the motion as to some of Dr. O'Laughlin's allegations; granting the motion without prejudice as to other such allegations; and granting the motion with prejudice as to still other such allegations. In contrast to certain specific allegations *within* specific counts, *no claim* (*e.g.*, count) *in its entirety was dismissed with prejudice*; and the Court expressly granted Dr. O'Laughlin leave to file a second amended complaint regarding the allegations that had been dismissed without prejudice.

Dr. O'Laughlin filed a motion for reconsideration (Dkt. 77), focusing entirely on a question as to the requirements for the qualifications of a supervising physician with regard to radiation therapy services and radiation simulation services.[3] However, to meet the deadlines in the Scheduling Order, and before that motion was decided by the Court, Dr. O'Laughlin filed his Second Amended Complaint (Dkt. 91).[4] The Court eventually denied Dr. O'Laughlin's Motion for Reconsideration. (Dkt. 97.)

The Defendants' filed a joint Motion to Dismiss the Second Amended Complaint. Dr. O'Laughlin opposed this motion (Dkt. 102), attaching to his opposition a proposed Third Amended Complaint (Dkt. 102-1). After a hearing (Dkt. 122) held on March 18, 2022, this Court granted

[3] The allegations addressing these are in Counts One through Four for the radiation therapy services; and Count Seven for the Radiation Simulation Services.

[4] Dr. O'Laughlin's Unopposed Motion to Amend the Scheduling Order Due to Attorney's Medical Issues (Dkt. 87), filed on July 2, 2021, was substantially granted (Dkt. 88); but as noted above, the deadline for filing the Second Amended Complaint was not changed.

Dr. O'Laughlin leave to file the Third Amended Complaint, explaining that "[R]elator's Third Amended Complaint, which was attached as an exhibit to the Response, does in fact limit the claims and remedy other deficiencies outlined in this Court's previous October 20, 2020 Order." (Page ID#1761-62.) After correcting a caption, Dr. O'Laughlin filed this Third Amended Complaint on the same day of the hearing. (Dkt. 124).

As of this date, none of the Defendants has filed an answer in this case.

## MEMORANDUM OF LAW

As a preliminary matter, the allegations asserted by Dr. O'Laughlin have already been vetted by the Court, in its Order issued on the Defendants' Motion to Dismiss the (first) Amended Complaint. (See the Order of this Court (Dkt. 76), October 20, 2020.) To a large extent, the issues now raised by the Defendants have already been resolved by the Court in favor of Dr. O'Laughlin. Dr. O'Laughlin has also narrowed his claims relative to the Amended Complaint so as to further satisfy the Court's Order. For this reason, this Opposition frequently cites to the Court's prior Order as the law of this case. *See generally Samons v. Nat'l Mines Corp.*, No. 20-3209, 2022 U.S. App. LEXIS 3849 (6th Cir. Feb. 11, 2022).

## I. THE ALLEGATIONS

The allegations and claims in the Third Amended Complaint are summarized as follows:

**Counts I and II: Services Supposedly Provided by a Qualified Physician but Which Were Not So Provided)**. These are claims billed by the Defendants to federal health insurance programs for radiation oncology services: (a) that have both a *professional* component and a *technical* component, where Medicare regulations require (for billing purposes) that a physician with the requisite skills and education provide the professional component (in other words, the professional component of the billed service must be provided by a *qualified* physician); and

(b) for which *no* such qualified physician provided these services, because, in each case, no qualified physician was on the premises when the service was performed.[5] (*See* the Order of this Court (Dkt. 76) at 8-10.)

**Counts III and IV: Services Provided to Patients Supposedly by, or Supervised by, Physicians.** These are claims billed to federal health insurance programs for radiation oncology services: (a) that require performance or supervision by a physician (whether "qualified" or not); and (b) for which no performance or supervision by *any* physician occurred, because in each case no physician was on the premises when the service was performed. (See Order at 15-21 (Dkt. 76).)

**Counts V and VI: Chemotherapy Services Provided to Patients Supposedly by, or Supervised by, Physicians.** These are claims billed to federal health insurance programs for chemotherapy services: (a) that require performance or supervision by a physician in order to be billed (and reimbursable) at 100% of the applicable Medicare fee schedule; (b) which were billed at the full rate as if a physician had performed or supervised the service; but (c) for which no such performance or supervision by any physician occurred, because in each case no physician was on the premises when the service was performed. (See Court Order at 21-22 (Dkt. 76).)

