UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT ASHLAND

***Electronically Filed***

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*Ex rel.* ROBERT C. O'LAUGHLIN, M.D.<br><br>PLAINTIFFS,<br><br>v.<br><br>RADIATION THERAPY SERVICES, P.S.C. dba ASHLAND BELLEFONTE CANCER CENTER, KIRTI K. JAIN, M.D., P.S.C., dba HIGHLANDS CANCER CENTER, A ONE BIZ SOLUTIONS, LLC, MANISH JAIN, and KIRTI K. JAIN, M.D.<br><br>DEFENDANTS. | ) | CIVIL ACTION NO. 0:16-cv-148-DLB |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THIRD AMENDED COMPLAINT**

The Defendants, Radiation Therapy Services, P.S.C. d/b/a Ashland Bellefonte Cancer Center, Kirti K. Jain, M.D., P.S.C. d/b/a Highlands Cancer Center, A-One Biz Solutions LLC, Kirti K. Jain, M.D., and Manish Jain (collectively, the "Defendants"), by counsel, for their Reply in Support of Defendants' Motion to Dismiss Third Amended Complaint [DN 125], state:

Relator's Response in Opposition to Defendants' Motion to Dismiss ("Relator's Response") [DN 131] is premised upon revisionist history and a continued inability to support his claims. The Court can review Relator's Response and see that—in response to Defendants' explicit arguments that Relator has not identified any CMS publication or standard supporting his claims—Relator *continues* to fail to cite materials that bolster his allegations. Moreover, Relator fails to address entire arguments raised by Defendants whatsoever. For these reasons, Relator's Response

does not remedy the many fatal flaws identified by Defendants in their Motion and the Third Amended Complaint [DN 124] must be dismissed.

## I. RELATOR FAILED TO IDENTIFY ANY SUFFICIENT BASIS THAT SUPPORTS THE ALLEGATIONS OF COUNTS I AND II AND THESE CLAIMS MUST THEREFORE BE DISMISSED.

Relator's Counts I and II allege that the professional components of the identified radiation codes must be performed by a "qualified physician"—which, based upon Relator's proffered definition, is a "qualified radiation oncologist." [Third Amend. Compl., DN 124, ¶ 34]. In Defendants' Motion, they argued that this is Relator's second (or third) attempt at establishing a "qualified physician" standard that is entirely unsupported by any factual or legal basis. [Mot. to Dismiss, DN 125, pp. 14-16]. In response, Relator continues to make clear that this "standard" belongs to him alone and it is not an actual requirement for reimbursement under the Medicare policies and guidelines.

Relator relies solely upon conjecture and assumptions in his attempt to establish that a radiation oncologist is required to provide the professional component of the relevant services. For instance, he quotes a portion of a CMS Manual where the text "presume[d]" that a radiologist participated in the applicable service. [Relator's Resp., DN 131, p. 15]. Conspicuously absent from this quoted portion, though, is any statement by CMS that a radiologist is required—as opposed to "presume[d]"—to provide the service. Because these are radiation services, it certainly would make sense to "presume" that a radiologist participated in the services—but this is not enough to establish that such participation is a condition of payment.

In fact, it is quite clear that a radiation oncologist is not required to provide the professional component of these services from the very CMS Guidance Manual that Relator quoted in his Response. He simply chose to not include the portion found at the very beginning of the Manual

where it says that contractors "must pay for the [professional component] of radiology services furnished *by a physician* to an individual patient in all settings under the fee schedule for physician services *regardless of the specialty of the physician who performs the service*." Medicare Claims Processing Manual, Chap. 13, 20.1 (emphases added). Not only did CMS choose to say that the professional component must be provided by a physician generally, it then made it abundantly clear that reimbursement should follow "*regardless* of the specialty of the physician who performs the service." *Id.* (emphasis added). Hence, CMS recognized that physicians of various specialties could provide the professional component of the services and issued an instruction for reimbursement that would maintain consistency regardless of the physician's specialty.

Since Relator clearly could not rely on CMS' written guidance, he was forced to look elsewhere for other sources to attempt to salvage his claims. However, his reliance was sorely misplaced. Relator includes several definitions for "radiologist" and then concludes based solely upon these definitions that "a physician who participates in these professional components must have the qualifications to do so, . . . ." [Relator's Resp., DN 131, pp. 15-16]. This is nothing more than *ipse dixit* logic. Quoting definitions of what it means to be a radiologist in no way establishes that a radiologist is required to provide the professional component of the relevant codes.

