UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

CIVIL ACTION NO. 0:16-CV-00148-DLB-EBA

UNITED STATES OF AMERICA, *ex rel.*,
ROBERT C. O'LAUGHLIN, M.D.,                                                              PLAINTIFFS,

V.                          **MEMORANDUM OPINION & ORDER**

RADIATION THERAPY SERVICES P.S.C., d/b/a,
ASHLAND BELLEFONTE CANCER CENTER, *et al.*,                          DEFENDANTS.

*** *** *** ***

This is a *qui tam* action brought by Dr. Robert O'Laughlin under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, based on the Defendants' alleged fraudulent misrepresentations to Medicare, Medicaid, and other federal programs regarding chemotherapy services. [R. 52 at pgs. 1–2]. Now, Defendants move to compel discovery from O'Laughlin. [R. 161]. The United States filed a statement of interest in response to Defendants' motion. [R. 164]. Defendants replied to the United States. [R. 166]. O'Laughlin responded in opposition to Defendants' motion, [R. 165], and Defendants filed a reply. [R. 167]. Thereafter, O'Laughlin moved for leave to file a sur-reply, [R. 168], which Defendants oppose. [R. 169]. O'Laughlin did not file a reply in support of his motion for leave to file a sur-reply. The matters are ripe for review. For the reasons below, the Court will deny O'Laughlin's motion for leave to file a sur-reply, grant in part Defendants' motion to compel, deny Defendants' motion for sanctions, and direct *in camera* review.

ANALYSIS

*Motion for Leave to File Sur-Reply*

In the Eastern District of Kentucky, a motion is submitted to the Court for decision after the filing of a motion, response, and reply (or where no response is filed and the time to so file

elapsed). LR 7.1(g). A brief filed outside of this pattern is a sur-reply. Sur-replies "are not authorized under the Federal Rules of Civil Procedure or the Local Rules." *Qiu v. Scott County Schools*, No. 5:21-CV-197-GFVT, 2022 WL 489686, at *1 (E.D. Ky. Feb. 17, 2022). Still, sur-replies "can be filed with permission from the Court, but such permission is only granted if the pleading presents a new argument or evidence for the first time." *Id.*

O'Laughlin moves for leave to file a brief outside of the typical pattern—a sur-reply—to address a "factual argument" that he asserts Defendants raised for the first time in reply. [R. 168 at pg. 1]. Defendants oppose the motion. [R. 169]. They argue that the "factual argument" to which O'Laughlin refers is, in fact, just their response to O'Laughlin's argument. [*Id.* at pgs. 1–2]. After reviewing the briefing, the Court agrees with the Defendants. Critically, Defendants' reply didn't present a new argument or any new evidence, so there's nothing for O'Laughlin to properly address in a sur-reply. Thus, his motion for leave is denied.

*Motion to Compel*

Rule 26(b)(1) provides that—unless otherwise limited—"[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fᴇᴅ. R. Cɪᴠ. P. 26(b)(1). This language is broadly construed to include "any matter that bears on, or that reasonably could lead to other matters that bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). The scope of discovery, however, is not without limitation. It is "well established that the scope of discovery is within the sound discretion of the trial court." *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981) (citing *H. K. Porter Co., Inc. v. Goodyear Tire and Rubber Co.*, 536 F.2d 1115 (6th Cir. 1976)). As such, "[a] ruling by the trial court limiting or denying discovery will not be cause for reversal unless an abuse of discretion is shown." *Id.*

When a party refuses to provide information requested by another party, which is thought by the requesting party to be within the scope of Rule 26(b), then the requesting party may move the court to compel disclosure of the requested information. FED. R. CIV. P. 37(a)(3)(B). Motions to compel may be filed where a party has failed to (1) provide a mandatory disclosure; (2) answer or admit an interrogatory or request for admission; or (3) produce discoverable information, materials, or documents. *See generally* FED. R. CIV. P. 37. However, prior to moving to compel, a party must in good faith confer or attempt to confer with the opposing party "failing to make disclosure or discovery in an effort to obtain it without court action." FED. R. CIV. P. 37(a)(1). Should the court determine that the matters sought to be compelled are within the scope of Rule 26, the motion shall be granted.

Defendants move to compel O'Laughlin to produce certain discovery. [R. 161]. Defendants take issue with three things. *First*, Defendants want O'Laughlin to supplement his initial disclosures. *Second*, Defendants seek production of O'Laughlin's disclosure statement—a statement prepared for and reviewed by the United States in False Claim Act actions to discern whether to intervene in a case. And *third*, Defendants want O'Laughlin to produce certain letters and email communications detailed in his privilege log. The Court will address each in turn.

