UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT ASHLAND

***Electronically Filed***

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*Ex rel.* ROBERT C. O'LAUGHLIN, M.D.<br><br>PLAINTIFFS,<br><br>v.<br><br>RADIATION THERAPY SERVICES, P.S.C. dba ASHLAND BELLEFONTE CANCER CENTER, KIRTI K. JAIN, M.D., P.S.C., dba HIGHLANDS CANCER CENTER, A ONE BIZ SOLUTIONS, LLC, MANISH JAIN, and KIRTI K. JAIN, M.D.<br><br>DEFENDANTS. | ) | CIVIL ACTION NO. 0:16-cv-148-DLB |

**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Come the Defendants, Radiation Therapy Services, P.S.C. d/b/a Ashland Bellefonte Cancer Center, Kirti K. Jain, M.D., P.S.C. d/b/a Highlands Cancer Center, A-One Biz Solutions LLC, Kirti K. Jain, M.D., and Manish Jain (collectively, the "Defendants"), by counsel, and pursuant to Fed. R. Civ. P. 56, hereby moves this Court to grant Summary Judgment in their favor against the Third Amended Complaint. As grounds, the Defendants state that they are entitled to judgment as a matter of law and that the evidence in the record is legally insufficient to establish a violation of the False Claims Act. Specifically, the evidence in the record merely describes, at best, a fraudulent scheme while failing to identify reliable evidence of a single false claim, or any damages related to any singular claim submitted to the Government, which is an essential element of the FCA. Further, the record fails to establish the requisite subjective knowledge scienter that

is required under the FCA. A Memorandum of Law in Support of Defendants' Motion for Summary Judgment is tendered herewith.

**MEMORANDUM OF LAW AND FACT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

As this Court has recognized previously, this matter has a "convoluted and lengthy" procedural history. [Doc. 141, p. 1]. Defendants therefore incorporate by reference the description of the procedural history from their Motion to Dismiss the Third Amended Complaint [Doc. 125.] . However, they also offer the brief summary below of pertinent procedural facts.

This matter was initiated in 2016 with a broad-sweeping eight-count Complaint. [Doc. 1]. After the United States conducted its investigation and declined to intervene in 2019, the Defendants moved to dismiss the Complaint. [Doc. 50]. In response, Relator filed his first Amended Complaint. [Doc. 53]. The Amended Complaint contained many of the problems from the original Complaint and Defendants again moved to dismiss. [Doc. 64]. Dismissal was largely granted by the Court on October 20, 2020. [Doc. 72]. Several counts were dismissed with prejudice, including Relator's claim alleging that Defendants fraudulently submitted bills for services under one physician's name when a different physician actually provided the service (the "Named Physician Claims"). [*Id.* at 15-20].

Other counts were dismissed without prejudice in recognition of Relator's arguments that certain claims could be salvaged. Relator thereafter filed a Second Amended Complaint. [Doc. 91]. But the Second Amended Complaint was essentially a copy of the flawed Amended Complaint. [*See* Doc. 123, p. 2 n.1 ("Because the Second Amended Complaint at issue here (Doc. # 91) and the Amended Complaint (Doc. # 53) . . . are almost identical, . . . .")]. When Defendants moved to dismiss, Relator abandoned the Second Amended Complaint and improperly introduced

a Third Amended Complaint. [Doc. 102, p. 8]. Despite never moving for leave to amend, the Court allowed the Third Amended Complaint to be filed. [Doc. 123].

Once again, Defendants moved to dismiss. [Doc. 125]. This Motion was once again largely granted by the Court and resultingly, Relator's expansive set of pleadings was reduced from eight counts to three. [Doc. 141, p. 14]. The only remaining actionable claims pertain to the provision of chemotherapy administration and specifically whether "Defendants billed for chemotherapy services as if they were provided by a physician, when they were neither provided by nor directly or personally supervised by a physician." [*Id.* at p. 9, (citing the Third Amended Complaint, Doc. 124 at ¶121).] The Court also allowed the Conspiracy claim to proceed to discovery, only to the extent it related to chemotherapy administration. [*Id.* at p. 14.]

The case proceeded to over thirteen months of discovery, during which time significant disputes arose. Certain of those disputes are explained at greater length in Defendants' Motion to Exclude evidence related to damages, filed contemporaneously herewith. However, to briefly summarize, Relator eschewed the Court's Order to create a statistically-valid random sample. Instead, he forged his own path based on his own "expertise" and requested records for three "tranches" of patients. *See* Defs.' Mot. to Exclude. Now, after seven years of litigation and expansive discovery, the record of this case is complete and this matter is ripe for the review of its merits.

## <u>STATEMENT OF UNDISPUTED FACTS</u>

This case was brought by a disgruntled former employee of Defendants Ashland Bellefonte Cancer Center ("ABCC") and Highlands Cancer Center ("HCC") (collectively, "the Cancer Centers.") The record reflects that Relator has a long history of working for various oncology practices whereby he was subsequently terminated or had contracts not renewed for a variety of

reasons.[1] [*See*, *e.g.*, EX 1 at 14:20-23; 18:21-25, 19:2-5]. Relator's contentious employment history also includes the fact that he is a former relator against a previous employer where, like the present case, the United States declined to intervene. [*Id.* at 25:5-25, 26:5-7.] That case was eventually dismissed. [*Id.* 26:14-16.]

As to his employment at the Cancer Centers, Relator testified that he left, not because of any reasons related to the allegations in this case, but because he "had problems with Manish Jain," the former Business Manager for the Cancer Centers. [*Id.* at 22:13-15.] Specifically, Relator testified that "toward the latter part of my work history there, Anshu Jain joined the practice. And the problem was they never notified me that Anshu Jain would join the practice. So basically it was deception. Again, it was nepotism.[[2]] I had been through that before and I knew that I was just a placeholder for the owner's son, so I didn't appreciate the deception." [*Id.* at 22:19-25, 23:1.] Apparently, this situation left the Relator irate at the Cancer Centers and their Business Manager, Manish Jain, in particular, such that Relator claims that Manish Jain "made some promises initially about the position" but "I found him to be a pathological liar as far as details about the job." [*Id.* at 22:16-18.] The Relator admitted that he "had issues with Manish. That was an ongoing thing." [*Id.* at 58:15; *see also id.* at 58:16-19 (saying he eventually "ignored Manish").] Relator left the Cancer Centers—not because he felt that the Centers were engaged in

---

[1] Such reasons have included failing to pass his national board certification [O'Laughlin Dep., Exh. 2, p. 14:20-23; salary disputes over compensation [*id.* at 18:21-25, 19:2-5]; being fired when he "didn't get along with the owner" [*Id.* at 19:4-18]; or due to perceived nepotism where Relator felt he "was a placeholder for one of the owner's sons" and "didn't appreciate the deception" when the practice hired another radiation oncologist who was related to the owner. [*Id.* at 15:21-25.]

[2] It is important to note that whereas Relator is a graduate of the "University Medical and Dental College of New Jersey" [*Id.* at 13:5-6], Anshu Jain completed his postdoctoral training at Harvard Medical School and Columbia University Medical Center and had served as a clinical instructor during an academic appointment at Yale University Medical School's Department of Therapeutic Radiology [Doc. 201 at p. 5, FN 4], and thus his hiring was not simply the product of "nepotism" as Relator contends.

any fraudulent behavior—but simply due to a chip on his shoulder caused by hiring another radiation oncologist.

As he had with a previous former employer, Relator, in his frustration over contractual issues, filed a qui tam False Claims Act case against the Defendants. As noted in the Procedural History outlined, above, the Complaint originally put extensive focus on what became characterized in this litigation as "named physician claims" or "absent physician claims" which alleged that the Defendants billed for "services supposedly provided to patients by physicians who were, in fact, *not* present in the facilities where these services were supposedly rendered." [Doc. 53 at ¶86.] The Court previously dismissed these allegations as insufficient as a matter of law. [Doc. 76 at p. 17-18.] In spite of this, when Relator was asked in an Interrogatory "Do you intend to allege that listing an incorrect physician on a claim form is a violation of the False Claims Act?", Relator responded in an affirmative "Yes." [EX 2 at p. 7.] During his deposition, Relator expanded upon this position, acknowledging that "[t]here may be situations where a physician, a medical oncologist, has ordered chemotherapy, but another physician who's in the building would be supervising the [chemotherapy] administration" before thereafter concluding that in such a case "you can only bill Medicare under the supervising physician's NPI."[3] In fact, Relator was provided with a real-world scenario involving the physicians at the Cancer Centers and doubled-down on his position that is contrary to this Court's previous Orders. Specifically, he was asked:

> Q: "here's a hypothetical scenario: Dr. Hayek orders chemotherapy for (a hypothetical) patient, Ms. Jones…when chemotherapy is administered, Dr. Jain was in the facility. If Dr. Hayek's name was listed as the physician on the claim form when somebody else was present in the facility, would you contend that to be a false claim?"
>
> A: "Absolutely."

