# EXHIBIT NO. 1

LOUISVILLE LEXINGTON LONDON FLORENCE CINCINNATI INDIANAPOLIS ORLANDO JACKSONVILLE TAMPA

KENTUCKIANA
COURT REPORTERS

# CIVIL ACTION NO. 0:16-CV-148-DLB

# UNITED STATES OF AMERICA

# EX REL. ROBERT C. O'LAUGHLIN, M.D.

# V.

# RADIATION THERAPY SERVICES, P.S.C., ET AL.

**DEPONENT:**

**ROBERT C. O'LAUGHLIN, M.D.**

**DATE:**

**December 11, 2023**

a courtroom powerhouse

schedule@kentuckianareporters.com
877.808.5856 | 502.589.2273

www.kentuckianareporters.com

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF KENTUCKY

ASHLAND DIVISION

CIVIL ACTION NO.: 0:16-CV-148-DLB

UNITED STATES OF AMERICA

EX REL. ROBERT C. O'LAUGHLIN, M.D.,

Plaintiffs

V.

RADIATION THERAPY SERVICES,

P.S.C., DBA ASHLAND BELLEFONTE

CANCER CENTER, ET AL.,

Defendants

DEPONENT: ROBERT C. O'LAUGHLIN, M.D.

DATE: DECEMBER 11, 2023

REPORTER: DANIELLE NICOLE CALVERT

APPEARANCES

ON BEHALF OF THE PLAINTIFFS, UNITED STATES OF AMERICA EX REL. ROBERT C. O'LAUGHLIN, M.D.:

Andrew Grosso, Esquire
Andrew Grosso & Associates
1101 30th Street
Suite 500
Washington, DC 20007
Telephone No.: (202) 298-6500
E-mail: agrosso@acm.org

ON BEHALF OF THE DEFENDANTS, RADIATION THERAPY SERVICES, P.S.C., DBA ASHLAND BELLEFONTE CANCER CENTER, KIRTI K. JAIN, M.D., P.S.C., DBA HIGHLANDS CANCER CENTER, A ONE BIZ SOLUTIONS, LLC, KIRTI K. JAIN, M.D., AND MANISH JAIN:

Christopher A. Melton, Esquire
Wyatt, Tarrant & Combs, LLP
400 West Market Street
Suite 2000
Louisville, Kentucky 40202
Telephone No.: (502) 562-7367
E-mail: cmelton@wyattfirm.com

INDEX


| | Page |
|---|---|
| PROCEEDINGS | 5 |
| DIRECT EXAMINATION BY MR. MELTON | 5 |
| CROSS-EXAMINATION BY MR. GROSSO | 117 |
| REDIRECT EXAMINATION BY MR. MELTON | 126 |


EXHIBITS


| Exhibit | Page |
|---|---|
| 1 - Notice of Deposition | 10 |
| 2 - Copy of CV | 11 |
| 3 - Declaration of Brenda Kelly | 50 |
| 4 - Complaint | 59 |
| 5 - Responses to Interrogatories | 66 |
| 6 - Additional Discovery Responses; Request for Production of Documents | 83 |
| 7 - Claim Scrubbing - Business News Daily | 92 |
| 8 - Copy of Amended Disclosures | 96 |
| 9 - Leukine - Web MD Article | 106 |
| 10 - Itemized Billing Statements - Patient B | 107 |
| 11 - Article Discussing Leukine (Sargramostim) for Parkinson's Disease | 110 |
| 12 - Travel Itineraries | 113 |

**Q. And when did you graduate from Rutgers?**
A. 1981.
**Q. And I see this -- what is UMDNJ?**
A. That stands for University -- let me double check. Yeah. Okay. University Medical and Dental College of New Jersey. They have since changed the name. There was a merger of multiple medical schools. Now I think it's called Rutgers Medical School.
**Q. Okay.**
A. Yeah.
**Q. So UMDNJ was part of Rutgers at that time or --**
A. Rutgers was a separate entity.
**Q. Okay.**
A. But I think ten years after I graduated, they -- there was a merger of all the medical schools in New Jersey, but -- but it used to be University of -- of Medicine and Dentistry of New Jersey.
**Q. Okay. Did you do any other post-grad besides what's listed here under education?**
A. I attended graduate school at Rutgers. I was thinking about doing research, so I was going for a master's degree at the time. And I had applied for three medical schools, and I happened to get into two of them. One of them was in -- in Newark, New Jersey.

