# EXHIBIT NO. 6

LOUISVILLE LEXINGTON LONDON FLORENCE CINCINNATI INDIANAPOLIS ORLANDO JACKSONVILLE TAMPA

KENTUCKIANA
COURT REPORTERS

**CIVIL ACTION NO. 0:16-CV-148-DLB**

**UNITED STATES OF AMERICA EX REL ROBERT C. O'LAUGHLIN, M.D.,**

**V.**

**RADIATION THERAPY SERVICES, P.S.C., DBA ASHLAND BELLEFONTE CANCER CENTER, ET AL.,**

**DEPONENT:**

**KIRTI JAIIN, M.D.**

**DATE:**

DECEMBER 21, 2023

a courtroom powerhouse

schedule@kentuckianareporters.com
877.808.5856 | 502.589.2273

www.kentuckianareporters.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION
CIVIL ACTION NO: 0:16-CV-148-DLB

UNITED STATES OF AMERICA
EX REL. ROBERT C. O'LAUGHLIN, M.D.,
Plaintiffs

V.

RADIATION THERAPY SERVICES, P.S.C.,
DBA ASHLAND BELLEFONTE CANCER
CENTER, ET AL.,
Defendants

DEPONENT: KIRTI K. JAIN, M.D.
DATE: DECEMBER 21, 2023
REPORTER: JESSE HARP

APPEARANCES

ON BEHALF OF THE PLAINTIFF, UNITED STATES OF AMERICA EX REL. ROBERT C. O'LAUGHLIN, M.D.:
Andrew Grosso, Esquire
Andrew Grosso & Associates
1250 Connecticut Avenue, Northwest
Suite 700
Washington, D.C. 20036
Telephone No.: (202) 298-6500
E-mail: agrosso@acm.org

ON BEHALF OF THE DEFENDANT, KIRTI K. JAIN, M.D.:
Christopher Allen Melton, Esquire
Wyatt, Tarrant & Combs, LLP
400 West Market Street
Suite 2000
Louisville, Kentucky 40202
Telephone No.: (502) 589-5235
E-mail: cmelton@wyattfirm.com

Also Present:
Lydia Ryan, Videographer

MR. MELTON: -- supplement the record for that.
BY MR. GROSSO:
**Q. All right. So you mentioned Dr. Hayek, Fadi Hayek?**
A. Hayek, Fadi Hayek.
**Q. And you mentioned Dr. Stacy.**
A. Yes.
**Q. Okay. So this is 2012. Who else was present working at these centers for you?**
A. As for the physicians, that is my recollection. There were some nurse practitioners who were there. But in terms of physicians, that's all I remember.
**Q. Was there a Dr. Robert O'Laughlin who was employed?**
A. He was. I -- I thought he got employed after Dr. Stacy left. So that would be about 2012 or 2013.
**Q. Okay. Anyone else who was a physician?**
A. Other than some locums, at the time, they were the only physicians. In 2014, we had some additional physicians who joined us.
**Q. That would be Dr. -- forgive me, I am horrible pronouncing names. In fact, we have a fight in my family as to how to pronounce my name which I think is fairly simple. But apparently, it's not so simple.**

or more, but generally on that schedule.

On the premises of Ashland Bellefonte Cancer Center and Highlands Cancer Center, we always ensured that there was a physician on those premises. With those basic principles, we were able to schedule our oncologist since we at least had three physicians. And at times in 2014, we had five physicians and two nurse practitioners. So that -- with -- with those minimum requirements, we were able to schedule without much difficulty.

**Q. You said you had five physicians. Prior to Dr. O'Laughlin joining your practices, I hear the name of Dr. Hayek, Dr. Stacy, and of course, yourself. That's three.**

A. Yes.

**Q. Is there a fourth and fifth person?**

A. So fourth and fifth were added in July 1 of -- or about July of 2014.

**Q. Okay. So at that time -- well, Dr. Hayek left around Christmas of 2013; is that correct?**

A. Yes. About the end of 2013 would be correct. Yeah.

**Q. Okay. So at that point, it would be down to two, you and Dr. O'Laughlin, correct?**

A. Two full-time on the payroll. Yes.

**Q. Okay. There were also some locum tenens during some periods of time thereafter, right?**
A. We had a few locums. Correct.
**Q. And then in July 1st of 2014, you hired Dr. -- why can't I pronounce his name? I have a mental block with names.**
A. Should I help you?
**Q. Konala?**
A. Konala. Actually, the correct -- correct pronunciation is yet different. But Konala.
**Q. What is the correct?**
A. Konala.
**Q. Konala.**
A. Yes.
**Q. I may remember that.**
A. There's a little -- there's a little twang there.
**Q. Konala. Dr. Batoo?**
A. Yes.
**Q. Dr. Anshu Jain?**
A. Correct.
**Q. You?**
A. Yes.
**Q. And Dr. Robert O'Laughlin?**
A. Correct.

