# EXHIBIT NO. 11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION

- - - - -

United States of America ex rel. Robert C. O'Laughlin, M.D., :

Plaintiff, :

vs. : Civil Action No. 0:16-CV-148-DLB

Radiation Therapy Services, P.S.C., dba Ashland Bellefonte Cancer Center, et al., :

Defendants. :

- - - - -

DEPOSITION OF JESSICA DOVE

- - - - -

Taken at Weston Hurd LLP
101 East Town Street, Ste. 500
Columbus, OH 43215
September 29, 2023, 9:06 a.m.

- - - - -

Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

Page 2

A P P E A R A N C E S

ON BEHALF OF RELATOR:

Andrew Grosso & Associates
1250 Connecticut Avenue NW, Ste. 700
Washington, DC 20036
By Andrew Grosso, Esq.

ON BEHALF OF DEFENDANT A-ONE BIZ:

Wyatt, Tarrant & Combs, LLP
500 West Jefferson Street, Ste. 2800
Louisville, KY 40202-2898
By Christopher A. Melton, Esq.
(Via videoconference)

ON BEHALF OF THE WITNESS:
Weston Hurd LLP
101 East Town Street, Ste. 500
Columbus, OH 43215
By Steven G. Carlino, Esq.

Page 3

Friday Morning Session
September 29, 2023, 9:06 a.m.

- - - - -

S T I P U L A T I O N S

- - - - -

It is stipulated by counsel in attendance that the deposition of Jessica Dove, a witness herein, called by Relator for cross-examination, may be taken at this time by the notary pursuant to notice and subsequent agreement of counsel that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -

Page 4

I N D E X


| Examination By | Page |
|---|---|
| Mr. Grosso - Cross | 5 |
| Mr. Melton - Cross | 37 |
| Mr. Grosso - Further Cross | 56 |

| Exhibits | Page |
|---|---|
| Exhibit 1 - Confidentiality and Protective Order | 19 |
| Exhibit 2 - Arbaugh Medical Administration Record, 6-18-2014 | 19 |
| Exhibit 10 - March 2014 Calendar | 31 |


(Exhibits returned to Mr. Grosso.)

Page 5

JESSICA DOVE

being first duly sworn, testifies and says as follows:

- - - - -

MR. GROSSO: This is the case of United States ex rel. Robert C. O'Laughlin against Radiation Therapy Services, P.S.C., doing business as Ashland Bellefonte Cancer Center. This is Civil Action 0:16-CV-148 in the Ashland Division of the United States District Court for the Eastern District of Kentucky.

My name is Andrew Grosso. I am counsel for the plaintiff, Robert C. O'Laughlin, also known as the relator.

MR. CARLINO: Steven G. Carlino, representing the witness, Jessica Dove.

MR. MELTON: And Chris Melton. I represent the defendants in this case.

MR. GROSSO: Okay. For the record, Mr. Melton's participating by Zoom.

- - - - -

CROSS-EXAMINATION

BY MR. GROSSO:

Q. You are the witness?

A. (Indicates affirmatively.)
Q. What is your name?
A. Jessica Dove.
Q. Okay. Spell your last name.
A. D-o-v-e, like the bird.
Q. Okay. Have you ever been deposed before?
A. No.
Q. This is a deposition in this case that may be used for testimony at trial. It may be used for evidence during motion practice.
You are under oath. You understand that?
A. Yes.
Q. Okay. Everything that you say here today must be the truth. If, after leaving here today, you realize you've said something that's incorrect or needs to be clarified in some way, you may be given that opportunity, but you need to contact us through your attorney as soon as possible.
A. Okay.
MR. MELTON: I'm going to need to jump in real quick. If -- Mr. Grosso, if you and



