# EXHIBIT NO. 12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**Ashland Division**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. ROBERT C. O'LAUGHLIN, M.D<br>Plaintiffs,<br><br>v.<br><br>RADIATION THERAPY SERVICES, P.S.C.,<br>dba ASHLAND BELLEFONTE CANCER CENTER,<br>KIRTI K. JAIN, M.D., P.S.C., dba HIGHLANDS CANCER CENTER,<br>A ONE BIZ SOLUTIONS, LLC,<br>KIRTI K. JAIN, M.D., and<br>MANISH JAIN,<br><br>Defendants. | CIVIL ACTION NO.0:16-CV-148-DLB |

**<u>EXPERT REPORT OF ELIN B. KUNZ</u>**

1. I, Elin B. Kunz, am principal of Kunz LLC, a healthcare consulting firm. Robert C. O'Laughlin, M.D. has retained me to provide this expert report and possibly expert testimony regarding the requirements and materiality aspects of supervisory and incident-to provisions in the Medicare and Medicaid programs, as they pertain to chemotherapy services provided in a free standing clinical setting and based upon the allegations and facts of this case; and concerning the reimbursement impact based on the different providers rendering and supervising the service.

## I. Qualifications & Compensation

2. My statements and opinions in this report are based on over twenty years in the

healthcare reimbursement, compliance, and medical coding/billing field. I am intimately familiar with the applicable billing guidelines, including the Center for Medicare and Medicaid Services' ("CMS") regulations and American Medical Associations' ("AMA") Current Procedural Terminology ("CPT") guidelines. I have lectured, authored articles, and performed audits related to physicians, non physician practitioners ("NPPs"), Medicare's Split/Shared Visits, and incident-to services since 2005.

3. I hold a Master in Business Administration and I am certified in healthcare compliance, and am a certified professional coder, a certified professional medical auditor, a certified coding specialist, and an AHIMA-Approved ICD-10-CM/PCS Trainer. Since 2014, I have provided healthcare coding, audits, consulting, and litigation services supporting clients in matters across the United States.

4. As a coder, medical billing and compliance expert, I am qualified by knowledge, skill, experience, and training in the business of medicine to analyze all aspects of healthcare reimbursement, including: (a) documentation standards to support coding and billing of medical services; (b) knowledge and application of medical billing and coding rules and regulations; (c) evaluating, appraising, and setting of prices for delivery of health care services; (d) collection of monies billed; (e) obtaining remuneration for medical services from various sources; (f) contracting and negotiations for prospective and retrospective payment of healthcare services; (g) reimbursement systems; (h) application of payment policy impacting reimbursement; (i) educating coders, billers, and providers in coding, billing and compliance, and (j) compliance with state and federal regulations governing billing and payment of medical bills in the United States.

5. Specifically, I worked 20 years for a large healthcare system with 200 plus employed physicians, including 6 years as Director of Physician Services, 3 years in Compliance

and 6 years in Corporate Finance.

6. In addition to my provider experience, I also have six years as an adjunct professor for Seminole State College, where I developed curricula and taught classes pertaining to healthcare reimbursement, physician billing and data analysis. I am currently serving as a Subject Matter Expert (SME) for the American Academy of Professional Coders ("AAPC"), a nationally recognized coding association, developing and reviewing coding and revenue integrity courses. I have also been a regular contributor to numerous magazines and journals on a variety of coding, auditing and compliance topics, and a frequent speaker, both nationally and internationally.

7. I also have practical and personal experience with serious compliance issues. I was the Director of Physician Services for Halifax Health in Daytona Beach, Florida. While there, I suspected Medicare fraud being perpetrated by the Hospital, and reported it to federal authorities. In 2014, Halifax settled with the U.S. Department of Justice by repaying to Medicare $86 million.

8. My *curriculum vitae*, attached hereto as **Exhibit 1,** details my experience in the health care profession.

9. I am being compensated at a rate of $225 per hour for this engagement.

## II. Background

10. Dr. O'Laughlin's Third Amended Complaint, as focused by the Orders of this Court, contains allegations regarding improper billing of chemotherapy services performed or supervised by NPPs in the clinic setting to various Federal and State Programs, stating and representing that those services were provided or supervised by medical doctors, when in fact such services had been provided by nurses with or without the direct supervision of NPPs, and neither provided by nor directly supervised by medical doctors ("the NPP claims").

11. At all times pertinent to the Complaint, the aforesaid representations made in claims presented, directly or indirectly, to the Medicare and Medicaid programs were preconditions and material for the payment of claims, as the Contractors to which the Defendants presented these claims would not have made payment in the amounts that they actually paid or, in for some claims, entirely had they known that the services had been provided to patients under the supervision of PAs or NPs, and not that of medical doctors; or under no direct supervision by any provider as required.

12. According to a 2009 OIG report[1], incident-to services may put beneficiaries at risk of receiving services that do not meet professionally recognized standards of care.

13. Services provided by employees as incident-to services must meet Medicare's general criteria for medical necessity, documentation, and quality of care.[2]

14. Additionally, Section 1833 of the Social Security Act ("the Act") requires that providers furnish "such information as may be necessary to determine the amounts due" to receive Medicare payment[3]. And Section 1862(a)(1)(A) of the Act states that no payment may be made for services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

15. Medicare's Program Integrity[4] manual includes that misrepresenting the person who performed the services and billing for non-covered services as examples of Medicare Fraud: *"Misrepresenting dates and descriptions of services furnished or the identity of the beneficiary or*

[1] OIG report OEI-09-06-00430"Prevalence and Qualifications of Nonphysician who performed Medicare Physician" Services", August 2009.
[2] Medicare Claims Processing Manual, Publication 100-04, Chapter 12, §30.6.4
[3] *"Information for determination of amounts due. No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.'* 42 U.S.C. § 1935l(e).
[4] Medicare Integrity Manual,Pub.100-08, Chapter 4, Program Integrity, §4.2.1

*the individual who furnished the services"* and *"Billing non-covered or non-chargeable services as covered items"*

16. Medicare's Benefit Policy Manual[5] provides a very specific example of how the provider's direct supervision is required for the incident-to services to be a covered service: *"if a nurse accompanied the physician on house calls and administered an injection, the nurse's services are covered. If the same nurse made the calls alone and administered the injection, the services are not covered (even when billed by the physician) since the physician is not providing direct supervision.*"

## III. <u>Data Reviewed</u>

17. I have reviewed the following documents and information as they pertain to the coding and billing of chemotherapy services in this case.

a. Doc# 124 Third Amended Complaint, filed 3/8/2022.

b. Doc# 141 Memorandum Opinion and Order 11/23/2022.

c. *HCPCS (Healthcare Common Procedural Coding) Level II Expert: 2013*, published by AMA.[6]

d. *CPT® (Current Procedural Terminology) 2013 Professional Edition*, published by the American Medical Association.[7]

e. *Find-a-Code* software.[8]

f. *CPT® Assistant.*[9]

[5] Medicare's Benefit Policy Manual Pub.100-02, Chapter 15 §60.1B
[6] Optum, *HCPCS 2013 Standard Edition* (2012).
[7] AMA, *CPT® 2013 Professional Edition* (2012).
[8] *Find-A-Code* Software. Subscription required.
[9] AMA, *CPT® Assistant*. Subscription required.

g. Coding Clinics for HCPCS.[10]

h. Coders' Desk Reference for Procedures.[11]

i. 42 C.F.R. §§ 410.26, 410.74(b) & 410.75(d),§§ 414.56(c) & 405.520(a).

j. Medicare Benefit Policy Manual, Publication 100-02, Chapter 15.

k. Medicare Claims Processing Manual, Publication 100-04, Chapter 1 &12.

l. Medicare Program Integrity Manual, Publication 100-08, Chapter 3 & 4.

m. 7/20/23 Call with Kentucky Medicaid Program representative.

n. KY Medicaid Provider Billing Instructions for Physician's Services Provider -Type 64, 65.[12]

o. A Declaration dated August 1, 2023, made by Dr. Fadi Hayek.

p. An Amended Rule 26 Disclosure Report of the Relator.

q. An Amended Rule 26 Disclosure Report of the Defendants.

r. Excerpts from Medicare Claims Data for the Ashland and Highlands clinics.

s. Two documents each captioned "Medical Administrative.

t. Two emails stamped CC Defendants0016003 and CC Defendants0020803.

u. A Medicare Denial Letter stamped CC Defendants0015375.

