# EXHIBIT NO. 13

LOUISVILLE LEXINGTON LONDON FLORENCE CINCINNATI INDIANAPOLIS ORLANDO JACKSONVILLE TAMPA

KENTUCKIANA
COURT REPORTERS

# CIVIL ACTION NO. 0:16-CV-148-DLB

# UNITED STATES OF AMERICA EX REL. ROBERT C. O'LAUGHLIN M.D.

# V.

# RADIATION THERAPY SERVICES, P.S.C., DBA ASHLAND BELLEFONTE CANCER CENTER, ET AL.

**DEPONENT:**

**ELIN KUNZ**

**DATE:**

**December 15, 2023**

a courtroom powerhouse

schedule@kentuckianareporters.com
877.808.5856 | 502.589.2273

www.kentuckianareporters.com

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF KENTUCKY

ASHLAND DIVISION

CIVIL ACTION NO. 0:16-CV-148-DLB

UNITED STATES OF AMERICA EX REL. ROBERT C. O'LAUGHLIN, M.D.,

Plaintiffs

V.

RADIATION THERAPY SERVICES, P.S.C., DBA ASHLAND BELLEFONTE CANCER CENTER, ET AL.,

Defendants

DEPONENT: ELIN KUNZ

DATE: DECEMBER 15, 2023

REPORTER: AMANDA SANKEY

APPEARANCES

ON BEHALF OF THE PLAINTIFF, ROBERT C. O'LAUGHLIN, M.D.:
Andrew Grosso, Esquire
Andrew Grosso & Associates
1250 Connecticut Avenue NorthWest
Suite 700
Washington, D.C. 20036
Telephone No.: (202) 298-6500
E-mail: agrosso@acm.org
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, RADIATION THERAPY SERVICES, P.S.C., DBA ASHLAND BELLEFONTE CANCER CENTER, ET AL.:
Victoria Boland Fuller, Esquire
Wyatt, Tarrant & Combs, LLP
400 West Market Street
Suite 2000
Louisville, Kentucky 40202
Telephone No.: (502) 589-5235
E-mail: vfuller@wyattfirm.com
(Appeared via videoconference)

lot about what I have published, so -- and where I have done speaking engagement, so it's very detailed, probably more than what you need.

**Q. It is very detailed. I will agree, you have an impressive amount of publications on here. So I'm going to start by scrolling down. So if I understand this correctly --**

A. Uh-huh.

**Q. -- you graduated college in 1990?**

A. Yes. I came to the United States to learn English in 1986, and went to school, and graduated in 1990.

**Q. Where are you originally from?**

A. Norway.

**Q. Okay. I wondered what Kunz was.**

A. (Inaudible).

**Q. I have not heard that one before. Yeah. So you graduated in 1990, and then you started working at Halifax Health System in 1994, correct?**

A. Correct.

**Q. Okay. So in that four-year period, did you have any additional education or training, or was it kind of just finish college and then --**

A. I worked for the Marriott Corporation from 1994 -- I'm sorry. From 1990 to about '93 or '4. I

A. -- so when I do the testimony, if I didn't have it on there, I would be questioned why it's not there.

**Q. No, completely fair. That makes sense. Okay. And I know we talked a little bit, very, very broadly about the nature of the work that you're doing currently and how most of it is in the personal injury context.**

A. Uh-huh.

**Q. I would imagine though, you've probably come across chemotherapy services, and/or oncology services; is that fair?**

A. Yes, I have done chemotherapy audits. I have done chemotherapy, looking at incident to. I've done chemotherapy, looking at split/shared services. You know, I -- I've actually done a lot of work with non-physician practitioners, audits of them.

And I also have done a lot of consulting work for the -- I'm trying to think the name. It's called AAPA. It's the American Association [sic] of Physician Assistants, so I have helped them with their consulting work, and I have helped them train physician assistants. And I have also done engagement through them where I had, I think, one that I can remember, maybe around 2016.

I think it was Henry Ford Hospital in Detroit,

**Q. Okay. So it says -- well, in your report you say, "Medicare's Program Integrity Manual includes that misrepresenting the person who performed the services and billing for non-covered services as examples of Medicare fraud." Is there something missing or -- it just reads a little awkward maybe. It includes that misrepresenting the person who performed the services and billing for non-covered services as examples of Medicare fraud?**

A. Misrepresent...

**Q. It's not a big deal if not. I just wanted to make sure that I was reading it correctly.**

A. Well, the direct quote is there. So --

**Q. Yeah.**

A. -- what I'm trying to say is that if you are submitting a claim for chemotherapy and you're putting a supervising physician on the claim as the supervising, but that physician is not there, then you're misrepresenting the person who performed the service, and in that case, it -- and when it talks about non-covered services, that means that if you are providing chemotherapy and there's no supervision, it becomes a non-covered service because you're not meeting Medicare's guidelines for it being a covered service. So that's in the Medicare integrity manual. They're

billed using their NPI numbers.

So in the TeamHealth case, when the physician -- the -- there was two physician relators, their concern was that split-shared services in the emergency room were being billed to Medicare as if they performed them when in fact they didn't. So the physicians were concerned that their number were being used. It was, you know, the identity of the -- the individual who furnished the service was misrepresented.

**Q. Okay.**

A. That's why I thought that was a good example.

**Q. Yeah. Yeah. So all this says though, in the manual, is that listing the incorrect provider may be an example of fraud, right?**

A. Well, it said -- I don't think it's may be an example of fraud --

**Q. Well, but if you look at it --**

A. It's clearly fraud.

**Q. It says, "Fraud may take such forms as," and then it includes as an example, misrepresenting the individual who furnished the services. That's all it says, right?**

A. It does. But in my interpretation, if you misrepresent the service, the provider who performed the service, that's fraud.

**you're a coder --**

A. Yes.

**Q. -- so you would understand --**

A. As a --

**Q. -- coding --**

A. -- a coder -- yeah. So I'm not someone who can opine on the medical necessity or the clinical side of that.

**Q. And that would include really understanding how the drug works and interacts with the patient, correct?**

A. Correct.

**Q. Okay. Okay. So I apologize. That was actually very helpful, so thank you for kind of going into the code descriptions. I was going to ask you about that later, but I'm going --**

**Oh, just for the record, I want to make sure that we know where we were talking about in her report. In all of our discussions concerning the CPT code ranges, hydration, therapeutic, and chemotherapy, we were looking at Paragraph 42 of her report.**

A. And also to add to that in one of my headings, I had left out -- like, when I copied and pasted that from the CPT manual, one of the headings got cut off, so I did an addendum to my report. And I believe it's the

A. Uh-huh.
**Q. What -- I'll let you look at this for just a second, but what is this record?**
A. So that is an MAR and -- let me see. So the -- it has -- yes. So this is what I looked at. It has the --
**Q. Okay.**
A. -- supervising physician on here. It has the RN and the start -- start time and end time, which is what we would typically look for when we audit these.
**Q. Okay. And so just -- you said this is what you reviewed, but I'm going to pull up --**
A. Yeah. Which is very limited actually. That -- in my opinion, that is not enough to determine if supervision was met.
**Q. Okay. Well, let's talk about that for a moment.**
A. Uh-huh.
**Q. Can you explain why you think that MAR is not enough to determine if incident-to or --**
**How did you say it? It's not enough to determine what?**
A. Direct supervision.
**Q. Why is that?**
A. So as an auditor, you know, in God we trust.