# EXHIBIT NO. 17

**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**Ashland Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **ROBERT C. O'LAUGHLIN, M.D.** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **CIVIL ACTION NO. 0:16-CV-148-DLB** |
| **RADIATION THERAPY SERVICE, P.S.C., dba ASHLAND BELLEFONTE CANCER CENTER, et al.,** | ) | |
| **Defendants.** | ) | |

**RESPONSES AND OBJECTIONS OF RELATOR DR. ROBERT C. O'LAUGHLIN TO THE THIRD SET OF INTERROGATORIES OF THE DEFENDANT RADIATION THERAPY SERVICES, P.S.C. D/B/A ASHLAND BELLEFONTE CANCER CENTER**

Dr. Robert C. O'Laughlin ("Plaintiff" or "Dr. O'Laughlin"), through his undersigned counsel and pursuant to the Federal Rules of Civil Procedure 26 and 33, hereby objects and responds to the third set of Interrogatories by Defendant Radiation Therapy Services, P.S.C. d/b/a Ashland Bellefonte Cancer Center (the "Defendant" or 'Ashland BCC"), as set forth below.

These Responses are based upon Dr. O'Laughlin's present knowledge of the matters covered by the Defendant's interrogatories, and his best efforts to answer these interrogatories. Dr. O'Laughlin's reserves the right to supplement and amend his answers to these interrogatories as he may become aware of addition responsive information.

**General Objections Applicable to Interrogatories**

1. Dr. O'Laughlin objects to the first set of Interrogatories ("Interrogatories") of the Defendant (including the accompanying definitions and instructions) to the extent that the Interrogatories seek answers that: were prepared in anticipation of litigation; constitute attorney

work product, disclose the mental impressions, conclusions, opinions or legal theories of any attorneys for Plaintiff, contain privileged attorney-client communications, or are otherwise protected from disclosure under applicable privileges, laws or rules.

2. Dr. O'Laughlin objects to the Interrogatories to the extent that they are not reasonably calculated to lead to the discovery of admissible evidence.

3. Dr. O'Laughlin objects to the Interrogatories to the extent that they are vague, ambiguous, overbroad, oppressive, or unduly burdensome.

4. Dr. O'Laughlin objects to the Interrogatories to the extent that they are not related to the time period and subject matter at issue in this litigation.

5. Dr. O'Laughlin reserves the right to object to the admissibility of any portion of his answers produced in response to the Interrogatories at any hearing or trial in this action.

6. Dr. O'Laughlin submits these responses without conceding the relevancy or materiality of the subject matter of any Interrogatory.

7. Dr. O'Laughlin objects to the Interrogatories to the extent that they are unauthorized by the Federal Rules of Civil Procedure and the Local Rules of this Court.

8. Dr. O'Laughlin objects to the definitions and instructions contained in the Interrogatories Instructions on the grounds that they seek to shift the burden of serving unambiguous interrogatories onto Dr. O'Laughlin. The Defendant is required to serve unambiguous interrogatories and, having failed to do so, Defendants cannot require Dr. O'Laughlin to respond to an unambiguous or vague interrogatory; or require him to "interpret" which of competing interpretations of an ambiguous or vague interrogatory applies.

9. To the extent that interrogatory calls for the production of publicly available information, Dr. O'Laughlin reserves the right to use and introduce any such information that he

may have in his possession now, or any such information that he may subsequently come into possession, regardless of whether or not he now produces it.

**ANSWERS**

Without waiving the foregoing objections, Plaintiff responds and specifically objects to the Defendant's first set of Interrogatories as follows.

