COMMONWEALTH OF KENTUCKY
BOYD CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 15-CI-00875

ORIGINAL

Individually and as Administrator of the Estate of

Plaintiffs,

Vs.

KIRTI J. JAIN, M.D., and RADIATION THERAPY SERVICE, P.S.C., d/b/a ASHLAND BELLEFONTE CANCER CENTER,

Defendants.

FILED
TRACEY L. KELLEY
OCT - 7 2016
BOYD CIRCUIT/DISTRICT COURT
BY: D.C.

VIDEO DEPOSITION OF KIRTI JAIN, M.D.

---

The video deposition of Kirti Jain, M.D., was taken on July 20, 2016, at the approximate hour of 3:09 p.m., located at 1505 Carter Avenue, Ashland, Kentucky.

---

ADKINS & ASSOCIATES REPORTING
1 Robin Lane
Barboursville, West Virginia 25504
(304) 733-1036

BRANDY D. MOWERY, CR

Appearances:

Debra Nelson, Esq.
The Nelson Law Firm, PLLC
Post Office Box 54497
Cincinnati, Ohio 45245

Dustin C. Haley, Esq.
Williams, Hall & Latherow
1505 Carter Avenue, Suite 200
Post Office Box 1008
Ashland, Kentucky 41101

Also present: Mable Barnes, Videographer
Mary Ann Stephenson

INDEX

| WITNESS | EXAMINATION | PAGE NO. |
|---|---|---|
| Dr. Kirti Jain | Ms. Nelson | 03 |

| EXHIBITS | PAGE NO. |
|---|---|
| Exhibit No. 1 | 03 |
| Exhibit No. 2 | 36 |
| Exhibit No. 3 | 41 |
| Exhibit No. 4 | 94 |

| OBJECTIONS | PAGE NO. |
|---|---|
| Mr. Haley | 07, 43, 47, 49, 100 |

Reporter's Certification - 103

THE VIDEOGRAPHER: We are on video record. Today is July the 20th, 2016, and the time is 3:09 p.m. We are here to take the deposition of Dr. Kirti Jain, in Ashland, Kentucky, pursuant to notice in the case styled Boyd Circuit Court, , and others, versus Dr. Kirti Jain, and others, Case No. 15-CI-00875.

I am Mable Barnes, the video technician. The court reporter is Brandy Mowery. Will the attorneys introduce themselves and state who they represent, please.

MS. NELSON: Debbie Nelson, on behalf of plaintiff, , as administrator of the estate of his late wife,

MR. HALEY: Dustin Haley, on behalf of the defendants.

(Exhibit No. 1 was marked for identification purposes.)

KIRTI JAIN, M.D., called as a witness, first being duly sworn by the Court Reporter/Notary Public, testified as follows, to wit:

EXAMINATION

BY MS. NELSON:

Q. Dr. Jain, we met off the record earlier. Again, I'm Debbie Nelson. I represent on -- on behalf of his wife,

Will you tell me your full name, please.
A. Kirti Kumar Jain.
Q. Okay. And, Dr. Jain, have you ever given a deposition before?
A. I have.
Q. How many times?
A. I can't recall, but maybe three or four times.
Q. Okay. Have you ever given a deposition as a defendant, as we are today?
A. I believe once --
Q. All right.
A. -- or maybe twice.
Q. Okay. When did you last give a deposition? How recent?
A. I don't have an exact recollection, but sometime in the last three years.
Q. And was that one of the depositions where you were a defendant?
A. No.
Q. In the other cases in which your deposition was given as a defendant, what were the issues that -- the allegations against you? What were they claiming that you did wrong?
A. These were quite old. More than 10 years --

Q. Okay.

A. -- and I don't have a total recollection. But in one case, there was a death by a fungal septicemia, a fungus infection, getting into the blood stream.

Q. Okay.

A. And, honestly, the second case was so old, I don't recall exactly what it was.

Q. Were both of those cases here in Boyd County?

A. They both were Green -- Greenup, sorry.

Q. Okay. I'm sure you've been given some instructions, but let me just remind you that if I ask a question, and you don't hear it or you don't understand it, let me know, and I'll be glad to -- to try to put it in a form that is better so that you can understand it or -- you know, if you need me to repeat it. But if you answer, I will assume that you understood the question and heard it correctly; is that fair?

A. Sure.

Q. All right. And you need to answer verbally rather than just nodding your head so the transcript can accurately reflect your testimony. And we can take a break -- I think we probably will from time to time. I hope this doesn't take too long but, you know, we'll -- we'll see how it goes. Okay?

A. Sure.

Q. All right. What have you done -- other than speaking with your attorneys, what have you done to prepare for today's deposition?

A. I have leafed through these papers.

Q. The records?

A. Yeah.

Q. All right.

A. Probably over a 15 to 20-minute period. That's really it.

Q. When did --

A. I did speak to my attorney --

Q. Sure. And I don't want to know what you all talked about.

A. Last week, yeah.

Q. Okay. How recently have you skimmed through the records or looked at any of them?

A. Today.

Q. So when you said 15 to 20 minutes, that was today, skimming --

A. Yes.

Q. All right. Okay. And you were -- you were sitting here in the room through the majority of Ms. Stephenson's deposition, right?

A. Yes.
Q. And, actually, that probably will help shorten this, maybe, a little bit. We'll see, but...
A. Okay.
Q. Do you agree that a doctor has a duty to keep a patient as safe as possible?
MR. HALEY: Object to form. You may answer.
A. Yes.
Q. And do you agree that doctors and nurses caring for cancer patients should be aware of the potential for platinum hypersensitivity in patients with lung cancer?
A. Yes.
Q. Do you agree that the oncology staff should verify previous reactions and treatment-related toxicity on each clinical visit for chemo?
MR. HALEY: Object to form. You may answer.
A. Yes.
Q. And why do you believe that that's important?
A. Well, our further treatment is guided by previous reactions. That's one. Secondly, we often want any toxicities to resolve -- at least the major important ones and -- the majority of them before we continue with the

treatment or certainly take cautions or precautions to minimize the toxicity.

Q. Okay. I was provided with a CV - what have I done with it - during discovery. And I just was going to see if this is -- if there's been any changes to it. Give me just a second here. There it is. This was marked as Exhibit A to your discovery responses.

A. Sorry. Let me find my glasses. No, no material changes.

Q. Okay. All right. Thank you. So you completed a fellowship in oncology and hematology at Memorial Slone Kettering Cancer Center, in New York City. And you did that from '80 to '83; is that correct?

A. Yes, ma'am.

Q. All right. And during -- at least from the time of that fellowship training in oncology, you knew that platinum chemotherapy agents could cause a hypersensitivity reaction?

A. Yes, ma'am.

Q. Okay. And Carboplatin is one of the platinum chemotherapy agents, right?

A. Yes, it is.

Q. Do you agree that hypersensitivity to Carboplatin is rarely seen during the first course of treatment?

A. Yes.
Q. Okay. And you knew that at the time of treatment?
A. Yes, ma'am.
Q. And you knew that most allergic reactions reported to Carboplatin have occurred after the patient has received a significant number of infusions, right?
A. The incidence is likely higher after several infusions.
Q. Okay. Are you aware of statistics that have been reported regarding the risk of allergic or hypersensitivity to Carboplatin during the first five cycles?
A. It's less than 5 percent.
Q. Okay. And how about the risk of a hypersensitivity reaction to Carboplatin during Cycle 6?
A. Not specifically during Cycle 6, but upwards of those numbers, the risk is higher.
Q. And do you -- and do you have a specific --
A. About 10 to 15 percent.
Q. Have you ever seen reports where the risk was higher -- reported higher than 15 percent with Carboplatin given after Cycle 7?
A. Reports, yes. The reports have been lower than 10 percent. Also, they've been higher than 20 percent too.

Q. Okay. And what -- is there any specific literature that you would rely on for the statistics that you gave me?

A. I haven't looked up any specific literature. That's just the knowledge we accumulate over a period of time and experience as we continuously learn.

Q. All right. What would be the source of your knowledge then?

A. Multiple sources. Annual meetings of American Society of Clinical Oncology, Best of ASCO, as we call it, the review of annual literature that is published, Up-To-Date as a reference database. Journals, like Journal of Clinical Oncology, Journal of Oncology Practice, Journal of Global Oncology and some others.

Q. When is the last -- the most recent time you recall seeing any statistics with regard to the risks associated with Carboplatin therapy?

A. When is the last time I saw a statistic --

Q. Yeah. How long ago has it been?

A. I regularly read literature.

Q. Okay. And would that be the literature that you just said, all of those different journals? Do you regularly read all of those?

A. Yes.

Q. Okay. When is the last time you've attended any conference or seminar discussing hypersensitivity to Carboplatin or the platinum --

A. I could not give you any -- any specific reference to Carboplatin.

Q. How about platinum agents, in general?

A. I don't think I can tell you that either. I mean, this is -- oncology is so vast, you -- you don't necessarily attend a seminar about a single topic like this. This would be one of about a thousand-plus topics I would be reading about. So --

Q. Okay.

A. -- this is something you just acquire over a period of time.

Q. Okay. How about a conference -- and I didn't -- and -- and I apologize. I didn't mean to ask you a conference where that was the exclusive topic. But do you recall being at a conference in the past five years, say, where hypersensitivity to platinum agents was discussed?

A. I remember an ASCO annual meeting, this topic in one of the sessions I was attending.

Q. Okay.

A. Where the allergic reactions -- or toxicities of the cytotoxic drugs were discussed, in general.

Q. And you say ASCO?
A. Yeah. That's American Society of Clinical Oncology.
Q. Okay. And about when was that conference?
A. I go to it every year.
Q. Okay. So was that discussed at last year's conference, do you believe?
A. I could not give you a time, but it certainly was within the last five years.
Q. Okay.
A. I think it was about two years ago -- or could have been a year ago.
Q. Okay. Did you look at any of those -- the literature or go back to any of -- of -- documents that you have, after learning of -- of what happened to ,
did you go back to look at and review those?
A. Not specifically.
Q. Okay. Have you done any literature search with respect to hypersensitivity reactions since January 9th, when had her last reaction?
A. I may have.
Q. Okay. What --
A. Not relating to her, but I'm looking at literature --

Q. Okay.
A. -- regularly.
Q. Do you have any memory of any specific literature?
A. No, no specific literature.
Q. Is it true that at least half of all reactions to Carboplatin have been reported that are moderate to severe in nature?
A. I believe incidence is less than half --
Q. Are moderate --
A. -- not more than half.
Q. Okay. And can hypersensitivity to a reaction to Carboplatin become more severe with subsequent administrations? In other words, you can have a moderate reaction at one point, and with a subsequent administration, it would -- could become more of a severe reaction?
A. The ones I've seen have been anaphylactic reactions.
Q. Okay.
A. But like any drug, the reactions can be a varying degree.
Q. Okay. Have you known of any patients that received -- that had a reaction to Carboplatin and then received another dose of the Carboplatin and -- and have a reaction again?

