COMMONWEALTH OF KENTUCKY
BOYD CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 13-CI-00506

CRYSTAL COMPTON, AS ADMINISTRATRIX OF THE ESTATE OF [redacted],

Plaintiff,

ORIGINAL

FILED
LINDA KAY BAKER
JAN 13 2014
BOYD CIRCUIT/DISTRICT COURT
BY

Vs.

ASHLAND BELLEFONTE CANCER CENTER, AN ASSUMED NAME CORPORATION OF RADIATION THERAPY SERVICE, P.S.C., AND S. SONI, J. SONI & K. JAIN, P.S.C.; HIGHLANDS CANCER CENTER, AN ASSUMED NAME CORPORATION OF KIRTI K. JAIN, M.D., P.S.C., KIRTI JAIN, M.D., DONNIE R. STACY, M.D.; PRECISION RADIATION ONCOLOGY, P.S.C.,

Defendants.

# VIDEO DEPOSITION OF KIRTI JAIN, M.D.

---

The video deposition of Kirti Jain, M.D., took place at the approximate hour of 8:41 a.m., on November 13, 2013, at Williams, Hall & Latherow, 1505 Carter Avenue, Suite 200, Ashland, Kentucky.

---

ADKINS & ASSOCIATES REPORTING
1 Robin Lane
Barboursville, West Virginia 25504
(304) 733-1036

BRANDY D. MOWERY, CR

Appearances:

Anita Parsons Johnson, Esq.
Gary C. Johnson, P.S.C.
110 Caroline Avenue
Pikeville, Kentucky 41501

Tyler S. Thompson, Esq.
Liz L. Shepherd
Dolt, Thompson, Shepherd & Kinney, P.S.C.
13800 Lake Point Circle
Louisville, Kentucky 40223

Kenneth Williams, Jr., Esq.
Williams, Hall & Latherow
1505 Carter Avenue, Suite 200
Post Office Box 2008
Ashland, Kentucky 41105

Daniel G. Brown, Esq.
Darby & Gazak, P.S.C.
3220 Office Pointe Place, Suite 200
Louisville, Kentucky 40220

Also present: Jim Damron, Videographer

INDEX


| WITNESS | EXAMINATION | PAGE NO. |
|---|---|---|
| Kirti Jain, M.D. | Mr. Thompson | 03 |

| EXHIBITS | PAGE NO. |
|---|---|
| None | |

| OBJECTIONS | PAGE NO. |
|---|---|
| Mr. Williams | 53 |
| Mr. Brown | 55 |
| Mr. Williams | 67 |

Reporter's Certification - 72

THE VIDEOGRAPHER: This is the video deposition of Dr. Kirti Jain, Civil Action 13-CI-00506, captioned Crystal Compton, as administratrix of the Estate of [redacted] a [redacted] v. Ashland Bellefonte Cancer Center, et al., Commonwealth of Kentucky, Boyd Circuit Court, Division I.

We're beginning at 8:41 a.m., Wednesday, the 13th day of November 2013, at the offices of Williams, Hall & Latherow, in Ashland, Kentucky. The court reporter is Brandy Mowery. I'm the videographer, Jim Damron. Will counsel, please, state their appearances. Then the court reporter will, please, swear in the witness.

MR. THOMPSON: Tyler Thompson, on behalf of [redacted]

MR. WILLIAMS: Ken Williams, on behalf of the Ashland Bellefonte Cancer Center and Dr. Kirti Jain.

MR. BROWN: Dan Brown, on behalf of Dr. Stacey.

KIRTI JAIN, M.D., called as a witness, first being duly sworn by the Court Reporter/Notary Public, testified as follows, to wit:

EXAMINATION

BY MR. THOMPSON:

Q. Would you state your full name, please.

A. Kirti Jain.

Q. And would you tell us your occupation?

A. I am an internist, medical oncologist and hematologist.

Q. And it's my understanding that [redacted] was a patient under your care in the past?

A. I personally only saw her one time in consultation about July of 2011 or so for a blood disorder.

Q. And then [redacted] ultimately wound up under the care of Dr. Stacy; is that correct?

A. So I understand.

Q. I'm going to ask you some questions about what you know about, sort of, the operation of the cancer centers and what went on, on October 26th, 2011, when [redacted] was a patient at the center. If I ask you anything that's not clear or needs to be rephrased or repeated, just tell me and I'll -- I'll try to make it more clear. Any time you need to take a break --

A. Sure.

Q. -- just say, Mr. Thompson, can we take a break and that will be fine too.

A. Thank you.

Q. First of all, it's my understanding that you were not present on October 26th, 2011, when [redacted] died;

is that correct?

A. From what I understand, [redacted] did not die that day, but [redacted] had a -- an event at Ashland Bellefonte Cancer Center. I was not there that day.

Q. You're -- you're -- you're correct. I -- that's when the incident occurred. [redacted] passed away later?

A. That is right.

Q. Yeah. Okay. When did you first hear about the incident?

A. I heard the same day -- same evening, rather.

Q. And who did you hear about it from?

A. I believe it was Manish, our manager, although I cannot be absolutely certain. But my recollection is the manager told me that there was an event.

Q. Okay. And where were you that day, do you recall?

A. I was in our Prestonsburg office.

Q. And I -- I need to ask you some questions about your background and training. It's my understanding that you are the owner and operator of the Ashland Bellefonte Cancer Center; is that correct?

A. Yes, sir.

Q. All right. You also are the owner and operator of the Highland Cancer Center?

A. That is true.

Q. All right. Are there any other corporations that you are an owner or operator of?

A. There -- there is -- we are involved in management of a radiation oncology center, in Logan, West Virginia, where we are part owners. I don't know the name of the corporation exactly right now, which has the part ownership along with the hospital. But we do have part ownership.

Q. Any others?

A. No. That is it currently. There is a company called Oncology Services, Inc., in West Virginia but, currently, it does not own any cancer center.

Q. Are there any other corporations that aren't affiliated with the cancer center that you are a part owner of?

A. There are some non-functioning corporations. I could not give you the names, but we have had a corporation on and off, which was designed to either own a building or something of that nature that I'm owner of. I -- I -- I could not give you an exact listing of those, but those are all that are functioning corporations in the US.

Q. And I've been provided a copy of your CV. And I'll try to sort of get through it a little bit quickly. But it looks to me like you were educated at the All India Institute of Medical Sciences, in New Dehli, India. And

prior to that, you had one year at the University of Delhi Udaipur, in India; is that correct?

A. That is correct. So University of Udaipur is where I did part of my bachelor's degree, which is a requirement before admission to medical school. And India Institute of Medical Sciences is where I did M.D. -equivalent degree called MBBS.

Q. All right. And then it says there was a rotating internship at the All India Institute of Medical Science, in New Delhi, India.

A. That's correct.

Q. All right. And then you came to New Jersey and did a -- a medical internship for one year at the New Jersey Medical Center?

A. It was the Jersey City Medical Center.

Q. All right. And what was it that precipitated the move to New Jersey?

A. I had -- after the M.D. degree, I had intended to pursue my studies in US, and that is why I came to New Jersey.

Q. Okay. And then you did a residency. Was this a three-year residency at Wayne State University affiliated hospitals, in Detroit?

A. So it was a part of three-year residency. The

first year was done at Jersey City Medical Center. And the remaining two years were done at Wayne State University. All three years combined together make the three-year residency required for internal medicine Board eligibility.

Q. Okay. And why did you leave New Jersey Medical Center to go to Detroit, Michigan?

A. We felt that the Wayne State University offered a better program.

Q. All right. And then it -- you did three years of a fellowship in medical oncology/hematology at Slone Kettering Cancer Center, in New York?

A. That is true. The full name is Memorial Slone Kettering Cancer Center.

Q. Yes. And what was -- what -- my -- usually, I see fellowships that are a year long, not three years long. And I'm curious why this was three years long?

A. Actually, I did a fellowship in two different subjects. That is medical oncology and hematology. The medical oncology itself is two years long, fellowship. That is very standard. There is no one-year-long fellowship. And hematology also is a two-year-long fellowship. But practically every program in the country offers a three-year fellowship in the two programs together because there is a significance overlap between hematology and medical

oncology.

