IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION
CIVIL ACTION NO: 0:16-CV-148-DLB

UNITED STATES OF AMERICA
EX REL. ROBERT C. O'LAUGHLIN, M.D.,
Plaintiffs

V.

RADIATION THERAPY SERVICES, P.S.C.,
DBA ASHLAND BELLEFONTE CANCER
CENTER, ET AL.,
Defendants

DEPONENT: KIRTI K. JAIN, M.D.
DATE: DECEMBER 21, 2023
REPORTER: JESSE HARP

APPEARANCES

ON BEHALF OF THE PLAINTIFF, UNITED STATES OF AMERICA EX REL. ROBERT C. O'LAUGHLIN, M.D.:

Andrew Grosso, Esquire
Andrew Grosso & Associates
1250 Connecticut Avenue, Northwest
Suite 700
Washington, D.C. 20036
Telephone No.: (202) 298-6500
E-mail: agrosso@acm.org

ON BEHALF OF THE DEFENDANT, KIRTI K. JAIN, M.D.:

Christopher Allen Melton, Esquire
Wyatt, Tarrant & Combs, LLP
400 West Market Street
Suite 2000
Louisville, Kentucky 40202
Telephone No.: (502) 589-5235
E-mail: cmelton@wyattfirm.com

Also Present:
Lydia Ryan, Videographer

INDEX


| | Page |
|---|---|
| PROCEEDINGS | 8 |
| DIRECT EXAMINATION MR. GROSSO | 9 |
| CROSS-EXAMINATION MR. MELTON | 203 |
| REDIRECT EXAMINATION MR. GROSSO | 216 |


EXHIBITS


| | Page |
|---|---|
| 1 - Dr. Kirti K. Jain, M.D. Curriculum Vitae | 33 |
| 2 - Dr. Kirti K. Jain, M.D. Passport | 38 |
| 3 - Medical Coding Manual - RETAINED BY COUNSEL | 51 |
| 4 - Medical Administration Record for Ashland - May 22, 2014 - REDACTED | 58 |
| 5 - Medical Administration Record for Highlands - May 22, 2014 - REDACTED | 66 |
| 6 - Schedule Report List from Ashland CC Defendants0028587-Defendants0028589 | 70 |
| 7 - Schedule Report List from Highlands CC Defendants0030183-Defendants0030183 | 72 |

EXHIBITS (Continued)

8 - [redacted] Obituary 74
9 - List of Drugs and Chemo Services Given to Patients - REDACTED 75
10 - Schedule Report List from Ashland - CC Defendants0028564-Defendants002856 85
11 - Calendar 87
12 - Schedule Report List from Highlands - CC Defendants0030150-Defendants0030152 87
13 - Declaration of Fadi Hayek, M.D. 89
14 - Start Dates for Dr. Konala and Dr. Batoo 90
15 - Start Date for Dr. Anshu Jain 51
16 - November 13, 2013, Letter 92
17 - February 4, 2014, Revised Letter 95
18 - March 12, 2014, Cancer Carepoint Letter 97
19 - March 13, 2014, Cancer Carepoint Letter 100
20 - May 8, 2014, Revised Cancer Carepoint Letter 100
21 - Data from Medicare Center - REDACTED 104
22 - Schedule Report List - CC Defendants0028417-Defendants00284 - REDACTED 110

EXHIBITS (Continued)

23 - Schedule Report List - CC Defendants0029944-Defendants0029947 - REDACTED 111
24 - E-mail with eTicket Itinerary 112
25 - E-mail with Flight Information 113
26 - Receipt from Avis 113
27 - Excerpt from Medicare Claim Data - REDACTED 118
28 - Medicare Enrollment Application 123
29 - Health Insurance Claim Form 128
30 - Updated Medicare Carriers Manual 134
31 - Medicare Benefit Policy Manual 134
32 - Excerpt from Medicare Claims Statement - REDACTED 148
33 - Agreement Between the Kentucky Department of Medical Services and the Kentucky Medicaid Provider 155
34 - Department for Medicaid Services and/or Kentucky Healthcare Partnership 157
35 - Appeal of Denial of Medicare Claim - REDACTED 158
36 - Dr. Jain - Minutes of Meeting - January 24, 2014 163

EXHIBITS (Continued)

37 - CMS Manual System Updated 167
38 - Medicare Claims Processing Manual 169
39 - E-mail from Dr. Kirti Jain to Dr. Kirti Jain 170
40 - Letter from Kentucky Board Of Medical Licensure - January 9, 2015 175
41 - Fee Schedule 177
42 - CMS Physician Fee Schedule Final Rule - 2016 181
43 - Injection Record - REDACTED 181
44 - Itemized Statement 186
45 - Topics for 30(b)(6) Deposition for Radiation Therapy Services, P.S.C. d/b/a Ashland Bellefonte Cancer Center 192
46 - Topics for 30(b)(6) Deposition for Kirti K. Jain, M.D., P.S.C. d/b/a Highland Cancer Center 192
47 - Ashland Master Schedule 194
48 - Highlands Master Schedule 194
49 - List of Claims from Medicare Claims Data 217

STIPULATION

The VIDEO deposition of KIRTI K. JAIN, M.D. was taken at TARRANT & COMBS, LLP, 400 WEST MARKET STREET, SUITE 2000, LOUISVILLE, KENTUCKY 40202 on Thursday the 20th day of December 2023 at 9:17 a.m. (ET); said VIDEO deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. It is agreed that JESSE HARP, being a Notary Public and Court Reporter for the State of KENTUCKY, may swear the witness.

PROCEEDINGS

THE VIDEOGRAPHER: My name is Lydia Ryan. I'm the videographer today. And Jesse Harp is the court reporter. Today is the 20th of December 2023. The time is 9:17 a.m. We're at the offices of Wyatt, Tarrant & Combs, LLP, to take the deposition of Dr. Kirti K. Jain, in the matter of United States of America ex rel. Robert C. O'Laughlin, M.D., v. Radiation Therapy Services, PSC dba Ashland -- Ashland Bellefonte Cancer Center, et al., pending in the United States District Court for the Eastern District of Kentucky, Civil Action number 0:16-CV-148-DLB.

Will the counsel please identify themselves for the record?

MR. GROSSO: Andrew Grosso, G-R-O-S-S-O, representing Dr. Robert C. O'Laughlin, who is the relator in this case. And Dr. O'Laughlin is representing the United States in this action.

MR. MELTON: And Chris Melton, I represent the defendants in this action.

THE REPORTER: Okay.

Can you raise your right hand? Do you solemnly swear or affirm that the testimony you're about to give is the truth, the whole truth, and nothing but

the truth?
THE WITNESS: I do.
THE REPORTER: Thank you.
You can begin.

DIRECT EXAMINATION

BY MR. GROSSO:
**Q. Dr. Jain, during the course of the deposition, we will say Dr. Jain. Unless I say otherwise, that means you and not Anshu Jain.**
A. Okay.
**Q. Okay. Thank you for coming. We're about to take your deposition in this case. Everything you say here must be truth and accurate. You are under oath.**
**Do you understand that?**
A. Yeah.
**Q. If after leaving here today, you decide that something you've said is not accurate, it is not complete in any way, you may be given an opportunity to correct that. But to take advantage of that opportunity, you must contact either the lawyers or the court reporters as promptly as possible.**
**Do you understand that?**
A. Sure.
**Q. During the course of the deposition, you may want to talk to your attorney. You are allowed to do**

that. But if there's a question that has been put to you, you need to answer the question first. And then --
A. Okay.
Q. You may consult with your attorney. If you need to clarify the question thereafter, you may do so.
A. Okay.
Q. If you want any breaks, let us know. I understood you have a cell phone there in case you get a notice. Just let us know that you need a break.
A. Sure.
Q. Have you taken any medication that might affect your memory within the last 48 hours?
A. I have not.
Q. All right. I have seen your CV. It's very impressive.
A. Thank you.
Q. And I'd like to learn a little bit more about you. You are from India initially, correct?
A. I am indeed.
Q. What nationality -- or I really should say: What citizenship do you have now?
A. Indian.
Q. All right. How long have you been in the United States?
A. 47 years, give or take.

**Q. Okay. What is your profession?**

A. I'm a medical oncologist and hematologist.

**Q. Where did you get your education from?**

A. So I got my M.D. degree, which is known as MBBS degree in India, from an institution called All India Institute of Medical Sciences which is considered the apex institute out of the 700 colleges in India. Following that, I did my internship in internal medicine at Jersey City Medical Center in New Jersey, followed by two years of internal medicine residency at Wayne State University affiliated hospitals in Detroit, Michigan, followed by three years of medical Oncology and hematology fellowship at Memorial Sloan Kettering Cancer Center in New York.

**Q. Okay. How did you come to Kentucky?**

A. Somewhat accidental. But all the same, it was a choice I made.

**Q. When did you come to Kentucky?**

A. I arrived in Kentucky in July, first week of July in 1983, but started my practice in first week of October 1983.

**Q. Why did you come to Kentucky?**

A. Well, if you must know the whole story, I was on my way to Chicago to join a practice there in the Chicago neighborhood. But in those days, there was

nobody to advise us how to go about doing that. So I had not signed any contracts. It was just a verbal contract. And on my way to Chicago, I was visiting a friend in West Virginia, in Charleston, West Virginia.

And he asked me about it.

And I said, "no, it's a verbal contract. There's no signed contract."

And he immediately asked me to get a contract.

Which I did. And it was not exactly what was agreed upon. And I turned my mind. And I said, "somebody is being dishonest with me. Right now, do I really want to associate with that person?" I decided I didn't. And I just stayed. I looked around and found Ashland and Huntington, West Virginia, to be towns without any trained oncologist. And I settled there.

**Q. You mentioned Ashland. You have a cancer center there, do you not?**

A. Yes. I do.

**Q. What is the name of it?**

A. Well, we currently -- the -- the company's name is Radiation Therapy Services, PSC, which stands for Professional Service Corporation, but currently is doing business as Precision Cancer Centers.

**Q. Was there a time that it was known as Ashland Bellefonte Cancer Center?**

A. Yes. It was.

**Q. Why was the name changed?**

A. We were located on the campus of a hospital called our Lady of Bellefonte Hospital. And in -- that hospital closed its doors on April 1, 2020. At that point, since Bellefonte word was in our name also, everybody thought we had closed as well. Since we were on their campus, there was a bit of an assumption amongst people that we were a part of the hospital somehow. And they thought we closed also. So we -- that was the time we decided to change the name to reflect that we were still open, that we were still providing care, and that we did not have any association with Bellefonte Hospital.

**Q. And you also mentioned -- well, let me back up.**

**When did you start -- I'm going to refer to it as Ashland Bellefonte or Ashland, if you don't mind.**

A. Sure.

**Q. When did you start the Ashland Cancer Center?**

A. So I started my practice there in 1983 as I mentioned. And it was a year later in 1984 that we started construction of that facility. And I believe it formally opened its door in 1985.

**Q. Okay. Who owns it?**

A. I do.
**Q. Completely?**
A. The -- the practice is owned by me. The building is not. We lease the building.
**Q. You mentioned Huntington?**
A. Yes.
**Q. That is in West Virginia?**
A. It's an adjoining town. Yes.
**Q. Yes. What type of practice do you have in Huntington, West Virginia?**
A. I had a similar medical oncology and hematology practice which I stopped somewhere about 10 to 15 years ago. But when I started in 1983, I had started a hospital-based practice in Ashland and a private practice in Huntington.
**Q. Okay. What was the name of the Huntington facility?**
A. It didn't really have any name. It was a practice in my personal name.
**Q. Sure. Was there an entity known as Logan Regional Cancer Center or Oncology Center?**
A. There was an entity, some similar name, Logan and Cancer Center, that was in existence sometime in early 2000 I'm aware of that was initially owned by the hospital and some group out of, I believe, Virginia. And

then they closed that service at some point.

**Q. All right. We will come back to that in a moment. I want to ask you about another cancer center. Did you have another one in Kentucky?**

A. I did not in the beginning. But in about 2002, we started Highlands Cancer Center.

**Q. What is Highlands Cancer Center?**

A. So it's with a company called -- which goes by my name, Kirti K. Jain, M.D. PSC. And it did business as Highlands Cancer Center until about the same time that we changed the name of Ashland Cancer Center. We started calling it Precision Cancer Centers also. But it provided similar oncology and hematology services including radiation services.

**Q. Now, who owns or owned Highlands Cancer Center?**

A. I do.

**Q. Okay. When did it start?**

A. It started about 2002.

**Q. And is the official name or the formal name Kirti K. Jain, M.D. PSC?**

A. That is the corporation's name. Yes.

**Q. Okay. Is there anyone else who is a shareholder or a co-owner of the entity?**

A. No.

**Q. You are using the name Precision Cancer Center?**

A. Precision Cancer Centers.

**Q. Are they separate entities today?**

A. They're remain separate entities. But we used the name along with designation. So we would say Precision Cancer Centers Ashland as our Ashland Bellefonte Cancer -- what used to be Ashland Bellefonte. And we would say Precision Cancer Centers Prestonsburg is what used to be Highlands Cancer Centers previously. And we identify so on our correspondence also where we would write the name Precision Cancer Centers, but also say, formally known as.

**Q. All right. Now, what was done -- let me go back to where I was.**

**The Logan entity was, and please correct me if I'm wrong, known as Logan Regional Cancer Center?**

A. That is correct.

**Q. Okay. What was the corporate structure of that, if you know?**

A. So the corporate structure already existed. The hospital had owned all the shares at the time we got involved. We purchased 50 percent of the shares that were previously owned by some other entity as I mentioned. I believe they were from Virginia. But I'm

not sure. So we purchased those shares through a company called -- sorry, Logan Williamson Cancer Center, an entity that was a corporation of ours.

That one purchased 50 percent of the shares of Logan Regional Cancer Center. So it became equal partner. But the hospital retained control by having three board members nominated by them as opposed to two board members of ours. So it was a partnership of sorts.

**Q. When you say, ours, who do you mean?**

A. Logan Williamson was the entity that owned these 50 percent of the shares.

**Q. You also said, we purchased, so I'm a little bit confused as to who -- if you say, we, you mean yourself?**

A. So originally, Logan Williamson was owned 95 percent by me and 5 percent by Manish Jain. But at some point along the lines, he decided to divest of it. And I had all the shares.

**Q. Okay. When was that?**

A. I don't remember the exact dates. But it may have been around 2014 or so. But once again, I do not have the exact dates.

**Q. What was the name of the hospital?**

A. The hospital was Logan General Hospital.

Q. And where was the Logan Regional Cancer Center relative to the hospital?
A. It was perhaps 1 to 2 miles away from it.
Q. All right. Now, I'm going to put something on the record. You are here both as an individual witness and as what we call a designated witness for both Ashland Bellefonte Cancer Center and the Highlands Cancer Center; is that correct?
A. Correct.
Q. Okay. Sometimes, the questions that I ask will pertain to you individually. Sometimes, they will require an answer from the designated witness for one or the other of the companies. And sometimes, it will be for all three. I will specify if the question I'm asking is for you in a designated witness capacity. And we're going to treat Ashland and Highlands as one answering entity for the purposes of this deposition. If clarification is needed as to whom the answer applies, then Mr. Melton has the right to --
A. Sure.
Q. -- come in and clarify that. Otherwise, we're going to wind up doing three separate depositions which can be done. But neither Mr. Melton nor I want to do it that way.
A. That's fine. That's fine.

**Q. Good. The time frame that I'm interested in begins in early 2012. And I want to ask you who the physicians working at Ashland and at -- let me back up.**

**Who the physicians working for you were at that time?**

A. My recollection is that, of course, I was working full time. There was a Dr. Hayek who was a medical oncologist like myself. He was working. And I remember a Dr. Stacy as a radiation oncologist. From time-to-time, I may have to consult an e-mail that I had asked them to review some employment records so that I'm -- I'm reasonably specific about timeline.

**Q. Well, if you consult an e-mail, I have a right to take a look at it.**

A. Sure.

**Q. So you may want to talk to your lawyer about when to do that now.**

A. Sure. I -- yeah. Just -- it's an e-mail just yesterday or day before that my -- my employee who had reviewed these records from the -- from the payroll service sent me. So --

MR. MELTON: I'll just jump in and say, as Mr. Grosso said at the beginning, if anything is inaccurate after we look back, we will --

MR. GROSSO: Sure.

MR. MELTON: -- supplement the record for that.
BY MR. GROSSO:
**Q. All right. So you mentioned Dr. Hayek, Fadi Hayek?**
A. Hayek, Fadi Hayek.
**Q. And you mentioned Dr. Stacy.**
A. Yes.
**Q. Okay. So this is 2012. Who else was present working at these centers for you?**
A. As for the physicians, that is my recollection. There were some nurse practitioners who were there. But in terms of physicians, that's all I remember.
**Q. Was there a Dr. Robert O'Laughlin who was employed?**
A. He was. I -- I thought he got employed after Dr. Stacy left. So that would be about 2012 or 2013.
**Q. Okay. Anyone else who was a physician?**
A. Other than some locums, at the time, they were the only physicians. In 2014, we had some additional physicians who joined us.
**Q. That would be Dr. -- forgive me, I am horrible pronouncing names. In fact, we have a fight in my family as to how to pronounce my name which I think is fairly simple. But apparently, it's not so simple.**

**There was a Dr. Konala?**

A. Dr. Konala.

**Q. Konala.**

A. Venu Konala. He joined on July 1 of 2014. Dr. Anshu Jain joined about the same time. And then there was a Dr. Sameer Batoo who was a medical oncologist who joined.

**Q. I have the exact dates in the records that I brought with me today. So if that becomes relevant, we can refer to those records.**

A. Sure.

**Q. What was the role of Manish Jain, who you mentioned, with regard to Highlands and Ashland?**

A. Manish Jain was the operations manager of both the locations.

**Q. And what does the term, operations manager, mean for the purposes of these two centers?**

A. It's primarily reflected to basically anything that was not medical. And that would include hiring employees, relieving employees, creating schedules, purchasing, overseeing anything non-medical.

**Q. Who oversaw the medical aspects of the practices?**

A. I primarily did. All the physicians act fairly independently by the nature of what we do. But

to the extent that there was any administrative requirement, as far as the medical aspects are considered, I would see them. But if there was any scheduling of physicians or filling in for an absent physician or vacationing physician, then Manish got involved with that.

**Q. Was there anyone else in management besides Mr. Manish Jain for business aspects and you for medical aspects?**

A. Primarily just us two.

**Q. Okay. You mentioned that there were also nurse practitioners who were employed.**

A. Correct.

**Q. Who were they? And when were they employed? Can you say if you remember?**

A. So in Ashland, primarily it was a lady by the name of Mary Ann Stevenson. I believe she was employed about 2012. But I don't have the exact date offhand. And in Highlands, there was another lady. And I'm trying to recall her name. Stephanie -- Stephanie was her first name.

**Q. I'm going to make some suggestions with Mr. Melton's permission. Van Dine?**

A. Yes. Correct.

**Q. Howard?**

A. That was her original name. She had changed her names a few times.

**Q. Howard? Stephanie Howard?**

A. Later on, she was Howard, I believe.

**Q. And Robert?**

A. That's correct.

**Q. Stephanie Robert?**

A. Her maiden name was Stephanie Robert. I believe at some point it was all three.

**Q. We deposed her. And she tried to explain.**

A. Okay.

**Q. Any other nurse practitioners during the period, July 1, 2012, through the end of 2016?**

A. Yeah. I believe towards the end, it might have been 2015 or so, that we also added another nurse practitioner by the name of Candice Stevens.

**Q. Now, I use the term nurse practitioner. There's also a category of non-physician provider known as physicians' assistant.**

**Did you have any physician assistants at --**

A. No. I did not.

**Q. Okay. All right. Who worked at the Logan Oncology Care Associates facility? I shouldn't say, facility. I should say, center.**

A. So Logan Oncology Center would be a fairly

general description since it had two different oncology services provided. One was radiation oncology and the other was medical oncology. Medical oncology was provided by a hospital employed physician. I don't recall the name. Perhaps you can make suggestions. But the radiation oncology was provided by the partnership that was called Logan Regional Cancer Center.

**Q. Let's go through the physicians. Do you remember when Dr. Stacy left?**

A. As to the dates, I believe it was about 2013.

**Q. Was it before or after or exactly when Dr. O'Laughlin joined?**

A. It would be exactly the same time.

**Q. Okay. So I will tell you my recollection is sometime in 2012. Does that sound right or not? We can pull out --**

A. It could be. It's 2012 or 2013. But it was when Dr. Stacy left, Dr. O'Laughlin joined.

**Q. What cancer centers did Dr. O'Laughlin work at?**

A. He worked at all three locations, that is Ashland Bellefonte Cancer Center, Highlands Cancer Center, and Logan Regional Cancer Center.

**Q. What facilities -- I keep using that word. That's a bad word to use here. What cancer centers did**

**Dr. Hayek work in?**
A. Dr. Hayek worked only in Kentucky which is the Ashland Bellefonte Cancer Center and Highlands Cancer Center.
**Q. Did he work at any cancer centers in Ohio?**
A. At some point, he was going to one half day a week or less to a facility in Seamen, Ohio. I'm not sure who owned that facility. But he did not. But he was filling the -- filling in the one half day or a couple of hours a week just -- just seeing patients for, my recollection is, a couple of hours or so. Because it was a very small town with a very small hospital. And there was a private radiation facility where he was going. Again, my recollection is it was a week -- week or every other week. I'm not sure.
**Q. Returning to your ownership of cancer centers, were there any other medical centers from which you were involved or had an ownership interest? And we're talking about mid-2012 to the end of 2016.**
A. There was a facility in Huntington, West Virginia, but I believe that had been closed around 2010, that I was involved with as we had a practice originally in Huntington. But I don't believe, in this time frame, we had any other facility we were involved in.

**Q. Okay. All right. Now, we said -- we talked about where Dr. O'Laughlin and Dr. Hayek worked. Where did Dr. Stacy work?**

A. He worked at all the same three facilities.

**Q. Where did or does Dr. -- again, Konala, Konal [sic]?**

A. Dr. Konala primarily worked at Ashland Bellefonte Cancer Center.

**Q. And Dr. Batoo?**

A. Dr. Batoo primarily worked at Highlands Cancer Center.

**Q. Are they still with your practices?**

A. No. Neither of them are.

**Q. How did you, and I use the word, you, for yourself and the cancer centers, decide how to schedule physicians to be at the various cancer centers?**

A. So in Logan, we were not required to have a physician except when patients needed to be seen since the supervision was provided by contract by the physician who was at the hospital. That is the medical oncologist who was employed by the hospital who was providing supervision. So we needed the presence of a physician which is radiation oncologist only to see patients which was generally one day a week or two half days a week. There were occasional times that was less

or more, but generally on that schedule.

On the premises of Ashland Bellefonte Cancer Center and Highlands Cancer Center, we always ensured that there was a physician on those premises. With those basic principles, we were able to schedule our oncologist since we at least had three physicians. And at times in 2014, we had five physicians and two nurse practitioners. So that -- with -- with those minimum requirements, we were able to schedule without much difficulty.

**Q. You said you had five physicians. Prior to Dr. O'Laughlin joining your practices, I hear the name of Dr. Hayek, Dr. Stacy, and of course, yourself. That's three.**

A. Yes.

**Q. Is there a fourth and fifth person?**

A. So fourth and fifth were added in July 1 of -- or about July of 2014.

**Q. Okay. So at that time -- well, Dr. Hayek left around Christmas of 2013; is that correct?**

A. Yes. About the end of 2013 would be correct. Yeah.

**Q. Okay. So at that point, it would be down to two, you and Dr. O'Laughlin, correct?**

A. Two full-time on the payroll. Yes.

**Q. Okay. There were also some locum tenens during some periods of time thereafter, right?**
A. We had a few locums. Correct.
**Q. And then in July 1st of 2014, you hired Dr. -- why can't I pronounce his name? I have a mental block with names.**
A. Should I help you?
**Q. Konala?**
A. Konala. Actually, the correct -- correct pronunciation is yet different. But Konala.
**Q. What is the correct?**
A. Konala.
**Q. Konala.**
A. Yes.
**Q. I may remember that.**
A. There's a little -- there's a little twang there.
**Q. Konala. Dr. Batoo?**
A. Yes.
**Q. Dr. Anshu Jain?**
A. Correct.
**Q. You?**
A. Yes.
**Q. And Dr. Robert O'Laughlin?**
A. Correct.

