IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION

- - - - -

| | | |
|---|---|---|
| United States of America ex rel. Robert C. O'Laughlin, M.D., | : | |
| Plaintiff, | : | |
| vs. | : | Civil Action No. 0:16-CV-148-DLB |
| Radiation Therapy Services, P.S.C., dba Ashland Bellefonte Cancer Center, et al., | : | |
| Defendants. | : | |

- - - - -

SEALED EXCERPTS OF THE
DEPOSITION OF JESSICA DOVE

- - - - -

Taken at Weston Hurd LLP
101 East Town Street, Ste. 500
Columbus, OH 43215
September 29, 2023

- - - - -

Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

A P P E A R A N C E S

ON BEHALF OF RELATOR:

Andrew Grosso & Associates
1250 Connecticut Avenue NW, Ste. 700
Washington, DC 20036
By Andrew Grosso, Esq.

ON BEHALF OF DEFENDANT A-ONE BIZ:

Wyatt, Tarrant & Combs, LLP
500 West Jefferson Street, Ste. 2800
Louisville, KY 40202-2898
By Christopher A. Melton, Esq.
(Via videoconference)

ON BEHALF OF THE WITNESS:

Weston Hurd LLP
101 East Town Street, Ste. 500
Columbus, OH 43215
By Steven G. Carlino, Esq.

Friday Morning Session

September 29, 2023

- - - - -

S T I P U L A T I O N S

- - - - -

It is stipulated by counsel in attendance that the deposition of Jessica Dove, a witness herein, called by Relator for cross-examination, may be taken at this time by the notary pursuant to notice and subsequent agreement of counsel that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -

INDEX


| Examination By | Page |
|---|---|
| Mr. Grosso - Cross | 5 |

| Exhibits | Page |
|---|---|
| Exhibit 3 - [redacted]Medical Administration Record, 2-11-2014 | 11 |
| Exhibit 4 - [redacted]Medical Administration Record, 2-11-2014 | 13 |
| Exhibit 5 - Declaration of Fadi Hayek, M.D., 8-1-2023 | 16 |
| Exhibit 6 - [redacted]Medical Administration Record, 6-18-2014 | 23 |
| Exhibit 7 - [redacted]Medical Administration Record, 6-18-2014 | 24 |
| Exhibit 8 - [redacted]Medical Administration Record, 6-18-2014 | 24 |
| Exhibit 9 - [redacted] Itemized Statement, 1-1-2014 to 6-30-2014 | 28 |


(Exhibits returned to Mr. Grosso.)

- - - - -

JESSICA DOVE

being previously duly sworn, testifies and says as follows:

* * * * *

(The following testimony was excerpted from page 20 of the deposition transcript.)

* * * * *

Q. Have you seen records like this before?
A. It is printed off in a format I am not used to seeing. We documented on computer.
Q. All right. How did you document? What did you document?
A. The first day of nursing school, you say, if you didn't write it, you didn't do it. So you try to document everything you do.
Q. What information do you document for any particular patient?
A. If you check any vital signs, for example, you document them. If you establish venous access, if draw labs, if you administer medications, discharge, admit, et cetera.
Q. Okay. Who entered the information that appears on this particular document, if you know?

A. I don't know. As I said, this is not the screen I would have seen. I would have documented the administration of the Venofer.
Q. Okay. How would you do it?
A. I don't even remember what computer system we had.
Q. All right. Do you recall entering this information?
A. Specifically about this individual patient, no, I do not.
Q. Do you recall entering information for patients in general while you worked at the Ashland Bellefonte Center?
A. Yeah. I would type in and record things that I administered to the patient.
Q. Okay. So let's walk through this. There's a patient name. In this case, it's Erma Arbaugh. I'm not asking you to remember this patient. It's been a long time.
The date for the treatment is June 18th, 2014. Who would enter the patient's name?
A. The name would already be in the system.

