IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF KENTUCKY

Ashland Division

* * * * * * * *

UNITED STATES OF *
AMERICA ex rel. *
ROBERT C. *
O'LAUGHLIN, M.D., *
Plaintiffs * Civil Action No.
vs. * 0:16-CV-148-DLB
RADIATION THERAPY *
SERVICES, P.S.C., *
dba Ashland *
BELLEFONTE CANCER *
CENTER, et al., *
Defendants *

* * * * * * * *

VIDEOTAPED DEPOSITION OF

STEPHANIE HOWARD

September 27, 2023

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

VIDEOTAPED DEPOSITION

OF

STEPHANIE HOWARD, taken on behalf of the Plaintiffs herein, pursuant to the Rules of Civil Procedure, taken before me, the undersigned, Leah Lambert, a Court Reporter and Notary Public in and for the State of Kentucky, at the Holiday Inn Express and Suites, 1900 Colby Taylor Drive, Richmond, Kentucky, on Wednesday, September 27, 2023 beginning at 10:05 a.m.

A P P E A R A N C E S

ANDREW GROSSO, ESQUIRE
Andrew Grosso & Associates
1250 Connecticut Avenue, NW
Suite 700
Washington, D.C 20035
COUNSEL FOR PLAINTIFFS

VICTORIA FULLER, ESQUIRE
Wyatt, Tarrant & Combs, LLP
400 West Market Street
Suite 2000
Louisville, KY 40202
COUNSEL FOR DEFENDANTS

I N D E X

DISCUSSION AMONG PARTIES 8 - 9

WITNESS: STEPHANIE HOWARD

EXAMINATION

By Attorney Grosso 9 – 110

EXAMINATION

By Attorney Fuller 111 – 131

RE-EXAMINATION

By Attorney Grosso 131 – 138

DISCUSSION AMONG PARTIES 138 - 139

CERTIFICATE 140

EXHIBIT PAGE

| NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| Defendant: | | |
| 1 | Schedule Report | 123 |
| 2 | Follow Up Visit Report | 126 |
| | | |
| 1 | Protective Order | 28 |
| 2 | Online Validation Results | 30 |
| 3 | Schedule Highlands Center | 32 |
| 4 | Schedule Report | 35 |
| 5 | Schedule Report | 40 |
| 6 | Schedule Report | 45 |
| 7 | Declaration of Hayek | 47 |
| 8 | Doctor Licenses | 52 |
| 9 | Bertram Obit | 55 |
| 10 | Q6 Claims | 57 |
| 11 | Schedules | 63 |
| 12 | Schedule List | 66 |
| 13 | Code List | 69 |
| 14 | Medical Record | 72 |
| 15 | Medical Record | 83 |
| 16 | Itemized Statement | 88 |
| 17 | Itemized Statement | 88 |

# EXHIBIT PAGE (cont.)



| NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| 18 | Itemized Statement | 94 |
| 19 | March 2014 Calendar | 96 |
| 20 | Itemized Statement | 102 |
| 21 | January 2014 Calendar | 103 |
| 22 | February 2014 Calendar | 103 |
| 23 | Email | 133 |

OBJECTION PAGE


| ATTORNEY | PAGE |
| --- | --- |
| Grosso | 129 |

S T I P U L A T I O N

-----------------------------------

(It is hereby stipulated and agreed by and between counsel for the respective parties that reading, signing, sealing, certification and filing are not waived.)

-----------------------------------

P R O C E E D I N G S

-----------------------------------

VIDEOGRAPHER:

We are now on the video record. My name is Adam Francis. I'm a videographer employed by Sargent's Court Reporting Services. The date today is September 27th, 2023. The current time is 10:08 a.m. This deposition is being taken at 1990 Colby Taylor Drive, Richmond, Kentucky. The caption of this case is In the United States District Court for the Eastern District of Kentucky, United States of

America V. Radiation Services, et al., Civil Action Number 0:16-CV-148-DLB. The name of the witness is Stephanie Howard.

Will the attorneys present please state their names and the parties they represent?

ATTORNEY GROSSO:

For the Plaintiff, my name is Andrew Grosso. I represent Dr. Robert C. O'Laughlin, the Plaintiff and the Relator, who is representing the United States.

ATTORNEY FULLER:

Victoria Fuller on behalf of the Defendants, Radiation Therapy Services PSC, Kirti K. Jain PSC, Dr. Kirti Jain, Manish Jain, and A1 Business Solutions, LLC.

VIDEOGRAPHER:

At this time, the court

reporter may now swear in the witness.

COURT REPORTER:

Okay.

I just need you to raise your right hand.

---

STEPHANIE HOWARD,

CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS FOLLOWS:

---

EXAMINATION

---

BY ATTORNEY GROSSO:

Q. Hello. My name is Andrew Grosso. We've spoken before.
Right?
A. Yes.
Q. Okay.
Have you been deposed before?
A. No. Never.
Q. Let me just explain a little bit about a deposition. You are under oath. You understand that?

A. Yes.
Q. Everything you say must be the truth, must be accurate. In the event that you say something that you later realize is incorrect or inaccurate in any way, you may be given the opportunity to correct that. But if you do want to take advantage of that opportunity, you need to contact one of the lawyers in this case as promptly as possible.
A. Yes.
Q. Okay.
You are being recorded both by the court reporter next to us, who will make a transcript of your testimony today, and by the videographer who is recording this. Because you're on camera, I ask that you talk to the camera, not to me. That's going to be very difficult, because I'm going to be asking questions and you're going to want to answer me.
But if we ever do go to a jury,

you need to look at the camera, so you're looking at them.
A. Okay.
Q. Okay.
Answer clearly. Because even though the court reporter is very good at understanding what we say, sometimes words can be a little ambiguous in the pronunciation, and we need to make sure we have an accurate record.
Have you taken any --- have you spoken with anyone other than me about this case?
A. No.
Q. Have you spoken with Ms. Fuller before today?
A. Yes. I did --- yes.
Q. Okay.
When was that?
A. I'm sorry. I don’t --- I was on my way home from work, so I don't remember.
Q. Okay.
Within the last week?

A. No.
Q. Month?
A. Within the last month, yes.
Q. Have you spoken with any other lawyers about this case besides her and me?
A. No.
Q. What did you discuss with Ms. Fuller?
A. Really, just the case, I mean, about what it was about, what you and I talked about for what I could remember.
Q. All right.
And how many times have you spoken with her?
A. Once.
Q. Have you spoken with anyone else about this case?
A. I did speak to my nurses just to verify my information.
Q. Have you spoken with any of the Defendants in this case?
A. No.
Q. Any of the parties?

A. No.
Q. Any --- when you say your nurses, what do you mean?
A. The ones who give chemotherapy.
Q. Where?
A. At Highlands Cancer Center.
Q. Who did you speak with at Highlands?
A. Christy Marion.
Q. Who was that?
A. Christy Marion. She wasn't there when Dr. O'Laughlin was there. She was just my last nurse that I remember.
Q. Anyone else?
A. No.
Q. What did you speak about with her?
A. I asked her about chemotherapy and because I wasn't involved as far as scheduling and knowing when the doctors were there, when they weren't. And so I wanted to verify my information and what I had spoken to you about was incorrect as far as the

policies go. They only give chemotherapy while a physician is there, so that was incorrect.
Q. Well, let's get to that point later on in the deposition.
Are you represented by an attorney?
A. No.
Q. Have you spoken with an attorney on your own behalf?
A. No. Should I?
Q. That's your decision. As far as I am concerned, you're not a Defendant or party --- a participant, other than as a witness.
I will note that if you want to take a break during the depo for any reason, you can. I'd ask you not to discuss the case with anyone else while you're being questioned today.
Have you taken any medicine or any other kind of drugs in the last 48 hours?
A. Forty-eight (48) hours, no.
Q. Have you taken anything that

may affect your memory?
A. Not in the last 48 hours, no.
Q. During the last week?
A. No.
Q. All right.
What is your address?
A. 527 Spinnaker Drive --- 527 Spinnaker Drive ---
Q. Camera.
A. --- Richmond, Kentucky. Sorry.
Q. Now, what is your current name and how you spell it?
A. Stephanie Howard, S-T-E-P-H-A-N-I-E, H-O-W-A-R-D.
Q. Have you gone by any other names?
A. Multiple. Life hasn't been nice to me.
Q. Can you please tell us those other names?
A. Since I worked with Dr. Jain?
Q. Since you were born?
A. Since I was born. It's going to be a large tombstone. I was originally a Gauze. Then I was a

Roberts. Then I was a Harliss (phonetic). Then I was a VanDine. Somewhere in there I was a Roberts again, only because I took the name back. And then now I'm a Howard.

Q. You've gone to high school?

A. Yes.

Q. You went to college?

A. Yes.

Q. What college?

A. Multiple.

Q. Tell me all of them in order.

A. St. Mary's School of Nursing after high school. I've done PCC, which is Prestonsburg Community College, Ashland Community College, St. Mary's School of Nursing, University of North Alabama. In there, I did a virtual that was somewhere out of Mississippi. I can't remember the name. And then I graduated with my MSN through UK, University of Kentucky.

Q. When did you get your last degree?

A. 2008.
Q. How are you employed now?
A. How am I?
Q. How are you employed today?
A. Full time salary. It that what you're ---?
Q. No. How are you employed? What do you do?
A. Oh, as a nurse practitioner.
Q. Where?
A. Commonwealth Pain and Spine.
Q. How long have you worked there?
A. I just started a job September 1st. Maybe a little bit before that.
Q. What did you do before that?
A. I worked at St. Joe Cancer Center.
Q. Where?
A. Lexington, Kentucky.
Q. How long did you work there?
A. A year and a half.
Q. What did you do there?
A. Nurse practitioner.
Q. We're going to get to what a nurse practitioner is, but first let

me finish with your employment history. What did you do before that?
A. I don't remember. I didn't know I needed to bring my CV. I'm sorry. It was a Suboxone clinic. I don't remember the name of it.
Q. Say it again.
A. A suboxone clinic, but I do not remember the name of it.
Q. A what kind of clinic?
A. Suboxone. Richmond Addiction Services. Richmond Addiction Services.
Q. Where is that?
A. Richmond, Kentucky.
Q. How long did you work there?
A. Honestly, I don't remember.
Q. What did you do before that?
A. I did telehealth at Sky Therapy --- no, not Sky Therapy. I'm sorry. What's the name of that? Dr. Chess was the doctor's name. Tapestry Health (phonetic).
Q. Tapestry. Where is that?
A. It was online and then I

practiced out of Pikeville.
Q. How long did you do that?
A. Probably a year.
Q. How were you employed before that?
A. Before Tapestry, I did Sky Health --- or Sky Therapy. I'm sorry. Which is online.
Q. How long did you do that?
A. That was ongoing for years. Honestly, I don't remember.
Q. And how --- what did you do before that?
A. I worked with Dr. Jain at Highlands Cancer Center.
Q. When did you leave?
A. 2018, I'm almost sure.
Q. When did you first go to work at that center?
A. I started as a new nurse practitioner in 2008.
Q. So that was ten years approximately. What did you do before that?
A. I worked as a nurse at St.

