**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**Ashland Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| ***ex rel.* ROBERT C. O'LAUGHLIN, M.D.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION** |
| | ) | **NO. 0:16-CV-148-DLB** |
| **RADIATION THERAPY SERVICES, P.S.C.,** | ) | |
| **dba ASHLAND BELLEFONTE CANCER** | ) | |
| **CENTER, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**RESPONSE OF RELATOR ROBERT C. O'LAUGHIN, M.D.**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Robert C. O'Laughlin, M.D. ("Dr. O'Laughlin"), the Plaintiff and Relator in this matter, hereby submits to this Honorable Court his Response to the Motion of the Defendants for Summary Judgment (Doc. 203, Page ID # 3450).

All exhibits referenced in the Response accompany the Declaration of Andrew Grosso, Esq (Doc. 223), filed separately.


By: /S/ Andrew Grosso
Andrew Grosso, Esq. (D.C Bar No. 358326)
*Pro Hac Vice*
ANDREW GROSSO & ASSOCIATES
1250 Connecticut Avenue NW, Suite 700
Washington, D.C. 20036
Telephone: (202) 298-6500
Email: Agrosso@acm.org

Attorney for Relator Robert C. O'Laughlin, M.D.

Ronald J. Jarvis, Esq.
Of Counsel on the Brief

## TABLE OF CONTENTS


| | | | Page |
|---|---|---|---|
| **I.** | **STATEMENT OF THE CASE** | | **1** |
| | **A.** | Procedural History of the Case | **1** |
| | **B.** | Nature of the Case | **3** |
| **II.** | **LAW** | | **6** |
| | **A.** | Summary Judgment Standard | **6** |
| | **B.** | The Federal False Claims Act | **7** |
| | **C.** | "Incident-to" Provisions of the Medicare Program | **9** |
| | **D.** | Requirements of the Kentucky Medical Assistance Program | **11** |
| **III.** | **STATEMENT OF FACTS** | | **11** |
| | **A.** | The Defendants | **12** |
| | **B.** | Upcoding "Incident-to" Chemotherapy Services, Provided with No Physician Supervision | **13** |
| | | 1. No Physicians on Weekdays | **16** |
| | | 2. No Physicians or Nurse Practitioners on Weekends | **18** |
| | **C.** | Specific False Claims Identified by Dr. O'Laughlin, in Four Separate Categories Demonstrate a Material Dispute With the Defendants' Assertion that Dr. O'Laughlin Has Done No More than to Prove "Routine Practice" as Opposed to Concrete False Claims | **19** |
| | | 1. Category 1: The 2014 1st Half Claims | **20** |
| | | 2. Category 2: The Ashland BCC Thursday Claims | **28** |
| | | 3. Category 3: The Highland CC Thursday Claims | **30** |
| | | 4. Category 4: The Weekend Claims | **30** |
| | **D.** | The Defendants Have Conducted No Competent Review of Medical Records | **31** |
| **IV.** | **ARGUMENT** | | **32** |

**A.** Chemotherapy Services Include Injections of Leukine **32**

**B.** The Knowledge Element for False Billing Is in Dispute **36**

**V.** **CONCLUSION** **40**

## MEMORANDUM

## I. STATEMENT OF THE CASE

Dr. Robert C. O'Laughlin, M.D., the Relator in this case, is a radiation oncologist. (Doc. 207-18, R. O'Laughlin Dep. 15:1-10, Page ID# 4424; 38:16-20, Page ID# 4447.) From July 2012 (*id*. 22:17-18; Page ID# 4431) until October 15, 2015 (*id*. at 53:23-24, Page ID# 23-24) he was employed by Radiation Therapy Services, P.S.C., d/b/a The Ashland Bellefonte Cancer Center ("Ashland BCC"), in Ashland, Kentucky. He worked at this cancer center, as well as its two "sister" centers: the Kirti K. Jain, M.D., P.S.C., d/b/a Highlands Cancer Center ("Highlands CC"), located approximately 70 miles away in Prestonburg, Kentucky; and the Logan Regional Cancer Center, in Logan ("Logan RCC"), located approximately 20 miles away from Ashland BCC, in Logan, West Virginia. (See Exhibit 1, Mileage Reimbursement Report.)

### A. Procedural History of the Case

In December 2016, Dr. O'Laughlin filed a "*qui tam*" or whistleblower case under the federal False Claims Act, 31 U.S.C. § 3729 *et seq*., naming these three cancer centers and two other persons as defendants in a scheme to defraud the Medicare and Medicaid programs. (Doc. 1; Page ID# 1.) The other defendants are Dr. Kirti K. Jain, M.D., a medical oncologist and the owner of Ashland BCC and Highland CC; and A One Biz Solutions, LLC ("A One Biz"), a billing company used by all three cancer centers. After a two-year investigation, the Government intervened in part for purposes of settling the case with Logan RCC (Doc. 34; Page ID# 214); and left it to Dr. O'Laughlin to prosecute the remaining cancer centers and the other Defendants. The Court ordered Dr. O'Laughlin to serve a summons and the complaint (Doc. 35; Page ID# 219), which he did.

After having been served, the Defendants filed motions to dismiss. Pursuant to Fed. R. Civ. P. 15, Dr. O'Laughlin filed an Amended Complaint without answering the motions. (Doc. 53; Page ID# 329.) The Amended Complaint added a Defendant, Manish Jain, who was the business manager of Defendants Ashland BCC and Highlands CC, and also a member of Defendant A One Biz. The Amended Complaint also converted Logan RCC from a Defendant to a co-conspirator.

The Defendants again filed motions to dismiss. On October 20, 2020, the Court issued its Order granting the Defendants' motion in part, with leave for Dr. O'Laughlin to proceed to discovery on some claims and to file an amended complaint as to others. (Doc. 76; Page ID# 766.). Due to the pendency of a motion for reconsideration (Doc. 78; Page ID# 807), an extension of time was entered for the filing of the Second Amended Complaint. (Doc. 79; Page ID# 810.) During this period, a Scheduling Order was entered, and then amended (Doc. 88; Page ID# 855) due to medical issues of Relator's counsel. (See Doc. 87; Page ID# 850.)

As these matters were proceeding, Relator sought leave to file his Second Amended Complaint ("SAC"), also asking **additionally** and **expressly** for leave to file a third amended complaint once the Court ruled on the motion for reconsideration. Relator's motion was **unopposed** by the Defendants, and the Court entered its Order granting such leave. (Doc. 90; Page ID# 934.) The SAC was filed on July 26, 2021. Subsequently, this Court denied the motion for reconsideration (Doc. 97; Page ID# 1055), and the Defendants moved to dismiss the SAC.

Dr. O'Laughlin responded to Defendant's motion to dismiss and attached as an exhibit a proposed Third Amended Complaint ("TAC," Doc. 102-1; Page ID3 1087). On October 20, 2021, this Court held a telephonic hearing on the question of whether the Relator could proceed on this proposed TAC. (See Mem. Order at 5, Doc. 123; Page ID # 1762.) During the hearing,

after the Court ruled that he could proceed with the TAC, Dr. O'Laughlin again sought leave to file a slightly revised version of the TAC, with some minor modifications from the original draft. The Court granted this request, and Dr. O'Laughlin filed the new, revised and final TAC (Doc. 124) *with the express leave of Court*. (Mem. Order at 6, Pt. 4.)[1]

The Defendants filed their joint motion to dismiss, which Dr. O'Laughlin opposed. The Court granted the Defendants' motion, with prejudice, as to all of the counts in the TAC that pertain to radiation oncology and simulation claims, leaving Dr. O'Laughlin to proceed on his remaining claims which concerned chemotherapy services, and his conspiracy count as it pertained to such chemotherapy services. (Order, Doc. 141; Page ID# 2041.)

Discovery ended on December 22, 2024, although the parties have continued to exchange documents that had been requested in discovery but are still outstanding; and Dr. O'Laughlin gave notice in his Status Report that he may file motions to compel documents that he requested but that have so far been withheld by the Defendants without any explanation or justification therefor. (See Doc. 200; Page ID# 3019.)

**B. Nature of the Case**

This case concerns the supervision, or more precisely, the *lack* of supervision, by physicians—and in some instances the lack of supervision by *any* providers, including non-physician providers ("NPPs," *e.g.*, nurse practitioners and physician assistants)—for

[1] The Defendants have repeatedly made the argument that the procedural means whereby Dr. O'Laughlin filed the TAC was in some way improper, and that the filing was done without any motion or leave of Court. They now make this argument again. (Doc. 203 at 2-3; Page ID# 3452.) This argument appears to be made for the purpose of "preserving" an "issue" for appeal. The argument is clearly meritless and the issue is non-existent. Among the considerations taken into account by the Court during the above referenced telephone conference was a medical issue, mentioned above, experienced by Dr. O'Laughlin's counsel prior to the deadline for the filing of the SAC, necessitating the filing of the TAC.

chemotherapy services provided by nurses and technicians at two of the Defendants' three cancer centers: Ashland BCC and Highlands CC.[2]

The services at issue are chemotherapy services. Medicare Part B pays physicians for their professional services, as well as for medical services and supplies provided "incident to" their professional services, doing so based upon rates set forth in the Medicare Physician Fee Schedule ("MPFS") published by the Center for Medicare and Medicaid Services ("CMS").

If a service is provided "incident to" a physician's professional service—for example, if it is provided pursuant to a physician's evaluation and diagnosis of a patient and his or her subsequent order for medical services and supplies—*and* the physician provides *direct supervision* of the provision of such services and supplies, then upon receipt of a proper claim, Medicare will pay 100% of the amount specified in the MPFS.

