UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT ASHLAND

***Electronically Filed***

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*Ex rel.* ROBERT C. O'LAUGHLIN, M.D.<br><br>PLAINTIFFS,<br><br>v.<br><br>RADIATION THERAPY SERVICES, P.S.C. dba ASHLAND BELLEFONTE CANCER CENTER, KIRTI K. JAIN, M.D., P.S.C., dba HIGHLANDS CANCER CENTER, A ONE BIZ SOLUTIONS, LLC, MANISH JAIN, and KIRTI K. JAIN, M.D.<br><br>DEFENDANTS. | ) | CIVIL ACTION NO. 0:16-cv-148-DLB |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Come the Defendants, Radiation Therapy Services, P.S.C. d/b/a Ashland Bellefonte Cancer Center ("ABCC"), Kirti K. Jain, M.D., P.S.C. d/b/a Highlands Cancer Center ("HCC"), A-One Biz Solutions LLC, Kirti K. Jain, M.D., and Manish Jain (collectively, the "Defendants"), by counsel, and as their Reply in Support of their Motion for Summary Judgment, respectfully state as follows:

Rather than supporting the viability of his claims, Relator's Response to Defendants' Motion for Summary Judgment ("the Response") actually highlights one of the primary, and fatal, fallacies to the Relator's legal claims: namely, the lack of evidence in the record to establish with any degree of specificity any individual claims that were submitted falsely. As previously pointed out by the Defendants in their Motion for Summary Judgment, the submission of the claim is "the

*sine qua non* of a False Claims Act violation." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006). Indeed, in prosecuting a claim under the False Claims Act, it is not sufficient for a Relator "merely to describe a private scheme in detail but then to allege simply that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Id.* at 877 (internal quotation omitted). Instead, in order to establish an actionable legal claim under the False Claims Act, an FCA plaintiff must show, at a minimum, "the time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what he obtained thereby." *U.S. ex rel. Wilson v. Kellogg, Brown, & Root, Inc.,* 525 F.3d 370, 379 (4th Cir. 2008).

The Defendants' Motion accurately established that, while the Relator has opted to allege conclusory generalizations related to physician supervision at the Defendant Cancer Centers, the record is insufficient to identify a single day, much less a single claim for a chemotherapy service that was billed for which lacked the requisite supervision standards for reimbursement.[1] Rather than address these insufficiencies, the Relator's Response simply doubles-down on the overgeneralizations and conclusory statements. In the end, as explained below, not only does the Response fail to cure the deficiencies observed in Defendants' Motion, it actually demonstrates the validity of the Motion's criticisms. Summary Judgment is therefore appropriate in this case.

[1] The Response attempts to downplay Relator's refusal to abide by this Court's previous Order, which directed Relator to engage in a statistical sampling methodology to ascertain a workable number of claims to review in this case. [Doc. 224 at p. 24, FN 24, Page ID# 6668.] Whereas earlier in the case, Relator had referred to Magistrate Judge Atkins as "not infallible" when referencing Judge Atkins' ruling that Relator was to engage in statistical sampling to limit the claims that would be reviewed in this case. Relator then refused and instead identified a more refined list of claims from which to seek discovery. Relator is misleading to state that Judge Atkins "ratified" his approach in this case. To the contrary, this Court merely found that Relator's discovery was no longer so overly-burdensome as to prohibit discovery. [Doc. 197 at p. 8, Page ID# 3014.] But while allowing for discovery, Relator's approach has instead created other problems for Relator. Specifically, had Relator engage in statistical sampling to identify a sample of dates of service to determine supervision on those dates, this case may have been more manageable. But instead, Relator has cherry-picked claims to pursue. And, as shown below, Relator has failed to unearth anything in discovery that would establish a lack of supervision on any of the dates of service for these identified claims.

I. THE RESPONSE REFERENCES AN "ANALYSIS" SUPPOSEDLY CONDUCTED BY THE RELATOR WHICH IS NOT PROPERLY IN THE RECORD AND AS SUCH MUST BE DISREGARDED.

The Relator's Response makes reference to "[a]n analysis of the evidence obtained in discovery and claims data obtained from the Medicare program" which Relator contends "establishes false claims for chemotherapy services." [Doc. 224 at p. 23, Page ID# 6667.] It is not entirely clear what "analysis" Relator is referring to, as the Response makes no reference to the record to cite this "analysis." Further, the descriptions of the "analysis" are not in keeping with the record of this case.

