UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT ASHLAND

**CIVIL ACTION NO. 16-148-DLB-EBA**

**UNITED STATES OF AMERICA**
*ex rel.* **ROBERT C. O'LAUGHLIN, M.D.**                                                                **PLAINTIFF**

**v.**                                **MEMORANDUM OPINION AND ORDER**

**RADIATION THERAPY SERVICES, P.S.C., et al.**                                          **DEFENDANTS**

\* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court upon Defendants' Motion for Summary Judgment (Doc. # 203). The motion has been fully briefed (Docs. # 204 and 228). For the reasons set forth herein, the Court finds that Defendants are entitled to judgment as a matter of law.

**I.**

Robert O'Laughlin, M.D. filed this *qui tam* action on behalf of the United States under the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., based on Defendants alleged fraudulent misrepresentations to Medicare, Medicaid, and other federal programs regarding radiation oncology and chemotherapy services they provided.[1] Defendants named are Radiation Therapy Services, P.S.C. d/b/a Ashland Bellefonte Cancer Center ("ABCC"), Kirti Jain, M.D., d/b/a Highlands Cancer Center ("HCC"), A One Biz Solutions,

---

[1] The "qui tam" provision in § 3730(b) authorizes private individuals to sue on behalf of the government in order to aid in ferreting out abuses, thereby "unleashing a posse of *ad hoc* deputies to uncover and prosecute frauds against the government." *Sanderson v. HCA – The Healthcare Company*, 447 F.3d 873, 876 (6th Cor. 2006).

1

LLC, Kirti Jain, M.D., and Manish Jain.  During the relevant period, Dr. Jain served as the president of ABCC and HCC (collectively "Cancer Centers"). (Doc. # 124 at ¶¶ 9, 11). Dr. Jain is a board-certified oncologist who practices medicine in the areas of blood and cancer care, as well as internal medicine. (*Id*. at ¶ 6). The Cancer Centers provide medical oncology, hematology, and radiation oncology services. (*Id*. at ¶¶ 8, 10). A One Biz Solutions, LLC provides medical billing services for the Cancer Centers, (*Id*. at ¶ 14), and Defendant Manish Jain serves as a manager of A One Biz Solutions, LLC and ABCC, (*Id*. at ¶ 7). Dr. Jain was also a manager of A One Biz Solutions until 2009 or mid-2010. (*Id*. at ¶ 16).

O'Laughlin initiated this lawsuit on December 7, 2016. (Doc. # 1).  Following its investigation, the United States declined to intervene.  In 2019, Defendants sought dismissal (Doc. # 50). O'Laughlin then filed an Amended Complaint (Doc. # 53). Defendants filed another Motion to Dismiss (Doc. # 64). Following a hearing on the matter, the Court allowed O'Laughlin to file a Third Amended Complaint which rendered the second motion to dismiss moot. (Docs. # 123 and 124).

The Third Amended Complaint essentially alleged the same counts as its previous iterations. Counts I, III, V, and VII are related to four separate "false presentment" claims under 31 U.S.C. § 3729(a)(1)(A), which prohibits "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." (Doc. # 124 ¶¶ 47-68, 76-110, 118-163 and 171-189). Counts II, IV and VI allege false records claims under 31 U.S.C. § 3729(a)(1)(B), which prohibits "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." (*Id*. ¶¶

69-75, 111-117, and 164-170). Lastly, O'Laughlin alleges a conspiracy claim pursuant to 31 U.S.C. § 3729(a)(1)(C). (*Id.* ¶¶ 190-195).

Defendants again filed a Motion to Dismiss (Doc. # 125) which this Court granted in part and denied in part, the surviving claims being those alleged in Counts V, VI, and VIII. (Doc. # 144).

Following protracted discovery and numerous discovery-related disputes, Defendants seek summary judgment as to the remaining claims alleged against them.

**II.**

A motion for summary judgment decides the dispositive question of whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Id.* 321. If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P.56(3).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 248, (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir.1990).

### III.

The FCA imposes liability on any person who "knowingly presents" to the government a "false or fraudulent claim for payment or approval," or who "knowingly makes ... a false record or statement" in order to have "a false or fraudulent claim paid or approved by the [g]overnment." 31 U.S.C. §§ 3729(a)(1)-(2). Specifically, to sustain a claim under the FCA, Plaintiff must prove each of the following elements by a preponderance of the evidence: (1) that Defendants made a claim, or made a statement in order to get the Government to pay money on a claim; (2) that the claim or statement was false or fraudulent; and (3) that Defendants knew that the claim or statement was false or fraudulent. *See* 31 U.S.C. § 3729(a)(2). Originating during the Civil War in response to widespread fraud in wartime defense contracts, the Act has been repeatedly amended, representing "a long history of repeated congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior. *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006).

### IV.

The bulk of the Third Amended Complaint was dismissed. What remains is O'Laughlin's claim that the Defendants billed for chemotherapy services that were provided when no physician was present at the clinic. Specifically, Count V of the Third Amended Complaint alleges that Medicare pays only 85% of the physician rate of a service performed by a physician's assistant or a nurse practitioner. (Doc. # 124 ¶ 119).

