RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0232p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA *ex rel.* ROBERT C. O'LAUGHLIN, M.D.,

*Relator-Appellant*,

*v*.

RADIATION THERAPY SERVICES, P.S.C., dba Ashland Bellefonte Cancer Center; KIRTI K. JAIN, M.D., P.S.C., dba Highland Cancer Center; A ONE BIZ SOLUTIONS, LLC; KIRTI K. JAIN, M.D.; MANISH JAIN,

*Defendants-Appellees*.

No. 24-5898

Appeal from the United States District Court for the Eastern District of Kentucky at Ashland.
No. 0:16-cv-00148—David L. Bunning, District Judge.

Argued: May 6, 2025

Decided and Filed: August 21, 2025

Before: BOGGS, GRIFFIN, and NALBANDIAN, Circuit Judges

---

**COUNSEL**

**ARGUED:** Andrew Grosso, ANDREW GROSSO & ASSOCIATES, Washington, D.C., for Appellant. Christopher Melton, WYATT, TARRANT & COMBS, LLP, Louisville, Kentucky, for Appellees. **ON BRIEF:** Andrew Grosso, ANDREW GROSSO & ASSOCIATES, Washington, D.C., for Appellant. Christopher Melton, Victoria Boland Fuller, WYATT, TARRANT & COMBS, LLP, Louisville, Kentucky, for Appellees.

---

**OPINION**

---

NALBANDIAN, Circuit Judge. Dr. Robert O'Laughlin brought this qui tam action on behalf of the United States under the False Claims Act. He claimed that his former employers, providers of radiation and chemotherapy services, fraudulently billed Medicare and other federal programs. He alleged that they falsely represented that their services were either supervised or performed by qualified physicians. The district court dismissed some claims and, after discovery, granted summary judgment for the defendants on the rest. O'Laughlin appeals both rulings. Because the district court correctly rejected his claims, we AFFIRM.

**I.**

**A.**

Dr. O'Laughlin was a radiation oncologist practicing out of three cancer centers in Kentucky from July 2012 until about October 2015. Through his work, O'Laughlin claimed to have learned that his employers were submitting false claims to Medicare and other federal programs. So in December 2016, he brought a qui tam action on behalf of the United States under the False Claims Act (FCA), 31 U.S.C. § 3729. The United States investigated and reached a settlement with one of the centers, Logan Oncology Care, in 2019. But it declined to intervene in O'Laughlin's remaining claims. So O'Laughlin moved forward on his own, and the remaining defendants moved to dismiss. O'Laughlin responded with an amended complaint, and the defendants again moved to dismiss. The court granted that motion in part and denied it in part, leading O'Laughlin to file a second and then third amended complaint, with the third amended complaint being the operative complaint in this appeal.[1]

---

[1]After O'Laughlin amended his complaint and the defendants moved to dismiss, the district court dismissed certain counts from O'Laughlin's amended complaint with prejudice. But in O'Laughlin's third amended complaint he "essentially allege[d] the same counts as its previous iterations" so the district court again considered the previously dismissed counts and rejected them for the same reasons as in the court's first opinion. So we treat the third amended complaint as the operative complaint on appeal.

The third amended complaint named five defendants: Dr. Kirti K. Jain; Manish Jain; Radiation Therapy Services d/b/a Ashland Bellefonte Cancer Center (Ashland BCC); Highlands Cancer Center (Highlands CC); and A One Biz, a medical billing company. During the relevant time, Kirti Jian was the director of both Ashland BCC and Highlands CC. And Manish Jain was a manager at Ashland BCC, Logan CC, and A One Biz. K. Jain also served as a manager at A One Biz.

The eight counts boiled down to claims that the defendants fraudulently represented that their services were either supervised by or performed by qualified physicians. The claims fell into two groups: claims for radiation services and those for chemotherapy services.

**B.**

Begin with the radiation-services claims. These claims covered counts I, II, III, IV, and VII.[2] Three of these counts related to radiation therapy and simulation services. O'Laughlin said that Medicare only allowed a radiation oncologist or radiologist to perform the professional component of radiation therapy and simulation services. And he claimed that no such qualified radiologists were present at the cancer centers when those services were done. So, he argued, any billing to Medicare for those services was necessarily fraudulent.

But the district court disagreed, dismissing these claims after finding that O'Laughlin did not show that a *specific type* of physician must perform these services. Because performance by a radiologist or radiation oncologist was not a material precondition of payment for the Medicare claims, the court dismissed the three counts (counts I, II, and VII) that relied on this argument.

The next two radiation-services claims dealt with the defendants' allegedly fraudulent billing practices (counts III, IV). O'Laughlin claimed that no physician either supervised or performed the services described in certain billing codes as 'physician services' because no physician was on site at the time. But the district court found that this allegation was

[2]Count I alleged false claims and count II alleged false statements related to radiation therapy services. Count VII alleged false claims related to simulation services. All three counts were based on the same theory of liability and underlying facts.

Count III alleged false claims and count IV alleged false statements related to what O'Laughlin called "absent physician" claims. Both relied on the same underlying facts.