**Count VII: Simulation Services.** These are claims billed to federal health insurance programs for "simulation" services, which require that certain documentation be created and maintained for the payment of the claims, but for which no such documentation was created or maintained. (See Court Order at 13-15 (Dkt. 76).)

---

[5] With regard to allegations that *no* physician was on the premises when relevant service was performed, to either personally perform the services or otherwise supervise the services, Dr. O'Laughlin has alleged in the 3rd Amd. Cmpl. that he is in possession of relevant physician schedules and locations supporting these allegations. (3rd Amd. Cmpl. ¶¶ 43-46.)

**Count VIII: Conspiracy.** This Count alleges that all Defendants, as well as Logan CC (which settled this case with the Government separately and is now dismissed) conspired to violate the federal False Claims Act by agreeing to engage in the conduct described in Counts I through VII. (See Court Order at 25-27 (Dkt. 76).)

The claims and allegations in the Complaint are summarized in Table I hereof, below:

**TABLE I**

| Counts | ¶¶ | Claims | Services | Comments |
|---|---|---|---|---|
| **I** | 47-68 | False Claims | Radiation Oncology | Patients Supposedly Treated by Qualified Physicians |
| **II** | 69-75 | False Statements | Radiation Oncology | Patients Supposedly Treated by Qualified Physicians |
| **III** | 76-110 | False Claims | Radiation Oncology | Patients Supposedly Treated or Supervised by Physicians |
| **IV** | 111-117 | False Statements | Radiation Oncology | Patients Supposedly Treated or Supervised by Physicians |
| **V** | 118-163 | False Claims | Chemotherapy | Chemotherapy Patients Treated Not by Physicians but by Nurse Practitioners or Physician Assistants |
| **VI** | 164-170 | False Statements | Chemotherapy | Chemotherapy Patients Treated Not by Physicians but by Nurse Practitioners or Physician Assistants |
| **VII** | 171-189 | False Claims | Radiation Oncology | Simulation Services and Documentation for Same |
| **VIII** | 195 | Conspiracy | All | |

1. <u>Medicare Coverage of Therapeutic Services</u>

Medicare Part B pays for "medical and other health services," 42 C.F.R. § 410.10, including physician services, 42 C.F.R. § 410.10(a), and X-ray and other radiation therapy services. 42 C.F.R. § 410.10(f). *See also* 42 C.F.R. § 410.35.

Medicare Part B pays for physician therapy services, provided that "they are furnished by one of the following professionals who is legally authorized to practice in the State in which he or she performs the functions or actions, and who is acting within the scope of his or her license." 42 C.F.R. § 410.20(a). Among these professionals is a doctor of medicine. 42 C.F.R. § 410.20(b)(1). To be reimbursable, services must be furnished by a facility or other person specified in the Code of Federal Regulations. 42 C.F.R. § 410.12(a)(2). Such services include radiation therapeutic services ("X-ray therapy"). 42 C.F.R. § 410.35.

2. <u>The Supervision Requirements for Radiation Oncology Services—in General</u>

Medicare pays for services "incident to" the service of a physician. 42 C.F.R. § 410.26(b). As further explained:

> In general, services and supplies must be furnished under the *direct supervision* of the physician (or other practitioner). Designated care management services can be furnished under general supervision of the physician (or other practitioner) when these services or supplies are provided incident to the services of a physician (or other practitioner). The physician (or other practitioner) supervising the auxiliary personnel need not be the same physician (or other practitioner) who is treating the patient more broadly. However, only the supervising physician . . . may bill Medicare for incident to services.

42 C.F.R. § 410.26(b)(5). The take away here is this: a physician may bill for services as if he personally performed them if he, directly, supervised another person (the "auxiliary personnel") who actually provided the services. So, for example, Defendant Dr. Kirti K. Jain or Realtor Dr. O'Laughlin could bill for the services provided by a radiation technician *if a physician in his practice group directly supervised* the provision of those services.

The definition of "direct supervision" is set forth in 42 C.F.R. § 410.26(b)(5), done by reference to 42 C.F.R. § 410.32(b)(3)(ii). In pertinent part, 42 C.F.R. § 410.32(b)(3) reads:

> [W]hen direct or personal supervision is required, physician supervision at the specified level is required throughout the performance of the test.

> (i) *General supervision* means the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure. Under general supervision, the training of the nonphysician personnel who actually perform the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician.
>
> (ii) *Direct supervision* in the office setting means **the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure**. It does not mean that the physician must be present in the room when the procedure is performed.
>
> (iii) *Personal supervision* means a physician must be in attendance in the room during the performance of the procedure.