Relator's insistence on the materiality of his defined "qualified physician" is further undone by his final quoted source. Relator includes an excerpt from the CMS website where it said that the professional component is covered when the service "represents the physician's (*e.g.*, radiologist, radiation oncologist) involvement in the care." [*Id.* at 16]. Again, CMS chose to say that a general, non-specific "physician[]" must be involved when it was clearly capable of specifically stating a "radiologist [or] radiation oncologist" was required. It did not do so. Even more problematic for Relator is the fact that CMS included radiologists and radiation oncologists

as *examples* of physicians who could be involved in the relevant services. According to Black's Law Dictionary, "e.g." is an abbreviated form of the Latin phrase meaning "for example." Consequently, the quoted portion from this CMS website actually says, "[t]he physician's professional component is covered in all settings when the billed service represents the physician's ([*for example*], radiologist, radiation oncologist) involvement in the care." [*Id.*]. It would make no sense whatsoever for CMS to identify radiologists and radiation oncologists as mere examples of the kinds of physicians who could be involved if the service was actually required to be provided by one of these practitioners.

Relator's failure to support his allegations that the professional component of these codes requires a radiation oncologist is fatal to the entirety of his Counts I and II. He chose to bolster his argument that a "qualified physician" is a radiation oncologist instead of responding to any of Defendants' arguments: he altogether fails to address that he is—again—improperly attempting to introduce a supervision requirement that is unsupported (and that has failed previously) and he failed to rebut Defendants' argument that there is no requirement that radiation oncologists review and approve guidance images in the ways alleged in the Third Amended Complaint. [Mot. to Dismiss, DN 125, p. 15-16]. Relator similarly ignored that his alleged requirements for review and approval of guidance images are in conflict with guidance published by ASTRO. [*Id.* at 16]. Because Relator failed to address these explicit arguments, he has waived opposition to dismissal of these aspects of these Counts. *Conrad v. U.S. Bank Nat'l Assoc.*, 391 F. Supp. 3d 780, 791-92 (S.D. Ohio 2019).

Defendants presented thorough, well-reasoned arguments as to why Relator's Counts I and II are legally insufficient and unsupported. In his Response, Relator failed to properly rebut Defendants' arguments. He instead relied upon his own conclusions that, based upon the definition

of radiologists, their participation is required. These claims are clearly unsupported and insufficiently pled. For these reasons, Counts I and II must be dismissed in their entirety with prejudice.

## II. RELATOR FAILS TO OFFER ANY SUBSTANTIVE ARGUMENT IN SUPPORT OF HIS COUNTS III AND IV AND THESE CLAIMS MUST THEREFORE BE DISMISSED.

Relator's other radiation therapy claims fare just as poorly. For Relator's Counts III and IV, Defendants argued in their Motion to Dismiss that these claims are fatally flawed due to Relator's mischaracterization of the claims at issue. [Mot. to Dismiss, DN 125, pp. 19-20] In his Response, Relator barely makes a half-hearted attempt to support these claims. Relator only argues that his allegations are sufficient because he alleged no physician performed or supervised the specific services nor was any physician on-site when the services were performed and "these counts do allege fraudulent claims." [Relator's Resp., DN 131, p. 17].

But this altogether fails to address Defendants' explicit argument, nor does it identify any legal or factual support for Relator's conclusion that the claims were actionable under the FCA. Defendants pointed out that only two of Relator's identified codes under Counts III and IV have any professional component and that these services do not have to be performed on-site at the respective facility. [*See* Mot. to Dismiss, DN 125, pp. 19-20 (explaining that only 77421 and 78815 have any professional component and the remaining codes have only technical components)]. Relator made no effort to rebut this or to even address this in any way.

Relator's overall approach to these claims is problematic. For one, by engaging in no substantive response, he has forced Defendants—and the Court—to try to figure out what his bare bones argument is trying to say. This is neither Defendants' nor the Court's responsibility—it is the Relator's obligation to support his claims. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th

Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal quotation omitted and alterations in original).