<u>A. O'Laughlin Must Supplement His Initial Disclosures.</u>

The Federal Rules of Civil Procedure are to be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." FED. R. CIV. P. 1. Rule 26 enumerates certain required disclosures. FED. R. CIV. P. 26(a). Among those required disclosures is the initial disclosure. FED. R. CIV. P. 26(a)(1). Although such disclosures are initial, the parties remain under an ongoing obligation to supplement when the disclosure "is incomplete or incorrect" or "as ordered by the

court." FED. R. CIV. P. 26(e)(1). The disclosure obligation should "be applied with common sense in light of the principles of Rule 1, keeping in mind the salutary purposes that the rule is intended to accomplish." FED. R. CIV. P. 26, Adv. Comm. Notes, 1993 Amend. In the ideal, parties will effectively manage discovery on their own to avoid any need for the court to order initial disclosure supplementation.[1]

Discovery shall not be used "to wage a war of attrition[.]" FED. R. CIV. P. 26, Adv. Comm. Notes, 2015 Amend. (citing Adv. Comm. Notes, 1983 Amend.). Thus, one of Rule 26's chief objectives is "to deal with the problem of overdiscovery." *Id.* (citing Adv. Comm. Notes, 1983 Amend.). The initial disclosure's scope—as tempered by "common sense"—is limited to "information that the disclosing party may use to support its position." FED. R. CIV. P. 26, Adv. Comm. Notes, 2000 Amend & Adv. Comm. Notes, 1993 Amend.

When a party litters its Rule 26 disclosures with swaths of irrelevant information— red herrings—it wages "a war of attrition[.]" FED. R. CIV. P. 26, Adv. Comm. Notes, 2015 Amend. (citing Adv. Comm. Notes, 1983 Amend.). That's what happened here. O'Laughlin disregarded the letter and spirit of Rule 26 by ignoring his ongoing duty to supplement his initial disclosures.

After Judge Bunning granted in part Defendants' motion to dismiss, only Counts V, VI, and VIII of the Third Amended Complaint remained. [R. 141 at pg. 14]. All three counts relate to alleged fraudulent billing practices by Defendants for chemotherapy treatment. Judge Bunning also entered a new Scheduling Order which reset the initial disclosure deadline. [R. 150]. Defendants properly updated their initial disclosure in light of the dismissed counts. O'Laughlin, however, decided to resend his then-two-year-old initial disclosure to Defendants as his latest initial disclosure, along with a "discovery production letter." [R. 165 at pg. 9] ("Our's remain the

---

[1] Judicial intervention is necessary, however, in cases like this one where "the parties fall short of effective, cooperative management on their own." FED. R. CIV. P. 26, Adv. Comm. Notes, 2015 Amend.

same, updated by our production discovery letter."). This, despite most of the information contained in his original initial disclosure having become irrelevant after Judge Bunning dismissed five of O'Laughlin's eight counts—and despite the initial disclosure containing *zero* information about chemotherapy billing. O'Laughlin concedes all of this. *See, e.g.*, [*Id.* at pgs. 10–11] (noting that his "disclosures describe what topics specific witnesses might be able to testify about; and the Defendants are free to decide if any of these witnesses are worth interviewing or deposing" and that "initial disclosures are just that—*initial* disclosures").

O'Laughlin's initial disclosure is cluttered with irrelevant information. This runs afoul of Rule 26(a)(1)'s purpose, which is to facilitate the disclosure of "information that the disclosing party may use to support its position." FED. R. CIV. P. 26, Adv. Comm. Notes, 2000 Amend. It's not the non-disclosing party's job to root through the initial disclosure and guess what material is relevant and might be used. No, it's the duty of the discloser to "only" disclose information which "may" be used "to support its position." *Id.* Irrelevant information cannot be used for such a purpose. O'Laughlin doesn't contend that the stale information lurking in his initial disclosure might be used to support his position. Instead, he impermissibly passes the buck to the Defendants. *See, e.g.*, [R. 165 at pgs. 10–11] (arguing that he "enable[ed] the [Defendants] to evaluate what may be useful" so "Defendants are free to decide if any of these witnesses are worth interviewing or deposing").

This is gamesmanship—which Rule 26 forbids. FED. R. CIV. P. 26, Adv. Comm. Notes, 1993 Amend. ("The litigants should not indulge in gamesmanship with respect to the disclosure obligations."). So, the Court will grant Defendants' motion to compel O'Laughlin to remove stale, irrelevant information from his initial disclosure.