[3] The NPI is the National Provider Identifier, and is a number assigned to healthcare providers which identifies them on documents such as insurance billing claim forms.

[EX 1 at 83:1-8.] Relator's testimony and discovery responses clearly articulate that, despite this Court's orders[4] to the contrary, he is intent on fashioning this case in large part to indicate that listing the ordering physician, as opposed to the supervising physician, on a claim form for chemotherapy services would constitute fraud.

Other discovery responses further make clear that Relator still intends to use the argument that the "named physician" was not on the premises as his basis for lack of supervision, despite the fact that this theory has already been rejected by this Court. Relator was asked in an Interrogatory to "provide the basis for the allegation . . . that chemotherapy services were provided by the Defendants when 'physicians were not even present on the premises' . . . ." [EX 2 at p. 3.] Relator Answered that "an examination of the records of chemotherapy services of five patients…indicate[s] that a physician supervised chemotherapy services for at least two different patients at two different locations at the same time, something that is impossible."[5] [*Id.*] Again, this theory of liability represents nothing more than a re-hashing of the previously-dismissed "named physician" argument, which this Court has found legally deficient. Relator further answered that "Dr. O'Laughlin has personal knowledge that chemotherapy services were provided by Defendants when physicians were not on the premises." [*Id.*] However, as shown below, this "personal knowledge" is simply an over-generalization that is largely contradicted by the undisputed facts in the record.

At his deposition, Relator elaborated on his personal knowledge, noting that his basis for this allegation was his knowledge of "Dr. Jain's routine schedule." [EX 1 at 68:22-25.] He went

---

[4] This is not only contrary to the Court's October 20, 2020 Order, but also the Order reducing the Third Amended Complaint which dismissed, in large part, the Third Amended Complaint, and which limited the justiciable issue in this case to whether the Defendants violated the FCA by providing chemotherapy administration services without a physician present on the premises to supervise the chemotherapy administration. [Doc. 141 at pp. 11-12.]

[5] Relator indicated that he would supplement this Answer after a further review of medical records to provide more than these five instances, but no supplemental Response has been served.

on to elaborate that, based upon his understanding of Dr. Kirti Jain's "routine", Dr. Jain would generally be scheduled to work at ABCC on Tuesdays and Thursdays and at HCC on Mondays Wednesdays and Fridays. [*Id.* at 68:25, 69:1-4.] According to Relator, HCC was left without a physician on Thursdays because both he and Dr. Jain would attend a "Tumor Board Meeting" at Our Lady of Bellefonte Hospital in Ashland on Thursdays and therefore would not be present in HCC in Prestonsburg on Thursdays. [*Id.* at 68:2-11.]

Relator also testified that, in addition to his knowledge of Dr. Jain's "routine" schedule, he also had knowledge that Dr. Jain "routinely would travel to India, [and] wouldn't tell me…he'd be gone for three weeks and…I never saw anyone cover for him." [EX 1 at 70:2-7.] But, Relator never provided any specific dates where the Cancer Centers administered chemotherapy without a physician present because Dr. Jain was traveling. Even with the allegation of lack of supervision, Relator never connected the allegation to any specific claim for payment that would have been submitted.

More so, the record makes clear that Relator's "personal knowledge" concerning a lack of physician supervision completely ignores the fact that the Cancer Centers had other physicians aside from Dr. Jain and the Relator who would have been present on the premises while chemotherapy was being administered. Further fleshing out the Relator's allegations, during discovery, Relator was asked in a Request for Production of Documents to produce documents "which in any way relate to the allegation . . . that Defendants submitted claims for chemotherapy services when 'physicians were not even on the premises when the chemotherapy services were produced.'" [EX 3 at p. 6.] In response to this Request, Relator listed four separate categories of documents, most of which were claims data from various sources, including "material from the

Kentucky Medicare Program;"[6] CMS[7] materials; and materials from WellCare, a Kentucky Medicaid Managed Care Organization. [EX 3 at p. 7.] Relator's Response also indicated, generally, that he had documents that he obtained "during his employment" at the Cancer Centers, which were probative. [*Id.*] At his deposition, Relator expanded upon this Response. He testified that the documents that he obtained "during his employment" were daily schedules of when patients were scheduled with certain physicians. [EX 1 at 84:15-19.] As to the remaining materials from Kentucky Medicaid, from CMS and from WellCare, Relator testified that these documents were comprised of claims data that outlined the Cancer Centers' billing to the various insurance carriers during the time period involved in this case. [*Id.* at 85:24-25; 86:1-6; 22-25; 87:1-7.] Relator was asked at his deposition how the claims data from these various sources would "show that no physician was present" when chemotherapy administration was occurring at the Cancer Centers. [*Id.* at 86:7-8.] Relator indicated that this claims data would need to be "cross referenced" with Dr. Kirti Jain's "routine", and specifically "the routine that Dr. Jain had every week. Tuesdays, Thursdays, [in] Ashland. Monday, Wednesday, Friday, late mornings in Highlands. And then his routine going to India every three—three months for three weeks.[8]" [*Id.* at 86:9-17.] It was clear from his testimony, however, that with less than two weeks left in discovery, Relator had not performed any such analysis. Relator was unable to identify with any degree of specificity,

---

[6] This was clarified in Relator's deposition to be a reference to Kentucky Medicaid, given that Kentucky does not administer the Federal Medicare Program. [EX 1 at 86:3-6.]

[7] "CMS" refers to the Centers for Medicare & Medicaid Services. It is the federal regulatory agency that oversees the Medicare program.

[8] While Relator alleges that one aspect of Dr. Jain's "routine" which he contends led to the Cancer Centers billing for chemotherapy administration when no physician was on the premises is rooted in the belief that Dr. Jain "routinely would travel to India, wouldn't tell me," [EX 1 at 70:2-3] Relator has not identified any specific claims that are associated with Dr. Jain's travel. Nor does the record demonstrate that Dr. Jain ever traveled without a locum tenens physician being hired to cover for Dr. Jain during his absence. As it stands, the record is silent as to any false claims that would have been submitted as a result of any travel "routine" by Dr. Kirti Jain and summary judgment is therefore appropriate. Since the close of discovery, Relator has began to provide listings of claims that he intends to contend are false, but Relator has notably not included any claims for services supposedly provided while Dr. Jain was traveling. It is not clear whether Relator is still pursuing claims on this theory.

any false claims. And his description of how those claims could be determined was so rudimentary as to be entirely unspecific and vague.

From discovery, therefore, Relator identified that the only bases that he had for the allegation that chemotherapy was administered at the Cancer Centers when physicians were not on the premises were: (1) data showing chemotherapy was billed under "named physicians" which would indicate that a physician would be at two different locations at the same time; and (2) the Relator's "personal knowledge," of Dr. Kirti Jain's "routine." [EX 2 at p. 3; EX 1 at 68:22-25.] Further, Relator has acquiesced that, in order to identify the alleged false claims, the claims data in this case would need to be cross referenced against Relator's understanding of Dr. Jain's "routine," which he had not done. [*Id.* at 86:7-17.] But Relator provided no explanation for how this cross-reference could be accomplished.

What is apparent from the record is that the totality of Relator's case hinges upon his over-generalization of what he proposes as a universal "routine" of one, singular physician at the Cancer Centers. However, the record in this case does not support Relator's overly-generalized "understanding" of this singular physician's "routine", nor does the record support that this "routine" would necessarily result in no physician being present when chemotherapy was being administered.

FACTS IN RECORD RELATED TO "ROUTINE" INVOLVING THURSDAYS/ TUMOR BOARD MEETINGS

As mentioned above, Relator testified that there was no physician at HCC on Thursdays because he and Dr. Jain attended Tumor Board meetings in Ashland. [*Id.* at 68:2-11.] But Relator's subsequent testimony undercuts this overly-broad statement. For instance, Relator made clear that he did not attend every Tumor Board meeting. [*See id.* at 71:7-12 (describing perfect attendance as "impossible"; 100:22-23 (stating he went only twice a month)]. Relator also testified that he

sometimes missed the Tumor Board Meetings in order to be at "Logan or *one of the other clinics* on a Thursday", which necessarily includes HCC. [*Id.* at 100:23-24.] Relator also testified that "they would [occasionally] adjust that [Tumor Board Meeting] schedule just based on, you know, doctors being absent." [*Id.* at 71:3-5.] Hence, despite stating upfront that there were *never* physicians on-site on Thursdays at HCC due to Tumor Board meetings in Ashland, Relator then testified that (i) he himself was often not at these meetings; (ii) he occasionally missed them specifically in order to be at the clinics, which would include HCC; and (iii) the Tumor Board Meetings were not always held on Thursdays, thus eliminating the proposition that Dr. Jain had to be in Ashland to attend these meetings on every Thursday. Relator also admitted that attending *every* meeting was "impossible." In the end, Relator could not point to *specific* days where HCC was left without a physician on the premises when chemotherapy was being administered while physicians attended Tumor Board meetings in Ashland. Instead, his entire theory of his case is predicated on false assumptions.