**Q. Got you. Go through some of your work history. Since you started out as a radiation oncologist at Medical Center of Delaware, was that your first --**

A. That was right out of residency.

**Q. Okay. And what did -- were you just listed as -- your position, was it radiation oncologist?**

A. Yes.

**Q. And I am -- I'm assuming you've primarily just seen patients as a rad onc?**

A. Yes. And I was -- because I was right out of training, they chose me to treat pediatric patients, which I -- I wasn't fond of, so.

**Q. Why not?**

A. Well, first you'd sedate the patients, and then you sedate the parents who were going through difficult times. No one else wanted to do that -- that work.

**Q. Got you. And then you went on to -- well, I guess, why did you leave Medical Center of Delaware?**

A. At the time, there -- there was a requirement to be board certified within a certain time. And I -- I missed a cutoff by a few months, so they -- so I basically left.

**Q. And is that board certified in radiation**

**oncology?**
A. Yes.
**Q. Okay. And was that a Delaware requirement?**
A. Yes.
**Q. Okay. And then from there, you went to Macomb Hospital Center; is that correct?**
A. In Michigan. Yes.
**Q. And who were you treating there? Was that pediatric or were you treating --**
A. No. most pediatric patients are treated at medical school centers, so that's more of an academic treatment. So I prefer private practice where you just treat adults. And it's usually lung cancer, prostate cancer, breast cancer. You see those patients every day.
**Q. Got you. So you were there until -- for about a year. Why did you leave the Macomb Hospital Center?**
A. It was more of a contract dispute.
**Q. How so?**
A. It was mainly salary. They had promised some bonuses, which never materialized. And one other thing was one of the physicians in the group had a son who was training in radiation oncology. And basically, I -- I was a placeholder for one of the owner's sons, so I didn't appreciate the deception when I took this job.

**Oncology Associates?**

A. It's a private practice medical group.

**Q. Okay. And looks like you were there just shy of seven years; is that correct?**

A. Right.

**Q. Why did you leave that practice?**

A. They let me go. Again, there -- it was a contract dispute over money, basically bonus payments.

**Q. And from there you went to -- it looks like you went back into -- with Cancer CAREpoint; is that correct?**

A. Right.

**Q. Okay. And I'm assuming for that two years, you weren't -- same thing, you didn't want to continue traveling?**

A. The main employer there was in Northern New Jersey. So I'm from Central New Jersey. There was a center in Northern New Jersey where I would help out. You know, it -- it wasn't full-time, but it was -- I'd say three out of four weeks out of the month.

**Q. Got you. And why did you leave after two years?**

A. Mainly salary. Oftentimes they'll promise you partnership, and then -- then after a couple of years they forget their initial conversation. So it was

mainly partnership issues.

**Q. Did you leave on your own accord or did -- were you let go?**

A. Let's see. Dr. Brown, he basically didn't renew my contract, so I -- I had to find another position.

**Q. Okay. And then you went to Nevada Care Centers in Las Vegas?**

A. Yes.

**Q. And you were there just shy of three years; is that correct?**

A. Yes.

**Q. And why did you leave that practice?**

A. Let's see. Well, I had a three-year contract at the time, and -- let's see. Basically, my contract was not renewed, and I -- I was going to leave anyway. Basically, I didn't get along with the owner.