**Q. So that brings us to five?**
A. Yes.
**Q. Until Dr. O'Laughlin left?**
A. Yes.
**Q. Which was in October 2015?**
A. '15. Yes.
**Q. Okay. By the way, let's get this handled now. Dr. Anshu Jain is your son; is that right?**
A. Correct.
**Q. I've also looked at his resume. And that's pretty impressive also.**
A. Thank you.
**Q. Let us talk about the time before July 1, -- no. Let's talk about all the time. During the period of July 1, 2012, to the end of 2016, how did the scheduling of -- how was the scheduling of the physicians determined?**
A. Once again, the principles that I gave you, that there will be a physician at each of the two locations in Kentucky which is Ashland Bellefonte Cancer Center and Highlands Cancer Center at all times. And Logan Regional Cancer Center did not require presence of a physician all the time. So on those principles, we scheduled them.
**Q. Okay. Prior to Dr. Hayek leaving, there would**

That is, I was the captain of the ship, so to speak.

**Q. Your name appears elsewhere on this record specifically under, "Supervising M.D.;" is that correct?**

A. That is correct.

**Q. What does your name mean in that position?**

A. It simply means that -- once again, that I was the ordering physician, the physician of record who oversaw the treatment plan for this patient and monitored this patient periodically as well as provided the long-term care needed for this patient.

**Q. Now, this is a medical administration record for the provision of drugs to a particular patient at the Ashland Bellefonte Cancer Center on May 22, 2014.**

A. Correct.

**Q. Your name is listed in the entries for supervising M.D. Does the entry -- does the listing of your name in the entry for supervising M.D. mean that you were on the premises for the time period that these drugs were being administered for this patient?**

A. It does not mean that. It means that there was a physician. But whether it was myself or somebody else, this record would not tell you that.

**Q. Okay.**

A. This record only lists the name of the physician providing care to the patient who formulated

THE WITNESS: I don't know that they needed to know that. But once again, the same data were available to them also. The schedule was available to them since they can remotely log into the EHR. They were doing the billing for E&M services. They were doing the billing for any diagnostic services. So they could find out who was on that -- who was there on that particular day. But having said that, I don't know that -- if they needed to know or not.

BY MR. GROSSO:

**Q. How did they know that the time had come to bill for a patient?**

A. They depended upon the time -- that -- that's more of an internal structure that the manager creates.

**Q. When you say, manager, who do you mean?**

A. Manish in this case.

**Q. I wanted to know whether it was India or in Kentucky.**

A. Sure. The data, like the superbill, has to be transmitted to the billing service. Some of the data relating to the infusion and such is available to them as soon as they're entered into the electronic health records. In this case, the -- this kind of data that is available to them right away. Radiation treatment data, if they're transmitted to them daily or once the full

**at the same time, right?**

A. That is true.

**Q. What physician was on the premises of each of these facilities at the time that these two patients were receiving their drugs?**

A. That would be a 9-year-old question that I could not answer, by any chance, for my memory. The names that are listed are that of me. But that simply means, as I explained to you, that I was the oncologist who planned that treatment, oversaw that treatment, and monitored that treatment for the patient. But this does not mean that I was there at that facility on that particular day at that time.

**Q. Did a A-One Biz Solutions Private Limited know that the term, supervising physician, meant that you -- did not mean that you were on the premises as supervisor?**

MR. MELTON: Object to foundation and form.

THE WITNESS: I could not speak on behalf of A-One Biz. I would hope they did because that was what most everybody follows, that the supervising physician is the person who plans, monitors the patient, devises the treatment plan. It does not mean the presence of that physician at that moment at that particular on that particular day. So

I really don't see a contradiction that you are alluding to. I did not need to be in two places at the same time. It was just that two of my patients were getting treatment on the same day at the same time.

BY MR. GROSSO:

**Q. Well, what is the difference in meaning for the entry physicians in the upper -- entry physician in the upper right-hand corner and the entry for supervising M.D. in the center of the MAR?**

A. There's no difference. I think one record comes from the initial data that is entered, the identity part of the patient that is the demographics that are entered. And the right upper corner comes from that. When demographics of a patient are entered into the medical records, they often enter -- well, there is a field where you enter the physician's name. That is in the right upper corner while the supervising M.D. is what nurses enter, implying who created the treatment plan or that particular treatment plan.