Ms. Dove could, just speak a tad bit louder, just marginally a little bit louder. It's not carrying quite as well as I'd like.
MR. GROSSO: Do we have a microphone?
MR. CARLINO: Let me ask Michael.
MR. GROSSO: Let's go off the record for a moment.
(A discussion is held off the record.)
Q. We are back on the record. This is being recorded both by a court reporter, who will make a transcript, and on Zoom. Because we are recording by camera and because Mr. Melton is participating by Zoom, when you give your answers, please look at the screen. And also this may be used at trial, so think that there's a jury there and talk to them.
I know that's going to be hard because I am going to be asking you questions. You're going to want to look at me, but remember the real audience may be out there.
A. Okay.
Q. And your answers should be given clearly, slowly. And don't talk to anyone else during this deposition except your attorney while



we have breaks. If you want to talk to your attorney, just let me know. It should not be in the middle of the question. In other words, if I put a question to you, please answer it. You can clarify the answer later. Do you understand that?
A. Yes.
Q. All right. You are represented by an attorney. Have you spoken with him today or before today about this matter?
A. Yesterday.
Q. Okay. And have you spoken with or been contacted by anyone else in this case?
A. No.
Q. Okay. Have you taken any medication or drugs in the last week that might have any effect on your memory or your ability to explain your answers?
A. No.
Q. Okay. Where do you live?
A. Grove City, Ohio.
Q. Okay. Can I have your address, please.
A. 4505 Windrow Drive.
Q. Have you been to college?
A. Yes.



Q. Can you please tell us your educational background.
A. I went to Otterbein College -- it's now Otterbein University -- where I got my BSN in nursing in 1997.
Q. Okay. Have you had any other education after that?
A. I began a master's degree but did not complete it, also at Otterbein.
Q. Where are you working now?
A. I am working for the James Cancer Hospital at OSU.
Q. What do you do?
A. I am the nursing staff development coordinator for outpatient infusion. I provide onboarding and education for infusion nurses.
Q. So you have a number of people who are working, quote/unquote, under you?
A. No. I am in nursing administration, and I have zero administrative authority. I provide education.
Q. Got it. How long have you had that position?
A. Three years. And not precisely.

Somewhere in that area.
Q. What did you do before that?
A. I worked at Martha Morehouse outpatient infusion, where we gave chemotherapy to patients there.
Q. Okay. How long did you work there?
A. Well, that would have been four years. That's all within OSU.
Q. Okay. And how long did you work -- let me rephrase that.
Where did you work before that?
A. The Edwards Comprehensive Cancer Center with Cabell Huntington Hospital in Huntington, West Virginia.
Q. Okay. What did you do there?
A. I worked as a nurse navigator and surgical breast oncology. And prior to that, I worked in -- and also during that time, I floated some in radiation oncology.
Q. How long were you there?
A. I came here, I think, up to Columbus -- I'm not sure that I'm precise on the dates. I will make my best effort on this. In 2016, I believe. And then I think I began there in about



2013.
Q. Okay. What did you do before that?
A. I worked at Ashland Bellefonte Cancer Center.
Q. Where is that?
A. That's in Bellefonte, Kentucky.
Q. Okay. Is it Ashland, Kentucky, or Bellefonte, or is it both?
A. I believe it's in Bellefonte, if you look at the address.
Q. Okay. And how long were you there?
A. I'm not certain how long I was there. I -- it wasn't for an extremely long period of time. It was rather -- it was fairly brief.
Q. Where did you work before that?
A. I worked with Tri-State Hematology and Oncology, and I think I was there for around nine months, perhaps.
Q. And before that?
A. Okay.
Q. We're digging.
A. Yes, we are digging. I've moved a lot for my husband's work. I was up in Mentor, Ohio, at the Ireland -- oh, what did they call it? It



was the Ireland Cancer Center, I think, if I'm getting the title right. They've changed it now. I was there for two years.
Q. And are we getting back towards when you graduated from college yet or do we have a few more --
A. We've got two more.
Q. Okay. Just tell us what they are.
A. Okay. I worked at Columbus Oncology and Hematology prior to that over on Jasonway, and prior to that, I was at Riverside Hospital, doing inpatient oncology.
Q. Let's return to the Ashland Bellefonte Cancer Center, which I may refer to it as Ashland Center. I may sometimes call it the clinic, you know. I realize it should have been called the center, but I've been used to calling it clinic for a while.
Can you tell us what months you worked at that center?
A. I can probably look it up on my phone. I don't know that I have the precise -- when I finished working there and began to work at Cabell, I was initially only getting limited work.