## IV. <u>Definitions</u>

18. In order to describe the billing regulations applicable to incident-to services in the clinic setting some definitions related to coding and billing is necessary. While both physicians who are medical doctors and NPPs, such as nurse practitioners and physician assistants, can bill

[10] AHA, *Coding Clinics for HCPCS*. Subscription required.
[11] AMA, Coders' Desk Reference for Procedures. Subscription Required.
[12] Team Kentucky Cabinet for Health and Family Services, Commonwealth of Kentucky, Version 9.1,March 1, 2023

for services performed incident-to their services, the payment varies depending who provides the service. For this text we will use the term "physicians" for medical doctors, and "NPPs" for physician assistants and nurse practitioners, and the term "providers" to include both physicians and NPPs.

## **Documentation of Services**

19. Accurate and complete documentation of services provided is the cornerstone of appropriate billing under CMS regulations. The Electronic Medical Record ("EMR") is a digital version of a patient's medical record ("MR") where different providers may add information to the same progress note. When this occurs, each provider must sign his or her entry, allowing verification of the amount of work performed and which provider performed the work.[13] Since this case includes both paper and EMR, we will use MR when referring to the medical record.

20. CMS requires providers to document all services rendered adequately in the patient chart or MR to justify the resultant billing codes (explained below) submitted to CMS for reimbursement.[14] This documentation requirement is exemplified by CMS's acknowledgement in its Evaluation and Management Services Guide of "*if it isn't documented it hasn't been done.*" Specifically, CMS cites the following as key principles of provider documentation:

- The medical record should be complete and legible;
- The documentation of each patient encounter should include:
  - Reason for the encounter and relevant history, physical examination findings, and prior diagnostic test results;
  - Assessment, clinical impression, or diagnosis;
  - Medical plan of care; and
  - Date and legible identity of the observer.

[13] CMS Electronic Health Records Provider Fact Sheet, December 2014.
[14] CMS Evaluation and Management Services Guide (2017).

- If the rationale for ordering diagnostic and other ancillary services is not documented, it should be easily inferred;
- Past and present diagnoses should be accessible to the treating and/or consulting physician;
- Appropriate health risk factors should be identified;
- The patient's progress, response to and changes in treatment, and revision of diagnosis should be documented;
- The diagnosis and treatment codes reported on the health insurance claim form or billing statement should be supported by documentation in the medical record;
- To maintain an accurate medical record, services should be documented during the encounter or as soon as practicable after the encounter; and
- The medical record cannot be altered. Errors must be legibly corrected so that the reviewer can draw an inference as to their origin. These corrections or additions must be dated, preferably timed, and legibly signed or initialed.

## Medical Coding & Billing

21. Medical coding is the process of abstracting healthcare diagnoses, procedures, medical services, and equipment into universal medical alphanumeric codes. The diagnoses and procedure codes are taken from medical record documentation, such as physician's notes. Medical billers use those codes to create claims for reimbursement.

22. Medical billing is the process of generating healthcare claims to submit to government payers and insurance companies for the purpose of obtaining payment for medical services rendered by providers. After translating a healthcare service into a billing claim using abstracted codes, the medical biller follows the claim to ensure the organization receives reimbursement for the work the provider performed.

23. After a provider treats a patient and documents that treatment in the patient's MR, the appropriate provider and/or medical coding professional responsible to such provider should review the completed MR. This is because the provider whose name goes on the billing form is legally responsible for any codes submitted for the service, at a minimum, the provider should be

made aware of the codes submitted on their behalf.

24. Medicare payments are based upon trust that the services are billed as performed and documented.

25. Physician services are billed using CMS Health Insurance Claim Form ("HICF") CMS-1500[15] or the electronic equivalent. And the claim form certification that providers agree to contain very specific language on incident-to:

*"Services performed were medically indicated and necessary for the health of the patient; Were personally furnished or **incident to** the physician's professional service by an employee under immediate personal supervision, except as otherwise expressly permitted by the regulations. For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills. Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws"*

26. Providers use the same HICF form for all payers.

27. Most Medicare beneficiaries choose to receive their Part A and B benefits through "Original Medicare" often called the traditional fee-for-service program offered directly through the federal government. It is sometimes called Traditional Medicare or Fee-for-Service ("FFS") Medicare.

[15] CMS-1500 Claim Form.

28. Medicare Part C, often referred to as Medicare Advantage ("MA"), permits patients to enroll in private insurance plans such as managed care, instead of receiving care on a fee-for-service basis. Medicare Advantage plans provide supplemental benefits not covered under Traditional FFS Medicare, most commonly dental, vision, hearing, and wellness programs.

29. For patients enrolled in FFS, providers submit claims to the assigned Medicare Administrative Contractor ("MAC"). The MACs are private insurance companies who act as the middle person between the patient, providers and CMS. The MACs process claims and issue payments to providers. Each geographic region (jurisdiction) has a specific MAC, and the MAC for Kentucky is CGS Administration, LLC[16].

30. The federal government relies on two trust funds to finance Medicare services provided through Medicare Part A, B and D. The Hospital Insurance (HI) Trust Fund, supplies money to the Medicare Part A, while Medicare B derives funding from the Supplemental Insurance ("SMI") Trust Fund.

31. For patients enrolled in a "MA plan," providers submit claims to the patient's MA plan, and the MA plan pays the provider. The payment from the MA plan to the provider is based on provider specific contracts with the plan. Depending on the specific contract it may provide additional payments to the provider for meeting certain quality indicators, but it could also be based on a capitated payment per patient, such as a set amount per patient per month.

32. The MA plans are paid by CMS a fixed amount each month for each beneficiary enrolled in their plans. These funds are taken from Medicare Parts A and B Treasury accounts to cover some or all of the costs of providing Medicare Parts A and B services under the policies.

33. The National Provider Identification number[17] ("NP1") is a unique identification

[16] CSG Administrator (A Celerian Group Company).
[17] CMS National Provider Identification Standard.

number for covered health care providers. Covered health care providers and all health plans and health care clearinghouses must use the NPIs in the administrative and financial transactions adopted under The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). The NPI is a 10-position, intelligence-free numeric identifier (10-digit number).

**The Healthcare Common Procedure Coding System ("HCPCS")**

34. CMS utilizes certain codes that correspond to diagnosis and inpatient procedures and services knowns as the International Classification of Diseases, 10th Revision, Clinical Modification/Procedure Coding System (ICD-10-CM/PCS). The use of ICD-10-CM diagnosis codes supports the medical necessity of a service or procedure by showing *why* a provider performed that service or procedure.

35. HCPCS are divided into two principal subsystems, referred to as level I and level II of the HCPCS.

36. Level I of the HCPCS is comprised of CPT codes, a numeric coding system maintained by the AMA. CPT is a uniform coding system consisting of descriptive terms and identifying codes that are used primarily to identify medical services and procedures furnished by physicians and other health care professionals and describe *what* service or procedure the provider performed. An example is CPT 96413, Chemo IV Infusion 1 hour.