**INTERROGATORY 16:** *Describe in detail the methodology by which you selected the patients identified within your letter entitled "First Tranche" (a copy of which is attached hereto for reference as Exhibit A). Include in your answer how these specific patients were chosen; the reason behind the selected date-range of December 27, 2013 through June 30, 2014; and an explanation as to why you are requesting only specific records (such as Medical Administration Records, or "MARs").*

**ANSWER TO INTERROGATORY NO 16:** This interrogatory calls for attorney work product. It also has multiple subparts. For these reasons Dr. O'Laughlin objects to this interrogatory. Notwithstanding these objections, Dr. O'Laughlin answers as follows:

> **Subpart One:** *Describe in detail the methodology by which you selected the patients identified within your letter entitled "First Tranche" (a copy of which is attached hereto for reference as Exhibit A). Include in your answer how these specific patients were chosen; [and] the reason behind the selected date-range of December 27, 2013 through June 30, 2014[.]*
>
> **Subpart Two:** *[An] explanation as to why you are requesting only specific records (such as Medical Administrative Records, or "MARs").*

**Answer to Subpart One:**

Tranches One and Two were compiled with the purpose of identifying and documenting those patients who, during the first half of 2014, received chemotherapy services without a supervising medical doctor, and in some instances without a non-physician practitioner, on the premises of the clinics where they received such services.

The dates of December 27, 2013 through June 30, 2014 were initially chosen because Dr. O'Laughlin knew from his time working at the Defendant clinics that Dr. Hayek had left the employ of the clinics either early in 2014 or prior to January 1, 2014; and that the clinics did not

have enough physicians to be present on the premises to supervise services from this point in time until Drs. Anshu Jain, V. Konala, and Sameer Batoo were hired later in the year. Discovery produced by the Defendants showed that these three doctors began working at the clinics July 1, 2014, and not before. When Dr. Hayek was interviewed, he explained that he left Kentucky on or about Christmas, 2013, for a new position in Indiana; and confirmed that at least as early as December 27, 2013 he was no longer on the premises of the Ashland or the Highlands clinics, as he was then and thereafter in the State of Indiana.

Initially, the physician schedules provided by Brenda Kelly to Dr. O'Laughlin (previously referenced as the "B Files," hereinafter as the "Brenda Kelly Schedules") were used to produce an excel workbooks for the Ashland clinic, with spreadsheets in that workbook broken out by healthcare insurers, *e.g.*, Medicare, Humana, Wellcare, Aetna, etc. On each spreadsheet the patients were listed and organized by dates. For each row for each patient for each date, entries were made in separate column for the following information (among other columns): the procedure that the patient received (*e.g.*, Chemo, Infusion, Port Flush, Injection); the specific carrier for the insurance company (in some instances, such as for Aetna, alternate carriers would be cited: in Aetna's case it was "Coventry Cares of Kentucky" or "Aetna"; the patient's policy number; whether the carrier was the patient's primary or secondary insurer; and what the schedule said (if anything) about Dr. Hayek's and Dr. Kirti K. Jain's presence at the clinic on that day. The dates chosen for listings were those dates on which Dr. Hayek was scheduled to see patients or was scheduled to have his appointments blocked at the Ashland clinic.

With this information similar spreadsheets, but not broken down by carriers (although this information was included in a column), were created for the Highlands patients. Again, the focus was on days what the schedules showed for Dr. Hayek being scheduled to see patients, or to have his appoints blocked, at the Highlands clinic.

After the Master Schedules were received in discovery, the spreadsheets were cross-checked with the Master Schedules to verify that the Brenda Kelly Schedules were in accord.

Using these two sets of spreadsheets, patients who had been scheduled to receive services at the two clinics were identified for days when Dr. Hayek was purportedly treating them or otherwise on the premises and available to supervise services.

Based upon the Ashland Workbook, a list of patients were created such that at least one patient was selected for each day that Dr. Hayek was purportedly at the Ashland clinic. Tranche I is a compilation of these patients. A list of patients was also compiled from the Highlands Master Schedule with at least one patient selected for each day that Dr. Hayek was purportedly at the Highlands clinic. Trance II is a compilation of these patients. In this way, the expectation was that Dr. O'Laughlin could prove that either that Dr. Kirti was scheduled to be at two clinics on the same day treating or supervising patients; or that Dr. Hayek was scheduled to be the only doctor at one of the clinics—on a day when he was no longer in Kentucky. In either instance, patients would have been treated with no physician being present. Sufficient patients were identified in this way such that there is an overlap of days between the Ashland and Highlands

tranches, so that days may be established on which patients were treated at either clinic when no physician was present.