A. Could you restate that?

Q. Sure. Have you known of patients -- and let's leave -- for this -- the purpose of this question, let's exclude .

A. Yes.

Q. Have you had -- have you known of patients who had a reaction to Carboplatin and then had another administration of Carboplatin?

A. I personally have not.

Q. Okay. All right. You were telling me that your -- that the knowledge you had of the reactions to Carboplatin had been anaphylactic?

A. Yes, ma'am.

Q. And that's in your experience?

A. Yes.

Q. How many anaphylactic reactions to Carboplatin are you aware of or have you been involved in?

A. I can't give you a specific number, but in the last five years, I would say I've had two or three.

Q. Other than , were there any deaths from those reactions?

A. I don't recall any.

Q. Do you recall, during your career, any other deaths from an anaphylactic reaction to Carboplatin?

A. I don't.
Q. Do you keep any logs of adverse events that occur to your patients receiving chemotherapy, whether it be --
A. No, we don't keep a separate log.
Q. Okay. And when you say "a separate," do you keep any information on that other than what you would just see in the record?
A. Only in the patient chart.
Q. All right. You don't have to report that information to any certifying body?
A. No, ma'am.
Q. Have you -- I -- I see you have some publications. Are any of those related to the platinum agents?
A. I don't think so, but I would like to look. The one publication stated here, the -- the treatment of external seminoma would involve using platinum in some of these patients. Then there is another publication which relates to treatment of testicular tumors or so-called germ cell tumors, which involve a combination of Cisplatin and a Trophocyte.
Q. And would those be applicable to the chemotherapy that received, any --
A. Not really, because she did not receive Cisplatin.
Q. Okay.

A. She received Carboplatin, which is a platinum, but certainly a different toxicity profile.

Q. Okay. Is it more or less -- Carboplatin more or less toxic than Cisplatin?

A. Depends what organ you're talking about. For example, Cisplatin has more toxicity on the kidneys, in the rear, and different nerves. Where Carboplatin is more toxic on the blood stream or -- or the blood cells, which is the bone marrow.

Q. Okay. Is there anything that you're aware of that has been shown to reduce the incidents of Carboplatin hypersensitivity?

A. People have used anti-allergy medications for minor reactions. That is Grade 2, 3 or 4 -- 2 or 3 reactions. But, certainly, for a higher grade, that is -- anaphylactic reactions are best avoided. People also carry down desensitization in situations where you must administer the Carboplatin drug. So there are ways to minimize that incidence in cases where reaction has happened and you need to use the drug.

Q. Okay. And that's what you are saying, it's best avoided -- the Carboplatin is, if there's been a previous reaction?

A. The reaction is a very general word. And let me

tell you that -- define reactions or -- well, generally, reactions have two kinds. What we call infusion reaction, anaphylactic reaction as a broad measure. Even allergic reactions can be five different levels as we -- Level 1 through Level 5 toxicity. And -- and -- and Level 1, you may not do anything while, for example, itching or -- or in Level 2, you might use some anti-allergy medications like Benadryl or a short dose of steroid. Level 4 would be, as an example, an anaphylactic reaction, where I would not want to repeat the drug unless it was an absolute must, where there was no other choice. So, clearly, a general statement cannot be made about that.

Q. Okay. All right. Let's go over then -- so I understand the -- the symptoms associated with each of these five levels, Level 1, I think you said, could be something like itching?

A. It's a minor --

Q. Yes.

A. -- symptom like itching, for example --

Q. All right.

A. -- or nausea.

Q. All right. And how about Level 2?

A. Level 2 reaction, you will have a little bit more -- like, mild wheezing or a feeling of palpitation,

some -- more of a symptom, but nothing more severe.

Q. Okay. And how about 3 then, Level 3?

A. 3 would be a step higher, which is you could have urticaria. You could have some difficulty talking because of throat edema, symptoms of that nature, which are not minor and, yet, not life-threatening.

Q. Okay.

A. Level 4 would be life-threatening, as an anaphylactic reaction. Level 5, basically, is death --

Q. Okay.

A. -- out of a reaction.

Q. Okay. Have you personally done any research on Carboplatin hypersensitivity or toxicity?

A. Personal research, no.

Q. Do you agree that a physician should inform patients receiving platinum agents of the risk of hypersensitivity?

A. Yes. That stands for all drugs, but more so for taxanes and platinums.

Q. Okay. And do you agree that physicians should inform the -- their patients of the increased risk of an adverse reaction, after they receive several infusions, that they have a higher risk?

A. We do inform patients that the -- the reactions

could happen any time, that the risk may be higher with certain drugs after multiple infusions.

Q. Okay. And do you have that conversation with regard to the platinum agents or the taxane?

A. Yes, I do.

Q. Do you think -- do you agree it's important for patients to understand that their risk of a potentially fatal reaction increases with a number of infusions they receive?

A. Yes.

Q. And do you agree that the physician should remind the patient that they are at increased risk as they have more infusions?

A. I think there's a fine line between reminding and educating. You -- when you -- if you repeat something at every visit, a patient may -- makes -- it overemphasizes certain risks also. So I'm not sure what you mean by "reminding." But the important things that the patient needs to watch for, we always remind them, because the patient may not remember. But it's not something I would remind them at every visit.

Q. Okay. Right. But is there -- at any point, would you agree that, at some point, as the patient has repeated infusions, that they should be re-educated that they are at

-- at an increased risk?

A. My personal way I do things is I repeat all toxicities one more time after the initial visit and intermittently, depending upon what they have experienced. I realize that, first visit, most patients neither grasp everything, nor retain it. I encourage them to bring a family member with them at least. Maybe more than one. Certainly, a caregiver. And I repeat these things. I often ask them to think of questions, based on our discussion, write them down on a piece of paper -- any questions that come up, bring that along, and I'll go over the treatment part one more time before we start it.

Q. Before starting it?

A. Yes.

Q. But once the chemotherapy is started, then, do you have any additional informed consent discussions with patients who are on platinum therapy?

A. We don't have a repeat informed consent, no --

Q. Okay.

A. -- unless it was a new course starting or new treatment starting. But we don't have a repeat one during the course of a treatment. Now, that is not to say that we don't talk about toxicity again. We do talk about toxicity multiple times, sometimes. It depends, partly, on the

patient, how good their understanding is and -- and, partly, on what we are doing with them, what kind of experience they have had, what kind of toxicity they have encountered. And, most importantly, some patients who don't follow instructions, they will repeat not just toxicity profile but precautions also multiple times.

Q. Okay. There's a difference between toxicity reaction and a hypersensitivity reaction --

A. Yes, there is.

Q. -- correct? All right. With respect to discussions on hypersensitivity, then, in a patient that completes one round of therapy with platinum agents, and then before starting the second -- a second cycle of chemotherapy with platinum agents, is it your custom to have another discussion with the patients about the risks of hypersensitivity?

A. Not with each cycle. Not with the second cycle. I do emphasize, in the beginning, that certain drugs like taxanes and platinums have a higher incidence of hypersensitivity.

Q. Compared to other agents?

A. Compared to other agents.

Q. But you never tell the patient that they -- that as their infusions increase -- they have multiple infusions,

that that risk goes up?

A. I would not say never. There are many times I do repeat these toxicities. So we tell patients that these reactions or toxicities can happen.

Q. Right.

A. In fact, anytime we start a new round of or a new course of treatment, we repeat and go through these toxicities.

Q. And that's what I was asking you. You heard me ask Mary Ann -- we were talking about treatment -- her initial treatment ran from June 5th, I believe, through July 28th of 2014. had eight cycles of --

A. Yes. The concurrent part of the treatment.

Q. On Round -- would you consider that Round 1, those eight treatments?

A. Yes.

Q. Okay.

A. You can give it a name, but I would call it induction therapy.

Q. All right. And then she started another set of therapy, beginning, I think it was, October 17th, sometime in October --

A. Yes.

Q. -- that continued through January 9th, right?
A. Yes.
Q. And what would you consider that round?
A. Well --
Q. Or what --
A. -- let's call it -- let's call it a consolidation therapy --
Q. Okay.
A. -- since she was responding and we were trying to consolidate on the response.
Q. Okay. So between -- as I understand it, before the induction therapy, you would have one conversation with the patient?
A. Yes.
Q. At least one. And, usually, two conversations, right?
A. Yes.
Q. And you tell them that there's an increased risk of hypersensitivity reactions, or can be, if -- with the platinum agents and the taxane compared to other chemotherapy, right?
A. Yes.
Q. And then before you would start the consolidated treatment or -- or -- what did -- I'm sorry. What did you

call the second round? Was it consolidation?

A. Consolidation round.

Q. Okay. Before starting the consolidated, do you have another discussion with the patient about the risks and benefits?

A. Yes.

Q. All right. And do you discuss the hypersensitivity --

A. Yes.

Q. -- the risk of hypersensitivity? And do you have the same conversation that you had before beginning the induction?

A. It's not the same conversation. It's similar in many ways, but it's a different treatment, different expectations and different toxicity profile. So we don't have the same conversations.

Q. Okay. But -- and -- and I'm focusing on the hypersensitivity part of the conversation rather than toxicity.

A. Uh-huh.

Q. Do you understand that? So is that part of the conversation a little different for the consolidated versus the induction therapy?

A. Yes. I inform that -- inform them that having had

this drug previously, the risk of reaction may be higher.

Q. Okay. And do you give them any specific numbers, statistics --

A. No, I don't give them specific numbers.

Q. -- as we had discussed? You don't tell them that?

A. Not a specific number, no.

Q. Okay. And do you have patients sign a consent form following each of those conversations or discussions?

A. The consent forms are signed by our nurses when they start -- when it's time to start chemotherapy. I, personally, don't do that.

Q. Okay. But you document that you've had the discussion with the patient in -- somewhere in the record?

A. I document a discussion about the drug and treatment pros and cons, benefits and risks.

Q. Okay. You agree it's important for patients to be appropriately educated about potential hypersensitivity reactions so that they can report their -- any symptoms immediately?

A. Once again, I would like to bring up the -- the difference between infusion reactions and anaphylactic reactions. I'm not sure if you're referring to one or the other, or you're just referring to them all in general.

Q. Just generally, at this point.

A. Yeah, they are -- they are told. Not just by the doctor - also by the nurses - that if they have any symptoms out of the ordinary -- and we often emphasize any, that they should report immediately, whether they are at the center or away from the center.

Q. Okay. Do you tell them -- give them any specific symptoms to be on the lookout for, or do you just say, you know, if you feel anything differently, we want to know?

A. Well, generally, it's difficulty breathing, you feel lightheaded, you have difficulty talking, swallowing, the -- the typical allergy-type of symptoms. The more common emphasis, however, is on if you have anything -- tell us immediately, anything out of ordinary. Because a lot of times, a list of symptoms are not well remembered by the patients. So we emphasize more on if you have -- if you feel anything out of ordinary, tell us immediately.

Q. Okay. Do you agree that administration of platinum and taxane agents should take place in a medical setting with all necessary resuscitation equipment available?