Q. Okay. And then you wound up coming to Ashland in 19 -- Ashland, Kentucky, in 1983 and have been here since then; is that correct?

A. That is -- well, in fact, I came to -- I lived in Huntington for several years, while I practiced in Huntington and Ashland. And then I had moved to Ashland in early '90s.

Q. Okay. And are you Board certified?

A. I am Board certified, yes.

Q. Which Board certifies -- by which Board, I guess is what I'm trying to ask, are you certified?

A. American Board of Internal Medicine gives certification in all internal medicine subspecialty as well as internal medicine itself. And medical oncology and hematology are subspecialties of internal medicine. So the same Board certifies in all three separately. That is internal medicine, hematology and medical oncology.

Q. Okay. And is that a -- do you know what program the American Board of Internal Medicine is affiliated with? Is that like a --

A. It's an independent Board. It is not affiliated with any entity that I'm aware of.

Q. Okay. You know, I've seen Boards that are -- what

is there --

MS. SHEPHERD: ABMS.

Q. ABMS or -- do you know if it's affiliated -- affiliated with --

A. To the best of my knowledge, it is not. It is an independent and the only Board I know in internal medicine. There might be some Boards that are not commonly accepted ones, but I'm not aware that American Board of Internal Medicine is affiliated with any other such Boards.

Q. Okay. And why did you take the Canadian Board of internal medicine? I'm curious.

A. There was a time I was just -- you know, when you're young, you just want to prove yourself, you can do this Board and that Board. I always thought Canadian Board of Internal Medicine was more comprehensive and -- and had a -- a part of it was a clinical exam, which American Boards don't have. American Boards have written exams, but not clinical exams. That is, you are given a patient or two and then they -- you get to evaluate the -- the actual patients or sometimes they can be actors. And then you are examined on them too.

So the Canadian -- Canadian Board consist of a written exam. If you pass it, you get to take clinical exam. If you pass it, then you get the Board certification.

And it was my feeling that clinical exams are important. So I went ahead and took it just for my own sake.

Q. Okay. In -- in your attempts to become Board certified by these various specialties, did you -- have you ever failed any of the tests?

A. No, I have never failed one.

Q. Okay. And for the American Board certification, internal medicine, was that a written and an oral exam?

A. No. All American Board exams are written. There is no oral exam involved.

Q. All right. And did you -- did you take those exams or did you take the Canadian exam and then sort of get reciprocity?

A. No. I took all four exams independently.

Q. Did you ever practice in Canada?

A. No.

Q. No. And do you currently live in Ashland, Kentucky?

A. I do.

Q. And what is your address?

A. 243 Bellefonte Circle, Ashland, Kentucky 41101. To be correct, the town is actually Russell, but it carries a postal address of Ashland.

Q. All right. Do you have any relatives over the age

of 18 who reside in Ashland, Kentucky, or --

A. Yes.

Q. -- the surrounding area? And can you tell me who they are?

A. My wife.

Q. Okay. Any other relatives?

A. No.

Q. No.

A. Let me -- just -- just to be complete, my middle child lives in Huntington, West Virginia.

Q. Okay.

A. I am not sure that would be neighborhood of Ashland or not, but it's about 20 miles.

Q. All right. In which hospitals do you currently have staff privileges at?

A. Currently, I have active privileges in the Ashland hospitals, which is Our Lady of Bellefonte Hospital, at King's Daughters Medical Center, and I have concerting privilege at Hyland Regional Medical Center, in Prestonsburg, Kentucky, as well as Paul B. Hall Medical Center, in Paintsville, Kentucky.

Q. Have you ever sat on any of the committees of these hospitals, responsible for setting up policies and procedures at the hospitals?

A. I have.

Q. Okay. And which -- which hospitals were you on the committee for setting up policies and procedures?

A. Mostly at Our Lady of Bellefonte Hospital. But I have been involved in some committees at other hospitals also.

Q. Okay. It's my understanding that in October of 2011, the Ashland Bellefonte Cancer Center was not accredited but was in the process of trying to obtain accreditation; is that correct?

A. We were in the process of trying to obtain accreditation for the diagnostic facilities like CT scans and PET scan.

Q. Okay. Was there any accreditation to the non-diagnostic aspect of the facilities?

A. At that point, there was not any process under way for the non-diagnostic part of it.

Q. Okay. Has there been an accreditation received since then for either aspect?

A. The PET CT. And prior to that, a stand-alone PET scan were accredited.

Q. And what about the rest of the facility, has it received any type of accreditation?

A. The rest of the facility has not applied for any

accreditation.

Q. Okay. And if it applied for accreditation, what entity would it apply to?

A. There are several entities that it can apply to. I have not looked into, fully, as to what all entities. I do know American College of Radiology is one. Another one would be -- I think there is an acronym ACCR. I'm not exactly sure what it stands for, but it's something to do with radiation oncology. There is no one facility -- or, sorry, there is no one accredited embody that would accredit the whole place because they are different specialties. But the -- the bodies like American College of Radiology can accredit the radiation oncology part of it. They cannot accredit the -- the medical oncology part of it. So I'm not aware of any one body that would accredit the whole center in one go.

Q. All right. You said that on October 26th, 2011, it was in the evening that you received a call from, I think, Manish, the office manager; is that correct?

A. Yes.

Q. What did he tell you when he called you to report this incident?

A. He told me that there was an incident where a patient had a reaction to the contrast agent, that the

doctors were there, and they resuscitated her and sent [redacted] to Our Lady of Bellefonte Hospital.

Q. Did he give you any more information other than that?

A. At that point, that's all the information he gave me.

Q. Okay. When was your next conversation about the event that occurred in the facility?

A. I don't have an exact recollection, but I believe it was the next day.

Q. And who did you speak with the next day?

A. I spoke with Manish to try to get a little more. He really didn't have any more information. And I spoke to Dr. Hayek briefly. I'm not sure it was the very next day or within the next few days, but I recall speaking to him briefly. He basically said the same thing that, yes, there was an event and that he was involved in resuscitation. I asked him, generally, how did it go? Were there any problems? He said, no, that [redacted] was resuscitated and sent to the emergency room.

Q. So they did not, at that time, advise you of any problems with equipment or not having available equipment?

A. No, he did not.

Q. Didn't tell you the Ambu bag was dry-rotted and

couldn't be used?

A. He did not.

Q. Okay. Did they tell you that the tubing for giving medication didn't work correctly and -- and that the Epi was spilled out into the floor?

A. He did not say anything to that effect. In fact, he said everything went well.

Q. Did you ever talk to Dr. Stacy about what occurred during the --

A. I did not --

Q. -- event?

A. -- speak to him.

Q. Up until the present, today, have you ever spoken to Dr. Stacy about what happened?

A. I did not. From what I understood, Dr. Hayek carried out the code or the resuscitation effort and, therefore, I spoke to him.

Q. Did you talk to any of the nurses that were present about what happened during the code and resuscitation?

A. I did not speak to any of the nurses. I did talk to Vanessa. She was talking to Manish, I think, the next day. I'm not certain of the exact date. And I was there. I did not ask her, specifically, any questions, but Manish

basically told her to write down what happened and submit it to him or to the chart. And I -- I did listen to part of what she had to say to him.

Q. And what do you recall her saying about what occurred?

A. She basically said the same thing, that she went through the -- the pre-checks for contrast administration, that she administered the contrast -- contrast, as [redacted] did not say [redacted] had any allergies. In fact, she mentioned that the patient had had contrast previously and that [redacted] had not had any problem. She went ahead, administered the contrast. [redacted] -- she was doing well. She finished the CT scan and, at that point, when she went in, patient complained of being short of breath. Then she set her up and was asking her questions like if she has had shortness of breath or if [redacted] used oxygen at home or such, at which point [redacted] started having some blacking out or lack of responsiveness when she called the doctor right away. She apparently called -- Jeanie was there, who called Dr. Stacy.