**Q. So that brings us to five?**
A. Yes.
**Q. Until Dr. O'Laughlin left?**
A. Yes.
**Q. Which was in October 2015?**
A. '15. Yes.
**Q. Okay. By the way, let's get this handled now. Dr. Anshu Jain is your son; is that right?**
A. Correct.
**Q. I've also looked at his resume. And that's pretty impressive also.**
A. Thank you.
**Q. Let us talk about the time before July 1, -- no. Let's talk about all the time. During the period of July 1, 2012, to the end of 2016, how did the scheduling of -- how was the scheduling of the physicians determined?**
A. Once again, the principles that I gave you, that there will be a physician at each of the two locations in Kentucky which is Ashland Bellefonte Cancer Center and Highlands Cancer Center at all times. And Logan Regional Cancer Center did not require presence of a physician all the time. So on those principles, we scheduled them.
**Q. Okay. Prior to Dr. Hayek leaving, there would**

**be at least one day a week when Dr. O'Laughlin would go to Logan; is that correct?**

A. Yeah. One day or one half depending upon the number of patients there or sometimes, around two half days.

**Q. And there were times when Dr. Hayek went to Ohio, correct?**

A. There were few hours. He was -- he would do his work in Ashland and then go to Ohio for -- for a little bit. My recollection is that he was doing it every other week. But I'm not certain if it was, to be clear, every other week.

**Q. All right. Fair enough. I apologize for coming back to this again. But I'd like to learn how the decision was made which doctor would be at what facility on what day during what times.**

**Who made that decision, if anyone?**

A. Generally, scheduling was done by Manish Jain. But if there were any questions, he would ask me.

**Q. Okay. And who scheduled the nurse practitioners?**

A. Once again, Manish Jain. But in general, Mary Ann stayed in Ashland and Stephanie stayed in Highlands.

**Q. I have - and I don't want to appear that I am being mischievous. Dr. O'Laughlin at my request, has**

**searched for and found a large number of travel records which I have yet to download from the Dropbox that he sent me. I have some records, and that's travel records, which I've already used in the deposition. And those are for around the holiday season of 2013, 2014. I have more records. But I haven't looked at them yet. So with that understanding, and if the records show something that you weren't aware of, I'll allow you to supplement your answers.**

**That being said, Dr. O'Laughlin did do a lot of travel to-and-from Las Vegas and other cities, did he not?**

A. He generally went over weekend to -- I'm not sure where. But the word around was that he loved to go to Las Vegas every weekend.

**Q. Okay.**

A. But that's a hearsay.

**Q. Okay. Dr. O'Laughlin is part of the case. So he can answer himself. You also traveled, right?**

A. I traveled some. Nothing like every weekend that he did.

**Q. Right. But when you went, you went to India, correct?**

A. I did.

**Q. And you went to the United Arab Emirates,**

**correct?**

A. I may have gone once, but not regular -- any regular basis. No.

**Q. Okay. I have a copy of your passport here.**

A. Okay. Yes. I provided that to you.

**Q. Yeah. Well, for beginning August of 2015 up until the present.**

A. Correct.

**Q. And I did not print it out. But I have a summary of your travels.**

A. Yes.

**Q. And there were times when you were gone for weeks at a time.**

A. On an average, it would be two weeks. But it has ranged from one week to longer than two weeks.

**Q. Did you own companies or have interest in companies in India?**

A. Yes.

**Q. Which companies did you have such interest in?**

MR. MELTON: Object to relevance.

You can answer.

THE WITNESS: I'm not sure I can give you an exhaustive names of all the companies. But there are some medical service companies as in hospital, some related to education, and a -- one company that

related to medical billing service.
BY MR. GROSSO:
**Q. Is that A-One Biz Private Limited?**
A. That is correct. A-One Biz Private Limited provided billing service during that -- is it specific to a period? Or is it open?
**Q. We are focused on July 1, 2012, to December 31, 2016.**
A. That would be about correct. A-One Biz --
**Q. We'll come back to that. But at the moment, let me see if -- one moment, please.**
MR. GROSSO: Well, this is Exhibit number 1.
(EXHIBIT 1 MARKED FOR IDENTIFICATION)
BY MR. GROSSO:
**Q. And we'll put in the exhibit numbers. I'll leave the court reporter to put in the dates. Is this your resume? Can you take a look at it? I think you refer to it as a curriculum vitae?**
A. That is correct.
**Q. All right. Now, this is -- if you look on the third page near the bottom continuing to the fourth page, you seem to be involved in quite a number of healthcare entities.**
A. Are you referring to the leadership positions?
**Q. Yes. And below that --**

A. All the ones that appear on page 3 are committees of the adjourning hospital at various times ranging from 1994 onwards. And going through page 4, same thing continues to the bottom of the page where either I'm a member or board member or committee member or committee co-chair and so on.

**Q. And on the bottom of page 4, there is a caption that says, "Management experience."**

A. Correct.

**Q. And under that, there is, "CEO and Medical Director of Health One."**

A. Health Center One.

**Q. Is that the center that you established in --**

A. That was a group of physicians established a facility. As it says, it was -- it was established around 1990. And I acted at its lead for two years, 1992 through 1994.

**Q. Did you remain active in it after 1994?**

A. Yes. Until around the turn of the century. This facility did not continue to work. I -- I believe it may have been late '90s that this facility stopped functioning.

**Q. And under that is, "CEO and Medical Director of Ashland Bellefonte Cancer Center."**

A. Correct.

**Q. Below that is, "CEO and Medical Director Tri-State Medical Center."**

A. So Tri-State Medical Center was a facility that took over the assets of Health Center One, the facility that appeared on the previous page. It was a new entity. Many of our physicians left the entity for a variety of reasons. And at that point, that entity was up for sale. And I started a new facility.

**Q. Okay. This says, "1996 to the present." This was provided to us in discovery about two years ago, maybe less than that.**

**So when did --**

A. So that is an error there. This facility stopped working -- it would be approximately 2010.

**Q. And you owned 100 percent shares of the company up to that point?**

A. I did.

**Q. And after that, did you have any interest, financial interest or control interest, in any subsequent entity that flowed from these?**

A. This entity closed its doors about then.

**Q. Okay. And below that there's, "CEO and Medical Director Fairmont Regional Cancer Center in Fairmont, West Virginia, 1997 to present. Owner 100 percent."**

**What is that?**

A. So this was a radiation therapy facility that I owned. And in 2011, it was sold.

**Q. And below that it says, "CEO and Medical Director Highlands Cancer Center, Prestonsburg, Kentucky. Present owner, 100 percent shares of the company."**

A. That is correct.

**Q. And that -- your 100 percent ownership -- well, I thought you said that the hospital owned 50 percent. And you owned 100 percent of a company that owned 50 percent?**

A. No. You are confused between Highlands Cancer Center and Logan Regional Cancer Center. This is --

**Q. You're right. You're right. I take that back. You're right. Okay. That's fine. Do you have a list of the entities in which you own or are involved in India?**

MR. MELTON: Object to relevance.

You can answer.

THE WITNESS: I don't have a list. But I can name some of them. I could not promise that it will be an exhaustive list.

BY MR. GROSSO:

**Q. Let's try.**

A. I have an entity called American International Health Management Limited.

**Q. What is that?**

A. That owns hospital and educational facility.

**Q. Okay.**

A. Then A-One Biz Solutions which provided medical billing service where I was a co-owner with several other people. Are we, once again, referring to the 2012-2016 period, I take it? And if we are referring -- I believe there were a few --

**Q. Yes.**

A. -- other entities which owned some real estate. There was company called Mewar Health, M-E-W-A-R. There was also a company called Classic Merchants which owned some real estate as well where I was a co- owner. There may have been a company or two which were minor businesses -- similar or -- businesses of sorts that are not very active that I can recall right now.

**Q. Okay. I'm going to ask the court reporter to keep this if we need it. If you want to reference -- better yet. Fine. I don't want to pile these documents up in front of you, but you should have them near you if you need to refer to them.**

A. Yeah.

MR. GROSSO: Mr. Melton?
MR. MELTON: Yes?
MR. GROSSO: Housekeeping is time-consuming. But if I don't do it, the documents are going to go all over the place.
I'm marking this as Exhibit number 2.
(EXHIBIT 2 MARKED FOR IDENTIFICATION)
BY MR. GROSSO:
**Q. Please review it. Please tell me what it is, if you recognize it.**
A. It's a copy of my passport -- current passport that I provided to you.
**Q. Okay. Bear with me. All right. Now, I have tried to prepare a spreadsheet of where you were and when. And the best I can figure out, if we look at page 9 of the passport, you left September 27, 2015. I have no control over how and where the customs officials put their stamps in the passport and on what pages so bear with me. You went to New Delhi.**
**So you would've left, would it have been, on a Saturday or a Sunday?**
A. I -- I do not see a September 1 stamp. Perhaps you can point it out.
**Q. No. September 27th.**
A. Yes. I see. A September 27, 2016, that

I departed New Delhi.

**Q. No. September 27, 2015.**

A. That's August 27. Okay. September 27. I do not see on page 9. Perhaps we're talking about different pages.

**Q. When I say, page 9, I mean the page of the passport, the ninth page.**

A. Ninth page of the passport? So I need to --

**Q. Yes.**

A. -- search and find it.

MR. MELTON: I think it's on page 5.

MR. GROSSO: You mean the fifth page?

MR. MELTON: Yes.

THE WITNESS: Yeah. Okay. I have that.

MR. MELTON: Page 5 of the exhibit.

THE WITNESS: So yes. 27th of September 2015, I see a stamp. Yes.

BY MR. GROSSO:

**Q. When you left with -- this says September 27, 2015, is a Sunday according to my schedule. Would you leave on a Saturday or a Sunday?**

A. I could not tell you.

**Q. Okay. That's fine. So you arrived --**

A. I'm not even sure what this stamp -- who is -- because it's so poorly visible. I'm not sure.

**Q. I have no control.**
A. I can't tell who stamped it. But having said that, go ahead.
**Q. All right. Well, there is one September 27, 2015, New Delhi. And then on this same page, there's you departing on October the 6th.**
**And October the 7th on the same page, there is departing United Arab Emirates?**
A. Correct.
**Q. I have not found an arrival at United Arab Emirates. But there are some stamps that are illegible. That may be one of them. And I see quite a number of entries over the course of the period of this passport to or from United Arab Emirates.**
**Why were you entering and leaving the United Arab Emirates?**
A. I have friends there that I visited.
**Q. Did you have businesses there?**
A. No. I don't.
**Q. You had no business at all?**
A. None.
**Q. Okay. And then you returned to New Delhi October the 9th. This is, again, on page 9.**
A. Page 9 of the passport?
**Q. Correct.**

A. Okay.
**Q. And then on page 16 of the passport --**
A. I -- I don't see where I returned to New Delhi on October the 9th. There is a stamp October the 6th.
**Q. I read that as a 9. If you --**
A. I --
**Q. Put your finger on the middle at the big blue stamp and then move it to the left.**
A. Could you maybe turn it for me?
**Q. Sure. Right here.**
A. Perhaps that's a 9th October. Okay.
**Q. So that is in New Delhi. And then on page 16 of the passport --**
A. Yes?
**Q. There is, again, an entry in the United Arab Emirates. Do you see that?**
A. Yes.
**Q. And then on page 8 of the passport --**
A. Yes?
**Q. There is a departure from Mumbai?**
A. Correct.
**Q. So you've gone from United Arab Emirates to Mumbai. And I have not seen a stamp, not one that I can read.**
A. Yeah. If I -- and when I went there,

generally I departed from India, because it was about a two-hour flight, very -- very close from Mumbai. So I would leave from there and come back there.

**Q. This does not have an entry when you returned to the United States. And let's assume that you flew from Mumbai on October 18, 2015, to the United States.**

**So that would be about a three-week period from September 27th to October 18, 2015, correct?**

A. Yeah. That would be about that.

**Q. And I'm not going to go through all of these, but in the passport as you arriving in Mumbai, India, December the 29, 2015 and departing the -- well, on January 5th. I can give you the page numbers if you wish.**

**Arriving at the United Arab Emirates, January the 5th, departing India, Ahmedabad?**

A. Ahmedabad.

**Q. And then on the 6th, arriving in New Delhi. And then on January 7th, arriving in Munich, Germany. And on January 7th, departing the United Arab Emirates. On January 15th, you departed Sweden.**

**Is it fair to say that you were out of the United States from December the 29, 2015 to January 15, 2016?**

MR. MELTON: Object to form.

You can answer.

THE WITNESS: That would be reasonable, I suppose. Although, I could not say based -- based on what you've just said that I was gone the whole time. But that seems like a fair interpretation.

BY MR. GROSSO:

**Q. All right. So that is about a two-week period there?**

A. Correct.

MR. GROSSO: As I said, I have scoped out the passport. And they're in colored blocks.

I can put this into the record, if you wish. It's on my laptop that I'm showing Dr. Kirti Jain and Mr. Melton.

BY MR. GROSSO:

**Q. But basically, you seem to be gone anywhere from one to three weeks at a time when you leave. Was there -- what was the purpose of visiting India with such frequency and such periods of time?**

A. So my India visits, as you said, ranged one to three weeks. They often were two to three a year. Sometimes -- well, I have family in India. I have businesses, as I discussed, in India. So it involved both of them. And sometimes, some side trips is a vacation, like some of the ones to United Arab Emirates.

So it was a combination of reasons that I made trips to India.

**Q. Now, we only have your passport beginning in late August of 2015 until when it was produced which was earlier this year. I have asked for your travel records and your passport for the period prior to that. I have not received it.**

**Were any of these trips charged as business expenses for either Ashland or for Highlands?**

A. I could not recall charging any as business expenses. But perhaps Manish, who looked after the accounting and such, would be able to tell you more about it. But most of these travels was paid for by me or the business in India or through points I had as travel point.

**Q. Do you have expense records for these trips?**

A. Currently, no. I don't. But if we looked for it, I'm sure many of them can be found.

**Q. Okay. I have asked for them. And I asked --**

A. Are you referring to the trips that you just talked about --

**Q. No. The ones --**

A. -- or some other trips?

**Q. The ones prior to -- what I'm trying to do is identify when you were out of the country.**

A. So we -- on your asking, we made very serious efforts to get those trips. We had a person write to Indian Embassy, make multiple calls to Indian Embassy, but did not get any response from them. I have no way to recall them from my memory. But all I can tell you is there were times I did not go to India for more than six months.

And there were times I might go every -- you know, twice in three months or four months. On an average, there were two to three a year. But I have no way of producing the records prior to this passport because I don't have that passport. And we have made utmost effort to get these records from the embassy, but not been successful.

**Q. Who did you notify at Ashlands, Highlands, or Logan that you were leaving the country for any period of time?**

A. Manish Jain would be the one.

**Q. How did you notify him?**

A. Generally, verbally.

**Q. Okay. Was there any e-mail communication referencing your plans to leave?**

A. I used to see Manish at least two to three times a week, if not more, because we were in the same office area. There was really never any need for me to

talk to him through e-mail. Most of this communication was personal. And I -- I may or may not have communicated through e-mail. But as a routine, that would not be how I would communicate with him.

**Q. Did you pay for these expenses by credit card?**

A. Some of them. Not all of them.

**Q. How did you pay for the others?**

A. Through miles.

**Q. Okay. Do you -- have you attempted to obtain the travel records from your credit card and airline companies?**

MR. MELTON: Object to form.

THE WITNESS: I have not attempted to get credit card. Because over the years, I had -- I've had a number of different credit cards. And I would have no recollection as to where would I have charged. Many of these trips were paid for by my business overseas if the trip was primarily to oversee the business or attend a board meeting.

And there was no way for me to track every trip to -- to find how exactly I paid for it. Since I didn't even have the dates prior to this passport as to when I traveled, it was practically an impossible way to first find out the dates and then track the credit card.

BY MR. GROSSO:

**Q. Well, I find that I can pull up my credit card statements going back quite a number of years regardless of what credit card numbers I've had and what credit cards the companies have updated me with.**

**Have you tried to look up your credit card statements for the years prior to August of 2015?**

MR. MELTON: Object to form.

THE WITNESS: I've not looked for the credit cards. I just was not sure how would I go about it not knowing the dates. Our business paid a lot of its expenses through credit cards. There will be literally thousands of entries every month. There -- and not knowing where to look for, whether to look for in India, whether to look for in my mileage statements, whether to look for in -- in the checks or -- or credit cards here, I had no way to search the extensive database that you're referring to.

BY MR. GROSSO:

**Q. Well, you didn't pay cash for your expenses when you were traveling, did you?**

A. I did not.

**Q. Okay. Then there would be some record maybe of your -- I mean, did you at times you use your personal credit cards to pay for expenses while**

**traveling?**

A. Correct.

**Q. One could look at your credit card -- personal credit card statements, see what charges were made overseas at what time; is that --**

MR. MELTON: Object to form.

THE WITNESS: If only one knew the dates, the cards. I think most of us have new cards every so often. And not knowing the dates and this being several years old and not knowing whether it was a trip paid for by my overseas business depending upon the purpose of the trip, I just had no way to -- to find these details.

MR. GROSSO: Well, I think we've gone through this enough. I have asked for that material. I think that it is possible to get personal credit card statements for prior years going back to July of 2012. And I will take that up with Mr. Melton after the deposition and if necessary, the Court. Okay. We've gone for, depending on how you count, an hour, an hour and a half.

Would you like a --

THE WITNESS: Can I have a water break here?

MR. GROSSO: Let's take a break.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Okay. We're now off the record.

(OFF THE RECORD)

THE VIDEOGRAPHER We are now back on the record. The time is 10:38 a.m.

BY MR. GROSSO:

**Q. Dr. Kirti Jain, we're back on the record. And you are still under oath. Do you understand that?**

A. Yes.

**Q. Okay. One of the companies you mentioned in India was A-One Biz Private Limited?**

A. I think the full name is A-One Biz Solutions Private Limited.

**Q. Thank you. What was it?**

A. It provided primarily billing services for physicians in USA.

**Q. Who owned it?**

A. There were about five people who jointly owned it, four or five.

**Q. Who were they?**

A. That was myself. There was another fellow by the name of Sapan Bafna. Manish Jain and Ramesh Gupta.

**Q. What was -- how was it managed? Who managed it?**

A. So there was a full-time manager in India,

I believe his name was Srini Vasn, he had extensive experience in managing these kind of companies in his previous years, who was on site and managed it over in Chennai, India.

**Q. Okay. Who were the employees?**

A. There were close to a hundred employees, give or take 50. There were a number of people that he would recruit and employ in the company.

**Q. And where were they from?**

A. They were all from neighborhood of the town which was Chennai. I -- I don't recall any employees outside except at -- at one point, there was a different manager who was from outside Chennai. But he lived in Chennai.

**Q. What was your ownership percentage in the company?**

A. My ownership was about approximately two-thirds of the company.

**Q. What was your management role with the company?**

A. The only management role I had was I was on the board of directors of the company. And every three to four months, we would have a meeting that I would attend as a board member.

**Q. I think you answered this. But let me ask it**

**again maybe in a different way. What services did this company offer?**

A. You can call it a revenue cycle company which provided end-to-end billing services for medical practices. Although many of the practices it provided the service were oncology practices, but it did have several non-oncology practices as well.

**Q. What did it do?**

A. It would take information from the practices for their charts, code for some of them, and simply take their codes for others, or a combination.

**Q. I'm confused. Can you repeat what you just said?**

A. So most of the medical billing involves using CPT codes for billing. Are you familiar with them?

MR. GROSSO: I'll mark that as Exhibit -- well, that has been marked as Exhibit 15 in the Manish Jain deposition, so we'll mark it as Exhibit 3 in this.

(EXHIBIT 3 MARKED FOR IDENTIFICATION)

MR. GROSSO: We're not going to put it into the record.

THE WITNESS: Are you giving it to me to prove that you know? Or are you giving it to me to look at?

BY MR. GROSSO:

**Q. I'm giving it to you to say: Is that what you're talking about?**

A. Yes. Correct.

**Q. All right.**

A. So --

**Q. You can refer to this whenever you want.**

A. Yes. Okay.

MR. GROSSO: I will take custody of this exhibit.

THE REPORTER: Okay. But you still want it marked in the transcript, or no?

MR. GROSSO: Yes.

THE REPORTER: Okay.

BY MR. GROSSO:

**Q. Go ahead.**

A. So some practices, like ours, a -- an E&M visit was marked by the physician. While other services, like a CT scan, would be coded by them.

MR. MELTON: So you said, E&M. Is that Evaluation Management?

THE WITNESS: Evaluation and management service.

Since physician directly provide it, they would circle a code on the -- on the billing slip. While

other services like a -- as I use an example, a CT scan, may be coded by the billing service. So they would use these codes, prepare a bill, and submit it to the insurance company. When the payments came to the practice, they would get the details of those, verify that they were posted. And if there was amount due, they would follow up to the second insurance or whatever the guidance of the practice was. So that's what I call revenue cycle management.

BY MR. GROSSO:

**Q. You said that for an E&M code or an E&M service, the physician would circle something. Explain to me how the services were identified for your billing company, A-One Biz Solutions Private Limited, so that they knew what they were billing for?**

A. So while Manish Jain handled all this on behalf of the company, what I do know is that E&M codes were circled by the physicians on the superbill.

**Q. I'll stop you there. What is a superbill?**

A. Superbill is a paper that would be -- that the physician would have at this time he or she saw the patient or a provider would have that had variety of E&M codes listed. It would have patient's name and identity, whether it is an office chart number or date

of birth and such printed on it. And it would also have number of other services, like laboratory tests to be done or imaging studies to be done.

They would be marked. They would be on it. So if I saw a patient, I would verify the name or -- and the identity of the patient, circle a code out of many codes that were listed for E&M services. And I would circle the laboratory test that I wanted done for that patient or any additional services I wanted undertaken for the patient. I would circle those. And that's what I call a superbill.

**Q. Would chemotherapy services or radiation therapy or diagnostic services be listed on the bill?**

A. Diagnostic services like imaging were listed on the bill. Or I could write it in. Generally, chemotherapy codes were not on the superbill. The -- that was -- the chemotherapy was administered by trained oncology nurses. And that was coded for -- by the billing service.

Because the nurses would simply either enter in the computer or a chemo superbill, so to speak, which would have the time or the duration of infusion, the type of infusion, the drug given, the dose administered. And all those would be used by the billing service to decide what codes to be billed.

**Q. Let's go back to the superbill. E&M codes were listed on them; is that correct?**
A. Correct.
**Q. Okay. Chemotherapy service codes were not listed, correct?**
A. That is correct.
**Q. Were radiation diagnostic codes listed on them, if you know?**
A. We generally wrote in diagnosis. The -- to the best of my knowledge, the radiation diagnostic codes were not listed on it.
**Q. What about radiation treatment codes?**
A. I believe there was a separate sample bill, which I did not see, which may have had treatment codes. But if there were, the radiation oncologist would not do anything to them. They were for the technologist to check off or the billing service to use them.
**Q. Now, you are a medical oncologist?**
A. That is correct. And a hematologist.
**Q. How were chemotherapy services and drugs ordered?**
A. So often I saw the patient, evaluated various data, decided on what treatment plan was to be created, created a plan, and entered in the -- one would say, ordered through the electronic health record. Once

I ordered that plan, the oncology nurses, and everybody else, would have access to that. Although, the administration of that plan was done under my direction by oncology nurses.