Q. Do you know who would enter it?
A. No.
Q. Okay. So what would you do to start further documenting?
A. I can only speculate. It's been too long since I've seen that system.
Q. Okay. That's --
A. I would have presumably clicked on a name or an encounter.
Q. Okay. Then it says the physician is Mary Ann Stephenson. Who would have entered that?
A. I do not know.
Q. Okay. On the left-hand side, it says date: June 18th, 2014. Who would have entered that?
A. That would have been prepopulated to the screen. I wouldn't enter a date.
Q. Got it.
A. Nurses chart by exception. They try to have as much in there in advance as possible.
Q. Now we have procedure: Venofer. Who entered that?
A. The Venofer would already be in the screen, so I wouldn't enter the name of the drug.

I would enter the time that I administered it.
Q. Okay. How do you know you administered this drug?
A. Well, I can't confirm that someone didn't assist me with the process, another nurse that may have been there.
Q. Okay.
A. We collaborated.
Q. Your name is listed?
A. Right.
Q. Does that mean that you provided the service?
A. Generally speaking, yes.
Q. Okay. And I see that your name is listed three places here. What are the other two -- what are all three places there for?
A. I don't know. I'm not used to this form.
Q. Okay. It says "Approved By." Did you approve any drugs or chemotherapy provided to the patients?
A. No.
Q. Okay. Then it says "Prepared By." Did you prepare any drugs or chemotherapy --

A. We --
Q. -- given to the patients?
A. -- did, practicing under the license of the physician.
Q. What did you do to prepare the drugs, including chemotherapy?
A. You researched the drug, find out whether it's compatible and what volume it goes in, whether it needs to be on short or long tubing, administration risks, complications, side effects, et cetera --
Q. Okay.
A. -- and inject it into the bag and administer it to the patient.
Q. Okay. And then it says "Administered By." Did you administer this drug to this patient?
A. When I look at this document, it suggests that I did. I do not recall the specific instance.
Q. Okay. So that's what that entry is supposed to indicate. Am I right?
A. Uh-huh.
Q. Okay. I also see a time frame. It

says start at 11:30, end at 12:15. What does that indicate?
A. That it went over a period of 45 minutes.
Q. During that particular time frame or not?
A. It appears that is what was documented. I do not recall the specific incidents.
Q. I understand. Now, in the middle, it says "Supervising MD." What does that entry indicate?
A. He was the ordering physician.
Q. Does it indicate that he was present?
A. I do not know. I am not used to this sheet.
Q. Okay. Does it indicate that he was supervising you directly, you know, in the same room?
A. He was not in the same room.
Q. Does it indicate that he was on the premises of the center?
A. I do not know what it indicates, his name on the page.
Q. Okay. When -- let me ask you this.

Well, no. Let's move on.
Okay. Are you familiar -- you mentioned him, so I gather you are -- with a Dr. Fadi Hayek?
A. Yes.
Q. How are you familiar with him?
A. He also worked there as a medical oncologist.
Q. All right. Let me give this to you.
MR. GROSSO: Mark this as Exhibit No. 3.
- - - - -
Thereupon, Exhibit 3 is marked for purposes of identification.
- - - - -
Q. Please take a look at this document. When you familiarize yourself --
MR. MELTON: And which document is this?
MR. GROSSO: This is 1A.
A. Okay.
Q. All right. And your name, again, appears in the little same three entries as having, quote/unquote, approved, prepared, and

administered this drug, okay?
A. I see it.
Q. The patient's name is Dorothy Carrico. The date is February 11th, 2014. So you would have been the person to enter the document the services provided to this particular patient, right?
A. Yes.
Q. Okay. Under "Supervising MD," there's nobody listed here. Can you tell me what that indicates?
A. I don't know. This form is unfamiliar to me.
Q. If there was no physician supervising or on the premises, what would you enter under supervising physician?
A. We did not enter that in --
MR. MELTON: Object to form.
THE WITNESS: Pardon me?
MR. CARLINO: He was --
MR. MELTON: Oh. I was just objecting to the form.
MR. CARLINO: Go ahead and answer.
MR. MELTON: You can answer.