Mary's in St. Mary's Hospital in Huntington, West Virginia.
Q. And what did you do before that?
A. High school.
Q. That's fine. Well, there's college in there somewhere.
A. Well, yeah, I mean, high school and college. Then --- I worked as a nurse extern. That's the only thing I did ---
Q. Okay.
A. --- while I was in nursing school.
Q. So let me --- how many colleges did you go to?
A. Some were simultaneous. So I went to multiple. But as far as degree wise, I got my nursing degree from St. Mary's. I got my Bachelor's from University of North Alabama, and I got my Master's from UK. The others were prerequisites. Oh, and I did. Alice Lloyd.
Q. You did what?

A. Alice Lloyd. Alice Lloyd College.
Q. Okay.
I didn't know what that was.
A. Yeah.
Q. Whether that was a person and institution.
A. Most people have never heard of it. It's in a little town called Pippa Passes.
Q. All right.
That's fine. We'll move on. We’ll move on. That being said, you are a nurse practitioner?
A. Yes, sir.
Q. And your title is ARNP?
A. APRN.
Q. APRN. What is that?
A. Advanced practice registered nurse.
Q. All right.
Let's start, what is an advanced practice registered nurse?
A. An advanced nursing degree. I'm able to treat and diagnose

patients, prescribe medication. I'm not sure ---.
Q. Well, this is your employment, your certification, so I'm not going to guess what your responsibilities are. Can you tell us in detail what you do treating patients, when you're seeing patients?
A. Currently?
Q. No. Well, let me back up. Let's concentrate while --- from this point on, unless I say otherwise, ---
A. Okay.
Q. --- let's concentrate on the time that you were employed at the Highlands Cancer Center.
A. Okay.
Q. That's 2008 through 2019. Correct?
A. Okay. Yes.
Q. Good. Were you always in the position of an APRN there?
A. Yes.
Q. What were your responsibilities, and if they changed

over the course of ten years, please clarify that, too?
A. Mainly I followed patients following chemotherapy to monitor for side effects, make sure that everything was okay with them and taken care of, and then order scans when appropriate, and then send them back to Dr. Jain.
Q. Did you order chemotherapy?
A. No, never.
Q. Did you order drugs of any kind?
A. Drugs, yes. I mean, I prescribe medication.
Q. Such as?
A. I mean, antibiotics. Anti-nausea medication. A wide range, as far as that goes. I mean, sometimes I would give IV fluids if they were dehydrated. Yeah, just make sure that all their needs were kind of taken care of as far as what I could do.
Q. Did you provide chemotherapy?
A. No, never.

Q. Who hired you at --- or for the Highlands Cancer Center?
A. For Highlands Cancer Center, I guess Dr. Jain and Manish.
Q. Dr. Jain and Manish?
A. I mean, I interviewed with Dr. Jain. I met Manish later.
Q. When you say Manish, who was that?
A. He was the --- he was over all the cancer centers.
Q. In what capacity?
A. I guess, you would consider manager. I'm not sure what his title was.
Q. Was he a doctor?
A. Huh?
Q. Was he a doctor?
A. No.
Q. He was a manager?
A. Yes.
Q. I understand there's more than one Dr. Jain who's been at the Cancer Center. Which Dr. Jain are you referring to?

A. Kirti.
Q. Kirti?
A. Yeah.
Q. K. Jain?
A. Uh-huh (yes.)
Q. There's also Anshu Jain. Am I right?
A. Anshu.
Q. Please correct my pronunciation.
A. That’s okay.
Q. Because I don't know these people personally. Anshu.
A. Anshu.
Q. Anshu. Unless you or I specify otherwise when we say Dr. Jain, let's refer to Dr. Kirti K. Jain.
A. Yes, that's who I dealt with most.
Q. What was your salary while you were working?
A. I mean, it ranged from 85 to 120. I say 120, 110 --- I don’t know. Somewhere in there. I do not think that that’s important.

Q. That's close enough. Who is your supervisor? Or if you had more than one, who were your supervisors?
A. In my heart, Dr. Jain. I'm --- at the office, I guess her office started out as Donita Bostic (phonetic).
Q. What do you mean by in the office?
A. As far as office manager, but not my manager as far as that goes. I mean, she was over the office.
Q. Okay. I didn't work there.
A. Right.
Q. So I’m asking ---.
A. A nurse practitioner is different. I mean, you have an office manager, yes, but as far as who I reported to would be Dr. Jaine.
Q. For medical matters.
Is that correct? Or for any matters?
A. Really for any matters. I mean, it always had to do with the office.

Q. And what were your responsibilities there?
A. I thought we already answered that.
Q. Yeah, I want to make sure I get it.
A. I mean, I just took care of patients after chemotherapy.
Q. Anything else?
A. I may respond to emergencies in the chemotherapy room if it occurred, yeah.
Q. Did you have any employees under you who you supervised?
A. Who I supervised? I was not in the supervisory position.
Q. Before we go any further, I'm going to ask the court reporter to mark this as Exhibit 1.

---

(Whereupon, Exhibit 1, Protective Order, was marked for identification.)

---

BY ATTORNEY GROSSO:
Q. It is the virtual order or the order --- protective order signed virtually by Magistrate Judge Atkins. I'm going to hand this to you. You've already seen it and read it.
Am I right?
A. Yes.
Q. And you've signed it?
A. Yes.
Q. So we're going to be going through some confidential information, some of it protected health information of patients.
ATTORNEY GROSSO:
Shall we go under seal?
ATTORNEY FULLER:
Sounds good.
ATTORNEY GROSSO:
Let's go under seal.
THE WITNESS:
What does that mean?
BY ATTORNEY GROSSO:
Q. We can't talk to anyone else about it without a court --- without

court permission.
A. Okay.
Q. I'm going to show you patient information. You know in your employment you can't disclose patient information.
A. Yes.
Q. You can't ---.
A. I understand.
Q. Same thing. Now, first document I want to show you after that order is your license verification. Can you mark this as Exhibit 2? Thank you.

---

(Whereupon, Exhibit 2, Online Validation Results, was marked for identification.)

---

BY ATTORNEY GROSSO:
Q. Please look at it. After you've reviewed it, let me know if you recognize it.
A. I recognize it, yes.

Q. What is it?
A. It's my validation of my nurse practitioner license. But I'm no longer under investigation, so ---.
Q. That doesn't concern me at this point. That's your license number, license type RN.
A. Yes.
Q. Yes to both questions?
A. Yes, sir.
Q. What is the difference between an ARNP and an RN?
A. I can prescribe medication. I can diagnose.
Q. Okay.
RN can't do that?
A. No.
Q. I've always wondered what's the difference between an RN and a licensed nurse?
A. An RN does what the doctor says, and a nurse practitioner is --- you can diagnose and treat a patients.
Q. All right.
Very simple and hopefully

slowly --- Exhibit Number 3.

---

(Whereupon, Exhibit 3, Schedule, Highlands Center, was marked for identification.)

---

BY ATTORNEY GROSSO:

Q. This is Exhibit 3. It is a schedule report, schedule date January 1st --- take that back, January 15th, 2014. For the record, I'm reading these out because I've given the exhibits to Victoria Fuller, but they're not marked, so I'm trying to make sure she understands which document we're using.

Please take a look at this and see if you recognize it.

A. Not in this format, but yes, I mean, I recognize some of the names. Yes.

Q. Let me ask you this. How did you know in advance, if you did, which patients you would be seeing on any

particular day?
A. I had a schedule.
Q. From where did you get that schedule?
A. Front desk.
Q. Who at the front desk would give you that schedule?
A. I guess you would call her the secretary.
Q. Okay.
Who were those people?
A. The people who did check out.
Q. What were their names?
A. I'll be honest, we had so many people coming in and out, I don't remember. We had a lot of ancillary staff that came in and out, so I do not remember.
Q. Do you know who prepared these schedules?
A. Whoever was in checkout that checked the patient out, that scheduled a follow up.
Q. Were you involved in preparing these schedules?

A. No, never.
Q. To your knowledge, was Dr. Jain involved?
A. No.
Q. Any other physicians involved?
A. No.
Q. Any other nurses involved?
A. Uh-uh (no).
Q. No? You’re ---.
A. To my knowledge, no.
Q. You're shaking your head and not answering.
A. I'm sorry. No, not that I'm aware of. I mean, honestly, I would just draw the follow up on my checkout sheet and they go to the front desk and check out. That's as far as I know.
Q. So is this the form that you saw when you were told what your schedule was going to be?
A. I would have --- no, I would have times and names, and that's really the only thing I needed was a schedule.

Q. So I knew this was going to happen. So are you ready to jump ahead some exhibits? Let's mark this as Exhibit 4.

---

(Whereupon, Exhibit 4, Schedule Report, was marked for identification.)

---

ATTORNEY GROSSO:

Is that what we're up to?

COURT REPORTER:

Yes.

BY ATTORNEY GROSS:

Q. I'm going to hand you Exhibit 4. Please look at that.
A. No, this is not what I saw.
Q. All right.
What was the form of the schedule that you would get?
A. That I would get, I would get a list of the patients that were on my schedule with names and times. That's

what I got.
Q. Were you given a list of any other physicians who need to see patients and give treatments?
A. I would always get myself and Dr. Jain's schedule, but ---.
Q. Anyone else?
A. No.
Q. Well, how about Dr. Hayek?
A. Dr. Hayek? On Dr. Hayek's days, I did. I got his.
Q. Dr. Batoo?
A. On --- no, I never got his that I remember. I don't remember.
Q. Dr. O'Laughlin?
A. No, never. They were radiation oncology.
Q. So you didn't know what Dr. O'Laughlin's schedule was?
A. No.
Q. But you knew what Dr. Kirti Jain's schedule was?
A. I did.
Q. Let's go back ---.
A. But it's different. It's

medical oncology versus radiation oncology.

ATTORNEY FULLER:

Can I ask is what you gave her this one that starts with January 13th, 2014?

THE WITNESS:

Yes.

ATTORNEY FULLER:

Okay. Just to make sure. Thank you. Sorry.

THE WITNESS:

You're welcome.

BY ATTORNEY GROSSO:

Q. Let's go back to Exhibit 3. Since you're the first witness that I'm deposing in this matter, I'm going to ask you several fundamental questions.