If, however, the submitted claim indicates that the physician did *not* provide direct supervision of the chemotherapy services, but instead the supervision was provided by an NPP, Medicare will pay only 85% of the amount specified in the MPFS on that claim.

Moreover, if the submitted claim indicates that the provision of the chemotherapy services was not supervised by *either* a physician *or* an NPP, but rather by nurses, technicians, etc. (collectively, "auxiliary personnel"), then Medicare will not pay *anything* under the "incident to" provisions of the Medicare program.[3]

By presenting claims to the Medicare and Medicaid programs for the chemotherapy services rendered to patients *as if* they were rendered by a physician, when in point of fact they

[2] Although Logan RCC is named as a co-conspirator, only radiation oncology services were provided to patients at that center. In the aftermath of this Court's Order dismissing all radiation oncology claims in the TAC, Logan RCC's role as a co-conspirator is marginal, if it relevant at all; and is treated as such in this Response.

[3] See Memorandum and Order, Doc. 141 at 9-12; Page ID# 2049-52; see also Declaration and Expert Report of E.B. Kunz, Doc. 183-1 at ¶¶ 76, 86-87; Page ID# 2702.

were neither rendered *nor* supervised by a physician, the Defendants falsely and fraudulently "up-coded" the claims for these services from the lower 85% tier to the 100% tier, thereby overbilling CMS and the Kentucky Medicaid program and unjustly and illegally enriching themselves at the expense of Medicare and Medicaid beneficiaries.[4] Even worse, on weekends and often during the noon hour on Thursdays at the Ashland BCC, only auxiliary personnel were available at the centers to treat patients—but the Defendants nonetheless, as a matter of course, billed as if a physician supervised the provision of drug infusions (*viz.*, at 100% of the MFS rate), when *neither a physician nor a NPP* was present. In those instances, *no amount at all* should have been billed or reimbursed by CMS or the Kentucky Medicaid program.

There are four categories of claims at issue in this case:

(1) Claims for chemotherapy services provided on weekdays during the period December 27, 2013 through June 30, 2014 (with certain specified dates excluded). During this period, the Defendant cancer centers had insufficient physicians on staff to cover Ashland BCC, Highlands CC, and Logan RCC at all times that chemotherapy services (and radiation oncology services) were provided to patients.

(2) Claims for chemotherapy services on Thursdays at Ashland BCC, during the hours of 12:00 p.m. to 1:00 p.m., when the physicians were off the premises of the Ashland BCC, attending "tumor board meetings" at a nearby hospital;

(3) Claims for chemotherapy services provided on Thursdays at Highlands CC, for days when no physician was on the premises; and

(4) Claims for chemotherapy services on weekends, when neither physicians nor NPPs were on the premises to supervise auxiliary personnel providing services to patients (in which

[4] Claims paid by the Kentucky Medicaid program are funded in part by CMS, and thus false claims submitted to that program fall under the reach of the federal False Claims Act. *See* 31 U.S.C. § 3729(b)(2)(A)(ii).

case *nothing* for the chemotherapy services actually rendered could legally be billed to CMS or Kentucky Medicaid).

The chemotherapy services at issue include the infusion and injection of chemotherapy drugs, well as of support drugs used as part of chemotherapy treatments. Specifically, they fall within the following code ranges as found in the Certified Procedural Terminology ("CPT") manual[5]:

| CPT Range | Section |
|---|---|
| 96360-96361 | Hydration |
| 96365-96379 | Therapeutic, Prophylactic, and Diagnostic Injections and Infusions (Excludes Chemotherapy and Other Highly Complex Drug or Highly Complex Biologic Agent Administration.) |
| 96401-96549 | Chemotherapy and Other Highly Complex Drug or Highly Complex Biologic Agent Administration. |

## II. LAW

### A. Summary Judgment Standard

Summary judgment is properly granted only where the parties' dispute presents no genuine issue of material fact. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court must view all facts and inferences in the light most favorable to the nonmoving party. *See S.E.C. v. Blavin*, 760 F.2d 706, 710 (6th Cir. 1985). The moving party has the burden of showing the absence of genuine disputes over facts that, under the substantive law governing the issue, might affect the outcome of the action. *See Anderson v. Liberty Lobby, Inc.*,

[5] Exhibit 2 contains the relevant pages of the CPT manual, from the 2011 edition used by the Defendants' expert Christine M. Miller, describing the relevant codes. All of the services represented by these procedures are used with chemotherapy, although not exclusively with chemotherapy. (181-1, Decl. & Report of E. Kunz ¶¶ 42, 43; see also Doc. 200, Second Decl. & Rebuttal Report of E. Kunz ¶¶ 26-27.)

477 U.S. 242 (1986). “The disputed issue does not have to be resolved conclusively in favor of the nonmoving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

**B. The Federal False Claims Act**

Before delving into the facts, it is appropriate to discuss the applicable law of this case, specifically that of the False Claims Act under which this case has been brought; and the federal and Kentucky regulatory regimes that the Defendants are alleged to have violated, resulting in the submission of the false claims.

The False Claims Act (”FCA”), 31 U.S.C. § 3729 *et seq*., imposes civil liability upon any person who “knowingly presents, or causes to be presented, a false or fraudulent” claim for payment or approval directly or indirectly, to the United States.

The definition of “claim” is broad. It includes any request or demand for money, whether or not the United States has title to the money. *See* 31 U.S.C. § 3729(b)(2)(A)(i). It also includes such requests or demands:

> [m]ade to a contractor grantee, or other recipient, if the money or property is to be spent or used on the Government’s behalf or to advance a Government program or interest, and if the United States Government—
>
> (i) provides or has provided any portion of the money or property requested or demanded; or
>
> (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2)(A)(ii).

As used in this case, liability under the FCA attaches to false or fraudulent claims presented to the Medicare program, whether directly or to a Medicare Contracting Organization.

It also attaches to claims submitted to a state-operated Medicaid or Medical Assistance program, including the Kentucky Medical Assistance program, which is funded in part by federal funds provided through the Centers for Medicare and Medicaid Services ("CMS") of the U. S. Department of Health and Human Services ("HHS").

The false or fraudulent claims must be presented "knowingly." However, the definition of the word "knowingly" as used in the FCA has a low bar. It includes three types of knowledge, any one of which, by itself, is fully sufficient to support liability:

(i) actual knowledge that information in the claim is false or fraudulent;

(ii) deliberate ignorance of the truth or falsity of the information provided in, or in support of, the claim; and

(iii) reckless disregard of the truth or falsity of the information so provided.

Importantly, no proof of any specific intent to defraud is required. *See* 31 U.S.C. § 3729(b)(1).

Among the essential elements of a violation of the FCA are two that are at issue here: (1) the falsity of the claim; and (2) the defendant's knowledge of the claim's falsity. *See, e.g., United States ex rel. Schutte v. SuperValu*, *Inc*., 598 U.S. 739, 747 (2023).

The federal FCA imposes triple damages for each false claim and false statement, as well as penalties for each false claim and false statement. The penalty amounts applicable depend on the year in which the offense occurred, and the year when a judgment is imposed. For our purposes, the minimum penalty for each false claim and false statement ranges from $5,500 to $13,946; and the maximum for each ranges from $11,000 to $27,894. The risk of harm to patients, here demonstrated by the wrongful death action brought against the Ashland BCC and Highlands CC, and against Dr. Kirti K. Jain personally (see *infra*), argue persuasively against any reduction in these amounts.

## C. “Incident to” Provisions of the Medicare Program

This Court has described the framework of federal regulations as they apply to chemotherapy services and the “incident to” requirements for billing and reimbursement for such services. See Mem. Opinion and Order, Doc. 141, at 9-12; Page ID# 2049-52. Additional information is provided in the Report of Dr. O’Laughlin’s expert, Elin B. Kunz, attached to her declaration (Doc. 183-1; Page ID# 2702); and in Dr. O’Laughlin’s Motion to Exclude Expert Testimony of Defendants’ Expert Cristine M. Miller (Doc. 202; Page ID# 3051). For this reason, we keep the description of these regulations and requirements brief.

In order to be reimbursable under Part B of the Medicare program, that portion of the Medicare program at issue in this case, a medical service or supply provided in an office environment must fall within the definition of “medical and other health services” of the Social Security Act. *See* 42 U.S.C. § 1395k(a)(1) and (b). This term, “medical and other health services,” is defined at 42 U.S.C. § 1395x(s), which lists a number of separate benefit categories. To be reimbursable under Medicare, such a service (or supply) must fall within one of these benefit categories. Among these categories are medical services provided “incident to” a physician’s professional services. This is defined as:

> (A) services and supplies (including drugs and biologicals which are not usually self-administered by the patient) furnished as an incident to a physician’s professional service, of kinds which are commonly furnished in physicians’ offices and are commonly either rendered without charge or included in the physicians’ bills . . . .

42 U.S.C. § 1395x(s)(2)(A).

To be reimbursable as an “incident to” service, a service must not only meet the above-stated definition, but must *also* not be “*specifically listed* in the [Social Security] Act [specifically, that is, in § 1395x(s)] as a separate benefit . . . .” 42 C.F.R § 410.26(A)(8) (emphasis supplied) . In other words, to be reimbursable under the Medicare program, a medical

service must either: (i) be provided incident to a physician's professional services, satisfying the conditions for this benefit category; or (ii) have its own, separate, benefit category specifically listed in the statute, that is, in 42 U.S.C. § 1395x(s).