Fed. R. Civ. P. 56(c) sets forth the requirements by which a Party must establish a factual position either in requesting or opposing summary judgment. Specifically, Rule 56(c)(1)(A) states that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion *by citing to particular parts of materials in the record*, . . . ." (Emphasis added.) The Rule goes on to provide several options to the Court in cases where "a party fails to properly support an assertion of fact;" one of which includes "grant[ing] summary judgment if the motion and supporting materials—including the facts considered undisputed is entitled to it." Fed. R. Civ. P. 56(e)(3). Indeed, the Sixth Circuit has recognized that once a movant has demonstrated through citations to the record that there exists an absence of a genuine issue of fact, "the non-moving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris,* 260 F.3d 654, 655 (6th Cir., 2001). Further, the Sixth Circuit has firmly held that a party opposing summary judgment cannot do what the Relator has done in this case. In the present action, in the days leading up to the Relator's filing of his Response, Relator filed nine separate "Notices of Filing" of documents into the court record. One of those notices included over 21 exhibits. These included numerous

deposition transcripts in their entirety and comprised thousands, if not tens of thousands of pages of evidence. Yet, despite the voluminous nature of all of these exhibits, he does not cite to any one of them when referencing this supposed "analysis". This failure is fatal to his case as the Sixth Circuit recognizes that "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479-80(6th Cir. 1989). Again, pursuant to *Morris*, the duty to cite to specific portions of the record to establish a genuine issue of fact rests upon the party opposing summary judgment.

More so, the Response's assertion that an "analysis" has been performed that somehow establishes a genuine issue of fact is not only unsupported, but it is directly contradicted by the record. Relator engaged a single expert in this case, but she performed no review. [*See* Doc. 203, pp. 17, 19 (explaining that Relator's expert reviewed two MAR, which she testified were "insufficient" for incident-to analyses, and she issued no opinion on damages or whether supervision standards were satisfied in this case). Page ID# 3466, 3468]

Instead, the Response apparently attempts to insinuate that this "analysis" was performed by the Relator, himself, stating that "Dr. O'Laughlin took great pains to identify specific false claims that were billed to the Medicare and Medicaid program." [Doc. 224 at p. 23, Page ID# 6667.] However, when Dr. O'Laughlin was deposed eleven days before the conclusion of discovery, it was apparent that no review had been performed by him or anyone else "to identify specific false claims" in this case. During his deposition, Relator was specifically asked if he could identify specific claims for unsupervised chemotherapy services. [EX 2 at 78:3-9.] Relator responded "I would say yes" before limiting those claims to the generalized category of "named physician claims" that the Court had previously dismissed, noting that Dr. Jain "can't be in two places at once." [*Id.* at 78:10-12.] Later in that same deposition, Relator was again asked about

the topic of whether "could you, as we sit here today, point to which claims are false" and (following objections from Relator's Counsel that the question "calls for legal conclusion") Relator once again referenced generalizations related to his understanding of Dr. Kirti Jain's "routine" without any specificity of any "analysis" he would have performed to identify specific claims. [Doc. 203-1 at pp. 26-27, Page ID# 3515-3516.]

The assertion by the Response that the Relator has taken "great pains to identify specific false claims" by use of some "analysis" in this case is simply not supported by the record in this case. At his deposition, which was taken a mere ten days before the close of discovery, Relator had not conducted any "analysis", nor could he articulate one that supports the results found within the spreadsheets attached to his Response. Nor does Relator cite to any portion of the record to support such a proposition. To date, the only false claims that have been in any way identified in this case have come from a series of spreadsheets produced by Relator's Counsel after the closure of discovery.[2] [Doc. 205-15, Page ID# 3904.] Relator essentially admits his counsel performed this review in other recent filings, noting that the spreadsheets that detail the alleged false claims are "summary evidence" of the analysis performed by Relator Counsel after discovery concluded which Relator's Counsel intends to introduce "by Dr. O'Laughlin himself, or by another witness." [Doc. 210 at p. 11, Page ID# 4594.] But again, this "analysis" was not performed by an expert (or any other witness available during discovery) and the damages were not calculated by an expert, nor were they properly disclosed during expert disclosures. In fact, Relator has recently equated these spreadsheets with having the weight of an expert review, as he has chastised the Defendants for not seeking leave to amend their own expert's report to deliver a rebuttal after the Relator served the product of his "analysis." [*See* Doc. 226 at p. 5 n.3, Page ID# 6696.] However, this

[2] These spreadsheets are the subject of a Motion to Exclude. [Doc. 205, Page ID# 3765].

"analysis" which resulted in a calculation of alleged damages and identification of claims were not even placed in the record during the time that discovery was pending. Instead, Relator is attempting to place these calculations and claims lists into the record *after* discovery has closed so that they cannot be subject to any further discovery into the methodology of their creation, or of their veracity. Simply put, the "analysis" that the Response so strongly relies upon is not part of the record in this case at all. As such it must not be considered in deciding this Motion.[3] Summary Judgment is therefore proper in this case.