4

O'Laughlin alleges that Defendants billed for chemotherapy services as if they were provided by a physician, when in fact they were neither provided by nor directly or personally supervised by a physician. (*Id*. ¶ 121). Count VI pleads a related false statement claim based upon the same allegations as Count V. (*Id*. ¶ 164). Count VIII alleges that each Defendant engaged in the conspiracy to present false claims as to Count V and Count VI.

In alleging fraud by way of "scrubbing" insurance claims, O'Laughlin essentially alleges that Defendants knew that their services were not provided in accordance with Medicare billing requirements. He has attempted thrice to demonstrate that Defendants billed for chemotherapy services when no physician was present at the clinics. Yet, despite having engaged in lengthy discovery, he fails to identify evidence of a single false claim. Indeed, during his deposition, O'Laughlin was asked if he could identify specific claims for unsupervised chemotherapy services. (Doc. # 228-2 at p. 78:3-9). He responded "I would say yes" before limiting those claims to the generalized category of "named physician claims" that the Court had previously dismissed. *Id.* at p. 78:10-12. He was later asked "could you, as we sit here today, point to which claims are false", and he, again, referenced generalizations related to his "understanding" of Dr. Kirti Jain's "routine" without any specificity and could not identify specific claims. (Doc. 203-1 at pp. 26-27). Instead, in his response to Defendants' motion, O'Laughlin broadly alleges a scheme which, in his view, is broken into three or four distinct categories of fraud. However, each "category" rests upon a shaky evidentiary foundation, conclusory allegations and speculation.

**A.**

The first category of claims asserted by O'Laughlin are claims for chemotherapy services provided on weekdays from December 27, 2013, through June 30, 2014. He contends that during this period, the Cancer Centers had insufficient staff to cover the services rendered. In support of his claim, he presents an "analysis" prepared by his counsel which purports to establish a number of claims that, in his estimation, must be false or fraudulent. Yet, his "analysis" is akin to a house built upon the sand. He relies heavily on the "Master Schedule" maintained by ABCC and HCC and summarily concludes that it establishes when physicians were or were not present when chemotherapy services were being provided. However, the record establishes that the Master Schedule is not created for the purpose of showing physician presence or absence at either facility.

In his deposition, Dr. Jain testified that these schedules are not "intended to be used for the purpose of documenting who was a supervising physician for chemotherapy supervision." (Deposition of Kirti Jain, Doc. # 228-1, p. 204:17-22). Nor are these schedules used for billing purposes in any way. *Id*. at 205:13-15. Dr. Jain testified the "sole purpose" of the schedules was to show which patients were scheduled. *Id*. at 205:1-2. He further testified that the Master Schedule is "a stock report" and not something that the physician or nurse practitioner would have reviewed on any given day. *Id*. at 205:4-5. Nurse Practitioner Stephanie Howard also testified that these schedules were not created by physicians or nurse practitioners but were created when a patient was "checked out" to schedule follow-up appointments and were not necessarily edited to reflect changes. (Deposition of Stephanie Howard, Doc. # 225-3, p. 33:19-25; 34:1-10). She further

testified that physicians would regularly be on-site even if they were not scheduled to see patients. *Id*. at 131:1-11.  O'Laughlin does not point to anything in the record which refutes the testimony that the Master Schedule was not intended to show physician presence or absence.  Rather, the undisputed record establishes that Master Schedule is a summary showing which patients – not physicians - are scheduled on which days.  His reliance upon the Master Schedule to prove physician presence or absence is misplaced and renders his "analysis" unreliable.

O'Laughlin also contends that there were only two physicians available to supervise services at three cancer centers – ABCC, HCC and Logan Regional Cancer Center (LCC).  He presumes that this proves the lack of physician supervision.  However, his testimony belies this assertion. He testified that through the end of 2013, there were at least three physicians covering the two Cancer Centers, including himself, Dr. Jain, and Dr. Fadhi Hayek. He testified that "Dr. Hayek left ABCC [in] December of 2013. And then I know Dr. Konala came on full-time later that year. It could have been June or July. And then Dr. Jain hired a full-time medical oncologist for Highlands, Dr. Sameer Batoo." (Deposition of Robert O'Laughlin, Doc. # 203-1. p. 63:14-18). He also ignores the undisputed record regarding ABCC and HCC's employment of temporary, locus tenens physicians to fill in on a part-time or short-term basis during the time period at issue. (Deposition of Stephanie Howard, Doc. # 203-4, p. 203-4 at 108:5-7; p. 118:22-23; p.119:1-6 and Deposition of Kirti Jain, Doc. # 228-1, p. 102:16-20).  In fact, O'Laughlin himself testified that the Cancer Centers used locum tenens during the time periods in this case. (Doc. # 228-5, p. 63: 21-22).  As for LCC, O'Laughlin unequivocally testified that chemotherapy was not administered at that location.  *Id.*at 66:2-4.  He explained that

7

LCC provided only radiation services and whether or not a physician was at LCC to supervise is irrelevant to the only claims left in this matter. *Id.*

O'Laughlin's "analysis" of the allegedly false claims submitted December 27, 2013, through June 30, 2014, is based upon unreliable information and is controverted by undisputed facts in the record. As such, it cannot withstand Rule 56 scrutiny.