"bare-bones" and inadequate to state a claim. R.141, Op. & Order on 3d Mot. to Dismiss, p.9, PageID 2049. And because O'Laughlin did not address any of the defendant's arguments on these counts in his response to the defendants' motion to dismiss, the district court considered counts III and IV waived and dismissed them.

**C.**

For his chemotherapy claims,[3] O'Laughlin claimed that the defendants billed Medicare as if physicians were performing chemotherapy services, when really, either a nurse practitioner or a physician's assistant performed the services. The district court allowed these claims to survive through discovery. After more than a year of discovery battles, the defendants moved for summary judgment, claiming O'Laughlin did not produce evidence of a single fraudulent claim. In response, O'Laughlin presented four "categories" of false claims.[4]

*Category One*. O'Laughlin claimed that on weekdays from December 27, 2013, to June 30, 2014, the centers billed federal programs as if physicians administered chemotherapy services when either no physicians were scheduled to work, or none could have worked at a center. To draw this conclusion, O'Laughlin used what he called a "triangulating" method—he compared the centers' employment practices, Master Schedules, and billing records. Appellant Br. at 16–22.

Based on this data, he argued only two physicians were spread across three centers. And because "a physician simply could not be in two places at the same time" no physician was available to see patients at the third cancer center. R.224, Resp. to Mot. for Summ. J., p.22. But the district court rejected this analysis because it hinged on the faulty inference that the Master

[3]Count V alleged false claims and count VI alleged false statements. Both relied on the same underlying facts.

[4]O'Laughlin presented the false claims in what he called "summary charts." The defendants moved to exclude these charts. While O'Laughlin claimed the charts were made based on his own expertise, the defendants found that he could not answer basic questions about the methodology, and so they say the charts were really the work of his attorney. And sure enough, when asked about the methodology, O'Laughlin invoked attorney work-product protection. So the defendants said O'Laughlin was trying to use his attorney as his expert and moved to exclude the charts. The district court did not separately rule on the motion but called O'Laughlin's "'analysis' unreliable" because of the data it was based on. R.234, Op & Order on Mot. for Summ. J., pp.6–7, PageID 6926–27. While the parties' briefing dedicates much attention to whether the charts should be excluded, we agree with the district court that a separate discussion of this issue is unnecessary.

Schedules correctly reported a physician's actual location at all times. O'Laughlin assumed that a physician scheduled to work at a particular center must have *actually* worked at that center at that time. But the district court found the record did not support that inference. The centers did not update the schedules to reflect personnel changes and the schedules were never designed to reflect when a *physician* would be present, only when a *patient* would be present.

O'Laughlin's theory also only accounted for two locum tenens physicians working at the centers, not several others discussed in the record. So there was little to suggest that two physicians were spread across three centers and O'Laughlin could not point to any specific day where a center lacked a physician.

*Categories Two & Three.* O'Laughlin's next two categories of false claims dealt with Thursday coverage. Category two covered chemotherapy services at the Ashland BCC during the noon hour. He claimed that every Thursday at noon all physicians attended a one hour "tumor board" meeting at a nearby hospital. As a result, no physicians could oversee chemotherapy at that center during that hour. Category three covered chemotherapy services at the Highlands CC all day on Thursdays. O'Laughlin said every physician was scheduled to work at the Ashland BCC that day so that they could attend the board meetings. For both claims, O'Laughlin relied on the Master Schedules, which showed that all physicians were scheduled to be at Ashland BCC on Thursday and had a "block" on their schedules for the noon hour.

The district court also rejected these claims. The court again found the Master Schedules unreliable indicators of which physicians were at the centers on any given day or time. And testimony from various doctors—including O'Laughlin—confirmed that physicians did not attend the meetings regularly regardless of if the time was blocked on their calendar. Because O'Laughlin could not definitively point to a single day that he could say a physician was absent from either center because of the meetings, the court found the claim lacked merit.

*Category Four.* The final category dealt with weekend claims. O'Laughlin claimed that no physicians worked on weekends unless there was an emergency. But the centers nonetheless regularly administered Leukine injections on weekends—a "chemotherapy service" that

O'Laughlin said needs a physician's supervision. And since no physicians were on site, none of these services were eligible for reimbursement.

Again, the district court found this claim lacked merit. It determined that Leukine is not a chemotherapy service and so did not require a physician to administer or supervise. Instead, it is a simple, usually self-administered injection offered to immunocompromised patients to boost their white-blood-cell count. And the centers only administered it to patients who couldn't do it themselves. So this category could not survive either.

Finally, O'Laughlin alleged a conspiracy count related to the facts underlying the radiation claims (count VIII). Since O'Laughlin had pleaded sufficient allegations that—taken as true—made out a claim of conspiracy, the district court allowed this claim to go forward.

Because each category of claims failed, the district court concluded that O'Laughlin did not show the existence of a single false claim. And that is necessary to an FCA claim, so the court granted summary judgment to the defendants.

O'Laughlin appealed both the district court's dismissal on the radiation-services claims and its grant of summary judgment on the chemotherapy claims.