(Italics in original; bold added.)

This "direct supervision" requirement is material. As one commentator has explained, the level of supervision requirements in the free-standing facility environment, such as the defendant-clinics, are stricter than those required in a hospital setting:

> CMS's supervision requirements set a higher bar for physician offices and freestanding centers than for hospital outpatient departments. Whereas CMS allows APs [nurse practitioners or physician assistants] to provide supervision in hospital outpatient departments, **a physician is required to supervise these services in the freestanding settin**g . . . .
>
> In addition, CMS does not require the supervising practitioner in the hospital outpatient setting to be physically present in the same office suite, just that he or she is "immediately available." **In contrast, the supervising physician in the freestanding setting must be present in the office suite or center.**

"What You Need to Know About Medicare's Physician Supervision Requirements," Deidre Saulet, The Advisory Board Company (May 13, 2016) (emphasis added).[6]

---

[6]https://www.advisory.com/research/oncology-roundtable/oncology-rounds/2013/01/what-you-need-to-know-about-medicares-physician-supervision-requirements. *See also* 42 C.F.R. § 410.27(a)(1)(iv)(A) (regarding therapeutic outpatient hospitals or Critical Access Hospitals): "[D]irect supervision" means that the physician or nonphysician practitioner must be immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician or nonphysician practitioner must be present in the room when the procedure is performed[.]"

Further clarification of the supervision requirements of the above cited regulations is found in the in the Medicare Benefits Policy Manual, Chapter 15, Section 90:

> X-ray, radium, and radioactive isotope therapy furnished in a nonprovider[7] facility *require direct personal supervision of a physician*. The physician need not be in the same room, but must be in the area and immediately available to provide assistance and direction throughout the time the procedure is being performed. This level of physician involvement does not represent a physician's service and cannot be billed as a Part B service. The physician would have to furnish a reasonable and necessary professional service as defined in §§ 30 of this chapter, in order for the physician's activity to be covered.

*Id*. Section 30.1.A defines "professional service" as:

> [T]hat part of the physician's activities that is directly related to the medical care of the individual patient. It represents remuneration for the identifiable medical services by the physician that contribute to the diagnosis of the patient's condition or to his treatment.

## II. ARGUMENT

So as to "ease into" the complexities of Medicare regulations and billing, Dr. O'Laughlin starts with the issues concerning the chemotherapy claims, before turning to claims regarding radiation oncology and simulations.

### A. The Chemotherapy Claims: Counts V & VI

Counts V and VI address patients who received chemotherapy at the Defendants' three clinics. They allege that the chemotherapy was not provided by physicians; that provision of the

[7] A "nonprovider" facility is a non-hospital entity, such as a physician's office or other freestanding facility that is not classified as a hospital outpatient department. Radiation therapy services furnished in a freestanding radiation therapy center, such as our defendant-clinics, are treated differently from therapeutic services provided in a hospital outpatient department. Freestanding center radiation therapy services are specifically covered under Section 1861(s)(4) of the Social Security Act. Further guidance pertinent to physician supervision of these services is provided in Chapter 15, Section 90 of the Medicare Benefit Policy Manual.

chemotherapy was neither performed by or supervised by physicians; and that the Defendants knowingly billed for these services as if they had been so performed or supervised.

Put simply, the Defendants make two arguments in support of their efforts to have these counts dismissed: that the counts on their face fail to allege a fraud; and that an exception for "in-office ancillary services" applies to the regulatory requirements for billing for chemotherapy. Both arguments are meritless.

As noted by the Defendants in their motion, addressing the Third Amended Complaint (Dkt. 124):

> Specifically, the Third Amended Complaint further pleads that these claims "were in fact neither provided nor supervised by Dr. Kirti K. Jain or by any physician, but were provided by a physician's assistant or a nurse practitioner." [*Id.* at ¶ 127.] The Third Amended Complaint refers to these claims as the "NPP claims," because the services were performed by non-physician providers. [*Id.* at 119.]

The Defendants argues that the Center for Medicare and Medicaid Services ("CMS") *allows reimbursement* from the Medicare and Medicaid programs where the chemotherapy is provided by *employees* of a physician, such as physician assistant or nurse practitioner, although not by the physician himself; and where the non-physician provider is not supervised by a physician. This is true *per se*. The fraud alleged in the Third Amended Complaint, however, is *not* grounded in whether the service is reimbursable when provided by a non-physician, but rather in the *amount* of the reimbursement claimed, which is based on *who provides* the chemotherapy, as follows.