By ignoring Defendants' arguments about the lack of professional components, Relator seemingly agrees that his claims fail to the extent they allege services must have been provided by physicians. Hence, based on this acquiescence and Relator's other allegations and arguments addressing supervision, it seems as though Relator is relying upon his supposed supervision requirements for these codes. [*See* Relator's Resp., DN 131, p. 17 (titling this section as "Supervision by Physicians")]. Defendants addressed Relator's improper supervision standards throughout their Motion. [*See* Mot. to Dismiss, DN 125, pp. 4-5, 13, 14-15]. Relator's apparent reliance on supervision requirements for these Counts III and IV is similarly flawed.

As noted in their Motion, all but two of Relator's identified codes are technical codes. While Relator seems to believe that these required "personal[] or direct[]" supervision by a physician, CMS disagrees. [*See*, *e.g.*, Third Amend. Compl., DN 124, ¶ 87]. Per the National Physician Fee Schedule Relative Value File for 2014,[1] the physician supervision component for codes 77414 and 77418 *did not apply*. G. John Verhovshek, MA, CPC, *Radiology Billing & Coding: Physician Supervision Requirements for Radiology*, RadiologyToday, https://www.radiologytoday.net/archive/rt0415p10.shtml (April 2015) (explaining that an indicator of "9" meant the "[c]oncept does not apply."). For the technical component of 77815, the

[1] For Counts III and IV, all but three of the dates of service are from 2014 and the supervision standards for the three dates of service in 2015 were unchanged per the 2015 schedule. Defendants reviewed historical versions of the Physician Fee Schedule Relative Value Files on CMS' website. These files are incredibly large spreadsheets with almost 16,000 entries and would have created unreasonably large PDF files to be attached to Defendants' reply brief. It is for this reason that Defendants have not attached a copy of the schedule at issue but, instead, direct the Court to CMS' website where these schedules are located: https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched/PFS-Relative-Value-Files?items_per_page=50&combine=.

supervision level was "01" which requires only *general* supervision (which is a service provided under the physician's overall direction and control but does not require the physician's presence) and not personal or direct supervision. *Id.* Consequently, Relator's supposed reliance on supervision requirements for these codes is misplaced: these codes either do not include supervision requirements, or they do not require the direct or personal supervision that Relator alleged to apply.

Because Relator offers only a minimal argument in support of these counts that fails to sufficiently support these allegations, his failed to support his claims. Moreover, these claims' supervision requirements are in conflict with CMS' requirements. Hence, these claims clearly do not pass muster and are insufficiently pled. For these reasons, Counts III and IV must be dismissed with prejudice.

## III. RELATOR FAILED TO SUPPORT THE ALLEGATIONS IN COUNT VII AND THIS CLAIM MUST THEREFORE BE DISMISSED.

Relator's Count VII, which alleges that Defendants fraudulently submitted claims certifying they maintained documentation that they did not actually create and retain, are similarly unsupported by anything beyond mere legal conclusions and must be dismissed. This Court has already reviewed a similar claim in the original (and largely dismissed) Amended Complaint. [Memo. Op. and Order, DN 76, pp. 14-15]. In their Motion, Defendants pointed out that the Third Amended Complaint contained no reference to any CMS policy that premised reimbursement for simulation services upon a treating physician preparing and signing/initialing a written report that is then retained by the Defendants. [Mot. to Dismiss, DN 125, p. 18]. Moreover, Defendants also pointed out that these requirements were entirely absent from published guidance created by a fiscal agent for Medicare tasked with administering the Medicare program and processing claims.

[*Id.*]. In his response, Relator completely ignores these arguments and *still* does not identify any CMS policy requiring the allegedly material documentation.