### B. O'Laughlin Must Provide the Disclosure Statement for an *In Camera* Review.

Under the False Claims Act, a private person can sue in the name of the United States. 31 U.S.C. § 3730(b)(1). But when he does so, he must provide a copy of the complaint to the United States for review. *Id.* at § 3730(b)(2). Also, he must prepare a disclosure statement that includes "substantially all material evidence and information [he] possesses" and serve it on the United States. *Id.* The United States then reviews the complaint and disclosure statement and discerns whether it should intervene in the action. *Id.*

Here, O'Laughlin sued in the name of the United States and complied with the False Claims Act by serving a copy of his complaint on the United States, along with a detailed disclosure statement. *See* [R. 1]. The United States elected to intervene in part but declined to intervene as to the remaining Defendants. [R. 18]. Now, four years after the case was unsealed, Defendants want the disclosure statement to be produced so they can better understand the nature of the allegations lodged against them. [R. 161]; *see* [R. 166]; [R. 167]. O'Laughlin and the United States, however, argue that the disclosure statement is attorney-work product and can't be produced. [R. 164]; [R. 165].

The producibility of False Claims Act disclosure statements is less controversial than the parties' briefing suggests. Disclosure statements are loaded with material, producible facts. *See U.S. ex rel. Burns v. A.D. Roe Co., Inc.*, 904 F. Supp. 592, 593 (W.D. Ky. 1995) (observing that "[t]here can be no doubt that the statement of material evidence contains relevant, factual information. In fact, a more complete recitation of the facts cannot be found"). And the False Claims Act doesn't suggest that disclosure statements are confidential. *See id.* (observing that "[n]othing in the statute mandates, or even suggests, that these statements are privileged"). However, such statements are prepared by attorneys in anticipation of litigation—raising questions

of the attorney-work product doctrine.[2] So, trouble can arise when assessing how, when, and whether to produce those facts.

Some courts simply direct legal theories and other sensitive information to be redacted from the disclosure statement before production. *See, e.g.*, *U.S. ex rel. Yannacopoulos v. Gen Dynamics*, 231 F.R.D. 378, 384 (N.D. Ill. 2005) (ordering a redacted version of the disclosure statement be produced); *U.S. ex rel. Cericola v. Ben Franklin Bank*, No. 99-CV-6311, 2003 WL 22071484 (N.D. Ill. Sept. 4, 2003) (same). Others decline to produce disclosure statements at all. *See, e.g.*, *U.S. ex rel. Bagley v. TRW, Inc.*, 212 F.R.D. 554, 563–65 (C.D. Cal. 2003) (protecting disclosure statement from production where it contained facts "interwoven with analysis, opinion, and conclusions" and where the "selection, organization, and characterization" of the facts revealed counsel's mental impressions and opinions). And still others direct disclosure statements to be produced in full without redaction. *See, e.g.*, *Burns*, 904 F. Supp. at 594–95; *U.S. ex rel. Stone v. Rockwell Intern. Corp.*, 144 F.R.D. 396 (D. Colo. 1992); *Grand ex rel. United States v. Northrop Corp.*, 811 F. Supp. 333 (S.D. Ohio 1992); *U.S. ex rel. Campbell v. Lockheed Martin Corporation, et al.*, No. 6:95-CV-549-ORL-28DAB, Doc. 235 at pg. 8 (M.D. Fla. Oct. 11, 2001) (acknowledging that while "the Act does not give express protection to the disclosure statement[,] . . . the Court cannot presume that Congress intended  to strip relators of the ability to assert privileges enjoyed by all other litigants, as a consequence of pursuing a *qui tam* action").

These decisions seem contradictory at first blush, but closer inspection reveals that all share one common thread: the moving party must first make the proper showing of substantial need and undue hardship; then, if the showing is made, the court should consider the content of the

---

[2] "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law, and it is meant to encourage clients to communicate freely with their attorneys." *United States v. Paulus*, No. 0:15-CR-15-DLB-EBA, 2021 WL 4494607, at *3 (E.D. Ky. Sept. 30, 2021) (referencing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

disclosure statement on a case-by-case basis to determine whether production—in full, in-part, or at all—is appropriate.[3] Of course, this rule is applicable because disclosure statements are protected by the work product doctrine, *see U.S. ex rel. Bingham v. Baycare Health Sys.*, No. 8:14-CV-73-T-23JSS, 2017 WL 1546504, at *4 (M.D. Fla. Apr. 15, 2016) (collecting cases), which protects both opinion *and* fact work product.[4] FED. R. CIV. P. 26(b)(3)(A)(i)–(ii); *id.* at 26(b)(3)(B). The overarching question, then, is whether the instant disclosure statement constitutes *fact* work product, *opinion* work product, or a hodgepodge of both. In any case, Defendants must first show substantial need and undue hardship to justify production. *Id.* at 26(b)(3)(A)(i)–(ii).

  i.  Defendants show substantial need and undue hardship.