While Relator testified that his entire "personal knowledge" that chemotherapy was administered on Thursdays without a physician present was based solely upon his understanding of Dr. Jain's "routine," his understanding of Dr. Jain's "routine" was directly contradicted by witness Stephanie Howard, who was a nurse practitioner formerly employed at HCC. In fact, Nurse Howard testified that "I don't know that we ever gave chemotherapy without a physician" present at HCC. [EX 4 at 107:18-20.] Nurse Howard instead testified that "I remember even when we go to tumor boards, [the chemo nurses] would, you know, be calling or texting to find out how long it would be before we get back" so that chemotherapy administration could commence. [*Id.* at 74:4-8.] Specifically as to Dr. Jain's "routine," the record reflects that Relator deposed Theresa Kintigos, Dr. Kirti Jain's Medical Assistant who has worked with him since 2006. [EX 5 at 16:11-

14; 19:23-25, 20:1-2.] Ms. Kintigos was specifically asked about Dr. Jain's routine schedule on Thursdays:

Q: Do you recall Thursdays, which office you may have been in?

A: On the days that [she and Dr. Jain] was at the office really depend on where the other providers was, because his schedule reflected with other providers to make sure there was a provider in the building.

[*Id.* at 23:2-9.] Kintigos could not recall the frequency with which Dr. Jain attended Tumor Board meetings in Ashland, but testified that she "mainly remembered Dr. Konala (another physician at the Cancer Centers) going to the tumor boards" in Ashland.

Dr. Kirti Jain testified, clarifying that the Ashland Tumor Board meetings were not held every Thursday, and were, at times, held on days other than Thursdays, noting that "periodically they were held; periodically, they weren't." [EX 6 at 80:5-6.] Dr. Jain testified consistent with Ms. Kintigos, that he attended Tumor Board meetings "very occasionally" and not "religiously". [*Id.* at 81:3-7.] Also, consistent with the testimony of Ms. Kintigos and Nurse Howard, Dr. Jain stated that with regard to supervision at the Cancer Centers during Tumor Board meetings that "at least one physician would stay back," further explaining that "this meeting was not a requirement for us . . . We attended voluntarily when we wanted to." [*Id.* at 81:10-14.] As to the scheduling of the Tumor Board meetings, Dr. Jain likewise testified (as Relator, himself, acknowledged) that these Tumor Board meetings would often be rescheduled on days other than Thursdays. Specifically, Dr. Jain noted that "every physician did not go. In fact, the surgeons were often difficult to have them attend because a lot of times, it conflicted with their surgical schedule. And therefore, the tumor board timing were changed time-to-time. There were times they were held at 7 am in the morning…they were held in the evening at times. The idea was to see what time they could get the best attendance." [*Id.* at 82:7-18.] Nurse Howard even testified that there were

times that the Tumor Board meetings would be held telephonically, such that the providers were able to attend from the Cancer Centers, while remaining on premises. [EX 4 at 75:11-17.]

In the end, however, Dr. Jain noted that while the Cancer Centers would try to get physicians to attend the meetings, they did not do so at the expense of chemotherapy supervision "because patient care came first." [EX 6 at 83:2.] For example, Dr. Jain testified that even though his written schedule may have shown that he blocked out an hour to attend a Tumor Board meeting, that he would not attend the voluntary meeting if he was seeing to patient care, noting that "if I had to see a patient or a patient who was scheduled before noon spilled over into the time [for the meeting], I would take care of the patient and then decide whether to go to tumor board or not." [*Id.* at 84:14-17.]

Hence, while Relator initially answered that there were no physicians on-site at HCC on Thursdays as a bright-line rule, his own testimony and other witnesses' accounts clearly undercut the accuracy of this statement. The record in this case is therefore insufficient to establish with any degree of certainty that Relator's understanding of Dr. Jain's "routine" has a shred of reliability and as such summary judgment is proper in this case.

<u>FACTS IN RECORD RELATED TO "ROUTINE" REGARDING PHYSICIAN SUPERVISION</u>

Relator's sole reference to his proof of insufficient physician supervision being his "personal knowledge" of Dr. Kirti Jain's "routine" is problematic on several levels. First and foremost, as noted above, Relator's characterization of Dr. Jain's "routine" is nothing more than an overgeneralization that is not consistent with the testimony of other witnesses in the record. Relator admits that he did not regularly communicate with Dr. Jain or with the Cancer Centers' Office Manager. [EX 1 at 58:16-19.] Despite this, he felt confident enough on his "personal knowledge" of an allegedly fairly consistent schedule to file an expansive lawsuit under the FCA.

However, his belief that Dr. Jain had a regular schedule was directly refuted not just by Dr. Jain, himself, but also by other witnesses, including Ms. Kintigos (Dr. Jain's medical assistant) who testified that Dr. Jain's scheduling for which location he would be at "really depend[ed] on where the other provider was, because his schedule reflected with other providers to make sure there was a provider in each building." [EX 5 at 23:5-9.] Kintigos even stated that "on occasions" Dr. Jain would visit one clinic in the morning before driving to a different clinic in the afternoon, if physician supervision was needed or patients needed to be seen. [*Id.* at 22:7-11.] Dr. Jain likewise testified that his schedule would fluctuate based upon the need for coverage, noting that "[t]here were days I might have been scheduled at one place and I would cancel the schedule and go to the other place if the need be such…I had to ensure that the coverage was there." [EX 6 at 89:7-11.] Likewise, Nurse Howard testified that, as coverage required, physicians would travel from one clinic to another if patient care required that be done. [EX 4 at 63:9-10.] One of the Cancer Centers' nurses, Katrina Holliman, testified that they would not start chemotherapy administration unless a practitioner was present to supervise. [EX 7 at 53:14-15.]

Further, the Relator's use of his characterization of Dr. Jain's "routine" as the sole evidence of lack of physician supervision is also problematic as it completely ignores the fact that, as the record attests, there were other physicians aside from Relator and Dr. Jain who were providing supervision at the Cancer Centers during the time period encompassed in this litigation. In fact, Relator himself admitted that through the end of 2013, there were at least three physicians covering the two Cancer Centers, including himself, Dr. Kirti Jain, and Dr. Fadhi Hayek. Relator testified that "Dr. Hayek left ABCC [in] December of 2013. And then I know Dr. Konala came on full-time later that year. It could have been June or July. And then Dr. Jain hired a full-time medical oncologist for Highlands, Dr. Sameer Batoo." [EX 1 at 63:14-18.] The record also reflects that

the Cancer Centers also employed a physician named Dr. Donnie Stacy during 2012. [EX 6 at 20:6-8.] Then in July of 2014, the Cancer Centers hired a second radiation oncologist, Dr. Anshu Jain. [*Id.* at 27:16-18.] The record also reflects that, in addition to these physicians, there were also several locum tenens physicians, who were seeing patients at the Cancer Centers during this time and filling in as substitutes for the Cancer Centers' physicians on a part-time or short term basis[9]. Relator recognized that the Cancer Centers used locum tenens during the time periods in this case, but the Relator testified that while the Cancer Centers "may have had a locum every now and then…I never met them"[10] and thus could not testify to when they would or would not have been present. [EX 1 at 63: 21-22.] Nurse Howard testified that while she could not recall who the locum tenens physicians were or when they actually worked at the Cancer Centers, she did testify that she knew that the Cancer Centers employed locums. [EX 4 at 108:5-7.] Dr. Kirti Jain testified that the Cancer Centers "had a few locums" during the time period. [EX 6 at 28:3.] Specifically, Dr. Jain indicated Drs. Bertram and Batra were at the Cancer Centers at least during the time period following the departure of Dr. Hayek. [*Id.* at 92:7-20.] Additionally, Dr. Jain testified that he knew that "there were other contracts" for locums, but that he could not remember their names. [*Id.* at 206:6-10.] Dr. Jain also testified that he remembered the Cancer Centers engaged for "short term locums" who would work for a week at a time. [*Id.* at 206:17-20.] Other witnesses testified that they, too remembered other locum tenens physicians working for the Cancer Centers at this time period. [*See* EX. 4 at 118:22-23, 119:1-6 (describing several different locums, including Dr. Bertram)].

---

[9] Under CMS, guidance, a locum tenens physician is a physician who provides services to another physician's patients when the absent physician is unavailable to provide the services. [*CMS Claims Processing Manual* Ch. 1 §30.2.10.] In such cases, the claims are to be billed under the absent physician's name and NPI. *Id.*

[10] It is not surprising that Dr. O'Laughlin wouldn't have been aware of the locums were working, given the fact that locums were specifically contracted with in order to provide supervision at clinics where physicians such as O'Laughlin wasn't present.

Clearly, then, Relator is wrong to rely on his "personal knowledge" of Dr. Jain's routine: Dr. Jain's routine was not definite, nor is Dr. Jain's "routine" dispositive since other physicians' schedules must be considered. Clearly, the record establishes that the Cancer Centers utilized numerous locum tenens physicians throughout the time period in question. Hence, even if Relator's over-generalization that Dr. Jain kept a "routine" schedule were to be believed, it would not establish that no physician was present, as the record has established that there were potentially numerous other physicians working at the Cancer Centers on any given day.