He -- he wasn't happy with the amount of money that the radiation oncology practice was generating. He had eight medical oncologists and -- and one radiation oncologist. And, you know, the medical oncologists were not referring patients to me, so.

**Q. Who was the owner; do you recall?**

A. It was Nagy. N-A-G-Y. I think the first name

**Q. Through who?**

A. CompHealth. They're a locum tenens agency in -- I think they're in Decatur, Georgia.

**Q. And was there an interview process to go there?**

A. Yes. I think my initial contact with ABCC was -- it might have been March of 2012.

**Q. And who did you talk with?**

A. The practice manager, Manish Jain.

**Q. Did you meet with any of the other physicians at that point?**

A. Just Kirti Jain.

**Q. And you left in October 2015. Why did you leave Ashland?**

A. Well, I had problems with Manish Jain. He -- he made some promises initially about the position. And I mean, basically, he -- I -- I found him to be a -- a pathologic liar as far as details about the -- the job.

And -- and again, toward the latter part of my work history there, Anshu Jain joined the practice. And the problem was they never notified me that Anshu Jain would join the practice. So that -- basically it was deception. Again, it was nepotism. I had been through that before and I knew I was just a placeholder for, you know, the owner's son, so I didn't appreciate the

deception.

**Q. Yeah. It sounds like you'd had that happen at Macomb?**

A. Yes.

**Q. Okay. And then you went to Carlsbad Medical Center?**

A. Yes.

**Q. Okay. And you were there just shy of two years. Why did you leave Carlsbad Medical Center?**

A. Let's see. Well, again, it was a contract issue. After two years, they adjust your salary and in this case, downward. They base it on -- I think it's called relative value units where, you know, I -- I was doing some calculations, my salary would have decreased by 30 to 40 percent from my initial salary. So I just -- I wasn't willing to take a -- a pay cut.

**Q. And you say they would adjust the salaries at -- after a year or after two years?**

A. It might have been after a year. Yeah. Initially to -- when they recruit, they give you a guarantee. Sometimes it's a year, some are two years. In this case -- yeah. The -- in this case, it might have been one year.

**Q. So you had been there a year and ten months, according to the CV?**

A. Right.
**Q. You've been a number of places. Now you filed the -- a False Claims Act case in the -- in this case, against Ashland-Bellefonte Cancer Center, as a relator.**
**Have you been a relator in any other cases against any of your other employers?**
A. Sam Brown in -- in New Jersey.
**Q. Which one would that be, would that be the Cancer CAREpoint?**
A. Let's see. I'm blanking on the -- the name of the practice. It was a -- there was a radiation oncology practice in Totowa, New Jersey.
**Q. When was that?**
A. That was -- let's see. I believe 1988. I'm sorry. 1998.
**Q. And I guess you were serving as a locum at this practice --**
A. Right.
**Q. -- during that time? What was the substance of that lawsuit?**
A. Dr. Brown was -- he was basically doing unnecessary procedures. He was basically padding the bill, adding procedures which were not required.
**Q. What procedures was he performing that were not medically necessary?**

A. Simulation procedures and every time you changed a radiation course, there were physical changes, there's symmetry changes, treatment planning changes. So that was his routine.

**Q. Did Department of Justice -- did they intervene in that case?**

A. They did not.

**Q. And what ended up happening with the case?**

MR. GROSSO: If you know.

THE WITNESS: Well, I mean, I had an attorney, and he elected not to -- to proceed without the government's assistance.

BY MR. MELTON:

**Q. So voluntary dismissal after the government declined to intervene?**

A. Yes. Right.

**Q. Okay. More questions on your CV. You have a -- on the first page, you have a skills section. And the -- and they're in two columns you see, and on that left-hand column at the bottom bullet point, it says, "Participation in online CME and webinar programs"?**

A. Right.

**Q. What is this referencing?**

A. Well, each state requires you to complete, you know, online courses, or you can attend conferences. You

Like I said, most patients will come from the medical oncologist. Some will come direct from the urologist. If it's prostate cancer, they don't need chemotherapy so they just will refer the patient directly. And some head and neck cases, like vocal cord cancer, they -- they just need radiation therapy.