**Q. Now, how would one determine who was actually on the premises during the delivery of either of those set of services to those two patients?**

A. Once again, I -- as I explained, there are many other ways. You can determine that by looking at

**Q. Where were they?**
A. And other days.
**Q. Okay. Where were they held?**
A. It dependent on which hospital, which tumor board. And you know, periodically, they were held. Periodically, they weren't. So it all depended on that.
**Q. Did the Ashland Bellefonte -- let's rephrase that.**
**Did Our Lady of Bellefonte Hospital hold tumor board meetings on Thursdays?**
A. Our Lady of Bellefonte Hospital used to hold tumor board meetings. Yes. But they were held on a variety of different days at a variety of different times.
**Q. Were they not held during the period of -- let me rephrase that.**
**During the period, July 1, 2012, to the end of December 2016, did the Our Lady of Bellefonte Hospital hold tumor board meetings on Thursdays at noon?**
A. So I would not be able to tell you if it was during that period or not. But there were times tumor board meetings were held on a Thursday at lunchtime which would be about noon. If it applied to that period and if it applied to all of that period, I could not tell you that.

**Q. Would you see patients -- let me rephrase that.**
**Did you go to the tumor board meetings?**
A. Very occasionally.
**Q. Did you not go religiously on Thursdays to the tumor board meetings?**
A. No. I did not.
**Q. When you went, did the other physicians who may have been on the premises go also?**
A. Generally, at least one physician would stay back. But this meeting was not a requirement for us. This was a hospital meeting that hospital undertook to ensure of their accreditation for oncology. We attended voluntarily when we wanted to. Tumor board is a multidisciplinary meeting where a patient, not all patients, some patients are discussed as to their treatment advice with input from surgeon, medical oncologist, radiation oncologist, pathologist, radiologist, and so on so that everybody can be together and review if the treatment course is proper.
If there's any new query from treating physician or if it is a new diagnosis, then advice as to what might be the proper treatment. Sometimes, these patients had already started treatment. And they were reviewed. And the tumor board may or may not have an

advice. The chairman of the tumor board was generally a hospital-employed physician. I recall a name, Dr. Rodriguez (phonetic) who was a pathologist. For a while, there was a radiologist. There were different physicians. Because the appointment was an annual appointment.

So every physician did not go. In fact, the surgeons were often difficult to have them attend because a lot of times, it conflicted with their surgical schedule. And therefore, the tumor board timing were changed time-to-time. There were times they were held at 7 in the morning, 7:30 in the morning, 8 in the morning. They were held at noon. They were held in the evening at times. The idea was to see what time they could get the best attendance from multiple physicians because we wanted attendance from family physician, from surgeons, from pathologists, radiologists, and so on, forth.

The idea is to have all disciplines involved including sometimes, nursing so that the input is there from all different specialties. And the hospitals struggle to have all specialties be there. And therefore, times were changed from time-to-time to see what worked best. As for us, we would try to get at least one medical oncologist and one radiation

oncologist in the tumor board. But we could not always do that because patient care came first.

**Q. Okay. Let's take a look at Exhibit 6. You have it in front of you. It's there.**

A. Sure. Okay. Thank you.

**Q. And this, again, is the excerpt of the schedule report provided by the defendants for May 22nd. Take a look at the entry on the second page for 12:00 p.m.**

**Your name is listed, correct?**

A. 12:00 p.m., I see it. Yes.

**Q. It says, "Block chair," correct?**

A. Correct.

**Q. And under that, it says, "Mary Ann and P."**

A. Correct.

**Q. And it says, "Appointment block." What does block mean on the schedule?**

A. I'm not sure what the block word itself means. I could interpret that. But I -- I personally do not know what that means. It implies to me that no patients to be treated at that time.

**Q. Okay. For both you and Mary Ann Stevenson, right?**

A. That's what the implication would be. Yeah.

**Q. And that was because on Thursday at noon, both**

**of you went to the tumor board meetings at the Our Lady of Bellefonte Hospital, correct?**

A. It's conceivable.

**Q. Okay. So when you went to those tumor board meetings, you did block your calendar so patients would not be scheduled to meet with you at that time, correct?**

A. Yes. This would -- my -- the block would be for visit of the patient. That is, the E&M visit.

**Q. Okay. So regardless of whenever other tumor board meetings might be, if you had a tumor board meeting on a Thursday at noon, you would block having to meet any patients at that time; is that correct?**

A. Not necessarily. We would attempt to. However, if I had to see a patient or a patient who was scheduled before noon spilled over into the time, I would first take care of the patient and then decide whether to go to tumor board or not. In fact, as it turned out, I usually ended up not going to the tumor board.