And so I offered to pick up some days here and there to supplement my income, and I'm not certain how long that time period, you know, continued over into the next employment. It might have been a few months. Hold on. Let's see here.
Sorry. I have my work history on here. I just -- I have to look it up.
All right. So I have that I worked there from August of 2011 through October of 2012. That was when I was only there, but I did pick up some days after that time.
Q. Okay. So you did work through -- at that center through 2013?
A. I believe I did. I do not have written records of what days I worked there.
Q. Okay. And I will show you some records that indicate you were there for some days in 2014.
A. Okay.
Q. That's not a big deal, but I wanted to know if I give you a document that shows you that.
All right. Why did you go to work for Ashland Bellefonte Cancer Center?
A. Because Veda Kazi, who worked there

who, needed open-heart surgery, and they needed a nurse who could take care of the patients quickly.
Q. Why did you leave?
A. I felt there would be good opportunities for me over at Cabell Huntington.
Q. Who hired you?
A. At ABCC?
Q. Yes.
A. Maneesh Jain.
Q. Who did you work under?
A. There was no manager. I'd say Dr. Jain.
Q. Okay. Why do you say there was no manager?
A. Because there wasn't one. There was an office manager, Maneesh Jain, but there was no nursing manager.
Q. Okay. Did you do any management?
A. No.
Q. How did the nurses learn which patients they were to treat each day?
A. They were on our schedule.
Q. Who gave you the schedule?
A. We scheduled them ourselves.



Q. Why did you do that?
A. We scheduled them when they needed a treatment.
Q. Okay. How did you know they were coming in?
A. We looked at the schedule, and we told them when to come back, and they would come.
Q. Okay. I'd like to clarify this.
A. Okay.
Q. You have hundreds or thousands of patients coming through this cancer center on a yearly basis?
A. I do not know.
Q. Okay. You have dozens or hundreds of people coming in on a daily basis?
A. That number sounds high, but I do not have a number in pocket.
Q. Okay. So, dozens?
A. I do not know how many were in the daily schedule. It's been a long time.
Q. Okay. You know you have so many patients, right?
A. Uh-huh.
Q. Who decided which patient would be



treated by which nurse?
A. We did not do what you would call primary patient care. It wasn't, Ms. Smith is my patient and Mr. Jones is yours. It was who was available to take the next patient.
Q. Got it. I understand. Okay. How were the schedules for the doctors prepared?
A. I do not know.
Q. Okay. What doctors were there while you were working there?
A. Doctors I remember were Dr. Jain -- Kirti Jain, Dr. Hayek. And, you know, I only worked in infusion. I was aware of Dr. O'Laughlin but did not, you know, work with him or for him. There may have been some others. I do not recall.
Q. I understand there were nurse practitioners who were also part of the center staff. Am I right?
A. There was one.
Q. Who was that?
A. I do not remember her name.
Q. Does the name Mary Ann Stephenson ring a bell?
A. Yes. Yeah. Mary Ann Stephenson, yes.



Q. Is it Stevenson or Stephenson?
A. Well, I thought it was Stephenson, but it has been a long time.
Q. Okay. Who supervised you during the treatment of patients?
A. We didn't have a direct supervisor.
Q. While you were -- well, let me stop there. We'll come back to that.
What treatments did you give to the patients?
A. Chemotherapy, immunotherapy, injections, port flushes, things like that.
Q. Okay. And who prescribed or ordered those treat -- those services?
A. Medical oncologists.
Q. What role did the nurse practitioners have?
A. They saw the patients in clinic.
Q. Okay.
A. Or she saw the patients in clinic.
Q. Did the medical doctors see the patients in clinic?
A. Yes.
Q. Okay. Were there locum tenens at the