37. Level II of the HCPCS is a standardized coding system that is used primarily to identify products, supplies, and services not included in the CPT codes, such as ambulance services, durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS) when used outside a physician's office. An example is J9035, Injection, bevacizumab, 10 mg (Avastin).

38. Evaluation and Management ("E/M") services codes, 99202-99499, are CPT

codes[18] that describe services provided by healthcare providers to evaluate patients and manage their care. These codes are widely used by healthcare providers in all specialties and are often referred to as visit codes. The several levels of E/M codes correspond to the level of treatment provided and describe the wide variations in skill, effort, time, responsibility, and medical knowledge required for the prevention or diagnosis and treatment of illness or injury, and the promotion of optimal health. CMS reimburses the different levels of E/M services at different rates. Generally speaking, E/M services that require higher levels of skill and treatment are reimbursed at higher rates. These codes are often used in combination with chemo administration codes when the patient has follow-up visits.

39. Modifiers are two digits added to the end of a CPT code to add additional information or change the description of service to improve accuracy or specificity. For example, modifier 25 may be used on the E/M code to signify that the E/M service is "significant" and "separate" from the chemo service in order for both services to be paid.

40. Chemotherapy is a treatment of disease by means of chemical substances or drugs usually used in reference to neoplastic disease. Chemotherapy administration codes are used for services performed by physicians, NPPs or qualified auxiliary staff employed by and under the supervision of a physician or NPP. The preparation of the chemotherapy agent(s) and related supplies are included in the code for administration of the agent(s).

41. Chemotherapy services require specific documentation in the MR to ensure correct code assignment such as:

- Drug/substance administered;
- Mode of administration;

[18] CPT Professional Edition, American Medical Association (2021).

- Access site (i.e. IV location, Vascular Access Device, etc.);
- Start and stop times;
- Rate of administration;
- Dose and volume of the drug administered;
- Evidence that the line was flushed when infusion/injection was completed;
- The amount of drug wasted or discarded and
- Ensure that proper use of JW modifier was applied for all drug wastage.

42. Chemotherapy services are reported using CPT codes and can be found in the Medicine Section of CPT titled: *Chemotherapy Administration and Other Highly Complex Drug or Highly Complex Biologic Agent Administration.* This section is further subdivided into 3 categories of codes:

| CPT Range | Section |
|---|---|
| 96360-96361 | Hydration |
| 96365-96379 | Therapeutic, Prophylactic, and Diagnostic Injections and Infusions (Excludes Chemotherapy and Other Highly Complex Drug or Highly Complex Biologic Agent Administration.) |
| 96401-96549 | Chemotherapy and Other Highly Complex Drug or Highly Complex Biologic Agent Administration. |

43. Providers' work related to hydration, injection, and infusion services involves the affirmation of the treatment plan and the supervision (pursuant to incident-to requirements) of nonphysician clinical staff.[19]

44. Other CPT codes commonly used with chemotherapy services include:

[19] Medicare Claims Processing Manual 100-04, Chapter12, Section 30.5.A

| CPT Range | Section |
|---|---|
| 36415 | Collection of venous blood by venipuncture |
| 36591 | Collection of blood specimen from a completely implantable venous access device |
| 36593 | Declotting by thrombolytic agent of implanted vascular access device or catheter |
| 82270 | Blood, occult, by peroxidase activity (e.g., guaiac), qualitative; feces, consecutive collected specimens with single determination, for colorectal neoplasm screening (i.e., patient was provided 3 cards or single triple card for consecutive collection) |
| 85025 | Blood count; complete (CBC), automated (Hgb, Hct, RBC, WBC and platelet count) and automated differential WBC count |
| 85610 | Prothrombin time |

Incident-to do not apply to these codes.

45. In addition to Chemo Chemotherapy codes, specific Level II HCPCS codes are used to identify the Chemotherapy drug(s) utilized. The following J codes are relevant to this case:

| CPT Range | Section |
|---|---|
| J1100 | Injection Decadron 1 mg |
| J1626 | Injection, Kytril 100 mcg |
| J1642 | Injection, Heparin Sodium |
| J2469 | Injection, Aloxi 25 mcg |
| J2820 | Injection, Leukine, 50 mg |
| J3489 | Zolendronic Acid 1 mg |
| J9000 | Injection, Adriamycin, 10 mg |
| J9035 | Injection, Avastin 50 mcg |
| J9045 | Injection, Paraplatin 50mg |
| J9178 | Injection, Epirubicin hcl, 2 mg |

| CPT Range | Section |
|---|---|
| J9190 | Injection, Fluoracil, 500 mg |
| J9263 | Injection, Oxaliplatin, 0.5 mg |
| J9265 (J9267) | Paclitexel 30 mg |
| J9181 | Injection, Etoside 10 mg |
| J9351 | Injection, Topotecan, 0.1 mg |

Incident-to do not apply to these codes.

**<u>Types of Providers</u>**

46. AMA[20] defines physicians as an individual who has received a "Doctor of Medicine", ("MD") or a "Doctor of Osteopathic Medicine", ("DO") degree or an equivalent degree following successful completion of a prescribed course of study from a school of medicine or osteopathic medicine.

47. In 2013 AMA[21] established a definition for Qualified Health Care Professional (QHP) in terms of which providers may report physician services "*physician or other qualified health care professional ("QHP") is an individual who is qualified by education, training, licensure/regulation (when applicable), and facility privileging (when applicable) who performs a professional service within his/her scope of practice and independently reports that professional service*."

48. In summary, QHP are health care professionals permitted by law to provide care and services within the scope of the individual's licensure and consistent with individually granted

[20] AMA Policy Finder, H-405.969
[21] AMA's CPT Professional Edition, Introduction section page xiv.

privileges by a facility's Board of Trustees.

49. QHP includes Physician Assistants, Advanced Registered Nurse Practitioners (Nurse Practitioners), Anesthesiologist Assistant, Certified Nurse Mid-Wife, Certified Registered Nurse Anesthetist, Clinical Nurse Specialist, and Clinical Social Worker.

50. There are many synonyms for QHPs, but for this text we will use NPPs.

51. Other examples include Mid-Level Providers ("MLPs"), Physician Extenders and Advance Practice Providers ("APPs").

52. NPPs are distinct from "clinical staff" or "auxiliary staff" in that NPPs can perform physician services and supervise incident-to services. When NPPs are working with physicians they are considered as working in the exact same specialty and exact same subspecialty as the physician.

53. Auxiliary staff work under the supervision of a physician or NPP and can perform or assist in the performance of a specified professional service; but do not individually bill for that professional service. Instead, their services are included incident-to the physician or NPPs service.

54. Examples of auxiliary staff includes nurses, technicians, and therapists, and common examples of services they perform incident-to a physician or NPP are injections, infusion therapy, chemotherapy, anti-coagulation therapy and some home care based medical services.

55. For this text and examples, auxiliary staff are registered nurses ("RN"), which are defined by the Kentucky Board of Nursing[22] to be licensed or hold privilege and "registered nursing practice" means the performance of acts requiring substantial specialized knowledge, judgement, and nursing skill.

56. In 2013[23], CMS finalized its proposal to require auxiliary staff who provide

[22] KS314.011.
[23] Medicare Physician Fee Schedule Final Rule CY 2014 (pgs. 74410-74414), December 10, 2013.

incident-to services and supplies to not be excluded from Medicare, Medicaid or other Federal healthcare programs, or to have their enrollment revoked for any reason at the time they provide such services or supplies. At the same time, the definition of auxiliary personnel was also clarified to require the individual providing incident-to services to also meet state licensure.