Dr. Batra was interviewed and confirmed that he worked at the clinics as a *locum tenen* only a few weeks" Days on which his name appears on the Master Schedule for being present at a clinic were avoided for the selection of patients for inclusion in the tranches. Similarly, claims data provided by the Medicare program show that beginning in mid-May 2014 through (at least) the end of June 2014, a *locum tenen* was used, that is, the modifier "Q6" appears in the claims data. With one exception, these dates were also avoided for the selection of patients for the tranches. The exception is January 29, 2014, as it appears from the Master Schedule that only an NP was scheduled for this day, and not a physician.

Days on which Dr. O'Laughlin was present at the Ashland or Highlands clinics, as indicated on the schedules, were avoided for the selection of patients on those days for those clinics, respectively, for Tranche I and Tranche II.

**Answer to Subpart Two:**

Three sets of documents have been requested for each tranche. They, and the reason why they have been requested, are as follows:

(1) **The MARs** were requested because they identify for each patient, and for each day such patient received chemotherapy services: the date and times that the patient underwent such services; the nurse who provided the services; and the purported supervisory physician for such services. This information is probative for Dr. O'Laughlin's claims as it shows that physicians—usually Dr. Kirti K. Jain—was the supervisory physician for different patients at different clinics on the same days and the same times. They also indicate that Dr. Hayek was the supervising physician on some days—something that was impossible given the time period involved. Finally, some MARs indicate that no supervising physician was present at all during services. The names of the nurses is also relevant as it can lead to the discovery of admissible evidence.

(2) **The Billing Statements** were requested because they provide the dates of and specific services provided to patients; the name of the supervising physician or non-physician practitioner; the insurance company that was charged for the services; and the amounts of the charges. Additionally, these billing statements provide a means of cross-checking between the Ashland and Highland clinics, by date, to establish whether a physician was purportedly in two places at the same time; and whether a non-physician practitioner provide the chemotherapy services when the Medicare claims data stated that a physician provided or supervised such services.

(3) **The Charge Statements** were requested because they provide dates, services, and charges for each patient, and the names of the supervisory non-physician practitioners. They also provide dates on which patients received specified services on weekends (for which no MARs have so far been produced despite being called for in Tranches I and II as well as Tranche III); and no schedules indicate physicians or non-physician practitioners seeing patients on weekends.

**INTERROGATORY 17:** *Describe in detail the basis upon which you believe that the patients and corresponding records identified in the "First Tranche" support any of your remaining claims alleged in the Third Amended Complaint.*

**ANSWER TO INTERROGATORY NO 17:** This interrogatory calls for attorney work product. For this reasons Dr. O'Laughlin objects to this interrogatory. Notwithstanding this objection, Dr. O'Laughlin answers as follows:

See Objections and Answer to Interrogatory No. 16.

**INTERROGATORY 18:** *Describe in detail the methodology by which you selected the patients identified within your letter entitled "Tranche II" (a copy of which is attached hereto for reference as Exhibit B). Include in your answer how these specific patients were chosen; the reason behind the selected date-range of January 1, 2014 through June 2014; and an explanation as to why you are requesting particular records for these patients on these dates.*

**ANSWER TO INTERROGATORY NO 18:**

This interrogatory calls for attorney work product. It also has multiple subparts. For these reasons Dr. O'Laughlin objects to this interrogatory. Notwithstanding these objections, Dr. O'Laughlin answers as follows:

See Objections and Answer to Interrogatory No. 16.