A. I do.

Q. And do you agree that staff should be experienced in treating hypersensitivity reactions?

A. Yes, ma'am.

Q. What should happen when a hypersensitivity reaction occurs? Does it depend on the level?

A. It does depend on the level.

Q. Okay. And you told me Level 1, you may or may not do anything differently. Just with itching or nausea, something like that, right?

A. Yes. You may address the symptom treatment.

Q. Right. Okay.

A. But that does not mean you necessarily change anything. You're going to clearly watch the patient closely if they are having any symptoms.

Q. Do you agree, with more severe reactions, that bronchodilators are indicated?

A. More severe reaction -- it -- it also depends on what reaction you're talking about. But, generally, you would use anti-allergy-type of medications like Benadryl, steroids and such.

Q. What's the appropriate dose of steroid for a Level 3 reaction, where there's some difficulty talking?

A. Generally, we use Hydrocortisone, 200 milligrams, IV push, right away, and give Benadryl or Diphenhydramine, 50 milligrams, IV, right away.

Q. Now, did you have -- have any protocols, any written protocols for the staff to follow in the case of

patients having a hypersensitivity reaction?

A. The first thing we tell them is if you notice any reaction, you stop the drug and call the provider right away, because there's always a provider on site. I prefer that the provider guides, based on the assessment, what gets done rather than a nurse taking actions, especially in terms of drug treatment.

Q. Okay. So the staff is informed to stop the drug, get the provider and then let -- the provider is going to make the --

A. Yes.

Q. -- treatment decisions?

A. Yes, ma'am.

Q. -- is that right? Okay. And that would include -- Ms. Stephenson, as a nurse practitioner, would be one of the providers --

A. Yes.

Q. -- right? Okay. Were staff provided with any education on -- other than that, or any training?

A. The nurses, when they are brought on site, they always work with a previously-trained nurse, number one. Number two, we provide them literature to read, including books and -- and resources that can improve their knowledge. And the nurse that is new - I presume you are referring to a

new nurse - is monitored by us in terms of their ability, before they become independent.

Q. Okay. What written documents did you provide to staff?

A. We provide books.

Q. Which -- which books?

A. Generally, these are books that are aimed at OCN certification, the Oncology Certified Nurse, because we encourage them to become certified as soon as they are eligible. And so these are provided early on so they can start reading and become oncologist certified.

Q. Do you purchase that through the OCN, those -- any -- any books or publications that you provide to staff?

A. I'm not sure they are purchased from OCN directly or other sources. I personally don't purchase them. Our manager does.

Q. And the manager -- I think Mary Ann told me the name.

A. Manish.

Q. And is that a relative of yours?

A. No, he's not.

Q. Oh, okay. Just has the same last name, huh.

A. Yeah.

Q. Like Nelson. Okay. Got it.

A. Or Adkins.

Q. Right. Do you recall the names of the books, the OCN literature?

A. I -- I don't particularly recall the name. I have done the selection in the past, but I just tell them to go and provide them. Sometimes the -- the first nurse will pass to the second nurse and so -- and sometimes we purchase them.

Q. Okay. Do you -- you remember

A. I do.

Q. Do you recall any discussions you had with her outside of what you have seen documented in the records?

A. I cannot tell you about any in-hall discussions, which sometimes happens if the patient or relative is passing by and they stop by and ask some questions. Besides those, most everything should be in the record.

Q. Okay. Do you have any specific memory of discussions you had with Carol about risks of her Carboplatin therapy or Taxol therapy or the combination of the two?

A. I'm not sure what you mean by "specific discussion." When she starts these agents, I do have a specific discussion with each patient and their family.

Q. Okay. All right. And sometimes people can say,

oh, I remember the -- the day I talked to Carol about that. But, typically, a lot of people say, well, no, I -- I -- this is what I say with every patient. I don't remember. I mean, you may not remember, specifically, talking to Carol, but you just say, this is a conversation I have with everyone. And that's kind of what I'm --

A. Yeah.

Q. -- asking.

A. So if you're asking me if I recall a specific conversation with her, no, I don't.

Q. Okay. So you are basing your -- your discussion with Carol on what you do with -- what your normal practice is?

A. Yes, ma'am.

Q. All right. And you've already told me about that, right?

A. I do recall some specific conversations --

Q. Okay.

A. -- with her family, but not as it relates to the --

Q. Risks.

A. -- specific discussions about the drug therapy.

Q. Okay. And do you recall who was present when you discussed with the risks of her therapy, whether

Ron --

A. No, I don't recall. As I already indicated, it is my practice to encourage them to bring a caregiver and family with them. I -- in fact, sometimes I make it a point. And if the patient comes by himself or herself the first time, I insist that they bring somebody else for the next discussion.

Q. Okay. Did you do anything to protect from the effects of her Carboplatin or Taxol therapy?

A. I'm not sure you -- if you mean like pre-medications or --

Q. Whatever it might be.

A. Yes. We provide -- we -- we -- we prescribe pre-medications for all patients receiving taxane. Therefore, she did too.

Q. Okay. And was that the -- the medication she received, the Benadryl and the Kytril and the --

A. Generally, we have three anti-allergy medications, and Kytril is not an anti-allergy, but anti-nausea.

Q. Okay.

A. But Dexamethasone, Benadryl or Diphenhydramine and Pepcid, this combination is for preventing allergy.

Q. Okay. And is there a standard dose that you have for that?

MR. HALEY: I'm sorry.

A. So, generally, it is preferred that the Dexamethasone be at least 12. Some people use 20. And we use 10 to 20 -- generally, 20. But if somebody is diabetic, sometimes we give a reduced dose. Diphenhydramine is given, 25 to 50 milligrams, depending on the tolerance. And either Pepcid or Zantac are given irrespective of either 20 or 150.

Q. So it -- assuming records indicate that she received -- her routine pre-medication was 20 milligrams of Dexamethasone, 25 milligrams of Benadryl and 20 milligrams of Pepcid, those would be the -- pretty standard doses?

A. Yes, ma'am.

Q. All right. Did -- I wanted to ask you a few questions about the corporation itself. As I understand it, you founded Ashland Bellefonte Cancer Center; is that correct?

A. Yes, ma'am. That is a dba name.

Q. Right. It's actually --

A. Radiation Therapy Services, PSC.

Q. And when did you found Radiation Therapy, or --

A. I believe it was around 1984.

Q. And are there -- is Dr. Konala currently a partner?

A. Dr. Konala is an employee and currently not a partner.
Q. Okay. Do you have any partners currently?
A. No, ma'am.
Q. Have you ever --
A. No. Now, let -- let me take that back.
Q. Okay.
A. I did have partners in the '80s, when it was founded. And they were from out of town. And they -- one at a time, they got out.
Q. All right. And who was responsible for -- do you -- strike that.
Do you make any of the decisions with regard to hiring and firing employees, or is that left to someone else?
A. It's primarily left to the manager. Sometimes he will seek my opinion, sometimes he will not.
Q. I asked Mrs. Stephenson about some of the documentation by Shana Clark. You may have recalled that. What were the circumstances that Ms. Clark left ABCC?
A. I don't recall. I don't have any recollection of any adverse circumstances, however.
Q. All right. Who is responsible for Ashland Bellefonte Cancer Center's website?

A. Our manager is.
Q. And do you approve the contents of that before it's published on the website?
A. Sometimes, he does seek opinion. I cannot tell you that we approve every bit of it.
Q. Okay. I'm not going to make -- let me just show you -- I should have -- I should have a clean copy, but I wrote what you said on the -- the top of it. But let me just show the -- the website that I found currently. Do you know if that was in existence during Carol's treatment?
A. I cannot answer that.
Q. All right. Did you approve the substance of this information that I have handed you?
A. I do recall seeing it.
Q. Uh-huh.
A. Whether I approved it for the website, I don't recall.
Q. Okay. Is there anything on there that -- as you look at that today, that you disagree with on the website?
A. No, I don't.
Q. I'll tell you what I'll do. I'll mark that as Exhibit 2 so we know what we're talking about, and I'll substitute it with a clean copy, if that's okay. I'll -- I'll show you what it is.

MR. HALEY: Can I see it?

MS. NELSON: Uh-huh.

(Exhibit No. 2 was marked for identification purposes.)

Q. Does the cancer center have any -- keep personnel files for each of its employees?

A. I believe there are personnel files. I'm not sure -- what do you mean by "keep personnel files"?

Q. Well, I would -- are those maintained for a period of time after the employee leaves their employment with ABCC?

A. I would think so, but I can't specifically answer to that.

Q. Is it fair to say the manager probably would have knowledge of that more?

A. Yes, ma'am.

Q. All right. Are you familiar with what are known as desensitization protocols?

A. Desensitization protocols?

Q. Yes.

A. Yes.

Q. Okay. And what is that? How would you describe a desensitization protocol?

A. In cases where a -- a drug is felt to be

absolutely necessary for a patient, and the patient has allergies, you go through a protocol to try to desensitize that patient. And that, generally, is referred to as desensitization.

Q. Okay. And is desensitization generally done by gradual re-introduction of small amounts of the agent they've reacted to?

A. Yes, ma'am.

Q. Did you have a desensitization protocol back in 2014 and '15?

A. No.

Q. Why not?

A. Because in those cases where I needed to use a drug, I personally put those patients in the hospital or -- in some cases, in ICU before I re-challenge them.

Q. And is that with any level of allergic reaction or only if -- once it gets to --

A. Only --

Q. -- a specific level?

A. -- in cases where it was felt to be a significant reaction. Because, once again, desensitization can be undertaken only under -- in certain circumstances where a drug has to be absolutely used and the patient has a significant reaction to it. Otherwise, if I can find an

alternative drug, I will change that.

Q. All right. Were you out of town -- were you away from the practice on December 26th, 2014?

A. I don't know if I was out of town, but I did look at the date. It was a Friday, when I'm generally at my other office.

Q. And which office is that, on Fridays?

A. In Prestonsburg.

Q. So, generally, you practice in Prestonsburg on Fridays; is that correct?

A. Yes, ma'am.

Q. When did you learn of -- when did you learn that had been transported from the cancer center to the hospital? That occurred on December 26th.

A. I don't recall learning about it until this filing of the lawsuit. Sorry, I take that back. Until she had the reaction on the 9th. And I was talking to the family on 9th, evening, as well as, I believe, the 10th, and one of them mentioned that there was a reaction of some sort two weeks prior to this. That was the first I learned of it.