Q. What is your understanding of how the contrast is administered? What's the procedure by which it's administered?

A. The procedure is, first of all, a physician has to

order it. Hopefully, for a good reason. Once the physician order is received, the technologist goes through a checklist of things like is the kidney function okay? Is the patient diabetic? Is -- is there any other problem like multiple myeloma? Basically, a checklist of conditions which can increase the kidney toxicity of the contrast. And, importantly, to check with the patient, if they have had it previously, is there any history of allergy to the contrast? Once that checklist is completed, then an IV is placed into the patient and the amount of contrast to be injected is determined and that much of contrast is connected to the IV. There is an automatic contrast injector that is set. There are some timings that are important in terms of when the contrast should be injected, how many seconds before the scan starts, the scanning -- that is, the CT scanning actually starts and so on, which are technical details that I don't know.

But once these details are determined by the technologist, she or he would set these parameters and remotely inject a contrast. Now, there is also a process whereby you can inject the contrast manually. So depending upon the need of the patient that is -- what is it being done for, a technologist would either manually inject or set it on an automated injector.

Q. And do you know, in this case, whether it was an automatic injector or manual injection?

A. I do not know that.

Q. And when the patient is in the scan, where is the attending nurse?

A. She's right outside the door. Since it's a radiation-producing machine -- so the -- the technologist is right outside, acquiring the images. There is a control center for the CT machine. She can continuously look at the patient also through a window that is adjacent. It is a window which has led glass lining so it protects her from radiation, but allows her to see the patient. So she's sitting right next to that window at a workstation and controlling the imaging process.

Q. And where are the images that were obtained on the 26th of November, 2011?

A. Well, I don't know where are they currently, but they are printed on a -- on the hard drive of the CT scan. And from there, they can be transferred to any machine they wish, or to a CD that -- that can be given to anybody that we need to.

Q. And those images would still be available, correct?

A. I would imagine. That CT machine has been

decommissioned since then, but it should be on a -- on a disk or in the physics computer, because those images are used to come up with a radiation plan. And that, I understand, was the intent of getting these images in the first place.

Q. All right. Going back to your CV, how many people were in the executive MBA class at Lewis College of Business when you were -- when you graduated?

A. There were about -- if I'm recalling right, there were 16 to 18, somewhere in that range. And they were mostly executives from different companies around the region.

Q. Let me ask you about some of the people that worked at the cancer center. And number one is Vanessa Ball. Who was she employed by?

A. She was and is employed by Ashland Bellefonte Cancer Center.

Q. Okay. Jeanie Armour?

A. I believe it might have been Jeanie Arthur or Armour, I'm not sure. But this young lady was employed by Ashland Bellefonte Cancer Center also.

Q. And where is she employed now?

A. I do not know.

Q. Michelle Brown?

A. Michelle Brown is a registered nurse who was and is employed by Ashland Bellefonte Cancer Center.

Q. Okay. Dr. Stacy?

A. Dr. Stacy was employed by a corporation of his own called Precision Radiation Oncology and had -- that corporation had entered into an agreement with Ashland Bellefonte Cancer Center to provide radiation oncology services.

Q. Okay. Dr. Hayek?

A. Dr. Hayek was and is employed by Ashland Bellefonte Cancer Center.

Q. And what is Dr. Hayek's specialty?

A. He's a medical oncologist and hematologist just like I am. He's also an internist.

Q. And Manish Jain?

A. Manish Jain is our business manager.

Q. Any relationship?

A. No.

Q. And why did Dr. Stacy, if you know, leave and no longer provide Precision Radiation Services?

A. From what he told me - and it is simply what he told me - that he had some family -- family reasons, whereby he had taken custody of some children of his brother and that he needed to move to a bigger town like Louisville. I

believe his wife may be from around there or close to that area also. But these were primarily family reasons. I did not go into details of this, but this is what he conveyed to me.

Q. All right. And Jeanie Armour -- why did Jeanie Armour leave employment?

A. I'm not sure of the details as to why she left, but Manish Jain would have better idea as to why she left. I generally do not get into the employee hiring and firing anymore than Manish asks me to.

Q. Did she leave voluntarily?

A. I do not know.

Q. All right. What training does Vanessa Ball have, to your knowledge?

A. Vanessa is a radiation -- sorry. I take it back. It's a radiology technologist. And she has been a technologist for more than 10 years, since she had been one even prior to joining us at various institutions in Huntington, West Virginia.

Q. Okay. Is she an RN, or do you know what her --

A. She is not.

Q. Okay. Do you know what her -- her educational --

A. I believe --

Q. -- level is?

A. I believe it's called RT. It's a Board of radiology technology.

Q. Do -- do you know what education she had to receive in order to be an RT?

A. You have to go to a school for at least two years, from what I understand. A school for radiology technology. And then there is a Board exam after that.

Q. What about Jeanie Armour?

A. Jeanie was brought in as a dosimetrist. A dosimetrist is a person who helps the physicist in doing various radiation treatment plans as well as various calculations relating to the administration of radiation therapy.

Q. And do -- do you keep employment files on each of these employees?

A. I do not know to what extent these are kept, but there is a file kept on all the employees but physicians.

Q. And when an employee leaves the employment, are they required to sign any documents, to your knowledge, confidentiality or anything of that nature?

A. To the best of my knowledge, no, but I could not tell you that for sure, because Manish really takes care of all business aspects of the practice.

Q. Okay. You stated that you saw [redacted] one

time as a patient.

A. Yes, sir.

Q. Can you tell me what the purpose of that visit was?

A. [redacted] was referred by her primary care physician for evaluation of Leukocytosis, which means too many white cells in [redacted] blood, and they were persistently elevated.

Q. And what did you determine was the cause of that elevation?

A. After evaluating [redacted], I determined that these were as a result of chronic lung problems and repeated bronchial infections that [redacted] had as a result of chronic lung problems.

Q. And did you refer [redacted] to someone else for treatment?

A. This sort of condition requires that you correct underlying lung problem and it did not require any referral to any other physician. [redacted] primary care physician had been taking care of the repeated bronchitis. The primary purpose was to ensure that this persistently elevated white cell count does not mean that there is an underlying blood problem primarily which [redacted] did not have. This was all a secondary phenomenon as a result of medical problems like bronchial infections, bronchiectasis, chronic bronchitis and

COPD.

Q. Okay. So you did not provide any treatment to her then?

A. I gave her a course of antibiotics because at the time I saw [redacted] was expectorating sputum that suggested that [redacted] had an active infection. So I did give her a course of antibiotic. And [redacted] had had many courses of antibiotics previously also, time to time. So beyond that, I did not provide her any treatment.

Q. And after that one visit, did you ever see [redacted] again as a patient?

A. No, I did not.

Q. Okay. Did you ever see her again just in passing or anything of that nature?

A. I did not, no. On that one visit, I -- I -- I think I only saw her one time, but it is conceivable that I may have seen, in a follow-up, a week later to give her the results of the tests, but I'm -- I'm not sure of that. I -- I do know that I saw her in consultation one time.

Q. Okay. How -- how long has the Ashland Bellefonte Cancer Center been in operation?

A. We've been in operation for about 28 years, since it opened its door in 1985.

Q. And as medical -- were you the medical director of

the Ashland Bellefonte Cancer Center?

A. Yes, sir.

Q. Okay. And as the medical director, were you responsible for formulating policies and procedures or rules to ensure patient's safety?

A. The policies are drafted by various people since I could not be drafting all policies since I do not have expertise in every field. But some policies -- policies are drafted by radiation oncology personnel as they relate to radiation therapy. They relate to medical oncology, then I would be drafting them or at least be involved in drafting them.

Q. All right. Who would be responsible for drafting the policies and procedures or rules as to how to respond to the code that was experienced by [redacted]?

A. These policies are drafted by radiation oncology, by us, and then jointly approved.

Q. So when you say "by us," who -- who is the --

A. That would be me.

Q. Okay. And then --

A. It would be run by other doctors also when we put in -- a policy in place. But, basically, I would have to, you know, finally approve them.

Q. Okay. So as far as what was drafted for

responding to the code experienced by [redacted], you would be responsible for drafting those policies and procedures and they would have to be approved by who?

A. Once again, I -- I won't have to be drafting them. I could have the -- the staff in radiation oncology, the physician, the physicist, the -- others draft them. I review them, make any changes and approve them.

Q. Okay.

A. Prior to that, they can be approved by the radiation oncologist also.

Q. Okay. And were there policies and procedures in place on October 26th, 2011, as to how to respond to the code experienced by [redacted]?