**Q. You would create a plan of care; is that correct?**

A. That is correct.

**Q. Would the orders for the chemotherapy services be identified in that plan of care or were they identified in some other way?**

A. It would depend upon the visit. For example, in the first visit of a patient, I might be focused on completing the diagnostic picture. Patient may have a diagnosis of a cancer. But he may not have been staged. Or she may not have had the molecular diagnostics required tested yet. So in that visit, I would not have a treatment plan.

I would have a plan, but not a treatment plan. Once I had all the required datasets, be it the type of cancer, be it any other opinions I needed, be it the diagnostic services, like CTs and PETs, be it molecular diagnostics, like next-gen sequencing, and so on so forth -- once I had all that I needed to create a treatment plan, I would then create a treatment plan and order it.

**Q. You say, next-gen. That's pretty cutting edge, isn't it?**

A. It is indeed. And it has dramatically improved the treatment of cancer in the last 10 years or so.

**Q. Was it in -- well, this is for my own edification so let me ask when we're off the record.**

**I am still unclear exactly how the orders were created for what chemotherapy services would be provided and on what schedule. How was that created? And how was it transmitted to the nurses?**

A. So once the physician determines what treatment plan to undertake for a given physician -- as an example, I decide that a certain set of chemotherapies need to be administered on a given schedule. They were often from, and practically always from, previously published literature because most of our treatments come from clinical research. We would take that regime. Or it would already be in the computer as one of the regimens we could use in our electronic health records.

We would take that, order it in the order section of electronic health records which would then populate the drug, the pre-medication, the precautions, the laboratory tests to be done, the dosage to be given,

the frequency of the schedule of administration, and how many times were they to be repeated. And that would be a treatment plan that would be ordered in the electronic health record.

**Q. Did you -- and I use the word, you, as collectively the medical oncologists at Ashland and Highlands.**

**Did you order these specific drugs in the specific doses which is -- and the specific numbers of administration and on what schedule? Or was it somehow automatically done by an algorithm in the electronic health records?**

A. There was no algorithm. The physician had to choose. There were times we modified the dosage based on patients' data. There were times we had to modify schedule. And this was a -- you can say, a live document that had to be modified all the way along depending upon the patient's condition.

**Q. I'm going to show you a record that I think is when you were describing that.**

MR. GROSSO: This will be Exhibit 4.

(EXHIBIT 4 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Please review it.**

MR. MELTON: And this will be redacted in the

record?

BY MR. GROSSO:

**Q. Please review it and tell me if you recognize it?**

A. I do.

**Q. Okay. What is it?**

A. It appears to be a part of a treatment plan of a patient.

**Q. How was it used at the cancer centers?**

A. I'm not sure I understand the question.

**Q. Well, this was produced to us. And the question that I have is: Was this a record that was, in fact, used at the cancer centers?**

A. Yes. I would imagine it was.

**Q. If it was used at the cancer centers, how was it used? What was it used for?**

A. For the treatment of this patient.

**Q. What information is recorded in this document?**

A. Basically, the document lists the date that the treatment plan was administered. It lists the medications, whether they were given orally or parenterally. It talks about the cycle number meaning was it the first treatment or the second set of treatments and such. It has bag ID, which simply means the infusion bag were numbered. It says what fluid the

drug was mixed in, what kind of fluid, like normal saline or any other. It refers to how the medication was administered, whether it was given IV or oral.

It lists the volume of the fluid in which the medication was mixed. It lists a time duration over which a particular drug was administered. It lists a supervising physician. It lists the dose and if there was any wastage of the drug. Because sometimes the exact dose that the patient receives does cannot match the exact vial size. It lists the start time of that particular infusion. It lists the end time of that particular infusion and over how many minutes that was infused and who administered it. All this information is on this sheet.

**Q. Okay. On the upper right-hand corner, there is an entry for physician in this particular record reads, "Jain, Kirti K., M.D."**

**That would be you, correct?**

A. Correct.

**Q. What does the entry for the physician indicate?**

A. This indicates that I planned the treatment for this patient, that I was overseeing the treatment of this patient over the required treatment course, and that I was monitoring this patient from time-to-time.

That is, I was the captain of the ship, so to speak.

**Q. Your name appears elsewhere on this record specifically under, "Supervising M.D.;" is that correct?**

A. That is correct.

**Q. What does your name mean in that position?**

A. It simply means that -- once again, that I was the ordering physician, the physician of record who oversaw the treatment plan for this patient and monitored this patient periodically as well as provided the long-term care needed for this patient.

**Q. Now, this is a medical administration record for the provision of drugs to a particular patient at the Ashland Bellefonte Cancer Center on May 22, 2014.**

A. Correct.

**Q. Your name is listed in the entries for supervising M.D. Does the entry -- does the listing of your name in the entry for supervising M.D. mean that you were on the premises for the time period that these drugs were being administered for this patient?**

A. It does not mean that. It means that there was a physician. But whether it was myself or somebody else, this record would not tell you that.

**Q. Okay.**

A. This record only lists the name of the physician providing care to the patient who formulated

this treatment plan and who oversaw this treatment plan.

**Q. How would one determine who was actually -- how would one determine what physician was actually on the premises during the time that these drugs were being administered to this patient at this time?**

A. If one really wanted to see who was on the premises, there are many other ways. One can do that by the -- the schedule that was prepared for that patient -- sorry, for that day and for that particular physician, by the billing records which may or may not list that physician.

But knowing where the physician was providing E&M services through billing records, one can get an idea of where -- who was at that location on a given day. But to the best I know, no oncologist lists a supervising physician for every drug that is given. It is always the physician who plans and monitors the treatment.

**Q. How did your billing company, A-One Biz Solutions Private Limited, know which physician was on the premises for a given patient on a given day for the given administration of drugs at one of your cancer centers?**

MR. MELTON: Object to form and foundation.

You can answer.

THE WITNESS: I don't know that they needed to know that. But once again, the same data were available to them also. The schedule was available to them since they can remotely log into the EHR. They were doing the billing for E&M services. They were doing the billing for any diagnostic services. So they could find out who was on that -- who was there on that particular day. But having said that, I don't know that -- if they needed to know or not.

BY MR. GROSSO:

**Q. How did they know that the time had come to bill for a patient?**

A. They depended upon the time -- that -- that's more of an internal structure that the manager creates.

**Q. When you say, manager, who do you mean?**

A. Manish in this case.

**Q. I wanted to know whether it was India or in Kentucky.**

A. Sure. The data, like the superbill, has to be transmitted to the billing service. Some of the data relating to the infusion and such is available to them as soon as they're entered into the electronic health records. In this case, the -- this kind of data that is available to them right away. Radiation treatment data, if they're transmitted to them daily or once the full

treatment plan is completed, it's more or less a choice that each practice makes.

For example, a radiation patient may get one treatment or three treatment or 10 treatments or 30 treatments. The course, when completed -- some bill it when the course is completed, others bill it on a daily basis. So that's the choice of every individual practice. And I'm not sure how ours did that. But that kind of -- that data had to be transmitted to the billing service.

**Q. Okay Do you know if the MARs was -- MARs, the Medical Administrative Record was transmitted to A-One Biz?**

A. This was automatically transmitted because this is a part of the electronic health record. And they had access to the electronic health record.

**Q. What else was transmitted automatically to A- One Biz in India?**

MR. MELTON: Object to form.

THE WITNESS: Other things that would automatically be transmitted to them would be records from a machine called Nucleus, I think currently it's called Nucleus, but it might have had a different name in the past, which is basically a chemotherapy storage machine computerized and

connected to the net. It keeps a track of what drug and how much of the dose was removed for which patient. And that data is available to the billing service as well as to us.

BY MR. GROSSO:

**Q. Was that automatically transmitted to the billing service?**

MR. MELTON: Objection.

THE WITNESS: I do not know if it was automatically transmitted or not. But it was available to them. I believe that it was automatically transmitted since it was a connected -- it was an internet connected service.

And they had access to confirm that those administered to the patient to match the dose that the machine set and that appeared in the electronic health records. So it was their mandate to ensure that the dosage matched before they undertook the billing.

BY MR. GROSSO:

**Q. Okay. Was the physician schedule automatically transmitted to the billing code?**

A. They had access to them. I'm not sure there was a transmission, as in a willful transmission by somebody. But they had access to physician schedule.

**Q. So if they wanted to, they could log on to your system in Ashlands or Highlands and access that schedule?**

A. Correct.

**Q. But it was not automatically transmitted to them without them asking?**

A. I'm not sure what the difference is. But I guess it's an active versus passive difference. If that's your question, then it was not actively transmitted by somebody or by a machine. But they had access to it.

**Q. Well, what I'm concerned about is this, MARs, the Medical Administrative Record, is automatically transmitted to be used for billing, correct?**

MR. MELTON: Objection.

THE WITNESS: I don't believe it was automatically transmitted either. I believe the process was same where they had to log in to electronic health record to have the details. But that's my understanding. I'm not 100 percent sure how they did it.

MR. GROSSO: One moment.

This is Exhibit 5.

(EXHIBIT 5 MARKED FOR IDENTIFICATION)

MR. GROSSO: It is another medical

administrative record and too, will have to be redacted.

BY MR. GROSSO:

**Q. And this is an MAR for a patient who was treated at Highlands Cancer Center on May 22, 2014; am I correct?**

A. That is correct.

**Q. And the physician listed in the upper right-hand corner is yourself; is that correct?**

A. That is correct.

**Q. And under, Supervising Physician," you are again listed, Kirti Jain, M.D., correct?**

A. Correct. Very similar to the one we went through.

**Q. Now, if you look at Exhibit 4 which you had before --**

A. Yes.

**Q. -- and you look at Exhibit 5, you will see that Exhibit 5 has the drug being administered from 11:30 to 12.**

**And Exhibit 4 has drugs being delivered from 9:50 in the morning until 3:00 in the afternoon; am I correct?**

A. That's correct.

**Q. Now, you obviously could not be in two places**

**at the same time, right?**

A. That is true.

**Q. What physician was on the premises of each of these facilities at the time that these two patients were receiving their drugs?**

A. That would be a 9-year-old question that I could not answer, by any chance, for my memory. The names that are listed are that of me. But that simply means, as I explained to you, that I was the oncologist who planned that treatment, oversaw that treatment, and monitored that treatment for the patient. But this does not mean that I was there at that facility on that particular day at that time.

**Q. Did a A-One Biz Solutions Private Limited know that the term, supervising physician, meant that you -- did not mean that you were on the premises as supervisor?**

MR. MELTON: Object to foundation and form.

THE WITNESS: I could not speak on behalf of A-One Biz. I would hope they did because that was what most everybody follows, that the supervising physician is the person who plans, monitors the patient, devises the treatment plan. It does not mean the presence of that physician at that moment at that particular on that particular day. So

I really don't see a contradiction that you are alluding to. I did not need to be in two places at the same time. It was just that two of my patients were getting treatment on the same day at the same time.

BY MR. GROSSO:

**Q. Well, what is the difference in meaning for the entry physicians in the upper -- entry physician in the upper right-hand corner and the entry for supervising M.D. in the center of the MAR?**

A. There's no difference. I think one record comes from the initial data that is entered, the identity part of the patient that is the demographics that are entered. And the right upper corner comes from that. When demographics of a patient are entered into the medical records, they often enter -- well, there is a field where you enter the physician's name. That is in the right upper corner while the supervising M.D. is what nurses enter, implying who created the treatment plan or that particular treatment plan.

**Q. Now, how would one determine who was actually on the premises during the delivery of either of those set of services to those two patients?**

A. Once again, I -- as I explained, there are many other ways. You can determine that by looking at

the schedules, by looking at who was providing E&M services on that particular day, but certainly not from MAR.

**Q. Okay. Let's take a look at the excerpt of the schedule for May 22nd. And this one is for Ashland.**

MR. GROSSO: It will be Exhibit 6.

(EXHIBIT 6 MARKED FOR IDENTIFICATION).

BY MR. GROSSO:

**Q. Please take a moment to review it. When you've done, let me know.**

A. Yes. I have looked at it.

**Q. As I indicated, this is an excerpt for schedule report provided to us by the defendants. Is this part of the schedule as used at Ashland Bellefonte Cancer Center, a question for both?**

A. It appears to be.

**Q. Now, were you on the premises of Ashland Bellefonte Cancer Center on May the 22, 2014?**

A. It appears that way.

**Q. Okay.**

A. Unless somebody was covering for me that day, I would have no way of recalling that.

**Q. Okay. What other physician was available on May 22, 2014?**

A. I would think of at least two physicians I can

think of. One would be Dr. O'Laughlin himself. Second one would be locum because we had several locums who were covering during that period. So it could be any one of us.

**Q. So does this schedule indicate who was actually on the premises or not?**

A. The schedule would indicate who the patient was scheduled with. It would not say who is on the premises, but who the patient is scheduled with.

**Q. You mentioned that one could use the schedule to determine who was on the premises. How could one do that if the schedule didn't specify who was on the premises?**

A. The schedule does not. There are billing records one can refer to. There was -- if you wanted 100 percent determination of who was on premise any and every day of the year, I do not know that I can tell you how you could determine.

But with the variety of resources that are there, one could generally make a determination, if you really wanted to get into it, combining the -- the employment records, the billing records, the schedule. I'm not sure that one document will tell you who was on the premise that day. But combining various documents, one could.

**Q. What information was sent to A-One Biz Solutions Private Limited to enable them to determine that, yes, there was a physician on premises and this is the physician?**

A. That information was not needed, to the best of my knowledge, by A-One Biz. That information was more important for us to ensure that if a chemotherapy was being administered, if radiation was being administered, that there is a physician coverage. And we ensured that there was a physician coverage.

**Q. Okay. Let's take a look at the same schedule the same days, but for Highland -- the same day, but for Highland.**

MR. GROSSO: So this will be Exhibit number 7.

(EXHIBIT 7 MARKED FOR IDENTIFICATION)

MR. GROSSO: And I am relying on the court reporter to tell me that I'm keeping them in order.

THE REPORTER: Uh-huh. Yes. That's correct.

BY MR. GROSSO:

**Q. Please review this. And when you are finished, let me know.**

A. I have.

**Q. Okay. What physician was on the premises of the Highlands Cancer Center on May 22, 2014, according to the schedule?**

A. Once again, this would not tell me which physician was on premises. I would repeat what I said a while ago, that we ensured a physician was on premises. But this schedule does not tell you that. And it may not tell you that in other instances also since if a physician was absent, the locum physician could be covering. There were times that a radiation oncologist could be covering.

The idea of physician supervision is very plain and simple. That is, to ensure that the patient received a treatment safely. And -- and it doesn't necessarily mean that the physician's name be the schedule, that any other means of documenting who is there be undertaken primarily to ensure that a physician is available in case of a need. And to that end, we ensured that all our physicians were certified -- all our providers were certified in advanced cardiac life support or even all our nurses were certified in ACLS as it is known.

**Q. Were there times when a patient had an adverse reaction and there was no physician on the premises for either Ashland or Highland?**

A. I do not recall that there were any times that an adverse reaction happened and nobody was available. You know, we've been doing this for 40 years. And the

nature of chemo treatments is such that some adverse reaction probably happens on a weekly -- weekly basis, not surprising. And if you do the math, in 40 years of doing this, there probably -- a few thousand reactions have happened.

If you did the -- if you just said one a week, it will turn into 2,000 reactions. And I do not recall a single event of an adverse outcome of a reaction when a physician was not available. The -- I think that should give you some idea of -- of the -- the availability of physicians that we ensured, that the training of the staff that we made sure.

MR. GROSSO: Let me hand you an exhibit.

(EXHIBIT 8 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Please review it.**

A. I have.

**Q. This is the printout of an obituary for Carol [redacted]**

A. Correct.

**Q. Date of death, January 11, 2015. Are you familiar with the name [redacted]?**

A. It does sound familiar. But I could not be certain.

**Q. Was that not a patient at the Ashland**

**Bellefonte Cancer Center in 2014 and January 2015?**

A. Just looking at this, I could not be certain of it. But that name is certainly familiar.

THE REPORTER: That was Exhibit 8, correct?

MR. GROSSO: 8.

THE REPORTER: Okay.

MR. GROSSO: Let's take a look at Exhibit 9, this.

(EXHIBIT 9 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. This is a list of drugs and chemotherapy services that were given to patients listed by code. Please look at all four pages.**

**And particularly pay attention to the name, [redacted], that is listed.**

MR. MELTON: And this will need to be redacted as well.

BY MR. GROSSO:

**Q. Let me know when you're finished.**

A. Yes.

**Q. The first page lists the Code 96413. That is for an injection and intravenous infusion; is that correct?**

A. That is correct.

**Q. And I would note that [redacted] is listed**

**as having received that service, correct?**

A. Yes.

**Q. And the last date of receipt is January 9, 2015?**

A. That is correct.

**Q. Turn to the next page. This is a listing of the Code J1100 which -- forgive me for mispronouncing this, dexamethasone which is a steroid, correct?**

A. That is correct.

**Q. And she had received that on numerous occasions. And the last day of her receipt of that drug is January 9, 2015, correct?**

A. Correct.

**Q. Please turn the page. This is a listing of the drug -- not drug, Code J9045, and the drug being -- I can't pronounce this, carboplatin?**

A. Correct.

**Q. And that's a chemotherapy drug, correct?**

A. It is.

**Q. And [redacted] received that several times from June of 2014 up until the last day of January 9, 2015, correct?**

A. Yes.

**Q. Turn to the next page. And this is a listing of the drug Code J9267 which is paclitaxel which is a**

**chemotherapy drug, correct?**

A. Are you referring to the same patient?

**Q. There are a number of patients that have received this particular code. They are listed from top to bottom starting with Ernest Day (phonetic) and ending with [redacted].**

A. Correct.

**Q. Okay. And [redacted] is listed two days for this, the first, December 26, 2014. But she didn't receive any units, correct?**

A. Yeah.

**Q. And the second is January 9, 2015. She received 117 units?**

A. You mean January 9th?

**Q. That's what I meant.**

A. Okay. Yes.

**Q. January 9, 2015, she received 117 units, correct?**

A. Correct.

**Q. It's the first time she received that drug, right?**

A. I do not know.

**Q. According to this sheet, this is the first time she received that drug, correct?**

A. Let me make sure. It appears that way based

on what you provided me.

**Q. Now, the first time she received that drug was January 9, 2015, correct?**

A. Yeah.

**Q. There was no physician on the premises when she received that drug, correct?**

MR. MELTON: Object to form.

THE WITNESS: I don't think that's correct. How would you deduce that conclusion?

BY MR. GROSSO:

**Q. By interview of people.**

A. I don't think so. I -- we ensured a physician presence all the time a patient was receiving a treatment especially if they were starting a new drug.

**Q. And she was taken by ambulance to the hospital on campus, correct?**

A. If she had a reaction, she might have been taken by ambulance to the hospital. That is not surprising. I do not know if it is correct. But it is a possibility. Yes.

**Q. Okay. And she died as a result of that adverse reaction, correct?**

A. No. I do not know that is correct. I do not have records to review and tell you that.

**Q. Well, if you review the records, can you then**

**tell me that?**

A. Yes. If I had the office records and the hospital records, yes. I could tell you that.

**Q. Okay. And maybe we can do that.**

A. I -- I'm sure we can. Yeah. But I have no way of recalling what you're telling.

**Q. Was Ashland Bellefonte Cancer Center not sued or threatened with a lawsuit by the family of [redacted]?**

A. I don't remember any suit by the family of [redacted]. I don't recall.

**Q. Were you not threatened with a lawsuit?**

A. I could not tell you if they threatened to somebody. They do not -- they did not threaten to me.

**Q. Okay. And you didn't approve a settlement with [redacted], did you?**

A. I don't -- I have never approved a settlement to anybody that I remember.

**Q. Let's go back to Exhibit number 6. And this is the schedule for May the 22nd?**

A. Yes.

**Q. I notice -- well, I'll tell you, this is a Thursday. And were there something known as tumor board meetings held on Thursdays?**

A. Yes.

**Q. Where were they?**
A. And other days.
**Q. Okay. Where were they held?**
A. It dependent on which hospital, which tumor board. And you know, periodically, they were held. Periodically, they weren't. So it all depended on that.
**Q. Did the Ashland Bellefonte -- let's rephrase that.**
**Did Our Lady of Bellefonte Hospital hold tumor board meetings on Thursdays?**
A. Our Lady of Bellefonte Hospital used to hold tumor board meetings. Yes. But they were held on a variety of different days at a variety of different times.
**Q. Were they not held during the period of -- let me rephrase that.**
**During the period, July 1, 2012, to the end of December 2016, did the Our Lady of Bellefonte Hospital hold tumor board meetings on Thursdays at noon?**
A. So I would not be able to tell you if it was during that period or not. But there were times tumor board meetings were held on a Thursday at lunchtime which would be about noon. If it applied to that period and if it applied to all of that period, I could not tell you that.

**Q. Would you see patients -- let me rephrase that.**

**Did you go to the tumor board meetings?**

A. Very occasionally.

**Q. Did you not go religiously on Thursdays to the tumor board meetings?**

A. No. I did not.

**Q. When you went, did the other physicians who may have been on the premises go also?**

A. Generally, at least one physician would stay back. But this meeting was not a requirement for us. This was a hospital meeting that hospital undertook to ensure of their accreditation for oncology. We attended voluntarily when we wanted to. Tumor board is a multidisciplinary meeting where a patient, not all patients, some patients are discussed as to their treatment advice with input from surgeon, medical oncologist, radiation oncologist, pathologist, radiologist, and so on so that everybody can be together and review if the treatment course is proper.

If there's any new query from treating physician or if it is a new diagnosis, then advice as to what might be the proper treatment. Sometimes, these patients had already started treatment. And they were reviewed. And the tumor board may or may not have an

advice. The chairman of the tumor board was generally a hospital-employed physician. I recall a name, Dr. Rodriguez (phonetic) who was a pathologist. For a while, there was a radiologist. There were different physicians. Because the appointment was an annual appointment.

So every physician did not go. In fact, the surgeons were often difficult to have them attend because a lot of times, it conflicted with their surgical schedule. And therefore, the tumor board timing were changed time-to-time. There were times they were held at 7 in the morning, 7:30 in the morning, 8 in the morning. They were held at noon. They were held in the evening at times. The idea was to see what time they could get the best attendance from multiple physicians because we wanted attendance from family physician, from surgeons, from pathologists, radiologists, and so on, forth.

The idea is to have all disciplines involved including sometimes, nursing so that the input is there from all different specialties. And the hospitals struggle to have all specialties be there. And therefore, times were changed from time-to-time to see what worked best. As for us, we would try to get at least one medical oncologist and one radiation

oncologist in the tumor board. But we could not always do that because patient care came first.

**Q. Okay. Let's take a look at Exhibit 6. You have it in front of you. It's there.**

A. Sure. Okay. Thank you.

**Q. And this, again, is the excerpt of the schedule report provided by the defendants for May 22nd. Take a look at the entry on the second page for 12:00 p.m.**

**Your name is listed, correct?**

A. 12:00 p.m., I see it. Yes.

**Q. It says, "Block chair," correct?**

A. Correct.

**Q. And under that, it says, "Mary Ann and P."**

A. Correct.

**Q. And it says, "Appointment block." What does block mean on the schedule?**

A. I'm not sure what the block word itself means. I could interpret that. But I -- I personally do not know what that means. It implies to me that no patients to be treated at that time.