A. Okay. Please repeat the question.
Q. Sure. Under a circumstance where there was no physician present on the premises of the clinic, the center, during the provision of services, what name, if any, of a supervising M.D. would be entered?
A. We did not list that. That was auto-populated, to the best of my recollection.
Q. Okay.
A. I do not -- I did not chart differently based upon physician presence or absence.
Q. Let's take...
MR. GROSSO: We're going to go to 1B. If you could, please mark that as Exhibit 4.

\- - - - -

Thereupon, Exhibit 4 is marked for purposes of identification.

\- - - - -

Q. Please take a look at it.
Are you familiar -- have you looked at it?
A. Yes.
Q. Are you ready?
A. (Indicates affirmatively.)

Q. All right. In this one, which is also dated February the 11th, 2014, there is listed information -- hold on. Hold on. Forgive me. I got two documents confused. I need to correct that.

This one is February 11th. It is for a patient by the name of [redacted] -- I take that back. [redacted]. This is a different nurse. Do you remember Michelle Brown?

A. Yes.

Q. Did you work in the center with her?

A. Yes.

Q. Okay. This says the supervising physician was Fadi Hayek. The other one has no supervising physician. That is Exhibit No. 3.

Can you tell us the difference between having one medical administrative record with a supervising physician listed and another without a supervising physician listed?

A. I -- not -- I don't know this document, and this is not what I would have seen or looked at. I don't know what the absence or presence of a physician's name designates.

Q. Okay. Let's take a step backwards, and

let us say that we have a -- you're entering information to document the procedure. Who would document the presence or absence of a physician?
A. Not the nurses.
MR. MELTON: Object to form.
MR. CARLINO: You can answer.
Q. If anyone.
A. I do not know.
Q. Okay. So this does not mean anything to you, that the...
A. It doesn't. We received orders from them to administer medicine. We were not involved in their presence or absence.
Q. Do you know if Dr. Fadi Hayek was there that day?
A. I do not know.
Q. Do you know if he was even working at the clinics on that day?
A. I do not know.
Q. Was there a time when Dr. Hayek left the center?
A. I do not -- I don't recall his -- details of his time working there.
Q. Okay.

MR. GROSSO: One moment, please. Let's take a brief break. I need to get a document, and I don't want to waste everyone's time.

(A short recess is taken.)

Q. I have handed you a document -- I need to have the court reporter mark it. It purports to be a declaration of Fadi Hayek.

- - - - -

Thereupon, Exhibit 5 is marked for purposes of identification.

- - - - -

Q. You've read it during the break, right?

A. Yes.

Q. Okay. So that record says that he wasn't on the premises after December 27th, 2013. And I showed you previously Exhibit No. 4, a medical administrative record, that says that Dr. Fadi Hayek was supervising the administration of a drug to [redacted] on February 11th, 2014.

Who was supervising Ashland Bellefonte Clinic on this day?

A. I don't know.

Q. Who would know?

A. That is a good question.

Q. Now, you told us earlier that you were educated while studying to be a nurse that if you didn't document something, it didn't happen.
A. Correct.
Q. Okay. Well, this is a document in the medical -- from the clinic. That's what the Bates stamp number on the bottom left-hand corner, CC Defendants0033173, indicates. So how did Dr. Hayek's name get into the documentation for this patient's treatment if Dr. Hayek was not present?
A. I don't know. I don't know.
Q. Were you asked to document which doctors were present on the premises?
A. No.
Q. Were there times when no doctor was present on the premises and treatments were being given to the patients?
A. Yes.
Q. Okay. How often did that occur?
A. I do not recall.
Q. Was it rarely, frequently, something in between?
A. I don't recall frequency.

Q. Okay. Let's talk about the period at -- do you remember when Dr. Hayek left?
A. I do not recall.
Q. Okay. We've seen -- you've seen the declaration, right?
A. Yeah. Yes.
Q. And this was during the time when you were working part-time there. Is that an accurate description, part-time?
A. Working part-time, yeah. Sort of -- it was minimal, but yes.
Q. All right. How did you know whether a doctor was or was not on the premises?
A. We were not in possession of that information. We were in a different area.
Q. So you didn't know whether there was a doctor present or not?
A. Correct.
Q. Okay. How do you know there were times when there was no doctor present?
MR. MELTON: I'm sorry, Andy. I didn't hear that last question.
Q. How do you know that there were times when no doctor was present on the premises?