A. Okay.

Q. Don't get bored. Let's look at Exhibit 3. This is again the schedule and says dated January 15, 2014. At the very bottom, it says Kirti K. Jain PSC. What is that?

A. I mean, it’s his name, and I'm not sure what PSC stands for.
Q. Okay.
Is this the --- this says Highlands Cancer Center.
A. Yeah.
Q. Are you aware of whether or not that is an alternate name for the Highlands Cancer Center?
A. Kirti K. Jane PSC? I don't know. I mean, that I'm aware of, no.
Q. Okay.
To --- upper left hand corner, it says Dr. Jain time. Are you aware of what that means?
A. Dr. Jain's schedule. And then on the second page, it says Dr. O’Laughlin, and it has time. And that's his schedule, I guess. Pet CT --- I forgot about that, yeah, is on the second page, and then that's what's on the third page as well.
Q. On the second page under Dr. O'Laughlin’s schedule for the third patient at 11:45 ---

A. Yes.
Q. --- on the far right hand corner, it says noose and then S ---?.
A. S VanDine right --- RT to sternum.
Q. What does that mean, if you know?
A. Likely I referred them to Dr. O'Laughlin.
Q. What reason might you have for referring a particular patient to Dr. O'Laughlin?
A. Depends on if their cancer was radiation or if I wanted his opinion, if he could give radiation to it.
Q. So that was a referral ---
A. Yes.
Q. --- by you. And Dr. O'Laughlin would see this person, Judy Blackburn, as a new patient for him ---
A. Right.
Q. --- or for the clinic?
A. Right.
Q. Is it a new patient for just him, or is it a new patient for the

clinic?
A. New him.
Q. I'm using the term clinic. I guess I should say center.
A. Right. But, I mean, they would be known to me, or else I wouldn't refer them to him.
Q. Right.
Mark this as Exhibit 5.
---
(Whereupon, Exhibit 5, Schedule Report, was marked for identification.)
---
BY ATTORNEY GROSSO:
Q. This is Exhibit 5, and I'll read this to you in a moment. This is a schedule report dated May 15, 2014.
A. I see February.
Q. Yeah, I'm looking at the wrong page. This is February 19, 2014. For the record, I have a notebook with all the exhibits, and they turn to the wrong page. Let's look at the

schedule dated February 2014 on the bottom half of the first page.
A. Okay.
Q. You are listed on the second page on the right-hand column again. Can you tell me what that means? It reads, chemotherapy until infection improves. We'll see S VanDine.
A. I don’t see it.
Q. Second page, right-hand column, ---
A. Second page.
Q. --- third patient down.
A. I see chemo held, infection improves. We'll see S VanDine.
Q. That's you.
Right? VanDine?
A. Yes.
Q. Can you tell me what that means?
A. That means that chemotherapy was held, she had an infection, until it improves. And she was to see me either to see if it was well enough where she would get chemotherapy or

not.
Q. What relation, if any, is there between chemotherapy and patients getting infections?
A. There's a huge correlation. I mean, it affects their white count, so of course, they get infections. They're prone to them.
Q. Do you have any understanding of why it affects their white counts?
A. Why does chemotherapy? Kind of stuns the bone marrow, decreases the production of cells, and healthy cells regenerate, and bad cells do not.
Q. That's how you kill cancer?
A. Basically. Well, before. Now we have immunotherapy.
Q. But this was during the time ---?
A. During the time, no, that’s ---.
Q. That's the way it worked?
A. Yes.
Q. What treatments, if any, were given at the center to patients who

received --- who had infections resulting from chemotherapy?
A. That had infections? We didn't give any antibiotics or we didn't treat as far as IV. I mean, we gave PO oral, but we did not give IV medication.
Q. So you didn't give any antibiotics?
A. No.
Q. Returning to the first page, when you received your schedule, was it laid out anywhere like this, such as chemo time and then the set of times for particular patients?
A. Actually, it wasn't. It was a typed out schedule is what I got.
Q. A what?
A. It was a typed out schedule, individual, my schedule for the day, Dr. Jain's schedule for the day. You know, I mean, that's how he and I did it. And Dr. Hayek did it that way as well.
Q. You didn't have times?

A. Yeah. I mean, it was typed out. It had times and the names.
Q. Got it. Did it have appointment type included in your schedule?
A. It might say new or, you know, follow up for some reason.
Q. Well, this says, for example, appointment type, first patient for [redacted] infusion, second patient, [redacted] injection, third patient, [redacted], chemo. Did you have that?
A. That chemotherapy schedule, I didn't have that. No.
Q. So but you were --- okay.
I understand. Now I'd like for you to look at all of the patients and appointment types for February 20th, 2014. There's no doctor list.
A. Because chemotherapy --- Dr. Jain was the doctor.
Q. Well, look at the time above that --- or the patient above that, February 19. It says Dr. Jain time.

A. Yeah.
Q. So he was in the office on that day?
A. I mean I guess.
Q. He was scheduled for the office.
A. Yes.
Q. Okay.
So below that, was he scheduled for the office on February 20, to your knowledge?
A. Himself, I don't know. I mean, I ---.
Q. Switch gears briefly. This is going to be Exhibit 6.

---

(Whereupon, Exhibit 6, Schedule Report, was marked for identification.)

---

BY ATTORNEY GROSSO:

Q. Please look at this. When you finish reviewing it, let me know.
A. Okay.

Q. [redacted].
A. [redacted].
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted].
Q. [redacted]
A. [redacted].
Q. [redacted]?
A. [redacted].
Q. [redacted]?
A. [redacted].
Q. Now, you mentioned Dr. --- I mentioned him, too, Dr. Hayek.

A. Hayek. Uh-huh (yes).
Q. Hayek. When did he work for the clinic --- for the center?
A. He was there when I started in 2008. I'm not sure when he quit, but I know he started --- he was there when I started.
Q. Exhibit Number 7.

---

(Whereupon, Exhibit 7, Declaration of Hayek, was marked for identification.)

---

BY ATTORNEY GROSSO:
Q. This is the Hayek declaration. I'll get his name right eventually. Hayek.
A. Hayek. Yeah.
Q. Excellent.
A. It doesn't matter. Most people do not pronounce his name correctly.
Q. I have trouble pronouncing my own name, and I'm not exaggerating. We have two different ways in the

family to pronounce it, and I'm on the wrong side.

Why don't you take a moment to read that since we're on the record --- let's go up the record just very briefly. This way, she can read it comfortably.

VIDEOGRAPHER:

Off the record at 10:47 a.m.

OFF VIDEO

---

(WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)

---

ON VIDEO

VIDEOGRAPHER:

Back on the record at 10:50 a.m.

BY ATTORNEY GROSSO:

Q. I had handed you, before the break a document captioned declaration of Fadi Hayek.

A. Uh-huh (yes).

Q. You’ve read it?

A. Uh-huh (yes).
Q. Okay.
Does that in any way refresh your memory as to when Dr. Hayek left?
A. I mean, obviously he left in 2013, December.
Q. So he was not at either of the clinics beginning December 27, 2013, according to this declaration?
A. According to this declaration.
Q. Do you have any information to the contrary?
A. No.
Q. We've used Exhibit 4 --- 7 --- okay, Exhibit 4 is the --- one moment, please. Okay.
Exhibit 4. This is a schedule report. It begins January 13, 2014. Are we using the same one?
A. I’m on Exhibit 4, yes.
Q. Good. Now, look at January 14th, 2014. That begins a little bit more than halfway down the page. You are listed in five different places on this page as being, quote, unquote,

resource.
A. Yes.
Q. All right.
In the next page, you're listed throughout it.
A. Yes.
Q. So you were --- were you on site at the center on this date, January 14?
A. Evidently, yes.
Q. Let's turn to the next page. More entries for January 14, 2014 appear, including your name twice. And there is a name of Dr. Hayek at 2:00 p.m. seeing patient [redacted] Who saw patient [redacted] on January 14, 2014 at the Highlands Cancer Center?
A. If it was a blood disorder, then I saw it. If it was a chemotherapy patient, then Dr. Jain would have been --- he would have been rescheduled for Dr. Jain's schedule.
Q. Okay.
So you --- you say he would

have been rescheduled. What do you mean by that?
A. Dr. Hayek would have had a schedule going out farther. I mean, just the same as when I left, I would have a schedule going out farther, so I would have patient scheduled. So I mean, I'm sure they would show up on my name. It's just the front desk's responsibility to reschedule.
Q. Okay.
Should he have been --- should Ronnie Goff have been billed for services that day if he was rescheduled for another day?
A. If he was rescheduled, no.
Q. Is that true for any other day that Dr. Hayek might have been listed on the schedule?
A. As far as I'm aware, yes.
Q. Okay.
After Dr. Hayek left, who, if anyone, replaced him?
A. Honestly, I don't remember.
Q. Was a Dr. Batoo hired?

A. Dr. Batoo came, but I don't know what year.

Q. How about Dr. Konala?

A. He is Ashley.

ATTORNEY GROSSO:

We're now up to Exhibit what?

COURT REPORTER:

Eight.

ATTORNEY GROSSO:

Okay.

So let's go to --- this is going to be Exhibit 8. You do not have this. Can you pass --- yeah, thank you.

THE WITNESS:

You're welcome.

---

(Whereupon, Exhibit 8, Doctor Licenses, was marked for identification.)

---

BY ATTORNEY GROSSO:

Q. Please look at it. Do you

recognize?
A. No.
Q. This is a document that has three parts to it. The last part is empty. It's not filled in. The first part lists the practitioner of Venu --- I can't pronounce this. Please help me.
A. It’s Dr. Konala.
Q. Konala. The second entry is Sameer Batoo.
A. Dr. Batoo.
Q. And there's a Bates stamp in the bottom right-hand side that indicates it was provided by the Defendants in discovery.
A. I’m sorry?
Q. It was provided by the centers ---
A. Oh, okay.
Q. --- in discovery.
A. I mean, there are times Dr. Konala filled in in Prestonsburg, but I mean ---.
Q. But I want you to look for both

of them and say graduation, residency, completion, date. You see those dates?
A. Uh-huh (yes).
Q. It's the same for both.
Right?
A. It appears.
Q. So ---.
A. I don't know.
Q. And then in the left-hand side on the same row, it says start date of practice for both doctors. And it has July 1st, 2014.
A. Yes.
Q. Okay.
Do you have any information that they started any earlier than that?
A. I have no idea. I don't know how it went. I don't know that.
Q. So Dr. Batoo --- if this is correct, Dr. Batoo and Dr. Konala were not present working at Highlands during December 27 through June 30th, 2013, 2014?