Chemotherapy services and supplies, *e.g.*, drugs, *do not* have their own benefits category under the Social Security Act, and therefore are not "specifically listed." Thus, to be reimbursable at all, they *must* be billed "incident to" a physician's professional services (or the services of a non-physician provider, such as a nurse practitioner).

One of the requirements for an "incident to" service to be reimbursable is that the service must be provided under the "direct supervision" of a physician or an NPP. *See* 42 C.F.R. § 410.26.

By way of explanation, there are three distinct types of supervision recognized by Medicare regulations, *viz.*: general, direct, and personal. *See* 42 C.F.R. § 410.32(b)(3). In pertinent part, § 410.32(b)(3) reads:

> [W]hen direct or personal supervision is required, **physician supervision at the specified level is required throughout the performance of the test**.
>
> (i) *General supervision* means the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure. Under general supervision, the training of the nonphysician personnel who actually perform the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician.
>
> (ii) *Direct supervision* in the office setting means **the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure**. It does not mean that the physician must be present in the room when the procedure is performed.
>
> (iii) *Personal supervision* means a physician must be in attendance in the room during the performance of the procedure.

(Italics in original; bold added.)

The requirements governing reimbursement for "incident to" services are found in 42 C.F.R. § 410.26 (Services and Supplies Incident to a Physician's Professional Services: Conditions), specifically at § 410.32(b)(3); and they expressly incorporate the definition of "direct supervision" found in § 410.32(b)(3)(ii). *See* 42 C.F.R. § 410.26(a)(2).

**D. Requirements of the Kentucky Medical Assistance Program**

Defendants Ashland BCC and Highlands CC are both located in Kentucky, and services provided to Medicaid recipients at these centers are subject to the applicable rules of the Kentucky Medical Assistance Program. For Kentucky Medicaid, when auxiliary personnel (*viz.,* a nurse or technician, etc.) perform the service, "direct physician" contact is required. This means that the physician must be *physically present with*, and must evaluate, examine and treat or diagnose the recipient. *See* 907 KRS 3:005 § 3(1)(c). Direct physician supervision is not required where, *inter alia*, the service is performed by a NPP, and such alternate provider, 907 KRS 3:005 § 3(2)(a), is under the supervision of a physician.

## III. STATEMENT OF FACTS

Dr. Robert C. O'Laughlin, M.D. ("Dr. O'Laughlin") was employed by Ashland BCC as a radiation oncologist from July 2012[6] until October 15, 2015.[7] As part of his employment, he also treated patients at Highlands CC and Logan RCC. Collectively, Ashland BCC and Highlands CC are also known as "Precision Cancer Centers."[8]

---

[6] Doc. 207-18, R. O'Laughlin Dep. 22:17-18; Page ID# 4431.

[7] *Id*. at 53:23-24; Page ID# 23-24.

[8] Doc. 215-1, K. Jain Dep. 12:16-15:25, Page ID# 4890-93.

### A. The Defendants

Defendant Dr. Kirti K. Jain was the owner and operator of Ashland BCC[9]; and was the CEO and Medical Director of Highlands CC and owned 100% of that company. [10] During the period covered by the allegations in the TAC (hereinafter, the "Complaint"), Defendant Manish Jain was the Business Manager or operations manager of both cancer centers.[11]

Both Ashland BCC and Highlands CC used the same billing company to submit claims to insurance carriers and other reimbursement entities. These entities included the federal Medicare program, the Kentucky Medical Assistance program, Medicare Contracting Organizations ("MCOs"), and Health Maintenance Organizations ("HMOs"). This billing company was Defendant A One Biz Solutions, LLC ("A One Biz"). Both Dr. Kirti K. Jain and Mr. Manish Jain were owners of A One Biz. A One Biz was a "shell" company, having no employees. [12] The actual submission of claims was done by another company with which A One Biz contracted, located overseas in the country of India. This Indian company was A One Biz Solutions Private Limited (hereinafter, "A One Biz India").[13] Ashland BCC and Highlands CC each had its own separate contract with A One Biz India,[14] and both Manish Jain and Dr. Kirti K Jain had ownership interests in that foreign company.[15]

---

[9] *Id*. 12:16-13:1; 22:7-10.

[10] *Id*. 36:4-15.

[11] *Id*. at 21:12-21. (There is no relation between Kirti K. Jain and Manish Jain despite the same last name.)

[12] Doc. 207-17, M. Jain Dep. 29:7-34:-13, Page ID #4194-99; Doc. 215-1, K. Jain Dep 37:6-10, Page ID# 4915.

[13] *Id*. at 34:9-35:16; Page ID# 4199-4200.

[14] *Id.* at 35:11-39:7, Page ID# 4200-04;

[15] *Id*. at 39:1-4, Page ID# 4204; Doc.215-1, K. Jain Dep. 32:19-33:6, Page ID# 4910-11.

Dr. Kirti K. Jain oversaw all the medical aspects of the practice at the two cancer centers.[16] He and Manish Jain were the two persons in charge of the two centers, Manish Jain for business aspects and Kirti K. Jain for medical aspects.[17] Together they were owners of both the domestic billing company and its foreign subcontractor, thus having complete control over the entire chain of falsity: the systematic generation of the false claims, their processing and their submission to the government for payment.

### B. Up-Coding "Incident-to" Chemotherapy Services, Provided With No Physician Supervision

As discussed above, the Medicare program pays fifteen percent (15%) less for "incident to" services provided or supervised by a non-physician provider ("NPP") than it does for the same services provided or supervised by a physician.[18] If the service is provided by a nurse, technician, or other auxiliary personnel, but is *not* supervised by either a physician or an NPP, then neither the Medicare nor the Kentucky Medicaid programs will pay for the service at all. (Doc. 183-1, E.B. Kunz Dec. & Report, ¶¶ 76, 86-87; Page ID# 2729, 2732.)

The required supervision of chemotherapy services is a precondition to, and is material for, whether or not the Medicare and Medicaid programs pay for provision of the services, and in what amounts. See Declaration and Expert Report of E.B. Kunz, Doc. 183-1 at ¶¶ 12-13, 86-87; at Page ID# 2712. As explained by Ms. Elin B. Kunz in her Declaration and Expert Report: "According to a 2009 OIG report, incident-to services may put beneficiaries at risk of receiving

---

[16] Doc. 215-1, K. Jain Dep. 21:22-22:6, Page ID# 4899-900.

[17] *Id*. at 22:7-10, Page ID# 4900.

[18] https://www.cms.gov/medicare/physician-fee-schedule/search; accessible through https://www.cms.gov/apps/physician-fee-schedule/search/search-criteria.aspx. The year and state desired, the CPT Code for the service, and the indicator "PCTC" must be selected. The indicator "PCTC" means "Professional Component/Technical Component" and provides the supervision level required for billing and reimbursement purposes.

services that do not meet professionally recognized standards of care." *Id*. at ¶ 13 (citing OIG report OEI-09-06-00430 "Prevalence and Qualifications of Nonphysicians Who Performed Medicare Physician Services," August 2009).

Let us be clear at the outset: proper supervision is important. Chemotherapy therapy involves the injection or infusion of foreign substances into the human body. In the case of the chemotherapy drugs themselves, these are poisonous substances, as their purpose is to kill cancer cells with (hopefully) minimal damage to organs of the body. In the case of other "biologicals," these being drugs that are not themselves chemotherapy drugs, but are drugs used as part of cancer treatments in tandem with chemotherapy drugs (such as Leukine, discussed below, which is used to boost the immune system during chemotherapy), but there is also the risk of an "adverse" reaction sending the patient into anaphylactic shock. This can cause death.

In fact, a patient at one of Defendants' clinics, Ashland BCC, went into anaphylactic shock in January 2015 from receiving chemotherapy agents, and died two days later at the Our Lady of Bellefonte Hospital. During his deposition as a Defendant in this case, Dr. Kirti K. Jain was questioned about his deceased patient, and he professed ignorance[19]:

> **Q.** And she was taken by ambulance to the hospital on campus, correct?
>
> **A.** If she had a reaction, she might have been taken by ambulance to the hospital. That is not surprising. I do not know if it is correct. But it is a possibility. Yes.
>
> **Q.** Okay.· And she died as a result of that adverse reaction, correct?
>
> **A.** No. I do not know that is correct. I do not have records to review and tell you that.

What is curious about Dr. Kirti K. Jain's testimony, and his denial of having memory of the facts—and indeed of the ensuing wrongful death action against his center and himself

[19] Doc. 215-1, Dep. K. Jain at 78:15-24, Page ID# 4956.

brought by the patient's estate in Boyd Circuit Court, Kentucky—is that *Dr. Jain was deposed* about this patient's death in that case. His deposition took place in July 2016[20]. During that deposition, Dr. Kirti K. Jain not only acknowledged that the patient died of anaphylactic shock from drugs delivered at his cancer center, but testified that *he* was the physician who met with the patient's family about the decision to take her off of life support and *who signed her death certificate*.[21]

A similar event occurred at Highlands CC from the infusion of a contrasting agent, used for diagnostic purposes in radiation oncology, resulting in a separate lawsuit brought in 2014. Dr. Kirti K. Jain was also a defendant in that lawsuit, and deposed in November 2013.[22] (Again, Dr. Kirti K. Jain claimed in his 2016 deposition that he *did not remember* being deposed as a defendant in a prior case within the last ten years.[23]) Leaving aside the convenient nature of Dr. Jain's memory, the takeaway from these incidents is that the infusion and injection of drugs pose significant dangers to patients, patients who are often already in poor health due to their illness.