II. THE UNDISPUTED EVIDENCE IN THE RECORD DOES NOT ESTABLISH RELATOR'S FOUR "CATEGORIES" OF FALSE CLAIMS.

Even if the Relator's proposed "analysis" were considered, the four "categories" of false claims that he identifies in the supposed damages are not supported by the record in this case. The Defendants hereby discuss each of the four "categories" in turn, below:

A. THE "2014 1ST HALF CLAIMS."

The Response indicates that, as a result of the "analysis" performed by Relator's Counsel, he has identified a number of claims which Relator posits must be false because no physician was listed on the "Master Schedules" maintained by ABCC and HCC and/or that Dr. Fadi Hayek would have been listed. [Doc. 224 at p. 24, Page ID# 6668.] Specifically Relator, in a manner never explained previously in the record, explained this portion of his analysis by stating "[w]e use these Master Schedules to determine when physicians were, and more significantly, were *not* on the premises of the cancer centers when chemotherapy services were being provided to patients." [*Id.* at p. 25 (emphasis omitted.), Page ID# 6669] The Response predicates its allegations of the falsity of these claims on three presumptions: (1) that the Master Schedules are accurate and were integral to billing; [*Id.*] (2) that there were only two physicians available to supervise chemotherapy

[3] Fed. R. Civ. P. 56(c)(2) allows for disallowance of cited materials that would not be admissible into evidence.

services at three cancer centers: ABCC, HCC, and Logan Regional Cancer Center ("LCC") [*Id.* at p. 24, n.28, Page ID# 6668]; and (3) that the Defendants only employed two substitute, or locum tenens, physicians "for only very limited periods of time" to cover for the absent Dr. Hayek until a permanent replacement was hired by the Defendants on July 1, 2014. [*Id.* at p. 25, Page ID# 6669.] Unfortunately for the Relator, however, none of these presumptions are supported by the evidence in the record.

<u>The Master Schedules</u>

First, Relator's overreliance upon the "Master Schedules" to establish physician supervision is fatal to his case, as the undisputed facts in the record clearly demonstrate that these schedules are not appropriate for this purpose. In his deposition, Dr. Kirti Jain testified that these schedules are not "intended to be used for the purpose of documenting who was supervising physician for chemotherapy supervision." [EX. 1 at 204:17-22.] Nor are these schedules used for billing purposes in any way. [*Id.* at 205:13-15.] Instead, the "sole purpose" of the schedules was to show which *patients* were scheduled. [*Id.* at 205:1-2.] The schedules were not intended to show physician presence, nor were they ever edited to show if a patient did not show up or any other change to a physician or patient schedule. In fact, Dr. Jain testified that the Master Schedule is "a stock report" and not something that the physician or nurse practitioner would have reviewed on any given day. [*Id*. at 205:4-5.] This is consistent with other witnesses as well. Medical Assistant Theresa Kintigos testified that neither she nor Dr. Jain created his schedules, and that they were "set in advance." [EX. 2 at 111:2-9.] Nurse Katrina Holliman testified that these schedules came from "the front office" and that they were patient-centric simply listing what patients were to be seen. [EX 3 at 22:13-16; 33:10-14.] Nurse Practitioner Stephanie Howard testified that physicians and nurse practitioners received their schedule of patients from "the secretary" at "the front desk."

[EX 4 at 33:2-9.] She further testified that these schedules were not created by physicians or nurse practitioners, but were created when a patient was "checked out" to schedule follow-up appointments and were not necessarily edited to reflect changes. [*Id.* at 33:19-25; 34:1-10.] Further, she also testified that physicians would regularly be on-site even if they were not scheduled to see patients. [*Id.* at 131:1-11}.]

Not only are the Master Schedules that Relator relies upon to establish physician presence or absence not intended to be used for those purposes, the undisputed facts in the record also establishes that they are not reliable. During her deposition, Nurse Howard was being questioned about a particular Master Schedule and pointed out errors that she saw on it. Specifically, Nurse Howard was pointed to a schedule for a particular day and was asked "there's no doctor listed as being present at Highlands Cancer Center on this day, is there?" To which she responded "But I'm not listed either" which highlights the errancy of the schedules because Howard pointed out that she "worked Monday through Friday" and would have been present on the day in question. [*Id.* at 64:17-25.] Medical Assistant Theresa Kintigos further called into dispute the accuracy of the Master Schedule to actually identify the physician present in the facility. Specifically, she was asked about instances where a physician on a schedule may have left the facility, and "how would that be reflected in the schedule" to which she responded "that physician may have been gone, but we always had a physician in the building" which might not have been reflected in the schedule. [EX 2 at 110:1-8.]