**B.**

O'Laughlin also asserts, as another category of false claims, that there was no physician supervision on Thursdays at ABCC from 12 p.m. to 1 p.m. or on Thursdays at HCC.

With regard to ABCC, O'Laughlin maintains that physicians were off premises for an hour on Thursdays to attend "tumor board meetings" at a nearby hospital. In support of his allegation, he relies upon his "understanding of Dr. Jain's routine." However, Dr. Jain testified that these meetings were not held on each and every Thursday but were "periodic" and that he attended "very occasionally" and" not religiously." (Doc. # 203-6, p. 80:506, 81:3-7). Dr. Jain noted that while the Cancer Centers would try to get physicians to attend the meetings, they did not do so at the expense of chemotherapy supervision "because patient care came first." *Id.* at p. 83:2. For example, Dr. Jain testified that even though his written schedule may have shown that he blocked out an hour to attend a tumor board meeting, that he would not attend the voluntary meeting if he was seeing to patient care, noting that "if I had to see a patient or a patient who was scheduled before noon spilled over into the time [for the meeting], I would take care of the patient and then decide whether to go to tumor board or not." *Id.* at 84:14-17. He explained that "every physician did not go" to the meetings and "at least one physician would stay back." *Id.* at

8

p. 82: 7-18, 81:10-14). O'Laughlin, nor any other witness, testified that no physicians were present at ABCC on Thursdays from 12-1. As such, O'Laughlin's claim in this regard lacks merit.

As for HCC, he has no evidentiary support for his claim that no physician was present on Thursdays. Indeed, Ms. Howard testified "I don't know that we ever gave therapy without a physician." (Doc. # 203-4, p. 107:18-20). O'Laughlin has not identified with any specificity a single day that he can definitely state that a physician was absent from HCC or an instance of chemotherapy that lacked the requisite physician supervision.

### C.

The final category of false claims alleged by O'Laughlin is for chemotherapy services on weekends. Specifically, O'Laughlin points to the administration of subcutaneous injections of Leukine to patients on weekends without a physician present. However, the record refutes that there were no physicians present on weekends. To the contrary, there is ample testimony in the record that although physicians were not scheduled on the weekends, they were often on-site. (Deposition of Kirti Jain, Doc. # 203-6, p. 146:20-25, Deposition of Stephanie Howard, Doc. # 203-4, p. 99:7-9).

Moreover, Defendants do not dispute that Leukine was given but state that this does not qualify as a "chemotherapy service." Ms. Howard explained that Leukine is offered to immunocompromised patients in order to boost their white cell count and help them combat infection. *Id.* at p. 112:13-20. It is a simple injection that in many cases, is self-administered by the patient; Cancer Centers would only administer Leukine in the office to patients for whom self-administration was impossible or difficult. (Deposition of Kirti Jain, Doc. # 203-6, p. 136:18-25). Notably, in its categorization, the American

Medical Association distinguishes Leukine from chemotherapy. However, O'Laughlin does not address the nature of Leukine or the AMA's categorization, instead appearing to suggest that each and every service provided by the Cancer Centers on the weekends – be it Leukine or a flu shot – is a "chemotherapy service." This broad assertion fails at the summary judgment stage. The non-moving party must "designate" specific facts showing there is a genuine issue for trial. Celotex, 477 U.S. at 324. The Court is mindful that "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies. *Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 405 (6th Cir. 1992). O'Laughlin has not done so here.

## V.

O'Laughlin's claim fails at the first instance – he has not established the existence of a false claim, the essential element of his case. As such, his case is not viable. The submission of a false claim is "the *sine qua non* of a False Claims Act violation." *Sanderson,* 447 F.3d at 878. Actual evidence of a submitted claim is required in order to establish FCA liability. The FCA places the burden upon plaintiff to present actual evidence of false claims that were submitted and paid, and not merely some scheme or artifice. *Id.* Yet, the long and winding litigation of this case has yielded little in the way of evidence. Despite repeated opportunities to shore up his claims and years of discovery, O'Laughlin has failed to identify and present definitive evidence of a single false claim. Instead, he speculates that there might have been some days within that category where maybe a physician might not have been present at one or more facilities. At best, he has accused Defendants of a scheme but articulating a theory is a far cry from presenting

10

record evidence of any false claims. At this end stage of the litigation, a theory will not suffice. To defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

As the Sixth Circuit has noted, when a defendant files a motion for summary judgment, the plaintiff is challenged to "put up or shut up" on critical issues. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). As is the case with each of O'Laughlin's "categories", the record does not support a finding of falsity on any particular day. His failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," mandates the entry of summary judgment. *Celotex,* 477 U.S. at 322–23.

Accordingly, for the reasons set forth herein,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment Doc. # 203) is **GRANTED**. A Judgment in favor of the Defendants will be entered contemporaneously herewith.

This 19th day of September 2024.

Signed By:
David L. Bunning
United States District Judge

G:\Judge-DLB\DATA\ORDERS\Ashland Civil\2016\16-148 MSJ.docx