## II.

O'Laughlin alleged two types of FCA violations: false claims for payment under 31 U.S.C. § 3729(a)(1)(A), and false statements under 31 U.S.C. § 3729(a)(1)(B). Section 3729(a)(1)(A) imposes liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." To state a claim, the complaint must allege "(1) a person present[ed], or cause[d] to be presented, a claim for payment or approval; (2) the claim [wa]s false or fraudulent; and (3) the person's acts [were] undertaken 'knowingly,' i.e., with actual knowledge of the information, or with deliberate ignorance or reckless disregard for the truth or falsity of the claim." *United States ex rel. Prather v. Brookdale Senior Living Cmtys.*, 838 F.3d 750, 761 (6th Cir. 2016) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 640 (6th Cir. 2003)).

Relatedly, § 3729(a)(1)(B) provides liability for "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

Both subsections rely on the relator alleging "an actual claim made to the government." *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 916 (6th Cir. 2017) (internal quotation marks omitted). "[I]t is insufficient to simply plead the scheme, [the relator] must also identify a representative false claim that was actually submitted to the government." *Id.* at 914 (internal quotation marks omitted). Even a "complex and far-reaching fraudulent scheme" must come with "examples of specific false claims submitted to the government pursuant to that scheme." *Id.* (internal quotation marks omitted). Put simply, "a fraudulent claim is the *sine qua non* of a False Claims Act violation." *United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 447 (6th Cir. 2008) (internal quotation marks omitted).

Both parties agree that "[t]he FCA reaches claims submitted by healthcare providers to Medicare." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011). Medicare Part B deals with doctors' services and outpatient care. *See* 42 U.S.C. §§ 1395j–1395w. The Department of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS) administers the Medicare Program. And CMS reimburses medical claims through fiscal intermediaries. *See generally id.* § 1395u. As relevant here, Medicare Part B reimburses "physicians' services," including radiation therapy services, that are "reasonable and necessary." 42 U.S.C. §§ 1395x(q), 1395y(a)(1); 42 C.F.R. § 410.20(a); 42 C.F.R. § 410.35. But not all services are reimbursed at the same rate. *See* 42 C.F.R. § 405.520. When a nurse practitioner or physician assistant performs a service, CMS will reimburse up to 85% of the amount payable to a physician. *Id.* § 414.56, 414.52. And billing at the higher physician rate for services performed by a nurse could be fraudulent.

**A.**

The district court found that O'Laughlin failed to state a claim on his radiation-services theories. FCA complaints are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Prather*, 838 F.3d at 760. The relator must plead "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). We review the district court's dismissal

de novo. *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 407 (6th Cir. 2016). And in the qui tam context, like with most motions to dismiss, we "construe the complaint in the light most favorable to the [relator], accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face." *Prather*, 838 F.3d at 761.

**1.**

We begin with O'Laughlin's counts related to radiation and simulation services. O'Laughlin admits that the same analysis applies to his radiation-therapy claims in counts I and II as his simulation-services claim in count VII. For both, he alleged that the defendants falsely certified their compliance with Medicare rules.

When compliance with a statute is a prerequisite for payment, failure to comply may make a claim under the statute fraudulent. *Chesbrough*, 655 F.3d at 467. This is the "false certification" theory of FCA liability. *Id.* But "a health care provider's disregard of Government regulations" alone does not create liability. *Prather*, 838 F.3d at 768. Instead, "noncompliance constitutes actionable fraud only when compliance is a *prerequisite to obtaining payment*." *Chesbrough*, 655 F.3d at 468 (emphasis added). So to allege a false-certification theory of FCA liability, the complaint must allege the defendant did more than "merely request payment" when filling out a claim. *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 190 (2016). The claim must implicitly "make[] specific representations about the goods or services provided," and "the defendant's failure to disclose noncompliance with material statutory . . . requirements" must make those representations misleading. *Id.*

O'Laughlin's false-certification theory fails because the law does not impose the requirements he claims. He alleges the centers allowed unqualified physicians to perform and supervise radiation and simulation services, so they did not follow Medicare rules and falsely certified to their compliance when submitting claims. But Medicare does not limit qualified physicians the way O'Laughlin says that it does.

CMS divides radiation services into two components: professional and technical. "[A] physician having appropriate qualifications" must perform professional components.

R.124, 3d Am. Compl., p.11; *see also* Medicare Claims Processing (MCP) Manual, Ch. 13, § 20.1. But a radiation therapist, nurse practitioner, or physician's assistant working under the supervision of a qualified physician can perform technical components. But the Medicare Claims Processing (MCP) Manual does not limit what makes a physician "qualified" to perform professional services or supervise technical services. It does the opposite; it says that any physician may perform radiation services "regardless of the specialty of the physician who performs the service." MCP Manual, Ch. 13, § 20.1.

O'Laughlin does not dispute this. Instead, he takes several steps, looking to a patchwork of federal and state authorities, to argue the law is more limiting than the MCP Manual's language suggests. First, O'Laughlin looks to 42 C.F.R. § 410.26(b)(7), which requires that reimbursable services "must be furnished in accordance with applicable State law." Then he argues that the applicable state law (Kentucky) requires that a radiologist or radiation oncologist perform or supervise radiation services either on its face or by incorporating industry practice standards.