A *physician* is paid at 100% of a Medicare fee schedule. A *non-physician practitioner*, such as a nurse practitioner or physician's assistant, is paid at 85% of this rate (or less). [8] As

[8] 42 C.F.R. §§ 405.520(a) provides:

[Continued . . . .]

explained by the District Court in *United States ex rel. Schiff v. Mardler*, No. 1:13-cv-24503, 2016 U.S. Dist. LEXIS 132280, at *18 (Sept. 23, 2016), citing the applicable regulations:

> Payment for services performed by either a physician's assistant ("PA") or nurse practitioner ("NP") (collectively, "NPP's"), must not be more than "85 percent of the physician fee schedule amount." *Landau v. Lucasti*, 680 F. Supp. 2d 659, 662, 667 (D.N.J. 2010) (citing 42 C.F.R. §§ 405.520(a), 414.52, 414.56); *see also U.S. ex rel. Heater v. Holy Cross Hosp., Inc*., 510 F. Supp. 2d 1027, 1035 (S.D. Fla. 2007) ("When the Government is billed for services rendered by a nurse or nurse practitioner which are not incident to the services of a physician, the provider is reimbursed at 85-percent of the rate otherwise paid.").

Thus, when a non-physician provides the service, the 85% reimbursement rate applies, unless the service was provided "incident to" the services of a physician.

The "Incident to" billing provision allows a non-physician to provide the service under the supervision of a physician and for the service to be billed under the physician's name, with his medical practice receiving 100% of the fee schedule instead of only 85%.

There are nine requirements and qualifications for a service to be an "incident to" service for the purpose of full reimbursement. *See* 42 C.F.R. § 410.26(b). Among these requirements is that the physician under whose name the service is billed must *directly* supervise the service. 42 C.F.R. § 410.26(b) (5). "Direct supervision" means that the supervising physician must be on the premises where the service is being provided. 42 C.F.R. § 410.26(a)(2) (incorporating § 410.10(b)(3)(ii)). As specified in 42 C.F.R. § 410.10(b)(3)(iii):

> **(ii)** ***Direct supervision*** in the office setting means the physician (or other supervising practitioner) *must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure*. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed . . . .

---

> **(a)** ***General rule.*** A physician assistant's, nurse practitioner's, and clinical nurse specialists' services, and services and supplies furnished incident to their professional services, are paid in accordance with the physician fee schedule. The payment for a physician assistants' services may not exceed the limits at § 414.52 of this chapter. The payment for a nurse practitioners' and clinical nurse specialists' services may not exceed the limits at § 414.56 of this chapter.

Thus to directly supervise the provision of chemotherapy, the physician must *at least be present* in the facility where the service is occurring.

The Third Amended Complaint specifically alleges that these chemotherapy services were not personally provided by any physician; and that that no physician either personally or directly supervised the provision of these services (3rd Amd. Cmpl. ¶¶ 121, 129-31, 137-39, 145-47, 153-55, 159). As expressly alleged, these services were, not "incident to [physician] services" for the purposes of billing by the Defendants (3rd Amd. Cmpl. ¶¶ 131, 139, 147, 155). The Complaint further alleges that the subject claims were "false and fraudulent" in that the Defendants "well knew" that neither the Defendant Kirti Jain (*Id*. ¶ 159(a)) nor any other physician (*Id*. ¶ 159(b)) directly supervised these services, was not near the premises when the services were provided, and that the services had instead been provided by a nurse practitioner or physician's assistant. These claims for chemotherapy should have been paid at the 85% rate instead of 100% of the Medicare fee schedule.

Dr. O'Laughlin has met this Court's requirement that he allege as false only those claims billed to federal health insurance programs for chemotherapy services: (a) that require performance or supervision by a physician; and (b) for which no performance or supervision by any physician occurred. See Court Order at 21-22 (Dkt. 76). He alleged that that no physician was on the premises when the service was performed.