Relator's Response takes a "throw everything at the wall to see what sticks" approach—but, unfortunately for him, each of his various attempts fails. He begins by quoting Section 1833(c) of the Social Security Act, which says that "[n]o payment shall be made to any provider of services or other person . . . unless there has been furnished such information as may be necessary in order to determine the amounts due such provider." 42 U.S.C. § 1395I. Yet, this is merely a codification of the requirement that claims for services actually be submitted; it does not speak to any documentation requirements for medical providers. Indeed, the plain reading of the statute is in line with CMS billing requirements. Chapters 1 and 24 of the *Medicare Claims Processing Manual* only require healthcare providers to submit claims for reimbursement on an appropriate claim form furnished by CMS. Under Medicare policies, providers do not submit the entire medical record for the patient because such documentation is not "necessary in order to determine the amounts due such provider" for the service billed. Relator then cites a nonbinding case from another District as grounds that "proper documentation is a precondition for payment." [Relator's Resp., DN 131, p. 18]. However, the case relied upon by Relator merely parrots the requirement that medical professionals maintain adequate documentation to establish medical necessity for the services rendered. This general requirement does not support the specific documentation for simulation services alleged in the Third Amended Complaint. Put simply, the Response mischaracterizes the ruling in the cited case, which merely requires that billed services be medically necessary as reflected in the medical record; it does not create FCA liability for insufficient documentation or documentation errors in general.

The Response then cites an irrelevant provision in the AMA's published CPT Code book—but this also fails to create a condition of payment in any way. The statement, which reads "[a] written report signed by the interpreting individual should be considered an integral part of a radiological procedure or interpretation", is found in the *preamble* to the chapter for radiology codes. [*See* Relator's Resp., DN 131, p. 19]. It is not specific to any of the hundreds of radiological CPT codes listed in that Chapter, nor does it appear in the CPT code books published by any entity other than the AMA. Further, the language of this provision is clearly aspirational and not intended to create a mandatory condition of payment: it only says that a written, signed report "*should be considered* an integral part" and not that one is actually required. [*Id.* (emphasis added)].

Moreover, even if Relator correctly relied upon this AMA statement, it does not provide the amount of support that he needs. The AMA excerpt mentions a signed report—but Relator's allegations go further. According to Relator, the documentation requirements for simulation require a written report "with a hard copy of an x-ray film or electronic images and evidence of image reviewed by the physician . . . ." [Third Amend. Compl, DN 124, ¶ 177]. "[H]ard cop[ies] of x-ray film or electronic images and evidence of image reviewed by the physician" are entirely absent from Relator's chosen AMA preamble excerpt. Consequently, even if this Court were somehow persuaded by Relator's reliance on this quote, it does not support his allegations requiring these specific kinds of documentation.

Instead, Relator seems to rely upon a transmittal from National Imaging Associates, Inc. for these requirements. [Relator's Resp., DN 131, p. 19]. However, this statement again defines best clinical practices and not that any such documentation is required as a condition for payment. As the Sixth Circuit has noted, a failure to document is not in and of itself a violation; the failure is only a violation of the FCA when the documentation is a condition of payment. *Chesbrough v.*

*VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011). Defendants pointed out in their Motion that Relator failed to allege in the Third Amended Complaint any reference to CMS policy to establish that this actually is a precondition of payment. This transmittal does not remedy that deficiency.

Relator's last attempt to salvage these claims is also insufficient. He states that, because the Third Amended Complaint alleges this documentation is a precondition of payment, it is sufficiently pled. [Relator's Resp., p. 19]. He then also says that this "*factual* allegation . . . is adequately supported by the *law and policy* set forth above." [*Id.* at 20 (emphasis in original)]. As to Relator's statement that his allegation is supported by the law, aside from general legal principles that documentation of some sort is required, Relator's response cites no supporting law whatsoever. Consequently, the Court can review Relator's response and see that he cites absolutely no law requiring the documentation he alleges to be material.

But Relator's argument as to the significance of his allegations is also incorrect. This Court has previously explained that Relator cannot simply state something *is* material without sufficient support. [Memo. Op. & Order, DN 76, p. 17 ("Yet, this statement amounts to a mere recitation of the materiality requirement—Relator must provide a legal or factual basis to support this otherwise conclusory allegation.")]. For the reasons explained above, Relator has still not provided any sufficient basis that supports his conclusion that the described documentation is material. But, even more fundamentally, something does not become "material" merely because Relator alleged it to be so. As stated by a court in the Western District,

> "The standard for materiality that we have outlined is a familiar and rigorous one. And False Claims Act plaintiffs must also plead their claims with plausibility and particularity under Fed. R. Civ. P. 8 and 9(b) by, for instance, pleading facts to support allegations of materiality." In other words, the Justice Department's decision to file an FCA lawsuit that describes a regulation as "material" cannot itself prove that CMS would've declined to pay such claims.

*United States v. Vora*, 2022 WL 89177, at *4 (W.D. Ky. Jan. 7, 2022) (quoting *Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 195 n.6 (2016)).