  Defendants make clear that they seek this disclosure statement because O'Laughlin's "production" related to some of his claims "remains severely limited[.]" [R. 161 at pg. 12]. "For example," Defendants assert that O'Laughlin "altogether side-stepped Defendants' Requests for Production concerning [the] conspiracy claim." [*Id.*]. In fact, as grounds for objecting to those requests for production, O'Laughlin stated that such information was "included in" the disclosure statement provided to the government—which he maintains is protected *in toto*. [*Id.*]. Additionally, per Defendants, O'Laughlin's answer to an interrogatory about the conspiracy claim "added nothing . . . beyond the allegations contained within his Third Amended Complaint." [*Id.*]. Thus, Defendants seek "the disclosure statement's *factual* content" to understand the remaining claims

---

[3] Or, as Defendants put it, "if the memoranda is boiled down to *factual* information, the defendant is not necessarily precluded from receiving the memoranda." [R. 161 at pg. 13].

[4] This position is not contrary to *Burns*, as Defendants assert, but is rather aligned with it. *See* [R. 166 at pg. 3] (stating that the United States' statement of interest "sought to diminish the rationale[] expressed in *Burns*"). In *Burns*, however, the court granted a motion to compel production of the disclosure statement precisely because it found that the movant had a substantial need for the document and that absent production the movant would suffer an undue hardship. *Burns*, 904 F. Supp. at 594 (concluding that movant's "need for this document is great and its equivalent cannot be obtained by other means").

against them.[5] [*Id.*] (emphasis in original); *see also* [*id.*] ("We are not asking for . . . mental impressions, conclusion, opinions or legal theories to be disclosed.").

In the United States' view, that's not enough to demonstrate substantial need and undue hardship. [R. 164 at pgs. 4–6]. It offers two (very similar) reasons why: (1) it's too early in discovery for there to be a substantial need; and (2) it's too early in discovery for there to be an undue hardship. The United States cites no less than six cases from districts in Texas, Florida, and Pennsylvania for the proposition that "there can be no showing of substantial need" "until depositions and other fact discovery is complete[.]" [*Id.* at pg. 5] (citing *Bingham*, 2016 WL 1546504, at *6–7; *U.S. ex rel. John Doe v. Health First, Inc., et al.*, No. 6:14-cv-501-ORL-37DAB, at *6–7 (M.D. Fla. July 8, 2016); *United States v. Homeward Residential, Inc.*, No. 4:12-CV-461, 2015 WL 4610284, at *3–4 (E.D. Tex. July 31, 2015); *U.S. ex rel. Singh v. Bradford Reg'l Med. Ctr.*, No. CIV.04-186ERIE, 2007 WL 1576406, at *2–3 (W.D. Pa. May 31, 2007); *U.S. ex rel. Hunt v. Merck-Medco Managed Care, LLC*, No. 00-CV-737, 2004 WL 868271, at *2 (E.D. Pa. Apr. 21, 2004); *United States v. Medica-Rents Co.*, No. CIV.A 4:00-CV-483-Y, 2002 WL 1483085, at *2 (N.D. Tex. June 21, 2002). And it argues that because discovery closes on December 8, 2023, there remains plenty of time for Defendants to serve additional discovery requests or depose O'Laughlin about the facts he disclosed to the United States in the disclosure statement. [R. 164 at pg. 7] (quoting *Bingham*, 2016 WL 1546504, at *6).

However, in this case there is no reason to believe that O'Laughlin will properly answer additional discovery requests, nor properly address the Defendants' questions via deposition.

---

[5] Only Counts V, VI, and VIII of the Third Amended Complaint survived Defendants' motion to dismiss. [R. 141 at pg. 14]. "Count V alleges that Medicare pays only 85% of the physician rate of a service performed by a physician's assistant or a nurse practitioner. O'Laughlin further alleges that Defendants billed for chemotherapy services as if they were provided by a physician, when in fact they were neither provided by nor directly or personally supervised by a physician. Count VI pleads a related false statement claim based upon the same allegations as Count V. . . . Count VIII alleges a conspiracy claim related to [Counts V and VI]." [*Id.* at pgs. 9, 13].

Indeed, as the Defendants highlight at length, O'Laughlin has yet to properly respond to discovery requests relating to the conspiracy claim on the grounds that, somehow, even the *facts* are protected from disclosure solely because those same facts *make an appearance* in the disclosure statement. *See* [R. 161 at pg. 12]; [R. 167 at pg. 8] ("[E]fforts at discovery have proven less than fruitful in ascertaining the Relator's contentions and the factual bases of his claims."). Thus, absent some contrary finding by this Court, O'Laughlin is unlikely to elaborate further on the matter.

That said, it's true that the Defendants have yet to depose anyone, let alone O'Laughlin. *See* [R. 165 at pg. 5]. It's also true that the Defendants "retain access to their own employees who are, or were, involved in the scheme alleged in the relevant counts of the Complaint" as well as "the relevant patient treatment schedules, billing records, and insurance records that are at the heart of this case." [*Id.*]. The Defendants' access to these witnesses, documents, and records undercuts their claim of "substantial need," to be sure, but does not eliminate it. Given the wide-breadth of discovery in this action, the Defendants need at least *some* direction as to where to look—even among their own records. And without guidance from O'Laughlin—the master of the complaint— about what undergirds his conspiracy claim, there is little the Defendants can do aside from make semi-educated guesses about the facts supporting the allegations lodged against them. That will not do.