Further, the record overwhelmingly reflects that witnesses testified that, based upon their recollections, physicians were present to supervise when chemotherapy was administered. Nurse Howard testified that chemotherapy was supervised by physicians, and not nurse practitioners at HCC. [EX 4 at 73:20-22.] Nurse Howard even testified that to her knowledge, and to the knowledge of the other nurses whom she spoke to, at no time was chemotherapy administered to patients before physicians arrived at the clinic. [*Id.* at 78:17-22.] Ms. Kintigos testified that she worked at the Cancer Centers for almost 17 years, and that she has never had an occasion where a need arose during chemotherapy administration where she wasn't able to find a physician on the premises at the Cancer Centers. [EX 5 at 95:2-11.] Dr. Kirti Jain testified that the Cancer Centers operated and scheduled physicians on the "principles…that there will be a physician at each of the two locations in Kentucky…at all times." [EX 6 at 29:18-21.] Former physician Dr. Donnie Stacy, who worked at ABCC and HCC until June 2012, testified that "I do not have any recollection of any instances in which chemotherapy infusion services were delivered at ABCC or HCC without a physician present, nor do I recall any discussion of any instances of chemotherapy services being rendered at ABCC or HCC without a physician present." [EX 8 at p. 2.]

Dr. Fadi Hayek, who provided oncology services at both ABCC and HCC until late 2013 offered a similar declaration that he could not recall any chemotherapy infusion services being performed at the Cancer Centers without a physician present, nor had he heard of any such occurrences . [EX 9 at p. 1.] Dr. Hayek went on to declare that he has "no reason to believe that chemotherapy services were rendered at ABCC or HCC without the requisite physician supervision" and that he has "no knowledge of any fraudulent activity perpetrated at ABCC, HCC, or by Dr. Kirti Jain, nor do I have any reason to believe that ABCC, HCC, or Dr. Kirti Hain has engaged in any fraudulent activity." [*Id.* at pp. 1-2.][11]

Even Relator's best evidence in the record is insufficient to help him establish an FCA violation. Nurse Katrina Holliman testified that there were times where physicians may have left early and that "sometimes they'd come in and say bye, and sometimes you'd go back to find them and they wouldn't be there, they'd be gone" but that this occurred only occasionally and "it was at the very end [of the day]…we might have just a little bit of time left" with the patient. [EX 7 at 18:1-15.] Likewise, former Nurse Jessica Dove testified that she had occasions where she finished working with a chemotherapy patient and then found out that "everyone else had left for the day." [EX 11 at 41:24-25.] However, Nurse Holliman acknowledged that, in the cases in which physicians had left early, that it was possible that they left *after* the actual chemotherapy administration had occurred. [EX 7 at 71:1-6, 16.] Similarly, Nurse Dove testified that ultimately, chemotherapy nurses "weren't watching [the physicians'] comings and goings" but instead was so focused on patient care that she "had no idea what the doctors were doing." [EX 11 at 21:3-4; 40:21-22.] Regardless, Nurse Dove testified that any time that a need arose that physicians "would

[11] Other witnesses provided similar statements. Kathryn McCoy was a radiation therapist who occasionally provided coverage at HCC and ABCC. She offered sworn testimony that she "cannot specifically recall any instances in which chemotherapy services were being delivered at HCC or ABCC when an oncologist was not present at the facility. [EX. 10.]

respond to my concerns" [*Id.* at 36:20-21] and that she would not be able to identify with any specific detail any dates, times or patients who would have been administered chemotherapy without a physician present. [*Id.* at 42:22-25; 43:1-3.] Thus, even Relator's best evidence is insufficient to identify a single false claim.

FACTS IN RECORD RELATED TO EXPERTS AND TO DAMAGES

Relator disclosed a single expert, Elin Kunz who was reportedly retained to opine "regarding the requirements and materiality aspects of supervisory and incident-to provisions in the Medicare and Medicaid programs as they pertain to chemotherapy services provided in a free standing clinical setting…and concerning the reimbursement impact based on the different providers rendering and supervising the service." [EX 12 at p. 1.] Essentially the entirety of Ms. Kunz's thirty-page Report consists of definitions and a summary of regulations related to incident-to billing as well as supervision requirements for incident-to billing. According to her Report, Kunz was only given two Medication Administration records ("MARs")[12], one from ABCC and one from HCC, to review . Kunz's Report does not indicate that she reviewed any claims data or billing data. In her Report, Kunz indicated that an MAR "is insufficient to determine if incident-to services were met on this date." [*Id.* at p.25, ¶91.] At her deposition, Kunz testified that a MAR "is very limited actually" and "not enough to determine if supervision was met" and instead she would require additional documentation that she was not given by the Relator and which the Relator had not requested in discovery. [EX 13 at 80:13-15.]

Instead of opining as to whether supervision was met, Kunz simply summarized incident-to requirements. The only testimony that Kunz offered that could remotely be considered an "opinion" relative to this case was that if a provider were to put an incorrect physician's name on

[12] The MARs were the primary clinical records sought by Relator through discovery

a claim form, even if the correct physician's name would have still been payable, that such action is tantamount to "misrepresenting the person who performed the service" thus making the service a "non-covered service." [*Id.* at 39:15-24; *id.* at 44:18 (stating her belief that placing the incorrect physician's name on a claim form is "clearly fraud")] Hence, Kunz's only "opinion" is one that directly opposes this Court's prior holding on the dismissed "named physician" claims.

Relator's decision to not engage Kunz to review the actual claims at issue in this case is particularly perplexing. While Kunz testified that she has experience "doing chemotherapy audits" and also at performing reviews to determine whether incident-to and supervision requirements are met [*Id.* at 26:12-16] she was not engaged by the Relator to perform any such review in this case. In fact, she testified that she was not engaged to perform a review or to give any opinion as to whether there were damages in the form of an overpayment in this case. [*Id.* at 12:4-6.] As such, her "expert" report and testimony hold little, if any, utility in this case.

Kunz's non-involvement in this case is in stark contrast with the Defendants' expert, Cris Miller. From the outset, Ms. Miller did disagree with Ms. Kunz's assertion that chemotherapy services are "physician services" that are subject to incident-to billing guidelines. Ms. Miller opines that because chemotherapy services are generally not performed by a physician, but instead are generally performed by auxiliary personnel, that they are not subject to the incident-to physician services guidelines and requirements. However, Miller testified that her ultimate conclusions in this case are not actually dependent on this distinction. Miller testified that she reviewed the Medicaid claims data provided by the Relator in this case, which was not limited to only chemotherapy claims, but which also included other claims submitted by the Defendants on the same dates of services. [EX 14 at 168:21-25; 169:1-4.] Miller testified that she reviewed the claims data to determine whether office visits were billed by physicians at the Cancer Centers on

the various dates in question. [*Id.* at 169:5-8.] Miller testified that the significance of the billing for office visits on these dates is that "when you do an office visit…in order to be able to bill it, [physicians] have to have a face-to-face interaction with the patient. That means they had to be in the clinic." [*Id.* at 169:13-19.] Ms. Miller therefore testified that she reviewed the claims data to confirm that physicians billed for office visits on the same days as chemotherapy, which would have indicated that a physician was in the office on the same day that the chemotherapy was administered. [*Id.* at 169: 20-25.] Miller also testified that she reviewed "a handful of medical records" to confirm that billings seemed accurate related to physician presence, and specifically as it related to locums. Ultimately, based upon this review, Miller concluded that regardless of which supervision requirements were applied; be it the general supervision requirements for chemotherapy billing, or incident-to billing requirements; that from her review, it appeared as though both supervision requirements were satisfied and that the billing data was consistent with a physician being present in the clinics when chemotherapy was administered. [*Id.* at 171:9-19.]

Relator was apprised of Ms. Miller's review by virtue of her Report that was delivered to him with Defendants' disclosure, and Relator had an opportunity to rebut Ms. Miller's review. However, Relator instead engaged Kunz to draft a report rebutting Miller's view that chemotherapy administration is not subject to incident-to billing requirements. In fact, Kunz's rebuttal report explicitly noted that it was not addressing whether supervision requirements were met, as she clearly stated "I have not done a medical record review in this case to opine on whether supervision was met for a particular service." [EX 15 at p. 13.][13] Relator bears the burden of

[13] Despite not engaging an expert to perform a review as to whether supervision requirements were met, after the close of discovery, Relator delivered, and indeed continues to deliver "on a rolling basis", several spreadsheets of claims that he contends to be examples of false claims where supervision requirements were not met. Apparently, Relator's Counsel is relying on his own "expertise" to perform these reviews, [Doc. 185-3 at p. 2 FN 5], essentially making himself his own expert witness in this case. For obvious reasons, Defendants are filing a Motion to Exclude as a result.

proof that claims were submitted for chemotherapy services where supervision guidelines were not met. At present, the record demonstrates that the Defendants' expert, Cris Miller's review by which she opined that supervision requirements were met on every date of service is uncontroverted. Because Relator has failed to satisfy this burden of proof through expert testimony, summary judgment is warranted.