**Q. Now, you mentioned Kirti Jain. There were other medical oncologists there, though, correct?**

A. Okay. When I joined in 2012, there was a part-time medical oncologist, Dr. Hayek.

**Q. Okay. And I guess if I'm thinking about the hierarchy, was there somebody who you would have been answerable to when you were there?**

A. In -- in what way? I mean, Dr. Kirti Jain was my employer.

**Q. Okay. Did you ever provide any chemotherapy services while you were there?**

A. No.

**Q. Have you ever provided chemotherapy services ever in your practice?**

A. No.

**Q. Okay. Do you ever even recommend a course of chemotherapy treatment, or is that something for medical oncologists to do?**

A. Usually, I -- I defer to them.

--
A. Right. But they're only given to chemotherapy patients.
**Q. So those drugs wouldn't be given to anybody who's not undergoing chemotherapy? It wouldn't be for, say, radiation or some other treatment?**
A. No. Blood counts usually drop from chemotherapy. Some patients will become mildly anemic from radiation, but not to the same degree as chemotherapy.
**Q. So those support drugs you were talking about, those aren't antineoplastic chemotherapy drugs, correct? They're not cancer killing, they're supporting the --**
A. They -- they supports their blood counts. Right.
**Q. Okay.**
A. Whether it be red blood cells, white blood cells, or platelets.
**Q. But they're -- they wouldn't be considered chemotherapy drugs, they would be support. Is that fair to say?**
A. Yes.
**Q. Okay. How long have you been a physician? Is it since '91?**
A. Going on 33 years in private practice.

him that I said he can go pound sand. And I -- I told her to get a lawyer and -- and sue him.

BY MR. MELTON:

**Q. Do you remember who that was?**

A. I -- I can't recall the name. And it was a -- a young female who was just out of radiation therapy school.

**Q. So getting back to the Brenda Kelly declaration and her giving you these records, I want to make sure I understand your testimony.**

**Did she know why you were asking for the records?**

MR. GROSSO: Objection. Foundation. You may answer if you can.

THE WITNESS: Right. Well, again, she knew that I had issues with Manish. That was an ongoing thing. I mean, eventually I got to the point where I just ignored Manish. If I saw him in the hallway, I'd - - I'd ignore him.

BY MR. MELTON:

**Q. Okay. And once you received those records, where did you keep them?**

A. I kept them in my office.

**Q. And aside from your lawyer and anyone you had working with you in this litigation, have you let**

**had you left the clinic yet, or were you still employed there?**

A. I was still employed there.

**Q. About what time during 2015 would this have happened?**

A. I would say early in the year because at the time I was having contract issues with Manish. And so I think I had asked Brenda Kelly to basically give me a schedule when I was in the -- the cancer center and Anshu Jain was in the cancer center.

**Q. And why is that?**

A. Okay. Long story. But once Anshu Jain joined the practice, Manish Jain basically was -- was, you know, steering more complex patients to Anshu Jain, who was not board certified at the time. And he was giving me the simple cases. And the reason for that is there was a reimbursement difference.

So even though I'm -- I'm the board-certified physician, Anshu Jain is getting all these new patients. And I -- I discussed this with Manish Jain and -- yeah. So that -- that was -- that was a problem for me.

**Q. And so these schedules would've shown that he was --**

A. I wanted -- I wanted to keep track of who I saw and who Anshu Jain was treating.

**clinics may have had the same physician listed on the -- on a claim form on -- in two clinics at the same day; is that correct?**

A. From the daily schedule.

**Q. Right. Sorry, go ahead.**

A. Well, I mean, Dr. Jain can't be in two places at once. They can't be in Ashland and then 80 miles away in -- at the Highlands Cancer Center. If they're treating chemotherapy patients at the same time, I think we had some records with a -- I mean, the -- the times were conflicting, that he can't be in two places at once.