**Q. Yeah. Bon Secours took over Our Lady of Bellefonte, right?**

A. Bon Secours took over many years ago from Franciscan Sisters for the Poor. And then later on, the Bon Secours gave it to the Mercy system. So it has changed hands several times. And then Mercy ended up

are scheduled. If the nurse practitioner needed their patients seen, that was not uncommon in our practices which were small practices, not the kind of large practices, like hospitals do.

We did things just to ensure that the patient safety and compliance are met and not necessarily everything is recorded. There were days I might have been scheduled at one place and I would cancel the schedule and go to the other place if the need be such. If one of my colleague got sick, I had to ensure that the coverage was there.

BY MR. GROSSO:

**Q. Okay. Well, Dr. Hayek left in December 2013 around Christmastime, correct?**

A. That would be correct.

**Q. All right.**

A. I think it might have been 27th of December.

**Q. Let me give you -- to look at a declaration by Dr. Hayek.**

MR. GROSSO: Exhibit 12, I believe.

THE REPORTER: This will be 13.

MR. GROSSO: 13.

(EXHIBIT 13 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Please look at it. Have you seen this before?**

A. So your question, could you repeat that? I didn't --

**Q. Sure.**

A. -- fully understand the question.

**Q. What physicians were employed -- let's start this way.**

**What physicians were employed by the practice during the period after Dr. Hayek left and before these three physicians?**

A. Okay. So the six months period of first half of 2014 is what you're referring to?

**Q. Right.**

A. So the two that were employed was myself and Dr. O'Laughlin. And we had locums filling in also.

**Q. Who were those locums?**

A. I recall a few names. There was a Dr. Bertram. There was Dr. Batra. I also recall another name. But I'm not sure if it was exactly the time period or not, Dr. -- Dr. Janowski. But -- and there may have been others.

**Q. Okay.**

MR. GROSSO: Are we on 16?

THE REPORTER: Yes.

(EXHIBIT 16 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**premises, the nurse practitioner is doing the direct supervision?**

A. True. The -- the difference would be the -- the administration charge, not the drug charge which remains the same, which is the dominant part of the charge. The administration part is -- which is a minor charge, usually, very minuscule compared to the drug cost.

**Q. Yeah.**

A. Yeah.

**Q. But that comes out of the Medicare trust fund. Am I right?**

A. I think so. Yes.

**Q. Except for those bills to Medicaid. And that comes out of the state funds, correct?**

A. I don't know what extent the state funds are subsidized by the federal government. I understood that it was dominantly state. But they were funded by the federal government. But that's a limited knowledge.

**Q. So funded in part?**

A. Yes.

**Q. Okay. Let's go back to this exhibit. Let's take a look at the dates of Friday, December 27, 2013, and Monday, December 30, 2013.**

**According to the Affidavit of Dr. Fadi Hayek,**

**nurse practitioner who remained there?**

A. Sir, I'm a clinician. I was trained like a clinician. I have always looked after the patient's interests.

**Q. Right.**

A. And I've always focused on delivering good medical care. I could not tell you what the technicalities of minor points of billings are. But I could tell you one thing, that we always, always oversaw the best interest of patients, whatever it took. And I have -- I can say that with no doubt in my mind that never have I ever compromised the care of a patient.

But have I looked into every minute detail of the billing? No. Do I care to? No. That's not my job. That's what you hire a manager for. So I could not tell you if I was there four hour. And one hour, nurse practitioner was there. Was that transition captured for two or $3 of difference would it make? I don't know. But I can tell you one thing, that I would not do anything to get that extra $2 or $3. It's neither worth my time nor it goes with my conscience nor would I ever advocate that.

**Q. What mechanism was in place to make sure that the appropriate provider was being billed if sometimes**

subcutaneous injection. So I'm not sure that unless you did a detailed analysis of the billing -- some patients got Leukine directly from their insurance. And it never went through our office. So there were all sorts of these arrangements. I'm not sure your statement is fully correct, that billing statements would identify these.