clinic while you worked there?
A. I do not remember any locum tenens. If there were, I do not recall.
Q. Okay. Does a Dr. Samir Batra ring a bell?
A. Sounds vaguely familiar. I can't confirm.
Q. How about a Dr. Juergen Bertram?
A. I do not recall that name.
Q. Okay. I'm going to -- we're going to go -- start viewing some documents, and before we do that, I want you to take a look at --
MR. MELTON: Andy, I'm sorry. I have no -- I'm not having any trouble hearing the witness, but I'm having a little bit of trouble hearing you.
Q. I am going to give you what I'll mark as Exhibit 1. We're going to start examining some documents with protected health information, and for that reason, I want to make sure that you read and signed this protective order.
A. So --
Q. You may look at it.
(A discussion is held off the record.)



- - - - -
Thereupon, Exhibit 1 is marked for purposes of identification.
- - - - -
A. Okay.
Q. Now, have you seen that before?
A. That's what he showed me yesterday.
Q. Good. Have you signed it?
A. I signed it just this morning.
Q. Thank you. I'm going to show you what is -- we're going to mark as Exhibit 2.
MR. GROSSO: For the sake of Mr. Melton, this is document 5A.
MR. MELTON: Thank you.
- - - - -
Thereupon, Exhibit 2 is marked for purposes of identification.
- - - - -
Q. Please take a look at it, and when you've familiarized yourself with it, please let me know.
A. Okay.
Q. Ready?
A. Yep.



Q. Good. The caption says "Medical Administrative Record, Ashland Bellefonte Cancer Center." And it does say Ashland, Kentucky. That's why I asked if it was Bellefonte or Ashland earlier.
A. I guess it is Ashland.
Q. Not a big deal.
A. I haven't been there in many years.
Q. Not a big deal.
MR. GROSSO: Let's go into -- let's put this under seal and go into seal on the record from this point forward until we say otherwise.
* * * * *
(Testimony given at this point has been designated confidential and has been bound separately.)
* * * * *
Q. When did chemo begin on any given day at Ashland?
A. I don't recall an exact start time.
Q. All right. When did it end?
A. I don't recall a specific end time, either.
Q. Okay. Did chemo treatments -- and when I use the term "chemo," I'm talking about any



treatments of the patients. Did they begin before doctors arrived on the premises or the clinic?
A. I don't recall, specifically. We weren't watching their comings and goings.
Q. So you --
A. They were in a different area than us.
Q. Is it fair to say that when the patients showed up and you were there and they were supposed to give drugs, you gave it to them whether or not you noticed there was a doctor there?
A. We would.
Q. Did any doctor tell you, you can start now?
A. Nope.
Q. Did any nurse practitioner tell you, you can start now?
A. No.
Q. Okay. Did anybody tell you, I'm leaving, you have to stop now?
A. No.
Q. Either for doctors or nurse practitioners?
A. No.

Q. Okay. Are you familiar with something known as tumor board meetings?
A. Yes.
Q. What are they?
A. Well, it varies depending upon the institution.
Q. Fine. Let's talk about Ashland Bellefonte Cancer Center. What were tumor board meetings, as that term refers or was used at that center?
A. I didn't attend any such meetings at that location.
Q. Did anybody attend such meetings?
A. I do not know.
Q. Okay. Were there times when all the doctors left to go to a meeting off the premises?
A. I don't recall.
Q. Okay. Did you ever go in on weekends for -- to provide any kind of treatment to patients?
A. I don't recollect doing that at all. I had small children.
Q. All right. Do you know if any of the other nurses did?