**Advanced Registered Nurse Practitioners**

57. Advanced Registered Nurse Practitioners ("ARNPs") are NPPs licensed in a state to practice professional nursing and certified in advanced or specialized nursing practice.

58. In Kentucky, APRNs can practice independently. KRS 314.042 (8)(9)[24] provides the only statutory requirements for physician involvement; requiring an APRN enter into a "collaborative agreement" for prescriptive authority ("CAPA") with a physician prior to prescribing drugs.

59. The APRN is individually responsible and accountable for his or her acts and decisions independent of the physician signing the APRN's CAPA. There is nothing in regulation or statute that limits the number of licensed Kentucky APRNs with whom a licensed Kentucky physician may enter into a CAPA.

**Physician Assistants**

60. Physician Assistants ("PAs") are health care professionals licensed to practice medicine with physician supervision. (PAs are also included as NPPs.)

61. In Kentucky, state law defines a "PA" as a person licensed under KRS 311.840 to

[24] Kentucky Board of Nursing.

311.862 [25]who has graduated from a physician assistant or surgeon assistant program accredited by the Accreditation Review Commission on Education for Physician Assistants or its predecessor or successor agencies and has passed the certifying examination administered by the National Commission on Certification of Physician Assistants or its predecessor or successor agencies; or possesses a current physician assistant certificate issued by the board prior to July 15, 2002.

62. The “supervising physician" means a physician licensed by the board who supervises one (1) or more PAs;

63. “Supervising” means overseeing the activities and accepting of responsibility for the medical services rendered by a physician assistant. Each team of physicians and physician assistants shall ensure that the delegation of medical tasks is appropriate to the physician assistant's level of training and experience, that the identifications of and access to the supervising physician are clearly defined, and that a process for evaluation of the physician assistant's performance is established.

## V. <u>NPPs General Requirements & Billing</u>

64. State law or regulation governs a NPP’s scope of practice in the state in which the services are performed.

65. Examples of the types of services that NPP’s may furnish include services that traditionally have been reserved to physicians, such as physical examinations, minor surgery, setting casts for simple fractures, interpreting x-rays, and other activities that involve an independent evaluation or treatment of the patient’s condition.

66. In order to be considered for payment by Medicare, a NPP must meet the general

[25] Kentucky Physician Assistants, 311.840: Definitions for KRS 311.840 to 311.862.

requirements listed below:

The practitioner must be providing services that are within the scope of licensure particular to the provider and the state in which he/she is practicing.

The services are considered "physician services".

The services would not be otherwise excluded from Medicare coverage.

The service must also meet the general criteria requirements, (e.g., medical necessity, reasonableness and appropriateness of service and patient eligibility.

67. ARNPs do not need to work under the supervision of a physician, but must work in collaboration with a physician. The collaborating physician does not need to be present with the ARNP when the services are furnished or to make an independent evaluation of each patient who is seen by the ARNP. The original of the protocol and the original of the notice should be filed with the state yearly, and a copy of the protocol should be kept at the site of practice of each party of the protocol.

68. PAs *must* work under the supervision of a physician. The PA's physician supervisor (or a physician designated by the supervising physician or employer as provided under state law) is primarily responsible for the overall direction and management of the PA's professional activities and for assuring that the services provided are medically appropriate for the patient. Effective January 1, 2022[26], PAs can bill and get paid directly by Medicare.

69. There are three billing options for NPP services depending on the setting:

In any setting, NPP services may be billed under their own NPI, receiving 85 percent the Medicare Physician Fee Schedule ("MPFS") amount, or 75 percent of amount reimbursable to Medicaid physicians[27];

i. In the clinic setting, NPP services may be billed as **incident-to** the physician's services for Medicare, receiving 100 percent of the MPFS if the appropriate requirements are met. For Medicaid this must be billed under the NPPs provider number and reimbursed at 75 percent.

[26] CMS MLN901623 Medicare Information for ARNPs, AAs, PAs Booklet March 2022.
[27] Kentucky Department of Medicaid Services Division of Policy and Operations (Amendment) 907 KAR 1:104 Reimbursement for ARNPs.

ii. In the hospital or emergency room setting, NPP services may be billed as a "Split/Shared Visit"[28] for Medicare receiving 100 percent of MPFS if the appropriate requirements are met. (There is no incident-to in this setting.) For Medicaid this must be billed under the NPPs provider number and reimbursed at 75 percent[29].

70. The provider's NPI must be reported in block 33 on CMS 1500 claim form or electronic equivalent. Services billed by the physician assistant must be paid to his or her employer since direct payment to PAs were not allowed under the Medicare program prior to January 2022. Direct billing and payment for ARNP services may be made to the ARNP.

## VI. Incident-to Services

71. In the clinic setting, services and supplies furnished as incident-to a physician's services may be billed as though the physician personally performed the service. The incident-to regulations allow practices to bill for services and supplies commonly furnished in the clinic or physician office setting that are provided by auxiliary staff or NPPs, and that are integral although incidental to the physician's professional services. Services meeting the incident-to requirements are reimbursed under the physician's NPI and paid at 100% of the MPFS amount for the CPT code, as if the service was performed by the physician.

72. If incident-to requirements are not met when the service is provided by NPPs, the services may be billed under the NPP's NPI and paid at 85% of the MPFS. However, incident-to services performed by auxiliary staff when the requirements are not met, are not a covered service and therefore not billable.

73. For Kentucky Medicaid, when auxiliary staff performs the service "direct physician" contact is required, which means that the billing physician is physically present with

[28] Split/Shared visits are not part of this case, and therefore not included in text. Incident-to are often confused with Medicare's Split/Shared Visit Policy, and while some similarities, the requirements are different.
[29] KY Medicaid Provider Billing Instructions for Physician's Services Provider -Type 64, 65 state that effective 10/1/2015 PAs service for Medicaid must be billed under the rendering provider (direct billing). However, prior Provider Billing manuals are not available online.

and evaluates, examines and treats or diagnoses the recipient.[30]

74. CMS defines the following levels of supervision:

General supervision: The procedure is furnished under a physician's overall direction and control; however, the physician's presence is not required during the performance of the procedure.

Direct supervision: A physician must be present in the suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It is not required that the physician be present in the room where the procedure is performed.

Personal supervision: A physician must be in attendance in the room during the performance of the procedure.

75. Incident-to billing ***only*** applies to services provided in physician offices and clinics. It cannot be used in the facility setting such as hospitals, emergency rooms, or nursing home facilities.[31]

76. To be covered incident-to the services of a physician or NPP services must meet all the requirements for coverage specified C.F.R.42 §410.27 . Specifically, the services must be:

i. furnished in a noninstitutional setting to noninstitutional patients;
ii. an integral, though incidental, part of the service of a physician (or other practitioner) in the course of diagnosis or treatment of an injury or illness;
iii. (commonly furnished without charge or included in the bill of a physician (or other practitioner);
iv. of a type that are commonly furnished in the office or clinic of a physician (or other practitioner);
v. under the direct supervision of the physician (or other practitioner);
vi. furnished by the physician, practitioner with an incident-to benefit, or auxiliary personnel;
vii. furnished in accordance with applicable State law and
viii. the physician (or other practitioner) may be an employee or an independent contractor.

77. Group practice is defined in 42 CFR § 411.352 and includes that the group practice must have at least two physicians who are members of the group (whether employees or direct or

[30] KY Title 907 KAR 3:005- Coverage of Physician Services.
[31] Medicare Benefit Policy Manual Chapter 15 § 60.1.A.

indirect owners).

78. In clinics, or a group practice, direct supervision may be the responsibility of several providers. In this situation, medical management of all services provided in the clinic is assured. The provider ordering a service need not be the provider who is supervising the service.[32] However, the physician providing direct supervision for the incident-to service must be the physician whose name is submitted on the claim[33].