**INTERROGATORY 19:** *Describe in detail the basis upon which you believe that the patients and corresponding records identified in "Tranche II" support any of your remaining claims alleged in the Third Amended Complaint.*

This interrogatory calls for attorney work product. For this reasons Dr. O'Laughlin objects to this interrogatory. Notwithstanding this objection, Dr. O'Laughlin answers as follows:

See Objections and Answer to Interrogatory No. 16.

**ANSWER TO INTERROGATORY NO 19:**

**INTERROGATORY 20:** *Describe in detail the methodology by which you selected the patients identified within your letter identifying your third tranche of patients (a copy of which is attached hereto for reference as Exhibit C). Include in your answer how these specific patients were chosen and an explanation as to why you are requesting certain records for these patients on these dates.*

**ANSWER TO INTERROGATORY NO. 20:**

This interrogatory calls for attorney work product. For this reasons Dr. O'Laughlin objects to this interrogatory. Notwithstanding this objection, Dr. O'Laughlin answers as follows:

The Medicare, Humana, and WellCare claims data spreadsheets were each condensed so as to maintain claims for services provided on weekends and to eliminate claims for services provided on weekdays. These were then broken into three subsets: Tranche IIIA uses claims data for the period prior to December 27, 2014; Tranche IIIB uses claims data for the period between December 27, 2013 and June 30, 2014, inclusive of both dates; and Tranche IIIC uses claims data for the period after June 30, 2014. For each tranche, patients were selected so as to cover weekend dates. To limit the number of patients whose records would be requested, not all weekend dates were selected, but selections were made so as to provide a statistical means of demonstrating how often, if at all, physicians were present on weekends in order to supervise the chemotherapy services provided to patients on the weekends. Because of the selection process, some of the patients in Tranche IIIA are also patients named in Tranches I and II. Nonetheless, to-date, no MARs have been produced by the Defendants in discovery for weekend services for any tranches. The reasons for the records requested are the same as those provided in Answer to Interrogatory No. 16.

In addition to providing information about weekends, the selection of these patients provides a means to determine when patients were seen on Thursdays in Ashland, when tumor board meetings were held at the Our Lady of Bellefonte Hospital. Physicians attended those meetings and therefore were not present at the Ashland clinic to supervise the provision of service to patients during the meetings. For these reason, Dr. O'Laughlin has not asked for a fourth tranche focused on patients seen on Thursdays.

**INTERROGATORY 21:** *Describe in detail the basis upon which you believe that the patients and corresponding records identified in the third tranche support any of your remaining claims alleged in the Third Amended Complaint.*

**ANSWER INTERROGATORY NO 21:**

This interrogatory calls for attorney work product. For this reasons Dr. O'Laughlin objects to this interrogatory. Notwithstanding this objection, Dr. O'Laughlin answers as follows:

See Answer to Interrogatory 16 Subpart Two. In addition, Dr. O'Laughlin has personal that the usual practice for the Ashland and Highlands clinics was that physicians did not see patients on weekends; and Dr. Batra explained in an interview that, to his knowledge, the clinics were closed on the weekends. Additionally, neither the MARs, nor the Master Schedules, nor the Branda Kelly Schedules show any physicians or non-physician practitioners scheduled to see patients on weekends. The absence of the requested records for weekend services supports Dr. O'Laughlin's allegations with regards to the absence of supervision by physicians for chemotherapy services provided on weekends.

Attorney for Plaintiff-Relator:

*/s/ Andrew Grosso*
Andrew Grosso, Esq.
Agrosso@acm.org
Pro Hac Vice (DC Bar No. 358326)
Andrew Grosso & Associates
1101 Thirtieth Street NW, Suite 500
Washington, D.C. 20007

**CERTIFICATE OF SERVICE**

I hereby certify on September 22, 2023, the foregoing was electronically to all counsel of record by electronic mail, pursuant to agreement among the parties.

By: /s/ Andrew Grosso
Andrew Grosso, Esq. (D.C Bar No. 358326)

Robert O'Laughlin, MD