Q. Okay. You had not discussed that with Mrs. Stephenson, then, before the 9th?

A. I have absolutely no recollection.

Q. And that's something you think you would have

remembered?
A. I believe I would have remembered because at the time the family mentioned it, I recall thinking, why did I not know about it, if she had a reaction.
Q. Okay. And then once you talked to the family on the 9th, did you then, at some point, go back and look at that record of the 26th?
A. I believe I did.
Q. Okay. And what were your thoughts, then, as far as the severity -- based on what you saw in the records, what the severity of Carol's reaction had been on the 26th?
A. Well, I looked at that and I looked at the emergency room records, and I did not think it was an anaphylactic reaction.
Q. All right. Okay. Did you assign a certain level to that reaction on the 26th based on the documentation you were seeing?
A. I'm not sure it was a Carboplatin reaction at all.
Q. Okay. Could you rule out a Carboplatin reaction?
A. Looking at the total picture, I felt that it was not a Carboplatin reaction.
Q. Why?
A. Number of things. One, the symptoms were limited to respiratory symptoms, which she had had chronically. She

has multiple comorbidities. There were none of the typical allergic or anaphylactic reactions you see -- you see. She didn't have a sudden onset. Her blood pressure did not drop. She did not have any trouble swallowing. She did not have any trouble talking. She did not have any sudden onset of severe wheezing. I -- I did not find any mention of any of these symptoms other than some shortness of breath and coughing. And I noticed that these two symptoms have been mentioned multiple times in her chart. So I could not find any evidence, including the emergency room record, that she had an allergic reaction to Carboplatin.

Q. Okay. Did you interview any of the staff of -- of -- your employees after learning of the reaction on the 9th, who had been involved in the -- with Carol on the 26th?

A. I remember mentioning it to Mary Ann, about the 9th. I -- I think she may have even called me that evening, that she had an anaphylactic reaction, and -- and that's why I went to the hospital that evening, even though it was not my day to make rounds. But when it comes to the 26th, I don't recall discussing that reaction. I mean, I might have. I -- I -- I just don't have any recollection.

Q. Okay.

A. And -- and I say that, also, because on the 10th, when the family mentioned it, after the fact, I -- I -- I

recall thinking, gee, if she had a reaction, how come I didn't know about it.

Q. Did you ever -- the records -- excuse me, the records indicate that Laura Hall documented the events that occurred in the cancer center on December 26th. Do you believe you've ever spoken to Laura Hall about what happened on the 26th of December?

A. No, I didn't.

Q. Have you ever seen an EMS record?

A. No, ma'am.

MS. NELSON: Let's take a little break.

MR. HALEY: Sure.

THE VIDEOGRAPHER: We are going off record.

(WHEREUPON, a break was taken in the proceedings.)

(Exhibit No. 3 was marked for identification purposes.)

THE VIDEOGRAPHER: We are back on record. The time is 4:15 p.m.

BY MS. NELSON:

Q. Dr. Jain, I'm going to hand you what I've marked as Exhibit 3. That's a copy of the death certificate.

A. Yes, ma'am.

Q. You signed the death certificate on January 16th, 20 --
A. I did.
Q. -- 15? That's your signature here --
A. Yes, ma'am.
Q. -- as -- as certifying the cause of death?
A. Yes, it is.
Q. All right. And you -- is this your handwriting for the immediate and --
A. It is.
Q. -- other conditions contributing to death?
A. Yes.
Q. Okay. And you have immediate cause of death for was cardiopulmonary arrest, correct?
A. Yes, ma'am.
Q. And that was caused by anaphylactic reaction to Carboplatin drug?
A. Yes, ma'am.
Q. All right. Do you stand by the -- those causes of death that you certified on January 16, 2015?
A. Yes. All of these are to the best of my knowledge.
Q. Okay. So you -- as of today, you still believe that had an anaphylactic reaction to her

Carboplatin on January the 9th, correct?

A. Yes, ma'am.

Q. Okay. What is your understanding of the symptoms that displayed before actually collapsed?

A. The -- and I -- as -- as you know, I was present during your (sic) previous testimony -- or --

Q. During Mary Ann's, right?

A. Yes. And I heard that was talking, was short of breath, was what she described as very anxious, breathing was rapid, and suddenly collapsed.

Q. Okay.

A. That is what I would call an anaphylactic reaction, because it meets the criteria. It's unexpected. It's explosive. It's serious.

Q. Okay. Other than the fact that quit breathing on January 9th and continued to breathe on December 26th, what's your understanding of the difference in her symptoms --

MR. HALEY: Object --

Q. -- before stopped breathing?

MR. HALEY: Object to form. You may answer.

A. The -- my knowledge is based on primarily the

records available. On December 26th, she had some coughing and shortness of air. There was no other symptom reported, and it resolved fairly quickly. She went to -- or she was sent to the emergency room right away. Looking at the emergency room records, they treated her like acute exacerbation of the COPD. I don't recall if they gave her any diuretic or not, and her symptoms improved and she was sent home. The severity of symptoms -- or the onset was nowhere close to what happened on the 9th of January. One could not call it explosive. One could not call it extremely severe. There was no angioedema type of symptoms. There was no hypertension. And the degree of the symptoms were dramatically different.

Q. Is it your understanding that -- that there was -- that -- on December 26th, that she was receiving Carboplatin at the onset of -- of her shortness of breath on that date?

A. That's my understanding.

Q. Okay. Do you know how much Carboplatin she received before she started complaining of those symptoms?

A. No, I don't.

Q. And it's true, hypothetically, a patient could have a less severe reaction -- hypersensitivity reaction on one date, and then with a subsequent dose, have a more

severe reaction?

A. It's possible. That's possible with any drug. But in cases of anaphylactic reaction, that is often the first reaction.

Q. Certainly, not always, right?

A. There's no always in medicine.

Q. Right. Are you aware of any literature that reports what percent of patients who have a hypersensitivity reaction to Carboplatin have an anaphylactic reaction the first time?

A. The majority of them.

Q. Okay.

A. I can --

Q. Can you cite me any particular literature?

A. Not offhand, but I can certainly look up and try to find for you.

Q. Okay. And if you do, will you provide that to Mr. --

A. And my own personal experience of more than 30 years is that any time I've seen Carboplatin reaction, it has been a first anaphylactic-like reaction.

Q. Okay. If you find that literature, will you provide that to Mr. Haley so he can give me a copy of whatever you find?

A. Sure.

Q. All right. You would agree -- and that -- the -- the purpose of the desensitization -- desensitization protocols is to -- to react to a non-anaphylactic hypersensitivity reaction?

A. Yes. There's anti-reaction drugs on board.

Q. Right. And -- and that would be -- desensitization protocols would apply to patients who didn't have an anaphylactic reaction necessarily in order to prevent a severe --

A. It can be used for patients who had anaphylactic reaction also.

Q. Okay.

A. And it is --

Q. Either way --

A. -- used for those patients -- also, a critical issue there is how important it is to re-use the drug during the alternative options occurs. So one would use desensitization in those limited number of patients.

Q. Let me ask it this way. Assuming that the -- that reaction -- the symptoms experienced on December 26th that -- that sent to the hospital, assuming those were due to Carboplatin, what would the standard of care require with her next chemotherapy

treatment?

MR. HALEY: Object to form. You may answer.

A. Let me understand it. You are asking me to assume that the symptoms she had on December 26th were due to an allergic reaction to Carboplatin?

Q. Yes.

A. If I was to assume that, I would re-evaluate her, re-inform her, propose to change her drug or stop her drug. Cr if I felt necessary to proceed, either talk about desensitization or adding more anti-allergic drugs and watching her in a more monitored setting.

Q. You would -- you would put her in the hospital to monitor her for her next treatment if she chose to proceed with that drug?

A. That would be the general procedure if I felt that it was truly a severe reaction to a given drug.

Q. So is it your opinion that it's a coincidence that had a reaction while receiving Carboplatin on December 26th, and then on her very next visit, had an anaphylactic reaction to Carboplatin?

MR. HALEY: Object to form.

A. Well, I don't believe that she had a reaction to Carboplatin on December 26th. Everything that I can put

together suggests to me that it was -- it was either fluid or exacerbation of her COPD, or both. And it's also been added that she was generally quite anxious. So it could have been a combination of all of these three.

Q. So it is your testimony that it's -- it's just a coincidence that had this reaction during Carboplatin therapy on the 26th? And then the next --

A. Coincidence implies -- implies that those were only two times she had any respiratory problems. Because has had respiratory problems multiple times. In fact, on a chronic basis. So I'm not sure I can associate these two dates and call them a coincidence.

Q. Okay. Certainly, we can agree that these are the only two dates that was sent to the emergency room due to respiratory problems or any kind of symptoms during her therapy?

A. I don't know that. has been to the emergency room other times. In fact, I think there was one that you brought up a little while ago where she received magnesium in the emergency room. And I suspect that she went for some other reason, because we don't send patients to the emergency room for magnesium infusion.

Q. Okay. But my question was: Are -- and I'll ask it a little differently. Are you aware of any other visits

to the cancer treatment center -- to your treatment center other than December 26th and January 9th, where was sent to the hospital from the treatment center?

A. I'm not aware of it, but I have not reviewed her records in detail to specifically and categorically say that.

Q. Okay. All right. Do you agree that none of other comorbidities were significant contributing factors to her death?

MR. HALEY: Object to form.

A. I do think there were many other factors contributed, including her comorbidities.

Q. Okay. Let's take those one -- one at a time. We can agree, first of all, you didn't include any of the other comorbidities on death certificate, right?

A. I did include lung cancer as a comorbidity.

Q. Okay. And we'll talk -- and we'll get into more about progression of her lung cancer. But as far as her obesity, was -- do you agree her obesity was not a significant contributing factor to her death?

A. Well, all of -- of her comorbidities are somewhat related to each other. As an example, she had arthrosclerotic heart disease or coronary artery disease, congestive heart failure, COPD and obesity. Let's just take

these four. These are related to each other in some form or fashion.

Q. How did that contribute to anaphylaxis?

A. No, I didn't say it contributed to anaphylaxis.

Q. Well, that's what caused death, right?

A. Well, the -- had anaphylaxis reaction, but had been somebody in a better general health, it's considerable, though, that would have come out of it better, because she was devoid from anaphylactic reaction. She had CPR. She had cardiac rhythm. She had blood pressure in the emergency room. Now, there was some damage that could have been caused by the reaction, but we all know -- at least we, in medicine, know that people who have adverse reaction, if their general health is better, they have a much better chance of recovery than if they have multiple comorbidities.

Q. Well, isn't it true -- I mean, patients in otherwise perfect health can have an anaphylactic reaction and die from it?

A. Yes, that can happen.

Q. Sure.

A. But the odds are better, of somebody without comorbidities, to recover. And I have had other people who

had Carboplatin anaphylactic reaction and recovered. These are not as sick people. But, as a general rule, you come out of an acute event much better if you have fewer comorbidities. The greater the number of comorbidities, the poorer the outcome is going to be.

Q. Is the resuscitation important to the outcome?

A. Certainly part of it.

Q. All right. You have not seen any monitoring data for the resuscitation that was performed on have you?

A. I didn't see any specific data, no, ma'am. I do know that Dr. Konala was there. Mary Ann was there. I've personally seen Mary Ann do resuscitation, and she's highly experienced and a very good trained nurse in resuscitating, since I do recall a patient had a reaction. I don't recall the drug. I saw her resuscitate him. I was there, and she was perfect. Dr. Konala is very well-trained. I believe he's also ACLS trained. And I had no reason to doubt anything less than optimum from either of them.

Q. Okay. Well, that may be true, but isn't it important to have monitoring equipment to know whether your resuscitation is being effective?