A. There were policies and procedures in place.

Q. Okay. And -- and those existed and were in existence at that time?

A. There were.

Q. All right. And did the policies and procedures require that there be crash carts that were stocked and functional -- stocked with functional -- functional equipment to respond to a code?

A. The policies required that there be equipment for resuscitation, medications for resuscitation.

Q. Did it require that it be what we call, I guess, a

crash cart, where it's all together in one spot?

A. Yeah. At that time, we didn't have a cart, but it was a crash box, you can call it. It was a portable box that had all the same things. It didn't have wheels, so I would not call it a cart. But it was a crash kit.

Q. And where was the crash kit kept at?

A. It was -- it was located in two places. One was the chemotherapy administration area and other was the CT area, where [redacted] was.

Q. Okay. Did anybody -- up until the present time, has anybody told you that there was a problem with any of the equipment that was obtained to respond to the code for [redacted]?

A. No, no one did.

Q. Did you ever hear that somebody had to run over to the hospital to get equipment to respond to the code for [redacted]?

A. No, I did not.

Q. And as we sit here today, you've never been informed of that?

A. I have not been informed of any problem that happened during that code. I had heard -- at a later point, one of the nurses had mentioned that the Ambu bag in the chemotherapy area may have been asked to be thrown out by

Dr. Stacy, saying that it was not disposable. So it should be thrown out. That's the only thing I've ever heard since then.

Q. So --

A. Other than -- let me add that I -- I did read Dr. Stacy's deposition and there was some mention -- he had made some vague reference to some malfunction. I'm -- I'm not sure I got any picture of what exactly was referring to. Perhaps, I can refer to that language again. But I do recall seeing some reference.

Q. When did you read Dr. Stacy's deposition?

A. It was several weeks ago.

Q. Okay. Where is the -- you -- you mentioned that there were two, what you called, boxes with equipment in them. Where were those boxes located?

A. One was in the CT area itself and other was in the chemotherapy room.

Q. Okay. And when you say it was in the CT area itself, where was it located in the CT area?

A. Inside the room.

Q. Where inside the room?

A. I do not know exactly where. That would depend upon where the technologist kept it.

Q. And with respect to the one in the chemotherapy

room, do you know where it was located in the chemotherapy room?

A. Exact location in the room, I do not know. It's -- it's one big room, which is -- which has a nursing area and another is in a patient area. So I think it would be -- should be in the nursing area, which is where all the equipment and machines and the computers are located.

Q. Okay. But as -- as far as where it's at in that room, do you know what drawer it would be in or what shelf it's on?

A. That location, I do not know.

Q. And then when [redacted] was undergoing the scan on the 26th of October, 2011, was [redacted] in the CT area itself?

A. Yes, [redacted]was.

Q. So to your knowledge, there should have been a -- functioning, working equipment immediately available to attend to the code that [redacted] experienced?

A. A resuscitation kit was to have been available immediately.

Q. And what is included -- when you say "a resuscitation kit," what's the equipment that is in a resuscitation kit?

A. Generally, there are medications, an Ambu bag. At

the minimum, these two things would be included, and oxygen.

Q. Okay. But, I mean, you say, generally, there would be. I'm trying to get very specific as to on October 26th, 2011, do you know what was available in the CT lab to attend to her code?

A. Well, I did not check it that day, so I could not tell you exactly what was available that day. But our resuscitation kit would have had the emergency medications and Ambu bag and oxygen.

Q. And when it has oxygen, what's the method by which the oxygen is supposed to be administered?

A. Oxygen can be administered -- well, first of all, oxygen tank is connected to a tubing, and that tubing can be connected to a mask or Ambu bag or even a nasal cannula. So depending upon the situation, one can connect the tubing to appropriate method of administering oxygen.

Q. Was there any equipment for intubation of the patient?

A. The -- I -- I know that we had equipment for intubation, including a laryngoscope. Now, which one of these two kits had it, I do not know.

Q. Was it your understanding that only one of the kits had a laryngoscope and intubation equipment?

A. I believe so, but I'm not totally certain of that.

Q. Then would you agree that reaction to contrast material is a recognized complication of the procedure that [redacted] was undergoing?

A. Uncommon and rare but, yes, recognized.

Q. And it's something that every physician and every nurse knows can happen when contrast is given -- or should know can happen when contrast is given?

A. That is true.

Q. And would you agree that any facility that administers contrast material should have the drugs and equipment immediately available to respond to a potential reaction to the contrast?

A. That is true.

Q. And would you agree that failure to have the drugs and equipment immediately available to respond to a contrast reaction would be a breach of the standard of care?

A. I'm not sure exactly what you mean by that question. But I do agree that the need to be available since there's a potential for reaction.

Q. Okay. Would you agree that a reasonable and prudent facility should have those available?

A. The resuscitation -- this -- this facility should have the ability to resuscitate the patient, yes.

Q. Okay. And if the facility does not have

resuscitation equipment and drugs available to immediately resuscitate the patient, that would not be reasonable?

A. I suppose. I -- I -- I guess I'm saying the same thing, different words. I -- I am not sure how -- what is the difference --

Q. Yeah.

A. -- in what we are -- I'm saying and what you are asking.

Q. Well, it's just a little bit of a different phraseology for legal purposes. But what I'm asking is failure to have resuscitation equipment and drugs immediately available would not be reasonable?

A. The ability to resuscitate the patient should be there, yes.

Q. And let's go through the policies.

MR. THOMPSON: Do you have those policies and procedures? I think they are right here.

Q. Dr. Jain --

MS. SHEPHERD: See if he has a copy.

MR. THOMPSON: Yeah. This is the --

MS. SHEPHERD: Exhibit B.

MR. THOMPSON: -- Ashland Bellefonte Policies & Procedures for the CT Department. Ken, do you have a copy of those with you?

MR. WILLIAMS: Yeah. Which -- which ones --

MR. THOMPSON: Exhibit B to the answers to interrogatories that were provided.

MR. WILLIAMS: Here you go.

Q. And could you tell me when these policies were promulgated?

A. They have been there several years. I could not tell you exactly the date. But they have been there many years and would have been there at the time the event occurred.

Q. And -- and do you know who drafted these?

A. These were originally drafted by our physicist, our radiation oncologist at the time, and were approved by me.

Q. Okay. And who was that person, the --

A. I think -- to my best -- best recollection, Mr. Sheree Walson was the physicist. Dr. Aaron Williams with the radiation oncologist at the original time of drafting.

Q. Okay. In looking through the records, I could not find where [redacted] was monitored during the code or that vital signs were recorded during the code. Were you able to find those when you reviewed the records?

A. I did not find any notation from either of the doctors involved in the code.

Q. Did you see anything from any of the nurses involved in the code?

A. I saw write by Vanessa about what happened in the code, her perspective of it anyway.

Q. Other than the incident report she filed, did you find any other write-up that contained vital signs and things of that nature that went on during the code?

A. I did not.

Q. Have you ever participated in a code yourself?

A. I have.

Q. Can you tell me on how many occasions?

A. In the hospital, on many occasions. At office, on the rare occasion.

Q. And have you participated in the resuscitation of a patient?

A. Yes, I have.

Q. And can you tell me about -- the times that's happened in the office, what was the condition that was going on that caused the need for the code?

A. The only other time I remember in last five years that we had a situation where a patient receiving chemotherapy had reaction to chemotherapy agent and we

resuscitated him and sent him to the hospital within a few minutes and he did fine.

Q. Okay. Who was involved in the resuscitation of that patient?

A. It was myself, my nurse practitioner, Mary Anne - her full name is Mary Anne Stevenson - and I believe it was Michelle Brown.

Q. Okay. And when this patient coded and needed to be resuscitated, tell me what the -- what physically happened with the patient.

A. He became unresponsive. He basically collapsed and stopped breathing. His blood pressure was not recordable, at which point the nurse called. I was there. Me and the nurse practitioner went there. We started CPR, gave him breathing assistance using an Ambu bag. And I do not recall if we administered Epinephrine or not. And before -- or as this process was being started, 911 was also called. Within about five minutes, we had the ambulance there. By then -- by then, the patient was -- was with vital signs. That is, pulse had returned. He went to emergency room, was watched for a day and discharged.