**Q. Okay. For both you and Mary Ann Stevenson, right?**

A. That's what the implication would be. Yeah.

**Q. And that was because on Thursday at noon, both**

**of you went to the tumor board meetings at the Our Lady of Bellefonte Hospital, correct?**

A. It's conceivable.

**Q. Okay. So when you went to those tumor board meetings, you did block your calendar so patients would not be scheduled to meet with you at that time, correct?**

A. Yes. This would -- my -- the block would be for visit of the patient. That is, the E&M visit.

**Q. Okay. So regardless of whenever other tumor board meetings might be, if you had a tumor board meeting on a Thursday at noon, you would block having to meet any patients at that time; is that correct?**

A. Not necessarily. We would attempt to. However, if I had to see a patient or a patient who was scheduled before noon spilled over into the time, I would first take care of the patient and then decide whether to go to tumor board or not. In fact, as it turned out, I usually ended up not going to the tumor board.

**Q. Yeah. Bon Secours took over Our Lady of Bellefonte, right?**

A. Bon Secours took over many years ago from Franciscan Sisters for the Poor. And then later on, the Bon Secours gave it to the Mercy system. So it has changed hands several times. And then Mercy ended up

closing it.
**Q. And when you went to the tumor board meetings, there was a registrar who kept track of when, correct?**
A. She kept track of the attendance. Yes.
**Q. And also kept minutes of who spoke, correct?**
A. The minutes of who spoke were somewhat sketchy as to -- it was a very brief summary about the patient which did not always -- was correct in the sense that every person who spoke or did not speak was listed. No. Because it was a very brief summary. And that was a summary according to the registrar who is a non-medical person. There were times I would correct her that that's not exactly the way it was done or discussed.
**Q. Okay. So you were noted in those minutes that you had been there, correct?**
MR. MELTON: Object to characterization.
You can answer.
THE WITNESS: That would likely be.
MR. GROSSO: Okay. All right.
MR. GROSSO: Let's mark this as Exhibit -- where are we?
THE REPORTER: This will be 10.
(EXHIBIT 10 MARKED FOR IDENTIFICATION)
BY MR. GROSSO:
**Q. Please take a look at this. It's excerpts**

**from the schedule report. But this time, it's for May the 1st.**

A. Yes.

**Q. Let's take a look at noon, May the 1st. You were listed as being blocked, correct?**

A. Okay.

**Q. And Mary Ann Stevenson is listed as being blocked, correct?**

A. That is correct.

**Q. At noon. And this is May 21, 2014, which is a Thursday.**

A. Is it?

**Q. Yes. I have a calendar. And I can show you.**

A. Because you said May 9th was a Thursday. But --

**Q. No. May 22nd. Let's take a look.**

A. I see if --

**Q. I have a calendar.**

A. Got it. I'll accept that.

**Q. Okay. Always a Boy Scout. Always be prepared.**

A. I'll accept that.

MR. GROSSO: Make this Exhibit -- what's today's date? I mean, what's --

THE REPORTER: The next exhibit?

MR. GROSSO: Yeah.

THE REPORTER: Would be 11.

MR. GROSSO: 11.

(EXHIBIT 11 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Please take a look at this calendar.**

A. Yeah. I have already accepted because it -- that's right.

**Q. Okay. So the 1st of May 2014 and the 22nd of May 2014 are both Thursdays?**

A. Yes.

**Q. All right. Now, let's take a look at the schedule for that day at Highlands.**

MR. GROSSO: This is Exhibit number 12.

(EXHIBIT 12 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Please tell me what physician was scheduled to be present at Highlands on May the 1st 2014?**

MR. MELTON: Objection.

THE WITNESS: I cannot tell you from this.

BY MR. GROSSO:

**Q. What?**

MR. MELTON: Objection. He has already asked and answered.

THE WITNESS: I don't see a physician's name on

that schedule.

BY MR. GROSSO:

**Q. So there is no physician scheduled to be at Highlands on May the 21st 2014, according to the records produced by the defense, correct?**

MR. MELTON: Objection. Mischaracterization.

You can answer.

THE WITNESS: Once again, I think -- if you're referring to schedule or presence, let me explain how it worked. There were days -- for example, let me first address the chair block that you're referring to. That -- we would tell them this particular day, this particular time, block it on a regular basis. That means they cannot schedule another patient at that time. It doesn't mean a spillover would not go into that time. And physician can still be working at that time. So block doesn't mean physician is not there at that time. It just mean there's no schedule.

Having said that, coming back to the second point that those days there is no patients scheduled in physician's name, again, does not mean there is no physician there. There could be a radiation oncologist there. There could be a locum physician who is scheduled who -- who would see patients that

are scheduled. If the nurse practitioner needed their patients seen, that was not uncommon in our practices which were small practices, not the kind of large practices, like hospitals do.

We did things just to ensure that the patient safety and compliance are met and not necessarily everything is recorded. There were days I might have been scheduled at one place and I would cancel the schedule and go to the other place if the need be such. If one of my colleague got sick, I had to ensure that the coverage was there.

BY MR. GROSSO:

**Q. Okay. Well, Dr. Hayek left in December 2013 around Christmastime, correct?**

A. That would be correct.

**Q. All right.**

A. I think it might have been 27th of December.

**Q. Let me give you -- to look at a declaration by Dr. Hayek.**

MR. GROSSO: Exhibit 12, I believe.

THE REPORTER: This will be 13.

MR. GROSSO: 13.

(EXHIBIT 13 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Please look at it. Have you seen this before?**

A. May I read it? Since I -- I don't recall it.

**Q. Okay. Sure. Any document that you're given you can review until you're satisfied that you understood it.**

A. Got it.

**Q. Yeah. Now, according to this Declaration of Dr. Fadi Hayek which is what this purports to be, he left around Christmas of --**

A. After Christmas of 2013. Yes.

**Q. So effective December of 27, 2013, he was no longer on the premises of either Highlands or Ashland clinics; is that correct?**

A. That would be correct. After the end of 2013. Yes.

MR. GROSSO: Now, this is Exhibit number 14?

THE REPORTER: 14. Yes.

(EXHIBIT 14 MARKED FOR IDENTIFICATION)

THE WITNESS: Yes?

BY MR. GROSSO:

**Q. Do you recognize these?**

A. I do.

**Q. Okay. They are two listings of the start dates and some other information for Dr. Venu Madhav Konala and Dr. Sameer Batoo.**

**These were -- were these prepared by Manish**

**Jain?**

A. I do not know who prepared them. But I recognize both names.

**Q. Okay. These are records obtained from the defendants. They state that the start date at the practice for both physicians is July 1, 2014; is that correct?**

A. That appears correct. Yes.

MR. GROSSO: This should be Exhibit number 15.

THE REPORTER: 15. Yes.

(EXHIBIT 15 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Please review it.**

A. Yes.

**Q. This is the same type of document as indicated before.**

A. Yes.

**Q. And it states that Anshu Jain started at the practice also on July 1, 2014, correct?**

A. Correct.

**Q. Okay. Now, what physicians were at the practice of both or either Ashlands and Highlands for the period after Dr. Hayek left effective December 27, 2013, and when those three physicians we just named arrived July 1, 2014?**

A. So your question, could you repeat that? I didn't --

**Q. Sure.**

A. -- fully understand the question.

**Q. What physicians were employed -- let's start this way.**

**What physicians were employed by the practice during the period after Dr. Hayek left and before these three physicians?**

A. Okay. So the six months period of first half of 2014 is what you're referring to?

**Q. Right.**

A. So the two that were employed was myself and Dr. O'Laughlin. And we had locums filling in also.

**Q. Who were those locums?**

A. I recall a few names. There was a Dr. Bertram. There was Dr. Batra. I also recall another name. But I'm not sure if it was exactly the time period or not, Dr. -- Dr. Janowski. But -- and there may have been others.

**Q. Okay.**

MR. GROSSO: Are we on 16?

THE REPORTER: Yes.

(EXHIBIT 16 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Now, this is a letter obtained from the defendants dated November 13th in 2013 from CompHealth. What, if you know, is CompHealth?**

A. It's a locum agency.

**Q. Right. It indicates that Dr. Juergen Bertram, first name, J-U-E-R-G-E-N, last name Bertram, B-E-R-T-R-A-M, would be serving as a locum tenens at the Ashland Bellefonte Cancer Center during the period, January the 6, 2014, to July 31, 2014.**

**Why was Dr. Bertram contracted through CompHealth to work at the Ashland Bellefonte Cancer Center?**

A. Well, we needed another medical oncologist after Dr. Hayek had left. And the two we had recruited were not starting until July 1. So we had a roughly six-month gap to fill.

**Q. Okay. And this would've filled that gap, correct?**

A. Yes.

**Q. Except for the period between and including December the 27th up to January -- and including up to January 5, 2014, right?**

A. Correct.

**Q. Who was covering the centers during that, what I would call, gap period of December 27th through**

**January 5, 2014?**

A. Well, one, there were quite a few holidays around that time as it's called the holiday season. And the other times, it would be the two of us. I do not recall if I had any short-term locum at that point or not.

**Q. Okay. Was Dr. Bertram -- or was Dr. O'Laughlin present during the time December 26th through January the 1st?**

A. I cannot recall. I would think so. But I don't have any recollection. And if he -- if he was not, then he did not -- he could not have been sanctioned officially in my opinion. I would've never allowed that. So I do believe that he was or he should have been.

**Q. Okay. We'll come back to that in a moment. Let's continue with Dr. Bertram's schedule. So he's initially scheduled for January the 6, 2014, to July 31, 2014.**

**Who made the decision to hire Dr. Bertram through CompHealth?**

A. The process would have been undertaken by Manish Jain and would have been completed by him. Although, he would've likely consulted with me in terms of whether he was the right candidate or not.

**Q. Okay. Who made the decision to hire a locum tenens for this period?**

A. Once again, the decision would be made by Manish for finding proper coverage. But it is likely that he would have consulted with me.

**Q. Why was no one scheduled to be brought on until January the 6, 2014?**

A. It may have been availability of the physician.

MR. MELTON: And I object also on foundation and characterization.

BY MR. GROSSO:

**Q. When did you learn that Dr. Hayek was leaving?**

A. I could not recall. That's nearly ten years ago. I do not recall. But he had certain notice periods, I would imagine, depending upon what it was, 60 days or 90 days or something along those lines.

**Q. So why did -- well, I think you've answered that question. All right. Sometimes I have a habit of repeating my questions. Forgive me. Let's try this.**

MR. GROSSO: 17?

THE REPORTER: Uh-huh.

(EXHIBIT 17 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. This is another letter from CompHealth dated**

**January 4, 2014. It says, "Revised." And now the physician's work schedule for Dr. Bertram has been reduced. Instead of the end date being July 31, 2014, it's now February the 4, 2013.**

**Why did Dr. Bertram's schedule change?**

A. I recall that he had left early. But my recollection was that he stayed for a couple of months or longer. But for some reason, once he arrived, he was not happy staying here longer. I'm not sure if it was the area or what he was looking for. But he did not complete the whole time he had contracted for.

**Q. Let me ask you if you had any conversations with him about why he was leaving early?**

A. That's such a long time ago. I would not be able to recall any conversation with him.

**Q. Did he tell you he was unhappy with the procedures in place for physician supervision?**

MR. MELTON: Objection to --

THE WITNESS: No. Absolutely not. I do not recall any of the physicians that we have had complaining about unhappiness with any physician supervision.

BY MR. GROSSO:

**Q. Okay. So we have Dr. Bertram working at the Ashland Bellefonte Cancer Center until February 4, 2014,**

**inclusive.**

**Did he also work at Highlands?**

A. I could not tell you that.

**Q. Sure.**

A. I -- when we brought on locums, we always told them that they could be at either of the facility. And I know that we had scheduled them at both facilities. But if you ask me a specific question about him, I could not recall that.

**Q. Okay.**

MR. GROSSO: This is number 18.

THE REPORTER: Yes.

(EXHIBIT 18 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Please review it.**

A. Yes. I do.

**Q. This is to Mr. Manish Amin (phonetic). Who is that?**

A. Sorry?

**Q. Who is Manish Amin?**

A. It appears to be a typo error. There is no -- there was no Manish Amin.

**Q. So it was probably Manish Jain?**

A. I suspect so.

**Q. All right. "Manish, this is to confirm that**

**you have formally accepted Dr. Ron Batra to provide your requested locum tenens coverage in Ashland and**

**Prestonsburg for Ashland Bellefonte Cancer Center. The dates of coverage are as follows and are scheduled pending successful hospital connection: April 7th through April 25, 2014, May 13th through May 23." That should be 2014. It says, "2104, and June 2nd through July 6, 2014."**

**So we don't have any coverage of locums for what we've seen from February 5th through April the 6, 2014; is that correct?**

MR. MELTON: Object to characterization.

THE WITNESS: By him. There is no coverage by him.

BY MR. GROSSO:

**Q. Okay. Were there -- what other locum tenens besides Dr. Bertram and Dr. Batra were present at the two cancer centers during this time?**

A. The locum tenens were hired through agencies. And I tried to get the details through my employment record which, as I told you, is on my e-mail. Unfortunately, they did not appear on the employment record because that was through payroll service, I think ADP or one of these national payroll services that are there.

I could not tell you who else was there. As -- I mentioned that I remember one name of another locum, Janowski. But I could not give you exact date that he was there. So I could not tell you who else was there or was not there. But all I can -- all this tells me that -- what dates he was there.

**Q. Okay. In fact, as we'll see, it doesn't even tell you that as we have two revisions for his schedule.**

**But you cannot, as you sit here, tell me the name of another locum tenens who you know was present during the six-month period after Dr. Hayek left and Dr. Konala and --**

A. Other than the names I've mentioned, nothing else comes to my mind.

**Q. But you can't tell me whether they were there during that period?**

MR. MELTON: Object to characterization.

THE WITNESS: No. Again, ten years is a long time.

BY MR. GROSSO:

**Q. Okay.**

A. Or nearly ten years.

**Q. Okay.**

MR. GROSSO: This is Exhibit number --

THE REPORTER: 19.

MR. GROSSO: 19.

(EXHIBIT 19 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. This is another letter from Cancer Point [sic] dated March 13th, the day after the last one. And we have a revision of the service dates. It's now April 21st through May 5th, May 23rd through June 1st, and June 8th through June [sic] 6, 2014.**

**Can you tell me why there was a revision to this agreement?**

A. I could not tell you why there was a revision. Once again, that's such a long time ago. But I've not calculated the -- the dates. But it might have been something he needed to do. Or I could not answer that.

**Q. All right. And let's go through one more.**

MR. GROSSO: 20?

THE REPORTER: Yes.

(EXHIBIT 20 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. And this is dated -- it's a letter again from Cancer CAREpoint to Mr. Manish Amin, probably Jain, dated May 8, 2014. And the dates now have been changed to May 12th through May 21st and June 10th through June 25th.**

**Why were the dates narrowed?**

A. Again, I can only speculate. That was so long ago. It may have been changes in other locums' availability. But I could not speculate as to why these changes were made since Manish Jain used to manage scheduling the locums, make their dates available, or change them. This was not something I got involved with day-to-day.

**Q. Okay. Well, you will notice that he is coming in on May -- coming in May 12th, leaving May 21st. Or his last day is May 21st. He's leaving in the morning of the 22nd.**

**So he was not available on the morning or the afternoon of the 22nd, was he?**

A. That would've been the implication for afternoon of 22nd.

**Q. Okay. But his dates of service are May 12th through May 21st, correct?**

A. That's the -- what it --

**Q. So we were looking at those schedules before for May 22, 2014, for both Ashland and for Highlands. We do not have a locum tenens scheduled on May 22nd for either facility, do we --**

MR. MELTON: Objective.

MR. GROSSO: -- either --

MR. MELTON: Form of characterization.

MR. GROSSO: -- cancer center?
THE WITNESS: We do not have -- I'm -- could you repeat the question?
BY MR. GROSSO:
**Q. Sure. Let me strike that.**
**We do not have a locum tenens scheduled for either Highlands or Ashland for May 22, 2014, do we?**
MR. MELTON: Objection.
THE WITNESS: I can only deduce that Dr. Batra was not scheduled to be there on the afternoon of May 22nd.
BY MR. GROSSO:
**Q. It says his schedule was up to the 21st. It does not say --**
A. That's the -- that's what the letter implies. Now, having said that, there've been enough changes. Whether there was yet another change, I do not know. Everything may not have been through e-mail and documents. Whether he -- he changed his dates yet again. I do not know.
**Q. Yeah. We've asked for all those records. And this is what we've been given. If there's something else, I would like to have it.**
MR. MELTON: Is that a question? I don't --
MR. GROSSO: It's a request.

MR. MELTON: Okay. Yeah.

MR. GROSSO: If there is nothing, you don't have to give it to me.

THE WITNESS: We -- we make a very serious attempt to get you everything we can including, as I said, we -- we call Embassy over and over, sent letters and such to get what you --

MR. MELTON: And we can --

THE WITNESS: But you have --

MR. MELTON: We can deal with the discovery disputes another day.

MR. GROSSO: Okay. It is just about 12:30. And we've been going with a short break for three hours. I could go another half an hour straight. But now is a good time for everyone to stretch their legs and take a break. So what say you-all? Let's take a break.

MR. MELTON: Yeah. I'm good to take a break.

MR. GROSSO: Let's come back in what, 40 minutes, 45 minutes?

MR. MELTON: Like, are you -- a break for lunch --

MR. GROSSO: Yeah.

MR. MELTON: -- is your thought? Sure. That sounds good to me.

MR. GROSSO: All right.

THE VIDEOGRAPHER: Give me one moment.

We're now off the record. The time is 12:26 p.m.

(OFF THE RECORD)

THE VIDEOGRAPHER: We are now back on the record. The time is 1:11 p.m.

BY MR. GROSSO:

**Q. All right. Dr. Kirti Jain, we are back on the record. And you are still under oath. Do you understand that?**

A. Yes, sir.

**Q. All right.**

MR. GROSSO: This is going to be Exhibit 21.

(EXHIBIT 21 MARKED FOR IDENTIFICATION)

MR. GROSSO: And I'm going to need more exhibit stickers.

THE REPORTER: Okay. Here we go.

BY MR. GROSSO:

**Q. I will tell you what this is. We, meaning Dr. O'Laughlin and I, obtained from Centers for Medicare & Medicaid Services or CMS, claims data for Ashland and Highlands and you and him. And this is a very, very, very, very small excerpt of that data. The column -- the numbers on the top above each column indicate the**

column out of which these entries came on the spreadsheet that was provided by CMS.

They have the numbers there. And the captions are either the same captions or slightly modified to fit the size of the cells so that I didn't have multiple sheets.

And the dates chosen here are December 27, 2013, which is the first day that Dr. Hayek was gone, December 30, 2013, Monday, January 13th, January 15th, January 16th, January 17th, January 24th, and January 29th. Everything that is in red is a claim submitted for services at Ashland. And everything that is in blue is for services submitted at Highlands. The first question I have has to do with the column labeled, "127, Rendering Provider."

How was the name or identity of the rendering provider obtained by your billing company so that it could be sent directly or indirectly to CMS for payment of the claim?

MR. MELTON: Objection. Form, foundation, and hearsay.

Answer.

BY MR. GROSSO:

Q. If you know?

A. As I explained to you previously, the

rendering provider was the oncologist who formulated the treatment plan who was overseeing the overall treatment plan, who knew about the plan, who knew the details about the patient as to why a certain plan was developed, and -- and made sure that that plan was executed properly.

It was not a physician who might have been present or not present on that day because that physician may or may not know anything about the patient. The idea of having a physician present is to ensure safety, not know anything about the patient or every patient who gets the treatment. So these -- this name of rendering provider was the physician who created the treatment plan and oversaw the treatment plan.

**Q. Do you know whether or not there was a requirement that the physician who actually provided the service or supervised the service directly was the person to be named in the entry for that column?**

MR. MELTON: Objection.

THE WITNESS: I'm not sure of any such requirement. To me, a physician who is developing a plan, who knows the patient's details, who knows the goals of the treatment, and who would oversee the whole execution of the treatment plan is the physician who is providing the treatment, not

somebody who is available to take care of an emergency or to provide any emergency assistance in case of a mishap.

BY MR. GROSSO:

**Q. Okay. Okay. So what's the difference between -- and they're not here. So I'll have to show you some other examples.**

**But what, to your understanding, is the difference between a billing provider and a rendering provider?**

MR. MELTON: Objection. Foundation.

THE WITNESS: I'm not sure the difference is between a rendering provider and a billing provider. To me, they are saying the one who oversees the patient's whole treatment plan is the man --

BY MR. GROSSO:

**Q. Okay.**

A. -- or woman in some cases. I -- I just -- from I -- I'm a clinician. And from clinician standpoint, the patient matters, the treatment matters, the execution of treatment matters, the -- the goal of the treatment matters, is it palliative, is it curative. The rest, all is technical. That's what a manager is for. That's who does rest of it.

**Q. Well, there's a difference in reimbursement.**

**If a nurse practitioner, for example, is doing the on-premises supervision and is -- and the claim is being billed that way as opposed to a physician being on the premises, doing the supervision, and the claim is being billed that way; am I right?**

A. So from what I know -- if a physician is on premises, then the nurse practitioner can be billed under that physician if he's supervising for that nurse practitioner. If there's no physician on premises, then it gets billed under nurse practitioner directly. And there is some difference in reimbursement. That's my knowledge about the subject.

**Q. Okay. So do you know the differential, how much more a physician would be paid as opposed to a nurse practitioner for providing a direct supervision?**

A. I think it's ten to 15 percent difference. I don't know the exact number. But it -- it's in that neighborhood.

**Q. So we're not talking, in this case, about patient safety per se. We're talking about the amount that Medicare is being billed and pays over, correct?**

A. In which case?

MR. MELTON: Object to form.

BY MR. GROSSO:

**Q. In a case where a physician may not be on the**

**premises, the nurse practitioner is doing the direct supervision?**

A. True. The -- the difference would be the -- the administration charge, not the drug charge which remains the same, which is the dominant part of the charge. The administration part is -- which is a minor charge, usually, very minuscule compared to the drug cost.

**Q. Yeah.**

A. Yeah.

**Q. But that comes out of the Medicare trust fund. Am I right?**

A. I think so. Yes.

**Q. Except for those bills to Medicaid. And that comes out of the state funds, correct?**

A. I don't know what extent the state funds are subsidized by the federal government. I understood that it was dominantly state. But they were funded by the federal government. But that's a limited knowledge.

**Q. So funded in part?**

A. Yes.

**Q. Okay. Let's go back to this exhibit. Let's take a look at the dates of Friday, December 27, 2013, and Monday, December 30, 2013.**

**According to the Affidavit of Dr. Fadi Hayek,**

**he was not on the premises?**

A. Correct.

**Q. And yet these claims were billed with him as being the rendering provider. Do you know why they were billed in that matter?**

A. So there is a provision in -- by Medicare that if a physician needs a practice, that for certain length of time, the billing can be done under that physician. I'm not sure the exact length. It's 60 days or 90 or 180. But there is a significant duration that they allow during which period, a locum or another physician covering. And the billing can be under that physician.

**Q. Would it be necessary for there to be a physician on the premises for it to be billed in the name of the departing -- I don't want to say departed, the physician who has left?**

MR. MELTON: Object to form.

THE WITNESS: I would think there would have to be a provider around. And we -- we -- we have him around. Yes. The -- the name, again, it goes back to the question of whether it is the physician of record who's providing the treatment plan or is it the one who is present?

MR. GROSSO: Sure.

I'm going to hand you what I've marked as

Exhibit 22.

(EXHIBIT 22 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. This is another excerpt of the schedule report for Ashland. The date I'm concerned with that's on here is December 27th.**

**Please review it and tell me who the physician was who was on premises at Ashland for December 27th?**

A. This schedule does not tell me who was on the premises.

MR. GROSSO: I'm going to hand you Exhibit 23.

(EXHIBIT 23 MARKED FOR IDENTIFICATION)

MR. GROSSO: This is a schedule for Highlands for the same day. Hold on.

Does somebody have the exhibit I marked 22?

MR. MELTON: That's mine.