A. If you reached out to them and they responded back to you and they were somewhere else.

Q. How often did that happen while you were working there?

A. I don't recall.

Q. Okay. But it did happen?

A. Yes.

Q. Okay. What did you do on those occasions?

Let me -- let me withdraw the question.

Why would you reach out to a doctor during the treatment of a patient?

A. If we needed orders.

Q. What would happen if the doctor was not on the premises and you reached out to him for orders, any difference from when he was on the premises?

A. Not that I recall.

Q. Okay. If there was no doctor on the premises, was there any other practitioner on the premises?

A. I do not recall.

Q. Was Mary Ann Stephenson or Stevenson be

present?
A. I don't recall what her hours were.
Q. Were there times when Mary Ann Stephenson was not there and there was no doctor there?
A. I believe there were.
Q. Okay. How could we determine that?
A. I don't know.
Q. Okay. Who kept the schedules for the medical doctors and the nonphysician practitioners?
A. I was never in possession of that information.
Q. Okay. One moment. As I mentioned earlier, I don't have my usual binders with me, so I'm being a little bit more careful in getting organized after each exhibit.
Now, I had shown you earlier Exhibit No. 2. Do you have that in front of you?
A. Yes.
Q. And Exhibit No. 2 indicates that the supervising M.D. was Kirti K. Jain on June 18, 2014, while you were the nurse treating a particular patient, this one being [redacted].

That having been said, I want to make this clear. What -- to your understanding, what does the fact that Kirti K. Jain's name appears under "Supervising MD" mean, if you know?
A. I don't know what this paper means. All I can say is his name on it would suggest to me that he probably ordered the medication.
Q. Not that --
A. Yeah.
Q. Not that he was supervising?
A. I don't know who decided to make it this way --
Q. Okay. But --
A. -- or what it means.
Q. But run that through for me again. What does it mean to you as someone who worked there?
A. Well, it requires a physician's order to administer any medication, and this suggests to me that he ordered the medication.
Q. What about the exhibits that I showed you earlier that showed no -- or the exhibit that had no doctor listed?
A. I don't know.

Q. How did you -- how were you told what drug to give to a particular patient?
A. It would be ordered into the computer by the ordering physician.
Q. So you would look at the computer?
A. Yes.
Q. And did it list which doctor had ordered it or --
A. Yes.
Q. It did? If there was no doctor who ordered it, would you give the drug to a patient?
A. No.
Q. If there was no doctor listed as having ordered it, would you have give that drug to a patient?
A. There in is the challenge. I don't remember this -- I don't know this document or remember this incident. There would have been an ordering doctor. I suspect someone forgot to type something in a spot.
Q. Got it. Got it.
A. We -- nurses do not prescribe medications.
Q. The reason I'm asking you this -- and I

can show these documents to you. I've looked at thousands, and there is one nurse that frequently has no doctor under the supervisory M.D. entry.

MR. MELTON: I can't hear you, Andy.

MR. GROSSO: I'll repeat.

Q. I have looked at thousands of these. There is -- for both Ashland Bellefonte Cancer Center and Highlands Cancer Center. There is one nurse for whom there are frequently no entries for the supervising M.D. on these medical administrative records. That nurse is you, and I'm wondering what is different with your treatment of the patient and the entry of a doctor's name for the supervising M.D. versus everyone else.

A. I don't recall any difference.

Q. All right. That's it. And I've shown you Exhibit No. 2. Take a look at...

MR. GROSSO: This one will be for -- this is file No. 5B. Can you mark this as Exhibit 6.

- - - - -

Thereupon, Exhibit 6 is marked for purposes of identification.