Correct?
A. According to this, yes.
Q. So Dr. Batoo or Dr. Konala could not have filled in for, say, Ronnie Goff at this point?
A. No.
Q. Were there any other doctors who worked at the ---?
A. We had locums. I don't know names, but we had locums that would fill in.
Q. Does a Dr. Bertram ring a bell?
A. No, I'm sorry. I've had a lot of surgeries since this time. I don't remember.
Q. Okay.
So you don't remember Dr. Bertram?
A. Uh-uh (no).
Q. Exhibit 9.

---

(Whereupon, Exhibit 9, Bertram Obit, was marked for identification.)

---

BY ATTORNEY GROSSO:

Q. I'm going to hand you this. Please look at it.

A. I remember him.

Q. You do? How do you know him?

A. I just remember his face. I mean ---.

Q. Was he at the Highlands Cancer Center?

A. I would assume.

Q. Do you remember him?

A. Can I 100 percent say yes? No. But I do remember his face.

Q. Do you have any recollection of how long he was there?

A. I have no idea. I just remember his face. I mean, I don't necessarily remember him being there at that one center. I mean, I don't remember, but I just remember his face. I remember working with him.

Q. Where did you work with him?

A. I said I don't remember.

Q. You don't remember ---

A. No.

Q. --- working with him?
A. I remember working with him. I just don't know where.
Q. Okay.
Well, where might you have worked with him other than at ---?
A. I mean, I've done oncology. I've done urgent care. I did a lot of different suboxone clinics.
Q. So it might have been ---?
A. It could have been anywhere.
Q. Got it.
A. But I didn’t know he died.
Q. Now, you mentioned locum. Are you familiar with how a locum tenens is billed to the Medicare program?
A. No. I have no idea.
Q. Have you ever heard of a code called Q16?
A. No.
Q. Can you please mark this?

---

(Whereupon, Exhibit 10, Q6 Claims, was marked for identification.)

---

BY ATTORNEY GROSSO:

Q. This is a sheet portion --- we'll call it captioned with Q6 claims. It's two pages. We're going to concentrate on the first page. I'm giving this to you. Take my word for it. It's been prepared from data in Medicare claims data that the Plaintiff, Dr. O'Laughlin, obtained, and it lists those claims that have what we call --- or what is called a Q6 modifier on the bill. Q6 modifier means a locum tenens provided the service. Okay.

There is one entry on January the 29th, 2014, for Ashland where a locum tenens unknown name provided the service. Then there is not another entry until May 12 for any locum tenens at either Ashland or Highlands.

What locum tenens provided services at Highlands during the period December 27, 2013 through May 11, 2014?

A. There is no way I’m going to remember that.
Q. You don't know if there were ---?
A. I mean, I know we had locums. To tell you when --- I mean, I have to ask my husband what year I got married. I just --- I don’t ---.
Q. You don't ---.
A. And I don't mean that bad.
Q. No.
A. I mean, I just --- I don't know.
Q. That's fine. I'm just trying to find out if there were locums, who they were, and I'm even trying to find out if there were locums in any particular date, since there's no Q6 codes.
A. And that I'm not going to be able to answer. I had nothing to do with billing. I just know I had locums that filled in.
Q. How did the clinics or the --- I call them clinics, I know I should

call them centers. How did the centers prepare their bills or claims to Medicare to the extent that you know?
A. I circle the --- on a sheet what my billing was.
Q. What kind of sheet was this?
A. It was a billing sheet.
Q. What was on the billing sheet?
A. Just different codes that you can charge patients.
Q. What kind of codes?
A. 99213, 99214 with the modifiers. If I didn't an incise and drain, I mean, just ---.
Q. So there were CPT codes.
A. I don’t know if there were CPT codes. There were SCD 10 codes.
Q. Okay.
A. I guess 9 at that time.
Q. So these are codes that identify what the service being provided to the patient was?
A. Basically, it says, okay, I saw this patient at this amount of time.

I put in, you know, whatever was going on with them. And this is the charge that I --- I mean, it's lined --- it's laid out with Medicare guidelines as to, you know, what a 99213 is, a 99214 or a new patient, you know, requirement.
Q. So just describe this form to me. Is there a patient name on the top or do you fill in the patient name?
A. No, they would put stickers on it. It was a generic form.
Q. How many codes were on this form?
A. Probably 50 to 100. I mean, it was an entire sheet. There was probably three to four columns of code --- possible codes.
Q. Now take a look at this Exhibit 10, captioned Q6 claims. And the third entry, May 13, 2014, has Dr. Batra. Do you recognize him?
A. I don't know who that is. But I'm sure they filled in. I do

remember that name. I just don't remember who it was. Just remember the name because thought it was neat.
Q. Okay.
Now, to the right it says claim, place of service, physician organization name. Again, I'm going to tell you that according to the Medicare claims data, that that right-hand column that's in pink or red identifies where the service was provided. And the master schedule says Dr. Batra was --- was at one or both of these places. And there were claims for Dr. Batra at the places listed in the right-hand column. And on May 13, Dr. Batra is listed as having provided services, and services were billed for him at both Ashland and Highland.
A. And there are times that they would see patients at both.
Q. How would they do that?
A. Like in the morning at one and then in the afternoon at the other.

Q. What --- are there instances where they overlap, where patient --- you see ---?

A. You can't overlap. I mean, it's Ashland and Highlands --- Ashland and Prestonsburg.

Q. So you can't be in two places ---?

A. Two places at once, no. But you can be in two places in one day.

Q. So if you were at --- were there instances where --- that's enough for that. One moment, please.

ATTORNEY GROSSO:

This will be what, Exhibit 11?

COURT REPORTER:

Uh-huh (yes).

---

(Whereupon, Exhibit 11, Schedules, was marked for identification.)

---

BY ATTORNEY GROSSO:

Q. Please look at this. This is a

schedule report dated January 13th, 2014. And I showed this to you because I want to ask you, this is for Highlands Cancer Center. Dr. Jain is listed as seeing patients during this time from 10:20 a.m. until 3:40 p.m. You see that?
A. Uh-huh (yes).
Q. And the next page says January 14th, and it says chemo time. And there are a whole list of patients being given chemo. And the next day is January 15th. And again, there's a whole list of patients being chemo --- being given chemo.
Let's go to the second page. January 14, 2014. There's no doctor listed being present at Highlands Cancer Center on this day, is there?
A. But I'm not listed either.
Q. Okay.
So who --- what doctor or nurse practitioner was scheduled for this day here?
A. I worked Monday through Friday.

Q. Okay.
A. And then, I mean, his days varied. I can't tell you what Dr. Jain's days were. They varied. His varies according to coverage. Dr. Hayek, from what I remember, he came once or twice a week, and Dr. Jain kind of filled in the other days or locums or ---.
Q. So what days of the week, if you recall, during this period of first half of 2014, was Dr. Jain at Highlands Cancer Center?
A. There is no way I'm going to know that.
Q. Was it a set schedule, whether you remember the schedule or no?
A. No. It would change. I mean, as far as that goes, according to --- like I said, according to what coverage we needed, according to what doctors we had.
Q. Dr. Hayek wasn't here at this time.
Right?

A. I think his thing said he left in 2013.
Q. So who would have been --- what medical doctor would have been at the cancer center in Highlands on January 14, 2014? Do you know if one was?
A. There's no way I'm going to know that.
Q. Okay. All right.
I’m going to give you Exhibit 12.

---

(Whereupon, Exhibit 12, Schedule List, was marked for identification.)

---

BY ATTORNEY GROSSO:
Q. Please look at that. When you're ready to answer questions about it, please let me know. This is the master schedule provided by the clinics or the centers. If you wondering from where the exhibit comes, if you look at the bottom right-hand side, you'll see a Bates

stamp. If it says CC Defendants, it was provided to us by the Defendants centers in discovery. Okay?

A. I don't know things.

Q. Well, good enough. At least it's on the record. This is a schedule report. The first page is January 14, 2013.

ATTORNEY FULLER:

January 14?

ATTORNEY GROSSO:

Right.

ATTORNEY FULLER:

I have one that starts with January 13.

THE WITNESS:

Yeah. That's what I have.

ATTORNEY FULLER:

Is that what this is? Okay.

THE WITNESS:

That's what I have.

ATTORNEY GROSSO:

I'm sorry. My fault.

January ---.

ATTORNEY FULLER:

That's fine. Okay.

Sorry.

BY ATTORNEY GROSSO:

Q. Now take a look at the page with the Bates stamp 99 --- 29971. That's 29971. Do you see that page?

A. Uh-huh (yes).

Q. Now, if you look at the third column that says resource and capture, Dr. Hayek's name appears five times, and your name appears once.

A. My name appears once? I see it multiple times.

Q. You're right. At least once.

A. Okay. Yes.

Q. So you were there on that day?

A. Yes, evidently.

Q. Was Dr. Hayek there?

A. Well, according to his thing, he was not. Again, it has to do with scheduling. I mean, you schedule patients out, you can't help what gets put on your schedule.

Q. All right.
Let's take a look at this.
This is Exhibit ---.
ATTORNEY GROSSO:
What are we ---?
COURT REPORTER:
Thirteen (13).
---
(Whereupon, Exhibit 13, Code List, was marked for identification.)
---
BY ATTORNEY GROSSO:
Q. Thirteen (13). Please take a look at this. And I want to ask you to look at the entry for number eight. You see that? [redacted].
A. Uh-huh (yes).
Q. Now, this data, I tell you, came from the Medicare claims data provided by CMS to the Relator. And entry number eight is for a [redacted]. Does that name ring a bell to you?
A. No.
Q. And it says that on this date

of January 16, 2014, the rendering provider to [redacted] was Fadi Hayek. And there were three codes. There are --- actually there's five codes listed for him. Do you recognize those codes?

A. Uh-uh (no). No, wait. Oh, wait. No.

Q. And it says --- you don't recognize any of those five codes?

A. I don't myself. I mean ---.

Q. All right.

I'm not asking you to say something that you can't say. I may press you to make sure that there is some little nook and cranny that you do remember, and I'd like to get it. But if it's not there, don't give me something that's not there. All right.

A. Uh-huh (yes).

Q. And it also provides or says that the services were rendered by Dr. Hayek at Highlands on this day. How is that possible?

A. I mean, obviously the high wasn't on, but I don't know.
Q. Let's go back to the previous exhibit, which is 12. Let's look at the page that is Bates marked 29970.
All the way near the bottom, second from the last entry, [redacted] appears as the patient and you appear as the resource on this day. Did you see him on this day?
A. I may have and he may have gotten chemotherapy the same day. I don't know.
Q. Were you --- my --- is it possible that you were the one who actually saw or supervised the provision of those five treatments with those five codes to [redacted] on this day instead of Dr. Hayek?
A. I mean, I could have. I don't know. There's no way for me to know that. I mean, as far as billing goes again ---.
Q. You don't know how they bill?
A. I don't know how. I don't have

anything to do with billing. I circle a number.
Q. Got it.
We've been going for an hour and 20 minutes. You want to take a break. I'm always cognizant that witnesses can get tired. Opposing Counsel can get tired. And then again, people may want to just get rolling.
A. It's up to you.
Q. All right.
A. And the other people in the room.
Q. This is going to be Exhibit 14.