In this case, there is a dispute as to whether the chemotherapy services involved were provided without physician supervision. But this dispute does not depend solely on the Relator's testimony. Numerous witnesses with direct personal knowledge have testified that such services were provided on weekdays and weekends during times when *no* physician was present; and on

[20] Doc. 213-1, Page ID# 4701. This deposition and that case are a matter of public record. They were not obtained by Dr. O'Laughlin until after the close of discovery, and the questions put to Dr. Kirti K. Jain during his deposition in the instant case were based on other information, some of which contradicts the deposition testimony in the earlier case. For the purposes of this briefing, Dr. O'Laughlin accepts the version of the adverse event as presented by Dr. Kirti K. Jain in his deposition in the 2016 case.

[21] Doc. 213-1, K. Jain 2016 Dep. 41:22-43:18., Page ID# 4741-43.

[22] Doc. 214-1, K. Jain 2014 Dep. The Defendants were given notice of this case by means of a Request for Production of Documents pertaining to this patient and this case. An examination of Dr. Kirti K. Jain's deposition testimony in the 2016 case reveals that he denied memory of this 2014 incident and case.

[23] Doc. 213-1, K. Jain 2016 Dep. 4:13-5:9, Page ID# 4704-05.

weekends when *no* physician *or* NPP was present; and documents enable us to identify specific claims that are false.

1. No Physicians on Weekdays

When deposed, Dr. O'Laughlin testified that chemotherapy services were provided at the Ashland BCC and Highlands CC without physicians being on the premises. (Doc. 207-18, Dep. R. O'Laughlin 60:19-64:20, Page ID# 4470-74.) This is supported by the testimony of other witnesses.

With regard to chemotherapy services, Nurse Jessica Dove, who worked at Ashland BCC and who now works at the hospital at Ohio State University, explained:

> **Q.** [W]hat I'm particularly interested in is: What supervision requirements you operated – you operate under when you're providing these services.
>
> **A.** That has not been the same every place I have gone.
>
> **Q.** Okay.
>
> **A.** At OSU, we would not administer medication without a physician on-site. I was told there that we did.
>
> **Q.** You were told there that you did what?
>
> **A.** That we would administer medication without a physician on-site. It wasn't necessary to stop if they were not present.
>
> **Q.** Which facility are you speaking of?
>
> **A.** Ashland Bellefonte Cancer Center.
>
> **Q.** Who told you that?
>
> **A.** One of the other nurses.
>
> **Q.** Okay. **Is that, in fact, the practice that was ongoing while you were working there?**
>
> **A.** **Correct.**

**Q.** Okay. Do you know how often the nurses gave chemotherapy services to patients while there's no physician on-site?

**A.** I do not.

**Q.** Okay. Did you question anyone why it was being done that way?

**A.** I did. They said it was one of those-- **it's the way it's always been done**. Not a very good evidence-based-practice answer.

(Doc. 216-1, Dep. J. Dove 25:14-26:19, Page ID# 5127-28)(emphasis supplied).

Likewise, Nurse Katrina Holliman, who worked at Highlands CC, testified:

**Q.** I want to ask you about the weekdays and when you were giving infusions.

**A.** Okay.

**Q.** Were there times when there were no physicians on the premises and chemotherapy infusions were being given?

**A.** Yes.

Now, there was a nurse practitioner. Whenever we started chemo, there was always somebody there, either a physician or the nurse practitioner. Now, they didn't always stay through the whole thing.

**Q.** How do you know that?

**A.** How do I know that they were gone?

**Q.** Yes.

**A.** Well, sometimes they'd come in and say bye, and sometimes you'd go back to find them and they wouldn't be there, they'd be gone.

(207-15, K. Holliman Dep. 17:7-18:4, Page ID# 3985.) (We note that CMS regulations require supervision *throughout* a procedure that is then billed as incident to. (*Infra* at 10-11.)

And:

**Q.** To what extent was the chemo schedule for patients determined by the availability of a physician or nurse practitioner to be on the premises?

**A.** Well, we couldn't start it until they were there.

**Q.** Now, what about the availability of just a physician, regardless of whether there's a nurse practitioner on the premises?

A. I don't remember that ever being an issue. As long as [Nurse Practitioner] Stephanie [Van Dine, aka Howard] was there we could start.

(*Id*. at 53:9-22, Page ID# 4021.)

Nurse Practitioner Maryann Stephenson, who worked at Ashland BCC, also confirms that there were periods when chemotherapy services were provided to patients when no physician was on the premises, including on Thursdays when tumor board meetings took place at a nearby hospital; and when Dr. Kirti Jain traveled to India. (Doc. 210-8, Decl. M. Stephenson ¶¶ 25, 26, Page ID# 4627.)

2. No Physicians or Nurse Practitioners on Weekends

When asked whether she was aware of physician being on the premises on weekends when injections of the drug Leukine were being administered to patients, Nurse Katrina Holliman answered, "Not that I am aware of." (Doc. 207-15, K. Holliman Dep. 63:13, Page ID# 4031; see also 62:12-63:13, Page ID# 4030.)

Nurse Practitioner Stephanie Howard was even more explicit, testifying while being shown records:

**Q.** Now let's get down to February 1st, 2014 and February 2nd, 2014. This patient received Leukine on each of those days. Right?

**A.** That's what it looks like.

**Q.** According to this?

**A.** According to this.

**Q.** There's no nurse or doctor or nurse practitioner listed. Right?

**A.** Right.

**Q.** That's a weekend?

**A.** Yes.

**Q.** So do you have any understanding why there's no nurse practitioner or doctor listed?

**A.** To my knowledge, it's not required.

**Q.** Okay. Nobody would be there.

**A. Nobody would be there.**

Q. **No nurse practitioner or medical doctor. Correct?**

A. **Correct.**

(Doc. 217-1, Dep. S. Howard 104:25-105:25, Page ID# 5301-02 (bold added).)

Both Nurse Practitioner Howard and Nurse Holliman worked at Highlands CC.

Brenda Kelly, who worked at all three cancer centers, confirms that no physicians were present at Ashland BCC on weekends:

> I was familiar with the schedules of the doctors and the nurses at the three cancer centers. This information was in the centers' computers, and was common knowledge to anyone who worked at the cancer centers. Anyone working at the centers could retrieve anything of the schedules or the patients. The physicians were not scheduled to work on weekends, except for an emergency. The only emergency situations that I recall were for radiation. The nurses were scheduled to treat patients on weekends. These patients were chemotherapy patients. To my knowledge, the physicians did not come in on weekends to assess and treat patients. My work schedule was weekdays, Monday through Friday.

(Doc. 207-1, Decl. B. Kelly ¶ 9, Page ID # 3920.)

## C. Specific False Claims Identified by Dr. O'Laughlin in Four Separate Categories Demonstrate a Material Dispute with the Defendants' Assertion that Dr. O'Laughlin Has Done No More than to Prove "Routine Practice" as Opposed to Concrete False Claims.

The Defendants argue in their Motion for Summary Judgment (hereinafter, the "MSJ Motion") that all Dr. O'Laughlin can argue is that services were provided without direct physician supervision "as a matter of routine," and that establishing mere routine is not enough

to sustain a false claims action. It is true that "mere routine" is not enough, and for that reason Dr. O'Laughlin took great pains to identify *specific false claims* that were billed to the Medicare and Medicaid programs without the requisite supervision. And he accomplished this objective.

The *specific* false claims identified by Dr. O'Laughlin fall into four categories:

> (1) The 2014 1st Half Claims: Claims for services at both Ashland BCC and Highlands CC during weekdays for the periods December 27, 2013 - January 5, 2014; February 5 - May 11, 2014; May 22 - June 9, 2014; and June 26 - June 30, 2014.
>
> (2) The Ashland BCC Thursday Claims: Claims for services during the period July 1, 2012 through December 31, 2016 for Thursdays at Ashland BCC during the time period of 12:00 p.m. through 1:00 p.m. for when there was no physician on the premises, or no NPP on the premises, or neither on the premises.
>
> (3) The Highlands CC Thursday Claims: Claims for services during the period July 1, 2012 through December 31, 2016, for Thursdays at Highlands CC when there was no physician on the premises as required by the nature of the Claims.
>
> (4) The Weekend Claims: Claims for services on weekends during the period July 1, 2012 through December 31, 2016, at both Ashland BCC and Highlands CC, for when there was no physician on the premises, or no NPP on the premises, or neither on the premises.

We address each of these specific categories of claims in order:

1. Category 1: The 2014 1st Half Claims

Dr. O'Laughlin has identified specific false claims presented by the Defendants Ashland BCC and Highlands CC to the Medicare program for services provided during the period December 27, 2013 through June 30, 2014. An analysis of the evidence obtained in discovery and claims data obtained from the Medicare program establishes false claims for chemotherapy services provided at these cancer centers when no physician was scheduled to be present, *and when no physician could be present*. These claims, and the services billed through these claims

are found in Exhibits 3A (Medicare at Ashland), 3B (Medicare at Highlands), 3C (Medicaid at Ashland), and 3D (Medicaid at Highlands).[24]

Effective December 27, 2013, Dr. Fadi Hayek, who had been employed as a medical oncologist by the centers, left their employ and moved out-of-state to Indiana. Thereafter he saw no patients at these centers and did not step foot into the centers.[25] Nonetheless, the Defendants not only continued to schedule the absent Dr. Hayek to see and to supervise the treatment of patients, *but also continued to bill the Medicare and Medicaid programs in his name*.[26] More significantly, by using Master Schedules provided by Defendants in discovery,[27] Dr. O'Laughlin identified days when *no* physician was or *could be* on the premises of a particular center.