In the end, the undisputed record demonstrates that the Master Schedules are documents that are not part of the patient record, are not used in billing in any way, and are not created for the purpose of showing physician presence or absence in the facility. The Response attempts to mischaracterize Dr. Jain's testimony to state that he advocated for the use of the Master Schedules

to determine physician supervision [Doc. 224 at p. 25, Page ID# 6669.], but while Dr. Jain mentioned the schedules as possibly being helpful, he testified unambiguously that "The schedule would indicate who the patient was scheduled with. It would not say who is on the premises, but [only] who the patient is scheduled with." [EX. 1 at 71:7-9.] Instead Dr. Jain testified that, as far as records that would reflect physician presence at the Cancer Centers, that "the schedule does not [reflect who was on the premises]. There are billing records one can refer to" which would be indicative of whether a physician was present or not. [*Id.* at 71:11-15.] To that end, Dr. Jain testified that "knowing where the physician was providing E&M[4] services through billing records, one can get an idea of where—who was at least at that location on a given day." [*Id.* at 62:12-15.] This testimony simultaneously establishes the fallacy in Relator's reliance upon the Master Schedules to determine whether a physician was on the premises when chemotherapy was administered, while also acting as a perfect description of the methodology employed by the Defendants' expert, Cristine Miller, to determine physician supervision. [Doc. 203 at pp. 18-19; Doc. 203-14 at p. 7, Page ID# 3467-3468, 3700. ] Ms. Miller's expert review is uncontroverted, as Relator chose not to disclose any expert review to establish his theories of liability.

Only Two Physicians Covering Three Clinics

The Response indicates that part of Relator's analysis is predicated on the understanding that for the first half of 2014, after the departure of Dr. Fadi Hayek, only two physicians were providing coverage at three clinics (ABCC, HCC and LCC), and therefore physician supervision of chemotherapy could not have been occurring. From the outset, it must be pointed out that the record in this case includes testimony from the Relator, himself, that LCC is a joint venture between an entity owned by Dr. Jain and Lifepoint Hospital ("the hospital.") [EX 5 at 48:22-25.]

[4] E&M refers to evaluation and management services, which are physician services, including office visits, which require face-to-face physician/patient interaction.

Relator unequivocally testified that chemotherapy was not administered at LCC. [*Id.* at 66:2-4.] In fact, the Response admits that "[a]lthough Logan RCC is named as a co-conspirator, only radiation oncology services were provided to patients at that center…Logan RCC's role as a co-conspirator is marginal, if it [*sic*] relevant at all." [Doc. 224 at p. 7, n.2, Page ID# 6651.] It is entirely surprising therefore, that the Response thereafter, a few pages later, states that "[c]ontrary to the assertion by the Defendants, Logan RCC provided both radiation and chemotherapy services . . . Thus, the remaining significance of Logan for this case is that the Defendants needed to provide a physician to be on the premises of all three centers, at a time when they had only two physicians on staff to do so." [*Id.* at p. 24, n.28, Page ID# 6668.] To this point, the Response is self-contradictory and the proposition that LCC provided chemotherapy services is an outright falsehood. Because, as Relator testified under oath, LCC provided *only* radiation services, whether or not a physician was at LCC to supervise is irrelevant to the only claims left in this matter.[5] [EX. 5 at 66:2-4].

Relator's assertion in his Response that there were only two physicians providing coverage at three clinics in the first half of 2014 also conveniently ignores the evidence in the record regarding ABCC and HCC's employment of temporary, locum tenens physicians to provide coverage, including during the time when Dr. Hayek left the Cancer Centers. The record undisputedly acknowledges that there were several locum tenens physicians seeing patients at

[5] However, the evidence in the record establishes that LCC had appropriate physician supervision beyond Drs. Jain and the Relator. As mentioned above, LCC was a joint venture with LifePoint Hospital. [EX. 5 at 48:22-25}.] Dr. Jain testified that "the medical oncologist who was employed by [Lifepoint Hospital] was providing supervision" of radiation oncology, and this was "by contract" with the hospital. [EX. 1 at 26:17-22.] Hence, per Dr. Jain, Lifepoint Hospital (a non-party that is a separate entity from the Defendants) was responsible for providing supervision at LCC and Relator has not offered any evidence to refute this. [*Id.* at 120:1-19]. As such, Relator's assertion that there were only two physicians providing coverage at three clinics is patently contradicted by the record, which demonstrates that beyond Drs. Jain and the Relator, the hospital provided an additional physician to supervise radiation therapy services at LCC. Moreover, at this point, Relator has no actionable claims pertaining to a lack of supervision at LCC for radiation therapy. Nor can he attempt to create such a claim through his brief. Mentioning LCC in any substantive way is nothing but an attempt to muddy the waters and the Court should ignore this effort.