There are several problems with this argument. First, § 410.26 doesn't apply to radiation services. Second, even if it did, Kentucky law likely does not impose the requirement O'Laughlin claims. And finally, even if he could clear these hurdles, O'Laughlin does not take the final, necessary step of showing this so-called requirement is a material precondition of payment.

We start at the federal level, where O'Laughlin tries to find support for his theory that CMS mandates compliance with state law for the centers to receive reimbursement for radiation services. Section 410.26(b) specifies that "Medicare Part B pays for services and supplies incident to the service of a physician" if the services meet certain requirements (one of those requirements being compliance with state law). But the section's definition for "services and supplies" covers those services "that are included in section 1861(s)(2)(A) of the Act and *are not specifically listed in the Act as a separate benefit included in the Medicare program*." § 410.26(a)(8) (emphasis added). Radiation-therapy services have a separate benefit category. *See* 42 U.S.C. § 1395x(s)(4) (separately listing "[x]-ray, radium, and radioactive isotope

therapy"). So it is not a service or supply regulated under § 410.26, and O'Laughlin's reliance on the section to lead him to state law is misplaced.

But even if § 410.26's requirements applied to radiation therapy, it's not clear that Kentucky law requires a radiologist or radiation oncologist to perform or supervise these services either. O'Laughlin first looks to Kentucky Administrative Regulation 201 KAR 46:040 § 1 (2015),[5] which regulates individuals performing radiation therapy "while under the direct or indirect supervision of a licensed practitioner of the healing arts as specified by practice standards, by scope of practice, and in the ACR-AAPM Technical Standard For The Management of The Use of Radiation in Fluoroscopic Procedures." He says the "scope of practice" language implied that the supervising physician's practice must be the delivery of radiation oncology.

Kentucky law defines both "licensed practitioner of the healing arts" and "scope of practice." A "licensed practitioner of the healing arts" is "a person licensed in Kentucky to practice medicine, osteopathy, dentistry, chiropractic, podiatry, or veterinary medicine." Ky. Rev. Stat. Ann. § 311B.020(8) (West 2012). And a "scope of practice" means "the parameter of the specific practice." 201 KAR 46:010(46) (2015). So reading the two provisions together, perhaps "scope of practice" narrows the broad category of "licensed practitioner of the healing arts" to only those licensed practitioners who practice radiology (i.e., radiologists or radiation oncologists).

But other provisions in the law make this questionable. Kentucky defines radiation therapy as "the therapeutic administration of ionizing radiation by a radiation therapist." *Id.* at 46:010(40). Missing from the definition of "radiation therapist" is any specific physician-supervision requirement, which other provisions explicitly include. *Compare* Ky. Rev. Stat. Ann. § 311B.020(15) (defining radiation therapist), *with* 201 KAR 46:010(44) (defining "radiologist assistant" as someone "who works under the supervision of a radiologist"), *and* 201 KAR 46:010(27) (defining "nuclear medicine advanced associate" as someone "who works under the supervision of a radiologist or nuclear medicine physician"). Similarly, Kentucky's

[5]These regulations were amended in November 2017, but the claims here only concern the 2015 version of the regulations and statutes.

regulations defining direct and indirect supervision contemplate oversight by "a licensed practitioner of the healing arts," but nothing more specific than that. So a rule that a radiation therapist must be supervised by a radiologist or radiation oncologist seems out of place with the larger regulatory language.

O'Laughlin tries to cure any defects in the regulatory language with yet another move. He points to 201 KAR 46:040 § 11, which required that licensed individuals conform to practice standards. And he claims practice standards support his supervision requirement. The defendants argue about both how much the regulations incorporate state practice standards and whether the state practice standards actually require supervision by a radiation oncologist. But we need not dive into Kentucky's practice standards as O'Laughlin suggests because he doesn't show, or even suggest, that compliance with these standards is a prerequisite for payment under federal programs.

To succeed on a false-certification theory, O'Laughlin must show that the defendants' compliance with the supervision requirement was a *prerequisite to obtaining* payment. *Chesbrough*, 655 F.3d at 468. "[G]arden-variety . . . regulatory violations" or noncompliance that is "minor or insubstantial" will not lead to liability. *Universal Health Servs.*, 579 U.S. at 194. The noncompliance must amount to materially misleading a regulatory official. *Id.* And O'Laughlin provides no argument that the defendants' alleged noncompliance rises to this level.

Sure, § 410.26(b)(7) says services "must be furnished in accordance with applicable State law." But a statement is not materially misleading "merely because the Government designates compliance with a particular statutory [or] regulatory . . . requirement as a condition of payment." *Universal Health Servs.*, 579 U.S. at 194. O'Laughlin must allege that the defendants misrepresented their compliance with state requirements "that are so central to the provision of [reimbursement] that the Medica[re] program would not have paid these claims had it known of these violations." *Id.* at 196. And for that, O'Laughlin has nothing besides the single sentence from § 410.26 saying services must conform with state law.