The United States District Court for the District of Hawaii considered a motion for summary judgment in another Medicare-fraud *qui tam* case. The Court interpreted the applicable "incident-to" regulations in the context of chemotherapy *as requiring that a physician be on the premises when a non-physician practitioner administered the chemotherapy*. The Court said:

> Neither party contests that during the time in question at [Defendant clinic] KMC, an oncologist made the initial assessment of the patient, established a treatment protocol, and directed the oncology nurse to administer the chemotherapy if the

> patient's blood levels and other lab results fell within the acceptable range. Furthermore, it is established that the supervising physician, who could be a non-oncologist, did not have to be in the room, but had to be present in the office suite and immediately available for assistance. KMC has presented evidence, and Plaintiffs have presented no evidence to the contrary, that KMC meets all the requirments [*sic*] of a physician-directed clinic as defined by the Medicare Benefit Policy Manual. *Applying the incident to rules to a physician directed clinic setting, as long as at least one physician was present in the office suite available to furnish assistance at all times that chemotherapy was being administered, KMC could deem the available physician as supervising physician for the purposes of billing for the chemotherapy.*
>
> * * * * *
>
> There are questions of fact as to whether Defendants billed for chemotherapy under [Relator] Lockyer's provider number when he was not present to supervise and whether the Defendants billed for chemotherapy services when no physician was present to supervise. *An affirmative answer to either factual question would constitute a false claim . . . .*

*United States ex rel. Lockyer v. Haw. Pac. Health*, 490 F. Supp. 2d 1062, 1076-78 (D. Haw. 2007)

The second part of the Defendants' argument relies upon language found at 69 Fed. Reg. 16105, 16070 (March 26, 2004). This reliance is woefully misplaced. This notice of rulemaking mentioning "in-office ancillary services" concerns an exception to the prohibition on self-referrals under the Stark Act, and does not in any way address the "incident-to" provisions applicable to the 85% reimbursement rule. To the contrary, the definition of "in-office ancillary service" cited by the Defendants, and addressed by this notice, found at 42 C.F.R. § 411.355 clearly states that the supervisory requirements at issue apply notwithstanding the commentary in the rulemaking notice. Section 411.355(b) defines "in-office ancillary services" as services that meet certain conditions, including:

> **(1)** ***Individual who furnishes the service.*** They are furnished personally by one of the following individuals:
>
> > **(i)** The referring physician.
> >
> > **(ii)** A physician who is a member of the same group practice as the referring physician.

> **(iii)** *An individual who is supervised by the referring physician or*, if the referring physician is in a group practice, *by another physician in the group practice*, provided that the supervision complies with all other applicable Medicare payment and coverage rules for the services.

(Emphasis added.)

In other words, to qualify as an in-office ancillary service, the non-physician practitioner must be supervised by a physician, with such supervision being in compliance "with the applicable Medicare payment and coverage rules for the services." Inasmuch as the gravamen of this Complaint is that the physician assistants and nurse practitioners who administered the chemotherapy were *not* supervised in compliance with such rules, this exception does not apply.

**B. Counts I and II: Billing for Professional Components of Radiation Oncology Services**

Radiation oncology services have professional and technical components. Table II in the Third Amended Complaint identifies which relevant services, by billing code, have which components.[9] (3rd Amd. Cmpl. ¶ 33.)

Some codes have *both* technical and professional components. As CMS explains[10]:

> Typically, radiology services have two separate components: a professional and technical component . . . . The technical component is billed on the date the patient had the test performed. When billing a global service, the provider can submit the professional component with a date of service reflecting when the review and interpretation is completed or can submit the date of service as the date the technical component was performed. . . . If the provider did not perform a global service and

---

[9] As explained in ¶ 33 of the Third Amended Complaint, the information contained in this table can be found in the CMS Physician Fee Schedule, which is available by year and code on the CMS website at: https://www.cms.gov/apps/physician-fee-schedule/search/search-criteria.aspx. For "Type of Information," the term "Payment Policy Indicators" must be selected. For "Modifier," the term "all Modifiers" should be selected. The modifier "TC" means technical component; the modifier "26" means professional component.

[10] "Guidance on Coding and Billing Date of Service on Professional Claims" (CMS Feb. 1, 2019), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/Downloads/SE17023.pdf.

> instead performed only one component, the date of service for the technical component would the date the patient received the service and the date of service for the professional component would be the date the review and interpretation is completed.

Dr. O'Laughlin has alleged that the codes billed by the Defendants had no modifiers attached for *any* services, meaning that the codes used for the submission of claims fraudulently billed for both the technical *and* the professional component (*i.e.*, the Defendants billed *globally*), despite as alleged (in Counts I and II) that no *qualified* physician provided the professional component.