While Relator has quoted various sources, none of them establish that CMS would have declined to pay the claims at issue for lack of the allegedly required documentation. His simulation claim is a legal conclusion supported by nothing beyond conjecture. While Relator's identified documentation may be good practice, it is not a condition of payment. For these reasons, Relator's Count VII fails to state a claim and must be dismissed in its entirety with prejudice.

IV. RELATOR'S COUNTS V AND VI FAIL TO SUFFICIENTLY ALLEGE THAT DEFENDANTS' CHEMOTHERAPY CLAIMS WERE FRAUDULENT BECAUSE A PHYSICIAN DID NOT PROVIDE THE SERVICES.

Relator's Counts V and VI are rooted in Defendants' allegedly fraudulent submission of claims for chemotherapy services and are similarly flawed. Relator's claims are premised upon a faulty foundation: while Relator alleges multiple times that Defendants' claims are fraudulent because they were not *provided* by a physician, Defendants explained at length that chemotherapy services are routinely provided by professionals other than physicians. [Mot. to Dismiss, pp. 7-8, 21-22]. Indeed, as the Defendants' Motion points out, and Relator's Response seems to concede, chemotherapy delivery is a service that is almost exclusively performed by personnel other than a physician. [*Id.* at pp. 23-24]. CMS has recognized this fact and has noted that chemotherapy delivery may be performed by an NPP such as a nurse practitioner or a physician assistant. *See id.*, DN 125-3, *Medicare Carriers' Manual,* Transmittal 1776; HN 15400(D), October 25, 2002 (noting that chemotherapy services are reimbursable even if they are "furnished by one of the physician's employees. . . if they are furnished under direct personal supervision in the office **by one of the physician's employees**.") (emphasis added).

Relator's entire argument that chemotherapy delivery is subject to the 85 percent cap for physician services performed by an NPP is based upon the inherently faulty premise that

chemotherapy delivery is solely a physician service. Per the transmittal cited above, CMS has recognized that it is not a physician service, but instead is a service that is most often performed by auxiliary personnel. *See id.* Simply put, physicians do not put needles in patients' arms; NPPs do. Chemotherapy delivery, which is done via infusion, is not a physician service in practice. CMS recognizes this fact, even if Relator does not. The 85% reimbursement limitation for physician assistants and nurse practitioners contemplate the limitation to be set against physician services performed by NPPs, as demonstrated by the fact that the limitation is applied to the amount "of the physician fee schedule amount for the service." 42 CFR §414.52(c). The above transmittal is taken from the Medicare Carriers Manual and is housed within the section involving the "Fee Schedule for Physicians' Services." Clearly, according to the language of the transmittal, CMS does not consider chemotherapy administration to be a physician service that is applicable to an 85% reimbursement cap, because CMS has explicitly recognized that "on days when a patient receives chemotherapy administration but the physician has no face-to-face contact with the patient, the physician may report and be paid for 'incident to' services furnished by one of the physician's employees, in addition to the chemotherapy administration, if they are furnished under direct personal supervision in the office by one of the physician's employees." *Medicare Carriers' Manual,* Transmittal 1776; HN 15400(D). The language of this transmittal recognizes what CMS has explicitly stated elsewhere, which is that chemotherapy administration is a service performed by auxiliary personnel, and physician supervision is not necessary. As such, chemotherapy delivery is not subject to the 85% reimbursement cap for physician services performed by auxiliary personnel.

In his response, Relator does not deny that chemotherapy services can provided by a non-physician provider, nor does he deny that those services can be reimbursed at 100% of the fee

schedule when provided by a NP or AP. [Relator's Resp., DN 131, p. 11]. Hence, to the extent that Relator's Counts V and VI allege that Defendants' claims were fraudulent because they were provided by a non-physician, these claims fail.

V. RELATOR'S ARGUMENT ADDRESSING LOGAN CANCER CENTER IS UNWARRANTED AND IMMATERIAL TO THE ISSUES RAISED IN DEFENDANTS' MOTION TO DISMISS.