And as to the undue hardship inquiry, the Court finds the analysis in *Burns* persuasive: because "a more complete recitation of the facts cannot be found" outside the disclosure statement, said statement "is the best source for this information and nothing can serve as its substitute." *Burns*, 904 F. Supp. at 593–94. Thus, even though this seven-year case is (still) in its "early" discovery stages, the Defendants make a satisfactory showing of both substantial need and undue hardship to justify production of at least the factual portions of the disclosure statement.

ii.  Because the Defendants show substantial need and undue hardship, the Court will review the disclosure statement *in camera*.

Although the Defendants show substantial need and undue hardship, that's not enough to warrant outright production at this time absent confirmation that the disclosure statement includes *only* factual content. Both the United States and O'Laughlin aver that the disclosure statement— drafted in the form of a prosecution memorandum—contains factual statements that are inextricably intertwined with legal theories, opinions, and anticipated defense theories. *See* [R. 167 at pg. 9] (observing that O'Laughlin's response claims that his "[c]ounsel is so skilled at drafting a disclosure statement that he is able to weave his impressions and opinions into each and every statement such that there exist no purely factual recitations in the entirety of the disclosure document"). While that may be true, the Court must ultimately be the judge of that. The Court will examine the disclosure statement *in camera* to determine whether it can be produced in full, in part, or at all. Therefore, O'Laughlin is directed to file the disclosure statement he provided to the United States into the record, under seal and *ex parte*, so that the Court may examine it *in camera*. The Court will determine whether the Defendants are entitled to the statement, or any part of it, by separate order.[6]

C. O'Laughlin Must Provide his *Touhy* Request for *In Camera* Review, and Produce the Kuley Letter, Bowman Emails, and Brown Emails to the Defendants.

A party can decline to produce an otherwise producible item or document where a privilege exists and is properly asserted in a privilege log. FED. R. CIV. P. 26(b)(5); *Osborn v. Griffin*, No. 11-CV-89-WOB-CJS, 2013 U.S. Dist. LEXIS 132613, at *6 (E.D. Ky. Sept. 17, 2013). The privilege log should lay out the information required under Rule 26.

---

[6] However, to be clear, the Court is satisfied that the Defendants made a proper showing of substantial need and undue hardship. That finding will be assumed in the subsequent order, which will be limited to whether the factual work product of the disclosure statement can be separated from its opinion work product.

*Mafcote, Inc. v. Federal Ins. Co.*, No. 3:08-CV-11-CRS, 2010 WL 1929900, at *2 (W.D. Ky. May 12, 2010). "This is done so that the Court can assess the claim of privilege and determine if it is a legitimate one." *Glowgower v. Bybee-Fields*, No. 3:21-CV-12-EBA, 2022 WL 4042412, at *8 (E.D. Ky. Sept. 2, 2022). For a claim of privilege to be justified, "a privilege log must contain sufficient factual content to allow the court" to conclude "that each element of that privilege is fulfilled." *Mafcote*, 2010 WL 1929900, at *5. The party asserting the privilege bears this burden. *See In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 450 (6th Cir. 1983).

During discovery, O'Laughlin determined that "several hundred" written communications between his counsel "and entities that were victims of the fraudulent scheme alleged in his Complaint" were subject to the attorney work-product doctrine and, thus, could be withheld from Defendants. [R. 165 at pg. 12]. So, he prepared a privilege log and provided it to Defendants. Now, Defendants challenge the sufficiency of O'Laughlin's privilege log and compel production of the documents it seeks to protect. [R. 161 at pgs. 15–18].

As a preliminary matter, in response, O'Laughlin advises that he and Defendants "reached an agreement" which narrows "the categories and numbers of items for privileges that must be adjudicated." [R. 165 at pg. 12]. Said agreement was memorialized in a letter signed by O'Laughlin and Defendants' counsels. [R. 165-2]. In reply, Defendants similarly advise that an agreement was reached. [R. 167 at pg. 11]. Only the producibility of two letters and two categories of emails remain at issue.[7] [R. 165 at pg. 12].