WEEKEND/LEUKINE CLAIMS

Finally, Relator has an additional set of claims that are based on his "personal knowledge" that certain "chemotherapy services" were provided on weekends when physicians were not on-site to supervise such services. Defendants do not dispute that services were provided on weekends and that physicians were not scheduled to be at the Cancer Centers. However, Relator's theory is problematic due to both the nature of the services offered and other facts revealed in the record.

First, the primary service offered on weekends were subcutaneous injections of a particular medication, Leukine. All parties agree that Leukine is not a chemotherapy drug. Instead, it is offered to immunocompromised patients in order to boost their white cell count and help them combat infection. [EX. 4 at 112:13-20]. It is a simple subcutaneous injection that could be administered by personnel other than RNs. [EX 6 at 138:8-12; EX 7 at 98:20-25, 99:1-4]. For example, Ms. Kintigos was a medical assistant who—despite not being authorized and trained to administer chemotherapy drugs—was allowed to administer Leukine injections [EX 5 at 93:14-24]. In fact, Leukine is, in many cases, self-administered by the patient[14] and the record demonstrates that in this case, the Cancer Centers would only administer Leukine in the office to patients for whom self-administration was impossible or difficult. [EX. 6 at 136:18-25.] As explained further below, administration of Leukine is recognized by authoritative sources as a

[14] Chemotherapy, on the other hand, is never self-administered.

service that is entirely separate and distinct from chemotherapy administration. *See, infra*, Part III. Hence, the only drug that Relator has identified as being provided on weekends is not a chemotherapy drug, nor is it considered similar to chemotherapy in any relevant respect. Relator's belief that this constitutes a "chemotherapy service" is therefore incorrect.

Further, while physicians were not scheduled to provide services on the weekends, the record has established that there still were physicians often on-site over the weekends. Dr. Jain himself testified that, in addition to making rounds at the hospital within walking distance, he was often at the Cancer Centers working on his charts and other documentation. [EX 6 at 146:20-25; 147:1-7]. Likewise Nurse Howard testified that she would often go to the clinics on weekends to catch up on medical charting. [EX 4 at 99:7-9.] Hence, again, despite making a broad statement that no physicians or other practitioners were on-site, witness testimony directly refutes this "personal knowledge".

## ARGUMENT

### I. SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure allow for Summary Judgment where there is no genuine dispute as to facts and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56. The Rule "provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). In determining whether the dispute as to material fact is *genuine*, the standard is whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. To this extent, the "proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the plaintiff." *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 375 (6th Cir. 2002). Summary judgment is the avenue by which the court

may determine "whether there is a genuine need for trial." *Id.* Whether there is a genuine dispute of fact must be apparent from the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations…admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

The present case presents a dispute that arises under the False Claims Act. While such claims are, admittedly, heavily fact-dependent, they are still appropriate for the scrutiny of summary judgment. In fact, the United States Supreme Court recognized this position, stating that it rejected the "assertion that materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss or at summary judgment." *Universal Health Servs., Inc. v. U.S.,* 136 S.Ct. 1989, 2003 n.6 (2016). The *Universal Health* Court went on to recognize that the elemental standard for FCA liability "is a familiar and rigorous one" and wholly appropriate for summary judgment review, despite its fact dependency. *Id.*; *see also Road Sprinkler Fitters Union 669, U.A., AFL-CIO v. Dorn Sprinkler Co.,* 669 F.3d 790, 793-794 (6th Cir., 2012) (recognizing that the fact-intensive alter-ego determination "is not readily distinguishable from most determinations made on summary judgment.").

The present case boils down to a singular, simple question: did the Defendants bill for "chemotherapy services" that were provided when no physician was present in the clinic? Relator bases his entire theory of liability on two flawed foundational premises: (1) that by billing under the same physician's name at two clinics on the same day, that the Defendants were inherently committing fraud; and (2) that lack of supervision is established by Relator's "personal knowledge" of the "routine" of one physician, Dr. Kirti Jain. Unfortunately for Relator, the first theory of liability has already essentially been rejected by this Court. And the second theory is grounded in over-generalizations that lack any specificity such that a particular claim could ever

be identified. Further, the Relator's assertions of Kirti Jain's "routine" and its effect on the Cancer Centers' physician staffing are unsupported by the evidence in the record. Moreover, Relator has taken an expansive view on what constitutes a "chemotherapy service" by lumping in each and every service provided to a chemotherapy patient. This scope is entirely unsupported and implausible, and—if Relator is to pursue any claims—they should be limited to *only* claims for chemotherapy drugs. Finally, Relator has rejected his duty to prove damages or to identify false claims through any recognized methodology, and has chosen to forego using his expert to identify the alleged false claims that he seeks to act upon. Instead, Relator's Counsel has taken it upon himself to employ his own "expertise" to conduct a review of the claims to identify which claims lacked supervision. As a result, Relator is left with no articulable basis for his supposedly identified false claims at issue in this case and the essential element of damages and falsity are left unsatisfied. As such, the Relator has not created a record which contains evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is appropriate in this case as a matter of law.

## II. THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW BECAUSE THE ELEMENTS OF THE FCA ARE NOT SATISFIED.

In order to establish his claim that Defendants violated the FCA, the Relator must prove the following elements:

> First, the defendant must have made a false statement or created a false record, and must have done so with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information. Second, the defendant must have submitted a claim for payment to the federal government. Third, the defendant's false statement must have been made with the purpose of getting a false or fraudulent claim paid or approved by the government. Finally, the

> defendant's false statement or record must have been material to the government's decision to make the payment sought in the defendant's claim.

*U.S. ex rel. SNAPP, Inc. v. Ford Motor Co*., 532 F.3d 496, 505 (6th Cir. 2008) (citations omitted). The FCA requires a showing of a scheme to defraud; innocent mistakes or mere negligence are not actionable. *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 413 (6th Cir. 2016). To that extent, in order to be actionable under the False Claims Act, a claim must include a false statement that is material to the government's decision to pay a claim. *U.S. ex. rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc*., 400 F.3d 428, 442-43 (6th Cir. 2005). In determining materiality, only actual, and not theoretical or conjectural, damages are recoverable under the FCA. *U.S. v. United Tech. Corp.*, 626 F.3d 313 (6th Cir. 2010). It is well-established that the FCA is not intended to be used as a vehicle to police regulatory or requirements or clerical errors. *U.S. ex rel. Garst v. Lockheed—Martin Corp.*, 358 F.3d 374, 376 (7th Cir. 2003). The FCA also requires a showing of materiality inasmuch as it only punishes false statements that are material to the government's decision to pay. *U.S. ex rel. Hobbs v. Medquest Assocs., Inc.,* 711 F.3d 707 (6th Cir., 2012); *U.S. ex re. Doe v. Jan-Care Ambulance Serv.*, 187 F. Supp. 3d 786 (E.D. Ky. 2016).

Further, a False Claims Act violation is not a strict liability offense. *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296 (6th Cir. 1998). Instead, a provider's conduct must be done knowingly in order to be actionable under the False Claims Act. 31 U.S.C. § 3729(b). This knowledge is defined to include "actual knowledge of the information, or with deliberate ignorance or reckless disregard of the truth or falsity of the information." *U.S. ex rel. A+ Homecare, Inc. v. Medshares Management Group, Inc.*, 400 F.3d 428, 451 (6th Cir. 2005). Recently, the United States Supreme Court clarified that this scienter element requires a showing of subjective, not objective knowledge of the fraudulent nature of the claim that was submitted in order for FCA

liability to attach. *U.S. ex rel. Schutte v. SuperValu, Inc.,* 598 U.S. 739, 749 (2023) (*internal quotes omitted*.)

This scienter distinction is very important in this case as it has been long-recognized that "the *sine qua non* of a False Claims Act violation" is the fraudulent claim itself. *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006). In order to satisfy the requisite showing that a defendant is liable under the FCA, the FCA plaintiff must show evidence that claims were submitted. Even more so, the United States Supreme Court has recognized that an FCA defendant cannot be held liable for the conduct of other actors because "[t]he Act, in short, penalizes a person for his own acts, not for the acts of someone else." *U.S. v. Bornstein,* 423 U.S. 303, 312 (1976). The Supreme Court recognized that the FCA standards are "familiar and rigorous" and not so fact dependent as to preclude summary judgment. *Univ. Health Servs.*, 136 S.Ct. at 2003 n.6. In the present case, the evidence in the record does not satisfy the FCA's "familiar and rigorous" elements and therefore summary judgment is appropriate.