**Q. And that's from the medical records would show Dr. Jain as a supervising physician at Highlands and at Ashland on the same day?**

A. Right.

**Q. Okay. Just trying to make sure I understand all these allegations. The first sentence also says, "Dr. O'Laughlin has personal knowledge that chemotherapy services were provided by defendants when physicians were not on the premises."**

**What's that referring to? What's your personal knowledge?**

A. Well, that refers to Dr. Jain's routine schedule where Tuesdays and Thursdays he would be in

Ashland. And then Monday, Wednesday, Friday he would be in Highlands. And the, I mean, in particular Thursdays, he's always in Ashland because that's when tumor board meetings are.

Even if there isn't a -- a meeting scheduled, he -- he would routinely be in -- in Ashland. And so patients down at Highlands, I mean, they do have a full-time nurse practitioner there, but she's being -- she's unsupervised.

**Q. What do you mean unsupervised?**

A. There's no physician on -- in the building.

**Q. Okay.**

A. At least from -- in 2012, 2013, and the first part of 2014.

**Q. Who is that nurse practitioner you're talking about?**

A. Stephanie Van Dine. And then -- I know she was divorced a few times. And Stephanie Roberts. And what -- what's her name? I'd have to --

**Q. He -- it's Stephanie Howard?**

A. Yeah.

**Q. Okay.**

A. Yes.

**Q. Okay. So you would base that based on your understanding of what Dr. Jain's routine schedule would**

**be; fair to say?**

A. Right. Plus the fact that he routinely would travel to India, wouldn't tell me. Maybe he told the nurse practitioners, I -- I don't know. But he'd be gone for three weeks and, you know, they're still treating patients at the cancer centers. And I never saw anyone cover for him and --

**Q. How often were you treating patients on the same day at the same clinic as Dr. Jain?**

A. Well, I'm answering that. We -- our schedules would overlap because, you know, everyone goes to the tumor board meetings on Thursdays. But like I mentioned before, in Highlands, some days I would go on a Tuesday and then -- let's see. That changed -- no, I'm sorry. The -- my -- in 2012, 2013, I would go on Wednesdays. When Anshu Jain joined the schedule, I would go on Tuesdays, he would go on Wednesdays, at Highlands.

**Q. So I'm trying to also picture then what days would you overlap at the same clinic as Dr. Jain?**

A. Always Thursdays in Ashland. And some days, you know, if I'm in Highlands on a Wednesday, I -- I would see him late morning.

**Q. And you say Thursdays because of the tumor board meeting; is that correct?**

A. Right.

**Q. Okay. Now, you said that those meet once a month?**

A. Usually three out of every four Thursdays. Sometimes on holidays they would adjust that schedule just based on, you know, doctors being absent. But usually three out of four Thursdays.

**Q. Now, I know you said that those are not required and they're optional. Is it your testimony that you attended every tumor board meeting?**

A. No.

**Q. Okay.**

A. That was impossible.

**Q. Did Dr. Jain attend all of the -- every -- was he at every tumor board meeting?**

A. Usually.

**Q. Okay.**

A. Everyone would go. If -- if you were in the clinic in Ashland, you would go. So Dr. Hayek would be there, Mary Ann Stevenson would go. And if -- you know, I was usually there Thursdays. I -- I would go as well.

**Q. Okay. So you say you have personal knowledge. Let me take a step back. You said you never supervised chemotherapy.**

**Why do you say that?**

A. I wasn't allowed to. I didn't have permission

**hypothetical scenario: Dr. Hayek orders chemotherapy for patient Ms. Jones and she -- when chemotherapy is administered, Dr. Jain was in the facility.**

**If Dr. Hayek's name was listed as the physician on the claim form when somebody else was present in the facility, would you contend that to be a false claim?**

A. Absolutely. You -- you can't use some -- another doctor's NPI number to bill. Whoever is in the building, you -- you have to use their NPI number. That's my understanding.