**Q. Now, Leukine was administered using an injection. And it was a 96372 billing code, correct?**

A. I believe that code is for a non-chemo subcutaneous injection. And therefore, it would be correct.

**Q. Okay. I am pulling out Exhibit 3, turning to 96372. And this is the CPT Manual. This is the CPT description of the 96372 Code, "Therapeutic, prophylactic, or diagnostic injection, substance, or drug, subcutaneous or intramuscular." And the description of the category in which this code falls under reads, "A therapeutic, prophylactic, or diagnostic IV infusion or injection other than hydration is for the administration of substances or drugs."**

**Skipping a sentence, "These services typically require direct physician supervision for any or all purposes of patient assessment, provision of consent, safety, oversight, and inter-service supervision of**

MR. MELTON: Objection.
BY MR. GROSSO:
**Q. For the purposes of billing and recovery?**
A. The direct supervision that we provided was for the -- for the benefit of patient, not for the benefit of billing.
**Q. Okay. But you did bill?**
A. We billed because if a person had to be there to administer, they had to be trained person. And -- and there's a cost to that. So we billed for it. But the decision about that is made keeping patient at the center of all this.
**Q. Okay. Why was it billed under a physician's name instead of a nurse practitioner's name?**
A. Same answer as I have answered several times before. It was part of a treatment plan formulated by the oncologist and administered under his or her guidance because he was the captain of the ship, so to speak.
**Q. Were injections given to patients on weekends?**
A. There were times they were.
**Q. Did the physicians go in on the weekends to supervise the provision of the injections of Leukine on the weekends?**
A. Not all the time. There were times we were in

office because there were other things to be done:
completion of medical records, some other things. There were times we were there, but definitely not all the time. I could be at the hospital 50 yards away, making rounds, but available. But a physician or physicians were always available, not necessarily on the premises all the time, but available all the same.

**Q. Okay. There is known, in Medicare regulations, as general supervision. That was provided, right?**

A. I'm sorry. Repeat that.

**Q. That was provided, general supervision that you were on call, but not on the premises?**

MR. MELTON: Objection.

THE WITNESS: Available on call --

BY MR. GROSSO:

**Q. Yes.**

A. -- is different than on call.

**Q. I stand corrected.**

A. Sure.

**Q. Okay. Let me just double check something before I have to withdraw. All right. I'm going to hand you another excerpt from the Medicare Claim Statement.**

MR. GROSSO: 32?

Janowski.
**Q. Janowski?**
A. But again, I don't know the dates. So --
**Q. Were there more than just those three locums between 2012 and 2017? Do you recall?**
A. I remember other doctors. But again, there are no other names coming to my mind.
**Q. You don't remember their names. But you do recall contracting with other locums?**
A. There were other contracts.
**Q. Okay.**
A. Exact dates is always a difficult thing, knowing how far back they were.
**Q. And I think you had mentioned the term, short-term locums. What is that? Is that, like, a locum who's only in for like a week or a month or --**
A. Short-term would be like a week or like -- a week.
**Q. So the centers utilize short-term locums?**
A. We have had them. Again, I could not testify to the time period. But usually, more often, they were longer-term than short-term.
**Q. And I think it was your testimony, then, that you'd attempted to identify what the dates were. But you found that impossible; is that fair to say?**

patient. And that patient comes in and gets chemotherapy. And let's say, Dr. Bertram happens to be working and seeing patients that day. And let's say, you're not there.

If that patient tolerates the chemo well, if all goes as well as it should and tolerates, no adverse reactions, no distress, is it fair to say Dr. Bertram may never lay eyes on that patient, correct?

A. That is correct.

Q. And Dr. Bertram may never have to consult that patient's record; is that correct?

A. True.

Q. And Dr. Bertram may never lay hands on that patient, never even have to touch or even see or even be in the same room as that patient; is that correct?

A. That is true.

Q. Dr. Bertram may not even know that patient -- may know patients are there, but may not know any specifics about the patient who's in that chemo room in the chemo chair getting chemo pushed intravenously; is that fair to say?

A. That is correct.

Q. So who would be -- in that scenario, wouldn't it be fair to say that the most appropriate physician who could certify to the medical necessity of those

**services would be you as the rendering physician and not Dr. Bertram?**

A. Very true.

**Q. Okay. I think you also testified -- switching gears here a little bit, you testified physicians would sometimes but not always be at the centers on weekends getting caught up on charting or keeping the records, getting caught up on the records; is that correct? That was a -- sometimes, that would happen?**

A. Yeah. Not every time. It was not uncommon that we were in the center catching up on charts. Because ever since electronic health records have been implemented, there is a lot of data showing that physicians spend a whole lot more time documenting than they ever did. So we are always running behind and trying to catch up. So it was not -- not an uncommon scenario that we were in the center doing our records.

**Q. So the EHRs that are supposed to streamline and make it easier are not necessarily as time helping?**

A. There is all kinds of data supporting what I just said that we have -- we spend more time on electronic records than ever.

**Q. Can you tell me about how often? I mean, how many times out of a month do you think you might would be there charting on a weekend while -- or just present**