A. How do you define "treatments"?
Q. Injections, infusions, anything.
A. I believe some injections --
Q. Okay.
A. -- were given.
Q. Who went in for the weekends to provide injections?
A. I don't have a record of schedules.
Q. Okay. Generally, which nurses went in?
A. I'm not sure who covered that.
Q. Do you know if the nurse practitioner went in on weekends?
A. I do not know.
Q. Do you know if the doctors went in on weekends?
A. I do not know.
Q. Okay. Now, you are currently working at -- what is it, Wexner?
A. The James.
Q. The James...
A. Cancer Hospital.
Q. Oh. How long -- not counting this employment, but how long have you -- and when I say this, I mean where you work at. How long did



you give chemotherapy services -- and I mean by that the drug -- chemotherapy drugs, injections of any kind, infusions of any kind -- to patients?
A. I have to count up the years. I haven't always participated in administration of chemotherapy.
Q. Without counting -- well, if you have to count up the years, do it in your head, but roughly how many years?
A. Okay. Am I missing anything? It might have been -- perhaps it was around 12 years of my nursing that I've done infusion. I'm not -- I'm not concerned -- I'm not confirmed on that number.
Q. Now, you say infusions. There's also injections.
A. Infusion is inclusive of injections.
Q. Got it. And how does chemo or chemotherapy relate to infusions and injections?
A. Chemotherapy --
MR. MELTON: I couldn't hear that last question.
Q. How does chemotherapy, the term, relate to the terms infusions and injections?
A. Chemotherapy is medication which kills



rapidly growing cells, and it can be administered in a variety of ways, including injections. And so it is not the method of administration. It's the method of causing cancer cell death.
Q. When you provided infusions or injections or other kinds of chemotherapy, what was the procedure that you were trained and that you actually used in order to provide the service to the patient?
A. How much detail do you want? I teach a two-day class on this.
Q. Well, you can start, and I'll stop you if you're going too detailed or not detailed enough. What I'm particularly interested in is: What supervision requirements you operated -- you operate under when you're providing these services.
A. That has not been the same every place I have gone.
Q. Okay.
A. At OSU, we would not administer medication without a physician on-site. I was told there that we did.
Q. You were told there that you did what?

A. That we would administer medication without a physician on-site. It wasn't necessary to stop if they were not present.
Q. Which facility are you speaking of?
A. Ashland Bellefonte Cancer Center.
Q. Who told you that?
A. One of the other nurses.
Q. Okay. Is that, in fact, the practice that was ongoing while you were working there?
A. Correct.
Q. Okay. Do you know how often the nurses gave chemotherapy services to patients while there's no physician on-site?
A. I do not.
Q. Okay. Did you question anyone why it was being done that way?
A. I did. They said it was one of those -- it's the way it's always been done. Not a very good evidence-based-practice answer.
Q. Were there any complaints?
A. By whom?
Q. By anyone about this practice.
A. Not that I'm aware of.
Q. Did you ever complain?



A. I said it was unusual.
Q. Did you say anything further?
A. I do not recall.
Q. Who did you say that to?
A. The other nurses.
Q. Did you say that to any of the doctors?
A. I do not recall.
Q. Did you say that to any of -- to Maneesh Jain?
A. I don't recall.
Q. Did you say that to a nurse practitioner?
A. I do not recall.
Q. Okay. Is that -- might that have been one of the reasons why you left?
A. I felt moving to a hospital-based setting, I would be able to provide better care to my patients.
Q. Is that one of the elements that convinced you of that?
A. It's -- I don't recall.
Q. I mean, you were about to say something. Give us your method process.
A. I didn't always agree with how they did



things, so I wanted to go somewhere where things were more in line with my practices.
Q. The way you were trained?
A. Well, I wasn't specifically trained, you must have a physician on-site. I don't know what the details of that are. It would depend upon where I was located.
Q. Did anyone ever -- let me back up.
Was there a standard operating order at Ashland Bellefonte Cancer Center?
A. Not that I recall.
Q. Why are you smiling?
A. It was an unusual place. Standards were not in abundance.
Q. What do you mean by "standards were not in abundance"?
A. There were not a great -- there may -- I don't know if there were any written policies or procedures, per se.
Q. Okay.
A. Perhaps there were, as -- it's been a long time.
Q. Okay. But what do you mean by -- why the smile to the face?