79. Under the *locum tenen* billing rules[34], the MAC may pay the patient's regular physician for physicians' services and services furnished incident-to such services that are provided to the regular physician's patients by another physician on an occasional reciprocal basis. *Locum tenen* billing requires a modifier (Q6) to be added to the CPT code, which means the service was provided by a "substitute" physician.

80. Incident-to applies only to services that do not have their own "benefit category" under Medicare, as defined by the Social Security Act (section 1861(s)).

81. Incident-to regulations require physician "direct supervision," which means the physician **must be present in the office suite and immediately available throughout the service** to furnish assistance if needed. However, the physician does not need to be in the room when the NPP services are provided.

82. Incident-to also requires the physician to perform an initial service and remain actively involved in the course of treatment in order for the service to be an integral and incidental part of the physician's professional service This means that the NPP cannot see new patients or

[32] Medicare Benefit Policy Manual Chapter 15 § 60.3.
[33] CSG Fact Sheet: The "incident to" Provisions of Medicare: "*Physician Directed clinics: …The* service would be billed under the NPI of the **supervising** physician/nonphysician practitioner".
[34] CMS Medicare Claims Processing Manual, Chapter1, §30.2.10 and §30.2.11

established patients with new problems on an incident-to basis.

83. Recommended documentation for incident-to services should clearly state physician involvement on an "active" level and it is recommended to document the link between the provider who performed the service and the supervising provider.

84. Medicare requires that services provided be "authenticated" by the author of the medical record, so that if a RN provides chemotherapy, the MR for that service must be signed by the RN and by the physician or NPP who provided direct supervision. The purpose of the physician's signature is to demonstrate that the services submitted for payment have been accurately and fully documented, reviewed and authenticated. And it confirms that the provider has certified the medical necessity and reasonableness of the services submitted to the federal program for payment consideration.[35]

85. The following are examples of proper use of services that meet incident-to requirements:

**Example 1:** In a clinic setting the **RN** (auxiliary staff) provides chemotherapy to an established patient while the physician is in the same office suite seeing other patients. The chemotherapy (and the medications used) can be billed out under the incident-to rules for both Medicare and Medicaid and paid at 100% using the physician's NPI. The supervising provider is the physician in the group practice who was on site and immediately available during the visit.

**Example 2:** Same example as above, but with chemotherapy performed by the **ARNP.** For Medicare, the chemotherapy (and the medications used) can be billed out under the supervising physician as incident-to requirements are met and payment would be 100%. (For Medicaid this must be billed under the ARNPs provider number and reimbursed at 75%.)

**Example 3:** In a clinic setting the **ARNP** sees an established patient for a follow up office visit (E/M visit encounter) while the physician is in the same office suite seeing other patients. The patient has no new complaints, and the visit is billed under the supervising physician's NPI and reimbursed at 100%, since incident-to requirements are met. (For Medicaid this visit must be billed under the ARNP and reimbursed at 75%.)

[35] Medicare Program Integrity Manuals CMS Pub.100-03, Chapter 3, §3.3.2.4.

86. For these examples incident-to requirements are not met:

**Example 4:** In a clinic setting the **RN** (auxiliary staff) provides chemotherapy to an established patient on the weekend while there is no physician available to supervise the service. The physician is scheduled to come in later the same day and review and sign the patient's MR. The chemo infusion (and the medications used) cannot be billed as incident-to services since direct supervision required for incident-to is not provided. Since this service was performed by the RN and incident-to requirements are not met, this service is not a covered service and cannot be billed.[36] The physician is required to supervise throughout the service and cannot be there for only part of the service.

**Example 5:** Same example as above, but with chemotherapy performed by the **ARNP**. Without supervision by the physician this service does not meet incident-to requirements and cannot be billed under the physician's NPI. However, this service can be billed directly by the ARNP and reimbursed at 85% of Medicare and 75% for Medicaid.

**Example 6:** In a clinic setting the **ARNP** sees an established patient for a follow up office visit (E/M service) while the physician is in the same office suite seeing other patients. The patient has new complaints of nausea and diarrhea and the ARNP provides a workup to treat the patients new side effects. This visit cannot be billed incident-to the supervising physician's NPI and reimbursed at 100%, since incident-to is not met once the patient has a **new problem that needs work up.** For Medicare this visit can only be billed under the ARNP's NPI and reimbursed at 85%. (For Medicaid this visit should be billed under the ARNP's NPI and reimbursed at 75%.)

87. The examples above would generate the following reimbursements:

| Example | Rendering Provider | Supervising Provider | Incident-to met? | Medicare Reimbursement | Medicaid Reimbursement |
|---|---|---|---|---|---|
| 1 | RN | Physician | Yes | 100 % | 100 % |
| 2 | ARNP | Physician | Yes | 100 % | 75% |
| 3 | ARNP | Physician | Yes | 100 % | 75% |
| **4** | **RN** | **None** | **No** | **Not covered & not payable** | **Not covered & no payable** |
| 5 | ARNP | None | No | 85% | 75% |
| 6 | ARNP | None | No | 85% | 75% |

88. Example 1 captures the main intent behind the incident-to service. The physician is readily available to assist as he is in the office suite. The physician is the ordering physician for

chemotherapy and is supervising the service.

89. Example 4 was performed without direct supervision by a provider (medical doctor or NPP) so this would not be a covered or payable service.

90. I was also provided two documents each captioned "Medical Administrative Records," ("MAR") one each for the Ashland and the Highlands clinics.

91. The Ashland MAR appears to be a printout of service documentation for one patient, service on 12/30/2013, and while it includes the name of the RN and the supervising physician, this is insufficient to determine if incident-to services were met on this date.[37]

92. The Highlands MAR also appear to be a printout of service documentation for one patient.[38] However, the only thing included on this page is the patient's name, patient date of birth, and a physician name. This is insufficient to determine if a patient visit took place on this date.

93. In order to determine incident-to compliance, a full copy of the authenticated and truthful MR and supervising physician's schedule for this date of service is needed.

94. CSG's incident-to guidance for signature requirements state that signatures may be appended in one of the following ways:

The documentation should be signed by the supervising provider with a reference in the notes as to who performed the service.

Co signed

Signed by the NPP performing the service

95. The following checklist is an example that can be used to audit incident-to services for compliance:

[37] Bates Stamp CC Defendants0032270.
[38] Bates Stamp CC Defendants0032395.