A. Yes.

Q. Okay. And that wasn't present at -- during

resuscitation at ABCC, on January 9th, was it?

A. The most important equipment are two. One is oxygen saturation because, eventually, you're oxygenating the vital organs. And -- and, secondly, is AED, because you need to know when to shock. And if you have AED, you -- you -- your -- your electrode conversion that's needed is satisfied.

Q. Well, it's important to know what rhythm -- heart rhythm a patient has so you can give the appropriate medication apart from defibrillation, correct?

A. So if -- if you have a pulse, then the heart becomes unimportant, number one. If you don't have a pulse, the heart can be two types, one which requires electrical heart and one which does not require electrical shock. If you -- if it doesn't require electrical shock, you continue the CPR. And if it requires electrical shocks -- shock, then AED senses it.

Q. Okay. Is it your opinion that -- that your staff followed the appropriate ACLS protocol in their resuscitation of on January 9th?

A. I didn't look at the resuscitation in detail. I cannot testify to that. I would think that it -- as I said, they are both highly trained and experienced. I have no doubt, but I cannot testify to that day. Neither I was

there, nor, I have any detailed description.

Q. Okay. What was -- what was
pulse -- or oxygen saturation while she was in your office? Do you know that?

A. No, I don't have any details of that day's numbers.

Q. Right. Or on December 26th?

A. No, ma'am.

Q. And you had said before that was not hypotensive on the 26th, before she was taken to the emergency room. Is that what you said?

A. Yes, that is my understanding.

Q. All right. What was blood pressure? What's your understanding as to what blood pressure was after she started having this reaction on 20 -- the 26th?

A. I didn't see any documentation of dropping blood pressure. And the general -- anytime a patient on chemotherapy is having any new symptoms, the first thing the nurses do is take their vital signs.

Q. Okay. Where do they record those?

A. I cannot tell you that they have recorded. They are supposed to record in the chart. Having said that, in this specific case, I cannot tell you that they did.

Q. So as far as factual data, you do not have any

data with regard to blood pressure on December 26th, other than the blood pressure that was taken before treatment was started; is that fair?

A. I can't answer that. I -- I can look at the note and I --

Q. Sure.

A. -- tell you if it is there or not. But I do know that they always take the vital signs, because the reactions, unfortunately, of some degree, happen not uncommonly, and -- and they always come back with -- with the vital signs.

Q. Well -- and I appreciate that. But other than taking your word for it and -- I mean, you weren't there the 26th --

A. I wasn't.

Q. -- or the 9th, right?

A. That's true.

Q. So you can't talk about your personal knowledge of what happened those days, right?

A. Not in this specific case.

Q. And there isn't any other data that you're aware of that would give us that information?

A. That and the testimony that I heard today.

Q. I'm -- I'm specifically talking about the vital

signs. Right?

A. Yes, ma'am.

Q. Okay. Would there be any other place -- handwritten notes, any other place you would expect to see documentation for vital signs or any other data besides what we see in this electronic record?

A. The nurse's used to make notes -- and there was a note section. There was an MAR. There was --

Q. Okay.

A. -- the -- the provider section and medical assistant section. So those are the places that I know that would record, if they recorded.

Q. Okay. All right.

THE WITNESS: Should I keep this?

MS. NELSON: Yeah. Just put it right here. Thank you.

Let me show you what I have marked as Exhibit 1. If you want to take -- these come straight from the records, but they are not in order. They are just ones I'm going to ask him about.

Q. Let me ask you, first of all: Who is Teresa Cantigos, C-A-N-T-I-G-O-S?

A. She's an employee of many years who acts as a medical assistant and does -- does some other work also at

the office.

Q. All right. Do you consider her the person most knowledgeable about your medical records system?

A. One of the persons, perhaps.

Q. Okay. All right. And as I understand it from Mrs. Stephenson's testimony, you had a MedSym - I think that was the name of it - electronic record system at the time of treatment?

A. Yes, ma'am. MedSym was the company's name. The actual product was called Hem/Onc Pro.

Q. Oh, wow. Okay. Hem/Onc. So for Hematology Oncology Pro?

A. Yeah. That was the actual product name.

Q. Okay.

A. And MedSym, Inc., owned that product.

Q. I see. And then since, I understand it, here recently, you changed systems?

A. Yes, ma'am.

Q. Which system do you have now?

A. We have gone with Electors (spelled phonetically) Mosaic System.

Q. And why did you make the change?

A. Because MedSym, Inc., made a decision not to continue to support this product.

Q. Okay. On Exhibit 1, the -- the top record, which is Bates No. 216, is an authorization for treatment.

A. Yes, ma'am.

Q. And it's dated June 5th, 2014, correct?

A. Yes.

Q. And the top signature there on the bottom is And is that your signature underneath?

A. No, ma'am.

Q. Whose signature is that?

A. It's an RN by the name of, I believe, Jessica Dove, D-O-V-E.

Q. Were you present for the discussion that Ms. Dove had -- or -- or -- or this consent?

A. On that day, I don't recall being there. I had met prior to that, but I cannot tell you that -- or I'm not even sure, prior to that, I had met her and discussed the treatment. But I am not sure that it was -- that day, I was present or not.

Q. Okay. Do you have any memory of the date that you initially discussed the risks of treatment with ? Would it have been the first treatment?

A. I remember the first time I met her.

Q. And I believe the records indicate that was -- I believe it was May 15, 2014. And then do you have a -- a --

any memory or documentation as to when you had any other conversation with about treatment, about the risks?

A. So I was actually the second oncologist -- that was the second visit with me. It had already been discussed by another oncologist who was covering for me during my absence, I believe, during her hospitalization. I'm not sure where that he met -- meet her, in the hospital or office. But I think I was the second oncologist who saw her.

Q. Okay. And who was the first oncologist?

A. I'm trying to recall his name.

Q. Dr. --

A. It -- it should be in my first note.

Q. I was trying to see if it was in here.

MR. HALEY: May I give him the page number?

MS. NELSON: Yeah.

Q. The first visit note I have is May 15, 2014.

A. Okay.

Q. Is that your understanding?

MR. HALEY: Dr. Jain --

A. That may be -- is there an exhibit number I can look at?

MR. HALEY: You -- Dr. Jain, you may

want to look at Page 214.

A. 214. Okay. That's on 3rd of June. Yes. My -- on that day, I mentioned his name was Dr. Batra, B-A-T-R-A. And I start out, internal history, with -- that first sentence, "The patient was seen by Dr. Batra."

Q. And where was the patient seen by Dr. Batra, in the hospital?

A. I believe so, because there's no office note. I -- I believe he was -- he saw her in the hospital.

Q. Is Dr. Batra an employee or --

A. No. He was a locum physician who was covering for me while I was away. He is also American Oncologist.

Q. Okay. He covers. Does he cover at the cancer center for outpatient treatment?

A. Yes, ma'am.

Q. Why wouldn't Dr. Konala or one of -- be covering for you? Was he there in June of -- or June of 2014?

A. I'm not sure if Dr. Konala was there. I believe he joined July 2014.

Q. Okay. All right. For what period of time had Dr. Batra worked with you?

A. A few weeks is all I can tell you. As I said, he was not a regular employee, but worked as a locum physician. I don't remember the exact duration, but he was not -- he

was not a long-term employee.

Q. Okay. So we were discussing your first -- your discussion with about the risks of treatment. And I -- do you see anything in -- in your first note referencing that Dr. Batra had any conversations with ?

A. Yes. In fact, came to start treatment. And since she had not had treatment, that was why I saw her. I -- I -- I refer to that in the first paragraph, saying, " is ready to start treatment." And I had talked to him about it, since I often got a sign-out from him about patients I had not seen before. He had discussed the treatment with the patient. I do not know whether any family was present there or not. Those details are not written.

Q. Okay. And you're referring -- when you're talking about the first paragraph, are you referring to this record on Page 214?

A. Yes, ma'am.

Q. All right. And you have written in this note, right? This is your note?

A. Yes, it is.

Q. Okay. And you say under -- under "Interval history: The patient returns today to discuss pain control as well as starting therapy." Right?

A. Yes.

Q. Is there any note in here that -- that Dr. Batra wrote?

A. I don't see it here. I -- I do believe he saw it in the hospital. So there should be a note in the hospital records.

Q. Where were you at the time that Dr. Batra first saw Carol?

A. I believe I was out -- out of town, but I don't have a recollection of exactly where.

Q. Did you leave for some extended period of time, do you think, in the Spring or Summer of 2014?

A. I have not left for more than two to three weeks in many, many years. So I'm not sure what you mean by "extended period," but it certainly wasn't months.

Q. Right. Okay. In order to get a locum tennam, someone like Dr. Batra, I would assume you wouldn't do that if you were just going to be gone for a --

A. Oh, I absolutely would --

Q. You would?

A. -- if -- we need 24/7 coverage, because we repeatedly stress on the patient to call for any issues at any time of the day or night or weekend.

Q. So is it your testimony, then, that Dr. Batra had the initial conversations with Carol about the risks of her

treatment?

A. He did have conversations about the treatment and pros and cons. I don't have the details, but I went ahead and had that conversation myself.

Q. Okay. That's what I want. So you did not assume, then, that Dr. Batra had covered the risks and benefits of her treatment, right?

A. I -- I -- I know that he covered it, but I don't know the extent to which he covered it.

Q. Okay. And have you ever seen documentation of what Dr. Batra specifically spoke to Carol about?

A. No, I have not seen the detailed documentation. Only from talking to the patient that first visit --

Q. Okay.

A. -- when they said we have talked to him, we met him, we are ready to start treatment.

Q. Okay. And then once you did that, once you came back and -- and you see at the follow-up visit, 6-3, you're the person that made the decision on what therapy she would receive?

A. Yes.

Q. Would Dr. Batra have known the specific agents that you intended to use in therapy?

A. Likely, the protocol we started on was a

rather commonly-used protocol. I cannot testify as to if he -- he discussed exactly the same agents or not.

Q. Okay.

A. But it is one of the more commonly used protocols.

Q. All right. Where -- if I wanted to get in touch with Dr. Batra, where would we find him, do you know?

A. He was from Florida. I don't have his contact information right this minute but, certainly, it can be found.

Q. Okay. Was there some service that you went through to get him to cover you?

A. I believe so. My manager arranged the coverage, so I cannot tell you --

Q. Okay.

A. -- exactly who it is, but I do think he went through a service.

Q. Okay. All right. So when is the first time you discussed with the risks and benefits of her treatment?

A. On the 3rd of June --

Q. All right. And --

A. -- of 2014.

Q. -- and we've already discussed, I think, earlier, what you believe you said to her, what you typically say,

right?

A. Yes, ma'am.

Q. All right. Now, is there anything that you've seen that signed with regard to consent to treatment or acknowledging the discussion of the risks of her treatment after your conversation on the 3rd?

A. Only the -- the authorization for treatment on the 5th of June.

Q. All right. And then have you seen any documentation that you had any other discussions with about the risks and benefits of her treatment?