Q. Okay. And with respect to the -- the code, were you able to immediately respond to this patient with the appropriate medication and the appropriate --

A. Yes.

Q. -- CPR?

A. Yes. I was on site and I did.

Q. And was the Ambu bag effective in ventilating the patient?

A. Yes, it was.

MR. THOMPSON: I think we need to change the tape. So let's go off the record.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Going off the record at 9:36.

(WHEREUPON, a break was taken in the proceedings.)

THE VIDEOGRAPHER: Back on the record at 9:47.

BY MR. THOMPSON:

Q. Dr. Jain, when this patient, [redacted], was in the Bellefonte Cancer Center and had a reaction to the contrast, what, to your knowledge, physically happened to her? I mean, was it bronchospasm, bradycardia, in terms of physically what went on? Do you know that, as we sit here today?

A. Since I was not there, it would only be a speculation. I, truthfully, do not know exactly what

happened.

Q. Okay. Did Dr. Stacy or Dr. Hyak or any of the nurses ever tell you what the patient's condition was during the code?

A. Vanessa had mentioned that she was complaining of being short of breath after the CT scan was completed. And as she was talking to her, she started collapsing and becoming nonresponsive, which is when she called Dr. Stacy.

Q. Did any of them tell you that -- that she complained of her head hurting?

A. I think Vanessa did mention that.

Q. And then in the policies and procedures, it says, in response to adverse affects to contrast agents, one of the responses for bronchospasm, hypotension, hypertension is to monitor, give oxygen, number one, via mask and, number two, monitor electrocardiogram, O2 saturation, pulse oximeter and blood pressure. And are those the things that need to be monitored on a patient who is having a reaction to contrast?

A. A patient who is otherwise stable and -- and you're only concerned about patient being short of breath or having bronchospasm, those -- those would be the things that you would do. On the other hand, if the patient has collapsed, as in cardiopulmonary arrest and -- from what --

what I gathered, by the fact that CPR was undertaken or cardiopulmonary resuscitation was undertaken, that [redacted] had cardiopulmonary collapse and it was not a situation where -- where you would limit to these measures, that -- that [redacted] would then need a full resuscitative effort.

Q. Do you know how much time elapsed between the time in which [redacted] began complaining of symptoms until she collapsed?

A. Once again, I was not there and I -- I could only speculate by what Vanessa said. It appears there was not much time that patient complained of headache. And [redacted] was talking to [redacted]. [redacted] complained of shortness of breath and then she collapsed. So it would seem to me it happened in a very short time of maybe a minute or so. But, once again, that is a bit of speculation on my part.

Q. Dr. Stacy has testified that there was not an EKG monitor or a pulse oximeter present to monitor the patient. Do you have any knowledge that would cause you to disagree with his assessment?

A. I do. We have had pulse oximeters in our office for many years. There has never been a time in last five years that we did not have a pulse oximeter. We have had an EKG machine on the premises of our office for many years. More than four years, that I can say, that, if asked for,

would have been produced. It is on premises. And whether it was not there, whether it was not needed, those things would be speculation on my part.

Q. Do you know where they would have been located on October 26th, 2011? I mean, what part of the building they would have been kept in at that time?

A. It's a small office. It is in office. I was not there that day, so I could not say what -- where exactly it was on that day, but it was on the premises.

Q. Do you know if it was in the CT lab or the CT area?

A. I would think not only because, you know, the more things you put in, in that area, the -- it -- it becomes a hurdle. So we don't keep everything there.

Q. And Dr. Stacy also testified there was no defibrillator available. Do you know if there was a defibrillator available?

A. To the best of my knowledge, not, but I'm not sure if, that day, there was one. I -- I don't recall one.

Q. Was it your policy to have a defibrillator available and on the premises?

A. I looked at the policies that you had referred to a few minutes ago. It was not listed in the policy.

Q. Should there have been a defibrillator present and

on the premises?

A. Part of it depends upon the specific situation. We are located about 50 yards from a full-fledged emergency room. It has all always been our feeling that a patient is best -- stands a best chance of living if we get a patient the quickest, to the emergency room. And while we get the patient there, maintain the cardiopulmonary status. That is, provide CPR.

As you may or may not know, the most important part of resuscitation is maintaining circulation. And we have always felt if we maintain circulation by an effective CPR and get the patient quickest to emergency room, that gives the patient the best chance of living.

Q. Do you know what the response time is -- if a patient has a condition where a defibrillator is needed, what the response time is from the time you call the ambulance -- or make the 911 call until -- until they call the ambulance, until the ambulance responds, until the patient gets to the emergency room?

A. Every time --

MR. WILLIAMS: Excuse me. You mean the average time --

MR. THOMPSON: Yes.

MR. WILLIAMS: -- based on his

experience?

A. I can only state my experience. I have been at that center for over 28 years and, unfortunately, there have been several occasions when we had to call. It was not always a case of CPT, but there are patients who get acutely ill and we had to call ambulance. In my experience, they always showed up in less than five minutes. And this other incident that I referred to when you talked about cardiopulmonary resuscitation, in that patient also, they were there in less than five minutes. And since the emergency room is next door, there was no reason to suspect any delay to happen.

Q. Okay. Should [redacted] have been immediately taken to the emergency room instead of attempting to resuscitate [redacted] in your opinion?

A. No. That would have wasted a lot of time because by the time you move a patient to a stretcher, get her out and wheel her down 50 yards, that -- that would waste a lot of time. So the appropriate thing was what was done. That is, do CPR, maintain circulation, get the ambulance. Because in an ambulance -- ambulance, you continue CPR. While if you are moving on a stretcher and wheeling down, you cannot continue CPR. Therefore, that would have been the wrong thing to do, I think. Doing CPR, calling

ambulance is the proper thing and that gives the patient the best chance of being resuscitated.

Q. Okay. So you agree it was appropriate to attempt to resuscitate her while waiting for the ambulance?

A. That is true.

Q. Yes. And in your opinion, would it have been beneficial to have a defibrillator present if [redacted] needed one while they were waiting for the ambulance?

A. I do not know if it was needed or not. Once again, I feel maintaining the circulation of the patient -- and, in fact, if you were to look at the 2010 updated guidelines about advanced cardiac life support or ACLS, it puts circulation first as opposed to the previous guidelines where breathing and airway was first. They changed it to maintaining circulation. And there have been debate whether breathing was even necessary. They -- they focus on circulation because evidence shows that the difference between a patient resuscitated and not resuscitated is the ability to maintain circulation. And our doctors were engaged in a good effective CPR the whole time. So I -- I do believe that is the right thing to do.

Q. And when you say they were engaged in a good effective CPR the whole time, what are you basing that on since you weren't there?

A. The -- Dr. Hyak said that we were continuously doing CPR on [redacted] and as -- as the CPR was initiated, that 911 was called at the very same time and they were waiting for the ambulance to get there and get her to ER, as I said, which is where she would have had the best chance of living.

Q. Would you agree that if they could have gotten the heart restarted with a defibrillator, that would be a better way of maintaining her circulation than doing chest compressions?

A. I do not know if [redacted] was in a condition where heart needed restarted. But not knowing that, one would have tried to maintain the circulation by cardiac compression. If heart is pumping, certainly, that's better. But if it is not, then the best thing is to provide external compressions to maintain the circulation.

Q. You kind of lost me there. You said you don't know. I'm saying, assuming that a defibrillator was needed, would you agree that that would be a better way of maintaining circulation, getting the heart started again, with a defibrillator than doing chest compressions?

A. And -- and that's what I'm saying. If heart is pumping, that's always better than somebody pumping from outside.

Q. Okay. With respect to the crash carts or the --

not a crash cart, but the box that had some --

A. Crash kit, yeah.

Q. -- equipment in it, who was responsible for maintaining that box and checking to make sure it had everything in it and that it was all properly functioning?

A. So we do an inventory of all of our medications on a monthly basis. That -- the nurses do that. And I'm not sure if the manager designates anybody else. But being a medical oncology office, we have a variety of different drugs. And we do a monthly inventory of all medications. At that time, we also check for any expiration date. So that inventory is done monthly and the manager coordinates that.