MR. GROSSO: Well, I only have one here.

MR. MELTON: And these exhibits can be redacted as well.

THE REPORTER: 22 and 23?

MR. MELTON: And I think 21 as well.

THE REPORTER: Okay.

MR. MELTON: Yeah. 21 as well.

BY MR. GROSSO:

**Q. Now, this 23 is for Highlands, as I said, for**

**December 27th. Will you please look at it and tell me where you were on that day?**

A. So I had a schedule at Highlands is what I can say from this.

**Q. So you were scheduled to be at Highlands?**

A. Yes.

**Q. Now, Dr. Hayek was gone. Dr. Bertram had not yet joined the practice. You were at Highlands.**

A. Well, I don't know whether I was. I'm scheduled. I said previously that I may have a schedule. But somebody else could be seeing patients, i.e. A locum. There were times if I could not make it to a certain schedule, I would ask my nurse practitioner to see those patients.

**Q. Okay.**

A. So I -- I -- from this, I cannot confirm to you that I was there. But I see a schedule for me.

**Q. So you were scheduled to be at Highlands?**

A. Correct.

MR. GROSSO: This is Exhibit 24.

(EXHIBIT 24 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. This is an e-mail with an e-ticket itinerary for Dr. Robert O'Laughlin, leaving Charleston, West Virginia, by United Airlines on December 24th, Christmas**

**Eve, flying to Philadelphia, arriving December the 24th. So he has left the cancer centers on the 24th of December.**

A. That's an itinerary, not a -- a boarding card. But go ahead.

MR. GROSSO: And the next exhibit is 25.

(EXHIBIT 25 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. And this is the same type of document but is a -- for a United Airlines flight for Dr. O'Laughlin returning December 31st from Las Vegas and arriving in Columbus, Ohio, on January the 1st, 1:17 p.m.**

MR. GROSSO: And this is Exhibit 26.

(EXHIBIT 26 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. This is an Avis Car Rental receipt indicating the car was returned to the airport at Philadelphia on December the 27th 2013.**

**So is it fair to say that Dr. O'Laughlin was not at the clinic, at the centers -- the cancer centers on December 27, 2013?**

A. I -- from this, I could not say that. I see an itinerary -- his airline itinerary, from two different places. I see a rental agreement. But I'm not sure that confirms. Besides, if you could produce

some sanctioned time off, that would be helpful. You had access to Manish Jain's e-mails. Perhaps you can --

**Q. Actually those type of e-mails have not yet been turned over. We will debate that after these depositions are done.**

A. I found several things that you showed me from Manish Jain's e-mail. So I presume you have access to those.

**Q. No. They were all limited to Medicare, ones that referenced Medicare and Medicaid. The additional e-mails have been requested. They have not yet been produced. We will worry about that later. I was not going to postpone the depositions for that.**

A. Fair enough. Well, to answer your question, you've shown me itinerary. There is -- I don't see any boarding tickets. I'm not sure he traveled this. But I do see that itinerary.

**Q. Okay. So he has left. If this itinerary is to be believed, he has left Kentucky, December the 24th. He's at the airport returning a car in Philadelphia on the 27th. And he's flying back from Las Vegas to Columbus on the 1st -- December 31st and 1st of January 2013 -- '14.**

**If that's the case, what physician was available on December 27th and December 30th to see**

**patients if there was no other physician other than you and you had two centers where patients needed to be seen?**

A. So first of all, there's obvious presumption that he was away. I do not know that for a fact. Secondly, patients who were scheduled in name -- my name, were not necessarily seen by me. They could have been seen by my nurse practitioner. Thirdly, there were times I went to both offices. That happened multiple times. This was not an unheard of occurrence. And fourthly, there could have been a locum. I could not answer that since I don't -- that has been ten years, almost ten years to -- to this day, short by a week. So I could not. There -- there are many possibilities that exist that happened those two days that you're talking about.

**Q. Great. Now, you said you would sometimes go from one cancer center to the other?**

A. Yes.

**Q. Okay. Some of these chemotherapy treatments, as we saw with one of the medical administration records, can begin early or mid-morning and go to mid-afternoon, right?**

A. Uh-huh.

**Q. Would you -- if you were the only physician at**

**a cancer center while patients were being given chemotherapy services, would you wait until all of the services to all of the patients at that cancer center were completed before you left for the other cancer center?**

A. So it depends on the individual situation. Once again, the -- I'll give you an example of a long chemotherapy, cisplatin which is commonly -- that includes pre-hydration of a patient. Patient is just hydrated. Then there's about an hour of chemotherapy. And then there's several hours of post-hydration because we want that drug to -- to get out of the system as much as it can. So if -- in a hypothetical situation you mentioned, one could watch the patient for -- chemo and hydration can be watched by a nurse practitioner. Now, I'm not sure that applies to these two days or not. But one could potentially do that if need be.

**Q. Well, as I said, the purpose of the -- or the focus of this case is not so much on the medical aspects. Although, that's part of it. But the focus is on the billing aspect.**

**If you left in midstream, so to speak, while a patient was being given, whether it be, infusion, hydration, chemo, dehydration, whatever, could that be properly billed under your NPI number as opposed to the**

**nurse practitioner who remained there?**

A. Sir, I'm a clinician. I was trained like a clinician. I have always looked after the patient's interests.

**Q. Right.**

A. And I've always focused on delivering good medical care. I could not tell you what the technicalities of minor points of billings are. But I could tell you one thing, that we always, always oversaw the best interest of patients, whatever it took. And I have -- I can say that with no doubt in my mind that never have I ever compromised the care of a patient.

But have I looked into every minute detail of the billing? No. Do I care to? No. That's not my job. That's what you hire a manager for. So I could not tell you if I was there four hour. And one hour, nurse practitioner was there. Was that transition captured for two or $3 of difference would it make? I don't know. But I can tell you one thing, that I would not do anything to get that extra $2 or $3. It's neither worth my time nor it goes with my conscience nor would I ever advocate that.

**Q. What mechanism was in place to make sure that the appropriate provider was being billed if sometimes**

**there was a nurse practitioner and other times there was a physician?**

A. Once again, that's a question for the manager. That's why we had operations manager who looked after these things, created policies, ensured that the proper charges were captured and transmitted to the billing.

**Q. Okay. All right.**

MR. GROSSO: This is going to be Exhibit number --

THE REPORTER: 27.

MR. GROSSO: I didn't hear you.

THE REPORTER: 27.

(EXHIBIT 27 MARKED FOR IDENTIFICATION)

MR. GROSSO: Which is appropriate since this concerns December 27th.

MR. MELTON: And this also will need to be redacted.

THE REPORTER: Uh-huh.

BY MR. GROSSO:

**Q. This is, again, excerpts from the Medicare claims data. It's dated -- it's for the date of December 27, 2013. The rendering provider is listed as Dr. O'Laughlin. And everything in red is a claim that was submitted by Ashland with Dr. O'Laughlin being listed as the rendering provider. Everything in blue is**

**the same for Highlands. And everything in yellow is the same for Logan.**

**And my first question is: How can Dr. O'Laughlin be specified as being the rendering provider at all three cancer centers on the same day?**

MR. MELTON: Objection to form and foundation.

THE WITNESS: I think --

MR. MELTON: And also objection to relevance.

THE WITNESS: I think I've answered this question a few times. And I shall repeat that Dr. O'Laughlin was the radiation oncologist of record in these three places. These patients were seen by him. The treatment plan was formulated by him and -- and overseen by him. And he -- as we have said before, the rendering provider was the oncologist who oversaw them and not who was present there in person.

BY MR. GROSSO:

**Q. Well, who was present at Logan? We've already seen on December 27th you're scheduled to be at Highlands. No physician is scheduled to be at Ashland. And now, Dr. O'Laughlin is listed as the rendering provider at all three locations including Logan. And this is a day when he is at Philadelphia Airport turning his car in -- his rental car in.**

**So I'm wondering who was at Ashland on this day?**

A. I'm repeating that. But I'm sorry. Since the question is same, my answer is going to be the same. Let's first take Logan. The person there by contract was supposed to be the hospital's oncologists there. And I presume that he was there.

**Q. Do you know if he was there?**

A. I do not. Ten years ago?

**Q. Okay.**

A. You have to be kidding me to -- to remember.

**Q. Okay. Go ahead.**

A. A specific date at a certain location, that was neither my job nor it -- it is physically possible to remember that. And -- and it was not my job to know that. We had a contract established with the hospital and that oncologist was contractually bound through the hospital. So I have to presume he was there. Could I -- would I have been checking every time?

**Q. Well, let me --**

A. I would not be checking any of them.

**Q. Let me say this: Every Friday, Dr. O'Laughlin, during this period, was scheduled to be at Logan which means he could not be at Ashland or Highlands. And furthermore, on this particular Friday, he was at the**

**Philadelphia Airport. I just want to know was --**

A. I don't know if he was playing hooky by choice or he had sanctioned leave. I don't know. If he said, "I'm going to Logan," and disappeared, there's no way to put a tracer on him.

**Q. Well, that's not the point. The point is, was this billing being done in his name when he was not there?**

MR. MELTON: Object to form.

BY MR. GROSSO:

**Q. And let me ask -- let me put it this way.**

A. Go ahead.

**Q. Dr. O'Laughlin was part of your group practice, right?**

A. He was.

**Q. Okay. The physician contracted from or on staff from the hospital at Logan was not part of your group practice, correct?**

A. That is correct.

**Q. So you could not bill for something that the hospital radiation oncologist was supervising, could you?**

MR. MELTON: Objection. Foundation. And also calls for legal conclusion.

THE WITNESS: Once again, the oncologist of

record was Dr. O'Laughlin because he formulated the plan. He oversaw the plan. The physician from hospital was supposed to be there for the need for a physician presence, not a billing physician. He didn't need to be part of our group, just like a locum is not part of our group. He did not need to be part of our group.

BY MR. GROSSO:

**Q. Well, there is a provision in the Medicare regulations to allow locums to supervise and for a member of the group practice to bill for his supervision. There is no such regulation allowing the billing of a person who is neither a locum nor a member of the group practice.**

**So the question I have is: How do you know that any member of your group practice was present at Logan on December the 27, 2013?**

MR. MELTON: Objection to characterization and to relevance.

THE WITNESS: When the hospital entered into a contract allowing the physician supervision, in all practical -- for all practical matters, he was a locum for that service for that day.

BY MR. GROSSO:

**Q. Yeah. Did he know he was a locum for you?**

MR. MELTON: Objection.

THE WITNESS: I said --

MR. MELTON: Speculation.

MR. GROSSO: I withdraw the question.

BY MR. GROSSO:

**Q. All right. I'm going to switch gears a bit. Ashland and Highland were both enrolled in the Medicare program, are they not?**

A. Correct.

**Q. All right. I don't have -- I've asked for them. But I don't have the enrollment application for Ashland and the Highlands. I do have the enrollment application for Logan or at least an updated version, meaning it was renewed. And your name does appear. Manish Jain's name appears.**

THE REPORTER: Is this Exhibit 28?

MR. GROSSO: 28.

(EXHIBIT 28 MARKED FOR IDENTIFICATION)

MR. MELTON: You've written it on mine. So appreciate it.

THE WITNESS: I see the application.

BY MR. GROSSO:

**Q. All right. Now, this was -- I said your name appeared. Manish Jain's name appears. I'm not entirely sure yours does.**

A. It's a 48-page application. If you would point out. And then I could look.

**Q. Well, the question that I have is: One of these was submitted and approved to and from -- to and by Medicare for each of the cancer centers, Highlands, Ashland, and Logan, correct?**

A. I would assume so.

**Q. Okay. All right. Bear with me. And if you turn to page 33 --**

A. Yes, sir.

**Q. Point 3 reads -- well, let me back up.**

**The introductory paragraph -- the second introductory paragraph reads, "By his or her signature, the authorized official name below," that's Manish Jain, "and delegated officials," that's Manish Jain -- Manish Jain, pardon me, "named in Section 16 agree to adhere to the following requirements stated in the Certification Statement. I agree to abide by the Medicare laws, regulations, and program instructions that apply to this supplier. The Medicare" --**

A. I'm sorry, where exactly are you reading?

**Q. Point 3 --**

A. Is it Page --

**Q. -- page 31. Page 31. You appeared to be on the wrong --**

A. 31. I --

**Q. Yes. You --**

A. -- I heard 33 first.

MR. MELTON: Yeah. I thought you said 33 as well.

MR. GROSSO: I apologize. I may be getting a bit tired at this stage.

THE WITNESS: Okay. Go ahead now.

BY MR. GROSSO:

**Q. Point 3, "I agree to abide by the Medicare laws, regulations, and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transactions complying with such laws, regulations, and program instructions including but not limited to the federal Anti-Kickback Statute and the Stark Law and on the supplier's compliance of all applicable conditions of participation in Medicare."**

**That's a pretty strong and straightforward statement. My question is: "Who in the Ashland and Highlands Cancer Centers was responsible for understanding the Medicare laws and regulations and complying with them?**

A. I think everybody who participates in Medicare is supposed to know the regulations. Having said that, more specifically in our practice, I had charged Manish Jain with ensuring that the regulations and the requirements are properly met with.

**Q. Now, he joined the practice when?**

A. He joined the practice around 2004, give -- give or take a year. I think it would -- that is about right.

**Q. Did he join -- when did he become the business manager of Ashland?**

A. Actually, the day he joined. He joined as business manager.

**Q. I don't have his deposition transcript in front of me because --**

A. Yeah. It was definitely before 2005. I could not give an exact date. But he joined before 2005.

**Q. Did his position or title change in 2013?**

A. No. He -- he was the operations person all through his stay.

**Q. What was his position when he first joined?**

A. Whether you call him operations manager or business manager, I'm not sure we gave him a formal title. But he was the manager for both these -- all three of these practices as in when they were commenced

from -- from his first day of joining.

**Q. What were his responsibilities regarding ensuring that the Medicare laws and regulations were being complied with for the three cancer clinics?**

A. His responsibility was to ensure proper information was submitted to billing company so proper billing can be carried out. Also, ensuring that the requirements were met, whatever -- because the requirements would vary from situation to situation, that the requirements were met.

**Q. How did the cancer clinics educate themselves as to what these requirements might be?**

A. So Manish did it through a variety of means. One, he would always hold a monthly meeting for all employees. And he would repeat these things. That would be one of the agendas on -- on his list of things he conveyed in the meeting was to make sure that we met with the regulatory requirements. And he would repeat. And he would follow through and such.

**Q. Okay. Do you know what means were used to learn the Medicare requirements?**

A. I could not speak on behalf of him. But he went to a variety of business -- medical business related conferences, oncology business related conferences. He ordered a number of books. Like,

pretty much every year he would order CPT book. He would send us reading material if there were any CPT code changes, if there -- if there were any new E&M codes, the requirements for different codes, if there was reading to be done. Me being as a lab director. He oversaw all of this.

And he always would either e-mail or hand over copies to read. Or -- or if there was license was due for enable, he would come and make sure that we had fulfilled the requirements in terms of CME and if there were any special requirements, like for opioid prescription and such. So he always made sure that the -- the information was conveyed to the right people and -- and the -- the requirements were met.

**Q. And we'll come back to that point shortly. But I want to address some other matters.**

MR. GROSSO: Exhibit --

THE REPORTER: 29.

(EXHIBIT 29 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Please take a look at this and tell me, after you've reviewed it, if you are familiar with it?**

A. It appears to be a HCFA 1500 form, a blank one, also known as CMS billing form.

**Q. All right. These were used at some point at**

**Ashland and Highlands; am I correct?**

A. I believe so. Yes.

**Q. And even though it may not have been in ink, your signature would be affixed in box 31 on those forms when they were used, correct?**

MR. MELTON: Object to form.

THE WITNESS: I would assume so.

BY MR. GROSSO:

**Q. I have some I can show you that were turned over in discovery. But it has patient name, patient information, and your typed name in that box 31. I can show that to you if you wish to see it.**

A. I would accept that.

**Q. Okay. Was your name entered there with your approval and your consent?**

A. Yes.

**Q. Okay. It reads in part, "Signature of physician or supplier including degrees or credentials. I certify that the statements on the reverse apply to this bill and are made a part thereof." And on the back, under, "Signature of physician or supplier, Medicare, CHAMPUS, FECA, and Black Lung."**

A. Which line are you reading?

**Q. If you look at the third caption --**

A. Yes.

**Q. Can you see it?**
A. I do.
**Q. Okay. There are two paragraphs. One, "I certify that the services shown in this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision except otherwise expressly permitted by Medicare or CHAMPUS regulations."**
**So you agreed to that when you authorized your signature to be put on these forms, right?**
A. Yes.
**Q. Okay. What does, "medically necessary and indicated," mean to your understanding?**
A. Medical necessity is determined by the patient's diagnosis, the treatment plan, and acceptance by the patient of the same. That, to me, would make it medically necessary, meaning a treatment that correlates with the patient's complete diagnosis in terms of the disease, the stage, and many other things that go into making treatment plan. So a treatment plan that addresses that and that is accepted by the patient.
**Q. All right. Under that, it says, "For services to be considered as incident to a physician's**

**professional service, they must be rendered under the physician's immediate personal supervision by his/her employee. Two, they must be an integral, although incidental, part of a covered physician service. And three, they must be kinds commonly furnished in physician's offices. And four, the services of non-physicians must be included on the physician's bills."**

**What are the -- to your understanding, what are the supervision requirements for incident to-services to be satisfied?**

A. I'm not sure the details of the provision requirements for incident to service. But to me, incident to-service is a service that is provided with the recommendation of physicians in the presence of a physician.

**Q. All right. So let's walk through an example. In your plan of care that you devise for a patient, you would sometimes order chemotherapy drugs, right?**

A. Correct.

**Q. You would not directly administer those drugs, would you?**

A. Generally not.

**Q. Okay. Who would?**

A. It's often administered by an oncology trained

nurse.

**Q. Okay. When the nurse administered those drugs, he or she was acting pursuant to your plan of care, correct?**

A. Correct.

**Q. So pursuant to your orders?**

A. Yes.

**Q. That service, if all the other requirements were met, was provided incident to your orders, correct?**

MR. MELTON: Objection. Calls for a legal conclusion and mischaracterization.

THE WITNESS: Could you repeat that question?

BY MR. GROSSO:

**Q. Sure. When the nurse provided the -- or administered the chemotherapy drugs, he or she was acting incident to your orders?**

MR. MELTON: Same objection.

THE WITNESS: Perhaps. Yes.

BY MR. GROSSO:

**Q. Okay. That would satisfy this requirement that we just read about incident to-services?**

MR. MELTON: Same objection.

BY MR. GROSSO:

**Q. Correct?**

THE WITNESS: I would think so.

BY MR. GROSSO:
**Q. Okay. And it also mentioned a requirement that it be done in the immediate -- it says, "personal." But we're using the term direct supervision.**
**What does that requirement mean to you?**
A. To me, the direct supervision of the patient has always meant direct supervision of the patient as a whole in longer term, not a treatment, but the whole treatment plan. That is the direct supervision of the patient. Because what matters to the patient is the whole treatment plan, not one blood pressure taking, not -- not one injection, not one infusion. That is not treatment. The -- to the patient and to me as an oncologist, the treatment plan is the delivery of the complete plan that has been formulated, that is supervised by me, and -- and modified time-to-time depending upon the need of the patient.
**Q. Are you familiar with the Medicare definitions of supervision?**
A. I could not say the Medicare definition. That sounds legalistic. But perhaps you can educate me.
**Q. By now, you know I have documents. Let's try this one. No.**
MR. GROSSO: And we have 30?
THE REPORTER: Yes.

(EXHIBIT 30 MARKED FOR IDENTIFICATION)

MR. GROSSO: Sometimes, when you have too many documents, it takes too long to figure out which one needs to be used. All right.

Let's use this one instead, 31.

(EXHIBIT 31 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Put 30 aside for the moment. This is part of the Medicare Benefits Policy Manual. Have you ever heard of the Medicare Benefits Policy Manual?**

A. I've heard about it. Yes.

**Q. Have you read it?**

A. I could not tell you that I read it word-by-word. No, sir.

**Q. Okay. If we look at the page that has bullet point 60.1 which is about 40 percent of the way through the document -- actually start with 60, "Services and supplies furnished incident to a physician/NPP professional service," bottom of the first page.**

A. Yes.

MR. MELTON: What page are you on?

MR. GROSSO: It doesn't have a number. But it's a page that at the top says, "50.55."

MR. MELTON: Okay.

MR. GROSSO: And at the bottom, it says, "60."

MR. MELTON: I see it.
BY MR. GROSSO:
**Q. 60 reads, "Services and supplies furnished incident to a physician's/NPP Professional Service a non-institutional setting. For purposes of this section, a non-institutional setting means all settings other than a hospital or a skilled nursing facility."**
**That would include your cancer centers, right?**
A. I would think so.
**Q. Yes. "Medicare pays for services and supplies including drug and biologicals which are not usually self-administered."**
**That would include chemotherapy, correct?**
A. Yes.
**Q. What about drugs that are not chemotherapy drugs but are used as part of the chemotherapy treatments?**
A. What about them?
**Q. Do they qualify, in your understanding, as biologicals and drugs?**
A. Self-administered are self-administered. Non-self-administered are non-self-administered. There is no confusion there. So I'm not sure what your question is.
**Q. All right. Let's talk about this. Leukine --**

A. Yes.
**Q. -- is a drug?**
A. It is a drug. Yes.
**Q. It is not a chemotherapy drug per se, is it?**
A. That is correct. It's not a chemotherapy drug.
**Q. How was it used in your practice at Ashland and Highlands?**
A. In multiple ways. It is a supportive drug, a drug that is meant to counter the effect or the ill effects of chemotherapy. One of the ill effect of chemotherapy is reduction of white cells in our body which makes a patient very prone to infections. It reduces the immunity. Leukine is meant to reduce the degree and duration of that drop in white cells. So basically, it is rescuing the body from the ill effect of the chemotherapy.
Therefore, we -- when we felt that a patient needed that, we often taught them how to self-administer and see if they can get the drug for self-administration at home. In situations where a patient was not comfortable, anxious about self-administering, not willing to learn, or did not have any support system like a close family member who could administer it, then we administered it in office. So it was used in a

variety of setting: self-administration by patient, by a family member, or sometimes even a neighbor. And when those things could not be undertaken, then in office.

**Q. Most of your patients who received Leukine received it in the office, correct?**

A. I do not know if they were most. I would say they were a fair number because of our location. Eastern Kentucky is a severely -- I -- I guess the term is that -- that they're poor and under-educated and less resourceful patients. Therefore, it's probably reasonable to assume that our percentage of in-office Leukine treatment was probably higher than elsewhere just given the demographics and the socioeconomic status of our patients. But I do not have any data to say if there were more at home or more in office.

**Q. Okay. Here were the billing statements identify what Leukine injections were given in the office, correct?**

A. Correct. Yeah. Well, not necessarily. I -- I change that. Because if a patient could administer at home and it was approved by their insurance, we would drop the shots and give it to the patient to take home.

**Q. Okay.**

A. So that would also go on billing as a drug charge, but not a -- an administration charge for

subcutaneous injection. So I'm not sure that unless you did a detailed analysis of the billing -- some patients got Leukine directly from their insurance. And it never went through our office. So there were all sorts of these arrangements. I'm not sure your statement is fully correct, that billing statements would identify these.