- - - - -

MR. GROSSO: And this is going to be from file 5C. Can you mark that Exhibit No. 7.

- - - - -

Thereupon, Exhibit 7 is marked for purposes of identification.

- - - - -

MR. GROSSO: And 5 -- file 5D. Mark this as Exhibit No. 8.

- - - - -

Thereupon, Exhibit 8 is marked for purposes of identification.

- - - - -

Q. So Exhibit No. 2 indicates that Dr. Kirti K. Jain was the supervising physician. You should have it there.

A. Okay.

Q. Yeah. Exhibit 2.

A. Got it.

Q. And Exhibit No. 6 indicates, at the same center, the Ashland Bellefonte Cancer Center, that Dr. Kirti K. Jain was the supervising physician or -- for whatever that may be. And Exhibit No. 7 is from the Highlands Cancer Center.

Now, you did not work at the Highlands Cancer Center?
A. No.
Q. Did you ever work there?
A. No.
Q. Do you know a nurse by the name of Katrina Holliman?
A. No.
Q. This is the same day, June 18th, 2014, and Kirti K. Jain is listed as the supervising M.D. And the next one, Exhibit 8, is for the same day, again the Highlands Cancer Center. This is for [redacted].
MR. GROSSO: And the last one, for the record, was [redacted].
Q. Going back to [redacted], this also indicates that on this day, Kirti K. Jain was the supervising physician.
Now, if you look at the times for these four -- take a moment and look at the times of the treatments.
A. You said four. Can you please repeat the -- which exhibit numbers you're referring to?
Q. We are looking at Exhibits 2, 6, 7,

and 8.

A. Okay.

Okay.

Q. You'll notice that there are times when Kirti K. Jain is listed as having been at the Ashland Bellefonte Cancer Center while you were the nurse treating these two particular patients, [redacted] and [redacted], Exhibits 2 and 6, and the time begins at 11:30 with Irma Arbaugh, at Exhibit 2, and ends at 1 in the afternoon for Exhibit 6, which is [redacted].

Then we look at Highlands, Exhibits 7 and 8, [redacted] and [redacted]. And according to this, Dr. Kirti K. Jain, who is listed as the supervising physician for both, was supervising this treatment from 12 in the afternoon -- or noon for [redacted] and ending at 3 in the afternoon for [redacted], and in the middle of that is [redacted] from 1 to 2 in the afternoon.

How can Dr. Kirti Jain be supervising both of these?

A. I don't know what the definition of "supervising" is.

Q. "Supervising" means, at a minimum for our purposes --

MR. MELTON: Object to form.

MR. GROSSO: I'm not asking a question, but if you're objecting to my statement, it's getting clarification to the witness for a predicate.

Q. For our purposes, it means that there is a physician, be it a medical oncologist or a radiation oncologist, who is on the premises.

With that understanding, how can Dr. Kirti Jain be supervising all four of these patients at the same time at two facilities?

A. I --

MR. MELTON: Same objection.

MR. CARLINO: You can answer.

A. I do not know.

Q. Okay. How far apart were they?

A. I don't know.

Q. Okay. That's fine. Is it possible or -- well, let me rephrase that. Is it accurate to say that the fact that there is a supervisory physician listed in this document indicative of nothing?

A. I don't know who made this form. It's not what I'm used to seeing. The "supervising" term is not something that I was involved with. I knew who ordered the medication.

Q. Okay. All right. Let's go back to generic questions, not about any particular form.

MR. GROSSO: And I think we can unseal at this point.

* * * * *

(The following testimony was excerpted from page 31 of the deposition transcript.)

* * * * *

Q. All right. Let's return to Exhibit 9. Turn to what is marked as page 9. I will note to this is -- it says itemized statement for [redacted]. And on page 9, at the top, for March 29th, 2014, there's two procedure descriptions listed. One is J2820, Leukine, 50 -- what is that, mcg?

A. Micrograms.

Q. Micrograms. And under that is 96372. It says injection. It says some more.

What are those two procedures, if you know?