---

(Whereupon, Exhibit 14, Medical Record, was marked for identification.)

---

BY ATTORNEY GROSSO:
Q. Please look at it and tell me when you're ready.
A. Okay.

Q. Do you recognize this document?
A. Do I recognize the doctor?
Q. No. Do you recognize the form in this document?
A. No.
Q. Have you seen forms like this?
A. No.
Q. Never?
A. No.
Q. All right.
Who supervised the provision of chemotherapy? Let me rephrase that. Who provided chemotherapy?
A. The nurses.
Q. The nurses. The doctors did or did not?
A. No.
Q. The NPs did or did not?
A. No.
Q. Who supervised the provision of the chemotherapy?
A. Our doctors.
Q. The NPs did not?
A. Not typically. I mean, we can, but I haven't that I recall.

Q. Okay.
So you don't recall supervising chemotherapy at the Highlands clinic?
A. No. I mean, I remember even when we go to tumor boards, they would, you know, be calling or texting to find out how long it would before we get back.
Q. What is a tumor board?
A. It's where you collectively have different disciplines, whether it be physical therapy, dietary, social services, and you discuss patients and you get other physician’s opinions on the best treatment to make sure, I guess, that there are other options out there, whether they qualify for clinical trial.
Q. Where did these tumor boards take place?
A. For us, it was Highlands.
Q. Where?
A. At the hospital.
Q. Where is the hospital?
A. Across the parking lot from the

cancer center.
Q. So the Highlands, they're discontinuous buildings?
A. Yes.
Q. Who would go to the tumor meetings?
A. Dr. Jain and staff.
Q. Other doctors?
A. Yeah. Our radiation doctors did. Dr. Batoo did. I don't remember if Dr. Hayek ever did. Some docs would zoom in and they were our docs, but were they --- I don't recall who they were.
Q. It wasn't zoom back then.
A. Well, you know, telephone. How's that?
Q. Okay.
A. They had a teleconference in the middle of the room.
Q. Why would the nurses text, quote, you, unquote, meaning whoever ---?
A. Because I was with him.
Q. What?

A. I was with Dr. Jain.
Q. Were there not other NPS or medical doctors at the center during the tumor boards?
A. If there were doctors there, we went over to tumor board. It was at 7:00 in the morning, so I mean, it was ---.
Q. When did the center open?
A. 9:00 I want to say. 9:00.
Q. 9:00 in the morning?
A. Uh-huh (yes).
Q. When did you get there?
A. Usually about 8:00. I would drop my daughter off and then I would go.
Q. Who opened the center?
A. Well, there's a lot of times I was the first one there.
Q. Who would close the center?
A. I don't know.
Q. Did you close it?
A. There are times that I was first one in, last one out, but, you know, ---.

Q. All right. I ---.
A. But I didn't lock up any the of front or anything like that.
Q. When did the doctors arrive?
A. Varies. Dr. Batoo was there first thing in the morning. Dr. Jain, sometime throughout either morning, afternoon.
Q. When did the tumor board meetings take place? What time, what days?
A. 7:00 a.m. I don't recall what days. It was set, but I don't remember what it was.
Q. When you say it was set, what do you mean by that?
A. I thought it was set on certain days. I just didn't remember when it was.
Q. Okay.
A. I didn't remember back then, so let alone now.
Q. Fine.
A. I only knew because they told me.

Q. When would treatment of chemotherapy services begin for the patients?
A. I know for a fact on tumor board days, it was when we got back from tumor board. They would give premeds, like dexamethasone, steroids, things that could be given, Pepcid, those kinds of medications.
Q. On days when there was --- were no tumor boards ---?
A. I had nothing to do with it. So I don’t know.
Q. You don't know when the ---?
A. I don't know the timing. I just do not.
Q. Were there times when chemotherapy services were provided to patients before the doctors got to the center?
A. To my knowledge and after talking to my nurses, no, but that’s ---.
Q. When you say after talking to your nurses ---?

A. I told you I'd talked to Christy Marion.
Q. Who was Christy Marion?
A. She was one of the RNs that was there when I left.
Q. When did she first work there?
A. I have no idea.
Q. Was she there in 2014?
A. No, because she doesn't remember who Dr. O'Laughlin is.
Q. Got it. 2015?
A. Honestly, I have no idea.
Q. If Dr. O'Laughlin left in August, September, I don't remember the exact date, 2015, so it would have to before then or after then that she --- okay.
So you're --- she's talking about the practice after Dr. O'Laughlin left.
A. Right.
Q. The ---.
A. But she would have been trained by the people that were there before.
Q. I'm talking about what she

knew.
A. Yes.
Q. And this is what you are relating to us today?
A. Yes, because she was trained from the prior nurses.
Q. Okay. So ---.
A. Yes. That were there with her.
Q. What I'm asking about is firsthand knowledge. Do you know?
A. I don't have no idea.
Q. Does she know what actually happened?
A. Not when Dr. O'Laughlin was there, no.
Q. Okay.
Let's take a look at Exhibit 14 again. Now this is a --- this is for patient Brian Fannin. And you don't recognize this document?
A. No.
Q. You didn't use this document?
A. No.
Q. It says on the left-hand side the date. And this is for January 15,

2014. It has a series of procedures. Do you know what those procedures are?
A. The procedures --- Kytril is a premed, dexamethasone is a premed. Doxorubicin is chemotherapy, Bleomycin is a chemotherapy, Vinblastine is a chemotherapy, and Dacarbazine is a chemotherapy.
Q. All right.
It says supervising MD. That's in the center.
A. Okay.
Q. And then Dr. Kirti Jain is listed for each of these procedures. There are six. If you know, what does it mean for Dr. Kirti's --- Jain's name to be entered under the caption supervising MD?
A. I've never seen this document, so I don't know.
Q. You don't know? Okay.
The first time listed for the beginning of the first procedure is 10:00 a.m.
Right? 10:00: ---?

A. Over there, yes. 10:00, 10:30.
Q. So that's the --- that's 10:00. And the last one ends lower right-hand side --- actually, second from the lower right-hand side is 1550, which would be 3:50 in the afternoon.
Right.
A. I see start --- 1530, yeah, so that would be, yes, 4:30 --- 3:30.
Q. Okay.
The one above that is 3:50.
Right?
A. Yes.
Q. And who is Deanna Johnson?
A. She's one of our nurses.
Q. Do you know where she works now?
A. Where she works now? No.
Q. No? So this patient, according to this document, started receiving treatment at 10:00 in the morning and finished at 3:50 in the afternoon.
A. Okay.
Q. And according to this document, if indeed that entry, supervising MD

means that the doctor listed there supervised procedure, that Dr. Jain was supervising from 10:00 a.m. to 3:30 in the afternoon --- 3:50 in the afternoon.

Correct?

A. Again, I haven't seen this document, so I don’t know.

Q. You don’t know.

A. I mean, I never entered any of this.

Q. Okay.

Would Dr. Jain be present for the entire period of these procedures for any particular patient?

A. To my knowledge, yes. I mean, we were there ‘til 7:00, 8:00, 9:00 in the evening.

ATTORNEY GROSSO:

Mark this is Exhibit 15.

ATTORNEY FULLER:

Would you mind if we take a break after this, if you want to ---?

ATTORNEY GROSSO:

We'll take a break after this.

ATTORNEY FULLER:

Okay.

---

(Whereupon, Exhibit 15, Medical Record, was marked for identification.)

---

BY ATTORNEY GROSSO:

Q. Please take a look at this, Exhibit 15. It is --- just like the other one, it says Medical Administration Record. But this one is for Ashland Bellefonte Cancer Center. You did not work at Ashland.

A. No.

Q. Did you ever work at Ashland?

A. Yes, sometimes I'd fill in, but it was maybe two times in ten years.

Q. Got it. So the patient listed as Mary Marcum. The date is January 15, 2014, and there is a nurse listed, Shana Clark. Do you know who Shana

Clark is?
A. I have no idea.
Q. And this patient received treatment from 10:54 and 58 seconds in the morning, almost 11:00, until 11:30 in the morning.
A. Again, I don't know what this form is. I don't know if they entered who ordered the procedure. I don't know.
Q. You don't know what supervising MD means?
A. Well, I mean, I know what supervising MD means, but do I know what the nurses meant by when they would enter it? Not necessarily.
Q. Okay.
What does supervising MD mean?
A. To me, they oversee it.
Q. To oversee it what do they have to do, if anything?
A. Nothing. They don't have to do anything.
Q. Do they have to be present?
A. Well, yeah.

Q. Now, going back to Exhibit 14, same date, January 15, 2014, this one's at Highlands. And the supervising physician from 10:00 a.m. until 5:30 p.m. is Dr. Kirti K. Jain. How can he be both --- supervising both at Highlands and at Ashland the same --- the same time?
A. Again, I didn't enter any of this information, so I can't speak to it. I mean, it simply could be who ordered it. And that's very likely because he ordered most of our treatments.
Q. Well, if it was only the person who ordered it and not the person ---?
A. I understand, but I can't speak to it because I never entered it.
Q. So you don't know?
A. No.
Q. You don't know ---
A. Not for certain.
Q. --- you don’t know if Dr. --- by this using these documents, you don't know if Dr. Kirti Jain was

president either place, do you?
A. Myself do I know 100 percent, no.

ATTORNEY GROSSO:
Can we take a break?

ATTORNEY FULLER:
Yes.

ATTORNEY GROSSO:
Thank you. How long is break going to be?

ATTORNEY FULLER:
Ten minutes or so.

ATTORNEY GROSSO:
They never last --- you know that.

VIDEOGRAPHER:
Off the record at 11:36 a.m.

OFF VIDEO

---

(WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)

---

ON VIDEO

VIDEOGRAPHER:

We are back on the video record. The time is 11:53 a.m.

BY ATTORNEY GROSSO:

Q. All right.

I've just handed you two exhibits, Numbers 16 and 17.

---

(Whereupon, Exhibit 16, Itemized Statement, was marked for identification.)

(Whereupon, Exhibit 17, Itemized Statement, was marked for identification.)

---

BY ATTORENY GROSSO:

Q. They are both captioned itemized statement. Do you recognize these particular type of documents?

A. No.

Q. You've never seen these before?

A. No, I haven't.

Q. All right.

Let's take a look at Number 16.