Dr. O'Laughlin was able to accomplish this for the following reasons. After Dr. Hayek left, only two physicians remained to see patients at Ashland BCC, Highlands CC, and Logan RCC[28]. These two physicians were Dr. Kirti Jain and Dr. O'Laughlin. Dr. O'Laughlin also saw patients at Logan RCC, in West Virginia; and both Dr. Kirti Jain and Dr. O'Laughlin saw patients in Ashland BCC on Thursdays, and sometimes both saw patients in Ashland BCC on

---

[24] The Defendants (again) accuse the Relator of ignoring this Court's Order to use statistical sampling to conduct discovery. However, they (again) ignore that they *previously raised this issue—and the Court not only expressly absolved the Relator* of any requirement to use statistical sampling but *ratified Relator's alternative method* for the relevant discovery. (Order at 2, 8 ¶ 1; Doc. 197 at Page ID #3008, 3014.) Further, the Defendants' attack on Dr. O'Laughlin's use of "tranches" is, at this point, irrelevant: the tranches were used as a discovery tool, and discovery is now complete (except for those documents requested earlier by Relator but still on this date withheld by Defendants). The spreadsheets discussed herein are independent of the tranches.

[25] Doc. 202-8, 1st Hayek Decl., Page ID# 3440.

[26] Going forward, Dr. O'Laughlin is not pursuing claims falsely billed under Dr. Hayek' name unless such claims are false for the separate reason that no physician was on the premises to provide supervision for the services.

[27] These schedules were requested in discovery on December 21, 2021, but were not produced until July 3, 2023.

[28] Contrary to the assertion by the Defendants, Logan RCC provided both radiation and chemotherapy services. (Doc. 215-1, K. Jain Dep. 23:22-24:7, Page ID# 4901.) Logan RCC has already settled with the Government. Thus, the remaining significance of Logan for this case is that the Defendants needed to provide a physician to be on the premises of all three centers, at a time when they had only two physicians on staff to do so. Whether these physicians were on premises to deliver or to supervise radiation or medical (chemo) oncology is not relevant: *someone* had to be there if the Defendants were to bill incident to under physician names and NPI numbers.

Tuesdays. This left numerous days when *no physician* was available to see patients at one or other of the cancer centers: a physician simply could not be in two places at the same time.

New doctors were not hired as permanent employees of the cancer centers until July 1, 2014. These new physicians were Dr. Venu Konala, Dr. Sameer Batoo, and Dr. Anshu Jain.[29] (Exhibits 4 and 5.) During the intervening period, two temporary, *locum tenens* physicians were hired, but for only very limited periods of time. These doctors were:

(1) Dr. Juergen Bertram, who was hired for the period January 5 through February 4, 2014 (Exhibit 6); and

(2) Dr. Ram Batra, who was hired for the periods May 12 through May 21, and June 10 through June 25, 2014 (Exhibit 7).

The time periods for the services for which false claims were filed were: (a) December 27, 2013 through January 4, 2014; (b) February 5 through May 11, 2014; May 22 through June 9, 2014; and (d) June 26, through June 30, 2014.

Exhibits 8 and 9 are excerpts from the Master Schedules for, respectively, Ashland BCC and Highlands CC. We use these Master Schedules to determine when physicians were, and more significantly, were *not* on the premises of the cancer centers when chemotherapy services were being provided to patients. In doing so, we are following the instructions given by Defendant Dr. Kirti K. Jain during his deposition:

> Q. How would one determine who was actually -- how would one determine what physician was actually on the premises during the time that these drugs were being administered to this patient at this time?
>
> A. If one really wanted to see who was on the premises, there are many other ways. One can do that **by the -- the schedule** that was prepared for that patient -- sorry, **for that day and for that particular physician**, by the billing records which may or may not list that physician . . . .

[29] Dr. Anshu Jain is the son of Defendant Dr. Kirti K. Jain.

(Doc. 215-1, K. Jain Dep. 62:2-11, Page ID# 4940 (bold added).)[30]

Theresa Kintigos, first an administrative assistant and now a medical assistant, confirmed that the schedules were used to determine which doctor was seeing patients at which cancer center, and when.

> Q. Does this [Medical Administrative Record[31], or "MAR"] tell you anything about which physician or physicians were on the premises of the Ashland Bellefonte Cancer Center at the time that these drugs were provided?
>
> A. This document doesn't look like it shows that. It should have had the document to say a doctor was in here. You would have to pull the schedule and see what physician was seeing patients that day.
>
> Q. Tell me about the schedules. How do they --- how would they tell you that information?
>
> A. We had a schedule of each physician and the dates and the times that the patients come in. And they were on each individual schedule. And that's how we captured them to do our billing. If the patient come in [*sic*], then they would be cued in. Once the provider saw him and done his note and the bill slip information was put in, then they're captured.

(Doc. 207-16, T. Kintigos Dep. 48:4-49:2, Page ID# 4100.)

These excerpts show when doctors were scheduled for specified centers, and they show when a physician *could not be* at one center because he was physically located at the *other* center at that time. Tables I-A and I-B, below, are summations of subsets of the Master Schedules for

---

[30] Dr. K. Jain repeated that one could use the schedule to determine when a physician was on the premises, doing so in his deposition (Doc. 215-1, 69:21-70:3, Page ID# 4947-48

> **Q.** Now, how would one determine who was actually on the premises during the delivery of either of those set of services to those two patients?
>
> **A.** Once again, I -- as I explained, there are many other ways. You can determine that by looking at the schedules, by looking at who was providing E&M services on that particular day, but certainly not from [an] MAR.

[Continued ….]

Later, Dr. Kirti K. Jain said that that one could not do this with "100 percent determination." *Id.* at 71:10-18, Page ID# 4949.

[31] As confirmed by the Defendants' expert witness, Christine Miller, the MAR is a legal document and must be accurate. (Doc. 202-2, C. Miller Dep. 109:18-110:21, Page ID# 3230-31.)

the Ashland BCC and Highlands CC cancer centers, for specific dates during February through early June 2014.

Table I-A shows days when no physician was scheduled to see patients at Highlands CC, as *both* Dr. Kirti K. Jain and Dr. O'Laughlin were scheduled to see patients at Ashland BCC. The "X" indicates when a physician was scheduled to see a patient at a specific cancer center on the specified day.

**TABLE I-A**
**(Blue)**

| | | HIGHLANDS CC | | ASHLAND BCC | |
|---|---|---|---|---|---|
| **DATE** | **WEEKDAY** | **K.K. Jain** | **R. O'Laughlin** | **K.K. Jain** | **R. O'Laughlin** |
| 2/13/14 | Thursday | | | X | X |
| 2/20/14 | Thursday | | | X | X |
| 2/27/14 | Thursday | | | X | X |
| 3/27/14 | Thursday | | | X | X |
| 4/17/14 | Thursday | | | X | X |
| 4/24/14 | Thursday | | | X | X |

Noteworthy is that for, all of the days in the table, the doctors are scheduled to see patients *on Thursdays and only at Ashland BCC*. During his deposition, Dr. O'Laughlin explained that all the physicians went to "tumor board" meetings on Thursdays, which were held at a hospital near Ashland BCC. This is supported by Nurse Practitioner Maryann Stephenson, who worked primarily at Ashland BCC, and who said in her declaration:

> Tumor Board meetings took place at Our Lady of Bellefonte Hospital. These meetings occurred on about three Thursdays a month, during lunch time from 12:00 until 13:00. Generally, all the physicians and the non-physician providers went to them. No physician or non-physician provider was left in the building at Ashland Bellefonte Cancer Center during the times of these meetings. ABCC was located on the campus of Our Lady of Bellefonte Hospital.

(Doc. 210-8, Decl. M. Stephenson at ¶ 25, Page ID# 4627.)

With regard to himself, Dr. O'Laughlin testified:

**Q.** Okay. But did you have, for scheduling purposes, did you -- were there certain days – was Monday your Ashland day and Tuesday your Highlands day, or was it more tailored than that?

**A.** It -- it was a -- usually it was a set routine. Things changed when Dr. Jain's son joined [in July 2014]. But, I mean, initially I believe I was in Ashland on Mondays, Highlands on Tuesdays, Logan on Wednesday, and then I usually go -- I -- I would stay in Ashland on Thursdays because that's when tumor board meetings are. And then I would finish the week usually in Logan.

**Q**. Where were you on Thursdays did you say?

**A.** Ashland.

(Doc. 207-18, R. O'Laughlin Dep at 36:23-37:10; Page ID# 4446-47.)

With regard to the other physicians, Dr. O'Laughlin was emphatic, explaining that *no physicians* were at *Highlands CC* on Thursdays, because they were *all in Ashland for the entire day* so that they could attend the tumor board meetings at the Hospital.

**Q.** So here where you say, "In fact physicians were not even present on the premises when the chemotherapy services were provided," you're not saying there was never an oncologist on the premises, are you?