ABCC and HCC during this time and filling in as substitutes for the Cancer Centers' physicians on a part-time or short term basis. Relator, himself testified that the Cancer Centers used locum tenens during the time periods in this case, even though he could not testify to when they would or would not have been present. [Ex. 5, at 63: 21-22.] Nurse Howard likewise testified that the Cancer Centers employed locums during this time, including Dr. Bertram, as well as "an Indian lady," someone named "Ramon," and other "different ones [who] would come in." [Doc. 203-4 at 108:5-7; 118:22-23; 119:1-6, Page ID# 3571, 3574, 3575.] Dr. Jain testified that he recalled another locum, named Dr. Janowski, as well as "others" working at the Cancer Centers. [Doc. 203-6 at 92:16-20, Page ID#3607.] Likewise, Dr. Jain testified that Drs. Bertram and Batra may have had additional changes to their employment contracts such that their time was extended beyond what is captured in their engagement letters. [EX 1 at 102:16-20.] So the record clearly contradicts Relator's baseline assumptions about locum tenens coverage upon which he builds his theory of liability and Relator's presumption that there were not enough physicians during the time period following the departure of Dr. Hayek in the beginning of 2014 is not consistent with the undisputed facts in the record. Relator has not identified a single day where he can definitively state that no physician was present to provide supervision at ABCC or HCC.

Further, Relator's reliance upon "Master Schedules" to establish whether a physician is present or not is completely misplaced, as the record has established that the Master Schedules are not intended to document physician presence or absence, but merely are meant as a summary to show what patients are scheduled on what days. Relator's delinquent "analysis" that was provided after the expiration of discovery and after expert disclosures is therefore based upon irrelevant and unreliable information, was not subject to discovery because of Relator's untimely disclosure and is contradicted by the claims data in this case, which, as acknowledged by the uncontroverted

review of Defendants' expert witness, demonstrates that physicians were indeed present at ABCC and HCC on the days at issue in this litigation, providing services to patients and therefore on the premises to provide supervision of chemotherapy administration. Summary Judgment is therefore appropriate.

B. <u>"Thursday Claims" at ABCC and HCC.</u>

Relator next claims, as a category of false claims, that there was no physician supervision for one hour every Thursday at ABCC when all physicians went to tumor board meetings and that on Thursday, no physician was at HCC because they would always be at Ashland for the tumor board meetings. Again, Relator's citation to the record for this point are sparse, at best. Relator's entire argument for this theory of liability is predicated on the presumption that *all* physicians at ABCC and HCC went to *every* tumor board meeting in Ashland, Kentucky on *every* Thursday and *never* worked at HCC on *any* Thursday.

In an attempt to establish this extreme generality, Relator points to a declaration by Nurse Practitioner Maryann Stephenson; however this declaration does not support the generalizations that Relator contends that it does. Tellingly, Nurse Stephenson's declaration is devoid of the definitive statements that Relator proposes, but instead states that tumor board meetings were held "on about three Thursdays a month" and that "Generally" the physicians attended them. [Doc. 210-8 at ¶ 25, Page ID# 4631.] This is not entirely inconsistent with Dr. Jain's testimony that tumor board meetings were held "periodically" and that "the tumor board timing were changed time-to-time." [Doc. 203-6, 82:10-11, Page ID# 3603]. The varying nature of the tumor board meetings was supported by other witnesses' testimonies (including Relator's) and were explained at length in Defendants' Motion. [*See* Doc. 203, pp. 11-12, Page ID# 3460-3461.] This one vague statement from Nurse Stephenson is not enough to refute these.

Importantly, Nurse Stephenson's declaration does *not* state that chemotherapy was administered when physicians were absent and attending the tumor board meetings. Relator only concludes without evidence that this occurred. Instead, the evidence in the record states differently, including statements from Nurse Howard, who testified that "[the chemo nurses] would, you know, be calling or texting to find out how long it would be before we get back" so that chemotherapy administration could commence. [Doc 203-4 at 74:4-8, Page ID# 3564.] Further, Theresa Kintigos never attended these tumor board meetings and testified that, over her 15 years with the Cancer Centers, a physician had *always* been on-site any time an incident arose during chemotherapy administration. [EX. 2 at 95:2-21}] As to patients who were currently being administered chemotherapy, Dr. Jain testified that "I would first take care of the patient and then decide whether to go to tumor board or not." [Doc. 203-6 at 84:14-17, Page ID# 3605.] These witnesses' testimonies are consistent with Defendants' stance that chemotherapy was not provided if physicians were off-site attending these tumor board meetings. Nurse Stephenson's declaration of the "general" activities of the Cancer Centers is not contradictory.