O'Laughlin does not attempt to argue that using the wrong *type* of doctor under state law (rather than no doctor at all) stretches beyond minor or insubstantial noncompliance with federal

regulations. O'Laughlin points to nothing to show that if Medicare knew the wrong type of supervising physician was used, it would withhold payment for the centers' otherwise lawful claims. So O'Laughlin has not met his burden. Because Medicare does not require a radiologist or radiation oncologist to perform or supervise radiation services as a material precondition for payment, O'Laughlin cannot state an FCA claim against the defendants on these counts.

**2.**

For the next two counts, O'Laughlin alleged that the defendants fraudulently billed radiation services as if a physician performed them when no physician provided the services, supervised the services, or was even on site for them. He calls these "Absent Physician claims" because he says a physician's name was listed on the bills, but no physician was there to supervise or provide the services. He adds that these "statements and representations were preconditions and material for the payment of these claims." R.124, 3d Am. Compl., p.31.

The defendants responded that only two of the allegedly fraudulently billed codes involve professional components—the rest are technical components that do not require a physician to perform or supervise. And the two professional codes relate to the interpretation of radiological procedures and need not be performed on the premises to be reimbursable. So even if the bills had an absent physician's name on them, it would either be proper because technical components don't require a physician or proper because the physician could perform the service remotely. O'Laughlin didn't respond to this argument in either his response to the motion to dismiss or when the defendant's raised it again on appeal. He has also never provided any relevant regulation or federal law to support his claim that the physicians' names were "preconditions and material for the payment of these claims." R.124, 3d Am. Compl., p.31.

Instead, O'Laughlin claims the district court blessed his argument in an earlier opinion with a sentence distinguishing professional and technical components. We disagree. In a different discussion about the other radiation claims, the court acknowledged that physicians often perform professional components and therapists perform technical components under supervision. R.76, Op. & Order on 2d Mot. to Dismiss, pp.10–11, PageID 775–76. But that dicta about components does not address O'Laughlin's specific claims here. Nor does it absolve

O'Laughlin of his responsibility to respond to the defendants' arguments on these claims. So his argument that he "relied upon" the district court which now "reversed itself" is unavailing. Appellant Br. at 56.

Because O'Laughlin has not defended either the law or the facts behind these counts, he has abandoned them. *Doe v. Bredesen*, 507 F.3d 998, 1007 (6th Cir. 2007). Despite multiple opportunities, O'Laughlin's allegations do not rise above "mere assertions and unsupported . . . conclusions." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006). So the district court correctly dismissed these claims.

* * *

The district court correctly dismissed O'Laughlin's radiation services claims under the FCA.

**B.**

Next O'Laughlin appeals the district court's grant of summary judgment to the defendants on his chemotherapy claims. After discovery, the court concluded O'Laughlin failed to present evidence of a single false claim.

We review a district court's grant of summary judgment de novo. *Smith v. Newport Utils.*, 129 F.4th 944, 948 (6th Cir. 2025). A court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must draw "all reasonable inferences in favor of the nonmoving party." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020). And "must consider whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is not enough. *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "[T]here must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting *Anderson*, 477 U.S. at 252).

Recall the FCA's bedrock requirement that a relator show "a representative false claim that was actually submitted to the government." *Ibanez*, 974 F.3d at 914 (internal quotation marks omitted). It is not enough to allege a fraudulent scheme. *Id.* "[A] fraudulent claim is the *sine qua non* of a[n] [FCA] violation." *Marlar*, 525 F.3d at 447 (quoting *Sanderson*, 447 F.3d at 878).

O'Laughlin alleged hundreds of false claims falling into four categories. Each category shows a different way to commit the same type of Medicare fraud: inflated reimbursement for services. Under Medicare rules, when a nurse practitioner or physicians' assistant performs a service, CMS will reimburse up to 85% of the amount payable to a physician. 42 C.F.R. §§ 414.56, 414.52. But when a physician performs the same service, CMS will reimburse the full amount. O'Laughlin alleged that in the first three categories of claims, the centers billed services at the physician's rate when no physician was on site to perform the service. And in the last category, he said the claims were ineligible for any reimbursement.

**1.**

O'Laughlin claimed that on certain weekdays from December 27, 2013, to June 30, 2014, the centers submitted Medicare claims indicating that physicians administered chemotherapy services when either no physicians were scheduled to work, or none could have worked at a center. This date range stood for the time between when Dr. Hayek left the centers and new physicians were hired. O'Laughlin also excluded certain dates when two temporary physicians were working. That left three cancer centers with only two physicians—O'Laughlin and K. Jain. From there, O'Laughlin used the Master Schedules to find specific claims for specific patients that had to be false because the physicians were scheduled elsewhere. And to bolster this analysis, he pointed to testimony describing the "practice at the . . . cancer centers to administer chemotherapy services without physicians being present." Appellant Br. at 15.

The evidence does not support O'Laughlin's conclusion and does not point to any specific false claims. First, O'Laughlin's claim that there were only two physicians working across three centers is unsupported. After Hayek left, O'Laughlin admits that the center hired temporary physicians (locum) when "there was a . . . gap" in coverage. R.207-18, O'Laughlin

Dep., pp.103–04, PageID 4512–13. In his briefing, he pointed to two temporary physicians, Dr. Bertram and Dr. Batra, who worked at the centers. And says he "backed-out" the dates they were employed from his claims. Appellant Br. at 19.