We look at one example. Among the codes at issue in this case is 77334 (Treatment Device Complex).[11] As again explained by CMS[12]:

> 70.5 - Radiation Physics Services (CPT Codes 77300 - 77399) (Rev. 1, 10-01-03)
>
> [CMS Medicare Contractors] pay for the PC [professional component] and TC [technical component] of CPT codes 77300-77334 and 77399 on the same basis as they pay for radiologic services generally. For *professional component billings in all settings,* [the Contractors] *presume that the radiologist participated in the provision of the service,* e.g., reviewed/validated the physicist's calculation. CPT codes 77336 and 77370 are technical services only codes that are payable by [the Contractors] in settings in which only technical component is/are are payable.

(Emphasis added.)

As defined in Ballentine's Law Dictionary (2010), a radiologist is "a doctor of medicine qualified as an expert in the employment of the x-ray and its use in the diagnosis and treatment of disease." As further explained by the American College of Radiology[13]:

---

[11] *See* 3rd Amd. Cmpl. ¶¶ 31, 33, 55 (Table IV, Entry 2), and 58 (Table V, Entries 3 and 5).

[12] Medicare Claims Processing Manual Chp. 13 at 70.5, "70.5 - Radiation Physics Services (CPT Codes 77300 - 77399) (Rev. 1, 10-01-03)," https://downloads.cms.gov/medicare-coverage-database/lcd_attachments/30320_23/L30320_RAD036_revised_cbg.pdf.

[13] https://www.acr.org/Practice-Management-Quality-Informatics/Practice-Toolkit/Patient-Resources/About-Radiology.

> Radiologists are medical doctors that specialize in diagnosing and treating injuries and diseases using medical imaging (radiology) procedures (exams/tests) such as X-rays, computed tomography (CT), magnetic resonance imaging (MRI), nuclear medicine, positron emission tomography (PET) and ultrasound.
>
> Radiologists complete at least 13 years of training, including medical school, a four-year residency, and most often, an additional one- or two-year fellowship of very specialized training, such as radiation oncology, pediatric radiology, or interventional radiology. They are certified by the American Board of Radiology, and they have exacting requirements for continuing medical education throughout their practicing years.

A radiation oncologist is a radiologist specialized in using radioactive substance and x-rays to treat tumors and cancer. McGraw-Hill Concise Dictionary of Modern Medicine (2002).

In other words, a physician who participates in these professional components must have the qualifications to do so, and be not "just" a physician of *any* specialty or a general practitioner.

As further explained on the CMS website[14]:

> 17. Radiation physics services (CPT codes 77300-77334, 77399) include a professional component (PC) *and* a technical component (TC). These services are covered following the same logic as other radiologic services that include PC and TC components.
>
> 1. The physician's professional component is covered in all settings when the billed service represents the physician's (e.g., *radiologist, radiation oncologist*) involvement in the care. Radiation dosimetry calculations are payable by Medicare Part B only when the physician personally performs the service described in the code, or when the physician participated in the provision of the service (e.g., reviewed or validated the physicist's calculation).
> 2. The technical component is covered only in settings where the TC is payable (e.g., freestanding clinic). The services provided by a Radiation Physicist are considered a part of the TC . . . .

(Emphasis added.)

The Third Amended Complaint alleges that no radiation oncologist or other *qualified physician* performed the specified services as including a professional component, including (but

[14] "Billing and Coding Guidelines for Radiation Oncology Including Intensity Modulated Radiation Therapy (IMRT)," LCD Determination ID Number L34652, https://downloads.cms.gov/medicare-coverage-

not limited to) the CPT Code 77334 (Treatment Device Complex).[15] CMS makes clear that a qualified physician, that is, a radiologist or radiation oncologist, must perform the professional component. The Defendants' argument fails.

**C. Counts III and IV: Supervision by Physicians.**

In its Order of October 20, 2020, this Court dismissed Counts Three and Four without prejudice, explaining Dr. O'Laughlin had merely alleged that one named physician, Defendant Dr. Kirti K. Jain, had not performed or supervised the services for which the Defendants billed federal health care programs had been billed, as opposed to alleging that no physician (qualified or otherwise) had performed or supervised the services. (Order at 15-21, 29.)

The Third Amended Complaint corrects this deficiency by alleging that *no* physician performed or supervised the specified services that were billed; and that *no* physician was on (or near) the premises when the services were performed. (3rd Amd. Cmpl. ¶¶ 79, 81, 87, 88, 91-92, 95-96, 99, 100, 103, 104.)