Because Relator was unable to sufficiently support his doomed claims, he chose to dedicate an entire (albeit brief) section to Defendants' supposed "complain[ts]" about the inclusion of Logan Cancer Center. [*Id.* at 21]. All Defendants did in their Motion was state the facts: Logan Cancer Center is a separate entity that has been dismissed from this action. [Mot. to Dismiss, DN 125, pp. 6-7, 19]. Even Relator's own description of Logan Cancer Center makes clear that Defendants did nothing more than describe what has transpired in this action. [Relator's Resp., DN 131, p. 21 (explaining that "Logan CC was dismissed with prejudice after the United States intervened . . . and settled that part of this lawsuit.")]. As to Relator's arguments addressing Defendants' potential liability, Defendants obviously disagree with Relator as to the extent of their potential liability for *any* actions, let alone any committed by Logan Cancer Center. [*See id.*].

The reason why Relator felt it was worth bringing up Logan Cancer Center is obvious in the first sentence of this section: it is clear that Relator wanted to use his Response to voice his own complaints, specifically about the state of discovery in this matter. [*Id.*]. This is apparent from Relator's throwaway comment about Defendants "refus[ing] to produce discovery about Logan CC and the patients and services provided at that facility." [*Id.*]. Defendants' discovery production is entirely unrelated to the issues raised in their Motion to Dismiss. This comment is nothing more than an attempt to distract the Court from Defendants' meritorious arguments warranting dismissal of Relator's claims. Further, even if this statement had some value to the current briefing cycle

(which, again, it does not), Defendants' reply would be simple: Defendants have previously explained that Logan Cancer Center is a separate entity distinct from any of the Defendants. [*See*, *e.g.*, Defs.' Reply in Support of Prot. Order, DN 117, p. 9 (" . . . [Relator] is asking Defendants to provide items that *belong* to Logan Cancer Center. Again, Logan Cancer Center is an entirely distinct entity and is not one and the same with Defendants.") (emphasis in original)]. Even Relator's own description of this matter's procedural history makes clear that Logan Cancer Center is *not* a party to this action. [*See* Relator's Resp., DN 131, p. 21 (describing that Logan Cancer Center was dismissed following settlement with the United States)]. If Relator wants to obtain items that belong to Logan Cancer Center, the Rules of Civil Procedure clearly provide a procedure through which he can attempt to do so. *See* Fed. R. Civ. P. 45. Continuing to fault Defendants for failing to produce documents that belong to a separate, non-party entity is a futile effort on Relator's part.

## VI. DEFENDANTS MAINTAIN THAT RELATOR'S ALLEGATIONS FAIL TO MEET THE HEIGHTENED STANDARD OF RULE 9(B).

Relator's final argument is nothing more than a continuation of the flaws that plagued the Third Amended Complaint: Relator decides, without support or explanation, that his allegations pass the heightened pleading standard imposed by Rule 9(b). [Relator's Resp., DN 131, pp. 21-22]. Defendants acknowledge without accepting that Relator's allegations are supposedly premised upon his own knowledge and other materials. However, they do not in any way accept that Relator has sufficiently alleged that these claims are fraudulent or false. Despite Relator's attempt to argue to the contrary, the Third Amended Complaint *does not* sufficiently allege that requirements identified in his claims are material. [*See id.* at 22]. Defendants raised the lack of supporting allegations for materiality in their Motion and Relator failed to sufficiently rebut these arguments in his Response. Consequently, Relator's claims are insufficiently pled under Rule 9(b).

## CONCLUSION

While Relator has had more than enough opportunities to sufficiently state his claims, he has yet to present a set of pleadings that should be allowed to continue in this action. Defendants articulated well-reasoned and supported arguments in their Motion to Dismiss that explained the many deficiencies plaguing Relator's claims. Relator failed to sufficiently respond to Defendants' arguments. For the reasons stated in Defendants' Motion and in their Reply, Relator's claims must be dismissed with prejudice.

Respectfully submitted,

*/s/ Christopher A. Melton*

Christopher A. Melton
Victoria Boland Fuller
Jake Eldemire-Smith
cmelton@wyattfirm.com
vfuller@wyattfirm.com
jeldemiresmith@wyattfirm.com
WYATT, TARRANT & COMBS, LLP
400 West Market Street, Suite 2000
Louisville, Kentucky 40202
Telephone: 502.589.5235
***Counsel for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on **May 20, 2022**, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the Parties.

*/s/ Christopher A. Melton*
Christopher A. Melton