---

[7] Those are: (1) a *Touhy* request, prepared in the form of a letter, addressed to Seema Verma, the then-Administrator of the Centers for Medicare & Medicaid Services; (2) a letter from O'Laughlin's counsel to Lauren Kuley of Squire Patton Boggs ("Kuley Letter"); (3) multiple emails between O'Laughlin's counsel and Jessica Bowman, an attorney in the Office of the General Counsel of the U.S. Department of Health and Human Services, sent between October 2019 and January 2022; and (4) multiple emails between O'Laughlin's counsel and Nancy Brown, an attorney in the Office of Counsel to the Office of the Inspector General of the U.S. Department of Health and Human Services, sent during October 2019.

i.      The Court will review O'Laughlin's *Touhy* request *in camera*.

First among the disputed items is a *Touhy* request that O'Laughlin addressed to Seema Verma, the then-Administrator of the Centers for Medicare & Medicaid Services ("CMS"). O'Laughlin avers that he prepared his *Touhy* request, in the form of a letter, at the direction of Attorney-Advisor Amy Weiser of the General Counsel's Office of the U.S. Department of Health and Human Services. [R. 165-3 at pg. 5]. O'Laughlin tendered the request to receive "specific information from CMS." [R. 165 at pg. 16]. In so doing, however, O'Laughlin states that he included "some . . . plans for developing his case." [*Id.*]. Consequently, O'Laughlin argues that the letter is attorney work-product and is otherwise protected by the common interest privilege. [*Id.*].

Executive branch agencies, like CMS, are empowered to prescribe housekeeping regulations for their own internal governance. 5 U.S.C. § 301. Housekeeping regulations that create procedures for responding to subpoenas are called *Touhy* regulations. Named after the mid-twentieth century case *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951), *Touhy* requests seek official information from the government for use in litigation, including witnesses and documents, when the United States isn't a party to the litigation. *Touhy* regulations—which govern *Touhy* requests—exist because federal employees can't be compelled or held in contempt for refusing to answer a subpoena, if prohibited from responding by their superior. *Frank v. U.S. Food and Drug Admin.*, 998 F. Supp.2d 596, 602 (E.D. Mich. 2014). "This compromise between public and private interests is necessary to conserve agency resources and to prevent the agency from becoming embroiled in private litigation." *Id.* (quoting *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 278 (4th Cir. 1999)). In essence, a *Touhy* request is a third-party discovery tool that's used when the party with information happens to be the federal

government, rather than a private entity. *See* [R. 167] (observing that O'Laughlin's request seems "akin to . . . third-party discovery").

Given the nature of *Touhy* requests, which generally include statements outlining the information sought, its nature, and its relevancy to litigation, O'Laughlin's contention that his *Touhy* request is protected from discovery is a curious one. However, O'Laughlin does represent, at least twice, that the request contains opinion work product. [R. 165 at pg. 16] (remarking that the letter "explains *some* of Dr. O'Laughlin's plans for developing his case") (emphasis added); [R. 165-3 at pg. 5] ("It requests certain documents, and in support of these requests it describes Dr. O'Laughlin's strategy for pursuing the case."). Moreover, O'Laughlin represents that he didn't waive the attorney work-product doctrine by sharing the information with CMS, because it and he share a common interest. [R. 165 at pg. 16]; [R. 165-3 at pg. 5]; *see Cooey v. Strickland*, 269 F.R.D. 643, 652 (S.D. Ohio 2010) (explaining that the common interest privilege protects "information disclosed to other parties, expanding coverage of the attorney-client privilege to include situations in which two or more clients with a common interest in a matter agree to exchange information regarding the matter").

Still, as was the case with O'Laughlin's disclosure statement, the Court must be the judge of the *Touhy* request's contents. The Court must examine the *Touhy* request *in camera* to determine whether it can be produced in full, in part, or at all. Therefore, O'Laughlin is directed to file the *Touhy* request he addressed to then-Administrator Verma into the record, under seal and *ex parte*, so that the Court may examine it *in camera*. The Court will determine whether the Defendants are entitled to the *Touhy* request, or any part of it, by separate order. Also at that time, the Court will take up O'Laughlin's assertion that he shares a common interest with CMS, negating any potential privilege waiver.

    ii.  Because O'Laughlin waived the attorney-client privilege and work product doctrine, he must produce the Kuley Letter.

   Next up is the "Kuley Letter," a letter prepared by O'Laughlin's counsel and addressed to Lauren Kuley of Squire Patton Boggs, who served as counsel to WellCare in an unrelated action. By way of background, two Defendants in this case previously brought a claim in arbitration against WellCare "alleging that WellCare failed to pay Medicaid claims promptly as required by Kentucky law"—or, as O'Laughlin frames it, that WellCare "*underpaid* its Medicaid claims[.]" [R. 165 at pg. 17] (emphasis in original); *but see* [R. 167 at pg. 13] (asserting that the matter "was not over whether WellCare 'overpaid the Defendants for chemotherapy services,'" rather, "the *Defendants* brought a lawsuit and initiated arbitration against *WellCare* for **underpaying** the Defendants to the tune of millions of dollars for chemotherapy services that the Defendants rendered to WellCare's beneficiaries") (emphasis in original). Inversely, O'Laughlin alleges in this action that the Defendants "*overbilled*" Medicare and Medicaid Managed Care Organizations, like WellCare. [R. 165 at pg. 17] (emphasis in original).