As noted above, Relator bases his entire theory of liability on two flawed foundational premises: (1) that by billing under the same physician's name at two clinics on the same day, that the Defendants were inherently committing fraud; and (2) that lack of supervision is established by Relator's "personal knowledge" of the "routine" of one physician, Dr. Kirti Jain. As to the first theory, the record demonstrates that the physician whose name appears on the Defendants' claims for chemotherapy, as well as the name of the physician listed as "supervising MD" on the MAR are *not* the supervising physician as Relator intends to use that term. In these contexts, "supervising MD" does not mean the physician who was on-site providing direct supervision over the chemotherapy administration. Instead, as Dr. Kirti Jain testified, the Cancer Centers understood this designation to mean "the ordering physician; the physician of record who oversaw the

treatment plan for the patient and monitored this patient periodically as well as provided the long-term care needed for the patient." [EX 6 at 61:6-10.] Dr. Jain's testimony clarified that the "supervising physician" or the physician named on the claim form "simply means…the oncologist who planned the treatment, oversaw the treatment…but this does not mean [the physician] at that facility on that particular day and time." [*Id.* at 68:8-13.] This portion of the record demonstrates the fallacy of Relator's position that having a physician's name appear on two claims at two facilities on the same day is indicative of fraud: the Cancer Centers were not representing that Dr. Jain was in two places at once, but, instead, that two of his patients were receiving treatment. [*See id.* at 69:1-5 ("I really don't see a contradiction that you are alluding to. I did not need to be in two places at the same time. It was just that two of my patients were getting treatment on the same day at the same time.")].

Hence, the Defendants understood that the physician listed on the claim forms issued to the Government was not the supervising physician who happened to be in the clinic, but instead the physician who was seeing the patient and who ordered the treatment. This decision was not random. The Defendants did this because the CMS 1500 claim form requires that the physician on the claim form attest that the services are medically necessary. [EX 16 at p. 2.] As Dr. Kirti Jain attested during his deposition, "if a patient tolerates the chemo well…with no adverse reactions, no distress…[the supervising physician on the premises] may never lay eyes on the patient," "may never have to consult the patient's record," "may never lay hands on the patient, may never have to touch or even see or even be in the same room as the patient," and indeed "may not even know that patient…may not know any specifics about the patient who's in the chemo room in the chemo chair getting chemo pushed intravenously." [EX 6 at 211] In short, the on-site supervising physician would know nothing about the patient and his/her course of treatment—

including whether the administration of chemotherapy was medically necessary. The record shows that because of this, the Defendants believed that the ordering physician, and not the supervising physician was the most appropriate physician to list on the claim form, since the ordering physician is the one who can certify that the services were medically necessary. [*Id.* at 211:22-25; 212:1-3.]

The Relator continues to pursue the claim that the Defendants committed fraud by having the same physician listed on claim forms at two facilities on the same day. Relator's own expert intends to opine that such action is "clearly fraud." But this is simply a rehashing of the same "named physician" claim that was previously dismissed by this Court. As noted in the procedural history, above, Relator previously pleaded that many of the claims "were false and fraudulent, in that they stated that a particular physician provided, or supervised, services billed in these claims, whereas in truth and in fact, such named physician did not provide these services; such named physician did not supervise the provision of these services; and such named physician was neither on the premises nor scheduled to be in the facility where these services were provided." [Doc. 124 at ¶87.] This theory of liability was rejected and these claims dismissed by this Court over three years ago. In this Court's Order on October 20, 2020, the Court addressed these "named physician claims" and held that "[c]ontrary to Relator's contention, 42 C.F.R. §410.26(b), which governs 'incident-to' services, does not support his argument that the actual, supervising physician must be named in order for the services at issue to be reimbursable." [Doc. 76 at p. 17.] The Court further rejected the notion that placing a wrong physician's name on a claim form would even be considered actionable fraud at all, noting that, as applied in this case, "while Relator alleges that the particular physician named on certain claims did not actually supervise those services, whether the particular named physician…was actually the physician who supervised the service would not impact Medicare's obligation to pay for the services, so long as they were directly supervised by

a physician." [*Id.* at 18 (emphasis omitted.)] Unfortunately, Relator has outright rejected or ignored this Court's Order and has instead continued to pursue his claims based upon a theory that listing a physician other than the supervising physician on a claim form is a form of fraud. Because one of the Relator's stated theories of liability—that Defendants violated FCA by billing for same physician as if he were at two facilities at the same time—is simply a re-hashing of the previously rejected "named physician" claims, the Defendants are entitled to summary judgment as a matter of law.

As to the second theory of liability in this case, whereby Relator is relying upon his "personal knowledge" of Dr. Jain's "routine" as a basis for FCA liability, this lacks a factual basis in the record to justify this case proceeding. As noted, above, Relator's "personal knowledge" of Dr. Jain's "routine" consists of nothing more than an over-generalized recitation of what Relator seems to think was Dr. Jain's schedule. But this "routine" is contradicted by the evidence and testimony in the record. This includes Relator's own testimony: he acquiesced that Tumor Board meetings are not held every Thursday, but are occasionally rescheduled, and that Relator, himself, has no knowledge of when Dr. Jain would have traveled out of the country because Dr. Jain never informed him of when he was traveling. Further, Relator acknowledges, as do all of the other witnesses in this case, that the Cancer Centers would contract for coverage by locum tenens physicians, but Relator doesn't know the extent of who those physicians were or when they worked. The undisputed evidence in the record does not establish this type of over-generalized theory.

Worse yet, Relator chose *not* to engage his expert to perform any review of the claims at issue in this case to determine whether there was any overpayment or any damages. Indeed, Relator's own expert admitted that she did not perform any review as to damages. When Relator

was deposed less than two weeks before the close of discovery, Relator could not point to a single claim that he had personally identified as being fraudulent. Now, instead, Relator's Counsel has chosen to utilize his "own expertise" to select samples, to create methodologies and to calculate, damages. This is evident from Relator's own discovery responses, when he was asked in the Third Set of Interrogatories to describe the methodologies that he employed to select patients for his separate "tranches" of patients at issue, he repeatedly objected, stating "[t]his interrogatory calls for attorney work product. For this reasons [*sic*] Dr. O'Laughlin objects to this interrogatory." [EX 17 at pp 3, 6. 7.] When asked for the basis as to why these patients and corresponding records would support any of his claims, Relator responded the same way, objecting to this information as attorney work product. [*Id.* at 6-8.] When asked to identify the actual false claims at issue in this case, Relator responded on the very last day of discovery with a convoluted response that "Dr. O'Laughlin intends to pursue four categories of false claims for which the Defendants falsely and fraudulently billed the Medicare Program, the Kentucky Medicaid program, or both." [EX 18 at p. 3.] These four categories differed from the previous discovery responses and from Relator's testimony the previous week. These responses discussed certain days that Relator was pursuing, which were not identified by the Relator's testimony the previous week, and omitted other days. [*Id.*] In the end, the response did not actually identify[15] any claims, but instead stated that "these claims will be provided to the Defendants on a rolling basis in the coming weeks." [*Id.*] Since this Response, Relator's Counsel has provided a series of spreadsheets and continues to provide spreadsheets. But there is no accompanying discussion of why these claims are considered false, or what methodology was used to discern which claims were false and which claims were not. Even more unfortunate is the fact that, because these calculations and methodologies were derived

[15] A Motion to Exclude follows this present Motion.

by Relator's Counsel, and not Relator himself or Relator's Expert Witness, there is no opportunity to depose a witness who developed the methodology and calculated the overpayment due to privilege. Worse yet, by unilaterally developing the methodologies and performing calculations, Relator's Counsel has made himself an indispensable witness in this litigation in violation of the Supreme Court's Rules of Professional Conduct. The mass effect of the manner in which Relator has approached the calculation of damages in this case is that these damage calculations and their methodologies are not properly in the record and therefore must not be considered.

Without a valid methodology and calculation of damages, this case cannot proceed and summary judgment is proper. Put succinctly, the Relator cannot proceed with a viable False Claims Act action without identifying any claims. As previously noted, the submission of the claim is "the *sine qua non* of a False Claims Act violation." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006). Actual evidence of a submitted claim is indispensable to establishing FCA liability. Among an FCA plaintiff's burden is to be able to show actual evidence of false claims that were submitted and paid, and not merely some scheme or artifice. *U.S. ex rel. Sanderson v. HCA-The Healthcare Company*, 447 F.3d 873 (6th Cir. 2006). Federal Courts have long recognized that an FCA plaintiff must show, at a minimum, "the time place and contents of the false representation, as well as the identity of the person making the misrepresentation **and what he obtained thereby**." *U.S. ex rel. Wilson v. Kellogg, Brown, & Root, Inc.,* 525 F.3d 370, 379 (4th Cir. 2008), (**emphasis added**). Because the Relator steps into the shoes of the government after declination, the Relator then "must assume the government's burden of proof as to damages in an FCA case." *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.,* 352 F.3d 908, 923 (4th Cir., 2003). When, as here, a Relator utilized a methodology to determine a sample of claims and to calculate damages, the Relator bears the burden of showing that the methodology used to

select the claims and to calculate the damages was sound. *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940 (7th Cir., 1997). In the present case, Relator Counsel cannot prove the validity or soundness of his methodologies or his calculations because to do so would place Relator's Counsel as a witness in this case. The Court had ordered Relator to utilize statistical sampling and extrapolation methods, but rather than to abide by this Order, Relator's Counsel insulted the Court and disregarded the Order and instead insisted that he would rely on his own expertise.[16] But as a result, there is now no evidence in the record to validate the methodology imposed by Relator's Counsel or his calculations.