**Q. Okay. But that -- so that's your understanding that's -- you would contend that to be a false claim then?**

A. Right.

**Q. Okay. Again, hopeful for me to understand where you're coming from.**

MR. MELTON: This is another document I'm going to mark. Are we on 6?

THE REPORTER: Yes.

( EXHIBIT 6 MARKED FOR IDENTIFICATION)

BY MR. MELTON:

**Q. Number 6. These are more discovery responses that were served to us by your attorney. Have you seen these? These are document requests.**

A. Yes.
Q. And did you assist with drafting of these responses too?
A. Yes.
Q. Turn to page 6. Request number 4, it asked, "Please produce any and all documents or other items obtained and/or retained by the relator," you, "which in any way relate to the allegation contained in preliminary statement of the third amendment complaint that the defendant submitted claims for chemotherapy services when physicians were not present on the premises when the chemotherapy services were provided."
And your response spills over onto page 7 to a number of categories of documents. Number 1 says, "Material taken or provided to Dr. O'Laughlin during his employment with the defendants."
Can you tell me what documents are being referenced here?
A. The daily schedules.
Q. Okay. Now, those were the daily schedules that involved Anshu Jain, or were there more than that?
A. No. Well, during 2012 through the first half of 2014, I was the only radiation oncologist. So I would keep in track of the daily schedule and also there were -- there was billing information on -- on the paper

charts that I would happen to glance at, so.

**Q. Okay. So daily schedules and --**

A. The billing summaries on the patient charts.

MR. GROSSO: May I add something here or no?

MR. MELTON: It is mostly just so I can get his impressions. I may follow up with you later on it. But I just -- it's good for me to understand his understanding.

MR. GROSSO: There were some documents that were recently turned over. He may not realize that they can fall under this category.

MR. MELTON: Okay. We can follow up.

THE WITNESS: Okay. I -- I know what he's referring to. Okay. Sorry.

BY MR. MELTON:

**Q. Okay. Well, what would be -- what would those be?**

A. We requested some information from CMS for -- was it three and a half, four years?

**Q. Yeah. This is -- it's helpful for me to just --**

MR. GROSSO: I'll do a cross.

BY MR. MELTON:

**Q. Yeah. Okay. Number 2 says "Materials obtained from Kentucky Medicaid program pursuant to**

**subpoena." Is this -- I'm assuming this is the claims' data that you received from Medicaid that we received? There was some claims' data that you -- we received from you-all from Medicaid? That's what this is referencing, right?**

A. That would be included, I would assume.

**Q. Okay. And how does that show that no physician was present?**

A. Again, the -- the routine that Dr. Jain had every week. Tuesdays, Thursdays, Ashland. Monday, Wednesday, Friday, late morning in Highlands. And then his routine going to India every three -- three months for three weeks.

**Q. So that's -- it would -- you would have to cross reference that with those routines. Is that your --**

A. Right.

**Q. And I'm also assuming where you have billing at the two different clinics on the same day. Is that also part of it?**

A. Yes.

**Q. Okay. And I see here also material provided by office's strategic operations and regulatory affairs by CMS number 3 -- CMS data. Is that kind of the same thing to be able to cross-reference that with the --**

**Dr. Jain's routine? Is that the CMS data?**

A. I would assume so. Yes.

**Q. And you talked about also material provided by WellCare pursuant to subpoenas. Is this kind of the same thing of claims data that you would have to cross-reference with Dr. Jain's routine?**

A. Right.

**Q. Okay. Let me ask you this: I asked earlier about, could you, as we sit here today, point to which claims are false, and you're talking about cross-referencing those with Dr. Jain's routine, how exactly would you -- what -- how exactly would you propose a methodology to cross-reference Dr. Jain's routine with the claims data to get -- to arrive at which claims are false?**

MR. GROSSO: Objection. Calls for legal conclusion. You may answer.