A. Because it was a very atypical situation.
Q. In what way?
A. Small, remote location. Very friendly. Staff hadn't been -- a lot of the nurses might not stay long. They would come and go quickly.
Q. Was there a training program for the nurses?
A. Nurses would onboard other nurses.
Q. Okay. So one nurse would teach another?
A. Correct.
Q. Was there any review of what the nurses were doing by the medical doctors or the management or the nurse practitioners?
A. I don't know what review they may have participated in.
Q. Did you undergo any review?
A. I am not aware of undergoing review, that I recall.
Q. Okay. Are you familiar with a drug called Leukine?
A. Leukine? Is that -- is that one of the interleukins? I'd have to look it up.

Q. Okay. Let me...
A. Or is that -- is that a shot for -- is that --
Q. Well --
A. I can't remember.
Q. Well, let's -- let me show you an exhibit, and maybe this will help.
A. All right.
Q. Maybe not.
A. Right.
MR. GROSSO: This will be file No. 6. Can you mark this as an exhibit. And this will be Exhibit No. 9.
- - - - -
Thereupon, Exhibit 9 is marked for purposes of identification.
- - - - -
MR. GROSSO: As long as we're doing that, let's go to -- let's mark this as Exhibit 10. It's a calendar page for the week of March -- not the week. The month of March 2014. Can you make that 10.
- - - - -
Thereupon, Exhibit 10 is marked for



purposes of identification.
- - - - -
MR. GROSSO: I'm not sure it has a file number.
Q. We'll get to that in a moment.
A. Oh. All right.
Q. Will you take a look at Exhibit 10, which is a calendar. You see March 29th and March 30th of 2014 are Saturday and Sunday, respectively --
A. All right.
Q. -- for that year?
A. Uh-huh.
* * * * *
(Testimony given at this point has been designated confidential and has been bound separately.
* * * * *
MR. GROSSO: Okay. May I have a moment? We may actually be coming to conclusion. I want to double-check my notes, and then if Chris has any questions, I'll turn the witness over to him.
(A short recess is taken.)
MR. GROSSO: I failed, when I moved



over to Exhibit No. 9, to put that under seal. So let's put Exhibit No. 9 under seal and the conversation that addresses it.
(A short recess is taken.)
Q. We're back on the record. Ms. Dove, I should have asked this sooner, but can you walk me through a typical day at the Ashland Bellefonte Cancer Center from your perspective.
A. You arrive when scheduled. Scheduled arrival times may vary, depending upon clinic need. Start preparing for the day.
And then when you -- when a patient arrives -- I don't recall how we knew if they arrived, if someone called us or we'd get them from the waiting room, and we would draw their labs, await lab results. We'd run the CBC. We'd get the result, and then we would look at our orders. And we would have established intravenous access at that point in time when we do the labs.
We would look at the orders and see what we were supposed to give them. We would, you know, establish pretreatment verification of readiness. If a patient appeared to be having complications or labs were not adequate, then we'd



speak to a providing physician to confirm any ordered changes in treatment, additional things, treatment being held, any additional medical concerns.
Then when we establish patient readiness for treatment, we would then prepare any ordered medications or prehydration, administer to those prior to the order -- drugs being ordered, given in the order in which they are ordered. They're written in the correct order to give. You administer those drugs over the prescribed period of time, addressing any concerns that may occur throughout the patient's infusion.
And when the patient is completed, it's always important to make sure that they know when to come back, that they are not lost to follow-up, that they have, you know, in hand phone numbers to contact us, that they're aware of when to call us, what to call for, et cetera, and then they are discharged to home. You establish that they're in, you know, safe condition leaving.
Q. When you showed up for work --
A. Uh-huh.
Q. -- did you check in with anybody?