| **If the answer is "no" to any of the questions, it is not appropriate to bill the service incident-to the physician**. (Medical record and Supervising Provider's Schedule needed.) | | | |
|---|---|---|---|
| **DOCUMENTATION TASK** | | **YES** | **NO** |
| Location | Does the place of service (POS) fall within the definition of an office or a physician directed clinic? | | |
| | The service is **not** performed in the institutional setting (i.e. hospital or skilled nursing facility)? Incident-to services **cannot** be performed in the emergency room, hospital outpatient department or provider based physician office (POS 22). | | |
| Employment relationship | Does the physician or group incur an expense and meet the employment requirements for the auxiliary staff? - OR- | | |
| | Does the auxiliary staff include employees, leased employees, or independent contractors of the physician or the entity that employs or contracts with the physician? | | |
| Supervision | Did the physician perform **direct supervision**? (Present in the office suite and available to assist, if necessary. The physician does not need to be physically present in the patient's treatment room for these services.) **But must be available throughout the service**. | | |
| | Is there a documentation link between auxiliary staff and the physician when the incident-to service was performed? (Archived records of when the supervising physician was in the office suite, i.e. physician schedules, etc. or documentation in the medical record by the physician.) | | |
| Services performed | Did the physician personally perform the initial service and develop the plan of care? (Non-physician practitioners **(NPPs) cannot see new patients or established patients with new problems incident-to).** | | |
| | Is the service a part of the patient's normal course of treatment? | | |
| | Is the physician actively involved in the course of treatment? | | |
| | Is the physician's involvement documented in order to prove physician involvement on an "active" level? | | |
| Auxiliary staff E/M services | If service is performed by auxiliary staff, who are not NPPs, is only a level 1 visit (CPT 99211) billed? | | |
| | If the review of systems (ROS) and past family and social history (PFSH) were performed by auxiliary staff is there documentation to support that the physician and/or NPP personally reviewed this documentation by confirming and/or supplementing to it in the medical record? | | |
| NPPs Qualified Staff | Are auxiliary personnel performing physician services qualified non-physician practitioners (NPP)? This includes Physician Assistants, Nurse Practitioners, and Clinical Nurse Specialists. | | |
| | Is the NPP licensed and certified to practice in the state in which they are practicing? | | |
| | The NPPs salary and benefits are excluded from the facility's cost report? | | |
| Scribing | If a scribe was used, did he/she only document what was dictated to them by the physician and is the scribe identified as such? (Scribes do not act on their own) | | |
| **Incident–to? 100% of feesch.** | **Yes or No?** If "incident-to" requirements are **not met,** the services may be billed under the NPP's own provider number and paid at **85%** of the Medicare physician fee schedule. | | |

96. Incident-to services are not apparent to CMS from claims submitted for reimbursement. Because a physician's NPI is used to submit claims for incident-to services, they look just like a claim for physician-only services. This is because payment is made at the appropriate MPFS rate based on the provider number entered on the claim. If the physician's NPI is used, then *this is an indication that the physician provided the service or it was performed incident-to the physician's care*, and 100% of the MPFS rate is applied to the entire claim; if the NPP's NPI is used, then for the same reason 85% of the MPFS rate is applied to the entire claim (and 75% for Medicaid).

97. The specific CPT codes used to bill Chemotherapy services for this case can be billed incident-to professional services under 42 C.F.R §410.26(b), and the service may be rendered by auxiliary staff or NPPs. If NPPs are supervising the service, the reimbursement is 85% for Medicare, 75% Medicaid, and 100% if supervised by physicians. However, incident-to services provided by auxiliary staff are not reimbursable if direct supervision is not provided.

## VII. <u>Conclusion</u>

98. Incident -o services have been around for a long time prior to this case and have been on the OIG workplan for several years[39], followed by frequent provider education from CMS and MACs. An example of such educations includes CGS[40] Fact Sheet on their website detailing the specific of the regulations. The OIG scrutiny and CMS and MAC provider outreach together with the incident-to certification on the claim form, all providers should be well aware of the

[39] OIG Workplan with incident-to includes 2001, 2003-2004, 2007-2009, 2012-2013; 2013 OIG Workplan: "*We will review physician billing for "incident-to"* services to determine whether payment for such services had a higher error rate than that for non-incident-to services. We will also assess Medicare's ability to monitor services billed as "incident-to."

[40] CSG Fact Sheet: The "incident to" Provisions of Medicare.

incident-to requirements.

99. In addition to training offered for free from CMS and MACs, providers can also access training from their medical association, and several online e-learning platforms as they regulatory send email solicitations for webinars to provider offices and hospitals.

100. I have personally lectured, published industry articles[41] and provided education on incident-to guidelines since 2005. My CV includes my speaking engagements and publications from 2010 to 2023. In addition to speaking engagements, I have also provided training to multi-specialty providers after auditing their documentation, as well as education to small and large physician groups, state medical associations and lectures during hospital physicians' medical rounds.

I reserve the right to supplement or revise my opinion based on my review of additional documents or other information that becomes available.

[41] 1. *Medicare's Split/Shared Visit Policy*, American Academy of Professional Coders (AAPC), Coding Edge -Hot Topic August 2008, 2. *Checklist for Incident-to Services,* Healthcare Compliance Association (HCCA): Compliance Manual & Revenue Cycle Institute 08/26/09. *3. Understand Medicare's Split/Shared Visit Policy,* HcPro: JustCoding.com 05/06/08.

Dated: August 25, 2023

Elin B. Kunz

Elin B. Kunz, MBA, CHC, CPC, CPMA, CCS
KUNZ, LLC

**Exhibits**

1. Curriculum Vitae
2. Expert Testimony List




# Elin B. Kunz

**MBA, CHC, CPC, CPMA, CCS**
(386) 837-3025
elinkunz@gmail.com


## PROFESSIONAL PROFILE

- Subject matter expertise & frequent speaker/author: Medicare & Medicaid Regulations, Coding, Audit, Compliance & Usual, Customary, and Reasonable (UCR) pricing.
- Independent Consultant since 2014. Previously employed 20 years for large Healthcare System (784 beds, 200 plus physicians & health plan), 6 years as Director of Physician Services, 3 years in Compliance & 6 years Corporate Finance including responsibility for charge master & physician revenue cycle.

| | |
|---|---|
| • Physician practice oversight including hospital/physician revenue cycle, financial performance, customer service training and project management. | • Develop education programs and deliver compliance and revenue cycle training, such as documentation requirements, coding, billing, claim preparation, reimbursement, regulatory compliance and CDM maintenance for physicians, managers and billing staff. |
| • Three years in Compliance with responsibility for the establishment and maintenance of organization wide program to detect and prevent violations of laws, rules, or regulations. | • Design and implementation of coding reimbursement, compliance policies and audit programs for physician practices.<br>• Hands-on chart reviews for coding and compliance, with emphasis on E/M Physician Audits and Education. |
| • Six years in Hospital Finance Department, including system budget preparation, financial analysis and revenue function responsibility including control of the hospital's Charge Description Master (CDM). | • Setting prices for hospital & physician CDMs.<br>• Participation in due diligence and contracting for physician practice.<br>• Fair market assessment of physician/hospital relationships including medical directorships and call coverage arrangements |

## EDUCATION / CERTIFICATIONS

- **Stetson University**, *Deland, FL*, Master of Business Administration (MBA), 1998
- **Florida International University**, *Miami, FL*, Bachelor of Science, Hospitality Management, 1990
- The American College of Financial Services, King of Prussia, PA CFP® Certification Program, 2022
- Certified Professional Coder (CPC), American Academy of Professional Coders (AAPC), 2005
- Certified Coding Specialist (CCS), American Health Information Management Association (AHIMA)
- Certified in Healthcare Compliance (CHC), HealthCare Compliance Association (HCCA), 2012
- Certified Professional Medical Auditor (CPMA), (AAPC), 2014

## EXPERIENCE

- **Kunz, LLC** Owner, Operator, *Healthcare Consulting, Audits, UC, Compliance & Education* 2014 - Present
- **Allegiant Experts, LLC,** *Coding Consultant, – UC Audits & Insurance Chart Reviews* 2022 - Present
- **AAPC- SME** Subject Matter Expert *Healthcare Coding, Curriculum Development* 2022 - Present
- **Halifax Health System, Dayton Beach, Florida** 1994 - 2014

## PROFESSIONAL PROFILE

- *Director, Physician Services* *2008 - 2014*
- Revenue Integrity Compliance 2005 - 2007
- Revenue Coordinator, Finance 2002 - 2004
- Financial Analyst/Budget, Finance 1998 - 2002

- **AYFIE, New York, NY (**Search and Text Analytics Solutions)
  *Independent Discovery and Compliance Consultant* 2016 – 2018