A. Any other documentation, as to, after the first one?

Q. Yes.

A. I don't think I saw again until after a few days. I -- I will have to refer to the notes to know when I saw her next.

Q. Okay. And, please, feel free to look at whatever you need in the complete set of records, or whatever you --

A. These records are not in order. So I'm not sure when I saw next.

Q. All right. Okay. Well, maybe we can go through it. We'll try to go through it here as best we can and see if we see anything --

A. Yes, ma'am.
Q. -- see the next time that you were involved in her treatment.
A. Yes, ma'am.
Q. Okay. You agree the first treatment was actually June 5th, right?
A. I'll, again, have to refer to -- I'm not sure -- it was a visit with the nurses, or was it a treatment --
Q. It was a treatment. I believe the -- the medication record indicates that treatment was started. And I can give you the page number on that to look.
A. Yes, ma'am.
Q. Page 306, it appears. If you'll look at that just to confirm.
A. Yes.
Q. Okay. Does it appear that that's the first date that received any of her chemotherapy?
A. Yes, ma'am.
Q. All right. Now, if you'll look at the second page on Exhibit 1 that I gave you there, it's a record Bates stamped No. 307. And this is also --
A. Yes.
Q. Okay. And it -- under "notes," these are notes dated June 5th, 2014.

A. Yes.
Q. Okay. And Jessica Dove has written, "One hour into Taxol patient had itching and hives. Taxol was stopped and Dr. Jain notified."
A. Yes.
Q. First of all, I read that correctly?
A. Yes, ma'am.
Q. Do you have any memory of those events?
A. No specific memory.
Q. It says, "Extra Benadryl given, per Dr. Jain's order, and treatment resumed and completed without further incident," correct?
A. Yes, ma'am.
Q. Is that -- did you consider that was having a reaction to the Taxol? That her itching and hives were from the Taxol she was receiving?
A. I thought it was a minor reaction.
Q. Okay. Would that be a -- one of the -- Level 1 reaction?
A. 1 or bordering 2.
Q. Okay. Now, are you aware of any other time, besides June 5th, when had this type of reaction, had any reaction during her Taxol treatment?
A. I don't have any recollection. There was a note

for -- another date, but as -- as you already pointed out, there was some question whether it was the same note --

Q. Yeah.

A. -- flowing into another date or separate. But I don't have any recollection.

Q. Okay. And if you look here on -- on the exhibit, there's a record -- that same record we talked about earlier on June 3rd, it's No. 232.

A. Yeah. This one is --

Q. Keep -- yeah. Go back --

A. -- 307. Yes.

Q. Okay. Does it -- and you heard Mrs. Stephenson and I talking about this record before. But do you agree that it appears that somehow, Ms. Clark's note from June the 13th was repeated here under the heading of July 3rd?

A. It does seem like that only because it says here for Taxol, Carbo Cycle 1, Day 1." And if it is Cycle 1, Day 1, that -- then it was on June 5th. The only reason I can't be certain is it is -- it is documented by a different nurse, while the previous one was documented by another nurse so --

Q. No. I'll tell you --

A. -- I have a little confusion here.

Q. If you look in the exhibit --

A. Yes, ma'am.

Q. -- I've got them together. They are back to back. So if you look at -- get -- one more page. Okay. That should be Page No. 236 --

A. Yes.

Q. -- right?

A. Yes, ma'am.

Q. And that's the note of June 13th, right?

A. Yes.

Q. And that was documented by Shana Clark, right?

A. Yes, ma'am.

Q. And then if you look at the next page, which is the note for July 3rd, isn't that --

A. So there is a --

Q. -- very similar?

A. Well, it is and it is not. I'm -- I'm a little lost myself, because in one place, it says "Cycle 2, Day 1," while another place, it says "Cycle 1, Day 1." So I'm not sure. Let me -- no. I'm sorry. So it does talk about Cycle 2, Day 1. It seems like a different date. I think there were two separate -- different nurse, different date, different reaction and different cycle.

Q. Who is the different nurse?

A. Shana Clark versus Jessica Dove.

Q. On -- can we agree on 236 and 232, those are both documented by Shana Clark?
A. I was looking at 307. The first one you mentioned was on 307, which was Jessica Dove.
Q. Right. That was the consent --
A. No.
Q. -- right?
A. I'm talking about the reaction note.
Q. Okay. But that -- that's dated June 5th, right?
A. Yes, ma'am.
Q. Okay.
MR. HALEY: I -- I think he's comparing June 13 and June 5th. You're asking about July 3rd and June --
MS. NELSON: June --
MR. HALEY: -- 13th.
MS. NELSON: That's right.
MR. HALEY: Is that right?
MS. NELSON: Yeah.
THE WITNESS: Could you tell me the -- which number --
MS. NELSON: That's why I keep referring to the pages numbers.
THE WITNESS: I'm looking at 236 and

207. Is there -- you want me to look at 232?

MS. NELSON: Yes.

THE WITNESS: Okay. I see July 3rd.

A. And -- and that -- you're right. I think that one seems similar to June 13th.

Q. Okay. I guess my question is really: Do you know whether or not -- that was treated for or had more than one reaction of itching and hives while she was receiving Taxol?

A. This implies that she had two episodes of it on the 5th and 13th.

Q. Of June, right?

A. Yes, ma'am.

Q. And are you aware of any different treatment that was given to on the 13th for an -- an alleged reaction?

A. I'll have to look up and see if she has documented anything. I -- I don't -- certainly don't have any recollection.

Q. Well, let me -- let me do it this way.

A. Okay.

Q. I want to do it faster. I'm looking at the -- the MAR.

A. Yes.

Q. I don't see any extra Benadryl given that date, or any other extra meds. Assuming that to be true --

A. Yeah.

Q. -- is there any other way we can know whether these notes that Ms. Clark wrote on the 13th of June and the -- July the 3rd, whether those are accurate with respect to the dates that had itching and hives?

A. I'm a little lost. Could you repeat that?

Q. Yeah. Well, I see the note -- I guess I -- I'll summarize. I see the note by Ms. Dove on June the 5th.

A. Yes.

Q. -- and she talks about the reaction on that first treatment, right?

A. Itching, yes, uh-huh.

Q. And she said extra Benadryl was given. And I see the extra Benadryl on the chart, on the MAR, right?

A. Yes, ma'am.

Q. Assuming that had a reaction the very next visit --

A. Yes, ma'am.

Q. -- on her second cycle, on June 13th --

A. Yes.

Q. -- would you expect that she would have received some type of treatment for it again?

A. I suspect did receive extra Benadryl, but it's not documented, and I have not looked through it. If it's not documented, I cannot make any statement --

Q. Okay.

A. -- about it.

Q. All right. Assuming that had two reactions of itching and hives to her Taxol with the first and second treatments, would that put her at any increased risk of having reactions to any of her other agents?

A. No, not necessarily.

Q. Of -- of having a more severe reaction to the Taxol at some point?

A. No.

Q. All right. Is there a governing agency for Ashland Bellefonte Cancer Center?

A. I'm not sure what you mean by "governing" --

Q. Well --

A. -- "agency."

Q. Are there agencies or organizations that certify infusion centers?

A. Doctor's offices are not required to receive any certification --

Q. Okay.

A. -- since it is under the care of a physician.

Q. All right. And whether you're required to do that or not, is -- was there any governing body for Ashland?
A. I don't believe there is any.
Q. Okay. Are there any particular standards that you're familiar with for administering chemotherapy agents?
A. Are there any standards required? I'm -- I'm not --
Q. You told me -- well, let me -- let me ask it a different way. You told me that your regimen for treatment was a fairly standard protocol, right?
A. Yes, ma'am.
Q. Where would I find such a protocol?
A. Most any oncology textbook or oncology resource.
Q. And in this -- these protocols for the treatment, are there standardized infusion rates and --
A. There's a range --
Q. All right.
A. -- of rates. It depends partly on the protocol you are following. As an example, when somebody has an itching reaction, we would stop, give them some Benadryl and resume at a little slower rate and watch them closely. And most of the time, they are fine. So there is no protocol that would tell you that this is how you do it. This is what an experience with a minor reaction would tell you,

that if you're going to resume, you watch them closely. Now, you would find enough reference that slowing down the drug infusion may help. That's sort of a suggestion in textbooks or other references that you may look it up.

Q. And I guess, really, what I was asking is: On your treatment plan for I see, for instance, Carboplatin, the -- she initially received 238 milligrams, correct?

A. That -- which -- which date you are referring to? I --

Q. In her initial cycle --

A. Okay.

Q. -- the induction therapy that she received.

A. Yes, uh-huh.

Q. And that was -- says that the treatment -- the duration was to give that over 60 minutes.

A. Yes, ma'am.

Q. All right. So where did you get that information? How do you know how long is the appropriate time to --

A. So --

Q. -- to be given?

A. -- Carboplatin is given multiple different ways. The usual duration of infusion can range from 50 to 60 minutes. Having said that, there are protocols where it is

24 hours. So a drug can be given multiple different ways, which depends upon what setting you are using it in, what dose you are using, and -- and -- and a particular protocol, how it was administered. Because most of these drug doses come from studies that have been performed on -- in -- in clinical trials.

Q. Okay. And how would your staff know how to infuse -- at the rate to infuse these drugs that they are giving?

A. So -- two things. Until two or three years ago, we had a book which defined every drug.

Q. Okay.

A. When -- a few years ago, a number of new drugs started coming out. We encouraged nurses to come ask us. And, as I said, we would -- we always have a nurse who is well-trained, along with the second nurse. So it's not that a nurse just picks it out of a hat. She would look at the drug insert, talk to a provider, talk to the -- the more experienced nurse, but never be in doubt.

Q. Okay. But my -- you did not have anything in writing for your nurses saying I want you to give Carboplatin or -- at -- at this certain rate?

A. I could not tell you. Generally, when I wrote orders, I generally say that, but I could not tell you that I specifically did that in this case or not.

Q. Okay.

A. I -- I know that now, we define everything in this -- new electronic health records, we obtain their -- we put everything, in detail. In the previous one, more often, they put the free-hand writing type of thing. So I could not answer with a -- define that or not.

Q. Okay. Do you recall the names of the specific books you had in your office, you said, up until a couple of -- or a few years ago, that gave you the calculations?

A. We had a hand-typed protocol book which listed all of the protocols we used and detailed instruction on how to administer a particular drug in a given protocol.

Q. Was that book being used in 2014?

A. I don't think so. I don't have a specific recollection, what date we phased it out.

Q. All right. And why did you phase it out?

A. Partly, because the number of new drugs had come around that were not in the protocol. Secondly, we've learned over the years that different oncologists, as we add, do things slightly differently, because everything is not totally done the same way. There is a range of applicable -- applicable ways to do things, and it did not meet everybody's requirement. As an example, if you administer Cisplatin, you can give two liters of IV fluids

before you give Cisplatin and two liters afterwards. Some people will use one liter. So there is a -- there is no extremely firm way to do a given protocol. There is some flexibility. Partly, depends on experience. Partly, the institution you came from. And, therefore, we did not want to have a very rigidly written protocol available there.