Q. Okay. And with respect to checking these -- these boxes with equipment, who would be the person, to your knowledge, that would be responsible for that? I mean, is it Vanessa or Manish or --

A. The --

Q. If you know.

A. I -- I -- I don't know for a fact, but the resuscitation box in chemotherapy room is to be replenished and looked at after it is used, every time, and the medications are inventoried and checked for expiration every month, along with all other medications.

Q. And is there some sort of a checklist that's kept to show that this has been done?

A. They do have some sort of process by which the manager is informed. I don't know exactly in what format they do it. But the fact that inventory is carried out every month and expiration dates are checked, I'm sure there is a process. I just do not know the exact form of it.

Q. Okay.

MR. THOMPSON: Ken, I'm going to make a request that we get a copy of --

MR. WILLIAMS: Whatever --

MR. THOMPSON: -- whatever checklist.

MR. WILLIAMS: Whatever list was used. Okay.

MR. THOMPSON: And then there's another document I -- that I wanted to try to get. It says in here under the policy for allergic reaction to contrast media that a written description of procedures to be followed for antephialtic reaction is located on the wall for quick reference. Is that --

THE WITNESS: There was a --

MR. THOMPSON: -- a poster?

THE WITNESS: There was a paper on the wall of the CT room which was a quick reference. You know,

do this, do that type of paper. That was on the wall of the CT room.

MR. THOMPSON: I'm going to see if I can make a -- or I'll make a request for that.

MR. WILLIAMS: We'll provide them. I'm not -- is that still in existence or do you know where it is at the facility?

THE WITNESS: Right now, I do not know, but we can certainly go back and get you a copy of that.

Q. And is the purpose of putting it on the wall for quick reference so that you don't have to take the time to go grab a book or -- or a manual and that you can immediately respond --

A. Well --

Q. -- if there's a problem?

A. -- until a physician comes. This is for the benefit of the technologist if there's something minor. Or some -- something happens, you can make a quick reference until the physician comes. Eventually, any reaction or -- or resuscitation effort is performed by the physician under the direction of the physician. And, therefore, any of these references become useless. So this paper on the wall of the CT room would be for the benefit of the technologist until the physician is there. And, of course, that time

interval is generally a few seconds because physician is in the building.

Q. Okay. So the purpose would be so that the nurse can respond immediately without having to go grab a manual or spend seconds looking up some sort of a --

A. True.

Q. -- procedure?

A. It's a quick reference.

Q. And there is a procedure here -- or a policy on contrast injection that says, "Never use a J-loop for contrast injection." Why would you not use a J-loop for contrast injection?

A. I'm not sure why would you not. It would probably have reference to the timing of contrast. The contrast injection is timed from -- for the CT acquisition in seconds because, ideally, the contrast should be in a certain location, at a certain time in the relation to acquisition of the CT films. And -- and while those images are obtained, if you have a tubing through which contrast has to pass, a short tubing, long tubing, that would affect the time for the contrast to reach the organ that you are interested in. And it may have that reason. It's more of a technical reason, from my standpoint, and I could not give you any better explanation than that.

Q. Okay. Would you agree that during a code, there should be documentation of the patient's vital signs and the amount of drugs given?

A. Ideally, yes. Having said that, codes are not a routine occurrence in our office. It is rare and it is conceivable that doctors were focused on the patient and did not bother to do the paperwork.

Q. Okay. And is -- is it sometimes the -- while the doctor is attending to the patient, some of the ancillary staff, such as nurses, will record the vital signs and -- and drugs given?

A. Once again, I think the answer is same. That, yes, you can record -- they are recorded at the direction of the doctor, but I think they were all focused on getting the patient resuscitated rather than doing the paperwork.

Q. Okay. Have you ever seen the image that was taken of [redacted] on October 26th, 2011, when the scan was conducted?

A. I have not.

Q. And would you agree that an oxygen tank should be immediately available with the equipment -- appropriate equipment to hook it up in a code situation?

A. We've always had oxygen tanks available in our office with appropriate tubing available.

Q. Yes. And would you agree that -- that -- that during a code situation, it's important to have them available with the appropriate tubing? I'm not just asking you, are they there. But it's important to have them there for the patient's care and treatment?

A. It is reasonable to have it available within reasonable access. That is -- I mean, I don't know that it needs to be right next to the patient, but within the office.

Now to go back to what I just said, it was the circulation maintenance that is the most important. And there have been even debate about whether breaths should be administered during resuscitation effort. It takes away from maintenance of circulation. So to that extent, the importance of oxygen is less than maintaining circulation.

Q. If the physician --

A. -- but --

Q. Oh, I'm sorry.

A. -- but we have it available at the direction of the physician.

Q. If a physician determines that Epi is needed in order to treat the patient's condition during a code procedure, is it important that it be immediately available and that the equipment to give it appropriately is also

available?

A. Yes.

Q. Did anybody, at any time, ever discuss with you that there was a problem with giving the Epi in this case?

A. Nobody mentioned any problem. Again, my recollection is there might have been something in Dr. Stacy's deposition about it. I forget the exact details, but some vague reference to it.

Q. Is there any documentation in the computer that would tell us the time that [redacted] underwent her CT scan?

A. I do not know.

Q. Okay.

MR. THOMPSON: Ken, I'm also going to make a request for the -- the scans themselves --

MR. WILLIAMS: Okay.

MR. THOMPSON: -- and any -- any information on the computer related to the scan that such -- you know, that would give us the timing that it was conducted.

MR. WILLIAMS: Okay. That's agreed. We'll -- we'll make a search of those.

Q. Who supervises Vanessa Ball?

A. She is supervised by the radiation oncologist.

Q. And who would that be?

A. At that time, it would be Dr. Stacy. And below that would be the physicist, Mr. Walson. And below that would be the chief radiation technologist.

Q. Okay. There was a meeting the day after the incident. Do you recall being present for a meeting the day after the incident where everybody got together to discuss it?

A. I do.

Q. Okay. Who all was present for that meeting?

A. Most everybody in the office who was there that day. It was mostly a briefing. You know, since everybody does not get involved in the resuscitation procedure, there was concerns on the part of other employees as to what happened. And we got everybody together and told them briefly what happened.

Q. Okay. Who all was present to your knowledge?

A. I don't remember exactly who all, but we asked the whole office to come to that meeting. It was done mostly impromptu. And other than, perhaps, one or two people who answered the phones, everybody did come in.

Q. Was there any discussion at that meeting of the need to have the appropriate equipment immediately available?

A. There was no discussion at that meeting. That meeting, basically, was about telling people that we had a reaction, that -- that [redacted] had cardiopulmonary collapse, that she was resuscitated and sent to emergency room, and that was the extent of what was done at the meeting.

Q. Okay. So no discussion about how effective the response was or difficulty finding equipment or that somebody had to go to the hospital and get another Ambu bag and run back to the -- to the lab? No discussions --

A. No. There was no discussion at that meeting, anything of that nature.

Q. Was there any discussion about setting up a crash cart so that it would be immediately available?

A. No.

Q. Did you ever have a discussion with Dr. Stacy, wherein he advised that they were in the process of setting up equipment in one universal place so everybody would know where it was and have it immediately available for a code situation as part of preparing for an accreditation review, but that they had not gotten around to assembling the equipment?

MR. WILLIAMS: Show my objection.

A. Not that --

MR. WILLIAMS: Show my objection to the

form of the question.

You can answer.

A. Dr. Stacy never communicated any such thing to me ever.

Q. Okay. Were you aware that there was any effort ongoing at the cancer center to prepare for an accreditation at that time?

A. I was aware that the process of getting the CT and PET scan and mobile PET CT was under way.

Q. Had there been a review for that accreditation already to your knowledge?

A. I don't believe so. I won't be able to tell you exact date. I -- I know that the process was underway. I don't think they had submitted all the data required. I would like to say that they were -- had not been a review, but I -- I could not be certain.

Q. Okay. And to your knowledge, had anybody sort of off site come to visit the cancer center to look at what was there and what was going on?

A. I don't believe so.

Q. All right. And as we sit here today, it's your testimony that Dr. Stacy, nor any of the nurses, had made you aware that -- or discussed with you that there was a -- a need which had been brought up that resuscitation

equipment be located in -- I guess, a crash cart immediately available in one central area and that they were attempting to work on that? Nobody had discussed that with you?