**Q. Now, Leukine was administered using an injection. And it was a 96372 billing code, correct?**

A. I believe that code is for a non-chemo subcutaneous injection. And therefore, it would be correct.

**Q. Okay. I am pulling out Exhibit 3, turning to 96372. And this is the CPT Manual. This is the CPT description of the 96372 Code, "Therapeutic, prophylactic, or diagnostic injection, substance, or drug, subcutaneous or intramuscular." And the description of the category in which this code falls under reads, "A therapeutic, prophylactic, or diagnostic IV infusion or injection other than hydration is for the administration of substances or drugs."**

**Skipping a sentence, "These services typically require direct physician supervision for any or all purposes of patient assessment, provision of consent, safety, oversight, and inter-service supervision of**

**staff. Typically, such infusions require special consideration to prepare dose or dispose of, require practice training and competency for staff who administer the infusions, and require periodic patient assessment with vital sign monitoring during the infusions. These codes are not intended to be reported by the physician in the facility setting."**

**Now, this description states that physician supervision is part of the description of the code. And it's required.**

**So is it fair to say that the reason why you had patients come in was that they needed to have supervision for the administration of Leukine?**

MR. MELTON: Objection to --

THE WITNESS: No, sir.

MR. MELTON: Objection. Mischaracterization of testimony. And also the CPT.

You can answer.

THE WITNESS: It is not fair to say that because first of all, this is a -- there's a long list of medicines that included the -- a B12 shot is given subcutaneous or intramuscular, a vitamin. I have practically never heard of anybody having a reaction. A number of patients self-administer it at home. A Leukine or Neupogen or insulin, all

these medicine, if given in office, would be under 96372. But majority of times, these drugs are administered in home setting by the patients themselves.

Now, why does it read, like, typically it -- it requires physician supervision? Here is my answer: "When it needs to be given in office." I'm going to repeat that. "When it needs to be given in office, it requires physician supervision." It does not mean that all of them need to be given in office. Because there is a subcutaneous chemo we give, as an example, Velcade, that requires physician supervision.

Or there is a biological that -- that has high risk of reactions. That needs to be given in the office. So when it needs to be given in office, it requires physician supervision. Not that all of them need to be given in office or require physician supervision which is why I believe it says, typically, it requires physician supervision, that is if it needs to be given in office.

BY MR. GROSSO:

**Q. Okay. Let us understand this: We have two assumptions. Leukine is a drug that is usually administered in the office?**

A. No, sir.

**Q. I said we have two assumptions.**

A. Yes.

**Q. You understand?**

A. Okay. I'm sorry.

**Q. And Leukine is not a drug that is usually given in the office. Assume that it is a drug that is -- let's assume it is a drug that is not usually given in the office, okay?**

A. Yes.

**Q. Then it is not a drug that falls under the incident to provision; am I correct?**

MR. MELTON: Objection. Calls for legal conclusion.

THE WITNESS: In that particular patient, for when it is not given in the office, it is not incident to.

BY MR. GROSSO:

**Q. Okay. And when it is given in the office?**

A. Then it would be incident to, I suppose. But it can be given in the office for patients who don't need physician supervision but they cannot self-administer either because they're anxious. There are a lot of patients who -- who pass out at the site of a needle, some of us probably.

**Q. Not anymore.**

A. But -- but these people simply need it given in the office because they have no way of self-administering.

**Q. All right. The way I see it -- and you've just given me a third option. But let's walk through all three so we have this clear.**

A. Sure.

**Q. Option number 1: Leukine is a drug that is not usually given in the office, okay?**

A. Yes.

**Q. In that case, it doesn't meet the incident to provisions for billing Medicare as an incident to-service, right?**

MR. MELTON: Objection. Calls for legal conclusion.

THE WITNESS: No. I would not say right because I'm not sure I understand your connection. I simply understand that a drug does not require to be given in office. Whether it meets or does not mean incident to requirements is a bit of a legal conclusion. And I'm not going to go into that.

BY MR. GROSSO:

**Q. Okay. I don't want to argue with you. But what I do want to understand is your understanding. And I just want to walk through all three, okay? I'm going**

**to read from the Medicare Benefit Policy Manual. Again, "Medicare pays for services and supplies including drug and biologicals, which are not usually self-administered that are furnished incident to a physician's or other practitioner's services," et cetera, et cetera, et cetera. If it is -- if Leukine is usually administered outside of the office --**

A. Correct.

**Q. Then it doesn't meet that incident to requirement?**

MR. MELTON: Same objection.

THE WITNESS: I'll give you that. If -- if -- I presume that you know the interpretation better.

BY MR. GROSSO:

**Q. If it is one given in the office usually, then to be billable and payable to and from Medicare, it must be provided with direct supervision of the physician or non-physician practitioner, correct?**

MR. MELTON: Same objection.

THE WITNESS: No, sir. I -- may I speak?

BY MR. GROSSO:

**Q. Yes. That's why we're here.**

A. I'm going to answer it a little differently. This drug can be given outside office, usually given outside office, usually self-administered or

administered by a friend or a family. And if that cannot be done, it is given in physician's office. I'm not sure how does the setting where it needs to be given decides the incident to or not. You are kind of approaching it in the reverse direction I understand.

**Q. Well, I am following Medicare reimbursement requirements, not medical care. And what I see are Medicare claims data which I can show you. And I have records of injections from your cancer centers which I can show you --**

A. Yes.

**Q. -- I have them here --**

A. Yes.

**Q. -- that show the provision and then the billing of Leukine injections --**

A. Got it.

**Q. -- at the cancer center.**

A. Got it.

**Q. Now, the regulations say if it's usually a drug or biological given outside of the office, then it cannot be billed incident to. And yet I have the claims data that says Leukine was billed incident to under Code 96372. If on the other hand, it is a drug that is usually given in the office, then we must have direct supervision for it to be billed incident to a**

**physician's services. The third option would be it could be billed under its own statutory benefit category. But it doesn't have one.**

**So my question is: Which of these three categories was Ashland and Highlands using when they billed the Medicare program for the provision of Leukine through injections?**

MR. MELTON: Object to form and foundation.

THE WITNESS: Ashland and Highlands are using based on the need of the patient. I think we forget who is at the center of all this. It is the patient. And we made it the most convenient for the patient. These shots were given daily for several days sometimes. And we did not want them to be coming to the office when they could be administered at home. Because they can be. But if they could not, we had them come to the office and administered it for them. I'm not sure I can take it any beyond that.

BY MR. GROSSO:

**Q. Okay. But if they were brought into the office, meaning the patients, and given a Leukine shot under 96372 -- correct, under the Code 96372 and Ashland or Highlands billed under that code, then direct supervision had to be provided; am I correct?**

MR. MELTON: Objection.

BY MR. GROSSO:

**Q. For the purposes of billing and recovery?**

A. The direct supervision that we provided was for the -- for the benefit of patient, not for the benefit of billing.

**Q. Okay. But you did bill?**

A. We billed because if a person had to be there to administer, they had to be trained person. And -- and there's a cost to that. So we billed for it. But the decision about that is made keeping patient at the center of all this.

**Q. Okay. Why was it billed under a physician's name instead of a nurse practitioner's name?**

A. Same answer as I have answered several times before. It was part of a treatment plan formulated by the oncologist and administered under his or her guidance because he was the captain of the ship, so to speak.

**Q. Were injections given to patients on weekends?**

A. There were times they were.

**Q. Did the physicians go in on the weekends to supervise the provision of the injections of Leukine on the weekends?**

A. Not all the time. There were times we were in

office because there were other things to be done: completion of medical records, some other things. There were times we were there, but definitely not all the time. I could be at the hospital 50 yards away, making rounds, but available. But a physician or physicians were always available, not necessarily on the premises all the time, but available all the same.

**Q. Okay. There is known, in Medicare regulations, as general supervision. That was provided, right?**

A. I'm sorry. Repeat that.

**Q. That was provided, general supervision that you were on call, but not on the premises?**

MR. MELTON: Objection.

THE WITNESS: Available on call --

BY MR. GROSSO:

**Q. Yes.**

A. -- is different than on call.

**Q. I stand corrected.**

A. Sure.

**Q. Okay. Let me just double check something before I have to withdraw. All right. I'm going to hand you another excerpt from the Medicare Claim Statement.**

MR. GROSSO: 32?

THE REPORTER: Yes.

(EXHIBIT 32 MARKED FOR IDENTIFICATION)

MR. GROSSO: This is going to have to be redacted.

BY MR. GROSSO:

**Q. I will tell you that the dates here are all weekends. This is January 18, 2014, which is a Saturday and September 27, 2015, which is a Sunday and October 4, 2015, which is also a Sunday. Now, for the September 27th and October 4, 2015, as we went through your passport earlier, you were in -- you were on travel, be it in India or United Arab Republic [sic]. You can go back and look at your passport again, if you wish.**

A. No. Go ahead.

**Q. This lists you as the rendering provider for those dates of injections of various drugs including Leukine J2820, but not limited to Leukine. And for October the 4th, you are listed as the rendering provider at both Highlands and Ashland.**

**I'd like to know what physician, if any, was on the premises of Ashlands or Highlands for the provision of these injections?**

A. You mean the Leukine injections?

**Q. Any of them including J1442 which is not Leukine?**

A. May I check what that is?

**Q. Yeah. I was about to do the same thing. Let's see.**

MR. MELTON: Filgrastim?

THE WITNESS: Okay. That's a very similar medication to Leukine. It's called -- also known as Neupogen. And now there are many generic versions.

THE REPORTER: What did you say the name was?

MR. MELTON: Filgrastim. F-I-L-G-R-A-S-T-I-M.

THE REPORTER: Thank you.

THE WITNESS: So as I said, that's a -- so the medications were similar and used for the same purpose. The question you had was who was the physician on site?

BY MR. GROSSO:

**Q. Yes.**

A. Number one, I don't know if it was a weekend if there was a physician on site. But there had to have been a physician available. There could have been a physician on site. There's no way I can tell you that today. But my name and Dr. Batoo's name appears because we were the -- we were the oncologist of record for those physicians -- so those patients, I'm sorry. As we have discussed this point many times today, that the name of the physician -- the rendering physician, was

the one who created the plan, oversaw the treatment plan execution, and monitored the patient.

**Q. Okay. Was there a nurse practitioner on the premises for these injections?**

A. Sometimes, there were. Sometimes, there may not have been.

**Q. Did that make a difference to you in terms of billing?**

A. I don't know if that would make a difference. Because the provision of subcutaneous shot, which is generally a self-administered drug, I'm not sure it makes any difference.

**Q. Well, if it's generally a self-administered drug --**

A. Uh-huh. Yes.

**Q. -- it doesn't fall under the incident to requirements?**

MR. MELTON: Objection.

BY MR. GROSSO:

**Q. It doesn't fall on the incident to --**

A. That's an interpretation you are giving me. I have not given you that.

**Q. Assume that to be correct. And if it doesn't --**

A. I cannot assume everything that you said to me

correct.

**Q. If it's not a drug that is usually administered inside the office, then it's not one that can be billed under the incident to provisions.**

A. It isn't --

**Q. How can it -- how could you bill for a drug if it was one that was usually administered at home?**

MR. MELTON: Objection to the foundation.

THE WITNESS: If it is --

MR. MELTON: Legal conclusion.

BY MR. GROSSO:

**Q. And when I say, bill for a drug, I mean, bill for the administration?**

A. It is done all the time because it is the service you have provided. It has nothing to do with what the drug is. It's a service you -- you provide. That's what you're charging for.

**Q. Regardless of whether it meets the requirements for reimbursement by Medicare?**

MR. MELTON: Objection.

THE WITNESS: I don't know. That's the interpretation you are making. I cannot go by that.

BY MR. GROSSO:

**Q. You billed?**

A. Yes.

**Q. You certified that you were billing in accord with Medicare regulations, right?**

A. Yes.

**Q. To bill incident to -- because you're not billing under the nurse's name. You're billing under your own name?**

A. Yes.

**Q. To bill incident to, you have to meet the Medicare requirements, right?**

A. Yes.

**Q. And to meet the Medicare requirements, it has to be a drug that is usually administered in the office, right?**

A. Usually doesn't mean always.

**Q. Okay.**

MR. MELTON: Object to --

MR. GROSSO: Okay. I agree.

MR. MELTON: -- legal conclusion.

THE WITNESS: Okay.

MR. MELTON: Object to foundation.

BY MR. GROSSO:

**Q. It also requires that there be direct supervision of either a physician or a nurse practitioner -- actually a physician or --**

A. Once again, I disagree for a drug administered

at home also. Patients are safely -- this country, there are one and a half to 2,000,000 new cancer patients diagnosed a year. And about half of them self-administer this drug at home. And other half does it in physician's office. So what does it say about it?

**Q. I'm not talking about the medical use of the drug. I'm talking about the billing for the drug.**

A. Sir, I'm not a biller. I'm not a coder. I'm a clinician. And I have said that before I'm going to say it again. I could not answer some of those questions that are meant for a biller or -- or a lawyer or administrator.

**Q. But it was your signature on that form, correct?**

A. It was indeed. And I say it again that I prescribed it.

MR. MELTON: Do you want to take a break at sometime soon?

MR. GROSSO: If you want, we'll take a break.

MR. MELTON: It's getting a little warm in here.

MR. GROSSO: Okay. I have no qualms with taking breaks.

THE VIDEOGRAPHER: Okay.

We are now off the record. The time is

2:45 p.m.

(OFF THE RECORD)

THE VIDEOGRAPHER: We are now back on the record. The time is 2:58 p.m.

BY MR. GROSSO:

**Q. Okay. Dr. Kirti Jain, we're back on the record. You're still under oath. Do you understand that?**

A. Yes, sir.

**Q. Okay.**

MR. MELTON: Do you need your microphone?

BY MR. GROSSO:

**Q. Okay. I want to get off this topic about Leukine and weekends. But before I do, two quick questions: Were physicians scheduled to be at the cancer centers on weekends?**

A. No, sir.

**Q. Were nurse practitioners scheduled to be at the cancer centers on weekends?**

A. Sometimes.

**Q. All right. Now, we were looking at the enrollment document which is fairly hefty. And we were looking at the -- what was once known as the HCFA 1500. It's now known as the CMS 1500. That was Exhibit --**

THE REPORTER: What was the title again?

MR. GROSSO: I don't --

THE REPORTER: I have the list right in front of me.

MR. GROSSO: It was the HCFA -- here it is. No. Yeah. I don't know. 29, Exhibit 29.

BY MR. GROSSO:

**Q. Okay. Now, at some point, the clinics -- the centers went from paper to electronic delivery of the claims; am I correct?**

A. Yes.

**Q. Okay. And pursuant to Medicare contractual requirements, all of the certifications that we were referring to before were incorporated into the electronic billing agreements; am I correct?**

A. That's true.

**Q. Hopefully we'll get done with this part very quickly.**

MR. GROSSO: This is Exhibit number -- what are we on?

THE REPORTER: Exhibit 33.

(EXHIBIT 33 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. This is a document that we obtained from the State of Kentucky. It says, "Agreement between the Kentucky Department for Medicaid Services and the**

Kentucky Medicaid Provider." You may look at it.
When you're familiar -- or when you're satisfied that you familiarized yourself with it, please let me know.
A. Go ahead.
Q. All right. This document is an Agreement regarding the submission of claims via electronic media in the Kentucky Medicaid program.
You were enrolled -- meaning, that Ashland Bellefonte Cancer Center and Highlands Cancer Center were enrolled in the Kentucky Medicaid program; is that correct?
A. They were. Although it appears this document belongs to Ashland Bellefonte Cancer.
Q. All right. Well, I have one for Highlands too which I'll show to you.
A. Sure.
Q. And when you agreed to submit claims electronically, you agreed to the certifications listed in this particular document, right? You see the ones on the second half? "Now, thereto is hereby and herewith mutually agreed by and between the parties hereto as follows." I didn't write this.
A. Yes.
Q. Okay. And on the second page -- all right.

**The second page mostly refers to what the state agrees to do in regard to you. So we'll move on. Unfortunately, I don't have the same document. But I have something that may serve the purpose. And this is for Highlands.**

MR. GROSSO: Is this 35?

THE REPORTER: This will be 34.

MR. GROSSO: 34.

(EXHIBIT 34 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Please take a look at it. Again, this is obtained from the State of Kentucky. And your name appears on this.**

**Can you please tell me, after you've reviewed it, whether you recognize it? There are several documents attached. This is the way the file came. And I didn't break it up.**

A. On the first page, my company's name appears. I see my name on the third page.

**Q. All right. I stand corrected. Your company's name appears, which is Kirti K. Jain, M.D. PSC?**

A. Yes, sir.

**Q. Well, and this shows Highlands was also enrolled in the Kentucky Medicaid?**

A. Yes.

**Q. When were Ashland and Highlands enrolled in the Kentucky Medicaid program, if you remember?**

A. I'm looking for the dates on this. I would not remember when were we enrolled because the -- we started some sort of electronic health records in early 2000s. And -- and the claim submission electronically started around then. But various insurers adopted it at different times. So I would not be able to give you answer.

**Q. Well, my question had to do -- was: When you enrolled, when your companies enrolled, when you personally enrolled in the program itself, not whether it was electronic or otherwise for submission.**

**O when did you -- did you begin billing Medicaid as soon as you established the Ashland and the Highlands Clinics?**

A. Yes, sir.

MR. GROSSO: Okay. That's what I was looking for. All right. I'm going to give you a document. And it was turned over by Defendants. Let me put a stamp on it. I'm sorry.

MR. MELTON: 35, right?

THE REPORTER: Yes. Exhibit 35.

(EXHIBIT 35 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. You can review it. I'm going to focus on what's on the first and second pages. But feel free to review the entire document.**

A. Go ahead.

**Q. You're done?**

A. Yeah. Yeah, basically, yeah.

**Q. All right. It's dated February 2, 2017. It references a claim denial from January -- well, from 2015 service date, February 26, 2015, by Kirti K. Jain, M.D. PSC, which is Highlands, correct?**

A. Yes.

**Q. And this is going to have to be redacted too. It has the patient's name in it. It has to do with an appeal of a denial of a Medicare claim, correct?**

A. Yes.

**Q. All right. Let's turn to the second page the last two paragraphs. The second to last paragraph reads, "If the beneficiary was informed by their provider or supplier in writing in advance of receiving the item/service that Medicare may not"**

A. Where -- I'm not -- where exactly are you?

**Q. Second page.**

A. Starting with the --

**Q. Third page. I'm sorry.**

MR. MELTON: Third.

BY MR. GROSSO:
Q. Third page.
A. Yeah. Go ahead.
Q. You know, I am getting tired because it is the second page that I should be on. And I was reading from the wrong section. My fault. All right. Second page, so second from last paragraph, full paragraph, "The purpose of rendering -- of a rendering, treating, or ordering practitioner's signature in patient's medical records, operative reports, orders, test findings, et cetera is to demonstrate that services submitted to Medicare have been accurately and fully documented, reviewed, and authenticated." "It also confirms the provider has certified the medical necessity and reasonableness for the services submitted to the Medicare program for payment consideration. This decision is based on the Internet- Only Manual, publication 100-03, chapter 3, section 3.34, which is located on the CMS website at www.cms.gov. This section provides a table summarizing the situations in which signature requirements are met."
I am not so much interested in what the signature requirements were and whether or not they were met. What I'm interested in is the citation to the Internet-Only Manual which provides information about

**Medicare requirements for billing.**

**So the question I have is: What use did Ashland or Highlands make of the Internet-Only Manual that's available on the internet?**

A. I think you're asking the wrong person. But having said that, I would imagine that our manager looked at the requirement and complied with it.

**Q. Did you look at the requirements?**

A. Did I personally look at it? No.

**Q. Did you look at any of the requirements?**

MR. MELTON: Object to form.

THE WITNESS: I have always, throughout our deposition today, said that when my signature went there, I formulated the plan, sought to its execution, monitored the patient, and -- and tried to achieve the goals set out for the treatment plan. To that extent, yes.

BY MR. GROSSO:

**Q. Okay. But you didn't make use of CMS publications available on the internet. Did you? Or did you not?**

A. Did I read that particular document? I cannot say that. I can't -- I -- I'm not even sure what this refers to. I mean, there are lots of numbers here, dot, dot, dot. I couldn't tell you what they are. If I can

keep up with the rapidly changing science of oncology, I'm doing good. You have no clue how much material comes out and what it takes to keep up with it. To keep up with all this, I need a manager. And that's what we had.

**Q. Got it. Got it. At some point you had to review what the requirements were for billing. Did you not?**

A. Directly, no. Indirectly, the manager would tell me from time-to-time, as I explained to you, through material -- reading material or through our monthly meetings or other means what the requirements were and if we needed to do any better.

**Q. Okay. So was it -- I don't want to put words in your mouth. So correct me if you need to. Was it Manish Jain's responsibility to check on these manuals and their updates?**

A. Yes.

**Q. Okay. Was it your responsibility?**

MR. MELTON: Objection.

THE WITNESS: Was it my responsibility to do -- do what?

BY MR. GROSSO:

**Q. Sorry. To read these --**

A. To check these manuals?

**Q. -- or check on the updates?**

A. No. I -- I delegated it to Manish Jain. Perhaps it was my responsibility. But I can't -- there's no way for me to read every letter that comes out and every page that is there, thousands of pages. Therefore, the business manager.

**Q. Okay.**

MR. GROSSO: This is Exhibit 36.

THE REPORTER: 36.

(EXHIBIT 36 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Please take a look at this e-mail. It is dated January 24, 2014. When you finish reviewing it, please let me know.**

A. Go ahead.

**Q. This has as its subject, "Dr. Jain minutes of meeting, January 24, 2014." What does that mean?**

MR. MELTON: Object to form.

THE WITNESS: Obviously, I did not write this e-mail. And I could not tell you what it means. But it appears to mean that it is related to Dr. Jain or his billing.

BY MR. GROSSO:

**Q. That's you?**

A. That would be correct.

**Q. And who is justin@A-OneBS.com?**

A. Clearly, he was a billing person or a manager at A-One Biz Solutions who was doing billing for us or for the company.

**Q. Okay. Do you know what is meant by, "RT audit sheets," that are referenced in the first paragraph?**

A. RT audit sheet would be Radiation Therapy audit sheets.

**Q. Got it.**

A. Which -- implication being, there is -- there was likely an audit sheet in place to ensure that the building was correct and complete.

**Q. Okay. Okay. Take a look down near the bottom. There are two paragraphs, second and third from the bottom, HCC Van Dine Wellcare and HCC Van Dine Coventry. Both of them reference essentially the same thing, "Nurse Practitioner Van Dine not enrolled with Wellcare or Coventry. We have 19,000, 14,000 value of Van Dine claims which cannot be billed under Dr. Jain since Dr. Jain not in office for appointment scheduled."**

**What was that about?**

A. It appears that they had a question how to build these claims. I'm not sure what Manish answered.

But the answer would've been there is another physician that can be billed under that physician,

I would think, if the treatment plan was ordered by me. It could be simply unawareness by this fellow, Justin, who has written the mail inquiring as to how to proceed with these claims for the days that I was not there. Perhaps the answer would've been the different physician was there. I'm not sure what the answer was or what days it referred. It's a very general question. And the answer would've been: Who was the physician there and could go under that?

**Q. Is it fair to say that Coventry and Wellcare were refusing to pay the bills because --**

A. No. It is not fair to say because we have not billed them yet.

**Q. Yes. Is it fair to say that they cannot be billed because --**

A. That's not fair to say either. Because if there is a physician on site who is in my place and -- and I created a treatment plan, they can be billed.

**Q. So if there has -- there has to be a physician on site; is that correct?**

MR. MELTON: Objection.

THE WITNESS: There should have been a physician on site because we always had one.

BY MR. GROSSO:

**Q. Okay. But there had to be one in order for it**

**to be billable whether it be under your name or the other physician's name, correct?**

A. I don't know what rules apply. But treatment plan is there. A physician is there. I would think it is billable. But again, you're asking me a question that really belongs to billing and coding.

**Q. Did this e-mail come to you at any point?**

A. I don't see it copied to me.

**Q. What does it mean by, "Dr. Jain minutes of meeting?"**

MR. MELTON: To the extent you know.

THE WITNESS: A minute -- a meeting held about Dr. Jain's billing.