A. Leukine is medication, and then the injection is the injection of the medication.
Q. Okay. Do you know -- does that refresh your memory at all what Leukine might be?
A. I think Leukine -- I would want to look it up to be confirmed -- is to stimulate -- it's -- I think it's like a G-CSF, a colony stimulating factor, to stimulate the growth of more white blood cells so that a patient reduces the risk of infection.
Q. Why would that be given?
A. Well, it's given to reduce the risk of infection to help patient maintain dose density or receive treatments in a timely fashion and reduce the risk of any type of sepsis or infection by increasing their immune response.
Q. Why is there a need, if any, to increase an immune response?
A. Because chemotherapy kills rapidly growing cells. Among those are the white blood cells, which we hope to grow back so that -- you want the cancer cells to die.
Q. All right.
A. You -- and hopefully not grow back.

But beginning 24 hours after chemotherapy's administered, you start giving on ones that cause depletion of white blood cells -- not all chemotherapy -- injections somewhat perhaps like this one. There are a variety out there.

Q. I'm not sure I caught all of that, so let's take it a step at a time. You give a chemotherapy drug to a patient?

A. Right.

Q. That drug may have the effect of suppressing the immune system?

A. Correct.

Q. That's an unintended effect?

A. It's an -- it's a side effect. There are side effects, and there are reactions. Side effects, we establish through clinical trials. We recognize them, and we find out if we can manage them, and we look at the risk-to-benefit ratio.

So that is a side effect. It is not -- it's not a dose-limiting -- hopefully, it's not a dose-limiting toxicity. It can be in some cases.

Q. Okay. So you want to give the patient some medication that may minimize the suppression of the immune system caused by the chemotherapy?

A. Correct.
Q. And how do you do that?
A. In this case, it's an injection.
Q. Of what?
A. Leukine.
Q. And Leukine does what, if you know?
A. I mean, as I had said previously, I would need to look it up to confirm --
Q. Uh-huh.
A. -- in Lexicomp. But I believe that that is to -- it's a granulocyte-colony stimulating factor, G-CSF, to produce more the -- white blood cells within the bone marrow more typically than they would typically naturally be produced.
Q. Okay. Who would order these?
A. The medical oncologists.
Q. Okay. Was that part and parcel to services being given to chemotherapy patients?
A. What does "part and parcel" mean?
Q. Is that part of the chemotherapy regime given to patients at Ashland Bellefonte Cancer Center?
A. Absolutely. It's important to keep

patients' treatments in a timely fashion to have the anticipated and desired response.

Q. All right. Do you know whether or not there was a medical oncologist on the premises on weekends when these shots were given?

A. I do not know.

Q. Do you know whether there was a nurse practitioner or nonphysician practitioner present?

A. I do not know.

\- - - - -

Thereupon, the foregoing confidential excerpt was concluded.

\- - - - -

State of Ohio : C E R T I F I C A T E
County of Franklin: SS

I, Craig Ross, RPR, CRR, a Notary Public in and for the State of Ohio, certify that Jessica Dove was by me duly sworn to testify to the whole truth in the cause aforesaid; testimony then given was reduced to stenotype in the presence of said witness, afterwards transcribed by me; the foregoing is a true record of the testimony so given; and this deposition was taken at the time and place specified on the title page.

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, the witness and/or the parties have not waived review of the deposition transcript.

I certify I am not a relative, employee, attorney or counsel of any of the parties hereto, and further I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Columbus, Ohio, on October 4, 2023.



______________________________________________
Craig Ross, RPR, CRR, Notary Public-State of Ohio
My commission expires July 7, 2026.

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling 2-Word Omitted 3-Wrong Word
4-Clarification 5-Other (Please explain)

| Page/Line | Correction or Change | Reason Code |
|---|---|---|
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |
| ________ | ____________________________________ | __________ |

I, Jessica Dove, have read the entire transcript of my deposition taken in this matter, or the same has been read to me. I request that the changes noted on my errata sheet(s) be entered into the record for the reasons indicated.

Date___________Signature______________________________

Ref: CR309457JD