This is [redacted] It is for [redacted] [redacted] The document was printed out 8/1/23. That does not mean that's when the document was prepared. That's when it was printed out it. All right.

You understand that?

A. Yeah.

Q. Good.

A. Sorry. I meant my answer ---.

Q. That's okay. Let's turn to the next page, second page, date of service, January 15, 2014. This is for [redacted]. And this date is the same date that we just saw before for the medical administrative record. And it has a number of different charges and they're all of them in the name of the physician being Fadi Hayek.

A. Fadi.

Q. Fadi. I got the first --- the last name right now.

A. I know. You did.

Q. Now we're going to have to work

on the first name. Fadi Hayek.
A. Fadi, yeah.
Q. How could any charges be listed under Dr. Hayek when he was no longer there, if you know?
A. I have no idea. I didn’t do it.
Q. To the left, there are six different procedures or services, I should say, codes listed. Which one of these ---? I mean --- stop. Code 96413 says chemo IV. I assume that's infusion.
A. Yes.
Q. Single initial drug, initial hour. What does that mean?
A. Single initial drug, initial hour, it looks like it'd be the initiation time, but I don't know. Looks like it'd be the initial drug. I have no clue, but ---.
Q. It says chemo.
A. Yeah. I didn't give chemo.
Q. You didn't give chemo? I know. This is Stephanie Mariann --- Mariann

---
A. Stephenson.
Q. --- Stephenson's chart. It's not yours. But since you were ARNP ---.
A. AP ---.
Q. AP ---.
A. That's all right, same thing. It used to be ARNP, so it doesn't matter.
Q. Do you recognize whether anything listed here is a chemotherapy drug?
A. None of it's a chemotherapy drug, no.
Q. Okay.
Why is chemo for infusion listed as a procedure if there's no chemotherapy drug listed?
A. Well, I didn't do billing, first off, but --- I'm not even going to guess. I don't know.
Q. Okay.
That's fine. Let's take a look at the next one. Exhibit 17. And

this is an itemized statement for services provided at Highlands for [redacted] and I know it's Highlands as opposed to Ashland since the left-hand corner, there's a P --- I can't even read that, PSC. Well, we know that [redacted] was a Highlands patient, so we'll take it from that.

January 15th, again, Dr. Kirti Jain is listed and you are listed at the very bottom of the first page. What service, if any, were you providing on this day?

A. I have no idea.

Q. Are any of these ---?

A. 99213 is a follow up, so I would assume I would have been doing the follow up, if on the previous page because Maryann Stephenson is at the bottom of that code, and that was Exhibit 16, and there was a billing charge of 214. So that's what I would take from it, but I don't know.

Q. Billing charge of 214?

A. Yeah.

Q. Where is that?
A. Previously on Exhibit 16, ---
Q. Right.
A. --- on the second page, if you look at the bottom, date of service, 1/15/14.
Q. 214, estimated patient ---.
A. 99214, and then if you look at the bottom of that encounter, it says Mariann Stephenson.
Q. Right.
A. And if you look at the bottom of mine or this one that you're showing me, it has my name, so that's what I take from it. But again ---.
Q. Which of these drugs are chemotherapy drugs?
A. The Bleomycin, dacarbazine Adriamycin and Velban. That’s it.
Q. Do you know why Dr. Kirti K. Jain is listed as the physician on this itemized statement?
A. No idea.
Q. You don’t know?
A. No. There are days we both saw

the same patient, so I have no ---.
Q. This will be Exhibit 18.

---

(Whereupon, Exhibit 18, Itemized Statement, was marked for identification.)

---

ATTORNEY GROSSO:
And this will be a itemized statement --- I have a problem. For some reason, I may have only one of these. Maybe there are two of them stapled together. No, it wasn't that simple. For some reason, I have only one of these. So what I'm going to do is give it to you --- you can take a look at it, Victoria?
ATTORNEY FULLER:
Which one is that?
ATTORNEY GROSSO:
Eighteen (18). Oh, I gave ---.

ATTORNEY FULLER:
I think, yeah ---.
ATTORNEY GROSSO:
I gave it to you already.
ATTORNEY GROSSO:
Yeah, I may have this one already.
THE WITNESS:
Again, it's an itemized statement, so I'm not going to be able to speak to it anyway.
BY ATTORNEY GROSSO:
Q. That's okay. Well, no, I'm entitled to ask questions. You're entitled to say I don't know.
A. Okay.
ATTORNEY FULLER:
Can I list the patient name just to confirm?
BY ATTORNEY GROSSO:
Q. Yeah. The patient name is [redacted]. Do you know [redacted]
A. Do I know [redacted]?

No. Who is that?
Q. Somebody who worked at one of the clinics.
A. At Ashland or Prestonsburg?
Q. At this moment, I don't recall. So let’s skip that particular point. Let's turn to the --- what is listed on the bottom as page nine. The Bate stamps has been clipped off on this print. You see the date March 29th, 2014, at the top of the page?
A. Uh-huh (yes).
Q. Now, I have a calendar here from March. Do we need to mark the calendar? I guess we should.

ATTORNEY FULLER:

Yes, go ahead.

---

(Whereupon, Exhibit 19, March 2014 Calendar, was marked for identification.)

---

BY ATTORNEY GROSSO:

Q. Thank you. This is March 2014,

Exhibit Number 19. The date of service here for March 29, 2014 is what day of the week, according to that calendar?
A. Saturday.
Q. And the date of service for the next entry of March 30th, 2014 is what day of the week?
A. Sunday.
Q. Did you go into the centers on Saturdays or Sundays?
A. Sometimes I did, but we also gave injections on the weekends, and a physician does --- well, I can’t speak to that.
Q. Well, what were you about to say to clarify?
A. I mean, Leukine can be given without a physician present.
Q. That's your understanding?
A. That's my understanding.
Q. Where did you get that understanding from?
A. We also give it in a hospital without a physician present.

Q. So in a hospital?
A. Uh-huh (yes).
Q. Who, if anyone, told you could give it at an off site ---?
A. They can take it home with them, so ---.
Q. Okay.
Can it be billed as if the physician provided it if they take it home, if you know?
A. It’s billed different --- from what I understand, it's billed differently. But now I don’t --- I didn't do billing.
Q. Okay.
So let's just talk about what you do know. Injections of Leukine were given on the weekends at the centers?
A. Uh-huh (yes). Yes.
Q. With, without or without a doctor being present?
A. I mean, it just depends. I mean, it could be both.
Q. To your knowledge, did doctors

go to ---?
A. No, docs usually didn't. I mean, and I would go in on occasion.
Q. You would go in on occasion. When you say on occasion, what do you mean by on occasion?
A. I mean, there were different times that I was there on Saturdays and Sundays.
Q. Why?
A. Why?
Q. Why?
A. Usually because I was behind on charting.
Q. Okay.
So you would go in and you catch up in your charting. Were there sometimes or always patients there getting injections?
A. No.
Q. Did you go in every weekend?
A. No.
Q. Did you go in every weekend when there was a patient there?
A. No.

Q. Did some other nurse practitioner go in when you didn't go in and there was a patient there?
A. I can't speak to Ashland. In Prestonsburg, I was the only one.
Q. Okay.
Now, what is Leukine?
A. It --- you produce more white blood cells with it, healthier white blood cells.
Q. So why is it given?
A. To increase your white blood cell count.
Q. What --- this bears back to what we were talking about earlier, but what is the relation, if any, between white blood cell production and chemotherapy?
A. Because it’s --- the white blood cells are produced in the bone marrow, so it stuns the bone marrow, so ---.
Q. The chemo?
A. Chemotherapy will stun the bone marrow. And so at times, their

neutrophil count would get low, and that's where you have to give them injections to be able to bring their neutrophil count up, so they aren't as susceptible to the infection.

Q. So as part of the treatment with chemotherapy, Leukine injections ---.

A. Yes, there are known chemotherapy regimens that cause.

Q. That's part of a normal chemotherapy regimen?

A. Yes.

Q. Thank you. All right.

Let me see you. I will give you --- we're getting down to the end.

A. Okay.

Q. We're doing fine.

ATTORNEY GROSSO:

This is Exhibit Number ---

COURT REPORTER:

Twenty (20).

ATTORNEY GROSSO:

--- 20.

---

(Whereupon, Exhibit 20, Itemized Statement, was marked for identification.)

---

BY ATTORNEY GROSSO:

Q. All right.
This is Exhibit 20. If you recognize it, please let me know.
A. I have no idea what this is.
Q. All right.
This is a bill you got.
Correct?
A. I don't know.
Q. You don't know?
A. It says itemized statement. So I'm assuming that's what this is.
Q. Okay.
This is for [redacted], who we've seen before.
A. I'm sorry.
Q. This is for [redacted] who we've seen before. And I notice that for January 15th, which is the date we

looked before, you have charges listed in the amount zero. Why is your name listed associated with these particular codes?

A. I wouldn't know.

Q. Were you the one who provided or supervised?

A. I may have I don't know. I may have provided the visit. I don't know. I mean, there's no way for me to know.

Q. Okay.

If we look at calendar --- we’ll mark this as Exhibit 21. And this is going to be Exhibit 22.

---

(Whereupon, Exhibit 21, January 2014 Calendar, was marked for identification.)

(Whereupon, Exhibit 22, February 2014 Calendar, was marked for identification.)

---

BY ATTORNEY GROSSO:

Q. These are just calendars, so you can look at the dates. Now going back to January 15, that's during the week according to the calendar, am I right?

A. Uh-huh (yes).

Q. You are listed as having done something to this patient on that day.

A. Okay.

Q. And that's the same for January 22nd.

Right?

A. That's ---.

Q. Right? January 22, 2014. Robert Stephanie --- Stephanie Roberts. That's you?

A. Yeah, that's one of my aliases.

Q. Okay. I've got a joke, but I'll keep it off the record.

And then January 29th, these are all weekdays.

Right?

A. Yes.

Q. Now let's get down to February

1st, 2014 and February 2nd, 2014. This patient received Leukine on each of those days.
Right?
A. That’s what it looks like.
Q. According to this?
A. According to this.
Q. There's no nurse or doctor or nurse practitioner listed.
Right?
A. Right.
Q. That's a weekend?
A. Yes.
Q. So do you have any understanding why there's no nurse practitioner or doctor listed?
A. To my knowledge, it's not required.
Q. Okay.
Nobody would be there.
A. Nobody would be there.
Q. No nurse practitioner or medical doctor.
Correct?
A. Correct.