**A.** I -- I am saying that.

**Q.** That there was never –

**A.** On Thursdays, tumor board meetings are given usually three out of the four weeks during the month. Kirti Jain's schedule was Tuesday, Thursday in Ashland. And then like I said, Monday, Wednesday, Friday, he go [*sic*] late morning to Highlands. But Tuesdays and Thursdays he was always at Ashland. Or that was his routine.

**Q.** So I'm trying to understand, then. Are you saying there was never a physician present on the premises on Tuesday?

**A.** And Thursday.

**Q.** And Thursday at –

**A**. Highlands.

(Doc., 207-18, R. O'Laughlin Dep. at 63:23-64:15.) This is borne out by entries in Table I-A.

Table II-B (below) has similar information but concerns days when (a) no physician is scheduled for Highlands CC; (b) Dr. Kirti Jain is scheduled for Ashland BCC (or no physician is scheduled for Ashland BCC); and (c) Dr. O'Laughlin is not scheduled—period.

**TABLE I-B**
**(Red)**

| | | HIGHLANDS CC | | ASHLAND BCC | |
|---|---|---|---|---|---|
| **DATE** | **WEEKDAY** | **K.K. Jain** | **R. O'Laughlin** | **K.K. Jain** | **R. O'Laughlin** |
| 2/6/14 | Thursday | | | X | |
| 3/6/14 | Thursday | | | X | |
| 3/13/14 | Thursday | | | X | |
| 3/20/14 | Thursday | | | X | |
| 4/10/14 | Thursday | | | X | |
| 5/1/14 | Thursday | | | X | |
| 5/8/14 | Thursday | | | | |
| 5/22/14 | Thursday | | | X | |
| 5/29/14 | Thursday | | | X | |
| 6/5/14 | Thursday | | | X | |

Attached as Exhibit 3B is a table of claims, and line items from these claims, billed by the Defendants to the Medicare program. The information in this table is a subset of data provided by CMS.[32] The line items (column 5[33]) are chemotherapy services (column 163) that were provided by auxiliary personnel (nurses, technicians, etc.) to patients at the Highlands cancer centers. The services (line items) are limited to those provided on the dates (column 11) appearing in Tables I-A and I-B. The services, their dates of provision, and other information

[32] This claims data is a subset of the claims data purchased by the Relator from CMS using a Data Use Agreement, and each line represents information about an individual service or supply billed to the Medicare program, directly or through a Medicare Contracting Organization. See Doc. 201, Decl. M. Hogle.

[33] The column numbers and their captions are as they appear in the original CMS Data. They have been rearranged so as to provide the relevant information in a more reader-friendly arrangement. The column numbers and their captions as they appear and are arranged in the original data set are described in Exhibit 10, a document provided by CMS with the data set.

are highlighted in colors to match the colors of the tables above for their dates. A claim (column 15) consists of all services for an individual patient that were billed together in one submission. (Usually these are services provided in a single day, but there are exceptions.) In this table, the separate claims are represented by alternating plain and bold fonts. In total for this table, there are 114 claims that are (collectively) comprised of 214 services. These are *false* claims and, for the reason that we now explain, the line items are *false statements* within these claims.

Non-chemotherapy services, including supplies such as the drugs provided with the services, are not included in this CMS data subset. All of the listed services were billed as if "rendered" by a physician having the following National Provider Identification number ("NPI"): 1952370066. This is the NPI number of Dr. Kirti K. Jain. (Exhibit 11.) Yet, as explained above, Dr. Kirti K. Jain was *not on the premises of Highlands for these days*, and therefore could neither provide nor supervise the provision of these services. Instead, they were supervised by a nurse practitioner. The claims that include these line-item services are false claims: by submitting these claims for these services as if a physician, instead of a nurse practitioner, provided or supervised them, the Defendants fraudulently "up-coded" the claims in order to capture the extra 15% reimbursement from the government.

There are four spreadsheets listing false claims:

(1) Exhibit 3A are Medicare claims for Ashland. There are 312 fraudulently billed services comprising 192 false claims identified. The total of the damages (15% of the paid amount) is $1,705.77.

(1) Exhibit 3B are Medicare claims for Highlands. There are 214 fraudulently billed services comprising 114 false claims identified. The total of the damages (15% of the paid amount) is $1,166.42.

(2) Exhibit 3C are Ky Medicaid claims for Ashland.[34] There are 107 false claims identified. The total of the damages (15% of the paid and encounter amounts) is $767.21.

(3) Exhibit 3D are Ky Medicaid claims for Highlands. There are 144 false claims identified. The total of the damages (15% of the paid and encounter amounts) is $802.45.[35]

2. <u>Category 2: The Ashland BCC Thursday Claims</u>

Dr. O'Laughlin has identified specific false claims presented by the Defendants to the Medicare program for services provided during the noon period at the Ashland BCC on Thursdays. As no physician or NPP was on the premises to supervise the delivery of drugs, the entire amounts billed for any chemotherapy services delivered in whole or in part during this period comprise damages. (This has been explained discussed above, *infra* at 10.)

When cross-referenced with the Master Schedules, the MARs obtained through discovery for the period December 27, 2013 through June 30, 2014, identify these false claims and services. Because the Defendants delayed production of the additional MARs requested by the Relator—for the periods July 1, 2012 through December 26, 2013, and July 1, 2014 through December 31, 2016—until well after the close of discovery, Dr. O'Laughlin has not yet analyzed these and reserves the right to supplement his list of false claims with relevant claims during these periods at a date closer to trial.

Subsets of the evidence obtained in discovery and claims data obtained from the Medicare program establishes false claims for chemotherapy services provided at the Ashland BCC when all of the physicians and the nurse practitioners left the premises to attend "tumor

[34] The Kentucky Medicaid claims data was obtained from the Kentucky Cabinet for Health and family Services by subpoena duces tecum. See Doc. 202, Decl. J. Bullen.

[35] Contrary to protestations made by the Defendants elsewhere in motion practice, no expert testimony is needed to introduce these spreadsheets and tables, or those described below: they are admissible under Fed. R. Evid. 1006.

board" meetings at a nearby hospital. These claims, and the services billed through these claims are found in Composite Exhibit 12. They are billing statements of the Defendants. The relevant MARs are in Composite Exhibit 13.

To specify these claims, Dr. O'Laughlin first used the Master Schedules to identify Thursdays when all doctors and the nurse practitioner were "blocked" at noon, indicating that they all were off-premises and attending a tumor board meeting at Our Lady of Bellefonte Hospital. Dr. O'Laughlin then used the MARs to identify patients who received drug infusions, as part of their chemotherapy services, during the noon hour, *i.e.*, from 12:00 noon to 1:00 pm. He then used the center's billing statements that included these services for these patients, obtained in discovery from the Defendants. Table II lists the dates, the supervising physician as specified in the MARs and the billing statements, the nurse who administered the drugs, the start and end times for the drug delivery services, and the insurance billed. The MARs used to prepare this table, and the Billing Statements that describe the false claims submitted to the Medicare of Medicaid programs, are identified by their Bates numbers as produced in discovery. Patient identification information has been withheld for privacy reasons.

**TABLE II**

| Date | Supervising M.D. | Administer by | Time Start | Time End | MAR Bates No. | Statement Bates No. | Insurance |
|---|---|---|---|---|---|---|---|
| 01/09/14 | Kirti K. Jain | S. Clark | 9:00 | 16:00 | 32279 | 31978 | WellCare of Ky |
| 01/16/14 | Kirti K. Jain | M. Brown | 12:15 | 12:15 | 33240 | 31821 | Medicare |
| 01/16/14 | Kirti K. Jain | M. Brown | 12:13 | 14:04 | 32185 | 31644 | Medicare & Medicaid |
| 02/27/14 | Kirti K. Jain | M.L. Smith | 9:55 | 13:25 | 33175 | 31756 | Medicare |
| 04/10/14 | Kirti K. Jain | S. Clark | 12:20 | 13:20 | 33159 | 31733 | WellCare of Ky |
| 04/17/14 | Kirti K. Jain | C. Lanthorn | 11:30 | 12:30 | 32105 | 31478 | Medicare |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 04/17/14 | Kirti K. Jain | M. Brown | 10:00 | 16:00 | 4869 | ROL-257 | WellCare of Ky |
| 04/17/14 | Kirti K. Jain | C. Lanthorn | 12:54 | 14:15 | 32017 | 31295 | Medicare |
| 04/17/14 | Kirti K. Jain | M. Brown | 11:27 | 13:00 | 32059 | 31382 | Medicare |
| 05/01/14 | Kirti K. Jain | C. Lanthorn | 10:19 | 15:15 | 32133 | 31561 | Medicare and Medicaid |
| 05/08/14 | Kirti K. Jain | J.L. Dove | 12:00 | 13:50 | 32193 | 31653 | Medicare & Medicaid |
| 05/15/14 | Kirti K. Jain | C. Lanthorn | 12:30 | 14:40 | 32064 | 31390 | Medicare |
| 05/22/14 | Kirti K. Jain | M.L. Smith | 9:50 | 15:00 | 32093 | 31443 | Medicare |
| 06/12/14 | Kirti K. Jain | M.L. Smith | 11:00 | 12:21 | 32069 | 31397 | Medicare |

3. Category 3: The Highlands CC Thursday Claims

Dr. O'Laughlin has identified specific false claims presented by the Defendants to the Medicare program for services provided at the Highlands CC on Thursdays. To do this, the Master Schedules for Ashland BCC, when compared to those for Highlands CC, identify days in the Highlands CC when no physicians were scheduled; and the same days at Ashland BCC when all physicians, then on staff for all centers, were scheduled.