Further, the Response's argument that an otherwise payable claim for chemotherapy would be non-reimbursable if a physician were to step away, even for a brief period, is not grounded in the law. This is evident in the Response, itself, which relies upon 42 CFR §410.32(b)(3) to state that "physician supervision at the specified level is required throughout the performance of the test." [Doc. 224 at p. 13, Page ID# 6657.] However 42 CFR §410.32 does not apply to the services in this case, but instead applies to "diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests." 42 CFR §410.32(a). This regulation which Relator relies upon does not in any way impute its requirements upon chemotherapy services. Relator has provided no authority for his proposition that a physician is required to be present for every minute of

chemotherapy as a condition of payment, such that if a physician steps out of the office suite for any period of time that the services are no longer reimbursable. Therefore Relator's proposition must be disregarded by the Court.

Additionally, the Response attempts to state that Relator's testimony "was emphatic" that no physicians were ever at HCC on Thursdays because they were always in Ashland to attend the tumor board meetings. [Doc. 224 at 28, Page ID# 6672.] This statement, however, is refuted by other witnesses who testified that providers attended these meetings irregularly. [*See* Doc. 203, pp. 10-11, Page ID# 3459-3460]. Further, this assertion is actually inconsistent with Relator's own testimony. Relator, himself testified that he did not attend every tumor board meeting because attending every meeting would have been "impossible" and that he missed the tumor board meetings occasionally because he was at HCC on Thursdays. [*Id.* at pp. 9-10, Page ID# 3458-3459.]

Yet again, Relator's entire case is based upon overgeneralizations that are unsupported in the record. Relator cannot establish based on the evidence that *no* physician was *ever* present at HCC on Thursdays or at ABCC during the noon hour on Thursdays. Furthermore, Relator has not identified a single day or that he definitively can state a physician was not present at either ABCC or HCC, or a single claim for chemotherapy administration that lacked the requisite physician supervision to be paid. As such, Relator, at best, may be able to articulate some theory of a scheme, but has ultimately fallen woefully short of identifying even a scintilla of evidence of a single claim to support his generalizations. Summary judgment is therefore appropriate.

C. "Weekend Claims."

The Response once again recycles much of the same arguments that the Parties have extensively briefed regarding the "weekend claims" for subcutaneous injections of the drug

Leukine, which is not a chemotherapy drug. This issue is well-pleaded and argued elsewhere in the record, including in several motions involving discovery disputes, and the Defendants incorporate those arguments by reference into their Reply, as this issue is now ripe for adjudication.

Defendants also point out that the Response fails to respond to several important points, both factual and legal, which are likewise dispositive on this matter. Legally, the Response does not address the dispositive nature of the AMA's categorization of CPT codes. Defendants explained in their Motion that the AMA has created separate categories of CPT Codes that clearly differentiates claims for subcutaneous injections of Leukine from claims for chemotherapy administration. [Doc. 203, pp 33-34, Page ID# 3482-3483]. Relator's Response ignores this point altogether, thereby waiving any argument against the controlling nature of the AMA's distinction between these kinds of treatments. Relator likewise fails to address the fact that his own expert acknowledged this differentiation, testifying that "words matter" and "the actual chemotherapy code has its own range. Therapeutic injections [have] their own range. And hydration has their own range." [EX. 6 at 71:17-22.[6]]

Further, the Response continues Relator's over-generalizations that are supported by zero facts. Relator points to a paragraph from a transmittal published by CMS in his response, but fails to interpret it correctly. [Doc. 224, p. 35, Page ID# 6679]. That transmittal says that other "incident to" services may be furnished and billed on days patients receive chemotherapy administration. "Incident to" services are not synonymous with Relator's made-up "chemotherapy services". *See* 42 U.S.C. § 1395x(s)(2)(A) (defining "incident to" services). This paragraph simply stands for the

[6] Defendants note that, while they quoted this excerpt from Ms. Kunz's deposition in their original Motion, they failed to include the relevant page. [*See* Doc. 203, p. 35, PageID#3484]. The correct page has been attached hereto and Defendants direct the Court there for this portion of Ms. Kunz's testimony.

proposition that, in addition to chemotherapy, a patient may receive additional services on the same day. This, in no way, supports Relator's arguments regarding Leukine.