But O'Laughlin also admitted in his deposition that he never met or worked with any of the temporary physicians. And other witness testimony said that the centers employed other locums that O'Laughlin (at best) did not know about. Nurse Stephanie Howard remembered "an Indian lady" that came in (both Bertram and Batra are men), a man named Ramon (neither Bertram nor Batra's first name), and other "different ones" who came in. R.217-1, Howard Dep., pp.118–19, PageID 5315–16.[6] She also said the centers used locums "off and on" "for it all" including when K. Jain or another physician were out. *Id.* at pp.120–21, PageID 5317–18. And the locums' schedules would change regularly "according to what coverage [the centers] needed." *Id.* at p.65, PageID 5262. As a result, she said that she didn't know of any instances after Hayek left when the centers "ever gave chemotherapy without a physician" present. *Id.* at p.107, PageID 5304.

K. Jain also said the centers "had several locums who were covering" after Hayek left. R.215-1, K. Jain Dep., p.71, PageID 4949. He named Bertram, Batra, and another locum, Dr. Janowski. Medical Assistant Theresa Kintigos also testified that the centers had locums after Hayek left and before other physicians began working full time. And there was "[n]ever a time that [she] was aware of" when neither Hayek, Bertram, nor Batra were working at the centers. R.207-16, Kintigos Dep., p.29, PageID 4081.

O'Laughlin's only response is to raise the testimony of other witnesses who alleged a "practice" of administering chemotherapy without a physician being present. Appellant Br. at 15. But in each of these depositions, the witnesses could not provide any specific dates when this may have occurred. For example, Nurse Jessica Dove said the nurses "would administer medication without a physician on-site." R.216-1, Dove Dep. I, p.26, PageID 5128. But she could not say how often this occurred, name any day when it may have occurred, or name any

[6]Almost all of these depositions occurred in late 2023 and early 2024. The period we are discussing is almost a decade earlier, so many witnesses said their memories of the exact names and number of locums was lacking.

patient who may have received chemotherapy without a physician present. Similarly, Nurse Katrina Holliman testified that there were occasions when a physician would leave the center before a chemotherapy session was over. But she also said it could be that the physician left after the chemotherapy drugs were administered while the patient was still there receiving ancillary care.

These statements alone are not enough to meet O'Laughlin's burden. They do not come close to naming the "who, what, when, where, and how of the alleged fraud." *Sanderson*, 447 F.3d at 877 (internal quotation marks omitted). At best, the centers' alleged "practice" provides a hint of a fraudulent scheme, but that is not enough for an FCA claim. *Ibanez*, 974 F.3d at 914. O'Laughlin must point to a specific fraudulent claim. And for that, he looks to the Master Schedules. When asked to name any claim where the clinic billed for chemotherapy when no physician was present, he referred to the Master Schedule. He said you would need to look at "when chemotherapy [was] administered" and compare that with where K. Jain was scheduled to work and his "routine schedule" because "he can't be in two places at once." R.207-18, O'Laughlin Dep., pp.78–79, PageID 4487–88. And recall, according to him, K. Jain and O'Laughlin were the only working physicians.

But this argument rests on even shakier foundations than the last. As discussed, O'Laughlin's claim that K. Jain "can't be in two places at once" relies on his misunderstanding of how many locums were used. And the Master Schedules do not serve the purpose O'Laughlin claims—just because a physician was scheduled to be at a particular center at a particular time, does not mean he *actually worked* at that center at that time.

The Master Schedules were created when a patient checked out and showed when the patient had scheduled his follow-up appointment. But they were not regularly updated to reflect changes. So while they may show when a patient would be on the premises, they did not necessarily show when a *physician* was on the premises. For example, K. Jain explained that if a locum ended up taking over the appointment, it would still appear on the schedule as if the originally assigned doctor worked it. R.215-1, K. Jain Dep., p.71, PageID 4949. For that reason, Hayek regularly appeared on the schedule after he left the centers. And Nurse Howard also

testified that physicians were "pretty regularly" on-site when they were not scheduled to see patients that day. R.217-1, Howard Dep., p.131, PageID 5328.

O'Laughlin responded that while the Master Schedules may not have been created to show who was at which centers when, they can still be used for this purpose. But as Howard and K. Jain's testimony make clear, they cannot be *reliably* used for this purpose. On any given day, it is not clear that who the schedule says worked, did work. And even the K. Jain testimony that O'Laughlin cited to show that the schedule can be used for this purpose does not show that the schedule *alone* can tell us who worked where. K. Jain says that a combination of documents, including the schedules, would need to be reviewed to learn where a physician worked on a particular day. So it is not reasonable to infer (as O'Laughlin alleged) that because K. Jain was scheduled to work at Highlands CC on Monday, March 31, he or any other physician was not also treating patients at Ashland BCC. K. Jain could have been at Ashland while a locum was at Highlands. Or his schedule could have changed. Or any other combination of events that show that the Master Schedule is an unreliable indicator of where physicians are actually working.