Contrary to the protestations of the Defendants, these counts do allege fraudulent claims. They allege that a physician performed or supervised these services when in point of fact a physician did *not* do so, and that these false statements were material and pre-conditions of payment from the Medicare and Medicaid programs (3rd Amd. Cmpl. ¶¶ 42 (3rd Bullet Point), 51). (*See* Order at 82.)

**D. Count VII:Simulation Claims**

Dr. O'Laughlin alleges in Count VII of the Third Amended Complaint that the Defendants billed for simulation services, using codes 77280 for simple simulation procedures and 77290 for

---

[15] See 3rd Amd. Cmpl. ¶ 55, Table IV, Entry 2; ¶ 58, Table V, Entries 3 and 5.

complex simulations. He also alleges that the Defendants failed to document, and to maintain documentation of these procedures; that such documentation was required and material to the payment of the claims submitted for these services; and, for these reasons (and an additional reason) the claims were false.

Section 1833(e) of the Social Security Act (42 U.S. § 1395I) requires that: "No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." As further explained by the District Court in *United States ex rel. Borges v. Doctor's Care Med. Ctr., Inc.*, No. 01-8112-CIV-RYSKAMP/VITUNAC, 2007 U.S. Dist. LEXIS 118341, at *10 (S.D. Fla. Jan. 25, 2007) ("*Borges*"):

> Reimbursement is only available under Medicare Part B or the FEHBP[16] unless adequate documentation exists in the beneficiary's medical file to demonstrate the performance and necessity of the services being billed. If the carrier pays the claim and subsequently discovers that the medical documentation is inadequate, the United States is entitled to deny the claim retroactively and obtain a refund. See 42 CFR § 413.64 (f).

While (as *Borges* demonstrates) proper documentation is a precondition for payment, the documentation for the required information does not have to be provided for each claim but can be certified as having been created and maintained by the provider of the service. This is the accepted procedure because of the huge volume of claims submitted to federal health insurance programs. *Id.*

[16] Federal Employees Health Benefits Program.

When a provider bills CMS (or other payor) using a CPT Code, it is making an express statement that the specifications and conditions defining that code have been satisfied.[17] In other words, instead of using one or more paragraphs to describe the procedure, the provider simply uses the code for the same purpose: the provider makes a statement by using a five-digit code instead of a lengthy description.

Among the specifications included in all radiology CPT Codes is the following: "A written report signed by the interpreting individual should be considered an integral part of a radiological procedure or interpretation." CPT Professional Edition 2015 at 407, American Medical Association (AMA)[18]. Thus, by using these codes, the provider represents to the payor that it has documented the procedure with the specified written, signed report. The existence and maintenance of this documentation *is material*: "Documentation of simulation requires a written record of the procedure and hard copy of an x-ray film or electronic images and evidence of image review by physicians including signature or initials and data review." *See* Radiation Oncology Including Intensity Modulated Radiation Therapy (IMRT) at 5, National Imaging Associates, Inc. (Oct. 2015) (Dkt. 66-4 at 6).

The Third Amended Complaint expressly alleges that the required documentation is a precondition for payment. (3rd Amd. Cmpl. ¶ 177.) The Defendants argues that the TAC contains

---

[17] As explained by the Office of the Inspector General of the U.S. Department of Health and Human Services:

> Level I HCPCS codes consist of Current Procedural Terminology (CPT) codes, a numeric coding system maintained by the AMA [American Medical Association], and are used primarily to identify medical services and procedures furnished by physicians and other health care professionals . . . .

"Medicare Improperly Paid Hospitals Millions of Dollars for Intensity-Modulated Radiation Therapy Planning Services" at 2, Report No. A-09-16-02033 (August 2018)

[18] The AMA holds the copyright to the CPT codes, and publishes the description of these codes.

no "reference to CMS policy to establish this precondition of payment." As demonstrated by the above and the allegations made in the Complaint, this is incorrect: the definitions for the relevant CPT codes are incorporated into and made a part of the Complaint by reference. The law establishes that the representations concerning documentation made by the use of these codes are material preconditions for payment. As explained by the U.S. Supreme Court in a nursing home and counseling case:

> [B] submitting claims for payment using payment codes that corresponded to specific counseling services, [the Defendant] represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment. Moreover, [Defendant] staff members allegedly made further representations in submitting Medicaid reimbursement claims by using National Provider Identification numbers corresponding to specific job titles. And these representations were clearly misleading in context.

*Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 136 S. Ct. 1989, 2001 (2016).