   Presumably discerning the potential overlap, Kuley reached out to O'Laughlin's counsel to discuss his *qui tam* action against the Defendants. *See* [*id.*] ("These are two sides of the same coin, as the facts supporting Dr. O'Laughlin's affirmative assertions might have been useable as defenses by WellCare; and the facts supporting WellCare's defensive allegations might have been useable by Dr. O'Laughlin as evidence against the Defendants."). About a month later, O'Laughlin's counsel penned the Kuley Letter to describe this action, request four specific items of documentary evidence, and inquire into whether WellCare personnel could testify by deposition or at trial on two specific topics. [*Id.* at pg. 18]. He avers these discussions were had because WellCare and O'Laughlin "were exploring a joint strategy" tangential to their shared common interest. [*Id.*]. He concedes, however, that WellCare and O'Laughlin ultimately didn't enter into a

joint agreement. [*Id.* at pg. 19 n.10]. Nonetheless, O'Laughlin argues that the Kuley Letter is attorney work-product and is otherwise protected by the common interest privilege.

Generally, anytime privileged information is disclosed to a third-party, the disclosing party waives any applicable privilege against production during discovery. *See In re Grand Jury Proc.*, 78 F.3d 251, 254 (6th Cir. 1996) (remarking that voluntary disclosure of once-privileged material to a third-party "runs counter to the notion of confidentiality," and therefore waives the attorney-client privilege); *In re Columbia/HCA Healthcare Corp. Billing Litigation*, 293 F.3d 289, 307 (6th Cir. 2002) (same, but as to attorney work-product). Thus, in the ordinary course, O'Laughlin's disclosure of confidential information to Kuley by and through the Kuley Letter constitutes a waiver of the attorney work-product doctrine, making it producible.

Of course, as with all things legal, there's an exception to the rule. The common interest privilege protects "information disclosed to other parties, expanding coverage of the attorney-client privilege to include situations in which two or more clients with a common interest in a matter agree to exchange information regarding the matter."[8] *Cooey v. Strickland*, 269 F.R.D. 643, 652 (S.D. Ohio 2010). Whether the parties are represented by the same attorney, or whether the parties are involved in the same legal action, is of no consequence to the privilege's applicability. All that matters is that the parties "share a common interest" in reaching "the same goal in litigation." *Id.*

Still, there are important limitations to the privilege's applicability—and at least one is fatal to O'Laughlin's claim of privilege. The common interest privilege applies "only when all

---

[8] Interestingly, O'Laughlin does not refer to the attorney-client privilege in his argument—just the work-product doctrine. However, the common interest privilege to which he clings necessarily implicates—and, indeed, expands the scope of—the attorney-client privilege between himself and his attorney.

attorneys and clients have agreed to take a joint approach in the matter at issue."[9] *Id.* Consequently, "[c]ommunications made before an agreement to proceed joint are not privileged." *Id.* (citing *United States v. Melvin*, 650 F.2d 641 (5th Cir. 1981) (holding that communications made to enlist a party's participation in a common defense were not privileged because they preceded any agreement)). As noted earlier, O'Laughlin concedes that he never entered into a joint agreement with WellCare. [R. 165 at pg. 19 n.10]. And the result would be the same even if O'Laughlin had reached an agreement with WellCare because he concedes that the Kuley Letter was sent while he was "exploring" entering such an agreement, [*Id.* at pg. 18], acknowledging that it was sent "before an agreement to proceed joint" was made. *Cooey*, 269 F.R.D. at 652.

The information contained within the Kuley Letter "was once shielded by the attorney-client privilege and work product doctrine. However, when" O'Laughlin's counsel "deliberately revealed to [WellCare] portions of its" trial strategy, "it waived both of those protections as to the disclosed information." *United States v. Paulus*, No. 0:15-CR-15-DLB-EBA, 2021 WL 4494607, at *4 (E.D. Ky. Sept. 30, 2021). So, the Court will grant Defendants' motion to compel the Kuley Letter's production.

    iii.    Because O'Laughlin's privilege log doesn't include the Bowman and Brown emails, he must produce them.

There remain two outstanding groups of documents that the Defendants move to be produced: multiple emails between O'Laughlin's counsel and Jessica Bowman, an attorney employed by the Office of General Counsel of the U.S. Department of Health and Human Services; and multiple emails between O'Laughlin's counsel and Nancy Brown, an attorney employed by the Office of Counsel to the Officer of the Inspector General of the U.S. Department of Health and

---

[9] This agreement need not be reduced to writing; "so long as the parties clearly and specifically agree to the joint venture in some manner, the doctrine will apply." *Cooey*, 269 F.R.D. at 652.