In fact, reflecting any damages, the record in this case actually establishes the contrary. The record in this case contains Cris Miller's uncontroverted expert review of claims data in this case that actually establishes that supervision requirements were met. Relator, however, proffered an expert report that admittedly performed no review of records or claims. Relator's expert, Elin Kunz, admitted that she was offering no opinion relative to damages and that she had not performed any medical records audit. Further, the only medical records that Relator every requested in discovery, the MARs, are, by Kunz's opinion, insufficient to determine whether supervision requirements were met. As a result, the evidence in the record cannot establish an FCA claim and therefore summary judgment is appropriate in this case.

## III. **RELATOR'S PROFFERED DEFINITION OF "CHEMOTHERAPY SERVICES" IS OVERLY-BROAD AND UNTENABLE AND, THEREFORE, SHOULD BE REJECTED.**

[16] In correspondence with defense Counsel, when asked how he would comply with the Court's Order requiring a statistical sampling technique, Relator's Counsel demeaned the Court's Order, remarking that "'in the words of Justice Black, judges 'are not final because we are infallible, but are infallible because we are final.' Having graduate degrees in both physics and computer sciences…I am aware that statistical analysis is too imprecise a tool to accomplish what I want to accomplish." [Doc. 185-1 at p. 1.] As it related to what methodologies he would utilize to conduct a review to determine damages, Relator indicated that he would "utilize [his] own expertise." [Doc. 185-3 at p. 2 FN 5.]

As explained above, Relator's pleadings have undergone several rounds of edits—either voluntarily or due to the Court's orders—in order to arrive at his final Third Amended Complaint, which is limited to "chemotherapy services" that were allegedly fraudulently billed by the Defendants due to failures to comply with incident-to requirements. [*See, generally*, Third Amend. Compl., Doc. 124, Count V; *see also* Memo. of Relator, Doc. 191, p. 1 ("Only 'chemotherapy services' remain at issue." (internal citation omitted))]. This framework creates two thresholds that Relator must clear in order to hold Defendants liable for any particular claim: first, there must have been a "chemotherapy service" provided to a patient, and, then, the "incident-to" requirements for that particular service must not have been met. Chemotherapy administration consists of using antineoplastic drugs, which are defined as "inhibiting or preventing the growth and spread of tumors or malignant cells." [17]

However, as mentioned above, Relator has not limited his claims to chemotherapy drugs—instead, he is pursuing claims based on "chemotherapy *services*". "Chemotherapy services" is not a term seemingly used by CMS. Instead, it appears to have been created by Relator, despite the fact that he is a radiation oncologist who, admittedly, was not ever involved in providing or overseeing chemotherapy. [EX 1, 35:16-25, 39:6-15]. Relator offered a definition of this term at his deposition: he explained that a chemotherapy service is something that has a CPT[18] code and is administered to a chemotherapy patient. *Id.* at 128:13-20.

[17] https://www.merriamwebster.com/dictionary/antineoplastic#:~:text=Medical%20Definition-,antineoplastic,of%20neoplasms%20or%20malignant%20cells , last visited Jan. 21, 2024

[18] "CPT" refers to "Current Procedural Terminology" codes that are used by healthcare providers to represent medical services and procedures for reporting purposes. AM. MED. ASS'N, "CPT Overview and code approval", https://www.ama-assn.org/practice-management/cpt/cpt-overview-and-code-approval#:~:text=Code%20applications%20%26%20criteria-,What%20is%20a%20CPT%C2%AE%20code%3F,reporting%2C%20increase%20accuracy%20and%20efficiency., last visited Jan. 21, 2024. Providers use CPT codes to represent their services when submitting claims for payment. *See id.* In this way, they are able to use a universal alpha-numeric "language" without having to provide any kind of a narrative description. The payor can review the submitted claim form, consult the CPT Codebook or other similar sources, and determine what should be paid based on the specific codes.

This definition is incredibly simplistic, overly-broad, and untenable. It essentially captures *every* service or medication provided by the Cancer Centers to a chemotherapy patient—regardless of the nature of the item at issue. For example, the Cancer Centers were not limited to solely administering chemotherapy; they also provided services as common as administering influenza vaccinations. [EX. 19 at p. 5, 1/28/2014 Date of Service. (CC Defs.031976).] A flu vaccine is not unique to chemotherapy patients, nor does it fight cancer. Yet, under Relator's expansive definition, a flu vaccination would constitute a chemotherapy service solely because it has a CPT code and was administered to a chemotherapy patient.

Unlike Relator, the AMA[19] *has* distinguished chemotherapy services from other services through its creation of the "CPT Codebook". The AMA is the authoritative guide on creating and explaining the proper uses for CPT Codes. *See* "CPT Overview and Code Approval", *supra* p. 32, n.15. When the Cancer Centers submitted claims seeking payment for treatments, they used CPT codes that were specific to the nature of the services provided. For example, an administration of a particular medication called sargramostrim (or Leukine) was billed by the Cancer Centers using 96372. This 96372 code informs the payor that this was an injection of a drug or substance under the skin or into muscle.[20]

Hence, the 96372 code represents the nature of the service that was rendered. As relevant to this matter, the AMA has created separate categories of treatment methods that are represented by three distinct ranges of CPT Codes. The first range (CPT Codes 96360-61) is used to submit claims for hydration services; the second range (96365-79) is used to submit claims for

---

[19] American Medical Association.
[20] AM. MED. ASS'N, "CPT Code 96372: Injection of drug/substance under skin or into muscle", https://www.ama-assn.org/practice-management/cpt/cpt-code-96372-injection-drugsubstance-under-skin-or-muscle#:~:text=CPT%C2%AE%20code%2096372%3A%20Injection,into%20muscle%20%7C%20American%20Medical%20Association, Last visited Jan. 26, 2024

"Therapeutic, Prophylactic, and Diagnostic Injections and Infusions (*Excludes Chemotherapy* and Other Highly Complex Drug or Highly Complex Biologic Agent Administration)"; and the third category (96401-549) represents services for "*Chemotherapy* and Other Highly Complex Drug or Highly Complex Biologic Agent Administration." [EX. 12 at ¶ 42 (emphasis added).]

Under a plain reading of the CPT Codebook, only *one* of these categories could possibly represent chemotherapy services—the third and final category, 96401-549. The "Hydration" range makes no mention of chemotherapy, and the second category for therapeutic, prophylactic, and diagnostic services explicitly *excludes* chemotherapy. Returning to the above example of Leukine, it is billed using CPT Code 96732 for the actual service—the "injection of drug or substance under [the] skin or into muscle." Hence, according to the AMA, Leukine is in a category that is entirely separate and distinct from chemotherapy. This makes sense because Leukine is not an antineoplastic drug fighting malignant cells (i.e., it itself is not chemotherapy), nor is it specific to chemotherapy patients. Leukine is a drug administered in order to boost white blood cell counts. [EX 4 100:6-13]. While it is often given to chemotherapy patients due to their weakened immune systems, it is not unique to chemotherapy. [*Id.* at 113:1-10]. As Relator himself was forced to admit, it is also given to patients undergoing radiation therapy—including one of his own radiation patients. [EX. 1, at 107:22-25, 108:1-7]. The other non-chemotherapy services and treatments represented using the Hydration and Therapeutic, Prophylactic, and Diagnostic code ranges are similarly expansive and are provided to treat other conditions.[21]

[21] Defendants do not want to belabor their point and also want to save space, while recognizing their need to be thorough. Hence, they list other non-chemotherapy services that should be excluded based on the fact that they represent either Hydration or Therapeutic, Prophylactic, and Diagnostic Services—not chemotherapy services—based upon the AMA's guidance: 96360; 96361; 96365; 96366; 96367; 96372; 96374; and 96374. For purposes of clarity, Defendants also state that the corresponding medications or treatments should also be excluded (i.e., the J#### codes submitted using the above 96### codes should also be excluded) since any drug or treatment administered using one of these codes is not a chemotherapy drug or chemotherapy "service" under the AMA's instruction through the CPT Codebook.

Relator's own expert recognized that the distinctions between these code ranges are important. When explaining these three code ranges, Ms. Kunz stated that "words matter" and "the *actual* chemotherapy code has its own range. Therapeutic injections [have] their own range. And hydration has their own range." [EX 13 at 72:17-22 (emphasis added).]