BY MR. MELTON:

**Q. You can answer.**

MR. GROSSO: You may answer.

THE WITNESS: Again. It's based on the daily schedule. He -- he -- he's routinely in Ashland on Tuesdays, Thursdays. He can't be 80 miles away at Highlands delivering chemotherapy for patients.

BY MR. MELTON:

**Q. Okay. So it would -- I guess that's a little bit different, where you're talking about specific patient encounters than a CME, or do you get CME credit for this?**

A. Okay. Just the general discussion of the treatment course, that -- that's medical information. Supposedly it's a learning exercise, so that's how you get the CME. So you usually get one CME credit for every hour that you attend. So if it lasted for an hour and a half, you get, you know, 1.5 credits.

**Q. So basically, it was a group of oncologists meeting up and discussing courses of treatment, and you would get CMEs for it?**

A. Right.

**Q. Is that yes?**

A. Yes.

**Q. Okay. And I think you said earlier that attendance isn't mandatory for these?**

A. Right.

**Q. Okay. How frequent did you attend the meetings?**

A. Well, on average, I'd say at least two of the meetings. But sometimes I'd have to go to Logan or one of the other clinics on a Thursday, so I didn't attend every meeting. I attended most of them.

MR. MELTON: So want to -- this will be Exhibit 10. And I'll tell you what, I will deliver this to you in a redacted form later, if that's okay. And I actually only printed off two of these.

(EXHIBIT 10 MARKED FOR IDENTIFICATION)

BY MR. MELTON:

**Q. These are the -- you can look at that. These are your itemized statements.**

A. Okay.

MR. GROSSO: I may want to -- is there a Bates stamp number on the bottom?

MR. MELTON: No. I don't believe so.

MR. GROSSO: Okay.

BY MR. MELTON:

**Q. These are itemized statements for a particular patient. You've seen these types of records, right? Are these the billing statements you had talked about?**

A. Yes. Right.

**Q. We'll call this Patient B. If you look starting at the entry on January 7th --**

A. January 7th?

**Q. It's on page 3. Looks like from January 7th onward, you see the next few pages, up until January 21, 2014. This Patient B would have been receiving radiation treatment.**

**Is that fair to say?**

A. Yes.

**Q. Also throughout that time, if you begin looking in January 11th on, this patient was receiving LEUKINE throughout the course of him receiving radiation treatment; is that correct?**

A. Yes. Right.

**Q. So this patient during that time was not receiving chemotherapy, but he was receiving radiation, and he was also receiving LEUKINE.**

**Isn't that fair to say?**

MR. GROSSO: Can I see that document?

THE WITNESS: Yes. Well, I will tell you that --

MR. GROSSO: Are you answering yes to the question or to, can I see that document?

THE WITNESS: Oh, I'm sorry.

MR. GROSSO: Which was it? Let me clear up the record.

BY MR. MELTON:

**Q. Yeah. So the patient was receiving LEUKINE, correct?**

A. Oh, yes.

**Q. Okay.**

MR. GROSSO: Okay. But your answer to his

**chemotherapy patients?**

A. Right. Yes.

**Q. Okay. Just also just to clarify, you've never met Dr. Batra, correct?**

A. Never crossed paths with him.

**Q. And I believe you also testify you never talked to Dr. Bertram, never met him before?**

A. Right.

**Q. Okay. So as it sits here today, you can't testify to what days they would've worked or not worked. Is that fair to say?**

A. I have no knowledge of -- of their start date and their end date.

**Q. Or their schedules?**

A. I -- my understanding was they -- they left prematurely.

**Q. Okay. But you don't know, like on such and such a date they worked as opposed to not worked. Is that fair to say?**

A. I mean, I think I would say no. I -- I'm not sure.

MR. MELTON: Okay. I have no further questions.

MR. GROSSO: Okay. No more questions. We will read.