A. I clocked in.
Q. And did you check in with a doctor?
A. No.
Q. Did you check on the nurse practitioner?
A. No.
Q. Did you check in with any management?
A. No.
Q. Did you check in with an administrative staff person?
A. No.
Q. When you left, did you check out with anyone?
A. No.
Q. Okay. Did you confirm anytime during the treatment of a patient that you were giving the ordered treatment to that patient?
A. What do you mean did I confirm that I was giving the ordered treatment?
Q. Did you tell the doctor, I'm starting this now or I'm doing this now?
A. No.
Q. Anybody, did you tell that to?
A. I gave just what they ordered. I



didn't -- it was -- I had a written order in the computer, so it was explicitly and clearly ordered.
Q. You followed the written order on the computer?
A. Correct.
Q. You did not verify or confirm with a physician or a nurse practitioner that you were doing what was in the order?
A. No.
Q. Okay.
A. Not unless I had questions.
Q. All right. And if you had questions, to whom did you go?
A. The medical oncologist.
Q. And if the medical oncologist was not on-site, what did you do?
A. I called them.
Q. How did you call them?
A. On the phone.
Q. Landline, mobile, text? What?
A. Any of the above.
Q. Okay. Did you -- how did you know whether -- how did you know to call them as



opposed to speak with them in person?
A. For example, if a physician is in a room and you text them, then they can reach back to you when they are not with a patient and you're not aware of maybe where they are or what they're doing.
Q. Okay.
A. And it gives them the ability to not interrupt their patient care.
Q. All right. So what I'm asking is: Do you know where a doctor is during the day?
A. No. I mean, sometimes, but not consistently.
Q. All right. When you try to contact a doctor, at that point, you would find out where the doctor was?
A. I didn't ask them where they were.
Q. Okay. I think earlier you said they texted back to you from someplace else?
A. They would -- yeah. They would respond to my concerns.
Q. All right. Okay.
A. But I didn't get a received location.
Q. Whether they were on-site or off-site,



they would get back to you?
A. Correct.
Q. All right.
A. Or we would page them. I think we paged them. I'm not -- it's been so long.
Q. I understand.
MR. GROSSO: Okay. I have no more questions. Mr. Melton?
MR. MELTON: Yeah. I have a couple.
- - - - -
CROSS-EXAMINATION
BY MR. MELTON:
Q. And, Ms. Dove, do you -- I know we just took a break. You don't need a break, do you?
A. No. Thanks.
Q. Or are you --
A. I'm good.
Q. Okay. Great. I'll try and be quick because -- I appreciate your time you've given today. I'm going to try to keep it to a minimum.
But early in your testimony -- I just want a little clarification. Earlier in your testimony, you said that -- you were talking about -- and I think you said the doctors you remember

working at Ashland Bellefonte were Kirti Jain and Dr. Hayek?
A. Correct.
Q. Now, there -- and I guess Dr. O'Laughlin as well. There may have been other -- I know you said doctors you remember. Do you believe that there may have been other doctors who you can't remember who worked there during that time?
A. I think another physician came in near the end of the time I was working there, but I don't remember his name.
Q. Okay.
A. And I don't know what sort of role he had there.
Q. And I want to kind of get a little bit of a picture here. My understanding from your testimony, your primary role at the centers was pushing the chemo and administering the chemotherapy. Is that fair to say?
A. Yeah.
Q. Okay. And so there -- the centers have an infusion room or an infusion hall. Isn't that -- is that correct?



A. There is a room at the back of the center. It's a square or rectangular, perhaps, room.
Q. Okay. And now to the best of your recollection, the physicians had offices there, correct?
A. Correct.
Q. And were those offices -- I'm trying to -- I'm not sure during the time period. Some points, they were on the second floor, and then other times, they were in the opposite corner of where the chemo -- of the building from where the chemotherapy room was. Do you recall where the physician offices were at that time?
A. If -- there was no second floor at Ashland Bellefonte Cancer Center. I am not familiar with the layout of the other centers. I have never been there.
When you walk in the front door, there is a waiting room. And then on the left side of the waiting room, you can walk down a hall. And then on the right is a large room in the back where the chemotherapy's administered. Just to the left of that, I believe, was Dr. Kirti Jain's