- **National Alliance of Medical Auditing Specialists (NAMAS)** Knoxville, TN 2015
  (subsidiary of Doctors Management), *Independent Presenter/Trainer,* Teaching Certified Professional Medical Auditor (CPMA) Bootcamps & ICD-10 Training for the Texas Medical Association

- **Seminole State College**, Orlando, FL, *Adjunct Professor & Curriculum Developer* 2006 - 2011
  - Health Information Technology Associate in Science:
    - HIM2272 Advanced Reimbursement Principles of Healthcare Services
    - HIM2214 Health Data Analysis Research and Management
  - Medical Information Coder/Biller Technical Certificate:
    - HIM 2270 Medical Insurance Billing and Reimbursement

- **HcPro, Marblehead, MA** Independent C*urriculum Development & Review* 2008 - 2010
  Develop & update Coding & Revenue Cycle e-Learning Courses

## VOLUNTEER WORK

- Board Member, The Anti-Fraud Coalition, Washington, DC 2022 - current
- Judge, Annual Ethics Competition, Stetson University, Deland, FL 2014 - current
- Member, University of Central Florida (UCF) Health Information Management (HIM) Advisory Committee 2011 - 2012
- Member, Seminole State College (SCC) HIM Advisory Committee 2006 - 2011

## PUBLISHED ARTICLES

- *Auditing and Compliance: Step into the Shoes of a Whistleblower,* AAPC Healthcare Business Monthly January 2017.
- *Prepared for Increased Audit Scrutiny, Part 2: Know Where Auditors Where Auditors are Focusing and Build a Solid Defense,* AAPC Healthcare Business Monthly April 2014.
- *Prepare for Increased Audit Scrutiny: Part 1: Steps 1-8,* AAPC Healthcare Business Monthly February 2014.
- *CMS Highlight Provider Vulnerabilities in Series of MLN Matter Articles,* HcPro: JustCoding.com 12/07/10.
- *Strengthen Efforts for Ensure Valid Orders in Light of RAC Audit Issue,* HcPro: JustCoding.com 09/25/10.
- Rec*ognize Levels of Observation Codes and Clean up Common* Misconceptions, HcPro: JustCoding.com 01/12/10.
- *Tips for Teaching Observation Coding to Physicians,* HcPro: JustCoding.com 12/28/09.

## PROFESSIONAL PROFILE

- *Examine Denials and be Aware of Red Flags Linked to Inappropriate Admissions,* HcPro: JustCoding.com 12/08/09.
- *Examine Denials for Inappropriate Admissions and Review Coding and Billing Processes,* HcPro: JustCoding.com 11/10/09.
- *Checklist for Split/Shared Visits,* HCCA: Compliance Manual & HcPro: Revenue Cycle Institute 10/07/09.
- *Checklist for Incident-to Services,* HCCA: Compliance Manual & Revenue Cycle Institute 08/26/09.
- *Checklist for Critical Care Services,* HcPro:JustCoding.com & Revenue Cycle Institute 08/05/09.
- *Understand the Differences Between Consultations and Referrals to Ensure Compliant Coding,* HcPro: JustCoding.com 05/05/09)
- *Tips for teaching physician consultation coding to physicians,* HcPro:JustCoding.com 04/28/09 & Healthcare Technology Online Newsletter "Top 10 Downloads of 2009"
- *Understand Medicare's Split/Shared Visit Policy,* HcPro:JustCoding.com 05/06/08.
- *Medicare's Critical Care Services – Part 1 & 2,* AAPC Coding Edge Feature December 2008 & January 2009.
- *Medicare's Split/Shared Visit Policy,* AAPC Coding Edge -Hot Topic August 2008.

## SPEAKING ENGAGEMENTS

- **2023: Association of Certified Fraud Examiners (ACFE),** New York Chapter, *"Healthcare Fraud from The Relator's Perspective"*
- **2022: The Cambridge 39th International Symposium on Economic Crime,** Jesus College University of Cambridge, United Kingdom, *"Balancing and Maximizing the lessons learned from whistleblowing."*
- **2021: Anti-Corruption Conference**, Oslo, Norway *"Perspectives from a healthcare whistleblower*"
- **2021: Institute of Internal Auditors (IIA)** Dallas Chapter, 16th Annual Fraud Summit, Dallas, TX. Keynote Speaker *"Perspectives from a healthcare whistleblower"*
- **2020: IIA Dallas Chapter,** 15th Annual Fraud Summit, Dallas, TX, Whistleblowing Panel Discussion
- **2020: Organization of Economic Cooperation and Development** (OECD *"Global Anti-Corruption & Integrity Forum Emergency measures to protect whistleblowers and promote reporting during the COVID-19 crisis and beyond"*
- **2019: Fordham University Law School,** New York City, NY, *"Behind the Crime: Crisis of Conscience"*
- **2019: George Washington University Business School,** Washington, DC, *"Whistleblowers: Saving Businesses & Saving Lives"*
- **2019 Al Jazzera TV- The Stream**, Washington, DC, "*Whistleblowers: Why do they risk it all"*

## PROFESSIONAL PROFILE

- **2019 NY State Bar Association (NYSBA) Presidential Summit** Panel Speaker, New York, NY, "*Enlisting the Public in the Fight Against Fraud: How Whistleblower Law Work, How They Have Evolved and the Courage It Takes To Be a Whistleblower*"
- **2018: European Symposium on Ethics and Governance, Organization of Economic Cooperation and Development (OECD) Global Anti-Corruption & Integrity Forum**, Paris, France, *"Businesses, and organizations facing the challenge of whistleblower protection: fostering trust for a more efficient whistleblowing line."*
- **2018: American Bar Association (ABA) Physician Legal Issues Conference**, Chicago, IL, "*The Relator's Perspective with Taxpayers Against Fraud Education Fund*"

Am**erican Health Information Mgt Association (AHIMA) National Conference:** 2015, 2017 & 2018

- 90th Annual AHIMA Convention and Exhibit - Clinical Coding Meeting, Miami, FL, 2018:
  *Key Strategies to Reduce your Compliance Risk for Shared Visits and Incident-to Services*
- 89th Annual AHIMA Convention & Exhibit, Anaheim, CA, 2017:
  *Key Strategies to Build Ethics Into Your Coding Compliance Program*
- 87th Annual AHIMA Convention & Exhibit, New Orleans, LA, 2015:
  *The Dirty Dozen of Coding Documentation Compliance*

**Healthcare Compliance Association (HCCA):** 2014, 2013 & 2008

- HCCA Compliance Institute, San Diego, CA 2014
  *Tick Tock…The Clock is Ticking (Time Based Coding*
- HCCA Clinical Practice Compliance Conference, Philadelphia, PA 2013
  *Key Strategies & Case Studies to Reduce you Compliance Risk with Non-Physician Practitioners*
- HCCA Clinical Practice Compliance Conference, Philadelphia, PA 2008
  *Audit Plan for Medicare's Shared Visit Rule*

**American Academy of Professional Coders (AAPC) Coding & Compliance Workshops (4 hours)**

- *Reimbursement Impact in Shifting Times* *2016*
- *Evaluation & Management: Fraud and Abuse. Stay Clear of It All* *2015*
- *Clear Your Path to ICD-10* *2015*
- *Medical Necessity vs Medical Decision Making* *2015*
- *Complete 2016 Procedural Coding Updates* *2015*
- *2015 Procedure Coding Updates* *2014*
- *Medical Auditing: The Next Step in Your Career* *2014*
- *Modifier 25 - In Depth Analysis and Best Practice* *2014*
- *Unlock the Secret to E/M Coding: Medical Necessity Skills for Coders* *2014*
- *Complete 2014 Procedure Coding Updates* *2013*
- *Mastering Documentation Review* *2013*
- *Advanced E/M Coding for EHRs* *2013*
- *Advanced E/M Auditing: The Secrets to Success* *2013*
- *2013 Complete CPT® Procedure Coding Updates* *2012*
- *Pathophysiology:*
  *Understanding Disease Processes Diabetes, Hypertension, CAD, and Obesity* *2012*
- *Clinical Documentation Improvement* *2012*
- *Teach Evaluation & Management Coding to Your Doctor in One Hour* *2012*