Q. Okay. Who was your most experienced nurse during Carol's treatment?

A. Jessica Dove.

Q. And is she still with you?

A. No, she's not.

Q. When did she leave?

A. I don't have a date. But more than a year, I believe.

Q. Okay. And do you know where she had went?

A. She had worked full-time for a while. Then she was working part-time for some time. And, more recently, she has not worked. With us, that is.

Q. Okay. Do you know if she's employed some place else locally?

A. I know she was employed at Cabell Huntington, but I don't know where she works currently.

Q. All right. Okay. On the last page of Exhibit 1 --

A. Yes, ma'am.
Q. -- there to your left is the -- they call it -- called it Carboplatin AUC Calculator.
A. Yes, ma'am.
Q. All right. And this is Page No. 178 of records, correct?
A. Yes.
Q. Is this something that you get off of the -- online, you can access this document?
A. Yes.
Q. Is this a calculation that you do?
A. Many times, we do. I -- generally, our -- our system is that two people should do the calculation. One person does it. Then the second person should verify. Can be a second RN or a provider or somebody.
Q. Okay. Do you know, in -- in case, whether you were involved in this calculation?
A. I could not tell you.
Q. All right. And am I correct, you just basically go down and plug in the numbers -- the information that the computer asks you to -- to give them, the weight --
A. Yes.
Q. -- the height, the target AUC, right?
A. Yes.

Q. Okay. And on this one, it's circled 134 milligrams, right?
A. That's what I see here.
Q. There isn't -- is there a date on this that I'm not seeing?
A. No, I don't see a date on here.
Q. Okay. All right. Did you ever have any conversations with about the information that she documented on her initial intake information, where she said that she did not want any of her family members, other than , to receive information about medical condition?
A. I saw the documentation.
Q. Have -- did you ever discuss that with ?
A. No, I don't recall discussing that.
Q. Okay. Do you recall ever having any discussions with about any of family members --
A. No, ma'am.
Q. -- or relationships? In other words --
A. No. I, personally, have not discussed any relationship issues.
Q. Okay. All right.
A. I did notice that the -- the -- the documentation that was in the chart, as well as her initial intake

information, where she noted that she was separated and that she did not want anybody else notified.

Q. Yeah. But you don't have any personal knowledge about why she documented those things?

A. No, ma'am.

Q. And you haven't discussed that with anyone else on your staff?

A. No, I did not.

Q. All right. Who -- where would we find your original file for ?

A. What do you mean by "original file"?

Q. Well, we requested a complete copy of your medical records. Are those -- is there a paper file maintained, or was this something that was printed out from your electronic record?

A. This was printed out from electronic records.

Q. And would there be any other documentation kept in the -- in your office or kept about your treatment of other than what's in the electronic record?

A. I doubt it, because we were pretty much completely electronic at this point.

Q. So, in other words, so I understand, for instance, when the patient in this case, , would fill out the new patient information, then is that then scanned into the --

A. Yes, ma'am.
Q. -- computer? Okay. All right. That one note that we -- I hate to go back to it, but that we talked about earlier, on Exhibit 1, the July 3rd record.
A. Could you tell me the page number?
Q. Well, I could if I find what I did with my copy of the records.
MS. NELSON: Ah-ha. Thank you.
Q. It is Page No. 232.
A. Yes, ma'am.
Q. It says, "Patient signed consent after verbal and written education was provided." Are you -- have you seen a consent signed on July 3rd?
A. No. I just see the one on July -- sorry, June 5th.
Q. Right. Okay. All right. I just wanted to make sure I'm not missing anything.
Q. Are you able to look -- to go through the actual treatment records and tell me when you were involved with treatment and when you -- you -- when you weren't?
A. I planned the treatment.
Q. Right. I -- anytime anybody had any questions, they would ask me. Although, I cannot tell you that that's documented. I -- when she had her PET scan done, and

Dr. Konala saw her for the first time, I saw her again two weeks later, at which point, we had talked about the second round of treatment.

Q. Hold on one second and let me -- let me see if I can find that record.

MR. HALEY: Which record are you looking for, Debbie?

MS. NELSON: The one where Dr. Konala talked about the PET scan.

Q. Okay. I did find it. If you look at -- look at -- Page 78, I think, is Dr. Konala's discussion about the PET scan; is that right?

A. Yes, ma'am.

Q. All right. And that -- that was the visit September 16th?

A. Yes.

Q. Okay. And then the next record that I have is for a visit September 24th. And that's Page 79.

A. Yes. That was not a visit with me.

Q. Okay. All right. What are you looking at that would tell you if -- if it's a visit with you?

A. So, first of all, if I did the visit, it would be -- at the bottom, my name would be there.

Q. All right.

A. Secondly, I always document impression and plans. And, thirdly, I always dictated my notes.

Q. So you didn't use the electronic system for your notes?

A. No. I will dictate, which would then get scanned in.

Q. Okay. So by looking at the records, are you able to tell me when you had a discussion -- another discussion with ?

A. Yes. It was -- I believe it was in early October. There was a note here. Since these are not chronological, sometimes --

MR. HALEY: May -- may I give him a page number?

MS. NELSON: Yes, please.

MR. HALEY: 198.

THE WITNESS: 198.

A. Yeah, that's October the 2nd.

Q. Okay. And if we looked at Page 199 as well?

A. Yes, ma'am.

Q. All right. You're talking -- under "impression," you're talking about that had Stage 3 disease?

A. Yes.

Q. And "She has had," you say, "concurrent chemo and

radiation therapy with fair response to it. Some residual disease remains." Correct?

A. Yes, ma'am.

Q. And that was the reason for giving a second round of therapy?

A. Yes.

Q. All right. Okay. Is that fairly typical, that a patient with the type of lung cancer that had doesn't respond completely to the induction round of therapy?

A. Many patients don't. And her response, I must say, was less than optimal.

Q. And why is that?

A. Only because if you read the actual scan and look at the measurements of the masses that she had, they went down only some -- very minor. Or -- or -- or it -- it wasn't even 50 percent. So it was a -- it was a slight reduction. There was no growth. But, optimally, we would want a complete termination. That's optimal, but everybody doesn't get that.

Q. Sure. Okay. Was there any evidence of distant metastesis as of January 9th, 2015?

A. Not that we're aware of.

Q. Okay. And do you recall the discussion with family members in the hospital, when they made you

aware that one of the nurses had indicated that
had metastises to her brain?
A. Yes, I do.
Q. Okay. And that was, I think, as Mrs. Stephenson said, a miscommunication from the nurse, right?
A. It was a miscommunication. And I recall talking to them at length. Multiple family members present. Based on that information, they wanted her taken off the life support right then, because they were like if already got it in the brain, why are we doing this? Stop it right away. And I recall telling them, that's not the case. Let's give some time to see if she recovers. They -- it took some time to convince them it was not in the brain, because they had received the information, processed it and came to believe that it was, in fact, in the brain.
Q. Okay. At some point, obviously, the decision was made to disconnect -- to remove her from life support, right?
A. Yes, ma'am.
Q. Were you part of that decision?
A. No, I was not. The family made the decision. The issue came up -- well, first, they wanted to discontinue it because they thought it was in the brain.
Q. Right.

A. Once I emphasized it that, no, it was not in the brain - let's allow her a little time - then some family members said never wanted to be on life support. Therefore, we should discontinue that. Then the issue came, did have brain-dead? The neurologist that first saw her, Dr. Bajorek, had suggested that, she seems to have had some anoxic brain damage, but how much recovery happens, we should allow about 72 hours to see if she shows some recovery. So I was hoping they would allow that time to see what recovery she shows. But then over the weekend, there was a different neurologist, another locum physician who, according to the family, told them that chances were rather slim, and they wanted to remove from life support.

I -- I believe I saw them the next day, the 10th, and I did suggest that, look, recovery can happen. It may take a few days. We don't know how much recovery she would have and if she would have any. But we won't know until we support and see how things go. But I believe the family chose to discontinue the life support. I'm not sure it was based on feedback from other physicians or it was based on own wishes not to be on life support. I don't know the details of how the decision was made.

Q. The decision was made when you were not present?

I mean, you weren't involved in that ultimate decision?
A. I -- it was not with my consent, no.
Q. Okay. Did you ever speak to any of the neurologists or any of the other physicians --
A. I --
Q. -- that were involved in that decision?
A. -- I believe I spoke to the lady who was covering that weekend. I believe she was a locum physician.
Q. And you -- what do you recall about that conversation?
A. She basically felt that the chances were not good for a recovery.
Q. Okay. Do you have any criticisms of family for disconnecting her or discontinuing her life support.
A. It's a choice patient and her loved ones make time to time. I don't allow my own feelings to come in there. I -- I find my role to explain, give them the choices, tell them the pros and cons and let them make the decision.
Q. Okay. And, of course, you would agree, you know, if there's another physician painting a much bleaker picture than what you are, that they -- it would be reasonable for the to rely on that information as well?
A. How they came to a decision, I don't know.

Q. Okay. All right. Okay. What is your understanding as to the cause of any anoxic brain damage?

A. Clearly, it was the cardiopulmonary arrest that she had --

Q. Yeah.

A. -- even though resuscitation was instituted immediately. But, as I said earlier, when you have multiple comorbidities, your likelihood of coming out of an acute episode like that is lower than if you are not -- if you don't have comorbidities. The reason is very simple. If you have COPD and lung cancer and congestive heart failure, your resuscitation is not going to be as effective since you already have compromise of cardiopulmonary system. Your oxygen diffusion is already poorer. Your circulation is already compromised. So that is why -- the earlier question of, did anything else contribute to it? That's how it contributes.

Q. Okay. Would her diabetes have contributed to -- to the resuscitation attempts?

A. I can't say directly. However, indirectly, diabetics have higher incidents of cardiac disease.

Q. Okay. Do you know the extent of coronary artery disease at the time of her death?

A. I know that had a history of congestive heart

failure, and that implies a more diffused cardiac problem.

Q. Okay. Is it your understanding that the congestive heart failure was associated with the events surrounding the heart attack that had back in the early -- around -- was it -- 2001, I think, or '99. But in that time period.

A. I -- I don't have those details, as to how many times she had it. And there was the suggestion of December 26th event, that she had congestive heart failure. And if, indeed, that was the case, then it seems like an extra volume of 250 cc's for magnesium precipitated -- that would imply rather poor cardiac function.

Q. All right. You wouldn't have expected to have been discharged from the hospital on the 26th if they had found that was in congestive heart failure, would you?

A. Oh, one can. If it is a mild congestive heart failure, you give some diuretic to improve. You can be discharged.

Q. Okay. Have you seen any specific documentation indicating that the diagnosis of congestive heart failure had been made on December 26th?

A. I didn't see any documentation of any specific diagnoses. I just saw that was given some treatment.

Q. When Mrs. -- when came into the Ashland Bellefonte Cancer Center on January 9th, 2015, was in congestive heart failure?