MR. BROWN: Object to the form.

A. No.

Q. Was an incident report created the other time that you had a contrast reaction to your knowledge?

A. I recall dictating a note for my patient that I resuscitated -- or I was involved in resuscitation.

Q. Okay.

MR. THOMPSON: Ken, I'm going to make a request that we get that note, with the name redacted of whoever the patient is. It's -- it's not that we want to contact the patient. We just -- we want to see what was done during that code and what was followed as part of the procedure.

MR. WILLIAMS: We'll -- we'll look for it. Doctor, you -- I think you testified you thought it was about five years ago?

THE WITNESS: No. It was within last --

MR. WILLIAMS: Oh, okay. I'm sorry.

THE WITNESS: -- two to three years. I -- I think the HIPAA law, notwithstanding, we can find it. But, obviously, we'll need to maintain the privacy.

MR. THOMPSON: I understand.

Q. Was there -- was that also at the Ashland Bellefonte Cancer Center?

A. It was.

Q. And who responded to that code with you?

A. As I indicated earlier, it was myself, my nurse practitioner, Mary Anne Stevenson, and I believe it was Michelle Brown, RN. Those three, I recall. There was, likely, another -- a second RN in the chemo room because we carried out this resuscitation in the chemo therapy room itself. That is my recollection.

Q. Have you ever been a defendant in a lawsuit before?

A. I have.

Q. And on how many occasions?

A. My recollection is two lawsuits were filed in last 30 years. I believe both were withdrawn. Neither went to trial or any settlement.

Q. Okay.

A. The plaintiffs withdrew both, to my best knowledge.

Q. Have you ever given a deposition in the past?

A. I have given deposition in a third-party claim, but not in any suit that was filed against me.

Q. Okay. When you say "a third-party claim," what -- what was the --

A. Sometimes a patient applies for disability or claim relating to the cause of their cancer, as in asbestos and such --

Q. Oh, I see.

A. -- and they would ask for my deposition. Again, that is rare. I -- right now, I only have one such recollection. It's not -- certainly not a frequent occurrence for me.

Q. Have you ever testified as an expert in a medical negligence case?

A. I don't think so.

Q. And who all have you discussed this case with? You've told us about a discussion with Dr. Hyak and Dr. Stacy, but anyone else.

A. I did not discuss it with Dr. Stacy.

Q. I'm sorry.

A. I did discuss with Dr. Hyak within a day or two of the event that happened and, basically, asked him what happened, and he gave me a brief answer that I narrated earlier. Other than that, the only person I talked to was Manish. I listened to the conversation of Vanessa with Manish. I don't know if I asked a question or so in between

or not, but it was not a primary conversation with me. I don't know if I ever mentioned to Michelle or not. If I -- I might have asked her about -- is everything -- the kit in order or not? Make sure, time to time. But nothing that I recall as a specific conversation.

Q. Okay. And with respect to the cancer center itself, what is the square footage of the cancer center?

A. I don't know the exact but, approximately, 8,000 square feet.

Q. Is it two floors or one floor?

A. Just one floor.

Q. Okay. And can you look at these policies and procedures. If you're able to - if you cannot, just tell us - tell us which ones were in effect on August -- I -- I mean, on October 26 of 2011.

A. When these policies were being copied, I had asked them, and I was told that all these policies that were sent were in effect at the time.

Q. Okay. So it's your understanding that each of the policies attached as Exhibit B would have been in effect on October 26th, 2011?

A. That is true.

Q. Okay. The policy --

A. Having said that, I -- I see some of the policies

which are titled "Seaman's Biograph Mobile Unit." Those would not have been in effect because at the time, the Seaman's unit was being -- was undergoing the process of accreditation and, therefore, any policy that is titled with Seaman's Biograph Mobile Unit would not be in effect since it was not being used at Ashland Bellefonte Cancer Center.

MR. WILLIAMS: Excuse me, Doctor. How are you spelling that? Tighter?

THE WITNESS: Oh, titled. I'm sorry.

MR. WILLIAMS: Any policies that has tighters?

THE WITNESS: Any policy that has a title --

MR. WILLIAMS: Oh, I'm sorry.

THE WITNESS: -- of Seaman's Biograph Mobile Unit.

MR. WILLIAMS: Okay. Thank you.

A. Those were drafted specifically for the mobile unit and, therefore, I'm not sure that those were in effect at the time or not. But any policy that is -- that does not have Seaman's Biograph as a part of it's title would -- would be in existence.

Q. Okay. How would we find out if the Seaman's Tomography Biograph Mobile Unit policies would be -- whether

they were in effect or not on October 26th, 2011?

A. We can find out and let you know when was it accredited. Because that is when we started using it and that's when those policies would have become effective.

Q. Okay. What is the Seaman's Biograph Mobile Unit?

A. That's a PET CT scan that we had referred to earlier. It has a -- a -- a combined of so-called hybrid PET and CT in it.

Q. Okay. And is -- is -- are these policies that were provided with the unit to your knowledge?

A. Anything that has Seaman's Biograph written in it's heading would be for the unit.

Q. Okay. But was it provided along with the unit?

A. Oh, are you asking if the -- the company provided us those?

Q. Yes.

A. I do not know. I -- I doubt it. I think these were drafted by us, but I don't know if they were provided and they took some of that from the provided policies. From what I recall, these were drafted by a group of people, including the physicists and some of the others, and were reviewed by the doctors.

Q. Okay.

A. The policy that's in effect under the computed

tomography Seaman's Biograph Mobile Unit says, under No. 2 here, "They will direct another staff member to get the AED and crash cart located inside the scan room." What is the AED?

A. It is an abbreviation for automated electrical defibrillator.

Q. All right. And -- and -- and crash cart -- we can agree there was not a crash cart, correct?

A. Well, if this policy was in effect at the time, there wasn't. But when the accreditation was obtained, they generally go by the -- the words as the creating body requires. So there was a crash cart -- actual cart obtained later, I believe, because as I said, accrediting bodies have very general policies and they don't look at specific requirement and they would have gone by those general policies and complied with each of them to be accredited.

Q. Okay. So these are the things that the accreditation -- in order to be accredited, the accreditation entity said you-all have to do these things; is that correct?

A. They would have a list of things that are required and if there's any deficiency, they would ask for those things to be added. That is the general procedure of any accreditation.

Q. And one of the things that they required under the computed tomography Seaman's Biograph Mobile Unit Adverse Events Policy was an AED, you know, defibrillator and crash cart located inside the scan room, correct?

A. I presume.

Q. Okay. And then -- and then they require that a staff member will document the events, correct?

A. Yes.

Q. And then they require that the physician --

A. Let me restate -- I -- I can't tell you that they required all these things. There's a minimum requirement. And when they are doing these things, sometimes we overdo them. And so I do not know if that is exactly a requirement or, you know, in order to make sure that we pass the accreditation the first time, they went beyond the requirement. But it does -- it is written in the policy if that's the question.

Q. Yes. And then under another section here, No. 5, it says, "An incident report must be completed by the staff members involved in the incident. The physician will document in the patient's medical record details of the emergency, including the date, time, signs and symptoms which prompted physician/nurse intervention and all relevant clinical information."

And was that something that was required by this policy?

A. As a general rule, physician involved should document everything that happened. We are used to doing that. As I indicated, I did it. I'm not sure why the physicians involved in this event did not document. I cannot speculate on that.

Q. All right. And then it says, "Following a review of the incident report, appropriate corrective action, policy visions" -- "revisions will be instituted if and when necessary."

And in this case, do you know if there was any corrective action or policy revisions instituted regarding the care of [redacted]?

A. In this case, there was no specific policy revision that was undertaken for two reasons. One, we felt, from what we knew, that adequate CPR was undertaken. And, two, that they were already looking at the accreditation requirement. And so we felt that the -- the revision was already under way in case anything was to be revised.

Q. Okay. And to your knowledge - I understand there were no policies revised - was there any corrective action taken?

A. Nothing that I recall.

Q. Okay.

MR. THOMPSON: Is this the billing?

MS. SHEPHERD: Yeah.