BY MR. GROSSO:

**Q. Okay.**

A. Clearly, Dr. Jain is not even involved in this. There's no copy to Dr. Jain.

A. Okay.

**Q. So it is a meeting about Dr. Jain.**

**Q. Okay. Let's take a look at Exhibit 30 which you already have.**

A. Yes, sir.

**Q. This is an excerpt or an update to the Medicare - Carriers Manual. Are you familiar with the Medicare - Carriers Manual?**

A. I know about it.

**Q. Did you have a copy in the office at either Ashland or Highland?**

A. I believe there is.

**Q. Okay. And who used it?**

A. It was often in Manish Jain's office that the copy would be situated.

**Q. Did the office, either of them, have a practice of checking for updates on the -- or for the CMS manuals?**

A. I believe Manish did that on a regular basis.

**Q. Okay. Let's take a look at this.**

MR. GROSSO: This is Exhibit number --

THE REPORTER: 37.

(EXHIBIT 37 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. This is an update to the CMS manual system dated May 26, 2006. So it would be in any version of the manual published after that date. Please review it.**

**When you're ready, let me know.**

A. It's a multi-page manual. You want me to review it all?

**Q. Well, let's go to the page that begins, "30.5." It's in red.**

A. Is that the one with title, "30.5?"

Q. Yes.
A. Yes, sir.
Q. It reads, the caption, "Payment for codes for chemotherapy administration and non-chemotherapy injections and infusions." This is the point that I was trying to make before. We're not talking about medical care per se. We're talking about billing and reimbursement with Medicare.
A. Yes, sir.
Q. "A, General, Codes for chemotherapy administration and non-chemotherapy injections and infusions include the following three categories of codes in the American Medical Association's current procedural terminology: one, hydration."
Did you do hydration at the centers?
A. Yes.
Q. "Two, therapeutic, prophylactic, and diagnostic injections and infusions excluding chemotherapy." Did you do those at the cancer centers?
A. Yes, sir.
Q. "Three, chemotherapy administration," you did those at the cancer centers?
A. Yes.
Q. For all three, "Physician work related to hydration, injection, and infusion services involves the

**affirmation of the treatment plan and the supervision (pursuant to incident to requirements) of non-physician clinical staff."**

**Was that followed at the cancer centers for all three categories of services listed there?**

MR. MELTON: Object to the --

THE WITNESS: Generally, yes.

BY MR. GROSSO:

**Q. Always?**

A. I could not testify to if somebody had to step out for five minutes to -- to go get something from the car or something along those lines. But other than some of the Leukine -- Leukine shots that we talked about the answer is yes.

**Q. All right.**

MR. GROSSO: And this is going to be Exhibit number 38.

(EXHIBIT 38 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. This is an excerpt from the Medicare Claims Processing Manual. Now, this, beginning with 30.5 on the bottom of -- I don't know what page it is. It's about page 6 or so. 30.5 at the bottom of the page, "Payment for codes of chemotherapy administration and non-chemotherapy injections and infusions." It**

**basically repeats what I read before with the update from 2006. This version is February 9, 2023. It hasn't changed.**

**And my question is: To what extent was the Word documents such as this reviewed for changes up until the present?**

A. They are reviewed. And as you said, it hasn't changed. We still do that.

**Q. Okay. Who keeps track of these documents today?**

A. We have a manager. Her name --

**Q. Who is that?**

A. Her name is Melinda Prasad.

**Q. She came in when?**

A. She has been in our office many years. But she was promoted to the operations manager position a little over three years ago.

**Q. Okay. That was after Manish left, correct?**

A. There were somebody else after Manish left. But Linda, as we call her, was promoted to the position about July 1 of 2020.

**Q. All right.**

MR. GROSSO: This will be Exhibit 39.

(EXHIBIT 39 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. This is an e-mail from you to yourself. Or is it to an e-list in your name? I need you to tell me.**

A. Okay.

**Q. What is this?**

A. I probably saw a good article as to how NPs can be best used in oncology practice and e-mailed it to myself to share it later with others.

**Q. When it says, "to," who are you sending it to?**

MR. MELTON: To the extent you're --

THE WITNESS: In this case, myself.

BY MR. GROSSO:

**Q. Well, the first paragraph reads, "NP's role in oncology practices is evolving. Below is description of one practice as to how they utilize NPs. We should also be creative in ways that complement our practice and helps our patients most. So put on your thinking caps and unleash your imagination, send your ideas."**

**So you're sending this to somebody? It's not just yourself?**

A. That's what it seems like. It -- this one doesn't read it. But clearly I intended to send it. I -- whether I sent it or not, I cannot tell you. It's an eight-year-old e-mail you just unleashed on me without giving me a chance to find out more about it.

**Q. Well, it was --**

A. But based on what you have shown me, it doesn't look like I sent it although I intended to. Now, did I share it later with them? I might have without necessarily sending another e-mail. I might have either forwarded it. Or I might have given copies to -- of this to them.

**Q. Okay. It's dated June 10, 2015?**

A. Yes, sir.

**Q. A publication is referenced, Oncology Practice Management, May 2015, Volume 5, number 4, Best Practices.**

**What is Oncology Practice Management?**

A. It's a journal.

**Q. Do you subscribe to it?**

A. No.

**Q. How did you come across this?**

A. Well, I'm a voracious reader. And I must have come across this in some either journal or oncology news pieces or some online journal. I could not tell you. But it is an article out of that journal which was obviously mentioned somewhere. It could have been in a conference. I -- I cannot tell you.

**Q. Now, this is Oncology Practice Management, not merely the practice of oncology. Why were you examining any article concerning management as opposed to oncology**

**as a medicine?**

A. I am a management person also. I -- you may have noticed that I've done an MBA in healthcare. It doesn't mean I could manage at the same time because practice of oncology is very time-intensive. So you cannot do everything and you cannot do everything well, for sure. Therefore, I delegated the management to Manish. But having said that, if I came across something that was useful, I would definitely take that. I more than likely gave it to Manish.

**Q. All right. On the second page --**

A. Uh-huh.

**Q. There's a caption that says, "Background." The second sentence -- and this is from the article. This is not you.**

A. Yeah.

**Q. "We learned that an NP could also provide coverage for the infusion room. Our practice has multiple satellite offices. And the ability to provide infusion services on days when a physician was not in the suite was of interest from the standpoint of continuity of care as well as from the standpoint of improved staff efficiency."**

**Now, with regard to Ashland and Highlands, were there periods of time when there would be provision**

**of -- where the provider on the premises was a nurse practitioner in lieu of a physician?**

A. We had -- we always had a physician. Now, what was the intent behind sending this article? Just to stimulate thinking. What could be done? This note says -- this article says the year was 2002. I could not use 2002's information in 2015. But having said that, here was an article. And I -- all I asked was, "think about it, whatever can we do." There's a lot more information in this article. It does not particularly refer to one sentence that you just spoke about. So it was just a point of information.

**Q. Okay. Well, you're right. There's a lot of topics in this article. I pulled that one out because I am interested in knowing how Ashland and Highlands used nurse practitioners both prior to as well as after the date of this e-mail.**

**The question is: Did Highlands and Ashland schedule nurse practitioners to be on the premises of the cancer centers on days when physicians were not present?**

A. That was never our -- our practice was not changed as a result of this article. We have not changed anything as a matter of fact. I sent articles for review, probably one a week. I sent lots of

articles to our nurse practitioners, our manager, anything I read that could be of interest. So I'm not sure we acted on it.

**Q. Okay. I want to -- I'm going to move on to some other topics. But I need to complete a few things first.**

MR. GROSSO: This is Exhibit number --

THE REPORTER: 40.

(EXHIBIT 40 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Let's take a look at this letter from the Kentucky Board of Medical Licensure. Just tell me, is that your -- is that a renewal for your medical license in Kentucky?**

MR. MELTON: By the way, I don't think you actually marked that. You put the sticker on. You didn't --

MR. GROSSO: Well, give it back to me. 40?

THE REPORTER: Yes. 40.

THE WITNESS: Yes, sir.

BY MR. GROSSO:

**Q. All right.**

A. You want this back, sir?

**Q. No. I just wanted --**

MR. MELTON: No.

BY MR. GROSSO:

**Q. -- you to verify that that is what it appears to be. All right. Okay. One moment. Are you familiar with the Physician Fee Schedule?**

A. I am.

**Q. What is it?**

A. A given insurer develops a list based on CPT codes as to how much they would reimburse for a particular CPT code. I believe that's the Physicians Fee Schedule. Yes.

**Q. How did you use it, if at all, in your practice?**

A. I'm not sure how Manish used it. I don't remember any particular time when he sought my opinion as to how to use it. That was just something the insurers determined. I'm not sure that changed anything. He did see annual cuts in it for the longest time. But that's about all I recall.

**Q. Okay. I have downloaded the entries for the 2014 Physician Fee Schedule for a number of service codes. They are in a spreadsheet format with approximately 50 columns.**

A. Okay.

**Q. So I'm not going to print them out and show**

**them to you because then we have strings of paper.**

A. Yeah.

**Q. But I did go to Palmetto. Are you familiar with, I think it's, GBA Palmetto?**

A. I believe it's a regional Medicare administrator or used to be.

**Q. Okay. And the information on their website is drawn from the Medicare program's website. Although, they put it in a much nicer format. And it could be fit on two pages.**

MR. GROSSO: I'm going to mark this. And if you want to see the original Medicare Physician Fee Schedule from 2014 published by CMS, as I said, I have it on my computer. And I can show it to you.

THE REPORTER: That was 41, correct?

MR. GROSSO: 41?

THE REPORTER: Yes.

(EXHIBIT 41 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Now, this is for 96372. And the fee numbers of the values have changed over the years. But it lists the fees, correct?**

A. Yes.

**Q. Okay. Under the fees, it has something known as a professional/technical component. Do you know what**

**that is?**

A. Yes.

**Q. What is it?**

A. Well, professional component of a service is the part of a CPT code or charge that is for the physician part of the -- the supervision or physician's involvement in a patient's care while the technical component is the one that does not require physician's involvement in any capacity. And that is --

**Q. Now, this says -- I'm sorry.**

A. -- often delivered by technologists of some type.

**Q. This says, "Professional/Technical Component 5."**

A. Yes.

**Q. Do you know what, "5," means?**

A. No.

**Q. Okay. It is included in this version of the -- the definition is included in this Palmetto version of the Fee Schedule. It is under the professional/technical component line. It says, "5."**

**And what does 5 mean? And then it reads, "Incident to codes. This indicator identifies codes that describe services covered incident to a physician's service when they are provided by auxiliary personnel**

**employed by the physician and working under his or her direct supervision."**

A. Got it.

**Q. Okay. Who was responsible for determining what codes -- what professional/technical component codes apply to which service codes for those services that Ashland and Highlands billed?**

MR. MELTON: Object to form and foundation.

THE WITNESS: It's a very general question you're asking me. But --

BY MR. GROSSO:

**Q. I'm asking: Who?**

A. Sorry?

**Q. My question is: Who?**

A. Who determined what was technical and what was professional?

**Q. Who was responsible for identifying what the professional/technical component was for each service billed?**

MR. MELTON: Same objection.

THE WITNESS: Manish Jain would.

BY MR. GROSSO:

**Q. Were you -- did you use the Physician Fee Schedule to look up either fees for services or the professional/technical component for the services?**

MR. MELTON: Same objection.
THE WITNESS: Did I personally do that?
MR. GROSSO: Yes.
THE WITNESS: No.
BY MR. GROSSO:
**Q. Did any other physicians look it up?**
A. I doubt it.
**Q. Did Manish Jain look it up?**
A. I believe so. We often talk about it.
**Q. What was the nature of your discussions?**
A. As I said, he would have some scheduled discussions and point of information, like monthly meetings. Then he would tell us at times, therefore, they have reduced the physician's fee schedule. And then primarily, this issue came up with the imaging and radiation treatment where the -- the technical component was built separately from the professional component. So he would talk about it and make sure that these things are properly billed and properly circled on the superbill.
**Q. Did you discuss the professional/technical component of any particular service with you that you recall?**
MR. MELTON: I'm sorry. What was the last thing you said?

MR. GROSSO: That you recall.
MR. MELTON: Object to foundation.
THE WITNESS: Other than -- other than informing us, there was no real discussion.
MR. GROSSO: I'm going to give you what is --
THE REPORTER: 42.
MR. GROSSO: 42.
(EXHIBIT 42 MARKED FOR IDENTIFICATION)
BY MR. GROSSO:
**Q. We're not going to go into this. But I want to find out who maintained it at your cancer centers and how it was used. This was given to us by the defense in discovery. So I would like to learn something about it.**
A. Is it a specific question?
**Q. Yeah. Who maintained this?**
A. Again, Manish Jain did.
**Q. Okay. And why would he -- why did he maintain this document? It's captioned, "CMS Physician Fee Schedule Final Rule 2016."**
A. Because that was part of his job, to keep up with any changes in position or technical reimbursement or any -- or -- or any changes in the rules.
**Q. I notice on page 6 there is a section captioned, "Incident to Policy For Calendar Year 2016." The pertinent portion is that in the calendar year 2014,**

**"PFS Final Rule," CMS required that, "As a condition for Medicare Part B payment, all incident to services and supplies must be furnished in accordance with applicable state law."**

A. Which line are you at?

**Q. I'm on page 6 under, "Incident to Policy For Calendar Year 2016."**

A. Yeah. Okay.

**Q. And I identify that only in order to inquire as to what attention you spent on Medicare updating its fee rules and particularly its incident to rules.**

A. I did not spend a lot of time on the rule changes. It was delegated to the manager. And if there was anything of relevance to us physicians, he would convey it to us.

**Q. Who would convey it to you?**

A. He would often discuss it with me. And then it -- it --

MR. MELTON: He asked, "who?"

THE WITNESS: Manish.

MR. GROSSO: Thank you.

We're not going to use all of these.

Now, we've looked at medical administrative records which were produced during the week for services provided. I should say, were produced for

services provided during the week.

This is Exhibit number 43.

THE REPORTER: Yes. 43.

(EXHIBIT 43 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. I understand this is an injection record?**

A. Yes, sir.

**Q. First question: How were these prepared at Ashlands and Highlands?**

A. How are these records prepared? Probably they were pulled from the available data based on a pre-formed report that was already there in the electronic health record. There's some stock reports. And my guess would be that stock report was pulled from the
EHR.

**Q. Okay. This needs to be redacted. It's for a patient. It is an injection record for that patient for Ashland Bellefonte Cancer Center. And the upper right-hand corner it says, "Rendering." And there's your name.**

**What does that mean?**

A. It's likely that I was involved in the care of this patient.

**Q. Your name appears in three places here: Under,**

**"Rendering," under, "Ordering," And then if we look for each individual injection, "Supervised by." And for three out of the four injections on this page, you as the supervisor. "Supervised by," I should say.**

**What is the difference between those three entries?**

A. To me, the implication is that I was likely the -- the person who ordered. But it could have been Dr. Konala also. I see his name up here some places. The -- the name on the day of injection is entered by the person who is giving the injection. And sometimes, it -- it just depends on the person. Sometimes, they might enter the name of the person they see is there or the person who is ordering it.

Because variety of people have entered different names. So there was no rule for that because the way we did, as I said, was we ensured that -- that a physician was around. But these medical records were -- different people entered different information. There was apparently -- some training must've been involved later. But it appears to me that whoever gave injection used a different name.

**Q. A different name than what?**

A. It almost depends. Like, in places, it's Dr. Konala. In places, it is mine. I once see in

places, it's Dr. Anshu Jain. So different names have been used.

**Q. Where it says, "Supervised by," does that mean the physician identified by that entry was actually on the premises when the injection was given?**

A. There was no such rule created to the best of my knowledge. But clearly some of these medical assistants or nurses have taken it upon themselves to do that.

**Q. To do what?**

A. To enter a name of a physician or provider who they decided was the name to be entered. I'm not sure they paid a lot of attention to it because there was no such policy that a particular name should be entered. And since there was a field, sometimes, they enter the name of the person they think first in their head.

**Q. Okay.**

A. One additional point I would want to make it is there were many times -- I see here where more than likely two or three of us were in the same location. But -- like, Dr. Konala was always there in Ashland. And I may have been there. And they -- some days, they picked my name. Some days, they picked his name. There seems to be no pattern to it as there was no such policy as to whose name could be entered.

MR. MELTON: Do you -- how much longer do you think you have to go?

MR. GROSSO: I will know very quickly.

MR. MELTON: I was wondering if it'd be possible to take, like, five minutes.

MR. GROSSO: Yes. We can take a five-minute break. Next one will be --

THE VIDEOGRAPHER: We are now off the record. Time is 4:01 p.m.

(OFF THE RECORD)

THE VIDEOGRAPHER: We're now back on the record. The time is 4:16 p.m.

BY MR. GROSSO:

**Q. Dr. Kirti Jain.**

A. Yes, sir.

**Q. I have -- you are still under oath. Do you understand that?**

A. Yes.

**Q. All right.**

MR. GROSSO: I have given to you, before we went on the record, Exhibit 44.

(EXHIBIT 44 MARKED FOR IDENTIFICATION)

THE WITNESS: Yes, sir.

BY MR. GROSSO:

**Q. It says, "Itemized Statement." And at the**

**bottom, it's Kirti K. Jain, PSC. Is that Highlands or is that Ashland?**

A. That's Highlands.

**Q. As I said, it says "Itemized Statement." It has got a patient name. And it has got a list of dates. Next to the dates are CPT codes. Next to that are, "Code description." And then, "Prescription, Units, Charge, Insurance Pay, Patient Pay, Insurance Adjustment, Patient Adjustment, Balance."**

**Please tell me what this document is?**

A. It appears to be a statement of account.

**Q. How was it prepared?**

A. I suspect it was a stock report that has been pulled off the computer or the practice management system.

**Q. How was it used at Ashlands and Highlands?**

A. I don't believe any such statement was used.

**Q. What was its purpose?**

A. It's a report that exists. You can look at it and get a sense of what's covered, what's not covered, what is the patient's payable, and such.

**Q. Under, "CPT," occasionally I see something that is not a CPT code such as, "JSRNP." Do you know what that means?**

A. No.

**Q. Does NP mean Nurse Practitioner?**

A. I don't know what NP means here. I know that Stephanie Roberts is a nurse practitioner.

**Q. Is what?**

A. Stephanie Roberts is a nurse practitioner, that I know.

**Q. Okay. So would, "JSRNP," mean that Robert, Stephanie charges?**

MR. MELTON: Objection.

THE WITNESS: Give me one second.

BY MR. GROSSO:

**Q. If you don't know, you don't know.**

A. I think I can answer that question. Yes. So when E&M visit was made by nurse practitioner, if I was there, they would be billed under me or whoever the physician was there. But we wanted to track their charges separately. So they entered a dummy code. And I think it is a dummy code.

**Q. For an E&M?**

A. For a E&M. Yes.

**Q. Now, I'm not challenging you on that. But I noticed that when --**

A. This is where the charge is zero.

**Q. Yes.**

A. And that allowed them to track the E&M charges

or codes for the NPs.

**Q. So that allowed you to track when the NPs were --**

A. So at the end of the month, if they -- if Manish wanted to know how many patients were seen this month by this particular NP or how many patients were seen by this physician, the -- the NP would screw up those numbers because NP was billed under physician. To separately track them, they started entering dummy code for NP E&M visit at some point.

**Q. Now, for the -- who gave the E&Ms, evaluation and managements, at the Highlands and Ashland Cancer Centers?**

A. Sorry. I'm not sure I understand.

**Q. Who provided the E&M services at the Ashland and Highlands Cancer Centers?**

A. Physicians as well as nurse practitioners.

**Q. Okay. Did they do them jointly or separately?**

A. They were often separately. But if a nurse practitioner needed me or a physician, we would see that patient or give them advice or whatever needs to be done.

**Q. All right. And we'll see how much longer we have to go. We have been talking about A-One Biz Solutions Private Limited in India.**

A. Yes, sir.

**Q. What was A-One B Solutions in the United States?**

A. It was the U.S. company which had -- which was a replica of the Indian company. I think it was created because there are some rules that govern what's called transfer pricing that is more on the Indian side since this is an Indian company. The payments received by -- by them as a percentage of total charges were governed by some Indian law which is called transfer pricing. I don't know the details. That's the extent I know. And to allow that or to comply with that, there was a U.S.

company of similar holding -- similar shareholding.

**Q. So were you a shareholder of the United States --**

A. Yes.

**Q. -- A-One Biz? Did it have any employees?**

A. To the best of my knowledge, it didn't. But I'm not certain of that.

**Q. When A-One Biz Solutions Private Limited billed or submitted claims on behalf of Ashland or Highlands, to whom did it submit such claims?**

A. Are you asking Ashland Bellefonte Cancer

Center and Highlands Cancer Center --
**Q. Right.**
A. -- when they submitted claims even when they -- who did they submit it to? I believe they were submitted to the U.S. company. And some of the work was done overseas.
**Q. And it was submitted to the U.S. Company. You mean A-One Biz?**
A. Yes.
**Q. How were they, then, submitted to the Medicare program, if you know?**
A. The submission was not a physical submission. It was an electronic submission. And those papers, when they were scanned, they may have been sent to both or sent from one to the other. I do not know those details.
**Q. All right. And when the reimbursements or the payments came back, where did they go?**
A. They went to our accounts directly.
**Q. When you say, "our," what do you mean?**
A. Ashland Bellefonte Cancer Center or Highlands Cancer Center. So there are two kinds of payments came. The one was electronic transfers which went directly into the accounts of these two companies -- two -- two companies respectively, rather. And when they came as

checks, we had a mailbox to which they came. And our employees at Ashland Cancer Center would pick the checks up and deposit it in appropriate accounts.

**Q. One moment, please. Now, you have been here as both an individual and as a designated witness for, respectively and separately, Ashland and Highlands, correct?**

A. Yes, sir.

**Q. And I have been asking questions pertaining to one, two, or all three.**

MR. GROSSO: Is this 46?

THE REPORTER: 45.

MR. GROSSO: 45.

(EXHIBIT 45 MARKED FOR IDENTIFICATION)

MR. GROSSO: Hold on one second. This is --

MR. GROSSO: Some of the -- what I'm handing you now, Exhibits 45 and 46, are the topics for you as a designated witness.

(EXHIBIT 46 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. As I said, many of these questions have been -- or I didn't say. But many of these questions have been asked and answered already. And I'm not going to repeat. And just with Mr. Melton's consent to use them, use your answers for both -- for all or any as**

appropriate. But I do want to -- I'll go through these topic numbers. Topic number 4, it says, "Master Schedule." And this is true for both Exhibit 45 which is the Topics Designated for the Witness for Ashland and 46 for the Topics for the Designated Witness for Highland.

It says, "For each service listed on the master schedules for Ashland CC provided by any of the defendants in this case in discovery for each patient and for each date, who is the physician or non-physician provider who rendered or supervised each such service?" I have here for both of them, Ashlands and Highlands, for the period, December of -- I'll give you the exact dates in a minute. I had written them down. Now, I'll try to track them down. Here it is.

"For the following dates, December 27, 2013, through January 5, 2014, February 5, 2014, through May 11, 2014, May 22nd through June 9, 2014, and June 26th through June 30, 2014." Now, I've eliminated dates outside that range. And I've eliminated the dates that I skipped over while I was reading those lists, those periods of time to you. I have them here. I'm going to give them to you and ask you to tell me, day-by-day, who the physician was that was listed in the topics as on one of the items that the designated witness should be

**prepared to answer.**

MR. GROSSO: So these are Exhibits 47, 48?

THE REPORTER: Yes.