Q. Okay. All right.
A. This is a medication that can be given at home by the patient.
Q. Okay.
In which case it's not billed as if a physician ---?
A. Again, I ---.
Q. You don't understand the billing mechanism.
A. Right.
Q. Okay.
A. I circle.
Q. That's fine. All right.
All that pertains to Ashland, so I don't think I'm going to waste your time with it. All right.
Bear with me. I think we're getting to the end. I just want to check my notes.
A. Okay.
Q. Were there times when --- when you were there where the only medical doctors present while chemotherapy was being given to patients had radiation oncologists as opposed to medical

oncologists on premises?
A. Uh-huh (yes).
Q. Yes?
A. Yes.
Q. Were there days when you didn't have a medical or a radiation oncologist on the premises until you got a locum after Dr. Hayek left?
A. On the premises during chemotherapy, is that what ---
Q. Yes.
A. --- you're asking? No. To my knowledge, no.
Q. To your knowledge.
A. To my knowledge. Again, I ---.
Q. To your knowledge or your memory?
A. To my knowledge. I mean, I don't know that we ever gave chemotherapy without a physician.
Q. After Hayek left December 27 and before Dr. Bertram ---
A. Batoo.
Q. -- Bertram, ---
A. Oh, okay.

Q. --- who was the locum?
A. I have no idea.
Q. Do you know whether there was a locum?
A. I know we had locums. To be able to tell you exactly when they were there, I can't tell you.
Q. Okay.
And until Dr. --- after Dr. Bertram left, before Dr. Batoo arrived ---?
A. You know, I'm not going to know that.
Q. You don't know?
A. No.

ATTORNEY GROSSO:

I think I've reached the end. It's your witness, if you so wish.

ATTORNEY FULLER:

I'd like to, but if we wouldn't mind taking just another maybe 15 minute break.

ATTORNEY GROSSO:

Actually, before we can

go.

ATTORNEY FULLER:

Oh, yeah.

BY ATTORNEY GROSSO:

Q. You mentioned that you spoke with a nurse at Highlands after you and I spoke.

A. She doesn't work at Highlands now.

Q. Okay.

She doesn't work there no more. What is her name again?

A. Christy Marion.

Q. Who contacted who?

A. I contacted her.

Q. Christy Mary?

A. Uh-huh (yes). Marion.

Q. Marion. Why did you contact her?

A. Because actually, I thought she was there when Dr. O'Laughlin was there. She was the one that told me that she wasn't. She didn't know who that was.

Q. Who contacted who when or

before you spoke with Ms. Fuller? Did you contact her or did she contact you?
A. She contacted me.
Q. Now, were there standard operating procedures at the clinic or the center?
A. Yes.
Q. Were they written?
A. Yes. Again, I went in. I saw patients. I did what I was supposed to do. So I don't know.
Q. What did the standard operating procedures provide?
A. I mean, I was --- I knew rules as far as written stuff. I'm not sure if it was kept --- if they had copies there in Prestonsburg or if it was given, or if it was in Ashland. Honestly, I don't know.
Q. All right.

ATTORNEY GROSSO:

I have no more questions.

ATTORNEY FULLER:

I would like to take a break, but I do have some questions.

THE WITNESS:

Okay.

ATTORNEY FULLER:

Maybe start back up at 12:30. That should give us about 12 minutes.

ATTORNEY GROSSO:

What time is it now?

ATTORNEY FULLER:

12:18 according to mine.

OFF VIDEO

---

(WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)

---

ON VIDEO

VIDEOGRAPHER:

We are back on video record. The time is 12:34 p.m.

---

EXAMINATION

---

BY ATTORNEY FULLER:

Q. I promise I will try to be brief. I appreciate the time you've already given us and the attention you've been giving, and we've gone through a number of different things, so I will try to not take up much more of your time.

Can we revisit --- and I apologize if I mispronounce this Leukine?

A. Leukine.

Q. Leukine. Thank you. Can you, again kind of describe generally what it does?

A. Basically, it produces more healthy white blood cells.

Q. Okay.

A. It's a granulocyte basically. It produces more granulocytes.

Q. Okay.

Is it a kind of chemotherapy drug?

A. No.

Q. Okay.

Do you know is it given IN instances when someone is not receiving chemotherapy?
A. Yes.
Q. Okay.
So there are other conditions where someone might be given Leukine, but they aren't receiving chemotherapy.
A. Yes.
Q. Okay.
And I think Mr. Grosso mentioned, you know, it was part of a chemotherapy regimen. That doesn't necessarily mean it's chemotherapy.
Correct?
A. No. A regimen can even include the premeds. So you can have dexamethasone, Benadryl, Pepcid, and that's all connected to the regimen.
Q. Correct. Okay.
And so, again, that wouldn't necessarily mean ---
A. Those are not chemotherapy.
Q. --- it’s not a chemo drug.

A. Yes.
Q. Okay.
It's just something administered ancillary to ---
A. Yes.
Q. --- chemotherapy administration.
A. Yes.
Q. Okay.
And we talked about this briefly. Do you know, were there ever physicians on site on the weekends when they were giving injections of Leukine?
A. I hate to say yes or no, because I mean, to be able to accurately say it --- but to my knowledge, no. But I'm sure there were instances because there'd be times that we'd have physicians around just doing documentation as well as myself.
Q. Right. So you can't say with any certainty that there was never a physician on site on the weekends.

A. Right.

Q. Okay.

Then if you still have in front of you his Exhibit 16, I believe.

ATTORNEY FULLER:

Are we still under seal?

ATTORNEY GROSSO:

That's up to you.

ATTORNEY FULLER:

For the moment, just to make sure that --- I can't pronounce this woman's name. Let's be under seal for this particular exhibit.

ATTORNEY GROSSO:

I consider everything from when I mentioned seal to now to be.

ATTORNEY FULLER:

That's what I assumed as well, but I wanted to make sure that we were.

BY ATTORNEY FULLER:

Q. So this is for [redacted], just to make sure that we're looking

at the same thing. If you'll go to the second page. I believe you looked at entry for January 15th, 2014. Just for that specific service date, are there any chemo drugs listed?
A. Not chemotherapy. Herceptin is considered a chemotherapy.
Q. Okay.
A. So that's the reason it's there.
Q. Okay.
A. But yes.
Q. So you would consider that a chemotherapy drug?
A. Yeah, most people do, but I mean, it's not necessarily, but it's not antineoplastic. But is it considered chemotherapy? Yeah.
Q. How is it then? I suppose how does that work? I guess if it's not antineoplastic, but it is a chemotherapy?
A. It’s more antibody therapy.
Q. Okay. Okay.
So what does it do? I'll be

honest, I'm not sure what Herceptin does.
A. Herceptin is actually for R2 positive breast cancer. And so actually, previously to Herceptin, it was better to be in Herceptin --- or R2 negative. But after the Herceptin, they found that --- I mean to be Herceptin positive --- or R2 positive to be able to receive Herceptin was actually better.
Q. Okay.
A. It is considered chemotherapy, though, and they do it for a year after they finish the regimen.
Q. Okay.
So even when they stopped other kinds of chemotherapy drugs.
A. Uh-huh (yes).
Q. Okay. Okay.
I just wanted to clarify that because it’s ---.
ATTORNEY GROSSO:
What exhibit was that?
ATTORNEY FULLER:

I apologize, 16. Mary Marcum. I have it as 16.

THE WITNESS:

I have it as 16 as well.

BY ATTORNEY FULLER:

Q. Can we discuss ---?

A. Maybe one you didn't have,

Q. Oh, that actually could have been one.

A. Yeah, because there was one you didn't have.

Q. Can we discuss kind of briefly your recollection of locums? We touched upon it a little bit, kind of throughout, but just kind of what do you remember about locums being on site, you know, if you have any specific memories of maybe physicians they would have covered while you were there that you can recall just kind of anything in general about ---?

A. I mean, I can remember an Indian lady that came. Date wise, I can't tell you.

Q. That's okay.

A. But I remember there was an Indian lady. Now that I saw Bertram's face, I remember him. Later we had Ramon. I just know different ones would come in. But to be able to remember names, I can’t.
Q. No, that's okay. Do you remember kind of generally who they would cover for sometimes or just ---?
A. Basically they would cover on the days that either Dr. Jain couldn't be there because when Dr. Hayek left, Dr. Jain picked up the days that he was coming up --- up to Prestonsburg.
Q. Okay.
So Dr. Jain would --- he would sometimes have locum coverage himself. Is that what ---
A. Yes.
Q. --- you're saying?
A. Yes.
Q. Okay. Okay.
So someone would cover for Dr. Jain?
A. And plus he had physicians in

Ashland to be able to cover so he would be able to cover us.

Q. Okay.

Was it just when Dr. Jain was like, trying to pick up Dr. Hayek's dates that you remember him ---

A. Yes.

Q. --- having locums or ---?

A. That I remember, yes, it was when --- we even had locums for radiation oncology, but I don't know if that was during O'Laughlin's time. We had locums for it all.

Q. Okay.

So you remember there being locum coverage just kind off and on ---

A. Yes.

Q. --- as the needs arose.

A. Okay.

Q. Okay.

And for more than maybe even Dr. Hayek?

A. Yes.

Q. You'd have a locum for Dr. Jain

sometimes?
A. Uh-huh (yes). Yes.
Q. Okay, okay.
While we're speaking of Dr. Jain, he mentioned briefly, or perhaps you brought him up first Manish Jain. And you remember Manish and his role at the cancer centers. Do you know if he and Dr. Jain are related?
A. To my knowledge, no.
Q. Okay.
A. Actually, I think I asked Dr. Jain that and he told me no.
Q. Yeah, yeah. Let's look at --- I'll just pick one kind of at random. Exhibit 15. This was medical administration records for Ms. Mary Marcum again.
And your testimony was that you are unfamiliar with this record.
Correct?
A. Yeah, I didn't ever give chemotherapy, so I never saw this.
Q. And you didn't know specifically what the supervising MD

signified as to this record?
A. I mean, it could be the doc who ordered it. It could be the doc that was present. It honestly would just be whoever was putting it in the computer.
Q. Okay.
So they would be the ones to understand ---
A. Yes.
Q. --- better what they meant by that, I'm assuming?
A. Right. Yes.
Q. Okay.
And that was not you.
A. Right.
Q. You did not do that?
A. Correct.
Q. And I apologize. I shouldn't have moved away from the locum subject again. I have a couple of exhibits that I would like to introduce pertaining to the locums. One of these we've produced in discovery, one we have not yet, but we obviously can

do so. If you wouldn't mind --- I don't want to mess with the mic a ton, but if you wouldn't mind to pass --- take one for yourself and pass it down. We can mark that as Defendant's Exhibit 1.

A. Is it one page?

Q. And I apologize. I should have kept one for myself.

---

(Whereupon, Defendant's Exhibit 1, Schedule Report, was marked for identification.)

---

ATTORNEY GROSSO:

How many of these exhibits?

ATTORNEY FULLER:

I'll only have two. Would you mind handing ---?