The results of this comparison are found Exhibits 14A and 14B. These exhibits are, respectively, subsets of the billing spreadsheets obtained from CMS and Kentucky Medicaid program. There are 239 false claims identified from the CMS data; and 1,959 false claims identified form the Kentucky Medicaid data.

4. Category 4: The Weekend Claims

Dr. O'Laughlin has identified specific false claims presented by the Defendants for infusions, including Leukine injections, provided on weekends. As already discussed above, doctors were normally not scheduled to come into the centers on weekends, and therefore there are no Master (or other) Schedules indicating when they did or did not come into the centers. As

also discussed above, occasionally physicians came into the center on weekends for emergency services (chemo and radiation). For this reason, the CMS and Ky Medicaid data have been scrubbed to remove dates from consideration when services other than infusions were provided to patient: the remaining dates are the dates on which the claims that include infusions, billed under the name of Dr. Kirti K. Jain, comprise false claims: since neither a physician nor an NPP was on the premises to supervise the provision of these infusions, they were not eligible for *any* reimbursement, and the *total* amount of the charges paid by the Medicare and Medicaid program are included as damages.

There are three spreadsheets listing false claims:

(1) Exhibit 15A are Medicare claims for Highlands and Ashland. There are 1,011 false claims identified. The total of the damages (100% of the paid amount) is $261,692.41.

(2) Exhibit 15B are Ky Medicaid claims for Ashland. There are 594 false claims identified. The total of the damages (100% of the paid and encounter amounts) is $88,501.32.

(3) Exhibit 15C are Ky Medicaid claims for Highlands. There are 1,450 false claims identified. The total of the damages (100% of the paid and encounter amounts) is $190,512.60.

**D. The Defendants Have Conducted No Competent Review of Medical Records**

The Defendants claim that they have had their expert review medical records, and that this review showed that physicians were on the premises for supervision of chemotherapy services. However, pursuant to a *subpoena duces tecum*, Ms. Miller brought to her deposition copies of the medical records that she had reviewed. During her deposition, she conceded during her deposition that the records that she reviewed and brought with her were *all* within the time period of January 6 through February 6, 2014. (Miller Dep. at 152:23-153:18, Page ID# 3273-

74.) A subsequent examination of these records (Composite Exhibit ___[36]) shows that *all* are within the even shorter period of *January 13 through January 31, 2014*. But, as explained above, this time period has been excluded from Dr. O'Laughlin's assertions of false claims, so Defendants' expert's testimony on this issue is completely irrelevant.

## IV. ARGUMENT

### A. Chemotherapy Services Include Injections of Leukine

The Third Amended Complaint addresses the improper supervision of chemotherapy *services*—not merely the administration of chemotherapy drugs. (TAC ¶¶ 151). This Court's Order expressly allowed Dr. O'Laughlin to proceed with false claims for chemotherapy *services*—not merely the administration of chemotherapy *drugs*. (Order, Doc. 141 at 9-12; Page ID# 2049-52.) Indeed, the paragraph cited by the Defendants, from the Medicare Carrier's Manual Transmittal 1117, in support of their motion to dismiss the TAC and quoted by this Court in denying the relevant portion of that motion, itself draws the distinction between "chemotherapy administration" and "chemotherapy services." It reads:

> On days when a patient receives chemotherapy **administration** but the physician has no face-to-face contact with the patient, the physician may report and be paid for "incident to" **services** furnished by one of the physician's employees, **in addition** to the chemotherapy administration, if they are furnished under *direct personal supervision in the office by one of the physician's employees* and the medical records reflect the physician's active participation in and management of the course of treatment.

Order at 10, Page ID# 2050 (bold added; italics in quote as replicated in this Order).

Leukine is a drug used in chemotherapy, and an injectable dose of 50 mcg of Leukine is coded for billing purposes as "J2820." Such injection is a service subject to incident-to and

[36] These records have been redacted to erase protected health information of patients. Also, pages have been inserted so as to separate and delineate the patients.

supervision regulations. (Kunz Decl. & Report at ¶¶ 43, 42, & 45.[37]) The code for the injection of Leukine (or any other drug) is "96372."

When used as part of chemotherapy treatments, provision of Leukine is a chemotherapy service (*id*. at ¶ 42), as this drug buttresses the body's immune system during the overall period when the "chemo" drugs are administered.[38] The TAC (Doc. 124, Page ID# 1765 *et seq*.) expressly alleges that an injection (code 96372) of Leukine (code J2820) is a chemotherapy service, by alleging that the billing of such service in the manner performed by Defendants was a false claim. See TAC ¶ 151, Table XVI, Service Nos. 8-9.

In their depositions, Nurse Practitioner Stephanie Howard (aka S. Van Dine, aka S. Roberts) and Nurse Katrina Holliman, who both worked at Highlands CC; and Nurse Jessica L. Dove, who worked at Ashland BCC, *all* confirmed that the subcutaneous injection of Leukine was a chemotherapy service as used at the Centers and elsewhere. (Doc. 217-1, S. Howard Dep. 100:7-101:13, Page ID# 5298; Doc. 216-1, Dep. J. Dove 51:24-54:1, Page ID# 5153-56; Doc. 216-2, Dep. J. Dove 28:13-32:2, Page ID #5189-93; 207-15, K. Holliman Dep. 35:3-37:13, Page ID# 4003). As explained by Nurse Holliman:

**Q.** Okay.· Who would order these [injections of Leukine]?

**A.** The medical oncologists.

**Q.** Okay. Was that part and parcel to services being given to chemotherapy patients?

**A.** What does "part and parcel" mean?

**Q.** Is that part of the chemotherapy regime given to patients at Ashland Bellefonte Cancer Center?

---

[37] "Incident to" regulations for reimbursement purposes apply to the fees billed for the injection *services*, *id*. ¶¶ 42-43, not to the cost of the *drugs* injected, *id*. ¶ 45.

[38] See *Leukine Prescribing Information*, Drugs.com (https://www.drugs.com/pro/leukine.html). Use of Leukine as part of a radiation regime was only approved in 2018, for whole body or bone marrow radiation (Page ID#2873), treatments the Centers did provide. Patient "P-20," cited by Defendants, suffered instead from brain cancer.

**A.** **Absolutely.** It's important to keep patients' treatments in a timely fashion to have the anticipated and desired response.

(Doc. 216-2, Dep. J. Dove 31:16-32:2, Page ID# 5192-93) (bold added.)

And, as explained by Dr. O'Laughlin, a radiation oncologist:

**Q.** How much do you know about chemotherapy and how it's administered?

**A.** Well, there are different forms of – of treatment. Most are IV treatment, in combination. It's usually two, possibly three drugs.· Some are given orally. And then there are, you know, there are biologic modifiers. If a patient is anemic, then they'll give, you know, Neupogen, Neulasta, LEUKINE to support their -- their blood counts.

**Q.** And those are support drugs that go along with

**A.** Right.· But they're only given to chemotherapy patients.

**Q.** So those drugs wouldn't be given to anybody who's not undergoing chemotherapy?· It wouldn't be for, say, radiation or some other treatment?

**A.** No. Blood counts usually drop from chemotherapy. Some patients will become mildly anemic from radiation, but not to the same degree as chemotherapy.

**Q.** So those support drugs you were talking about, those aren't antineoplastic chemotherapy drugs, correct? They're not cancer killing, they're supporting the –

**A.** They -- they supports [*sic*] their blood counts. Right.

**Q.** Okay.

**A.** Whether it be red blood cells, white blood cells, or platelets.

**Q.** But they're -- they wouldn't be considered chemotherapy drugs, they would be support. Is that fair to say?

**A.** Yes.

(Doc. 207-18, Dep. R. O'Laughlin 38:16-22, Page ID# 4448-49; see also *id*. 105:15-106:25, Page ID# 4515-16; 121:9-12, Page ID# 4531.)

Finally, the Defendants themselves treated the administration of Leukine as a "chemo" service, demonstrated by cross-referencing the Master Schedule of Ashland BCC (Page ID# 2750) with itemized statements. On the Master Schedule, a patient (redacted name) was

scheduled to receive “chemo” at 2:15 p.m. on January 30, 2014. The patient's itemized statement shows that this patient was billed for two, *and only two items* for this day: “J2820 Leukine” and “96372 Injection Single Initial TX Drug SQ IM” (Page ID#2752). Another example occurs on a Saturday, February 1, 2014. This patient was scheduled for “chemo” (Page ID #2758), and the itemized statement (Page ID# 2774) shows that he received an injection of Leukine—but *no* other services or injections.

It is clear that, until the advent of this case motivated them to assert otherwise, Defendants themselves clearly understood that the term “chemo” included the injection of Leukine.[39]

Dr. Kirti K. Jain conceded that physicians were not scheduled to come into the centers on weekends. (*Id*. 154:13-17.) He conceded physicians were not in the office on weekends when these injections were provided, unless there were “other things to be done.” (Doc. 215-1, K. Jain Dep. 146:20-7, Page ID# 5024.) He conceded that “sometimes” there was a nurse practitioner on the premises on weekends and “sometimes” there was not. (*Id*. 150:3-6.) He conceded that these injections were billed under the name of the physician (at the maximum rate) as if the physician was supervising the service, and this was because the injections were part of the treatment plan that the physician formulated—and not because a physician was on the premises. (*Id*. 146:13-19, Page ID# 5024.).