Defendants do not dispute that their chemotherapy patients received Leukine. But this is not enough to make Leukine a "chemotherapy service". Relator is absolutely incorrect to state that Defendants' witnesses confirmed that Leukine is a "chemotherapy service". While they acknowledged that Leukine is provided to patients undergoing chemotherapy, they also distinguished it from chemotherapy itself. [*See* Doc. 203-4, 112:9-25; 113:1-20, Page ID# 3572-3573]; [EX. 7 at 52:5-24; 53:1-18; EX. 3 at 72:1-7]. In fact, Relator's Response, on its face, proves that the argument that Leukine is a chemotherapy service is completely illogical. The Response cites portions of the record that indicate that Leukine is a drug that can be self-administered by the patient at home. [Doc. 224 at p. 39.] But previously, the Response urges that "there is the risk of adverse reaction" with administration of chemotherapy services which can result in "sending the patient into anaphylactic shock" which "can cause death." [*Id.* at p. 17.] The Response takes pains to express that chemotherapy services carry "significant dangers to patients, patients who are often already in poor health due to their illness" and that "proper supervision is important" for chemotherapy services. [*Id.* at pp. 17-18.] But in this way, Relator's arguments seem to be so self-contradictory as to present a faulty syllogism: if chemotherapy services are as risky and dangerous as Relator would lead us to believe, it makes no sense, therefore that Leukine, a drug which the Response asserts can be self-administered in a patient's home, can be considered a chemotherapy service. Indeed, to this point, Relator's argument that Leukine is to be considered chemotherapy is logically invalid.

Moreover, the fact that Leukine is not exclusive to chemotherapy is unrefuted. Relator's response quotes his deposition transcript where he testified that only chemotherapy patients

received Leukine, but then conveniently omits the portion where Relator was asked about one of his own patients receiving radiation therapy that *also* received Leukine. [Doc. 203, p. 34, Page ID# 3483].

Relator's response overlooks most of Defendants' arguments on this issue. Instead, Relator tries to point to an administrative document created by Defendants as an attempt to argue that, for purposes of reimbursement by CMS, Leukine is a "chemotherapy service". This argument is cut from whole cloth. Defendants' annotated schedules cannot—and do not—determine the classification of drugs for Medicare reimbursement. Even if Defendants considered Leukine to be chemotherapy (which the testimonies conclusively refute), their subjective opinions would not transform Leukine into chemotherapy under CMS's billing guidelines and policies.

Clearly, though, Relator is forced to rely on these schedule excerpts because he has nothing else. He cites his expert's report for the proposition that "[w]hen used as part of chemotherapy treatments, provision of Leukine is a chemotherapy service." [Doc. 224, p. 33, Page ID# 6680]. But his expert said no such thing in her report. Instead, Relator's chosen citation is where his expert stated that chemotherapy services' CPT codes are found in a particular section of the CPT Codebook [Doc. 203-12, ¶ 42, Page ID# 3659].

Relator tries to incorporate his pleadings from the Third Amended Complaint in order to create an issue of fact on this point. But the Court is far past the point of accepting as true his allegations. The Court is not reviewing this under the more favorable Rule 12(b)(6) standard. Instead, as this Circuit has routinely explained, summary judgment requires the non-moving party to "put up or shut up." *Street*, 886 F.2d at 1478. Relator needs something more than his allegations and his failure to create anything substantive is dispositive.

The Defendants pointed out in their Motion that (i) "chemotherapy services" is not defined by any controlling source but was created by Relator; (ii) the AMA clearly distinguishes Leukine from chemotherapy; (iii) Leukine is given to chemotherapy patients *and* patients undergoing other kinds of treatments, including radiation; and (iv) Relator's broad-sweeping "chemotherapy services" definition is untenable and unsupported. His response fails to address all of these points, thereby waiving any argument against them. Relator relies on this expansive "chemotherapy services" for an obvious reason: his potential recovery increases exponentially if he can include *every* claim for Leukine for *every* weekend over a four-year period. [*See* Doc. 224, p. 34, Page ID# 6678 (stating the total amount of damages for weekend services at HCC and ABCC is $540,706.33)]. But a windfall is not enough to recognize an undefined and unsupported made-up phrase. The Court should reject Relator's "chemotherapy services" term and conclude that Leukine is not an actionable service in this matter.

Additionally, the Response continues the trend of offering presumptions, without evidentiary support, that run contrary to the record in an effort to establish his claims. Specifically, the record demonstrates that even if subcutaneous injections of Leukine were actionable, Relator cannot state that there was *never* a physician present on weekends, as the record shows that physicians regularly spent time in the clinics on weekends even if they were not scheduled to see patients. [*See* Doc. 203, p. 21, Page ID# 3470]. Once again, Relator, at best, articulates an over-generalized scheme to defraud, but falls short of identifying a single claim that would have been submitted falsely.