Because O'Laughlin's weekday category relies on two unreliable indicators— the locums and the Master Schedules—he cannot say with any certainty that any single one of the claims he presented is, in fact, false. And a representative false claim is a prerequisite to an FCA violation, so this category of claims fails. *See Ibanez*, 974 F.3d at 914. Speculation cannot support an FCA violation. *See Marlar*, 525 F.3d at 447. O'Laughlin can't show there were only two physicians split between three centers, and the Master Schedules don't offer sufficient evidence on the staffing of the different centers either. So his analysis "triangulating" which claims are false is, as the district court described, "a house built upon the sand." R.234, Op & Order on Mot. for Summ. J., p.6, PageID 6926.

**2.**

O'Laughlin's next two categories of fraudulent claims deal with Thursday services. He claims that every Thursday, all physicians worked out of Ashland BCC so that they could attend educational "tumor board" meetings in a nearby hospital at noon. So no physicians worked at Highlands CC on Thursdays and no physicians were available during the noon hour at Ashland

BCC on Thursdays to provide chemotherapy services. But this category suffers from two flaws: it assumes every physician attended the meetings and it relied on the Master Schedules to say both that all physicians were at Ashland BCC and that all physicians were unavailable for the noon hour.

First, the record does not support O'Laughlin's claim that every physician attended the board meetings every Thursday. Start with O'Laughlin's own testimony. He said that physicians were not required to attend the meetings, that they were held "[u]sually three out of every four Thursdays," and that the schedule would "adjust" if doctors could not attend. R.207-18, O'Laughlin Dep., pp.32, 72, PageID 4441, 4481. He also admits that he did not attend every meeting and says it would be "impossible" to do so. *Id.* at p.72, PageID 4481. He later said he would attend "on average, . . . at least two of the meetings." *Id.* at p.101, PageID 4510. But sometimes he would "have to go to Logan or one of the other clinics on a Thursday" such that he could not "attend every meeting." *Id.* At first, he also agreed that K. Jain would "usually" attend the meetings because it was his "routine schedule." *Id.* at pp.69–70, 72 PageID 4478–79, 4481. But he later said K. Jain would "[a]lways" attend the meeting and leave the clinic to do so. *Id.* at p.124, PageID 4533.

K. Jain testified that the meetings took place on Thursdays as well as "a variety of different days at a variety of different times." R.215-1, K. Jain Dep., p.80, PageID 4958. Sometimes they were held in the mornings and sometimes in the evenings—whatever time "could get the best attendance from multiple physicians." *Id.* at p.82, PageID 4960. He also said he attended "[v]ery occasionally" and agreed that he did "not go religiously." *Id.* at 81, PageID 4959. The centers aimed to have at least one medical oncologist and one radiation oncologist attend, but K. Jain acknowledged that this did not always happen "because patient care came first." *Id.* at p.83, PageID 4961. And while he would try not to schedule patients during the meetings, if an earlier scheduled patient "spilled over" or a patient needed to be seen, he would not attend the meeting. *Id.* at p.84, PageID 4962.

Other testimony was similar. Medical Assistant Kintigos said K. Jain "hardly ever attended" the meetings unless they were in the morning before the centers opened. R.207-16, Kintigos Dep., p.108–09, PageID 4160–61. And when he did, he would go to the meetings and

then "would come back for when patients started" coming in. *Id.* at p.24, PageID 4076. She said only one physician, Doctor Konala, attended the meetings regularly. Nurse Howard said that when K. Jain went to the meetings, she would go with him. But she also said the meetings were at 7:00 a.m. on those days and the center did not start seeing patients until K. Jain returned.

Only one person claimed that "[n]o physician or non-physician provider was left in the building" when the meetings were going on. R.210-8, Stephenson Decl., p.5, PageID 4631. But even she said the meetings only "occurred on about three Thursdays a month" and "[g]enerally" all physicians went to them. *Id.* At best, this is a scintilla of evidence in O'Laughlin's favor. It does not counter the overwhelming evidence—including from O'Laughlin himself—showing that the meetings did not occur regularly on Thursdays at noon, K. Jain did not attend them regularly, and patient care was not affected when he did attend the meetings. And so it does not create a genuine dispute of fact. *See Baker*, 936 F.3d at 529.

O'Laughlin pointed to the Master Schedules as a final piece of evidence in his favor. For the reasons outlined above, the Master Schedules are not reliable for proving which physicians were at each clinic. Even so, he says that each physician had a "block" on their schedule during the noon hour on Thursdays, so the physicians were not on the premises. But while Medical Assistant Kintigos said a schedule block *could* mean a physician was not on the premises, she never said that was necessarily what it meant. This tracked K. Jain's testimony that the block implied that the physician should not be scheduled with patients at that time. And the centers tried not to schedule physicians when they thought the meetings would be in the hopes that they could attend. But if the physician had to work because another patient's appointment spilled over or a patient needed care, they could (and would) skip the meeting. Medical Assistant Kintigos also testified that the blocks were set in advance based on predicted schedules. And we know the schedules were not regularly updated to reflect changes.