In summary, the *factual* allegation is made in the Complaint, and the allegation is adequately supported by the *law and policy* set forth above. There is no requirement that a complaint be drafted as a legal argument or court brief: facts must only be *alleged* by the plaintiff, while the law is decided by the Court.

Count VII is adequately pled.

**E. Count VIII: Conspiracy Claim**

The Defendants limit their attack on Dr. O'Laughlin's conspiracy claim (Count VIII) to this argument: if Counts I though VII are all dismissed, then there is no unlawful plan and no overt act in furtherance of any unlawful plan; and, under such a circumstance, the conspiracy charge must also be dismissed. Having failed to raise any other challenge to Count VIII, the Defendants

are left with the following ineluctable corollary: if *any* of Counts I through VII survive the motion to dismiss, then the conspiracy claim must also survive.

**F. Inclusion of Logan CC**

The Defendants complain about the inclusion of Logan CC as a named Co-Conspirator. (and similarly have so far refused to produce discovery about Logan CC and the patients treated and services provided at that facility. See Relator's Reply in Support of His Motion to Compel (Dkt. 113), Page ID#1649. As previously explained in that Reply, Logan CC was dismissed with prejudice after the United States intervened in the action against it and settled that part of this lawsuit. The Defendants' earlier motion to dismiss the conspiracy alleged in the first Amended Complaint, which named Logan CC as a co-conspirator, was denied by the District Court. (Dkt. No. 76, PageID# 790-92.) Thus, Logan properly remains named as a Co-conspirator in this case, and the remaining Defendants remain individually liable for all false claims submitted by Logan CC—for both penalties and damages under the False Claims Act. *United States v. Bailey*, 973 F.3d 548, 576 (6th Cir. 2020).

**G. Rule 9(b) Is Satisfied**

Finally, we come to the Defendants' argument that the Complaint merely alleges "conclusionary" allegations, instead of factually based allegations. This argument is difficult to grant legitimacy given the contents of the Complaint.

The Complaint contains numerous tables asserting the patients, services, charges, reimbursements, and dates, these being for the claims and statements that Dr. O'Laughlin asserts are false. (See 3rd Amd. Cmpl. ¶¶ 55, 58, 61, 86, 90, 94, 98, 102, 123, 127, 135, 143, and 151.) Dr. O'Laughlin has also alleged that he based the allegations in these tables upon not only his

personal knowledge but also upon "computer print-outs and handwritten forms, provide to him by clinic personnel prior to the date on which filed his initial complaint . . . ." (3rd Amd. Cmpl. ¶ 44.) Rule 9(b) is thus satisfied.[19]

Similarly, Dr. O'Laughlin's assertions as to the reasons why these claims are false or fraudulent are well founded and well pled. The Third Amended Complaint addresses Medicare-Medicaid requirements and materiality. See for example: the professional and technical components of services (3rd Amd. Cmpl. ¶ 32-33); the levels of supervision (*Id*. ¶¶ 36-37); and the supervision requirements for different services (*Id*. ¶¶ 39, 64). To the extent that his Court previously found objectionable the allegation a claim needed to identify the physician who actually provided the specified service for the payment of a claim (Page ID#783), this allegation is now absent. In this regard, the Complaint now satisfies the requirements included in this Court's Order of October 20, 2020. (See Page ID#783-86.)

## CONCLUSION

For the reasons set forth above, all count, the Defendants' Motion to Dismiss the Third Amended Complaint must be denied.

By: /s/ Andrew Grosso
Andrew Grosso, Esq. (D.C Bar No. 358326)
*Pro Hac Vice*
ANDREW GROSSO & ASSOCIATES
1101 Thirtieth Street, NW, Suite 500
Washington, D.C. 20007
Telephone: (202) 298-6500
Email: Agrosso@acm.org

*Attorney for Relator Robert C. O'Laughlin, M.D.*

[19] "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## CERTIFICATE OF SERVICE

I hereby certify on May 6, 2022, the foregoing was electronically filed with the clerk of the court by using the Court's electronic filing system to all counsel of record.

By: /s/ Andrew Grosso
Andrew Grosso, Esq. (D.C Bar No. 358326)
*Pro Hac Vice*
ANDREW GROSSO & ASSOCIATES
1101 Thirtieth Street, NW, Suite 500
Washington, D.C. 20007
Telephone: (202) 298-6500
Facsimile: (202) 298-5599
Email: Agrosso@acm.org

*Attorney for Relator Robert C. O'Laughlin, M.D.*