Human Services. The Bowman emails were purportedly sent between October 2019 and January 2022. [R. 165 at pg. 13]. The Brown emails were purportedly sent in October 2019. [*Id.*].

Puzzlingly, neither group of emails makes an appearance on O'Laughlin's privilege log—which is at the heart of this discovery dispute. [R. 161-3]. The log generally details bundles of emails sent between O'Laughlin's counsel and attorneys with the United States Attorney's Office, Logan CC, WellCare, Kentucky Department of Medicaid Services, Humana MCR, McKesson, and Change HealthCare. [*Id.*]. Also, the log details a group of emails sent to "Personnel from HHS, CMS, CGS, and Blue Cross and Blue Shield of South Carolina" that were sent "December 2019 until present." [*Id.* at pg. 2]. It is, of course, possible that the "Personnel" designation includes attorneys Bowman and Brown. However, the dates are off (the Bowman emails were sent between October 2019 and January 2022; the Brown emails were sent in October 2019).

Even if O'Laughlin's privilege log can fairly be said to include the emails at all, it remains deficient. In the log, O'Laughlin asserts that the work product doctrine and common interest privilege protect emails between himself and "Personnel" from production. However, as to the subject matter of those emails, O'Laughlin relays that they include "[c]ommunications regarding CMS, CGS, and Palmetto GBA claims and contract data." [*Id.*]. There is no indication that the communications were oriented toward developing a legal theory for the case, or otherwise opining on the matter—and this assumes that the "Personnel" privilege log entry refers to the emails in dispute. If these emails merely contain facts, it's uncertain why they should be shielded from production. To make matters worse, in his response, O'Laughlin doesn't indicate the nature of these emails. Instead, he just avers that the emails generally "include the thought processes of Dr. O'Laughlin's counsel amassing evidence that may be necessary to build his case and prepare for discovery and trial." [R. 165 at pg. 14]. He offers nothing more than that.

The amassment of evidence, without more, does not suggest the development of sensitive opinion work product. Nor is it certain that the Bowman and Brown emails are even contemplated in the privilege log—again, the dates are off. For these reasons, the Court will grant the Defendants' motion to compel the Bowman and Brown emails.

*Rule 45 Sanctions*

Finally, Defendants move to sanction O'Laughlin for his use of third-party discovery without first noticing Defendants, as required by Rule 45—conduct that O'Laughlin admits. [R. 165 at pg. 19] ("Undersigned counsel apologizes to opposing counsel, their clients and to the Court, and confirms that it will not happen again."). Rule 45 governs subpoenas. FED. R. CIV. P. 45. Attorneys may issue a subpoena *duces tecum* to compel the production of documents and other things. *Id.* at 45(a)(1)c). Yet, before issuing a subpoena, an attorney must provide "[p]rior notice" to the other side so it has an opportunity to object. *Id.* at 45(b)(1).

At times, district courts have found it appropriate to sanction attorneys who violate Rule 45's letter or spirit by failing to provide prior notice. *See, e.g.*, *Auto Inspection Servs. Inc. v. Flint Auto Auction, Inc.*, No. 06-15100, 2007 WL 3333016, at *3–7 (E.D. Mich. Nov. 9, 2007). Appropriate sanctions, however, are preceded by bad faith conduct. *See First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 519 (6th Cir. 2002). A mere "mistake" isn't enough. *Mann v. Univ. of Cincinnati*, 114 F.3d 1188 (table), 1997 WL 280188 (6th Cir. 1997).

Here, O'Laughlin asserts that his failure to provide advance notice "was a systemic oversight" on his part that "was not done intentionally to circumvent the rules or to hide something from the Defendants." [R. 165 at pg. 19]. And he advises that, prior to the instant motions' filing, he sent a letter to the Defendants which identified "every such subpoena *duces tecum*" issued during discovery. [*Id.* at pg. 21]. Making a mistake isn't the same as deliberately acting in bad

faith. O'Laughlin made a mistake. Discerning no bad faith, the Court will deny the Defendants' motion for sanctions.

### CONCLUSION

Six years into discovery, Defendants move to compel discovery from O'Laughlin and for the Court to sanction him. Defendants' motion to compel [R. 161] is GRANTED IN PART. O'Laughlin shall produce the Kuley Letter, the Bowman emails, and the Brown emails within seven days of this Order's entry. Also within seven days, O'Laughlin shall file his disclosure statement and *Touhy* request under seal and *ex parte* for *in camera* review. Defendants' motion for sanctions is DENIED.

IT IS SO ORDERED.

Signed July 27, 2023.



**Signed By:**

**_Edward B. Atkins_**

**United States Magistrate Judge**