Defendants do not deny that they administered these other kinds of services to chemotherapy patients and submitted claims representing those additional services. But these additional treatments serve their own purposes. Certain of these medications treat side effects created by chemotherapy, but this is not enough to render them a chemotherapy service. A physician who administers a vaccination will recommend that the patient use ibuprofen or acetaminophen to combat muscle soreness created as a side effect of the injection—but this should not mean that ibuprofen and acetaminophen are "immunization services". Under Relator's logic, however, he would have to argue that they are such services, similar to what he is attempting to do with "chemotherapy services." This problematic definition is not based on any kind of discernible limitation. It does not look to the nature of the services or medications that would be provided, nor does it look to the purpose of the particular service at issue. It is a simple mathematical equation: if X (CPT Code) plus Y (chemotherapy patient), then it equals a chemotherapy service.

A definition this broad is functionally not a definition—it is *everything* that follows a chemotherapy patient walking through the Cancer Centers' doors. It is not based on any objective, identifiable qualities meant to create a coherent understanding of what is or is not a "chemotherapy service". It ignores the underlying nature of the treatments, services, and medications provided to a patient. Instead, Relator's "definition" is nothing but a money grab: if he can lump everything given to a chemotherapy patient as a chemotherapy service, then his potential award as a result of this lawsuit grows exponentially.

This definition cannot pass any kind of muster and should be rejected. Relator should be limited to the only "services" that can be identified using a discernible limitation—the administration of chemotherapy drugs using the CPT Code Range for Chemotherapy as provided by the AMA.

## IV. THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE SCIENTER ELEMENT IS NOT SATISFIED IN THIS CASE.

A False Claims Act violation is not a strict liability offense. *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296 (6th Cir. 1998). Instead, a provider's conduct must be done knowingly in order to be actionable under the False Claims Act. 31 U.S.C. § 3729(b). This knowledge is defined to include "actual knowledge of the information, or with deliberate ignorance or reckless disregard of the truth or falsity of the information." *U.S. ex rel. A+ Homecare, Inc. v. Medshares Management Group, Inc.*, 400 F.3d 428, 451 (6th Cir. 2005). It is well-settled that "the False Claims Act condemns fraud but not negligent errors or omissions." *U.S. ex rel. Garst v. Lockheed—Martin Corp.*, 358 F.3d 374, 376 (7th Cir. 2003). The elemental requirement of a scienter for FCA liability is foundational. The FCA requires a showing that the defendant made "the false record or statement to get a false or fraudulent claim paid or approved by the Government." *Allison Engine Co., Inc. v. U.S. ex rel Sanders*, 553 U.S. 662, 668 (2008) (*internal citations omitted*). The *Sanders* Court elaborated that this scienter requirement "denotes purpose, and thus a person must have the purpose of getting a false or fraudulent claim paid or approved by the Government in order to be liable" for violating the FCA. *Id*. at 668-69. As the Supreme Court recently held, "[t]he FCA imposes liability on those who knowingly present a false or fraudulent claim for payment or approval. Thus two essential elements of an FCA violation are (1) the falsity of the claim and (2) the defendant's knowledge of the claim's falsity." *U.S. ex rel. Schutte v. SuperValu, Inc.,* 598 U.S. 739, 747 (2023) (*internal quotes omitted.*) As it relates to the "knowing"

element, the *SuperValu* Court held that "[t]he FCA's scienter element refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *Id.* at 749. Therefore, pursuant to the Supreme Court's recent holding in *SuperValu*, it is not enough to establish liability by showing that a person's submission of a claim for payment was subjectively unreasonable; instead, the FCA mandates a requisite showing that a person submitted a claim that they subjectively knew was false.

In the present case, the evidence in the record is insufficient to establish that the Defendants knowingly submitted false claims. Relator's Counsel has admitted that, to the extent that Defendants may have been overpaid in this case, that any such damages would be insignificant and that he was seeking not the nearly absent treble damages in this litigation, but instead was seeking the FCA's penalties (and attorney fees) "regardless of the magnitude of the charges" associated with the claims at issue. [EX 20[22] at p. 2.] The use of the FCA in order to pursue claims against defendants where the amount overpaid is de minimis is problematic on a number of levels. First, while it is true that monetary penalties are contemplated in the FCA, they have been found to be unconstitutionally excessive when, like here, the actual fraud amount is relatively small. *U.S. ex rel. Smith v. Gilbert Realty Co., Inc.*, 840 F. Supp. 71 (E.D. Mich., 1993). In *Gilbert Realty*, the Court struck down as unconstitutionally excessive, monetary penalties of $290,000, roughly 178 times the actual fraud amount of $1,630. The reason why courts must guard against excessive penalties is because of the potential for abuse of the FCA. Recently, the United States Supreme Court warned against misuse of the FCA in *Universal Health Services v. U.S.*, 136 S.Ct.

[22] Relator made this statement in communications with Counsel for WellCare Health Plan, a Kentucky Medicaid Managed Care Organization whom the Cancer Centers had sued and were engaged in an arbitration with at the time of the Relator's letter. Ironically, the Cancer Centers had brought an action against WellCare for WellCare's systemic *underpayment* of millions of dollars of claims for chemotherapy administration. Despite Relator's interference by this letter, WellCare still settled its underpayments with the Cancer Centers, although the exact monetary terms of that settlement are confidential.

1989 (2016). The Court noted that because of its enhanced penalties and fines, "the False Claims Act is not an all-purpose antifraud statute." *Universal Health,* 136 S.Ct. at 2003, *quoting Allison Engine Co. v. U.S.*, 128 S.Ct. 2123 (2008). In order for fraudulent actions to be actionable, they must have an actual impact upon the government. The Court went on to hold that "[t]he False Claims Act is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Universal Health,* 136 S.Ct. at 2004. In the present case, it is impossible to evaluate the Relator's damage calculation because the record is silent as to any methodology used by the Relator to calculate or arrive at damages, despite the Defendants' attempts to discover such methodologies.

But even more so, the insignificance of the alleged false claims is evidence that, even if the Defendants would have submitted claims that would be considered improper, that such submissions would not have been made knowingly, as it would defy logic that the Defendants would risk patients' lives and the draconian penalties associated with the FCA in order to achieve an entirely insignificant increase in reimbursement. Dr. Kirti Jain addressed this fact in his deposition when he testified that the difference in reimbursement in the scheme articulated by the Relator "is a minor charge, usually very miniscule." [EX 6 at 109:3-7.] And ultimately Dr. Jain's testimony adamantly addressed any allegation that the Defendants would compromise patient care for a miniscule reimbursement, stating:

> Sir, I am a clinician. I was trained as a clinician. I have always looked after the patient's interests…And I've always focused on delivering good medical care. I could not tell you what the technicalities of minor points of billing are. But I could tell you one thing: that we always, *always*, oversaw the best interests of patients. Whatever it took. And I have—I can say with no doubt in my mind that never have I ever compromised the care of a patient…But have I looked into every minute detail of billing? No. Do I care to? No. That's not my job. That's why you hire [an office] manager for…But I can tell you one thing: I would not do anything to get an extra $2 or $3. It's neither worth my time nor does it go with my conscience; nor would I ever advocate that.

[*Id.* at 117:2-23.] Other facts support this dedication. For instance, Theresa Kintigos testified that—in the 14 or 15 years that she had served as a medical assistant—she had never once been unable to find a physician on-site when a patient suffered an adverse reaction to chemotherapy. [EX 5 at 95:2-21]. Nurse Howard testified that RNs did not start chemotherapy administration without a physician being on-site and that, when she attended Tumor Board meetings, she would receive text messages from the RNs asking if they could start the actual chemotherapy administration and the answer was always no. [EX 4 at 74:1-8, 75:21-25, 76:1, 78:1-9]. The most that Relator could say is that, based on Ms. Holliman's and Ms. Dove's vague testimonies, there were occasional instances that physicians left at the end of the day, possibly while a chemotherapy session was ongoing or concluding. But this is not enough to overcome Relator's burden on this point. The record clearly shows that the Defendants were indignant in their wholehearted devotion to patient care. The fact that, by the Relator's own admission, even if the allegations of the Relator's Complaint were true, the actual financial benefit to the Defendants would have been relatively insignificant. It follows, therefore, that the record in this case is inconsistent with any reasonable finding that the Defendants would have submitted fraudulent billing with the requisite subjective knowledge. As such, summary judgment is proper in this case.

WHEREFORE, Defendants respectfully request that Summary Judgment be GRANTED in their favor in this case, and the above-styled action be DISMISSED.

Respectfully submitted,

*/s/ Christopher A. Melton*

Christopher A. Melton
Victoria Boland Fuller
cmelton@wyattfirm.com
vfuller@wyattfirm.com
WYATT, TARRANT & COMBS, LLP
400 West Market Street, Suite 2000
Louisville, Kentucky 40202
Telephone: 502.589.5235
***Counsel for Defendants***

**CERTIFICATE OF SERVICE**

I hereby certify that on **January 26, 2024,** the foregoing was electronically filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the Parties.

*/s/ Christopher A. Melton*
Christopher A. Melton

101465113.1