office, just off of the infusion room.
Q. Okay. So Dr. Kirti Jain was off of the infusion room?
A. I think so. And I have no idea where Dr. Hayek's office was or if he had one or -- I, yeah, can't remember.
Q. Okay. And then where, in relation to that would the exam rooms be, where doctors met with patients?
A. They would be on the hallway as you're walking toward infusion.
Q. Okay.
A. I don't know if they were left or right. It's been too long.
Q. Okay. I guess given the fact that you spent a lot of time in your infusion -- in the infusion room -- well, put it this way: You probably weren't keeping tabs on where each doctor was at any point, at any given time of day. Is that fair to say?
A. We didn't have time to go to the bathroom. I had no idea what the doctors were doing. I drank too much coffee.
Q. You testified there were -- and you did



say there were times that no doctor was present, and I believe you said you based that on the fact that you reached out and they responded that they were somewhere else other than the facility. Is that --
A. Right.
Q. Was that correct? Did I hear that correct as your testimony?
A. Yeah. The best of my recollection.
Q. Okay.
A. I might wander around the office and see if I saw someone and -- couldn't find someone and call someone if I could manage to do that. It's -- I don't remember specific examples to share.
Q. But if you were calling somebody and they weren't -- they were at a different location, that wouldn't necessarily mean that there wasn't another physician present necessarily, correct?
A. Well, that alone would not, but in other times, I was there by myself.
Q. Okay. And why do you know that?
A. Because everyone else had left for the day.

Q. Gotcha. But as you sit here today -- I know this is a long time ago. I believe you testified that you cannot recall -- you weren't even able to tell how frequent there would have been a time that there would be no physician there?
A. Correct.
Q. Is that accurate?
A. Correct.
Q. And --
A. I cannot recall.
Q. And as you sit here today, you could not tell us, on such-and-such a day at such-and-such a time, a physician wasn't present, correct?
A. Correct.
Q. And you could not testify or be able to identify any given patient who was administered chemotherapy without a physician present; is that correct?
A. Please repeat that question.
Q. You couldn't sit here today and testify and identify a -- any given patient who you know was administered chemotherapy without a physician



present; is that correct?
A. I am not able to recall that level of detail.
Q. And you testified, I think, that the listing of -- I know on some of the exhibits that we had looked at had -- in the MARs, in the medication administration record, that there was a -- there was a term and a listing on there for "Supervising MD"?
A. Yes.
Q. And you said you weren't typically familiar with that in an MAR as that being something listed; is that correct?
A. Correct. We would see who had ordered the drug. We didn't have --
Q. Okay.
A. -- cognizance of supervision.
Q. So --
A. We would not give the drug without an order.
Q. Makes sense. So, typically, what you would -- you -- as the nurse looking at this, your understanding of "supervising" would be the ordering physician. Is that accurate?



MR. GROSSO: Objection.
A. I mean --
MR. GROSSO: You may answer.
A. A supervising physician -- I don't know what it meant to them down there. A supervising physician in other settings would be somebody within reach or in the building or something, if something went south. But I don't know what it meant to them down there. The practice was different.
Q. So when you say, though, you usually see in an MAR the ordering -- it's usually called an ordering physician?
A. Correct.
Q. That would be the person who's supervising the course of treatment for a given patient. Is that fair to say?
A. Yeah. I just -- I'd leave the "supervising" out of it. I am not -- a MAR doesn't signify who's watching what's happening. A doctor can order something on a Friday. You give it on a Monday. They're in Uruguay. You don't care or know. They ordered it. They have other covering physicians to handle the case.



Q. Gotcha. Now, you -- I mean, have you ever seen an MAR that does not have the ordering physician listed on it?
A. Well, you -- I don't know about the MAR, but the order has to have a physician on it or you can't give it.
Q. Well, I mean, you've documented in other MARs. I mean, they typically have -- list who the ordering physician is.
A. Yes.
Q. Is that accurate?
A. Correct.
Q. Okay. So assuming that the Ashland's MAR intended the supervising physician to be the ordering physician, it then wouldn't be unheard of to have two patients at two clinics who had both been ordered by the same physician that they undergo chemotherapy -- to be undergoing chemotherapy at the same time, correct?
A. If they designate the supervising physician to be the ordering physician, then it would make sense that they could order things that would occur simultaneously and not be present when they were administered, if that is what they