## PROFESSIONAL PROFILE

- *What You Need to Know NOW About ICD-10!* *2011*
- *Modifiers The Rest of the Story* *2011*
- *Advanced E/M Chart Auditing* *2011*
- *Advanced Surgical Chart Auditing* *2011*
- *Making Sense of E/M Rules for Your Medicare Administrative Contractor* *2010*
- *How to Perform a Successful Chart Audit* *2010*
- *Identifying Leaks in Your Revenue Cycle* *2010*
- *EMRs—What You Need to Know NOW!* *2010*
- *Advanced E/M Coding and Auditor Techniques* *2009*
- *Surefire Methods for Defensible Coding* *2009*
- *Prepare for Recovery Audits* *2009*
- *Communicate With Confidence to Physicians: Coding as a Second Language* *2009*
- *2009 Code Changes* *2008*
- *How to Dissect Operative Reports to Find Missing Pieces* *2008*
- *Coding and Billing in Best Run Practices* *2008*
- *How to Effectively Teach Evaluation & Management Coding in Under 1 Hour* *2008*

**Flagler Volusia Chiropractic Society, Daytona Beach, FL** 2017
*Chiropractic Services Compliance Update*

**Advanced Practice Provider Executives (APPex) Leadership Summit,** Boston, MA 2016
*Risks Areas for Non-Physician Practitioners and Incident-to*

**Michigan Medical Biller Association (MMBA) Southeast Conference**, Detroit, MI 2014
*Compliance Update*

**American Association of Orthopedic Executives (AAOE), Virtual Conference** 2014
*What Ortho Ortho/Spine/Neuro Practices Need to Know about 2014 OIG Workplan*
*Risk Areas for NPPs and Incident-to*

**Eli Research: Audio Educator Webinars & Virtual Workshops** 2009-2019

- *Compliance Update* *2019*
- *E/M Common Coding Errors 2019*
- *Non-Physician Practitioners (NPPs)* *2019*
- *2018 CPT Updates for E/M coding* *2018*
- *Modifiers: Coding, Billing, and Compliance Regulations Virtual Boot Camp* *2018*
- *Appropriate Modifier Usage for Correct Coding and Reimbursement -Clearing up the Confusion* *2017*
- *Incident to & Shared Visits - Clearing Up the Confusion* *2017*
- *Physician Compliance Updates and Key Targets to Prepare for* *2017*
- *Modifier -25: Appropriate Use and Examples* *2016*
- *How to Avoid Common E/M Coding Errors* *2016*
- *How to Improve your Accounts Receivables* *2016*
- *Case Studies to Reduce Your Compliance Risks with Non Physician Practitioners* *2016*
- *2015 Physician Compliance Update* *2015*
- *ABCs of Incidents-to vs. Shared Billing* *2015*
- *Modifiers 51, 52, and 59 - More Clarity On Their Usage* *2014*
- *2014 OIG Work Plan Update for Physicians* *2014*
- *2014 Risk Areas for NPPs and Incident-to.* *2014*
- *Modifier -25 Examples* *2014*
- *Ensure Compliance with Time Based Codes: Prolonged Care, Discharge Mgt & Critical Care* *2013*
- *Compliance Update: Key Physician Targets to Prepare for in 2014* *2013*

## PROFESSIONAL PROFILE

- *Practical Strategies to Minimize Your RAC Risk* 2013
- *Physician E/M Documentation For Compliant Coding* 2013
- *Capturing Revenue Using Key Metrics* 2013
- *Physician Coding & Reimbursement for Observation* 2013
- *Adult Critical Care Services* 2013
- *Modifier -25 Best Practice* 2013
- *ABC of incidents-to vs Shared Billing* 2013
- *Be Prepared for Increased RAC, CERT and Private Payer Audits* 2013
- *A/R Best Practices* 2013
- *Ethical Coding & Billing 2012 Best Practice* 2012
- *Physician E/M Coding Documentation Tips for High Level Codes* 2012
- *Code 44: Know it All* 2012
- *Compliance Update OIG Work Plan & E/M Trend* 2012
- *Top AR Tactics* 2012
- *Global Surgical Package* 2012
- *Non-Physician Providers Recent OIG Scrutiny* 2012
- *Observation or Admission? What Every Physician Needs to Know* 2011
- *RAC, CERT, ZPIC and OIG Compliance -What to Watch out for* 2011
- *Teaching Coding and Billing to Physicians* 2011
- *Consultation Services– Are you ready for a RAC review?* 2011
- *The ABCs of Incident-To & Shared Billing: Update* 2011
- *RAC, CERT and Private Payer Audits* 2011
- *Top AR Tactics* 2011
- *Observation vs. Admitting* 2010
- *Physician Coding & Billing* 2010
- *The ABCs of Incident-to vs. Shared Billing* 2010
- *Knowledge Is Your Best Defense: Expert Advice for RAC, CERT and Private Payer Audits* 2010
- *Modifier Round Up for E/M* 2010
- *Save Hundreds with These A/R Best Practices!* 2010
- *Observation vs. Admitting Meet these Guidelines to Ensure Pay* 2009

**Coding Institute Orlando, FL & Las Vegas, NV, Annual Reimbursement Conferences 2008*-2012**

- *Master E/M Urology Coding in the Hospital and Office Workshop (3 hours)* 2012
- *Orthopedics: Incident to & Shared Visits-What Every Physician Needs to Know* 2012
- *Admission or Observation: Why the Increased Government Focus?* 2012
- *Non-Physician Practitioners in Pain Practice* 2012
- *Orthopedic: Global Surgical Package- Expert Tips* 2012
- *A/R Best Practice* 2012
- *Non-Surgical Urology Coding in the Hospital and Office* 2011
- *Understand the Global Surgical Package* 2011
- *Orthopedics: Incident-to & Shared Visits- Why the Increased OIG Focus?* 2011
- *Consultation Tactics Every Ortho Professional Needs to Know* 2011
- *Admission or Observation? What Every Physician Should Know* 2011
- *Recognize incident-to Services or Pay the 15% Price* 2010
- *Hone you're A/R Practices and Processes in Just 1 hour* 2010
- *Tackle RAC, CERT, ZPIC, and Private Payer Audits with Confidence and Ease* 2010
- *An Appeal May Be Your Best Option, But Not Always - Examine the Pros and Cons* 2010
- *Best Practices Protect Nurse Visit Pay and Other Audit Hot Spots* 2010

*2008 & 2009 -detailed titles available upon request

# Expert Witness Testimony 2023 of Elin B. Kunz

MBA, CHC, CPMA, CPC, CCS
AHIMA-Approved ICD-10-CM/PCS Trainer

1. Andy Ramirez v Jorge L. Pereda and Sentry Industries Inc. Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida (2021-001587-CA-01). Engaged for the defendant by Nicholas DeMahy (Cole, Scott & Kissane). Deposition August 8, 2023.

   *Personal injury - Medical record and billing review and analysis. (ongoing)*

2. James Kehoe v Joseph Rowe and Direct Millwork & Furnishing, Inc. Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida (2022-CA-002825-O). Engaged for the defendant by Gavin Mackinnon (Goldberg Segalla). Deposition August 11, 2023.

   *Personal injury - Medical record and billing review and analysis. (ongoing)*