A. I don't know. I didn't see her. I didn't see any documentation of that.

Q. All right. Fair to say you don't know when -- was most recently diagnosed with congestive heart failure prior to death?

A. December 26th could be one of those episodes, as has been talked about. But other than that, I don't know the specific date she had congestive heart failure.

Q. Do you know what normal baseline arterial blood gas studies would have shown?

A. No, but -- the fact that was on oxygen therapy, clearly, she would be hypoxic without the oxygen. I think you told me towards the beginning of the deposition when we first started, that you had had some conversations with family at different times. And I know we've talked about --

A. When -- yeah, I met her originally, the family was there -- there were several -- several family members. I could not name them.

Q. Okay.

A. And time to time, yes, from -- from whatever

recollection I have, there was always family with her.
Q. Okay. Do you --
A. Or practically always.
Q. Excuse me. Do you recall anyone that you think would have been a family member with other than or ?
A. Well, in the hospital, there were a number of family members. There were probably close to 10 people, because it was a room full of them.
Q. Okay. But in the clinic, do you -- or the cancer center, do you recall meeting with anyone other than --
A. I -- I could not tell you who all were there.
Q. And you have told me about the conversations you had about the life support with family and about the information they received erroneously from the nurse about the brain cancer.
A. Yes, ma'am.
Q. Are there any other significant or -- you know, conversations that stand out in your mind that you had with any of family members, either in the hospital or at the cancer center, that we haven't already discussed?
A. No, I don't.
Q. I think I asked you this, but after this many hours, I -- I just want to make sure. So I'll -- assuming

that reactions on December the 26th had been due to a possible Carboplatin -- possibly due to her Carboplatin, I think you told me you would do things -- you would have expected things to have been done differently on the 9th.

A. I said if I felt that she had a serious reaction to Carboplatin, I would have met , discussed options, including changing therapy or stopping.

Q. But only with a serious, not --

A. Not for a minor reaction.

Q. Or a moderate?

A. As I said, there are five levels.

Q. Right.

A. So what -- what do you call moderate? To me minor would be 1 and 2.

Q. Okay. So moderate would be 3 if anaphylactic is 4?

A. 2 would be moderate. To me, 4 and 5 would be severe, but that's my own way of looking at it.

Q. Okay.

A. In fact, since you can't really categorize everything to my moderate/severe. Therefore, the numbers...

Q. What -- in the records, I asked Mrs. Stephenson about these -- the documentation at the bottom -- at the end

of the notes for the visits, where it says -- like, there's a note, "claim accounting." Do you know what that refers to?

A. Claim accounting?

Q. Yes.

A. I -- I don't know what it refers to. It certainly sounds like a billing --

Q. Okay. And --

A. -- related issue.

Q. -- HCFA claim?

A. I believe that's a billing term which stands for Healthcare Financing Administration. There is a HCFA form of some sort. I've heard that term before.

Q. Okay. How about the PQRS?

A. PQRS is a Physician Quality Reporting System maybe. But it's -- it's a -- a -- PQRS is a quality reporting system to Medicare.

Q. Okay. Did you have --

A. I'm not giving you the exact translation. It's close enough.

Q. Okay. Were you required to report adverse events to -- to any quality reporting system or Medicare?

A. No, ma'am.

Q. And you didn't voluntarily do that?

A. There is no system of reporting.
Q. I know what I wanted to ask you before I -- give me a second to find it here. I thought I had two copies, but I didn't bring it. But let me show you this record from January 9th. It's not Bates stamped, but I'll just represent to you that that was part of the initial records I received from the cancer center after we -- maybe shortly before we filed suit. And I think the only difference is there's some -- you see the writing on the bottom right-hand side.
A. Yes, ma'am. I see some writing admitted.
Q. Right. Who -- who -- do you recognize that writing?
A. I don't. I can only say it's not mine --
Q. Okay.
A. -- but I don't recognize it.
MR. HALEY: May I see it?
MS. NELSON: Yeah. I'll mark this as Exhibit 4 just so we know, later on, what record we're talking about.
(Exhibit No. 4 was marked for identification purposes.)
Q. Let me just ask you: With respect to the handwriting, do you -- are you able to interpret that note?

MR. HALEY: You mean interpret whose it is or --

MS. NELSON: No.

MR. HALEY: I'm sorry.

MS. NELSON: What it's -- what it's saying.

A. It refers to, in my opinion -- and there is a bit of presumption here. But it says -- it says, "admitted," and gives two different date sets. I suspect it refers to two hospitalizations, starting December 29th, 2014 through December 31st, 2014. And then the second one, January 9, 2015 through January 11, 2015. Then there's a notation made, "allergic reaction." I'm not sure what it refers to, whether it refers to the second hospitalization or both, or what exactly does it -- it says nothing.

Q. Okay. Fair enough, because that was really my question. I was trying to figure out what that allergic reaction note refers to. We'll have to find that out from somebody else, I think.

I think it was Kendall Huff that -- that -- and you weren't here for his testimony last week. But I think it was his testimony that he thought that the emergency room doctor, on December 26th, had sent something back to the cancer center indicating that -- that the order

should be changed with respect to her chemotherapy agents. Are you aware of any documentation that came from the emergency room to Ashland Bellefonte Cancer Center with regard to the treatment that -- that received on December 26th?

A. I have never seen anything in writing or otherwise. I never got a call from the emergency room physician. If they think that there's an allergic reaction and treatment should be changed, they would call the doctor and tell them verbally, also in addition to documenting. But there was absolutely zero communication, as far as I'm concerned.

Q. Okay. All right. And I assume if there was any such record, that would have been incorporated in -- into electronic record?

A. I would think so.

Q. Okay. Are you going to -- well, let me -- let me ask you this way first. During the times that you were involved in treatment, did you ever discuss prognosis with her?

A. Yes.

Q. Okay. Tell me about those discussions.

A. I have told them the applicable prognosis to Stage 3 lung cancer in a person with multiple comorbidities.

The things I would tell them -- that, generally, it's not a curable cancer, that the treatments are aimed at prolonging life and possibly improving the quality of life, that it would add a few months of additional benefit in terms of survival -- surviving the cancer, on an average. And these three facts are conveyed in more detail. If they ask more questions, I answer them. A lot of times, people want to know, am I going to be cured? The general answer in Stage 3 is unlikely. But there's a small chance that you may be a long-term survivor. I do not use the word "cure" in these settings.

Q. Okay. Based on your experience with all the patients you've treated with non-small cell lung cancer --

A. Yes, ma'am.

Q. -- and you treated them with agents similar to -- to the types of agents that you treated Carol's cancer with, what is the range of -- of survival from a Stage 3?

A. In general, the non-small cell lung cancer in Stage 3 has a median survival of about one year. Median would mean 50 percent would do. Less than a year, 50 percent more. Having said that, the reported median survival range is 10 to 17 months or so. Of course, every history has a slightly different median survival, but that's an -- approximately, reasonable number. About -- and these

are people with a little less comorbidities than did. So her prognosis may be a little worse. The two year survival is usually -- without the same number of comorbidities, about 25 to 30 percent -- or 20 to 30. A five-year survival is usually about 10 percent. Once again, these numbers are for a large number of patients, most of whom don't have this many comorbidities.

Q. Okay. And I assumed, when you're giving me this -- this -- statistics, that's with treatment?

A. That's with treatment.

Q. Okay.

A. Because most people get treated. These are numbers with some sort of treatment. I'm -- I'm sure with some patients, they might have elected no treatment. But most oncologists -- practically everybody recommends therapy in Stage 3 of non-small cell type.

Q. Okay. Would this include -- the statistics you gave me, does that apply just to people treated for non-lung cell Stage 3 that are treated with a combination of radiation and Carboplatin and Taxol, or is this all treatment?

A. These apply to Stage 3 cancer with concurrent chemo/radiation. Now, chemotherapy choice can be slightly different from physician to physician. Carboplatin Taxol is

one choice. Some people use a Cisplatin-based regimen. But in case, Cisplatin was not a good choice because of the amount of fluids required to prevent kidney toxicity. You have to give at least 2 liters additional to what she was receiving. Sometimes more. So you throw them into congestive heart failure. So some people have used Cisplatin. Some people have used Cisplatin Trophocyte. But the most common -- more common used is Carboplatin Taxol.

Q. Okay. And what studies are you using to -- for the statistics that you provided?

A. Oh, multiple studies. This is a common cancer. And there are lots of studies out there. The survival data -- probably one of the most authoritative sources would be so-called SEER data, S-E-E-R, which comes from a very large population-based study. I believe it was done in the Connecticut area. I'm not totally certain. But the SEER data is a huge reference database. I think it's called Surveillance and Epidemiology Reporting --

Q. Okay.

A. -- something.

Q. I should be able to find that, I would think, by looking up SEER --

A. Oh.

Q. -- right?

A. Very common --
Q. Okay.
A. -- yeah.
Q. All right. We talked about -- let me ask you this. Do you believe that any other healthcare providers bear any responsibility for anaphylactic reaction for her death?
A. I'm not sure anybody bears responsibility for anaphylactic reaction of any kind. By nature, anaphylactic reactions are unexpected and -- and acute and -- and very severe.
Q. Okay. An anaphylactic reaction would not necessarily be a surprise in a patient who had a less severe reaction to the same drug?
A. Anaphylactic reaction is always a surprise --
THE WITNESS: I'm sorry.
MR. HALEY: I was just going to object to the form. That was fine.
Q. Okay.
A. -- by nature, by definition.
Q. Okay. One last thing. Let me find this. Are you familiar with the American Society of Clinical Oncology Administration Safety Standards for --
A. Yes, ma'am.

Q. -- for chemotherapy? Do you adhere to those standards?

A. We do try to.

Q. Okay. All right. Let me take a real fast peek, and I think -- no. One other thing. You told me about a couple of lawsuits that you had had where you gave depositions. Were -- have you ever been involved and named as a defendant in any other lawsuit?

A. I believe there was a -- I'm not sure if I was named a defendant. There was one against the company where -- I was not, personally, named, to the best of my recollection.

Q. And that would have, again, been in either Boyd or Greenup County?

A. I believe so.

MS. NELSON: Okay. I think that's all I have.

MR. HALEY: We'll read.

THE VIDEOGRAPHER: This concludes the deposition. The time is 5:51 p.m.

(The video deposition of Dr. Kirti Jain concluded at the approximate hour of 5:51 p.m.)

* * * * * * * * * *

COMMONWEALTH OF KENTUCKY

COUNTY OF BOYD, to wit:

I, BRANDY D. MOWERY, Shorthand Reporter and Notary Public in and for the Commonwealth, duly commissioned and qualified, do hereby certify that the foregoing transcript of testimony was taken by me and before me at the time and place for the purpose specified in the caption hereof.

I FURTHER CERTIFY that the foregoing transcript of said testimony is a true and correct transcript of the testimony given by the said witness at the time and place specified herein.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney of counsel, or financially interested directly or indirectly in this action. Witness chose not to waive signature.

My Commission expires April 28, 2018.

Brandy D. Mowery

BRANDY D. MOWERY

Court Reporter/Notary Public