Q. Now, let me see if you can make sense of this billing for me. Under the submissions to Medicare, it looks like that there were bills sent out for $3,530 for the treatment that occurred on October 26th, 2011. And it says "Provider name: Donnie R. Stacy." Dr. Stacy says he did not send any bill and didn't know anything about this. So the bill is for CT guidance, for placement of RAD therapy fields. Treatment planning, complex. Simulation fields, COMP and low OCM 300, 349 MG."

And if I can hand that to you, that's one bill. And then attached to this is the other. And can you tell me what those bills are for and why they were sent?

A. These, obviously, related to the radiation -- planning related bills. I do not know, personally, these details. The billing is done by our office manager -- under his guidance, not by him, but under his guidance. And radiation related bills are reviewed by the provider as to what needs to be billed because, eventually, service is provided by the radiation oncology related providers. So I would not be able to tell you any details of what it involved, but these are radiation related and relating to

the planning of the radiation.

Q. Okay. And so that would be billing. If I understand correctly, the office manager and provider would be -- Manish --

A. Yes.

Q. -- Jain was the office manager and Dr. Stacy would be the provider?

A. Dr. Stacy. And the physics part which is, again, done under the direction of Dr. Stacy, would be Sheree Walson, who is the physicist.

Q. Okay. So this -- this in May here, would be -- the planning -- and this October 26th, 2011, bill --

MS. SHEPHERD: (Inaudible).

MR. THOMPSON: Okay. So there's not really a date on here for the --

MS. SHEPHERD: (Inaudible).

MR. THOMPSON: Date of service, 10-26-11.

MS. SHEPHERD: (Inaudible).

Q. So here's where I'm confused. It says date of service, 10-26-11 for all of these things and a bill of charge of $2,515. This payment summary form, Medicare Secondary Payor Recovery Contractor, RMK5-5, has a bill of $3,530. So they've added another $1,015 for the same

provider date.

What is this contractor that they are referring to here?

MR. WILLIAMS: Why don't you refer to the Exhibit --

A. I don't know who the --

MR. WILLIAMS: -- number.

A. -- payor recovery contractor is, but what I do know is there is a primary payment that comes from Medicare for patients who have Medicare as their primary insurance, and they pay 80 percent of what they approve. And, oftentimes, the remaining 20 percent of what they approve -- in this case, as you know, out of a charge of 1,250, 397 is approved. And out of a charge of 515, 124 is approved. And out of other two charges, nothing was approved. So out of the, roughly, $500 approved, Medicare will generally pay 80 percent and remaining 20 percent would be paid by a secondary coverage or patient's responsibilities. So that's all I can tell you about this part. I'm not really sure what is Medicare Secondary Payor Recovery Contractor. I would suggest Manish can shed more light on it.

Q. Okay. And in this one, it looks like the charges were 2,515, and the payment was 679. And then [redacted] got a bill that says "pay this amount, 169.96." Or

at least her estate did. Do you know why there are separate bills with separate charges and separate reimbursement amounts?

A. No. I couldn't answer. Again, I would refer to Manish Jain, who oversees the -- the billing process.

Q. Has Medicare ever instituted an inquiry into your-all's billing practices at any of the facilities in which you own?

MR. WILLIAMS: Show my objection. But you can answer.

A. Time to time, Medicare asks for requests of records to verify the billing. We have never had any inquiry as to improper practices or punitive measures, if that is the question.

Q. Have they ever conducted an on-site investigation to your knowledge?

A. No, I don't think so.

Q. Okay.

A. I'm -- I'm assuming --

MR. WILLIAMS: How are you doing on time?

THE WITNESS: I need to be leaving soon.

Q. I'm assuming with regard to her care and treatment, since you were not [redacted] physician, that you're not

going to express any opinions about what Dr. Stacy was doing, what he should have been doing or whether it was going to be effective or not?

A. I can only express a general opinion about [redacted] to the extent that I've looked at Dr. Stacy's note on [redacted]. I did not see the patient and, therefore, I cannot give you a specific recommendation from me. But to the extent that I've reviewed [redacted] records which were, again, limited by my evaluation about July of 2011 and Dr. Stacy's evaluation around October of 2011 -- to that extent, I can provide an opinion since I am an oncologist.

Q. Okay. Have you reviewed any of [redacted] other records other than those two records?

A. I -- I don't know if there was a letter or some kind of paper from University of Kentucky. Right now, I'm not recalling any. My recollection is only of these two consultation notes. That is, one by me and other by Dr. Stacy at four-month interval --

Q. Okay.

A. -- for, of course, two different conditions.

Q. And if you have any additional opinions regarding her care and treatment or prognosis or anything of that nature --

A. Could you be more --

Q. -- what would they be?
A. -- specific?
Q. Not really. I mean --
MR. WILLIAMS: Let me interject. As a medical oncologist who saw her on one occasion, also looked at the records that -- at the cancer center, he is in a position to provide some general opinions about staging, prognosis, et cetera. I --
MR. THOMPSON: That's what I'm asking.
MR. WILLIAMS: I can't say --
Q. Do you intend, at trial, to express opinions about [redacted] prognosis?
A. If I'm asked, yes.
Q. Okay. I'm not going to ask you, but -- so -- you know, I mean, as we sit here today --
A. I am able to provide an opinion since I am a subspecialist in the field of medical oncology. So if the question is if I am able to, the answer is yes. I don't know -- I'm not -- maybe I'm not understanding the question.
Q. Yeah. I'm -- I'm -- you know, this is our time to like, I guess, take your depo and find out what you're going to testify to at trial. And so, you know, if there is any other opinions you intend to express at trial, I guess I need to know them now.

A. I am able to provide an opinion as it relates to her cancer about staging, prognosis and treatment. So if I am asked, I shall.

MR. THOMPSON: Yeah. I guess then my question is, is that something you intend to ask him or --

MR. WILLIAMS: Just to be totally candid with you, we discussed those in general terms, but I don't know that -- that we have a -- any sort of formal disclosure we could give you today. He feels competent to address those issues.

MR. THOMPSON: Well, I guess, you know, here's -- here's -- it's kind of an issue we get into. You know, until I know what your opinions are, it's hard for me to prepare to ask you questions about them. So if you intend to be an expert at trial, I would probably ask that I be provided time for a telephone deposition or something just to -- and -- and I'll -- I'll make it pretty short, but I'd like to explore what his opinions are.

MR. WILLIAMS: We can do that. I think the opinions he's referring to is what he knows based upon the issues you addressed in Dr. Stacy's deposition and the records that he's looked at. Plus, his personal event. Plus, treating patients with the same or similar conditions. So we can do that.

MR. THOMPSON: All right. If -- I'll just say if there's something he's going to testify to at trial, I would ask to be supplemented.

MR. WILLIAMS: But we haven't really formalized those in any fashion at this point.

MR. THOMPSON: And I -- I understand. I mean, our disclosures aren't due for a while. And I -- you know, it's not that I thought we'd show up here today and you'd -- you'd have all of that ready. It's just -- it's -- it's kind of a -- if he's going to be an expert and express -- it's sort of a two-stage process. So --

MR. WILLIAMS: I understand.

MR. THOMPSON: All right.

I'm -- I think -- where did Anita go?

MS. SHEPHERD: (Inaudible.)

MR. TAYLOR: I -- I think that's all the questions I have, Doctor.

MR. WILLIAMS: Do you have anything, Dan?

MR. BROWN: I have no questions.

MR. WILLIAMS: Thank you, Dr. Jain.

THE VIDEOGRAPHER: Going off the record at 10:44 a.m.)

* * * * * * * * * *

COMMONWEALTH OF KENTUCKY

COUNTY OF BOYD, to wit:

I, BRANDY D. MOWERY, Shorthand Reporter and Notary Public in and for the Commonwealth, duly commissioned and qualified, do hereby certify that the foregoing deposition of KIRTI JAIN, M.D., was taken by me and before me at the time and place for the purpose specified in the caption hereof, the said witness having been by me first duly sworn.

I FURTHER CERTIFY that the foregoing transcript of the said deposition is a true and correct transcript of the testimony given by the said witness at the time and place specified herein.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney of counsel, or financially interested directly or indirectly in this action. Witness chose to waive signature.

My Commission expires April 15, 2014.

Brandy D. Mowery

BRANDY D. MOWERY

Court Reporter/Notary Public