(EXHIBIT 47 MARKED FOR IDENTIFICATION)

(EXHIBIT 48 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. Okay. So 47 is Ashland. 48 is Highlands. Those are the excerpts from the master schedules.**

**Are you prepared to look through those, and tell me, day-by-day, who the physician was on site?**

A. I'm definitely prepared to look through them. But as I indicated, as -- as person rather than a corporate representative, the only way to determine those would be combining the schedules with the billing records and such. And these have been provided to you. So --

**Q. Go ahead.**

A. But I cannot tell you by available information, if it is just the schedules, who was there on what day.

**Q. Well, I'm not asking you to use the schedules to determine it because I can do that. What I'm asking you is that if there's any difference between who was present and what the schedules indicate was the person, if any, who was present, please tell me who the actual**

**person physician on site for both Ashland and Highlands were for the dates in those scheduled excerpts.**

MR. MELTON: I'm going to object right now. in our conversations, you had indicated you weren't going to request him to do any more than what Chris Miller had done which -- and I think he has answered, she utilized the claims data and identified from the claims that --

MR. GROSSO: She could -- he could do the same thing.

MR. MELTON: Well, if you have the claims data and want to provide that, he can do that.

MR. GROSSO: He was supposed to prepare this in advance of coming here. I didn't choose him.

BY MR. GROSSO:

**Q. I know it's a lot of work. I know you're a medical oncologist and not a CPA or an auditor. Highlands and Ashland chose their designated witness. You were the selected person. And I'm entitled to ask. If you cannot answer, then that will be a matter for the Court and perhaps for presumptions regarding evidence and conclusions of law.**

MR. MELTON: And I think he has answered it, that it's in the claims data.

BY MR. GROSSO:

**Q. The claims data, what I have heard, it does not necessarily identify who was on the premises. Furthermore, if you look at the claims data, there are conflicts. He had -- he would be -- Kirti Jain and others would be billed on days where they're supposedly in two places or three places at the same time, days when, hey, Dr. Hayek isn't present. But he's being billed under his name. So the point that I am getting at is I want a -- if it can be done, I want a definitive statement as to who was present on each day in those schedules. If it cannot be done, I'll accept that.**

MR. MELTON: You didn't have to bang on the table, Andy. Okay.

MR. GROSSO: No. That wasn't intentional.

MR. MELTON: We're all here.

MR. GROSSO: I have my fist open, not closed. So it wasn't an intentional bang.

BY MR. GROSSO:

**Q. If it cannot be done, I'll accept that as an answer. But I don't want to hear, we haven't done it.**

A. I don't think it cannot be done. I believe it can be done using those data, claims data, the schedules. And we provided them to you.

**Q. So with the schedules, with the billing statements to the patients, with the claims, with the**

**itemized statements such as the one I showed you, is it possible to identify which physician was on the premises?**

A. I believe so. I believe mostly that can be identified. Yes.

**Q. Okay. Are you telling me that you cannot do this today?**

A. That is correct.

**Q. Are you telling me that it cannot be done?**

A. No.

**Q. And you're telling me that with the schedules and the billing statements to the patients and the itemized charge statements, that it can be done?**

MR. MELTON: That is mischaracterization.

BY MR. GROSSO:

**Q. I'm asking a question. You can say "yes" or "no."**

A. I think putting it all together since there were no separate records kept, we've never felt that there was a need for records since we staffed, with the physician, both these places. Therefore, if you must know, I think that is the best -- next-best way to find out.

**Q. What is -- what is the next-best way?**

A. Best way would have been if there was a

separate record kept which we haven't, which we never felt the need. But if you must know, the next-best is the claims data combined with the schedule.

**Q. What do you mean by the claims data?**

A. I think that's evident. That is billing data. The charge sheet. That -- that is the superbills.

**Q. No. I don't have all of that. You said --**

MR. MELTON: You didn't ask for them.

MR. GROSSO: What?

MR. MELTON: You didn't ask for the superbills.

MR. GROSSO: I didn't say I did. I'm asking for the designated witness to identify who was on the premises for each day. And if you have the superbills and you can use the superbills to answer that question, then that is what should have been done. And either we will have the Court order it be done or we'll have a presumption that it's not doable or something similar. But I've asked --

MR. MELTON: We will motion for that.

MR. GROSSO: I've asked for it. I'm entitled to get it. It's not done. And you know, we have federal rules of procedure and evidence.

MR. MELTON: Okay.

BY MR. GROSSO:

**Q. I'm entitled to get it. I haven't gotten it.**

**There are multiple ways to get answers. You don't have to ask -- tell me there's a specific way. If you want to come in and give me the superbills or the other documents that will answer it, that's fine, okay? But I'm asking it to be done this way, and I'm entitled to have it done this way. I narrowed it down from everything to just this period.**

**And you've told me you haven't done it. You're saying it can be done using -- if you tell me that I can do it using certain records that are available to me, that's adequate. If you're telling me that there are additional records that need to be acquired, then I'm asking to produce them in lieu of the designated witness addressing the topic.**

A. All I can tell you is we've given everything you asked for. I do believe it can be done from correlating various data sets that I mentioned. Other than that, all of the conclusions that you're drawing is your prerogative.

**Q. All right. We will leave it at this. It has not been done. I do not have answers. And we will proceed with the Court as appropriate. All right.**

**All right. Number 8, the topic is --**

MR. MELTON: Before we move on, I will just, again, for the record, state that I think that

mischaracterizes his testimony. And it also mischaracterizes what we had discussed prior to. But I -- all that to say, I think this is an argument to be had later on as well.

MR. GROSSO: There were letters between --

MR. MELTON: I understand. I understand. I understand you --

MR. GROSSO: Let me finish putting on the record. There were letters between Mr. Melton and myself regarding how this would be handled, no, and offset.

MR. MELTON: And I believe we've handled it in accordance. But we can argue that later.

BY MR. GROSSO:

**Q. "Point 8, Kirti K. Jain travel for the period July 2012 through December 2016. Identify all days that Dr. Kirti K. Jain was not on the premises of the Ashland Center due to the fact that he was outside of the United States on such days. And identify each physician who was on the premises for each of those days."**

**Are you prepared to answer that topic?**

A. We have given you the passport copies. And you told me that you made a list of the days I was not there. That is, I was out of country. The periods before the passport dates which is about August of 2015,

we have done our best to find them, as I said, through the Embassy of India. Phone calls, letters, none of them are answered. And we already answered the question of who was on premises. That can be found out through -- through the claims data, through the superbills, and the schedules.

**Q. We've asked for expenses, defense records, charges. We haven't received them. As I -- as I indicated earlier, I know from my own experience that I can go back quite a number of years with my credit cards and get statements. There had been sometimes when they were already been archived. Apparently, that hasn't been done here, and has not been produced to us.**

**So I'm asking again, since the information is in your control, on what days between July 2012 through December 2016 were you outside of the country?**

MR. MELTON: Objection. Asked and answered.

THE WITNESS: My answer remains the same.

BY MR. GROSSO:

**Q. So you cannot answer beyond what is in the passport that you've given to us?**

A. That is correct. I might add, perhaps you retain records a lot longer than I do. I mean, we generally retain these records that requires minimum -- since I don't --

**Q. Do you use American Express?**
A. I do. But that's only one of the several cards I do.
**Q. That may very well have charges on it. Just look up the statements.**
A. Once again, it's one of many cards I use.
**Q. Okay. Number 13 for Ashland Bellefonte, "Thursday tumor board meetings for the period July 2012 through December 2016. Identify physicians who attended tumor board meetings, when and where those meetings took place, during what hours such meetings took place, and the identities of the physicians and non-physician providers on the premises of the Ashlands Center on such days and at such time."**
**Now, are you prepared to identify each Thursday when there was a tumor board meeting?**
A. First of all, the meeting was not held each Thursday. There were many Thursdays it was not scheduled for. And many Thursdays, when it was scheduled for, it was canceled. The meetings had been changed to various days. Sometimes, they were Wednesdays and times, as I explained to you earlier -- so it is not each Thursday for sure.
Having said that, the only way that we identified is through the records that we just talked

about. But that said, I am going to re-emphasize on you that I attended those meetings rarely. I was -- when I did attend, I was practically always late because the -- the patients had to be taken care of. And I ensured that that's what happened over attendance to the meeting which was a voluntary attendance to start with.

MR. GROSSO: Okay. I have no more questions.

CROSS-EXAMINATION

BY MR. MELTON:

**Q. Dr. Jain, I just have a couple. I just want to clear up a few things. First of all, you were talking about the Logan Cancer Center. And you stated that it had medical oncology as well as radiation oncology.**

**And you also stated that it was, I guess, a joint venture between the hospital and your corporation, I think it was Logan-Williamson?**

A. Logan-Williamson Oncology.

**Q. Yeah. I'll just call it Logan-Williamson.**

A. Yeah.

**Q. So it was a joint venture between Logan-Williamson and the hospital; is that correct?**

A. Yes.

**Q. And did the JV perform any medical oncology?**

A. No.

Q. Okay. So the medical oncology was performed by the hospital, correct?
A. Correct.
Q. Okay. So the JV would've only performed radiation; is that correct?
A. That is correct.
Q. Okay. And I think you had stated -- I just want to make sure I'm clear for the record. I think you had stated that by contract, the hospital took on the requirements for any kind of supervision for the therapies; is that accurate?
A. Yes.
Q. Okay. Now, I know you testified about certain documents, Exhibits 6, 10, and 12 which are these schedule reports?
A. Yes.
Q. These schedule reports -- is the purpose of these schedules -- when they're created, are they intended to be used for the purpose of documenting who was supervising physician for chemotherapy administration?
A. No.
Q. Okay. I guess just in general, why are these -- are these just to show in the future what patients are scheduled? Is that their sole purpose?

A. Yeah. These are exactly what it says, that this was -- these were the patients who were scheduled. And in our normal day, we would not have to see a schedule like this. This was a stock report that was pulled on request.

**Q. Okay.**

A. We would each have our own separate schedule.

**Q. So this just basically shows -- and I guess this would be a compilation, then -- compilation report. And this just shows what patients are scheduled each day; is that right?**

A. Correct.

**Q. And it's not used for billing purposes or anything of that nature?**

A. No.

**Q. Okay. I want to talk a little bit about locums and clear up -- just so I understand some of your testimony. The time period of this would be 2012 to 2017. Did Ashland -- or I'll call it ABCC or HCC.**

**During that time period, did they contract with any other locums other than Dr. Batra and Dr. Bertram? Or I think you had mentioned a third locum. What was --**

A. There was a name -- there was a physician who had worked with us. I -- I remember his last name is

Janowski.

**Q. Janowski?**

A. But again, I don't know the dates. So --

**Q. Were there more than just those three locums between 2012 and 2017? Do you recall?**

A. I remember other doctors. But again, there are no other names coming to my mind.

**Q. You don't remember their names. But you do recall contracting with other locums?**

A. There were other contracts.

**Q. Okay.**

A. Exact dates is always a difficult thing, knowing how far back they were.

**Q. And I think you had mentioned the term, short-term locums. What is that? Is that, like, a locum who's only in for like a week or a month or --**

A. Short-term would be like a week or like -- a week.

**Q. So the centers utilize short-term locums?**

A. We have had them. Again, I could not testify to the time period. But usually, more often, they were longer-term than short-term.

**Q. And I think it was your testimony, then, that you'd attempted to identify what the dates were. But you found that impossible; is that fair to say?**

A. I could not find that. Mostly because our records, we will tend through the -- the payroll service. And the locums did not go through payroll service. In fact, they didn't even -- the checks did not even have their names since they were gotten through a variety of locum services. And there are so many of them.

**Q. Got you. I want to just ask: There was a lot of testimony about incident to-services. Do you have any certifications in coding or billing?**

A. No. I don't.

**Q. Okay. If I were to ask you -- well, let's put it this way: If I were to have a question about coding and billing, would you say it's more -- would you -- who would you trust more me to ask that question of you or a certified coder and billing expert who has decades of experience in coding and billing?**

A. By far the billing expert. I do not know coding very much. If you ask me anything oncology, I can answer it. But when it comes to coding, I barely know anything about them.

**Q. Okay. Couple other questions here. I think we could turn Exhibit 30. This was the Medicare Carriers Manual. It talks about incident to-services to a degree. And it says -- it references, "Services and**

**Supplies Incident to Physicians Services." And similarly, Exhibit 31, the portion that was, I think, referenced to here says, "Medicare pays for services and supplies." And then a parenthetical. And it says, "That are furnished incident to a physician's or other practitioner's services." And also, the 1500 form has on the back -- it talks about, "For services that would be considered as incident to a physician's professional service."**

**Let me ask you this: Chemotherapy, I think you had testified to this. You said you have very seldom delivered or administered chemotherapy yourself; is that fair to say?**

A. Yeah.

**Q. Was that accurate?**

A. That is very accurate.

**Q. And I think you said that was typically done by one of your chemotherapy nurses; is that fair?**

A. Correct.

**Q. Just in general, in medical -- with medical oncologists, do most medical oncologists deliver and administer chemotherapy themselves? Or is that usually done by a nurse?**

A. Practically always done by oncology certified nurses.

**Q. So it's practically always by the nurse, correct?**

A. Yes.

**Q. What about delivery of a subcutaneous injection? Do physicians usually do the injections? Or is that the nurses?**

A. These are generally performed by nurses. In a pinch, a physician can give it. But no. They're not provided or given by the physicians.

**Q. And I suppose in a lot of times, subcutaneous injections may even be self-administered. And I think you talked about that too, correct?**

A. In a good number of times, they are. Yes.

**Q. So I mean --**

A. Especially if it is a non-chemo drug, we generally do not allow patients to self-administer chemo drugs.

**Q. Right.**

A. But non-chemo drugs, yes.

**Q. So is it fair to say, then, as you understand it as a clinician, then, would administering chemo -- is that a physician service? Or is that a service delivered by nurses?**

A. It's a service delivered by nurses.

**Q. Okay. So I want to turn back to Exhibit 29.**

I think Mr. Grosso had read a portion. It says, "For services to be" -- I'm sorry. The paragraph before that says -- this is what is certified on this Box 31 where it says, "Signature of the physician." This is the physician who appears on the claim form. And says -- and it certifies what is on the back. And here on the back, it says, "I certify that the services shown on this form were medically indicated and necessary for the health of the patient."

A. Correct.

Q. I think you had talked about you had seen yourself as rendering provider being the physician who has developed the plan.

I think you called it, the captain of the ship; is that fair to say?

A. Right.

Q. And it was the physician who had seen the patient, met with the patient, ordered the chemotherapy, the dose, the administration, the duration, the number of cycles, all of that.

That would be done by the ordering physician, correct?

A. That is correct.

Q. And say, you're seeing a patient. And you have gone through this process and ordered this for a

**patient. And that patient comes in and gets chemotherapy. And let's say, Dr. Bertram happens to be working and seeing patients that day. And let's say, you're not there.**

**If that patient tolerates the chemo well, if all goes as well as it should and tolerates, no adverse reactions, no distress, is it fair to say Dr. Bertram may never lay eyes on that patient, correct?**

A. That is correct.

**Q. And Dr. Bertram may never have to consult that patient's record; is that correct?**

A. True.

**Q. And Dr. Bertram may never lay hands on that patient, never even have to touch or even see or even be in the same room as that patient; is that correct?**

A. That is true.

**Q. Dr. Bertram may not even know that patient -- may know patients are there, but may not know any specifics about the patient who's in that chemo room in the chemo chair getting chemo pushed intravenously; is that fair to say?**

A. That is correct.

**Q. So who would be -- in that scenario, wouldn't it be fair to say that the most appropriate physician who could certify to the medical necessity of those**

**services would be you as the rendering physician and not Dr. Bertram?**

A. Very true.

**Q. Okay. I think you also testified -- switching gears here a little bit, you testified physicians would sometimes but not always be at the centers on weekends getting caught up on charting or keeping the records, getting caught up on the records; is that correct? That was a -- sometimes, that would happen?**

A. Yeah. Not every time. It was not uncommon that we were in the center catching up on charts. Because ever since electronic health records have been implemented, there is a lot of data showing that physicians spend a whole lot more time documenting than they ever did. So we are always running behind and trying to catch up. So it was not -- not an uncommon scenario that we were in the center doing our records.

**Q. So the EHRs that are supposed to streamline and make it easier are not necessarily as time helping?**

A. There is all kinds of data supporting what I just said that we have -- we spend more time on electronic records than ever.

**Q. Can you tell me about how often? I mean, how many times out of a month do you think you might would be there charting on a weekend while -- or just present**

**on a weekend charting?**
A. Two to four times.
**Q. Okay. So maybe -- I mean, would we say like half the time, a third of the time, two-thirds of the time?**
A. It's hard to characterize because it would vary from month-to-month. But a third to half would not be an overstatement.
**Q. And I'm guessing there's no rhyme or reason into when that would happen?**
A. Correct.
**Q. Of when you would be in the office charting versus when you wouldn't?**
A. Generally, I tried to coordinate the time with the injections. But it was not always.
**Q. Okay. Well, what I mean by that is would you know whether or not -- like, you couldn't say, like, it was every second Saturday. Or it was every --**
A. No.
**Q. Okay. Let me ask you this. You're a physician. Leukine, is that only given to chemotherapy patients?**
A. It is used in non-chemo situations as well.
**Q. Okay. I mean, it's given to -- I mean, it basically is helpful to just about any patient who needs**

**to have their white blood count elevated; is that fair to say?**

A. So if it is a --

**Q. If they're in a situation, a diagnosis, that has caused -- or a situation where their white blood count is abnormally low, Leukine would help that patient, correct?**

A. In most such patients. It is used in bone marrow transplant patients. It is used in chronic neutropenias where patients have chronically low, dangerously low white cell count, used in myelodysplastic syndromes where you're not using chemo but you need to elevate the white cells. So yes. The answer is that it is used in situations where chemo was not given to a patient.

**Q. Okay. So I want to talk about the topics really quickly on that, Topics 4 and 8. I know you talked about claims data.**

**Would the claims data show the physicians who provided evaluation and management and office visits? And when I say, claims data, claims data that would reflect what the centers were paid by Kentucky Medicaid or by CMS. Would that data show what physicians were providing evaluation, management, or office visit services at the centers on days where -- on the days**

**reflected in the master schedules or days that correspond with the dates on your passport?**

A. The E&M visit codes, unless the physician present was a locum, it -- it would have the physician's name attached to the evaluation and management service. But if it was a locum physician, then he would be billed in the name of the original physician for only was filling in.

**Q. That's a -- that's a good point. So the locum --**

MR. GROSSO: Objection.

MR. MELTON: The locum --

MR. GROSSO: Commentary.

BY MR. MELTON:

**Q. The locum aside, so the E&M or the office visits would show who the physician was.**

A. Correct.

**Q. And if it's, you know -- the classic example, I guess, if it's showing Dr. Hayek and Dr. Hayek has already left and Dr. Hayek is billed, that would likely be a locum.**

**Is that what you're saying?**

A. Correct.

**Q. Okay. And you have records -- well, let me ask you this: Would Ashland or ABCC or HCC maintain**

**records of who attended each and every tumor board meeting?**

A. No.

**Q. Okay. So that's not something the Centers would have maintained, correct?**

A. No. That's not something we maintained. Once again, tumor board was not a -- Ashland or Highlands --

**Q. Got you.**

A. -- creation. It was required by the hospital for the health recognition and we -- we attended voluntarily.

MR. MELTON: I've got no further questions.

REDIRECT EXAMINATION

BY MR. GROSSO:

**Q. Now, when locum tenens were providing the services but were being billed under the names of other physicians, was there not a code used to identify that fact?**

A. There is. From what I understand there's a modifier they used. But I -- I don't know what they used.

**Q. Is it not a Q6 modifier?**

A. I don't know.

MR. GROSSO: What's the --

THE REPORTER: 49.

MR. GROSSO: This is Exhibit 49.

(EXHIBIT 49 MARKED FOR IDENTIFICATION)

BY MR. GROSSO:

**Q. It is a list of claims from the Medicare CMS claims data that listed Q6 on the -- as the modifier on the claim. And you can see --**

MR. MELTON: Object to foundation. Hearsay.

MR. GROSSO: I'm explaining what the record is.

MR. MELTON: Fine. I understand. You don't have to get angry. I can put in my objection on the record.

BY MR. GROSSO:

**Q. These are the only ones that have Q6. What other locum tenens were billing or were providing services for which physicians at Highlands and Ashland were billing for?**

MR. MELTON: Object to that again.

THE WITNESS: I already answered that question. I -- I don't recall any other names than what I mentioned.

BY MR. GROSSO:

**Q. Okay. Okay. You mentioned three conditions for which Leukine might be administered other than for chemotherapy treatments. One was bone marrow transplant.**

**You didn't do bone marrow -- or didn't do whole body radiation for bone marrow transplant, at the cancer centers, did you?**

A. Since we did not do bone marrow transplant, we did not provide the whole body radiation.

**Q. What were the other two?**

A. I mentioned chronic neutropenias and myelodysplastic syndrome.

**Q. Did you treat those at the cancer centers?**

A. Yes.

**Q. Okay. Which ones?**

A. Both.

**Q. How many?**

A. Myelodysplastic syndromes are more common than neutropenias. But everybody who has myelodysplastic syndrome doesn't always require treatment. Sometimes, they require observation. Sometimes, they requires treatments like Leukine or erythropoietin which is a similar molecule but for a different cell. And there were other times, if they progressed to become more serious disease, then they might require additional treatment including bone marrow transplant or chemo.

**Q. Okay. If I were to look at the services provided to a patient, would I be able to identify those patients in those two categories?**

A. Is the question referring to would you find a patient who had those?
**Q. Suppose I have a -- suppose I see a patient. And I look at the services that he or she was rendered at the cancer centers.**
A. Right.
**Q. There'd be a diagnosis, right?**
A. Yes.
**Q. And that diagnosis would identify whether that patient had one of these two conditions, correct?**
A. Yes.
**Q. What is the -- I need to write these down because I will never remember them. Please give them to me.**
A. I mentioned myelodysplastic syndrome.
**Q. How do you spell that?**
A. M-Y-E-L-O-D-Y-S-P-L-A-S-T-I-C.
**Q. D-I-C, D-I-C? T-I-C. Go ahead.**
A. Should I spell syndrome?
**Q. No. And the other, neuro?**
A. There was chronic neutropenia, N-E-U-T-R-I-N-O-P-E-N-I-A.
**Q. Okay. So by looking at the diagnoses, I could identify which patients had those two conditions.**
A. You should be able to.

**Q. Okay. And you didn't do bone marrow transplant with the whole body radiation?**

A. No.

**Q. Okay. Any others?**

A. Any others for the use of Leukine?

MR. MELTON: To the extent you know.

THE WITNESS: These are primarily the situations because the Leukine's primary role is elevating white cells. These are -- the chronic neutropenia, for example, is a very broad category. And there are times you just watch them. There are times you need to use Leukine, not always.

BY MR. GROSSO:

**Q. All right.**

A. Same way myelodysplastic syndrome which leads to neutropenia in many patients.

MR. GROSSO: I have no more questions.

MR. MELTON: I have none either. Thank you.

MR. GROSSO: We're done.

MR. MELTON: Thank you, Doctor.

THE WITNESS: Awesome.

THE REPORTER: Well, before we go off the record, Mr. Grosso, what would you like to order?

MR. GROSSO: Yes. Electronic.

THE REPORTER: Electronic.

And then, Mr. Melton.

MR. MELTON: Could I get the hard copy of the full and then obviously repository? And I don't need a video.

THE REPORTER: No video. Okay. All right. okay.

MR. GROSSO: I want the video.

THE VIDEOGRAPHER: Okay.

We are now off the record. The time is about 5:12 p.m.

(DEPOSITION CONCLUDED AT 5:12 P.M. ET)

CERTIFICATE OF REPORTER

COMMONWEALTH OF KENTUCKY AT LARGE

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Stipulation page hereof, by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel and that I am in no way interested financially, directly or indirectly, in this action.

JESSE HARP,
COURT REPORTER / NOTARY
MY COMMISSION EXPIRES: 01/28/2027
SUBMITTED ON: 01/05/2024