ATTORNEY GROSSO:

Is this one exhibit?

ATTORNEY FULLER:

Yes.

ATTORNEY GROSSO:
Three pages or two pages?
ATTORNEY FULLER:
It's one page.
THE WITNESS:
So one of them's mine.
ATTORNEY GROSSO:
One's yours, one's the court reporter's.
ATTORNEY FULLER:
Yes. I apologize. Just one single ---.
ATTORNEY GROSSO:
Well, this is going to be yours.
ATTORNEY FULLER:
Okay.
COURT REPORTER:
You said Defendant 1?
ATTORNEY FULLER:
Yes.
BY ATTORNEY FULLER:
Q. I went ahead and redacted these just out of an abundance of caution.

I did try to keep the initials visible for one particular patient. I don't think I did a very good job, but I did try to put an asterisk. If you'll look at the --- well, first, this is a schedule report, and if you'll look at the bottom, it's for Ashland. And my understanding is you didn't --- except maybe moonlighting occasionally, you really were not ---
A. Right.
Q. --- at Ashland very often. So it was the quickest example I could come up with. So this starts with January 17th, 2014. And if you will look at the 3:00 p.m. appointment block, who is the physician listed there?
A. Dr. Hayek.
Q. Correct. And according to the declaration that Mr. Grosso gave you, Dr. Hayek stated that he was no longer working for the cancer centers after December sometime 2013.
Correct?

A. Yes.
Q. Okay.
But he is still listed there. So then this will be Defendant's Exhibit 2.

---

(Whereupon, Defendant's Exhibit 2, Follow Up Visit Report, was marked for identification.)

---

BY ATTORNEY FULLER:

Q. If you look at the patient's name --- again, I apologize, I did a bad job redacting. But I did try to keep some initials. There's an E. Well, can you see what the initials are?
A. Yeah, EMD.
Q. EMD. Yes.
If you wouldn't mind to pass these down as well, I'll give you a moment to look at that. And like I said, this is our Exhibit 2, please.

COURT REPORTER:

Is it one page or two?

ATTORNEY FULLER:

It is two pages.

COURT REPORTER:

Okay.

BY ATTORNEY FULLER:

Q. What is this from what you can tell?

A. This is a follow up note from a follow up visit. This is what we would dictate following after seeing the patient.

Q. Okay.

What's the date indicated on this follow up visit?

A. 1/17/2014.

Q. Okay.

And again, I know I tried to redact the patient name, but can you see some --- any identifying letters for this patient name?

A. PM.

Q. Okay.

So far does that seem to match what we have for Dr. Hayek on January

17th at 3:00 in the afternoon?
A. Yes.
Q. Okay.
And if you go to the second page there, at the bottom there seems to be --- it's typed, but I'm assuming a signature of the physician who would have seen this patient.
Is that correct?
A. So on the right, I see Dr. Bertram's name. On the left, I see --- I don't know the name, so I mean, I'm not sure who that is.
Q. But typically when you're looking at this kind of ---.
A. If I'm looking at this kind of a note, then that would mean that Dr. Bertram saw the patient.
Q. Correct. Okay.
That's my question.
A. Okay.
Q. If that was your understanding of it, yes.
Is Dr. Bertram listed on the schedule anywhere that you can see?

A. No, no.
Q. So even though Dr. Hayek is listed on the schedule, it doesn't mean necessarily that Dr. Hayek was the one who saw this particular patient that day?
A. Right.
Q. Why do you think that may be?
A. An error, a clerical error.
ATTORNEY GROSSO:
Objection. Calls for speculation.
BY ATTORNEY FULLER:
Q. Okay.
You can still answer.
A. I mean, we would see patients all the time that, oh, we forgot to put them --- take them off this person's schedule, and then we just add them to ours. And what they did on the front end of it, I have no idea. We just saw the patients.
Q. Okay.
Do you think it could because Dr. Bertram was Dr. Hayek's locum?

A. Locum, yes.
Q. Okay.
I think I'm done with those.

ATTORNEY GROSSO:

All right.

ATTORNEY FULLER:

Oh, I'm sorry. No, I was done with those exhibits.
I did have a couple questions.

BY ATTORNEY FULLER:

Q. Just kind of thinking about the schedules in general, I know you said that this isn't necessarily the kind of schedule that you saw, and your testimony was that your schedules that you saw every day were pretty limited. It was only just yours and Dr. Jain.
Is that correct?
A. Right, right.
Q. Okay.
A. I mean, I would look over the chemotherapy schedule ---
Q. Right.
A. --- just so I kind of had an idea of what was going on.

Q. Yeah. Do you remember --- and again, I know a lot of time has passed, but were there instances where maybe physicians were on site, even though they weren't necessarily scheduled to see patients that day?
A. Yes.
Q. Did that happen with any kind of regularity?
A. It happened actually pretty regularly. Yes.
Q. Okay.
What would be some reasons why they would be on site even if they're not scheduled to see patients that day?
A. Whatever you can think.
Q. Okay.
And I think you mentioned sometimes you come in on weekends for other reasons.
A. Yeah.
Q. They maybe were charting, perhaps, or doing something like that.
A. Yeah, documenting.

Q. Yeah. So just because --- in your understanding, then, a patient --- or I'm sorry, a physician could be on site, even though he wasn't necessarily listed on the schedule.
A. Yes.
Q. Okay.
And then just kind of generally, do you recall any instance where chemotherapy drugs were given without a physician being on site?
A. That I'm aware of, no.
Q. That's all I'm asking you. Yes. Just from your recollection for the ten years or so that ---
A. Yeah.
Q. --- roughly that you were there, you don't recall?
A. I do not recall.
Q. Okay.

ATTORNEY FULLER:
I believe that should be everything that I had. So I'm done. Thank you.

---

RE-EXAMINATION

---

BY ATTORNEY GROSSO:

Q. Okay.

I have just a few more questions ---.

VIDEOGRAPHER:

Counsel, I don't think we have enough ---.

BY ATTORNEY GROSSO:

Q. Just a few more questions. With regard to Dr. Bertram, do you know when he began working there?

A. No.

Q. Let me show you Exhibit Number ---.

ATTORNEY GROSSO:

What are we up to for Plaintiff?

COURT REPORTER:

Twenty (20) --- we're at 22. So that's going to be 23.

---

(Whereupon, Exhibit 23, Email, was marked for

identification.)

---

ATTORNEY GROSSO:

I don't think she has one.

ATTORNEY FULLER:

Is it --- I might. Is it ---?

ATTORNEY GROSSO:

Yeah.

ATTORNEY FULLER:

Yeah.

BY ATTORNEY GROSSO:

Q. This, as indicated from the Bate stamp on the bottom, was provided by the Defendant Centers. It's an email between mean Manish at abcc.us Is that Manish Jain's email?

A. Uh-huh (yes).

Q. At abcc.us is what?

A. Yes.

Q. What is that?

A. Ashland Bellefonte Cancer Center.

Q. It's an email dated Monday,

December 2nd, 2013, between --- or from Comp Health and the orientation first day request for Dr. Bertram, at least that's the subject matter. The first sentence reads, Dear Manish, if you are not the correct contact person for this information, please let me know in order to arrange details for Dr. Bertram's assignment starting January 6, 2014. I will need the following information ASAP.

Does that --- did Dr. Bertram work at either of the centers prior to that date?

A. I mean, I don't know, but according to this, no.

Q. Let's go to Exhibit Number 13. This is, as we saw before, a list of claims billed in the name of Dr. Hayek as the rendering provider. And I asked you to look at the first entry for Tammy Martin. The date is 12/27/13. And then the fifth entry for Wilma Freeman, 12/27/14. This is before the January 6 start date

indicated by the email that I just showed to you.

Who was present for --- who was providing these services if Dr. Bertram wasn't there and Dr. Hayek wasn’t there?

A. I don’t know. I mean, I can’t ---.

Q. Do you know if anyone was providing these services? Any physician was providing or supervising these services?

A. Somebody would have, but I don't know who it was.

Q. You don't know if anybody --- you didn't have firsthand knowledge that anybody indeed did that?

A. I mean, I know there would have been somebody there, but to know who it was, whether it was radiation oncology or medical oncology, I can't tell you.

Q. You know it was the policy to have somebody there.

Correct?

A. Yes.
Q. You don't know whether on this particular day there was actually somebody there, do you?
A. I can't speak to it, no.
Q. How did they determine who to bill as the rendering provider to the Medicare program after a patient received a service?
A. I don’t --- I didn’t do the billing.
Q. Okay.
I have no more questions of you. We're about to release you.
A. Okay.
Q. I thank you. I understand that this is not the way you'd like to spend your day.
A. No.
Q. But that being said, I must add, if after you leave here today there's anything you realize that isn't correct or unclear, you may be given an opportunity to correct it, but you need to tell us very, very

quickly.

ATTORNEY GROSSO:

All right.

We will read.

VIDEOGRAPHER:

This concludes the video deposition of Stephanie Howard. The time is 12:55 p.m.

COURT REPORTER:

Do you want an electronic copy or do you want hard, if you even want a copy?

ATTORNEY FULLER:

Yes, we do. We don't need it condensed, I know. He wanted if we could do a pdf and a hard copy.

ATTORNEY GROSSO::

You have my info, right?

COURT REPORTER:

Yes.

VIDEOGRAPHER:

Just to be sure, do you want a copy of the video?

ATTORNEY GROSSO:

Yeah. Can I postpone that or no? If the answer is no, let me know.

VIDEOGRAPHER:

I can enter unsure.

ATTORNEY GROSSO:

Okay. Let me order it.

COURT REPORTER:

Do you want an electronic copy or do you want a hard copy?

ATTORNEY GROSSO:

Electronic.

COURT REPORTER:

Okay. Can you write down your email address for me, please?

* * * * * * * *

VIDEOTAPED DEPOSITION CONCLUDED

AT 12:55 P.M.

* * * * * * * *

COMMONWEALTH OF KENTUCKY )

CERTIFICATE

I, Leah Beth Lambert, a Notary Public in and for the Commonwealth of Kentucky, do hereby certify:

That the witness whose testimony appears in the foregoing deposition, was duly sworn by me on said date and that the transcribed deposition of said witness is a true record of the testimony given by said witness;

That the proceeding is herein recorded fully and accurately;

That I am neither attorney nor counsel for, nor related to any of the parties to the action in which these depositions were taken, and further that I am not a relative of any attorney or counsel employed by the parties hereto, or financially interested in this action.

[signature]

Leah Beth Lambert,
Court Reporter

*LEAH BETH LAMBERT*
*Notary Public – State At Large*
*KENTUCKY – Notary ID #KYNP*
*My Commission Expires 11-23-2026*