He testified that Leukine was a drug that could be given at home, and not usually in the office (id. 140:22-25)—*a factor that takes the injection of Leukine out of not only the incident to*

[39] Defendants have argued that a Leukine injection cannot be a chemotherapy service because the instructions for this drug say to not provide it within 24 hours of the administration of chemotherapy drugs. However, the precise timing of when Leukine is administered makes no difference for defining it as a “chemotherapy service”: the drug is not “chemotherapy” *per se*, but is part and parcel of the provision of *chemotherapy services*, and thus is itself a chemotherapy service.

*benefits category, but out of all benefits categories for the Medicare Part B program*. (See *supra*.) He then conceded that when the drug was administered in the office, the cancer center billed for the administration of the drug, even though it was a drug that could be self-administered at home (*id*. 138:13-140:25), because it was done in the office.

Dr. Kirti K. Jain conceded that in billing incident to, he was billing under his own name. (*Id*. at 150:4-7, Page ID# 5028.) He conceded that, to bill incident to, one must meet the Medicare regulations. (*Id*. at 152:8-10, Page ID# 5030.) Finally, he conceded that he (and as a designated witness under Rule 30(b)(6), the cancer centers) certified that he "was billing in accord with Medicare regulations," (*id*. at 150:1-3, Page ID# 5028)—when he (and they) clearly was (and were) not.

**B. The Knowledge Element for False Billing Is in Dispute**

As discussed above, there are three alternative methods of establishing the requisite "knowledge" element of the federal False Claims Act. "Actual knowledge" is but one.

Willful blindness also meets the definition of "knowledge" under the FCA, although it is "constructive" as opposed to "actual" knowledge. *Havana Docks Corp. v. Carnival Corp*., 592 F. Supp. 1088 (S.D. Fl. 2022) (interpreting the Helms-Burton Act concerning the economic embargo of Cuba). And circumstantial evidence *in lieu* of direct evidence supporting an inference of willful blindness is sufficient to maintain a prosecution. *See United States v. Ford*, 821 F.2d 63, 74 (1st Cir. 2016) ("willful blindness" instruction may be given when "the evidence would support an inference that the defendant consciously engaged in a courts of deliberate ignorance").

Alternatively, liability may be premises on "reckless disregard" of the truth. As explained by the Eleventh Circuit (citing with approval the holdings of other circuits), for

purposes of the FCA, "reckless disregard" is "akin to 'an extension of gross negligence' or an 'extreme version of ordinary negligence.'" *Urquilla-Diaz v. Kaplan University*, 780 F.3d 1039, 1058 (11th Cir. 2015). As further explained by that Court:

> Congress added the 'reckless disregard' provision to the False Claims Act in 1986" in order "to ensure that 'knowingly' captured 'the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted.' " (quoting S. Rep. 99–345, at 21, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286).

*Id*. (quoted and applied in *Graves v. Plaza Medical Centers, Corp*., 281 F.Supp.3d 1260 (S.D.Fla. 2017).

Turning to the words of Dr. Kirti K. Jain: "I think everybody who participates in Medicare is supposed to know the regulations." (215-1, Dep. K. Jain 126:1-2, Page ID# 5004.) Then, when asked about the billing aspect of the Medicare program, he answered that he didn't care:

> And I've always focused on delivering good medical care. I could not tell you what the technicalities of minor points of billings are. But could tell you one thing, that we always, always oversaw the best interest of patients, whatever it took. And I have -- I can say that with no doubt in my mind that never have I ever compromised the care of a patient.
>
> But have I looked into every minute detail of the billing? No. *Do I care to?* No. That's not my job. That's what you hire a manager for. *So I could not tell you if I was there four hour[s]. And one hour, nurse practitioner was there. Was that transition captured for two or $3 of difference would it make? I don't know.* But I can tell you one thing, that I would not do anything to get that extra $2 or $3. It's neither worth my time nor it goes with my conscience nor would I ever advocate that.

(*Id.* at 117:6-23, Page ID# 4995 (emphasis added).)

The Medicare program requires that for full payment under its incident to provisions, the physician be *present throughout the procedure*. 42 C.F.R. § 410.32(b)(3) (expressly incorporated by 42 C.F.R. § 410.26 (Services and Supplies Incident to a Physician's Professional Services: Conditions)). At the Defendants' centers, the provision of services without physician

supervision; the “transitioning” from physician to nurse practitioner, and the provision of weekend Leukine injections without *any* supervision, physician or NPP, were not isolated incidents: this went on daily, for years, for thousands of patients. The totals for the money differentials were never insignificant. But, in the words of Dr. Kirti K. Jain: “Do I care . . . ?”

Dr. Kirti K. Jain controlled both Defendant Cancer Centers. They are his. (215-1, K. Jain Dep. 13:25-15:17, Page ID# 4891-93; Doc. 207-17, M. Jain Dep. 18:3-8, Page ID# 4183.)

As discussed above, Dr. Kirti K. Jain testified that Manish Jain was responsible for the billing. But Manish Jain testified in his deposition that he was *not* in charge—that billing was done automatically: the Electronic Health Records (“EHR”) system and the medical records system, and the billing system were all part of the same system, and the necessary information was transmitted automatically to the billing company. (Doc. 207-17, M. Jain Dep. 70:14-19, Page ID# 4235; 73:1974:11, Page ID# 4238). When asked if the name on the MAR for supervising physician was in fact the supervising physician, he answered:

> Q. Is that the name of the supervising physician that was sent to the billing system to bill for this particular service?
>
> A. I really wouldn't know. I really wouldn't know. And there is another thing here. I don't know where this name is coming from.
>
> Q. Which name?
>
> A. This supervising physician name. I don't know if it is coming from here, where it says "physician." I don't know if the -- the billing that was done was under a different physician because somebody else was there. I -- I'm so sorry. I don't know the answer to this question.

(M. Jain Dep. 68:2-14, Page ID# 4233.) And more significant, he testified:

> Q. Okay. Did the billing system have any way to verify that there was a supervising physician for a particular patient for a particular service on a particular day?
>
> A. In an automated fashion, I don't think so.

(Doc. 207-17, M. Jain Dep. 68:25-69:4, Page ID# 4233-34.)

In other words, the automated system used by the Defendants could not verify the supervising physician for a patient and service: it used the EHR and the schedules (207-17, M. Jain Dep. 73:19-74:6, Page ID# 4238) which, as we have seen above, are each internally inconsistent. And the person in charge of the billing, Manish Jain, testified that (i) he didn't know how the supervising physician names were entered into the billing system, and (ii) he knew that the billing system had no way of confirming the truth of what was being submitted to the government for reimbursement.

The Defendants maintained the necessary books and manuals so that they could keep abreast of Medicare and Medicaid regulations, and they had access to the Internet and webinars from which they could learn the requirements, including numerous incoming emails. (207-17, M. Jain Dep. 120:25-126:11, Page ID# 4285-91; 146:3-158:16, Page ID# 4311-23.).

Dr. Kirti K. Jain concede that *he didn't look at* these materials, but delegated that responsibility to his office manager, Manish Jain. (Doc. 215-1, K. Jain Dep. 161:2-163:6, Page ID# 5039-41.) However, Manish Jain testified that "no one in particular" was responsible for checking CMS (that is, Medicare) requirements. (Doc. 207-17, M. Jain Dep. 142:21-144:5, Page ID# 4307-09.) With regard to attending programs on billing Medicare, Manish Jain testified that he "probably" didn't attend: "I'm not a biller, so I probably wouldn't." (*Id*. 122:18-21, Page ID# 4287.). And when asked "who was responsible for the processing . . . of claims to Medicare," Manish Jain again answered "No one in particular." (*Id*. 158:11-16. Page ID# 4323)

And the Defendants did not have a compliance program, or at least none that the office manager, Manish Jain, could remember. (*Id*. 204:5-20, Page ID# 4369.) And no one signed up for training that was available, or at least none that Manish Jain could remember. (*Id*. 150:3-14, Page ID# 4315.)

Dr. O'Laughlin effectively contradicts the Defendants' arguments, and thus creates a material dispute, as to whether the Defendants had the requisite knowledge (*viz.,* the relatively low level of awareness required by the False Claims Act) that they were filing claims that falsely reported who were the rendering and, more importantly, the supervisory physicians:

*First*, chemotherapy services were provided without physicians on the premises and after physicians left the premises, and *everyone knew that the physicians were never on premises, or had left the premises* while chemotherapy was on going—this is **Actual Knowledge**;

*Second*, the Defendants' billing system relied on internally inconsistent schedules and MARs for determining who was the supervisory physicians for particular patients and services, and despite the fact that this was admittedly known to the Defendants, this was never fixed; and used names of physicians on the MARs as supervisory physicians who were not, and could not be on the premises—this is **Reckless Disregard**; and

*Third*, the Defendants ignored the information available to them for Medicare and Medicaid requirements, and had no compliance program and no training in place at their centers or training for their personnel—this is **Willful Blindness**.

## V. CONCLUSION

The Defendants' Motion for Summary Judgment should be denied.


By: <u>/S/ Andrew Grosso</u>
Andrew Grosso, Esq. (D.C Bar No. 358326)
*Pro Hac Vice*
ANDREW GROSSO & ASSOCIATES
1250 Connecticut Avenue NW, Suite 700
Washington, D.C. 20036
Telephone: (202) 298-6500
Email: Agrosso@acm.org

Attorney for Relator Robert C. O'Laughlin, M.D.

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Response has been served this 4th day of March 2024, by Electronic Service to all counsel of record.

/S Andrew Grosso
Andrew Grosso, Esq.