As is the case in each of the various "categories" of claims that the Response alleges have been identified through an "analysis" by the Relator, the record does not support falsity on any particular day. At best, the Relator has been able to develop three categories of claims where he

has articulated a theme that he can support with some facts that there *might* have been some days within that category where *maybe* a physician *might not* have been present at one or more facilities. But the record will not allow Relator to identify a single date of service where he can definitively state a physician was not present at one of the facilities. Instead, he has identified categories of dates where he feels there is a likelihood that a physician might not have been present. Unfortunately for Relator, theories liability based upon overgeneralizations and potential schemes are not enough to satisfy the requisite showing for an FCA violation. *Sanderson*, 447 F.3d at 877-78. It is well-settled that only actual, and not theoretical or conjectural, damages are recoverable under the FCA. *U.S. v. United Tech. Corp.*, 626 F.3d 313 (6th Cir. 2010). As such, a case such as the one at present, that is predicated only on overgeneralizations and not on facts relevant to specific dates and claims, most definitely lacks the requisite specificity of naming the who, what, when, and where of the fraud occurrence that would need to be shown in order for Relator to prevail. *U.S. ex rel. Wilson v. Kellogg, Brown, & Root, Inc.,* 525 F.3d 370, 379 (4th Cir. 2008). Summary Judgment is therefore merited in this case.

## III. THE REVIEW CONDUCTED BY THE DEFENDANTS' EXPERT, CRIS MILLER, IS UNCONTROVERTED AND DISPOSITIVE AND RELATOR'S ATTACKS ON HER METHODOLOGY ARE MISLEADING AND MUST BE DISREGARDED.

Continuing Relator's mischaracterizations of this case, the Response argues that "The Defendants claim that they have had their expert review medical records, and that this review showed that physicians were on the premises for supervision of chemotherapy services." [Doc. 224 at p. 34, Page ID# 6678.] Relator thereafter claims that the medical records that Ms. Miller based her opinions regarding supervision on were from a "short time period" were "completely irrelevant" and that therefore there the Defendants' expert "conducted no competent review of

medical records." [*Id.* at pp. 34-35, Page ID# 6678-6679.] This assertion, however, is nothing more than a bizarre mischaracterization of the review that Defendants' expert conducted.

This issue has been briefed through Relator's Motion to Exclude Defendants' Expert. [Docs. 202, 219, 226, Page ID# 3051, 5342, 6692]. Defendants briefly point out once again that Ms. Miller relied on her review of Medicaid claims data and *not* on any review of medical records. [Doc. 203, pp. 18-19; Doc. 203-14 at 168:21-25; 169:1-4, Page ID# 3467-3468, 3699, 3700.] To the extent that any medical record review occurred, Miller testified that she reviewed "a handful of medical records" only to reach a level of confidence that the billings in the claims data seemed accurate related to physician presence, and specifically as it related to locums. However, Ms. Miller's opinions were not in any way influenced by the medical records, but instead were based solely on the claims data. [Doc. 203-14 at 171:9-19, Page ID# 3701.] The small sample of medical records that she reviewed was only performed as an extra precaution to verify the accuracy of the claims data.[7] As it stands, Ms. Miller's review of the claims data is both dispositive and uncontroverted. Summary Judgment is therefore appropriate in this case.

WHEREFORE, Defendants respectfully request that Summary Judgment be GRANTED in their favor in this case, and the above-styled action be DISMISSED.

---

[7] It is especially curious that Relator would criticize the Defendants for not engaging in a greater review of the medical records in this case. Relator's own expert opined that the Medication Administration Records ("MARs"), which were the only medical records requested by the Relator in this case, were completely insufficient to determine whether physician supervision occurred in this case. [Doc. 203-12 at p.25, ¶91; Doc. 203-13 at 80:13-15, Page ID# 3671, 3693.] Ms. Miller agreed, which is why she did not base her opinions regarding supervision on the medical records, but instead utilized the claims data to determine whether a physician was in the particular facility on every date of service that chemotherapy was administered. Relator's expert admitted that she performed no such review. [Doc. 203-15 at p. 13, Page ID# 3716.]

Respectfully submitted,

*/s/ Christopher A. Melton*

Christopher A. Melton
Victoria Boland Fuller
cmelton@wyattfirm.com
vfuller@wyattfirm.com
WYATT, TARRANT & COMBS, LLP
400 West Market Street, Suite 2000
Louisville, Kentucky 40202
Telephone: 502.589.5235
***Counsel for Defendants***

**CERTIFICATE OF SERVICE**

I hereby certify that on **March 29, 2024,** the foregoing was electronically filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the Parties.

*/s/ Christopher A. Melton*
Christopher A. Melton

101501272.2