The evidence shows that the tumor board meetings did not occur regularly on Thursdays at noon, were not regularly attended by K. Jain or O'Laughlin, and physicians were at the centers regardless of when the meetings took place or what the Master Schedules said. Thus, the evidence does not show that physicians were absent from the Highlands CC on Thursdays or from the Ashland BCC on Thursday from noon to 1:00 p.m. In other words, as the trial court

found, there isn't sufficient, reliable evidence on which a jury could rely on to find in O'Laughlin's favor. So these two categories of claims also fail.

**3.**

O'Laughlin's final category of chemotherapy claims covered weekend services. He said the centers administered chemotherapy services on weekends without physicians present. Specifically, he asserted that Leukine injections are a chemotherapy service administered on weekends and physicians do not work on weekends. So any reimbursement for these services was improper because they were ineligible for reimbursement. The defendants don't dispute that physicians seldom work on weekends but argue that Leukine injections are not a chemotherapy service.

Leukine is a drug that stimulates the production of white blood cells to reduce a patient's risk of infection after chemotherapy. A patient can often self-administer it. But if the patient cannot, they can come into the centers and have it administered for them.

Both parties look to the American Medical Association's (AMA) Current Procedural Terminology (CPT) guidelines to define "chemotherapy drugs." Medical codes are housed in the Healthcare Common Procedure Coding System (HCPCS), which is split into two main levels. Level one has the CPT codes, which provide identifying codes for medical services and procedures. And in the CPT, the chemotherapy administration codes range from 96401 to 96549. Level two of the HCPCS has another standardized coding system for identifying products, supplies, and other services not included in the CPT codes. Leukine is in level two.

O'Laughlin concedes that Leukine is listed separately from chemotherapy drugs. But he argues that it is an injection and infusion service that is part of the overall chemotherapy services that require physician supervision. But even his own expert said the opposite. In his deposition, the expert clarified that Leukine's class of codes are not chemotherapy codes, saying: "[W]ords matter. . . . I call it all chemotherapy services, but the actual chemotherapy code has its own range. Therapeutic injections ha[ve] their own range. . . . That's how the CPT book is . . . set up." R.228-6, Kunz Dep., p.6, PageID 6811. So O'Laughlin's own expert's testimony does not support his argument that Leukine injections are a chemotherapy service.

Instead, O'Laughlin looks to deposition testimony that, according to him, shows that the centers viewed Leukine injections as "part and parcel" of chemotherapy services. But even if that were true, how the staff treats a service does not change its classification for Medicare purposes. And anyway, it does not seem like that is true. Medical Assistant Kintigos said these injections "didn't have to be supervised . . . because the[y] are not chemotherapy shots." R.207-16, Kintigos Dep., p.44, PageID 4096. Nurse Dove said a medical oncologist orders the medication, but that is true of most medications—the physician orders it and someone else administers it. And she agreed that Leukine injections were "part and parcel" with chemotherapy services, but only when O'Laughlin's attorney defined "part and parcel" as "part of the chemotherapy regime given to patients at Ashland [BCC]." R.216-2, Dove Dep. II, p.31, PageID 5192. But Nurse Holliman said it was not a chemotherapy drug. And Nurse Howard said she believed Leukine injections could be given without a physician present, and they were given on weekends when a physician may or may not have been there. Even O'Laughlin agreed Leukine injections were a "chemotherapy service" but not a "chemotherapy drug." R.207-18, O'Laughlin Dep., p.123, PageID 4532. So even if the staff considered Leukine injections part of the centers' overall chemotherapy treatment, it is unclear the staff considered Leukine injections a chemotherapy service.

Because O'Laughlin did not demonstrate that Leukine injections were a chemotherapy service, the defendants did not improperly bill Medicare for these services, and this category of claims fails as well.

* * *

All three alleged categories of false claims fail, so O'Laughlin cannot identify any specific claim that was false. And because "a fraudulent claim is the *sine qua non* of a[n] [FCA] violation," the district court properly granted summary judgment for the defendants. *See Marlar*, 525 F.3d at 447 (quoting *Sanderson*, 447 F.3d at 878).

**C.**

O'Laughlin's final count alleged a conspiracy to submit false or fraudulent claims to defraud the government. The FCA provides liability for conspiracies to violate the statute.

*United States ex rel. Angelo v. Allstate Ins. Co.*, 106 F.4th 441, 451–52 (6th Cir. 2024). But "an agreement that made it *likely* there would be a violation of the FCA" is not enough. *Id.* at 452 (internal quotation marks omitted). The agreement's purpose must be to violate the FCA—that is, the relator must "plead a 'specific statement showing the plan was made *in order to defraud* the government.'" *Id.* (quoting *Ibanez*, 874 F.3d at 917). And "without facts demonstrating 'a plan to get false claims paid,' the allegations fail[]." *Id.* (quoting *Ibanez*, 874 F.3d at 917).

The only evidence that O'Laughlin pleaded in support of his conspiracy claim was that all the defendants committed FCA violations. After all, coordinated false and fraudulent claims by the defendants would be strong evidence of a conspiratorial agreement. And yet O'Laughlin has not provided enough proof of these violation. So the conspiracy claim fails.

**III.**

For these reasons, we affirm.